# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

CITY OF PHILADELPHIA,

*Appellee,*

*v.*

Secretary U.S. Department of Interior; U.S. Department of Interior; Director National Park Service; National Park Service,

*Appellants.*

On Appeal from the February 16, 2026 Memorandum Opinion & Order Granting Appellee's Motion for Preliminary Injunction in Case No. 26-cv-434-CMR in the United States District Court for the Eastern District of Pennsylvania

## EMERGENCY MOTION FOR AN IMMEDIATE ADMINISTRATIVE STAY AND A STAY PENDING APPEAL

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHAEL VELCHIK
Senior Counsel to the Assistant
Attorney General

DAVID METCALF
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

GREGORY B. IN DEN BERKEN
Assistant United States Attorney

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

STATEMENT ..................................................................................................... 3

ARGUMENT ...................................................................................................... 7

I.     The Government Will Likely Prevail ................................................. 7

       A.     The City Lacks Standing or a Viable Claim Based on 16 U.S.C. § 407n and the Relevant Agreements ......................................... 8

       B.     The District Court's Opinion Fails to Support Its Preliminary Injunction .......................................................................................16

       C.     The City Failed to Establish Irreparable Harm ........................ 22

II.    The Equities Support a Stay................................................................ 24

CONCLUSION ................................................................................................ 25

COMBINED CERTIFICATIONS ................................................................. 27

ADDENDUM .................................................................................................. 28

## INTRODUCTION

On January 22, 2026, the National Park Service removed slavery-focused panels and videos from the President's House—a federal historic site within the 55-acre Independence National Historical Park in Philadelphia. The City of Philadelphia sued to force NPS to reinstall those materials. On Monday, the district court issued a mandatory preliminary injunction that requires the Government to immediately reinstall the exhibits. The Government appealed, and now seeks a stay pending appeal.

The district court's injunction is extraordinary. It dictates what NPS must display at the President's House and how NPS must operate that federal site. It bars "any and all further changes" to the site—including installing "replacement materials"—without the City's "mutual agreement," and imposes a continuing operational mandate. ADD1-2. The injunction gives a municipality veto power over the Federal Government's operation and messaging on federal property.

The district court's injunction is predicated on a fundamental legal error. The court read 16 U.S.C. § 407n and a related 1950 agreement between the Secretary of the Interior and the City as granting the City a veto over "any changes or alterations" to the entire Park. ADD19. But § 407n and the 1950 Agreement limit such veto power to the

"Independence Hall National Historic Site"—the five-acre block owned by the City known as Independence Square. They do not give the City authority over the President's House, much less the whole Park. The court also held that the City had contractual rights over the exhibits based on a 2006 agreement, but that agreement expired long ago and vested ownership in NPS. Without these flawed premises, the City lacks standing or a viable claim—which precludes the court's injunction.

The Government will suffer irreparable harm absent a stay. The injunction subordinates the Government's authority over the President's House to a municipality (and adverse litigant) that lacks any interest in the property. The district court's interference with the Government's authority is an improper intrusion on the workings of a co-equal branch of government. The injunction also improperly compels the Federal Government to speak. It requires the display and operation of expressive exhibits—at a marquee national historic site in the run-up to the nation's 250th anniversary—when the Government has chosen not to display those exhibits. Such compelled speech and interference with speech rights inflict irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The Government respectfully requests that the Court issue an administrative stay pending resolution of this motion and stay the district court's injunction pending this appeal.

## STATEMENT

1.     The President's House is a federally managed site within Independence National Historical Park in Philadelphia. For years, the President's House included interpretive materials addressing the topic of slavery at the founding and the lives of the slaves who lived at the House.

2.     On January 22, 2026, NPS turned off the videos at the President's House and removed the interpretive panels as part of a plan to replace them with new materials. That same day, the City filed this lawsuit to challenge the removal of the materials. The City also moved for a preliminary injunction seeking immediate restoration of the materials.

The Government opposed, arguing (among other things) that the City lacks standing, that the City's claims are contractual and thus subject to the Tucker Act, that the challenged actions are not reviewable under the APA, and that the City's requested relief would improperly compel the Government to engage in speech that it does not wish to convey. The Government also stressed that there was no basis to grant the City's extraordinary request for a mandatory injunction. As confirmed by a sworn

declaration from the Park's Superintendent, NPS was securely storing the materials pending the outcome of the case and could reinstall them if ordered to.

3.     The district court held a hearing on the City's motion on January 30. The court then directed the City to file an amended complaint and amended motion for a preliminary injunction. The Government filed its opposition to the amended motion on February 13. The Government's arguments were similar to those in its first opposition, but it emphasized that the City's claims were based on a fundamental misinterpretation of 16 U.S.C. § 407n. Properly construed, § 407n establishes that the City lacks standing and has no viable claim. Three days later, on President's Day—a federal holiday—the court issued a preliminary injunction requiring immediate compliance.

4.     The injunction is mandatory and immediate. It requires the Government to "restore the President's House Site to its physical status as of January 21, 2026." ADD1. It bars the Government from making "any and all further changes" to the site, including installing "replacement materials," without the City's "mutual agreement." ADD1-2. And it directs the Government to provide "immediate, continuing, and proper maintenance to the Site, its exhibits, grounds, artifacts, video monitors, and

recordings" and mandates that those "**SHALL** remain operable." *Id.* These provisions must be followed "immediately, that is **FORTHWITH**." ADD2.

5.      The district court based its injunction in large part on an expansive interpretation of § 407n. According to the court, that provision provides the City with "a statutory right and expectation to mutual agreement *on any changes or alterations to the Park*." ADD19 (emphasis added). The court effectively awarded the City supervisory authority over NPS's operation of the whole Park. It then held that the City demonstrated a likelihood of success based on NPS's removal of the panels without the City's approval. ADD27-37.

The district court took a similarly expansive approach to irreparable harm. *See* ADD37-41. It embraced the City's capacious arguments that removal of the panels qualifies as "erasure, undermines public trust," and "compromises the integrity of public memory" and that this establishes irreparable harm. ADD38-41. And despite the requirement that the *movant* show that it "specifically and *personally* risks irreparable harm," *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (emphasis added), the court held that similarly indeterminate harms asserted by amici also established irreparable harm, ADD39-40. It cited no legal authority for those conclusions.

The district court also determined that the equities favor the City. It brushed off the Government's concern that granting the City's request would improperly compel the speech of a co-equal branch of government: "Restoration of the President's House does not infringe upon the government's free speech, nor is the government prevented from conveying whatever message it wants to send by wiping away the history of the greatest Founding Father's management of persons he held in bondage." ADD41.

In its opposition, the Government asked the district court to stay any injunctive relief pending appeal or at least for an administrative stay to permit an expedited request to this Court. The court did not address that request.

6. The Government filed its notice of appeal at approximately 6:30 PM on February 17. The next day, at approximately 2:00 PM, the district court issued an order stating that:

> upon consideration of Defendant's failure to comply with this Court's February 16, 2026 Order to **FORTHWITH** follow terms and conditions of the Order, it is hereby **ORDERED** that Defendants shall comply with the terms of this Court's February 16, 2026 Order by restoring the President's House site to its physical status as of January 21, 2026 by **Friday, February 20, 2026 at 5:00 PM.**

ECF No. 64.

The Government began working to implement the court's injunction immediately upon its receipt on February 16. But (1) February 16 was a federal holiday; and (2) reinstallation of the panels is a considerable project requiring significant planning and preparation. Even so, a significant portion of the glass panels were reinstalled on February 19. Reinstallation efforts remain ongoing and the Government plans to file a compliance report with the district court today.

7.     On February 18, the Government moved the district court for an emergency administrative stay and stay pending appeal. The court denied that motion this morning. ECF No. 70.

## ARGUMENT

This Court should issue an administrative stay and a stay of the preliminary injunction pending appeal because the Government will likely prevail, faces irreparable injury absent a stay, and the equities support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I.     The Government Will Likely Prevail[1]

The Government will likely prevail for two reasons. First, the injunction rests on a fundamental legal error: the City and the district court

---

[1]     Although these arguments are omitted here due to time and length constraints, the City's claims fail independently under the Tucker Act and APA principles. *See* ADD353 (PI Opp.).

misread 16 U.S.C. § 407n and the relevant agreements as providing the City with veto authority over changes to the President's House. That premise is wrong. Without this statutory or contractual entitlement, the City lacks a cognizable injury to support standing (and cannot show a likelihood of success on the merits). Second, the City failed to establish irreparable harm, which independently forecloses injunctive relief.

## A. The City Lacks Standing or a Viable Claim Based on 16 U.S.C. § 407n and the Relevant Agreements

Read generously, the City's amended complaint asserts two kinds of injury: (1) violations of a statutory right contained in 16 U.S.C. § 407n; and (2) violations of alleged contractual rights under agreements that the City and NPS entered into in 1950 and 2006. *See* ADD45-46, ADD60-70. But those theories of harm are predicated on the City's fundamental misread of § 407n and the relevant agreements.

1. Section 407n imposes no restriction on the Government's removal of the President's House exhibit and thus does not establish standing. As relevant here, § 407n authorizes the Secretary of the Interior to enter into a cooperative agreement with the City "to assist in the preservation and interpretation of the property known as the Independence Hall National Historic Site . . . , in connection with the Independence National Historical Park." Section 407n further instructs that this

agreement must specify "that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, . . . except by mutual agreement" of the parties.

Section 407n thus distinguishes between "the Independence Hall National Historic Site" and "the Independence National Historical Park." And although § 407n says that its cooperative agreements are "in connection with" the *Park*, it specifies that the cooperative agreement with the City is directed at the *Site*. Similarly, the "no changes or alterations" term is likewise limited to "the property within the Independence Hall National Historic *Site*." 16 U.S.C. § 407n (emphasis added).

This distinction matters because the President's House is *not* part of the "Independence Hall National Historic Site" referenced in § 407n. Five years before Congress enacted § 407n, Interior designated the "Independence Hall National Historic Site" as a national historic site under federal law. *See* 8 Fed. Reg. 7283 (dated May 14, 1943; published June 1, 1943). That designation included a specific definition: "All those lots, pieces, or parcels of land which are now owned by the City of Philadelphia, located within the block bounded by Walnut, Fifth, Chestnut, and Sixth Streets, known as Independence Square, in the City of Philadelphia, Commonwealth of Pennsylvania." *Id.* Congress relied on that definition in

drafting § 407n. *See, e.g.*, H.R. Rep. No. 80-1819, at 8 (1948); S. Rep. No. 80-1622, at 6 (1948). The preamble of the 1950 Agreement—entered into pursuant to § 407n—also incorporates this definition of the relevant property. *See* ADD75.

The "Independence Hall National Historic Site" is thus limited to Independence Square:



Nat'l Park Serv., *TractsNet Public 1.5*, https://arcg.is/0q9oLj1 (last visited Feb. 20, 2026) (interactive map application; click "Zoom to" in bottom left "nps_tracts" window to view lot). That means it does not cover the President's House, which is located a block north on the corner of Sixth and Market Streets. And it makes sense that § 407n covers only Independence Square—because the *City* owns that land. Not so for the land on which the President's House sits, which is owned by the Federal Government.

So § 407n imposes no restriction on the Government's removal of the President's House exhibit. By extension, § 407n cannot support any alleged injury based on the removal and thus does not confer standing on the City. That also means the City cannot show a likelihood of success.

2.     The second kind of injury that the City alleges is predicated on supposed violations of purported contractual rights under the 1950 Agreement and the 2006 Cooperative Agreement, including its amendments. But those theories also fall short.

The 1950 Agreement was entered into pursuant to § 407n and is thus inapplicable for the same reason. Section 407n is directed at Independence Square and the 1950 Agreement entered into pursuant to § 407n is likewise directed at Independence Square. *See* ADD75 (referencing "the Independence Hall group of historic structures comprising Independence Hall, Congress Hall, Old City Hall, and associated historic objects, located in Independence Square in the City of Philadelphia, Commonwealth of Pennsylvania" and the 1948 legislation codified in part as 16 U.S.C. § 407n). Consistent with that scope, Article I of the 1950 Agreement addresses "ownership of the Independence Hall group of structures and of the land whereon they are erected, and the park area adjacent thereto known as Independence Square." ADD77. By logical extension, mention of "grounds"

or "buildings" elsewhere in the 1950 Agreement is similarly in reference to grounds or buildings on Independence Square. *E.g.*, *id.* (Secretary agrees that "he will occupy the grounds and buildings" specified in Article I only for agreed-upon purposes).

Granted, Article III(e) provides that it is "the purpose" of the parties to develop a unified program "for the whole Independence National Historical Park" and says that the parties "pledge . . . to consult on all matters of importance to the program." ADD80. But that vague pledge does not include any substantive component, so—even if the City could somehow enforce this consultation pledge—at most it would provide a purely procedural right of consultation (without any veto authority). And such a right would still fail to support standing. *See, e.g.*, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 (2016) ("a bare procedural violation" without any associated harm does not provide standing); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("deprivation of a procedural right without some concrete interest that is affected by the deprivation . . . is insufficient to create Article III standing"). The 1950 Agreement thus does not confer standing on the City.

The 2006 Cooperative Agreement and its amendments are similarly unavailing. Those agreements expired in May 2010 (*see* ADD18; ADD56),

and their terms do not support the City's assertions that the exhibit was to remain in place in perpetuity or that the City retained any authority over the exhibit after the project was completed. Quite the opposite. The 2006 Cooperative Agreement specified, under a section titled "Ownership of Exhibit," that, "[u]pon completion of the Exhibit in accordance with this Agreement, ownership of the Exhibit shall transfer to the NPS." ADD91. The same section specified that "NPS ownership of the Exhibit shall survive any termination of this Agreement." *Id.* A separate section titled "Management & Maintenance of the President's House Exhibit" further provided that "NPS agrees that it shall undertake all responsibility to manage, occupy, utilize, operate, repair, maintain, *interpret and administer* the Exhibit, which shall become property of the NPS in accordance with this Agreement." ADD92 (emphasis added).

A host of other provisions further reflect the parties' agreement that NPS would have complete control over the exhibit upon its completion—without any rights reserved for the City:

- "The Project will be owned, maintained, managed, and interpreted by the NPS following completion of the Project and acceptance by the NPS." ADD146.

- The City agreed "to donate to NPS the Project identified in the Cooperative Agreement as amended. This donation is made by the City on its own volition and without compensation." ADD148.

- "NPS will own and manage the commemorative work at the conclusion of the process." ADD165.

- "The Project will be owned, maintained, managed, and interpreted by the NPS." ADD169.

So the 2006 Cooperative Agreement and amendments unambiguously establish that NPS obtained complete and unconditional ownership of the exhibit upon its completion.[2] These agreements thus cannot support the City's theory of contractual breach based on the exhibit's removal. *Cf. Horne v. Dep't of Agric.*, 576 U.S. 350, 361-62 (2015) (ownership of property confers on the owner the "rights to possess, use, and dispose of" the property).

3.    The City tried to raise additional injuries, gesturing at alleged harm to the public (ECF No. 45 at 42-43) and invoking a "property right" and "public benefit" in the exhibit based on the 2006 Cooperative Agreement (*id.* at 21, 28, 30, 38). But these attempts fall short too.

First, these arguments appeared only in the City's brief and are not supported by its amended complaint. In assessing the sufficiency of a

---

[2]    The City entered the contracts into evidence at the preliminary-injunction hearing. ADD73. Their express terms thus trump any contrary allegations in the City's amended complaint. *See, e.g.*, *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018) (if a plaintiff's "own exhibits contradict her allegations in the complaint, the exhibits control").

complaint, "the legal theories set forth in [a plaintiff's] brief are helpful only to the extent that they find support in the allegations set forth in the complaint." *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988). These unsupported arguments thus do not help the City.

Second, the City's public-harm theory fails as a matter of law and its property-right theory fails as a matter of fact. The City cannot invoke alleged injuries to the public to sue the federal government because "it is the United States, and not the state, which represents [citizens] as parens patriae, when such representation becomes appropriate." *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923); *see also Town of Milton, Mass. v. FAA*, 87 F.4th 91, 96 (1st Cir. 2023) ("municipalities cannot assert that they have been injured because of an alleged injury to their residents"); *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 193 (3d Cir. 2016) (similar). And the City's property-right theory is contradicted by the 2006 Cooperative Agreement and amendments. The City specifically agreed to "[c]ertify in writing that upon NPS' acceptance of the Project as complete, *all right, title, and interest* to any completed construction, improvements, installations, fixtures, or associated donations, *are free and clear of all debts, liabilities, or obligations*." ADD152 (emphasis added). The City further "*waive[d] any claim or right to any property interest*, including

use rights, or to compensation for any Project components donated to NPS." *Id.* (emphasis added).

The City thus cannot plausibly maintain that it retained any enforceable property right.

### B. The District Court's Opinion Fails to Support Its Preliminary Injunction

1. Although the district court found that the City established standing, its reasoning fails to persuade. The court observed that § 407n contains additional language directed at Carpenter's Hall—"which is not part of the Independence Square block"—and determined that "[t]he region of the Park that is subject to bilateral decision-making is therefore ambiguous." ADD20-21. The court proceeded to resolve that ambiguity based on its assessment of the statute's legislative history and "manifest purpose," and concluded that the City's rights under § 407n extend to the entire Park. ADD19-21 ("the City has a statutory right and expectation to mutual agreement on any changes or alterations to the Park, including the President's House"). Every part of that reasoning is problematic.

First, the district court conducted no interpretive work before finding statutory ambiguity. That gets it backwards. An ambiguity determination comes *after* a court exhausts the traditional tools of statutory construction, not before. *United States v. Rutherford*, 120 F.4th 360, 380 n.28 (3d Cir.

2024). And the court failed to identify *which statutory term* it found ambiguous. ADD21 (declaring that "[t]he region of the Park that is subject to bilateral decision-making" is "ambiguous").

Second, there is no ambiguity here. Section 407n's terms about Carpenter's Hall are straightforward: the statute authorizes the Secretary to enter into cooperative agreements with two parties to manage two specific properties, specifically (1) "with the city of Philadelphia to assist in the preservation and interpretation of the property known as the Independence Hall National Historic Site"; and (2) "with the Carpenters' Company of Philadelphia to assist in the preservation and interpretation of Carpenters' Hall." Section 407n further requires that both such agreements contain specific provisions, including "that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts." So the provision authorizes entry into two cooperative agreements to manage two specific properties not owned by the Federal Government—Independence Hall National Historic Site and Carpenter's Hall. And it draws a clear distinction between "Carpenters'

Hall" and "the property within the Independence Hall National Historic Site." 16 U.S.C. § 407n. There is no ambiguity here.

Third, the district court erroneously construed § 407n as applying to the 2006 Cooperative Agreements and amendments. *See* ADD19 (asserting that § 407n authorized the "2006 Cooperative Agreement and amendments thereto"); *see also* ADD29-30. As discussed above, the only cooperative agreements with the City that § 407n authorizes are those directed at "the property known as the Independence Hall National Historic Site." The 2006 Cooperative Agreement and amendments were directed at the President's House project and so cannot be squeezed into § 407n. Indeed, each of the contracts cites *different* statutory authority[3]—and none references § 407n. So § 407n does not apply to the 2006 Cooperative Agreement and amendments.[4]

Fourth, the district court's interpretation of § 407n is overbroad and contravenes fundamental principles of statutory interpretation. According to the court, "the City has a statutory right and expectation to mutual

---

[3]  *See* ADD91 (2006 Cooperative Agreement); ADD122-23 (First Amendment); ADD144 (Second Amendment); ADD153 (Third Amendment).

[4]  Elsewhere, the district court declared that the parties "have consistently relied upon § 407n as a source of statutory authority for conducting cooperative agreements that relate to the development of the President's House." ADD21. That is wrong for the same reasons.

agreement *on any changes or alterations to the Park*." ADD19 (emphasis added). That interpretation vastly expands the City's authority. It transforms the City's authority from a right to supervise changes to *the City's own* property to a right to supervise changes to both City *and Federal* property. That drastic expansion is deeply problematic.

Consider the scope of the City's judicial promotion: Independence Square (which the City owns) has three buildings and makes up about 5 acres, while the entire Park has over 40 historic structures and spans about 55 acres. That vast expansion of the City's authority is not warranted and makes no sense. And arrogating such vast authority over a federal park to the City contravenes federalism principles as well as federal sovereignty.

Although the Federal Government has complete ownership of vast portions of the Park, it must now ostensibly secure approval from a municipality before it may do *anything* with its own property. That is untenable. And the City's expansive veto authority cannot be squared with the Federal Government's exclusive statutory authority over the Park. Federal law provides that "[t]he administration, protection, and development of the park shall be exercised under the direction of the Secretary of the Interior by the National Park Service," 16 U.S.C. § 407q, and that the Director of NPS "shall have the supervision, management, and

control of [National Park] System units," 54 U.S.C. § 100302(a)(3). None of these authorities contemplates a court blue-penciling in a municipal backseat driver with veto power.

The district court's interpretation of § 407n also contravenes fundamental principles of statutory interpretation. "[O]ne of the most basic interpretive canons" instructs that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) (citation omitted). But by the district court's read, § 407n's distinct terms "Independence Hall National Historic Site" and "Independence National Historical Park" end up meaning the same thing. The court's interpretation also "runs afoul of the usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (citation omitted); *see also Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012) ("[v]ague notions of statutory purpose provide no warrant for expanding [a statutory term] beyond the field to which it is unambiguously limited").

2.     The district court articulated three additional bases for standing, namely that removal of the panels affects "the City's tourism, use

of approximately $5 million of the City's funds to establish and maintain the project, and its promotion of its history in advance of the 250th anniversary of the founding." ADD20 (footnotes omitted). A fundamental problem with those purported injuries is that they are not injuries alleged in the City's amended complaint. *See* ADD43-71. Each also falls short for an additional reason.

First, the tourism injury has no factual basis. The district court cited four pages of testimony by the City's Chief Cultural Officer. *See* ADD20 at n.99 (citing "1/30/26 Hr'g Tr. at 104-08"). Those pages are labeled ADD284 through ADD288 in the attached addendum. Some of this testimony covers tourism; the witness shared that her expectation of visitor turnout for 2026 was "A lot. It depends on who you talk to. It could be as many as 1.5 million." ADD284:20-23. She also said that removal of the panels "absolutely impacts all of [the City's] activities," and left the City organizers "bereft." ADD286:6-19. But she never testified that the panels' removal harmed the City's tourism.

Second, the alleged monetary harm falters on traceability and redressability. To establish standing, an injury must be "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo*, 578 U.S. at 338 (citing *Lujan v. Defs.*

*of Wildlife*, 504 U.S. 555, 560-61 (1992)). The City's amended complaint mentions the $3.5 million and $1.5 million contributions to the project during its term. ADD52, ADD55-56. But the City incurred those costs *as part of the project*. They are not "fairly traceable" to the removal of the panels. Nor will a favorable judicial decision result in the City recovering any of that money. So traceability and redressability are absent.

Finally, the alleged harm to the City's "promotion of its history in advance of the 250th anniversary of the founding" strains credulity. The Government's removal of the panels in no way impairs the City's ability to promote its history. The City has ample communication channels, resources, and property that it can use to promote whatever aspect of its history it chooses. Of course, the same holds true for the Federal Government.

### C.     The City Failed to Establish Irreparable Harm

The Government will also likely prevail because the City failed to satisfy its burden to show irreparable harm. This Court has emphasized that if the movant "ha[s] shown no harms beyond ones that can be cured after final judgment," that fact "alone suffices" to deny injunctive relief. *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 205 (3d Cir. 2024) (cleaned up). And because preliminary

injunctions are "inherent[ly] risk[y]," a movant cannot rely on "generalized" assertions—it must show a "drastic" injury that is truly "irreparable," supported by record evidence—not conjecture or rhetoric. *Id.*

The City did not satisfy these requirements here. At most, the City asserted reputational, messaging, and promotional harms—that changes at the President's House somehow impair the City's ability to promote history and tourism ahead of the nation's 250th anniversary. Those are paradigmatic harms that are neither irreparable nor imminent; they are diffuse, difficult to quantify, and depend on third-party reactions and speculative future events. More fundamentally, they can be readily addressed through normal litigation remedies.

The record also reflects that the exhibits were kept securely in NPS custody, capable of restoration if the City prevailed in this case (and restoration is currently in process due to the injunction). Where the challenged condition is reversible—where items are preserved and can be returned—any alleged harm can, by definition, be "cure[d] after final judgment" and thus cannot support the extraordinary remedy of an injunction. *Id.*

Nor did the City substantiate the sort of concrete, time-sensitive injury that justifies mandatory injunctive relief. The City did not show that

any physical damage would occur absent an injunction. To the contrary, the Government established that the materials were secured and preserved. And the City's remaining assertions amount to a generalized grievance about the content of government messaging on federal property. Because the City failed to show a "drastic," non-speculative injury that cannot be remedied after final judgment—and because it failed to support its assertions with evidence—the district court erred in finding that the City established irreparable harm.

## II.      The Equities Support a Stay

The district court's injunction threatens significant and irreparable harm to the Government, *see Nken*, 556 U.S. at 435, which outweighs the indeterminate harms asserted by the City.

As discussed above, the district court's interpretation of § 407n vastly expands the City's authority over the Park. That expansion infringes on the Government's exclusive authority over the Park as provided by 16 U.S.C. § 407q and its exclusive authority over the National Park System under the Organic Act, 54 U.S.C. §§ 100101 *et seq.* Those intrusions qualify as irreparable harm. *See, e.g.*, *INS v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers) (holding that equities favored the Government where the

underlying order was "an improper intrusion by a federal court into the workings of a coordinate branch of the Government").

The injunction also improperly compels the Federal Government to speak. It requires the display and operation of expressive exhibits—at a marquee national historic site in the run-up to the nation's 250th anniversary—when the Government has chosen not to display those exhibits. Such compelled speech and interference with speech rights inflict irreparable harm. *Elrod*, 427 U.S. at 373; *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015) (coordinate branch of government "may not force the President himself to contradict his earlier statement"); *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) (Federal Government "has the right to speak for itself" and "select the view it wants to express.").

The City's indeterminate harms do not outweigh these significant harms to the Government. The City cannot invoke alleged harms to the public. *See, e.g.*, *Mellon*, 262 U.S. at 486. And its vague assertions about the erasure of history or truth fail to qualify as particular, actual, imminent irreparable harm.

## CONCLUSION

The Court should stay the injunction pending appeal.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DAVID METCALF
United States Attorney

MICHAEL VELCHIK
Senior Counsel to the
Assistant Attorney General

*/s/ Gregory B. David*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

*/s/ Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Phone:  (215) 861-8200
Email:   gregory.indenberken@usdoj.gov

February 20, 2026

# COMBINED CERTIFICATIONS

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Local Appellate Rules 27.3 and 113.4, I certify that:

1.     This motion complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,190 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

2.     This motion complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 27(d)(1)(E) because this motion has been prepared in a proportionally spaced typeface in 14-point Georgia font using Microsoft Word for Microsoft 365.

3.     On February 20, 2026, I filed this motion via the Court's CM/ECF system and thus served the motion on all parties' counsel registered to receive electronic notices.

Dated:  February 20, 2026            */s/ Gregory B. in den Berken*
                                     Gregory B. in den Berken

**ADDENDUM**

**TABLE OF CONTENTS**

Page

Order Granting Amended Motion for Preliminary Injunction,
ECF No. 54 (Feb. 16, 2026)............................................................ADD1

Memorandum Opinion,
ECF No. 53 (Feb. 16, 2026).......................................................... ADD3

Amended Complaint,
ECF No. 44 (Feb. 6, 2026) .......................................................... ADD43

Plaintiff's Preliminary-Injunction Exhibits (Selected),
ECF No. 36 (Index) .................................................... ADD73
ECF No. 36-1 (1950 Agreement)................................. ADD75
ECF No. 36-3 (2006 Cooperative Agreement)........................... ADD89
ECF No. 36-4 (2007 First Amendment).................................. ADD122
ECF No. 36-5 (2008 Second Amendment) .............................. ADD143
ECF No. 36-6 (2009 Third Amendment)................................. ADD146

Jan. 30, 2026 Preliminary-Injunction Hearing Transcript,
ECF No. 45-1 (Feb. 6, 2026) .......................................................ADD181

Defendants' Opposition to Plaintiff's Amended Motion
for Preliminary Injunction, ECF No. 52 (Feb. 13, 2026) ......... ADD353

Supplemental Declaration of Superintendent Steven Sims,
ECF No. 52-1 (Feb. 13, 2026)......................................................ADD393

Declaration of Superintendent Steven Sims,
ECF No. 27-1 (Jan. 28, 2026) ....................................................ADD396

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CITY OF PHILADELPHIA**<br>**Plaintiff,**<br>**v.**<br>**DOUG BURGUM,** *et al.*,<br>**Defendants.** | **CIVIL ACTION NO.  26-434** |

<u>**PRELIMINARY INJUNCTION ORDER**</u>

　　　**AND NOW,** this 16th day of February 2026, upon consideration of Plaintiff's Amended Motion for Preliminary Injunction and Temporary Restraining Order [Doc. Nos. 45, 2], Defendants' Opposition thereto [Doc. Nos. 52, 27], and after hearing and oral argument thereon, including giving consideration to the amended briefing of the Parties and briefing and arguments of *amici curiae*, it is hereby **ORDERED**:

　　　1.　　　For the reasons stated in the accompanying Memorandum Opinion, the Amended Motion for Preliminary Injunction [Doc. Nos. 45, 2] is **GRANTED**. The alternative relief for the Amended Motion for Temporary Restraining Order is hereby **DISMISSED AS MOOT**.

　　　2.　　　Defendants Doug Burgum, United States Department of the Interior, Jessica Bowron, and National Park Service are hereby **ORDERED** to restore the President's House Site to its physical status as of January 21, 2026.

　　　3.　　　Defendants are hereby **ENJOINED** from taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site, are **ORDERED** to take all necessary steps to ensure the safety, security, and preservation of any such items that had been removed from the President's House Site on January 22, 2026, and are **ENJOINED** from making any and all further changes to the President's House Site, including the installation of

ADD1

replacement materials, without mutual agreement of the City of Philadelphia during the pendency of this litigation or until further Order of the Court.

4.    Defendants are hereby **ORDERED** to provide immediate, continuing, and proper maintenance to the Site, its exhibits, grounds, artifacts, video monitors, and recordings which **SHALL** remain operable.

5.    Defendants are hereby **ORDERED** to maintain the President's House Site in a clean and accessible manner, cleared of debris, snow, ice and/or any other impediment to public access.

All terms and conditions of this Order for preliminary injunctive relief must be followed immediately, that is **FORTHWITH.**

**BY THE COURT:**

**/s/ Cynthia M. Rufe**
_____
**CYNTHIA M. RUFE, J.**

ADD2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CITY OF PHILADELPHIA,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO.  26-434** |
| **DOUG BURGUM, *et al*.,** | |
| **Defendants.** | |

**MEMORANDUM OPINION**

**Rufe, J.**                                              **February 16, 2026**

> *All history was a palimpsest, scraped clean and reinscribed exactly*
> *as often as was necessary. In no case would it have been possible,*
> *once the deed was done, to prove that any falsification had taken*
> *place.*
>
> George Orwell, *1984*[1]

As if the Ministry of Truth in George Orwell's *1984* now existed, with its motto "Ignorance is Strength," this Court is now asked to determine whether the federal government has the power it claims—to dissemble and disassemble historical truths when it has some domain over historical facts. It does not.

The President's House is a component of Independence National Historical Park that commemorates the site of the first official presidential residence and the people who lived there, including people enslaved by President George Washington. On January 22, 2026, the National Park Service ("NPS") removed panels, displays, and video exhibits that referenced slavery and information about the individuals enslaved at the President's House.

Plaintiff City of Philadelphia ("the City") filed this lawsuit under the Administrative Procedures Act ("APA") against the Secretary of the Interior Doug Burgum, the Department of

---

[1] George Orwell, *1984* at 40 (Penguin Random House LLC, 75th anniversary ed. 2023) (1949).

the Interior, the Acting Director of NPS Jessica Bowron, and NPS, claiming, *inter alia*, that Defendants' removal of the displays is unlawful agency action, arbitrary and capricious, and, alternatively, *ultra vires*.

      The City has moved for a preliminary injunction, and after initial briefing by the parties and *amicus* briefs in support of the motion filed by *amici curiae* Commonwealth of Pennsylvania Governor Josh Shapiro, Avenging the Ancestors Coalition ("ATAC") and the Black Journey, and Members of the Democratic Caucus of the Senate of Pennsylvania, the Court held a hearing on January 30, 2026. At the hearing, the City presented evidence. Defendants did not. The Court entertained oral argument from the parties as well as from *amici* ATAC and the Black Journey. The Court then entered a Post-Hearing Order permitting amended briefing and directing that "No further removal and/or destruction of the President's House site will be permitted until further order of the Court."[2]

      In turn, the City filed an Amended Complaint and an Amended Motion for Preliminary Injunction and Temporary Restraining Order ("TRO").[3] In the Amended Motion, the City seeks a preliminary injunction to restore the President's House exhibit as it existed on January 21, 2026, and seeks a TRO to temporarily enjoin Defendants from damaging items from the President's House site or making any further alterations to the President's House.[4] Defendants have filed an Opposition,[5] and that Opposition has been considered herein.

---

[2] Post-Hearing Order [Doc. No. 37].

[3] Am. Compl. [Doc. No. 44]; Pl.'s Am. Mot. Prelim. Inj. & TRO ("Pl.'s Am. Mot.") [Doc. No. 45].

[4] Pl.'s Am. Mot. at 1 [Doc. No. 45].

[5] Defs.' Opp'n to Pl.'s Am. Mot. [Doc. No. 52].

ADD4

I.    BACKGROUND

In 1948, Congress passed legislation (the "1948 legislation") establishing Independence National Historical Park "for the purpose of preserving for the benefit of the American people as a national historical park certain historical structures and properties of outstanding national significance located in Philadelphia, Pennsylvania, and associated with the American Revolution and the founding and growth of the United States."[6] In addition to establishing the Park, the statute authorized the Secretary of the Interior "to enter into cooperative agreements with the city of Philadelphia to assist in the preservation and interpretation of the property known as Independence Hall National Historic Site."[7] Such cooperative agreements "shall contain, but shall not be limited to, provisions that . . . no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts."[8]

In 1950, pursuant to the 1948 legislation, the City entered into an agreement with the Secretary of the Interior to cooperate in the preservation of the Independence National Historical Park (the "1950 Agreement").[9] Under the 1950 Agreement, the City retained ownership of the Independence Hall structures, land, and park area adjacent to Independence Hall.[10] The Secretary of the Interior, through NPS, was granted an exclusive right to occupy the area "for the purpose of preserving, exhibiting, and interpreting them to the American people and otherwise utilizing

---

[6] An Act To Provide for the Establishment of the Independence National Historical Park and for Other Purposes, Pub. L. No. 80-795, 62 Stat. 1061 (codified as amended at 16 U.S.C. §§ 407m, 407n).

[7] 16 U.S.C. § 407n.

[8] *Id.*

[9] Pl.'s Ex. 1, 1950 City-US Cooperative Agreement ("1950 Agreement") [Doc. No. 36-1].

[10] *Id.* at 3.

them and their adjacent grounds for national historical park purposes."[11] The 1950 Agreement also designated curatorial responsibilities to the Secretary.[12] Under the 1950 Agreement, the City and the federal government cooperated for decades to preserve, maintain, and expand Independence National Historical Park.[13]

At the turn of this century, historians identified the location of the first official residence of the President of the United States, where Presidents Washington and Adams lived during their terms.[14] This historical research also identified information about nine enslaved Africans whom President Washington owned, brought to the official presidential residence, and rotated in and out of Pennsylvania, a practice which prevented enslaved individuals from petitioning for their freedom under Pennsylvania law.[15] Etched into a wall within the President's House exhibit are the names of those nine enslaved individuals: Oney Judge, Austin, Christopher Sheels, Giles, Hercules Posey, Joe Richardson, Moll, Paris, and Richmond.[16] Of those nine, Oney Judge escaped the house in 1796, eventually making her way to New Hampshire.[17] Hercules also eventually escaped his enslavement after he was brought to Mount Vernon.[18]

Based on these revelations, the United States House of Representatives in 2003 urged NPS to commemorate the lives of slaves who were owned by President Washington and who

---

[11] *Id*. at 3.

[12] *Id*.

[13] *See* Pl.'s Ex. 3, 2006 City-US Cooperative Agreement ("2006 Agreement") at 1 [Doc. No. 36-3].

[14] *See* Pl.'s Ex. 14, Request for Qualifications Professional Services Contract ("RFQ") at 2-3 [Doc. No. 36-15]; 1/30/26 Hr'g Tr. at 35-36, 38 [Doc. No. 45-1].

[15] Pl.'s Ex. 10, Application and Approval For President's House in Underground Railroad Network ("Network to Freedom Application and Approval") at 7 [Doc. No. 36-10].

[16] *Id.* at 6.

[17] *Id.* at 14-17.

[18] Pl.'s Ex. 12, 2010 Script for Video Media at 17 [Doc. No. 36-13].

ADD6

lived on site.[19] Specifically, the House urged NPS "to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy."[20] The House also directed NPS to submit a report detailing the actions taken toward the realization of this project.[21]

According to the testimony of Joyce Wilkerson, Chief of Staff for the City to Mayor John Street from 2000 to 2007, the City became aware of the significance of the President's House site through the emergent historical research and public advocacy.[22] Ms. Wilkerson led the City's involvement in the project.[23] In 2003, the new Liberty Bell Pavilion opened adjacent to the site that would become the President's House. The juxtaposition of the newly placed Liberty Bell and the recently uncovered history of slavery at that spot motivated the City to collaborate with NPS to tell a "fuller story" because "it was finally time to tell an honest story about American history and the founding of this country and the role that slavery and enslaved Africans had . . . as well as the free [African-American] Philadelphians."[24]

To tell this fuller story, the City committed $1.5 million of City funds towards commemoration efforts for the President's House in 2003.[25] Intending to fill gaps in funding the project, this monetary commitment reflected the City's prominent role in moving this project forward" to ensure "the full story be told."[26] In 2005, Congress appropriated $3.6 million for

---

[19] Pl.'s Ex. 2, 2003 House of Representatives Report 107-564 at 46-47 [Doc. No. 36-2].

[20] *Id.* at 47.

[21] *Id.*

[22] 1/30/26 Hr'g Tr. at 34-36, 58 [Doc. No. 45-1].

[23] *Id.* at 44-48.

[24] *Id.* at 37-38.

[25] *Id.* at 39-40.

[26] *Id.*

"Independence National Historic[al] Park scenic enhancement and pedestrian walkways improvement project in conjunction with the [P]ark's Executive Mansion Exhibit."[27] Around that time, NPS and the City began to collaborate by jointly issuing a Request for Qualifications ("RFQ") document for contractors and later by convening an Oversight Committee comprised of stakeholders such as representatives of advocacy groups, historians, and community activists.[28] NPS and the City also agreed that NPS would organize an excavation of the President's House site, with City-approval needed for NPS to select an archeological firm.[29] As the excavation proceeded, NPS was to provide recurring reports regarding its historical findings.[30]

In 2006, pursuant to the founding Congressional legislation, the City and NPS entered into an agreement (the "2006 Cooperative Agreement" or "2006 Agreement") to establish an exhibit at the site of the President's House to "illuminate[] the history of the site of the former President's House."[31] The 2006 Cooperative Agreement established terms of cooperation between the City and NPS "in the planning, development and preparation of the design, fabrication and installation" of the President's House Exhibit.[32] The Agreement established that, upon completion of the Exhibit, ownership of the Exhibit would transfer to NPS.[33] The Agreement also identified that the City's provision of funds for the President's House project fulfilled a public purpose "because it enables the City to commemorate the symbolic and historical importance of the President's House for the City of Philadelphia, its citizens, and all

---

[27] Pl.'s Ex. 17, 2/27/07 City-NPS Press Release ("2/27/07 Press Release") at 2 [Doc. No. 36-18]; Pub. L. No. 109-59, 119 Stat. 1304 (2005).

[28] RFQ [Doc. No. 36-15]; 2/7/07 Press Release at 2 [Doc. No. 36-18].

[29] 2006 Agreement at 5 [Doc. No. 36-3]; Network to Freedom Application and Approval at 20 [Doc. No. 36-10].

[30] 2006 Agreement at 5 [Doc. No. 36-3].

[31] 2006 Agreement at 2 [Doc. No. 36-3].

[32] *Id.* at 3.

[33] *Id.*

Americans nationwide, and by doing so, there is a public benefit inuring to the City."[34] The 2006 Cooperative Agreement ensured its "terms, covenants and conditions" extended to and bound the parties and their successors.[35]

The 2006 Cooperative Agreement was subject to a one-year term, which was renewable at the City's option.[36] The 2006 Agreement was then amended and extended in 2007 (the "First Amendment"), 2008 (the "Second Amendment"), and 2009 (the "Third Amendment").[37] The First Amendment provided nearly $26,000 in additional funds to the project from the City.[38] Otherwise, the 2006 Agreement remained unchanged and in full force.[39] The Second Amendment extended the 2006 Agreement, and all other terms and conditions of the 2006 Agreement, as modified by the First Amendment, remained unaltered.[40]

The Third Amendment designated the City as responsible for the "design, fabrication, installation, and completion" of the President's House Project, which would be "owned, maintained, managed, and interpreted" by NPS upon its completion.[41] The City agreed to "undertake and complete in a timely manner, at its sole cost and expense, the Project."[42] The Third Amendment included a Project Development Plan, which was created at the direction of Congressional legislation, to facilitate the objectives of all parties. This Plan specifies that the

---

[34] *Id.*

[35] *Id.* at 12.

[36] *Id.* at 4.

[37] *See* Pl.'s Ex. 4, 2007 First Amendment to Cooperative Agreement ("First Amendment") [Doc. No. 36-4]; Pl.'s Ex. 5, 2008 Second Amendment to Cooperative Agreement ("Second Amendment") [Doc. No. 36-5]; Pl.'s Ex. 6, 2009 Third Amendment to Cooperative Agreement ("Third Amendment") [Doc. No. 36-6].

[38] First Amendment ¶¶ 2-3 [Doc. No. 36-4].

[39] *Id.* ¶ 4.

[40] Second Amendment ¶¶ 2-3 [Doc. No. 36-5].

[41] Third Amendment at 1-2 [Doc. No. 36-6].

[42] *Id.* at 2, Attach. C.

interpretation of the site "will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved."[43] The Project Development Plan also states that "NPS will review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended."[44] The Third Amendment permits amendment or supplementation to the Project Development Plan "by written agreement of the parties."[45]

The Third Amendment institutes a term of one year beginning May 1, 2009.[46] Under this term, the Third Amendment expired on May 1, 2010. However, the Third Amendment also contained a Survival Clause, which states:

> Q. Survival: Any and all provisions which, by themselves or their nature, are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive and be enforceable after the expiration or termination of this Third Amendment. Any and all liabilities, actual or contingent, which have arisen during the term of and in connection with this Third Amendment shall survive expiration or termination of this Third Amendment.[47]

Under the Survival Clause, certain provisions in the 2006 Agreement extend beyond May 1, 2010.

As set forth in the 2006 Agreement and amendments, the City made significant financial contributions to the President's House, including $3.5 million toward the overall project.[48] The project was also funded by the Department of Transportation ($3.6 million) and the Delaware River Port Authority ($3.5 million).[49]

---

[43] *Id.* at Attach. C.

[44] *Id.*

[45] *Id.* at 7.

[46] *Id.* at 9.

[47] *Id.* at 13.

[48] *Id.* at Attach. B.

[49] *Id.*; 12/15/10 Press Release at 3 [Doc. No. 36-24].

ADD10

The President's House exhibit opened in December 2010.[50] On December 15, 2010, the City and NPS jointly issued a press release announcing the opening of the "President's House: Freedom and Slavery in the Making of a New Nation."[51] The City's involvement in the President's House, however, continued.

Everett Gillison served as the Chief of Staff for Mayor Michael Nutter beginning in 2010.[52] Mr. Gillison managed the project on behalf of the City during his tenure. Mr. Gillison testified to his cooperation with NPS on the President's House, primarily through communication and cooperation with then-Superintendent of Independence National Historical Park, Cynthia MacLeod.[53] Ms. MacLeod would notify Mr. Gillison of any maintenance, improvements, or other action to be taken by the City, and Mr. Gillison would coordinate with her to address such issues and to provide any needed funding.[54] Certain of the primary improvements were to the site's video monitors and the temperature and humidity controls of the President's House ruins, which are fragile.[55]

Mr. Gillison was tasked to "get it done and get it done right."[56] He testified that the completion of the President's House, between 2010 and 2015 was accomplished through a partnership between the City and NPS.[57] He also recognized the crucial role of the public in identifying issues with, maintaining, and promoting the site.[58] The City continued funding the

---

[50] 12/15/10 Press Release at 1 [Doc. No. 36-24].

[51] *Id.*

[52] 1/30/26 Hr'g Tr. at 68 [Doc. No. 45-1].

[53] *Id.* at 72-92.

[54] *Id.* at 76-82.

[55] *Id.* at 78-80.

[56] *Id.* at 74.

[57] *Id.* at 76.

[58] *Id.* at 79.

ADD11

site and further established an approximately $1.5 million endowment to maintain the site going forward.[59] This endowment was later transferred to NPS after completion of the site in 2015 and continues to this day.[60] That endowment did not expire or terminate. In early 2016, the City and NPS finalized an agreement that assigned the intellectual property of the President's House Project to NPS.[61]

In 2017, NPS issued a Foundation Document for Independence National Historical Park.[62] The Foundation Document sets forth basic guidance for the Park, describes its purpose, its reason for inclusion in the national park system, its significance, and its fundamental values and resources, and sets forth legal and policy requirements, special mandates, and administrative commitments that apply to the park.[63] Independence National Historical Park's Foundation Document describes the President's House as "where George Washington and John Adams and their households lived and worked during their terms as the first and second presidents of the United States . . . [and] is interpreted by the park, especially in the paradox of the Washingtons bringing their enslaved people to work and live there."[64] NPS specifically identifies this "Paradox of Freedom and Slavery" as crucially significant to Independence National Historical Park.[65]

In describing the "fundamental" archeological resources of the park, NPS describes archeological investigations at the President's House site "which revealed physical connections

---

[59] *Id.* at 88-89.

[60] *Id.* at 93.

[61] Pl.'s Ex. 7, 2015 City-US Assignment of IP Rights ("IP Rights Assignment") [Doc. No. 36-7].

[62] Pl.'s Ex. 8, 2017 Independence National Historical Park Foundation Doc. ("Foundation Doc.") [Doc. No. 36-8].

[63] *See generally id.*

[64] *Id.* at 5.

[65] *Id.* at 9.

ADD12

to the enslaved in President George Washington's household. This information was used to guide future development at the site. Based on these discoveries, the park designed its first community-based exhibition at the President's House archeological site that interprets race and slavery in its historic context."[66] The Foundation Document also identifies "Pioneering Partnerships and Collaboration" as a "fundamental value" of the park, noting "[t]he dynamic role of partnerships at the park is best illustrated by Independence National Historical Park's close working relationship with the City of Philadelphia."[67]

NPS's Foundation Document also details "Interpretive Themes" for the park, including "Liberty: The Promises and Paradoxes," explaining that "[t]he promises of liberty and equality granted in the founding documents present a paradox: not only are they ideals to strive for but they are unfulfilled promises for people who struggle to be fully included as citizens of our nation."[68]

In April 2022, the President's House was nominated to be a National Underground Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act of 1998. [69] The Act directs NPS to establish a "National Underground Railroad Network to Freedom" ("Network to Freedom") program and to "produce and disseminate appropriate educational materials," and authorizes the Secretary of the Interior to enter into cooperative agreements and to make grants in furtherance of the goals of preservation and restoration of historic buildings associated with the Underground Railroad.[70]

---

[66] *Id.* at 11.

[67] *Id.* at 12.

[68] *Id.* at 13.

[69] Network to Freedom Application and Approval [Doc. No. 36-10]; National Underground Railroad Network to Freedom Act of 1998, Pub. L. No. 105-203, 112 Stat. 678 (1998) (current version at 54 U.S.C. §§ 308301-308304).

[70] 54 U.S.C. §§ 308302(a), 308302(b).

ADD13

The President's House was nominated as a Network to Freedom site because it was the location where Oney Judge escaped to freedom.[71] In September 2022, the Superintendent of the Independence National Historical Park consented to the site's inclusion in the Network to Freedom.[72] NPS thereafter designated the President's House as a National Underground Railroad Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act.

On March 27, 2025, the President issued Executive Order ("EO") 14253—"Restoring Truth and Sanity to American History."[73] EO 14253 provides, in relevant part:

> **Section 1.** *Purpose and Policy.* Over the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth. This revisionist movement seeks to undermine the remarkable achievements of the United States by casting its founding principles and historical milestones in a negative light.
>
> . . . .
>
> It is the policy of my Administration to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing. Museums in our Nation's capital should be places where individuals go to learn—not to be subjected to ideological indoctrination or divisive narratives that distort our shared history.
>
> . . . .
>
> **Sec. 4**. *Restoring Truth in American History.*
>
> (a) The Secretary of the Interior shall:
>
> . . . .
>
> (iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar

---

[71] Network to Freedom Application and Approval at 1 [Doc. No. 36-10].

[72] *Id.* at 28.

[73] Exec. Order No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.[74]

On January 22, 2026, as admitted by Defendants, NPS removed 34 educational panels from the Presidents House that referenced slavery, and further, deactivated video presentations that accompany these educational panels.

## II.    STANDING

The City alleges APA violations under 5 U.S.C. § 702 and § 706, and alternatively that NPS's conduct was *ultra vires*.[75] Before considering the merit of those claims, the Court examines standing and other threshold issues.

The City argues that it has standing based upon the public benefit that inured to it, at its expense and through its leadership, once the President's House exhibit was completed.[76] The City also argues that it suffered an injury because Defendants' removal of slavery-related panels ran afoul of the requirements for mutual agreement in the 1948 legislation, 1950 Agreement, and 2006 Agreement.[77] Defendants, by contrast, contend that the 1948 legislation and 1950 Agreement did not create a legally protected interest as to the President's House. The provisions therein, Defendants insist, only required mutual agreement for changes to the Independence Hall National Historic *Site*—a term that Defendants read not to encompass the President's House.[78]

---

[74] *Id.* §§ 1, 4.

[75] Am. Compl. ¶¶ 77-138 [Doc. No. 44].

[76] Mem. L. Supp. Pl.'s Am. Mot. at 28-29 [Doc. No. 45].

[77] 1/30/26 Hr'g Tr. at 154 [Doc. No. 45-1]; Am Compl. ¶¶ 110-13 [Doc. No. 44].

[78] Defs.' Opp'n to Pl.'s Am. Mot. at 7-9 [Doc. No. 52].

ADD15

Defendants also deny the 2006 Agreement as a basis for standing and argue that the City's property interest in the project ceased under the Third Amendment.[79]

Federal court jurisdiction is limited to "Cases" and "Controversies."[80] A plaintiff must have standing to sue in order for an action to be a case or controversy.[81] Standing requires a plaintiff show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[82] An injury in fact requires an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[83] An injury is concrete if it is "real" and "actually exist[s]," and an injury is particularized if it "affect[s] the plaintiff in a personal and individual way."[84]

The City's interest in the President's House is not only as a representative of the public. The President's House resulted from decades of cooperation between the City and the federal government, enshrined by Congressional legislation, Foundation Documents, and funding.

Congress envisioned that collaboration when establishing Independence National Historical Park in the 1948 legislation.[85] The legislation authorizes the Secretary of the Interior "to enter into cooperative agreements with the city of Philadelphia to assist in the preservation and interpretation of the property," and requires that such cooperative agreements include a term that states "no changes or alterations shall be made in the property within the Independence Hall

---

[79] *Id.* at 10.

[80] U.S. Const. art. III, § 2.

[81] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

[82] *Id.*

[83] *Id.* at 339 (internal quotation marks omitted).

[84] *Id.* at 339-40 (internal quotation marks omitted).

[85] *See* 16 U.S.C. §§ 407m, 407n.

ADD16

National Historic Site, including its buildings and grounds . . . except by mutual agreement."[86]
As anticipated, the parties then executed a series of cooperative agreements.

First, the City and the Secretary of the Interior entered into the 1950 Agreement. In doing so, they consented to terms that recognized the City's ownership interests in components of Independence National Historic Park and the corresponding need for bilateral decision-making. The 1950 Agreement provides that the City "retain[s] ownership of the Independence Hall group of structures and of the land whereon they are erected and the park area adjacent thereto known as Independence Square."[87] It then adds that:

- "Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon."[88]

- "[N]either of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the building or grounds without the written consent of the other."[89]

- "[I]t is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States, and to secure this result a high degree of cooperation is necessary with each other . . . and the parties hereto pledge themselves to consult on all matters of importance to the project."[90]

The 1950 Agreement indisputably remains in effect. By its terms, it "shall continue in effect until such time as Congress enacts legislation inconsistent with its continuance or expressly providing for its termination."[91]

---

[86] 16 U.S.C. § 407n.

[87] 1950 Agreement at 3 [Doc. No. 36-1].

[88] *Id.* at 5.

[89] *Id.* at 6.

[90] *Id.*

[91] *Id.* at 7.

ADD17

The City and NPS deepened their collaboration by concluding the 2006 Cooperative Agreement and its subsequent amendments. The 2006 Cooperative Agreement, as modified by the Third Amendment, incorporates the Project Development Plan, which specifies that the site's interpretation would "focus on the house and the people who lived and worked there, . . . the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved."[92] The Plan also stated that NPS would "review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended."[93]

Although the 2006 Agreement, as updated by the Third Amendment, ceased as of May 1, 2010,[94] the terms in its Project Development Plan remained effective under the Third Amendment Survival Clause. The Survival Clause states that "provisions which, by themselves or their nature are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive."[95] Because the President's House project was not contemplated to be completed by the expiration of the Third Amendment, it was reasonably expected that terms relating to the Project Development Plan would remain in effect to ensure that the commemorative exhibit was realized in accordance with the parties' initial plan. While the Third Amendment granted NPS the right to interpret the exhibit after it was completed, it is the Project Development Plan that established the interpretive framework that NPS would employ. Profound alterations to that framework, seen here in the effort to remove all references to slavery, African-American Philadelphia, and the move to freedom for the enslaved, would, under the Project Development Plan, require the written approval of both the City and NPS. Accordingly, the

---

[92] Third Amendment at Attach. C [Doc. No. 36-6].

[93] *Id.* at 9.

[94] *Id.* at 13.

[95] *Id.* at 13.

evidence presented to the Court to date proves the 2006 Cooperative Agreement and amendments provide inclusive rights to the City, which continue and remain in full force and effect today.

Further, the 1948 legislation authorized the 2006 Cooperative Agreement and subsequent amendments. While these agreements do not explicitly contain a term that "no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds . . . , except by mutual agreement between the Secretary of the Interior and"[96] the City, the Department of the Interior, through NPS, is statutorily required to include such a term. The agency lacks authority or discretion to delete or ignore this term. Accordingly, this Court must apply that term to the parties' working relationship, pursuant to the 1948 legislation.[97] Such a fundamental term that is required by Congress is also reasonably expected to remain in effect under the Survival Clause.

Under the terms of the 1950 Agreement, 2006 Cooperative Agreement and amendments thereto, and 16 U.S.C. § 407n authorizing the agreements, the City has a statutory right and expectation to mutual agreement on any changes or alterations to the Park, including the President's House, to written agreement for placement of any monument or memorial, and to consultation on all matters of importance to the Park. Removal of the President's House displays invaded this legally protected interest.

This interest is concrete, particularized, and actual. The City is particularly identified as a party in the 1950 Agreement and 1948 legislation, and the City owns certain subject land and

---

[96] 16 U.S.C. § 407n.

[97] *See, e.g., McClain v. Delaware Cnty. Tax Claim Bur.*, 344 A.3d 1149, 1157 (Pa. Commw. Ct. 2025) (holding that to the extent an agreement did not comport with the relevant statute, the agreement violated the statute, and stating that "[t]he terms of the contract must yield to the mandates of the statute").

ADD19

buildings in the Park, as well as the defining landmarks of the Park—Independence Hall and the Liberty Bell.[98] The removal affects the City in a personal and individualized way. The injury impacts not just the City's statutory rights, but also the City's tourism,[99] use of approximately $5 million of the City's funds to establish and maintain the project,[100] and its promotion of its history in advance of the 250th anniversary of the founding of the United States of America.[101] Accordingly, the City has established it has Article III standing.[102]

The Court is not persuaded by Defendants' contention that the City's interest is restrained to the portion of the Park that is Independence Hall National Historic *Site*. Although that term was defined in 1943 to encompass the Independence Square land bound by Walnut, Fifth, Chestnut, and Sixth Streets,[103] the City's agreement is still required for changes that occur within the Park's broader territory. After all, § 407n also mandates that the Secretary of the Interior obtain approval from contractual parties for alterations to Carpenters' Hall, which is not part of

---

[98] *See* 1/30/26 Hr'g Tr. at 38 [Doc. No. 4-1]; 1950 Agreement at 3 [Doc. No. 36-1].

[99] *See* 1/30/26 Hr'g Tr. at 104-08 [Doc. No. 45-1].

[100] *See, e.g.*, *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 262 (6th Cir. 2009) (concluding that the plaintiff school districts, which expended funds to comply with federal education standards, established an injury in fact to challenge those standards).

[101] The Court notes that the government described this celebration as the "250th birthday" of the federal government, Defs.' Opp'n Mot. Prelim. Inj. at 6 [Doc. No. 27], but the signing of the Declaration of Independence on July 4, 1776 did not, in fact, create the federal government. Even the Articles of Confederation, establishing a central government, were not adopted by the Continental Congress until 1777. Indeed, the federal government as currently established is more appropriately traced to the adoption of the Constitution in 1789.

[102] *See City of Lafayette, La. v. SEC*, 481 F.2d 1101, 1103 n.3 (D.C. Cir. 1973) ("The Cities satisfy the standing requirement by alleging injury in fact and a non-frivolous claim that the 1935 Act requires consideration of the Cities' contentions in an acquisition proceeding."); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) ("In this Circuit we have found standing for a city suing an arm of the federal government when a harm *to the city itself* has been alleged.").

[103] *See* Independence Hall National Historic Site. 8 Fed. Reg. 7207, 7283 (June 1, 1943).

ADD20

the Independence Square block.[104] The region of the Park that is subject to bilateral decision-making is therefore ambiguous.[105]

As the Court finds, the legislative record and understanding of § 407n by the parties resolve that ambiguity. The House Report summarizing § 407n states that the underlying bill was amended to "provide for the establishment of a suitable Advisory Commission" representing entities including Pennsylvania and the City of Philadelphia.[106] The reason for this Commission, the Report clarifies, is "to coordinate for the preservation and exhibition" of the Park's "various areas for the benefit and inspiration of the people of the United States."[107] Moreover, NPS and the City have consistently relied upon § 407n as a source of statutory authority for conducting cooperative agreements that relate to the development of the President's House.[108] Defendants' argument ignores both these cooperative agreements and the mission of the 1948 legislation to provide for the commemoration of "Independence Hall, Carpenters' Hall, and *surrounding historic sites and buildings*," a portion of which are owned by the City.[109] The Court declines to adopt an interpretation that would effectively divide the park in two.

Courts also apply a prudential standing analysis, which requires "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory

---

[104] 16 U.S.C. § 407n; Foundation Doc. [Doc. No. 36-8].

[105] *See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 473 n.27 (1985) (noting that a statute is ambiguous if it is "reasonably susceptible of different interpretations"); *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (observing that courts should consider legislative history only where the statutory language is ambiguous).

[106] H.R. Rep. No. 80-1819 at 4 (1948).

[107] *Id.*

[108] *See United States v. Hayes*, 555 U.S. 415, 418 (2009) (preferring an interpretation that favors the statute's manifest purpose).

[109] H.R. Rep. No. 80-1819 at 1 (1948).

ADD21

provision or constitutional guarantee invoked in the suit."[110] The zone of interests test applies to suits under the APA,[111] and "is most usefully understood as a gloss on the meaning of [5 U.S.C.] § 702."[112] Under that provision, a party has standing to bring a suit under the APA if it suffered a "legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action within the meaning of a relevant statute."[113] The interest may reflect "aesthetic, conservational, and recreational" values, and standing may stem from them.[114]

The 1948 statute explicitly refers to, authorizes, and prescribes requirements for cooperative agreements between the City and the federal government. In developing this legislation, the House of Representatives stated in one House Report that "[t]he proposed Independence National Historical Park is one part of an integrated three-part program of improvement to be shared alike by the city of Philadelphia, the State of Pennsylvania, and the Federal Government, for the preservation and exhibition of these sites and buildings."[115] Further, in reference to the cooperative agreements, the Report describes the need for the agreements for the project to include land still owned by the City, and that the agreements "will provide the basis for an integrated program shared equally by the city, State, and Nation in a manner appropriate to the broad national and patriotic objectives implicit in the entire project."[116] This reflects an intent for the city to have a shared interest in the exhibition of the sites.

---

[110] *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted).

[111] *Id*. at 163 (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970); *Barlow v. Collins*, 397 U.S. 159 (1970)).

[112] *Clarke v. Secs. Indus Ass'n*, 479 U.S. 388, 400 n.16 (1987).

[113] 5 U.S.C. § 702.

[114] *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970).

[115] H.R. Rep. No. 80-1819 at 5 (1948) (emphasis added).

[116] *Id.* at 8.

ADD22

The City, specifically named in the 1948 legislation and House Report, and party to the 1950 and 2006 Agreements, and its subsequent amendments, is within the class of aggrieved persons who suffered a legal wrong from agency action and is within the zone of interests contemplated by the 1948 legislation. The City has both Article III and prudential standing.

## III.    JURISDICTION AND REVIEWABILITY

The City next argues that it has established that NPS's removal of slavery-related displays is a final agency action under the APA and that no other statutes preclude judicial review by this Court.[117] Defendants disagree, contending that a final agency action has not occurred, that NPS's conduct was committed to discretion, and that the City's claims are barred by the Tucker Act.[118] The Court addresses the first three APA-related arguments before turning to the Tucker Act.

5 U.S.C. § 702 of the APA waives sovereign immunity for "actions for non-monetary relief against an agency,"[119] so sovereign immunity does not bar the City's claims, so long as the plaintiff shows those claims are valid under the APA. To do so, the plaintiff must challenge a "final agency action for which there is no other adequate remedy in court," demonstrate that "[no] statute precludes judicial review," and must establish that agency action is not "committed to agency discretion by law."[120]

Here, the City has challenged a final agency action. An agency "action," as defined by the APA, "includes the whole or part of an agency rule, order, license, sanction, relief, or the

---

[117] Mem. L. Supp. Pl.'s Am. Mot. at 24-25, 29 [Doc. No. 45].

[118] Defs.' Opp'n to Pl.'s Am. Mot. at 14-25 [Doc. No. 52].

[119] *Treasury of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 398 (3d Cir. 2012) (internal citations omitted).

[120] *Bennett* 520 U.S. at 175 (citing 5 U.S.C. §§ 704, 701(a)).

ADD23

equivalent or denial thereof, or failure to act."[121] This broad definition "is meant to cover comprehensively every manner in which an agency may exercise its power."[122] Removing the displays from the President's House is an exercise of the Department of the Interior and NPS's agency powers. And, contrary to Defendants' arguments, the dismantling of the President's House is not an unreviewable act of "day-to-day operations"[123] but rather a jarring alteration to the integrity of the site. Therefore, it is agency action.

An agency action is final if "the action . . . mark[s] the 'consummation' of the agency's decisionmaking process . . . . And second, the action . . . [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.' "[124] The removal of displays is clearly the consummation of a decision-making process—a unilateral one. The action also occasions legal consequences. The President's House resulted from collaboration between the City and NPS, as envisioned by the 1948 Congressional legislation and carried out in the parties' course of dealing through joint agreements, the RFQ document, press releases, and the sustained maintenance of the completed site. The removal of the slavery displays therefore undermines the City's statutory and long-running interests in the completion of Independence National Historical Park and the President's House. Further, NPS's removal of the displays interferes with tourism to the City, the City's intention to represent its own history, and the

---

[121] 5 U.S.C. §§ 551(13), 701(b)(2).

[122] *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 478 (2001) (citing *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980)).

[123] Defs.' Opp'n to Pl.'s Am. Mot. at 20 [Doc. No. 52].

[124] *Bennett*, 520 U.S. at 177-78 (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)) (citation omitted).

ADD24

City's contribution of approximately $5 million to unearth, present, and maintain that history.[125] The City has thereby established finality as well.

Next, no exception to APA reviewability applies. No statute precludes judicial review, and this action is not committed to agency discretion by law. Neither 16 U.S.C. § 407n nor the agreements between the City and the government assign discretion to the Department of the Interior or NPS to unilaterally transform the purpose, interpretation, and exhibits at the President's House. Because § 407n imposes judicially administrable standards on NPS's unilateral decision-making, the Court need not substitute its discretion for that of the agency.[126]

The Court must next address whether the Tucker Act constitutes a complete or partial bar to the Court's review of the City's APA claims under 5 U.S.C. § 702 and § 706.

The Tucker Act states that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon . . . any express or implied contract with the United States."[127] Pursuant to the Tucker Act, litigants may seek monetary relief in the Court of Federal Claims, but not equitable relief, as "the Claims Court does not have the general equitable powers of a district court to grant prospective relief."[128] Crucially, the Tucker Act "impliedly forbids" district courts from reviewing APA claims if the "source of the rights upon which the plaintiff bases its claims" is contractual rather than statutory, constitutional, or predicated upon any other legal ground.[129]

---

[125] *See* 1/30/26 Hr'g Tr. at 88-89, 104-08 [Doc. No. 45-1]; Third Amendment at Attach. B [Doc. No. 36-6].

[126] *See Hecker v. Chaney*, 470 U.S. 821, 830 (1985).

[127] 28 U.S.C. § 1491(a)(1).

[128] *Bowen v. Mass.*, 487 U.S. 879, 905 (1988); *see also* 14 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 3657 (4th ed. 2025) (noting that the Tucker Act "confers jurisdiction over claims against the United States for money damages").

[129] *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

ADD25

The Supreme Court recently provided guidance to determine when the Tucker Act forecloses a district court's jurisdiction over a claim challenging a federal policy. Reviewing a district court's ruling declaring unlawful and vacating policies that forbade grants related to diversity, equity, and inclusion, gender identity, and COVID-19, a majority of the Court found the district court had jurisdiction to determine that the manner in which the government terminated the grants violated the APA.[130] As in that case, the City claims that public officials "have acted contrary to their statutory mandate and in conflict with statutory . . . requirements . . . . This is the stuff of APA litigation."[131] As an exception, however, the Court agrees with Defendants that the Tucker Act impliedly forbids the City from obtaining relief for its "Breach of Contract Claim"[132] under 5 U.S.C. § 702 (Amended Complaint, Count 1), since that claim requests specific performance because NPS "breached the Agreements,"[133] a presentation that undeniably sounds in contract. The Court therefore will not rest its instant decision on the § 702 claim as pleaded.

Apart from the City's claim under 5 U.S.C. § 702, the Court concludes that it has jurisdiction to review the City's APA claims.

## IV.    LEGAL STANDARD

When considering whether to grant a motion for a preliminary injunction, courts must consider four factors under Federal Rule of Civil Procedure 65: (1) likelihood of success on the merits; (2) likelihood of irreparable harm to the movant in the absence of relief; (3) balance of

---

[130] *Nat'l Insts. of Pub. Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661-62 (2025) (Barrett, J., concurring in the judgment).

[131] *Am. Pub. Health Ass'n v. Nat'l Insts. of* Health, 786 F.Supp. 3d, 237, 262 (D. Mass. 2025), *aff'd in part, Nat'l Insts. of Pub. Health*, 145 S. Ct. at 2858.

[132] Mem. L. Supp. Pl.'s Am. Mot. at 23 [Doc. No. 45].

[133] Am. Compl. ¶ 81 [Doc. No. 44].

ADD26

the harms between the plaintiff on one hand and the defendants on the other; and (4) the public interest.[134] When the government is the defendant, the third and fourth factors may be considered together.[135] Generally, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[136]

The issues of likelihood of success on the merits and irreparable harm are considered first, as they are the "most critical."[137] If the movant satisfies its burden on these factors, the court considers whether "the balance of equities tips in [the movant's] favor" and whether "an injunction is in the public interest."[138] The court then assesses "whether the balance of all four factors warrants granting preliminary relief."[139]

## V.  DISCUSSION

### A.    Plaintiff is Likely to Succeed on the Merits

The Court proceeds to consider the City's three APA claims that allege arbitrary and capricious agency action, as well as its *ultra vires* claim. Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[140] The City has demonstrated a likelihood of success on the claim that NPS's removal of the panels and further changes to the President's House without any consultation with, notification of, or cooperation with the City are arbitrary and capricious and that Defendants' actions are in excess of their authority.

---

[134] *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 178 (3d Cir. 2018); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[135] *Smith v. City of Atl. City*, 138 F.4th 759, 779 (3d Cir. 2025).

[136] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[137] *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (internal quotation marks omitted).

[138] *Winter*, 555 U.S. at 20.

[139] *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (brackets omitted).

[140] 5 U.S.C. § 706(2)(A).

ADD27

1.    <u>Arbitrary and Capricious Claims</u>

Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[141]

The City alleges that the government acted in an arbitrary and capricious fashion (1) in violation of the National Underground Network to Freedom Act of 1998, (2) in violation of the 1948 legislation codified at 16 U.S.C. §§ 407m-n, and (3) in violation of NPS's own Foundation Document. The government's only provided rationale for the action is EO 14253, and there is no record evidence that Defendants notified, consulted with, or sought mutual agreement from the City.

        *a.    Arbitrary and Capricious in Violation of the National Underground Railroad Network to Freedom Act of 1998*

The National Underground Railroad Network to Freedom Act of 1998 required the Secretary of the Interior to establish a national network of Underground Railroad sites and to "produce and disseminate appropriate educational materials."[142] The Congressional statutory directive to identify and commemorate sites along this Network to Freedom was explicitly motivated by the United States' Congressional intent to "preserve and protect" the sites.[143] In 2022, NPS supported the inclusion of the President's House site in the Network to Freedom, thereby recognizing the escape of Oney Judge in a manner consistent with the Third

---

[141] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[142] 54 U.S.C. § 308302.

[143] H.R. Rep. 105-559 at 4 (1998).

ADD28

Amendment's Project Development Plan. The Project Development Plan stated that the President's House interpretation would highlight "the move to freedom for the enslaved."[144]

In removing displays from the President's House, NPS removed educational materials about Oney Judge, her escape to freedom, and her life in New Hampshire after she escaped.[145] By removing this information, NPS conceals crucial information linking the site to the Network to Freedom. Moreover, Defendants' removal of the displays discounted the purpose of the Network: to preserve and protect historical sites like that of Oney Judge's bondage and escape.

Although Defendants argue that the National Underground Network to Freedom Act of 1998 does not expressly preclude alterations to sites in the Network,[146] their decision to excise Oney Judge's story from the Network runs counter to Congressional directives and to the Act's legislative intent. Because, on this preliminary record, Defendants failed to consider those all-important aspects of their decision, the City is likely to prevail on its claim that Defendants' agency action was arbitrary and capricious in violation of the National Underground Railroad Network to Freedom Act of 1998.

> b.    *Arbitrary and Capricious in Violation of 16 U.S.C. §§ 407m, 407n*

The City also alleges the removal was arbitrary and capricious in violation of the 1948 Congressional legislation. The 1948 legislation established Independence National Historical Park and authorized the Secretary of the Interior to engage in cooperative agreements. Under 16 U.S.C. § 407n, those cooperative agreements are required to reflect the understanding that "no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual

---

[144] Third Amendment at Attach. C [Doc. No. 36-6].

[145] *See generally* Network to Freedom Application and Approval [Doc. No. 36-10].

[146] Defs.' Opp'n to Pl.'s Am. Mot. at 23-24 [Doc. No. 52].

ADD29

agreement between the Secretary of the Interior and the other parties to the contracts."[147] The 1950 Agreement and the related 2006 Cooperative Agreement and subsequent amendments were created pursuant to this legislation. However, the government did not seek agreement from the City, nor did the government notify the City of its intended actions.

The terms of the 1950 Agreement require that: "any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work have been mutually agreed upon"; that "neither of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the buildings or grounds without the written consent of the other"; and that the parties "pledge themselves to consult on all matters of importance to the program."[148]

As an initial matter, the removal of the interpretive heart of a core component of Independence National Historical Park—its display of slavery—denies the importance of the 2006 Cooperative Agreements and amendments to preserve this history to educate the public. By failing to consult with the City on this significant decision, Defendants likely violated the terms of the 1950 Agreement.

Defendants' removal of the President's House displays also disregards the 2006 Agreement and amendments thereto. The Third Amendment contained the Project Development Plan, which, as discussed, this Court finds to remain in full force and effect through the Third Amendment's Survival Clause. That Plan states that site interpretation will focus on people who lived and worked at the President's House as well as the move to freedom for the enslaved.[149]

---

[147] 16 U.S.C. § 407n. To the extent Defendants argue that § 407n cannot support an arbitrary and capricious challenge because its scope is limited to the Independence Hall National Historic *Site*, this Court disagrees. *See supra* § 2 (discussing standing).

[148] 1950 Agreement [Doc. No. 36-1].

[149] Third Amendment at Attach. C [Doc. No. 36-6].

28

Alteration of this term requires written agreement of the parties.[150] Here, there has been no written alteration of the Plan. As such, the removal violated the agreed-upon interpretive framework and, by extension, the 2006 Cooperative Agreement and amendments.

In sum, the record indicates that Defendants failed to consider statutorily authorized and directed Agreements between the City and the government, and the government's obligations thereto, all in violation of the 1948 legislation. Defendants' professed rationale, EO 14253, specifically directs the Secretary of the Interior to take action "as appropriate and consistent with applicable law."[151] It does not and cannot confer to Defendants any authority to violate or disregard Congressional intent. The City is likely to prevail on its claim that Defendants' agency action was arbitrary and capricious in disregarding applicable law that mandated mutual assent.

> c.    Arbitrary and Capricious in Violation of NPS Foundation Document for Independence National Historical Park

NPS's Foundation Document is the governing document for Independence National Historical Park. The Foundation Document, which describes the Park's purpose, significance, values, and interpretive themes, specifically identifies the paradoxical nature of the Liberty Bell and Independence Hall representing freedom for the colonists while the history of President Washington at the President's House relied substantially on slavery.[152] The "Paradox of Freedom and Slavery" is one of the enumerated statements of significance about the Park.[153] "Pioneering Partnerships and Collaboration," specifically with the City, is an explicitly listed fundamental value of the Park.[154] The second enumerated "Interpretive Theme" is "Liberty: The Promises and

---

[150] *Id.*

[151] Exec. Order No. 14253, 90 Fed. Reg. 14563, 14564 (Mar. 27, 2025).

[152] Foundation Doc. at 5, 9 [Doc. No. 36-8].

[153] *Id.* at 9.

[154] *Id.* at 12.

ADD31

Paradoxes," which recognizes the ideals of the founding era both as aspirational and as false promises for people who "struggle to be fully included as citizens of our nation."[155] The removal of displays recognizing the paradox of slavery and freedom at the President's House therefore conflicts with NPS's own interpretive themes and directives about the site.

The Foundation Document clearly emphasizes the role of slavery and the importance of recognizing paradoxes at Independence National Historical Park. The President's House is also identified as a significant component of the Park. Removing the President's House displays represents a sharp turnaround in agency policy, for which no "reasoned explanation" has been provided.[156] Indeed, Defendants have provided no record evidence showing NPS's "awareness that it is changing its position" regarding the truthfulness of the display materials.[157] The removals disregard the still-controlling Foundation Document.

Defendants argue in supplemental briefing that their policy reversal does not amount to arbitrary and capricious agency action because the Foundation Document lacks binding force."[158] The Court is not convinced. Defendants cite one district court case and one D.C. Circuit case in support of their position.[159] However, more recent cases in the D.C. Circuit have embraced the notion that agencies are accountable to explain drastic shifts in policy even when the "changed policy ar[ises] from an action without the force of law."[160] A recent Supreme Court case also

---

[155] *Id.* at 13.

[156] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[157] *Id.*

[158] Defs.' Opp'n to Pl.'s Am. Mot. at 24 [Doc. No. 52].

[159] *Horses of Cumberland Island v. Haaland*, No. 23-cv-1592, 2024 WL 5430835, at *11 (N.D. Ga. Nov. 8, 2024); *The Wilderness Soc. v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006).

[160] *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (reviewing an agency's reasons for departing from a policy based on Congressional testimony and a "guidance" document); *Ctr. Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 74-75 (D.C. Cir. 2023).

supports this trend.[161] In light of that case law, the preliminary nature of relief sought, and absence of any "highly technical" decisions "that are in the agency's province of expertise,"[162] the Court finds the Foundation Document to be an adequate basis upon which to consider NPS's change in policy.

Defendants' only proffered rationale for NPS's policy shift is EO 14253. But EO 14253 does not offer a reasoned explanation for NPS's removal of the displays. The government shrugs off NPS's action as within its power and discretion, but that action violates the expressed intention of the same EO the government claims motivated it. EO 14253 seeks to prevent revisionist attempts to "replace[] objective facts with a distorted narrative."[163] NPS's action did the opposite, by dismantling objective historical truths.

It is not disputed that President Washington owned slaves. *Amici* ATAC and the Black Journey summarize their roles at the President's House:

> The people who [President Washington] held in slavery include: [Oney] Judge (Staines), who was held in slavery as a maid to Martha Washington; Austin, [Oney]'s brother; Christopher [Sheels], who was held in slavery as President Washington's body servant; Giles, who was held in slavery as a carriage driver and driver of wagons; Hercules Posey, who was held in slavery as a chef to the Washingtons; Joe Richardson, who was held in slavery as a coachman; Moll, who was held in slavery as a nanny for Martha Washington's grandchildren; Paris, who was held in slavery as a stable worker; and Richmond, who was the son of Hercules and held in slavery as a chimney sweep.[164]

---

[161] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 217 (2016) (examining a change in policy that was originally disseminated in an opinion letter).

[162] *Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 549 (3d Cir. 2023).

[163] Exec. Order No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

[164] ATAC & The Black Journey Amicus Br. at 5-6 [Doc. No. 25]. The record evidence submitted at the January 30, 2026 hearing supports this factual summary as to the nine individuals. *See* Network to Freedom Application and Approval [Doc. No. 36-10]; Pl.'s Ex. 11, Photos of Site [Doc. Nos. 36-11. 36-12]; Pl.'s Ex. 12, 2010 Script for Video Media [Doc. No. 36-13].

Some escaped to freedom, including Oney Judge. The President's House displays recognized Oney Judge and focused on how her struggle for freedom represented this country's progress away from the horrors of slavery and into an era where the founding ideals of "Life, Liberty and the pursuit of Happiness"[165] could be embodied for every American.

And yet, in its argument, the government claims it alone has the power to erase, alter, remove and hide historical accounts on taxpayer and local government-funded monuments within its control. Its claims in this regard echo Big Brother's domain in Orwell's *1984*, where:

> The largest section of the [government's] Records Department . . . consisted simply of persons whose duty it was to track down and collect all copies of books, newspapers, and other documents which had been superseded and were due for destruction. A number of the *Times* [a newspaper] which might, because of changes in political alignment, or mistaken prophesies uttered by Big Brother, have been rewritten a dozen times still stood on the files bearing its original date, and no other copy existed to contradict it. Books, also, were recalled and rewritten again and again, and were invariably reissued without any admission that any alteration had been made. Even the written instructions [for workers in the Records Department] . . . never stated or implied that an act of forgery was to be committed; always the reference was to slips, errors, misprints, or misquotations which it was necessary to put right in the interests of accuracy.[166]

The government here likewise asserts truth is no longer self-evident, but rather the property of the elected chief magistrate and his appointees and delegees, at his whim to be scraped clean, hidden, or overwritten. And why? Solely because, as Defendants state, it has the power. At oral argument, Defendants insisted:

> Although many people feel strongly about this one way, other people may disagree or feel strongly another way. Ultimately, it is in this context that the Government gets to choose the message it wants to convey.
>
> . . . .

---

[165] The Declaration of Independence para. 2 (U.S. 1776).

[166] George Orwell, *1984* at 40 (Penguin Random House LLC, 75th anniversary ed. 2023) (1949).

ADD34

. . . [T]he message that the Government chooses to convey is for the Government to choose. I don't get to choose what that message is. And it's our position that the City doesn't either.[167]

An agency, whether the Department of the Interior, NPS, or any other agency, cannot arbitrarily decide what is true, based on its own whims or the whims of the new leadership, regardless of the evidence before it. Accordingly, the City is likely to prevail on its claims that the removal was arbitrary and capricious.

### 2.    *Ultra Vires* Claim

In addition to its APA claims, the City presents an *ultra vires* claim, which it urges the Court to consider, should the Court find that relief does not lie under the APA.[168] Defendants deny that an *ultra vires* claim is cognizable because of the Tucker Act's implied prohibition on such a claim and because of the absence of strict statutory guardrails.[169]

Prior to the enactment of the APA, there had existed "a right to equitable relief where an agency's action was *ultra vires*—that is, unauthorized by any law and . . . in violation of the rights of the individual."[170]  There are strict boundaries to non-statutory *ultra vires* review. It "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to *a specific prohibition*' in a statute."[171] *Ultra vires* review is unavailable if a statutory review scheme provides a meaningful and adequate opportunity for judicial review for aggrieved persons or a statutory scheme forecloses all other opportunities for judicial review.[172] Accordingly, the City's *ultra vires* claim is as an alternative ground for relief under which the

---

[167] 1/30/26 Tr. at 141 [Doc. No. 45-1].

[168] Mem. L. Supp. Pl.'s Am. Mot. at 37-38 [Doc. No. 45].

[169] Defs.' Opp'n to Pl.'s Am. Mot. at 25-26 [Doc. No. 52].

[170] *Nuclear Regul. Comm'n v. Tex.*, 605 U.S. 665, 680 (2025).

[171] *Id*. (quoting *Ry. Clerks v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 660 (1965)).

[172] *Id*.

ADD35

City argues that Defendants committed *ultra vires* action by unilaterally removing displays from the President's House in contravention of 16 U.S.C. § 407n.

Meritorious *ultra vires* claims are rare, but have succeeded when a claim challenges action "based on unexplained and obvious deviations from statutory text, and when the government's interpretation of its statutory authority would 'lead[] to an absurd result.' "[173] *Ultra vires* review protects parties from statutory violation by an agency that directly contravenes congressional authorization and intent.

Here, § 407n authorizes the Secretary of the Interior to enter into cooperative agreements with the City in connection with the establishment and maintenance of Independence National Historical Park. The agreements were required to include a term that no alterations to the Independence Hall National Historic Site, including its buildings and grounds, were permitted absent mutual agreement of the parties to the agreement. The Secretary of the Interior entered into the 1950 Agreement without including that precise term. However, a similar term was included[174] and the parties, until recently, had complied with the statutory directive.

Congress specifically limited the authority of the Department of the Interior and NPS to unilaterally alter or control Independence National Historic Park. The agencies do not have the authority to flout that Congressional directive. The decision to unilaterally strip away a core component of Independence National Historic Park without seeking or obtaining mutual

---

[173] *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *9 (D.C. Cir. Sept. 25, 2025) (Pan., J., concurring) (citation omitted).

[174] The 1950 Agreement stated that "Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon." 1950 Agreement at 5 [Doc. No. 36-1]. The government argues, but does not brief, that the President's House is not a "building" subject to the term in the 1950 Agreement. 1/30/26 Hr'g Tr. at 137 [Doc. No. 45-1]. Regardless, the 1948 legislation requires the term include, but not limit itself to, the buildings and grounds of Independence Hall National Historic Site. *See* 16 U.S.C. § 407n.

agreement from the City is an "unexplained and obvious deviation from statutory text."[175] There is a specific statutory requirement for the Secretary of the Interior, as he enters into cooperative agreements regarding the Independence Hall National Historic Site, to include the stipulation that no alterations can be made without mutual agreement of the parties.

Defendants have completely ignored their legislatively imposed duties. They have disregarded statutory authority, compelled by Congress, by taking unilateral action without seeking agreement from the City of Philadelphia. An agency, part of the Executive branch, is not entitled to act solely as it wishes. Rather, it is the Legislative branch which authorizes agency action, and the Executive branch must comply with that direction.

Defendants' actions impede the separation of powers instituted by the Constitution. Here, the Executive branch is directing a Congressionally created and funded agency to take "measures incompatible with the expressed or implied will of Congress."[176] It is in this posture that the executive's "power is at its lowest ebb, for then he can rely upon only his own constitutional powers minus any constitutional powers of Congress over the matter."[177]

Defendants acted in excess of their authority as agencies authorized by Congress within the executive branch. Even in the event that the Court were to find that the APA does not provide a meaningful and adequate opportunity for judicial review, the City has demonstrated a likelihood of success on its *ultra vires* claim.

## B.    Likelihood of Irreparable Harm in the Absence of Relief

The City argues that it will incur various forms of irreparable harm if the displays are not restored and safeguarded. Among the harms the City alleges are a loss of access to historical

---

[175] *Fed. Educ. Ass'n* 2025 WL 2738626, at *9 (Pan., J., concurring).

[176] *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

[177] *Id.*

ADD37

truth, an undermining of the public trust, and an inability to recount its own story in preparation for the semiquincentennial.[178] Defendants contend that those asserted injuries do not suffice, either because they are not particularized to the City or because they can be remedied if the displays are restored in a final judgment.[179]

The City must demonstrate that is "more likely than not" to suffer irreparable harm absent a preliminary injunction.[180] "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages."[181] "Furthermore, a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a 'clear showing of *immediate* irreparable harm.' "[182]

The harm at issue in this case must account for the significance of the slavery-related displays that NPS removed. As the federal government itself recognized, "the President's House and its history is important and meaningful to many people for many reasons."[183] The President's House has resulted from years of advocacy, engagement by the public, and cooperation between the City and the government. As the City argues, the removal of interpretive displays and exhibits "constitutes erasure, undermines public trust, and compromises the integrity of public memory."[184]

---

[178] Mem. L. Supp. Pl.'s Am. Mot. at 39-43 [Doc. No. 45].

[179] Defs.' Opp'n to Pl.'s Am. Mot. at 26-28 [Doc. No. 52].

[180] *Reilly*, 858 F.3d at 179.

[181] *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000).

[182] *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (internal quotation marks omitted).

[183] 1/30/26 Hr'g Tr. at 121 [Doc. No. 45-1].

[184] *Id*. at 40-41.

ADD38

Similarly, *amici* Members of the Democratic Caucus of the Senate of Pennsylvania warn of irreparable harm to their constituents because "this sudden loss of rich history and Defendants' rejection of the true historical narratives about black history in America is causing deep constituent harm and anxiety."[185] Unilateral action by the executive branch that flouts Congressional directives, cooperative agreements with the City, and decades of multilateral collaboration irrevocably degrades the public's trust in the government.

The President's House represents the City "fulfilling an obligation to tell the truth—the whole, complicated truth."[186] Removal of the crucial interpretive materials strips the site of that truth and deprives the public of educational opportunities designed to be free and accessible. As *amici* ATAC and the Black Journey contend, that abrupt elimination of "historically significant educational material" is like "pulling pages out of a history book with a razor."[187]

The Court agrees with *amici*. The removed displays were not mere decorations to be taken down and redisplayed; rather, they were a memorial to "men, women, and children of African descent who lived, worked, and died as enslaved people in the United States of America," a tribute to their struggle for freedom, and an enduring reminder of the inherent contradictions emanating from this country's founding.[188] Each person who visits the President's House and does not learn of the realities of founding-era slavery receives a false account of this country's history.

In addition, every day the President's House lacks interpretive material to express the City's intention to invest years of time, millions of dollars, and countless individual and

---

[185] Members of Democratic Caucus of the Senate of Pa. Amicus Br. at 3, 6-7 [Doc. No. 34].

[186] 2/7/2007 Press Release [Doc. No. 36-18].

[187] ATAC & The Black Journey Amicus Br. at 16 [Doc. No. 25]; 1/30/26 Hr'g Tr. at 119.

[188] *See* Pl.'s Ex. 11, Photos of Site at 28 [Doc. Nos. 36-11. 36-12] ("Memorial" erected at the President's House site and co-signed by the City of Philadelphia and the National Park Service).

ADD39

collective efforts, the City of Philadelphia is deprived of the ability to honestly and accurately tell the story of its own history—as the government puts it: to "tell[] an important [tale]."[189] Indeed, the government's removal of displays from the President's House implicates federalism concerns raised by *amicus* Governor Shapiro. He argues that the dismantling of the President's House, in contravention of the City's designated role in its development, embodies the federal administration's effort to transgress the principles of federalism that limit federal executive power.[190] The Tenth Amendment, the Governor notes, assigns all powers unenumerated by the federal Constitution to state governments and, by implication, to local governments.[191] The Governor urges that the federal government's disregard of the City's role in creating the President's House, and of Pennsylvania's interest in conveying its history,[192] therefore undermines state sovereignty in favor of an unchecked rewriting of this country's history.[193]

Finally, the remaining displays and memorials at the President's House would likely sustain substantial damage if removed. They are etched in concrete or preserved within a glass structure, such that removal would result in irreparable harm to the integrity of the site. But the risk of harm to the City is not just physical. If the President's House is left dismembered throughout this dispute, so too is the history it recounts, and the City's relationship to that history. Worse yet, the potential of having the exhibits replaced by an alternative script—a plausible assumption at this time—would be an even more permanent rejection of the site's

---

[189] 1/30/26 Hr'g Tr. at 121 [Doc. No. 45-1].

[190] Gov. Shapiro's Amicus Br. at 6-11 [Doc. No. 23].

[191] *Id*. at 7 [Doc. No. 23]; U.S. Const., amend. X.

[192] Gov. Shapiro's Amicus Br. at 3-4, Ex. A [Doc. No. 23] (highlighting the markers of slavery across Pennsylvania meant to provide a fulsome account of the Commonwealth's history).

[193] *Id.* at 4-5 (noting the federal government's contemporaneous efforts to reinstall a monument to a confederate general in Washington, D.C.).

ADD40

historical integrity, and irreparable. For the foregoing reasons, the City has met its burden to establish irreparable harm.

### C.    The Balance of Harms and the Public Interest

Where, as here, the government is the sole defendant, the Court may consider the third and fourth prongs of a preliminary injunction analysis together.[194]

In its favor, the City has established that the government's actions to remove displays from the President's House are likely contrary to law. And, as courts recognize, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.' "[195] Further, with the parties accepting the displays as historically accurate, there is a public interest in the preservation and exhibition of that history.[196]

Defendants, for their part, raise only one argument for why an injunction would be inequitable. They argue there is a public interest in upholding the federal government's right to convey its preferred speech.[197] Restoration of the President's House does not infringe upon the government's free speech, nor is the government prevented from conveying whatever message it wants to send by wiping away the history of the greatest Founding Father's management of persons he held in bondage. President Washington's house would not merit designation as a historic site if he had not commanded the army that won the Revolutionary War, whose presence presiding over the Constitutional Convention graced it with the gravitas and spirit necessary to

---

[194] *Smith*, 138 F.4th at 779.

[195] *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) ("[T]here is generally no public interest in the perpetuation of unlawful agency action."); *New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025) (denying government's stay request and being mindful that state plaintiffs in an APA challenge were likely to succeed on the merits and that there is no public interest in unlawful agency action).

[196] *See Sayler Park Vill. Council v. U.S. Army Corps of Eng'rs*, No. C-1-02-832, 2002 WL 32191511, at *1 (S.D. Ohio Dec. 30, 2002).

[197] Defs.' Opp'n to Pl.'s Am. Mot. at 28-30 [Doc. No. 52].

the creation of our government's foundational document, and his restraint and modesty radiated strength and wisdom that defines the ideal chief executive to this day. The government can convey a different message without restraint elsewhere if it so pleases, but it cannot do so to the President's House until it follows the law and consults with the City.

The City has shown that the balance of harms and the public interest tip in the City's favor. The Motion for Preliminary Injunction will be granted.

## VI.    CONCLUSION

For the reasons stated above, the Motion for Preliminary Injunction will be granted. The preliminary injunction will remain in place pending further litigation in this matter. There can be no prejudice to Defendants' restoration of the status quo as of January 21, 2026, which requires that Defendants reinstall all panels, displays, and video exhibits that were previously in place. Defendants shall further prevent any additions, removals, destruction, or further changes of any kind to the President's House site, except in the event that a mutual written agreement is reached between Defendants and the City of Philadelphia. An order will be entered.

ADD42

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CITY OF PHILADELPHIA,<br><br>Plaintiff,<br><br>v.<br><br>DOUG BURGUM, SECRETARY OF THE INTERIOR,<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>JESSICA BOWRON, ACTING DIRECTOR OF THE NATIONAL PARK SERVICE,<br><br>and<br><br>NATIONAL PARK SERVICE, UNITED STATES DEPARTMENT OF THE INTERIOR,<br><br>Defendants. | Civil Action No. 2:26-cv-434 CMR |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTION RELIEF

## I.    INTRODUCTION

1.    The President's House is one of the many buildings that comprise the Independence National Historical Park, the creation of which was directed by Congress in 1948. Congress specifically instructed that nothing would change on the buildings and grounds of National Independence Historical Park except by mutual agreement with the City of Philadelphia.

2.    Consistent with the statutory overlay on the Park, development of the President's House was the product of over a decade of close collaboration between the City and the United States, which entities worked together with the community to build a monument recognizing the

ADD43

complexity inherent in the fact that some of the individuals instrumental to the founding of our country and its commitment to freedom themselves enslaved other human beings at the same time.

3.      The recognition of this complexity, and the work to develop the President's House, spanned several federal administrations culminating in a Cooperative Agreement in 2006 between the City of Philadelphia and the federal government that, through a series of amendments, detailed the design of the President's House Project as well as the rights and responsibilities of the parties.

4.      In March 2025, Executive Order No. 14253 called for, among other things, the Interior Department to "ensure that [materials under the jurisdiction of the department] do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times)."

5.      Without notice to the City of Philadelphia, the National Park Service has removed artwork and informational displays at the President's House site referencing slavery, pursuant to the mandate in the Executive Order.

## II.      JURISDICTION AND VENUE

6.      The Court has jurisdiction under 28 U.S.C. § 1331. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

7.      Venue properly lies within the Eastern District of Pennsylvania because this is an action against an officer or employee of the United States and an agency of the United States, Plaintiff City of Philadelphia resides in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district. 28 U.S.C. § 1391(e).

ADD44

## III.    PARTIES

8.      Plaintiff City of Philadelphia (the "City") is a municipal corporation and charter city organized and existing under the laws of the Commonwealth of Pennsylvania. The City is the birthplace of our Nation, home to Independence Hall, and served as the Nation's first capital.

9.      Defendant Doug Burgum is the Secretary of the Interior, a cabinet level position.

10.     Defendant United States Department of the Interior is a cabinet level agency of the United States.

11.     Defendant Jessica Bowron is the acting Director of the National Park Service, an agency of the Department of the Interior.

12.     Defendant National Park Service is an agency of the Department of the Interior and manages the property at Independence National Historical Park, where the President's House is located.

## IV.    FACTUAL ALLEGATIONS

Congress Establishes Independence National Historical Park

13.     In 1948, Congress enacted Public Law 80-795, now codified at 16 U.S.C. §§ 407m-407s, to provide for the establishment of Independence National Historical Park ("Independence Park") in Philadelphia.

14.     Among other provisions, the law authorized the Secretary of the Interior to enter into "cooperative agreements" with the City of Philadelphia "to assist in the preservation and interpretation of the property." 16 U.S.C. § 407n. The law further provided that such agreements must include a term "that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds . . . except by

ADD45

mutual agreement between the Secretary of the Interior and the other parties to the contracts," namely, the City. 16 U.S.C. § 407n.

15.    Pursuant to the authorizing legislation, the City and the United States, through the Secretary of the Interior, entered into a cooperative agreement for Independence Park in 1950 ("1950 Agreement"). (Doc. No. 36-1.)

16.    The 1950 Agreement provides the framework for cooperation between the City and the United States in the administration, maintenance, and exhibition of the Park to the public, including the term that "Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon." (Doc. No. 36-1 at art. III(c).)

17.    The 1950 Agreement also provides that "neither of the parties to this agreement will erect or place, or permit the erection or replacement of any monument, marker, tablet or other memorial, in or upon the buildings or grounds without the written consent of the other." (Doc. No. 36-1 at art. III(d).) Even the "design and location of any signs upon the exterior of the buildings . . . shall be subject to the approval of the City." (*Id.*)

18.    The 1950 Agreement further provides that "it is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole [Park] for the inspiration and benefit of the people of the United States, and to assure this result a high degree of cooperation is necessary with each other and with other bodies participating in the project . . . and the parties hereto pledge themselves to consult on all matter of importance to the program." (Doc. No. 36-1 at art. III(e).)

19.    Finally, the 1950 Agreement "shall continue in effect until such time as Congress enacts legislation inconsistent with its continuance or expressly providing for its termination."

ADD46

Doc. No. 36-1 at art. III(j).  Congress has not terminated the 1950 Agreement, either expressly or implicitly, and it is undisputed that the 1950 Agreement remains in effect.

<u>Around the Turn of the Century, Congress Enacted the Underground Railroad Act and the History of President's House and its Connection to the Underground Railroad was Rediscovered.</u>

20.     In 1998, Congress enacted the National Underground Railroad Network to Freedom Act, Pub. L. 105–203, July 21, 1998, 112 Stat. 678, codified at 54 U.S.C. §§ 308301-308304.

21.     The purposes of the Act, as recognized by Congress, are:

(1) To recognize the importance of the Underground Railroad, the sacrifices made by those who used the Underground Railroad in search of freedom from tyranny and oppression, and the sacrifices made by the people who helped them.

(2) To authorize the National Park Service to coordinate and facilitate Federal and non-Federal activities to commemorate, honor, and interpret the history of the Underground Railroad, its significance as a crucial element in the evolution of the national civil rights movement, and its relevance in fostering the spirit of racial harmony and national reconciliation.

Pub. L. 105–203, July 21, 1998, 112 Stat 678.

22.     The Act directed the Secretary of the National Park Service to establish a "National Underground Railroad Network to Freedom" consisting of sites throughout the country that have a connection to the Underground Railroad. 54 U.S.C. § 308302.

23.     In the early 2000s, the National Park Service ("NPS") and the City collaborated on a project to create a new Liberty Bell Center to maintain and exhibit the Liberty Bell.

24.     Around the same time, independent historians and community members began raising awareness regarding the site of the former "President's House" in Independence National Historical Park.

ADD47

25.     The President's House served as George Washington's home and workplace while he was the first president of the United States.  John Adams and his family also lived there before the nation's capital was moved and a new executive residence established.

26.     In 2001, Edward Lawler, Jr., independent historian, published an article on the history of the home, whose exact location near Independence Hall had been subject to speculation after its demolition in the 1800s.

27.     Lawler wrote of the history of the home and the surrounding block, as well as the fact that George Washington and his family kept at least nine enslaved people on the property in free Pennsylvania, bringing the fact to prominence after it had been forgotten.

28.     Notably, President Washington kept enslaved individuals on the property as maids, cooks, stable hands, carriage drivers, and other roles critical to the functioning of the executive mansion, despite the fact that Pennsylvania was a free state.

29.     While Washington resided at President's House, Pennsylvania permitted owners of enslaved people to keep them in the state for up to six months, after which the enslaved person would be free under Pennsylvania law.  Later, Pennsylvania removed this six-month buffer period.

30.     Letters from Washington to his secretary reveal that our first president intentionally brought enslaved individuals out of the state before the six-month period had run, cycling them between his home at Mount Vernon or even sending them, in at least one instance, across the river to New Jersey for one day to skirt the purpose of the Pennsylvania manumission law.  Washington even advised that the enslaved people should not be informed of the true

ADD48

purpose of their travels outside of Pennsylvania and that they should be transported under pretext to deceive the enslaved and the public.[1]

31.    One enslaved individual, Ona Judge, was Martha Washington's maid, inherited from her first husband after his death and known as "dower slave," brought into the Washington family through Martha's ownership.  Judge served Martha Washington at President's House, tending to her needs daily and interacting with free Black individuals in Philadelphia when sent out of the home for errands, typically accompanied by male enslaved individuals.  In 1796, Judge overheard Martha Washington say that Judge would be given as a gift to Martha's eldest granddaughter, Eliza Parke Custis Law, whom Judge and many others knew to have a fierce temper.  As the Washingtons prepared to go back to Virginia for the summer, Judge escaped when the family sat down for a meal – the brief time when her presence would not be missed.  She was twenty-two years old.

32.    The Washingtons offered a $10 reward (roughly $250 today) for Judge's return and searched for her for years.  Even though she reached the free state of New Hampshire, Judge was a fugitive under the Fugitive Slave Act.  While Martha Washington was hurt by Judge's escape, George was incensed.  He would have to pay back the Custis estate for the loss of property if he were unable to return Judge to bondage.  At one point, one of Washington's agents found Judge in New Hampshire.  Washington instructed that Judge should not be taken by force at the time to avoid a potentially violent incident in abolitionist New Hampshire and the political blowback that would result.  Judge said she would be willing to return to slavery with the Washingtons if they would promise to free her upon their deaths.  George Washington wrote that

---

[1] *See* Edward Lawler, Jr., Washington, the Enslaved, and the 1780 Law, https://www.ushistory.org/presidentshouse/slaves/washingtonand8.php; *see also* Ona Judge, https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/ona-judge.

ADD49

while he supported gradual abolition, if politically feasible, he could not reward such an escape with freedom while other enslaved individuals were more loyal.  Years later, Washington again asked an associate to try to retrieve Judge but he, too, returned empty-handed, as a United States Senator from New Hampshire and a free Black friend helped keep Judge safe.

33.     Judge lived until 1848, marrying and having children as a free individual, and telling her story through interviews in the 1840s.  While Judge lived in poverty at the end of her life, she never regretted escaping to freedom, where she had her own family and learned to read.

34.     As a result of this rediscovered history, activists Avenging the Ancestors Coalition and others campaigned for a memorial to the enslaved individuals and an exhibition that told the long-buried true story of the inhabitants of the President's House in Philadelphia.

35.     The movement to recognize "The House and the People Who Worked and Lived In It" gained traction.  In a 2003 Appropriations report, the United States House of Representatives stated that "given the historical significance of this issue," it "urge[d] the NPS to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy."

36.     Joining the community and activist voices, NPS Chief Historian Dwight Pitcaithley also wrote to Independence Park's superintendent to urge her to consider a different perspective:

> The contradiction in the founding of the country between freedom and slavery becomes palpable when one actually crosses through a slave quarters site when entering a shrine to a major symbol of the abolition movement . . . . How better to establish the proper historical context for understanding the Liberty Bell than by talking about the institution of slavery? And not the institution as generalized phenomenon, but as lived by George Washington's own slaves. The fact that Washington's slaves Hercules and Oney Judge sought and gained freedom from this very spot gives us interpretive opportunities other historic sites can only long for. This juxtaposition is an interpretive gift that can make the Liberty Bell

"experience" much more meaningful to the visiting public. We will have missed a real educational opportunity if we do not act on this possibility.

(*See* Gary Nash, *For Whom Will the Liberty Bell Toll? From Controversy to Collaboration*, The George Wright Forum, Vol. 21, No. 1 (Mar. 2004) at 46-47, *available at* https://www.jstor.org/stable/43597891?seq=9.)[2]

37.    Elected representatives on the federal, state, local level would soon add to the chorus of pleas. The U.S. House of Representatives Committee on Appropriations, in a July 2022 report on the Department of Interior and Related Agencies appropriations bill, stated that:

> The Committee is aware of recent developments relating to the identification of the site of the first official residence of the President of the United States at the current location of Independence National Historical Park in Philadelphia, Pennsylvania.  It has been discovered that George Washington and his household, including eight [sic] African American slaves, were quartered at the first Executive Mansion for six and one half years.  **Therefore, given the historical significance of this issue, the Committee urges the National Park Service to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy.**  Furthermore the Committee directs the Director of the National Park Service to submit a report to the Committee no later than March 31, 2003, detailing the actions taken at Independence National Historical Park to property address and resolve this issue.

(*See* 2003 U.S. House of Representatives Report 107-564, Prelim. Inj. Hr'g Ex. 2 (Doc. No. 36-2) at 47) (emphasis added.)

38.    That same year, the Pennsylvania House of Representatives passed House Resolution 490, which "[u]rg[ed] the National Park Service to erect a commemorative plaque in recognition of the slave quarters located on the site of the planned Liberty Bell Pavilion." (*See*

---

[2] While the Washingtons' cook at President's House, Hercules Posey, did escape from bondage, he did so from the Washingtons' Virginia home of Mount Vernon, not from the President's House site. Hercules left on George Washington's birthday, February 22, 1797, while the President held a ball in Philadelphia. Hercules Posey, https://www.mountvernon.org/library/digitalhistory/digital-encyclopedia/article/hercules.

H.R. 490, 2001-2002 Gen. Assemb., Reg. Sess. (Pa. 2002),

https://www.palegis.us/legislation/bills/text/PDF/2001/0/HR0490/PN3509.)

39.     Shortly thereafter, Philadelphia City Council passed its own resolution advocating

for NPS to "appropriate[ely] memorializ[e]" "the human beings of African descent held in

bondage at the President's House."  (*See* Phila. Council Resolution No. 020521 (Sept. 12, 2002),

available at https://phila.legistar.com/legislation.aspx.)

40.     In October 2003, the City, under the leadership of then-Mayor John Street,

committed $1.5 million of City funds toward commemoration efforts for the President's House.

41.     Two years later, driven by advocacy from the local delegation, Congress

appropriated $3.6 million for "Independence National Historic [sic] Park scenic enhancement

and pedestrian walkways improvement project in conjunction with the Park's Executive Mansion

Exhibit."  (*See* 119 Stat. 1308, Public Law 109-59 (Aug. 10, 2005).

42.     By 2005, despite its earlier resistance, NPS and Independence Park would become

"a full and enthusiastic partner" with the City.

43.     Indeed, in a briefing statement regarding work at the grounds, NPS wrote that:

> NPS fully recognizes that the President's House site is one of very great historical
> significance and that it carries tremendous cultural and emotional significance for
> community groups. The site has much to teach us about the birth of our nation and
> the intertwined themes of slavery and freedom.

(*See* URS Corp., NPS, and Independence Park, *The Archeology of Freedom and Slavery*

*Excavations at the President's House Site in Philadelphia* (Nov. 2009, Revised Sept. 2023) at

Appendix A at 13, *available at* https://npshistory.com/publications/inde/pres-house-

excavations.pdf.)

ADD52

44. In October 2005, the City and NPS issued a nationally distributed Request for Qualifications to implement the vision of President's House advanced through advocacy efforts and public engagement.

45. The City and NPS also convened a formal Oversight Committee to help guide development to represent the public interest in the selection process.

46. After selecting finalists for the design and construction of the project, the City provided funding for the bidders to create three-dimensional models of their proposals, which were placed on public display at the National Constitution Center and African American Museum in Philadelphia. Nearly 1,000 visitors completed evaluation cards. These evaluations were reviewed by the Oversight Committee and posted on the City's website. This process reflected the understanding that public input was essential to the development and vision of President's House.

47. In February 2007, the City and Independence Park jointly announced the selection of project designers. Mayor Street stated that:

> This is a great day for Philadelphia and our nation. We are one huge step closer to fulfilling an obligation to tell the truth – the whole, complicated truth – about this small parcel of land on the doorstep of the Liberty Bell Center . . . I got personally involved in this project because enslaved Africans lived in our first President's household right here in Philadelphia – and most visitors to these symbols of liberty and justice, even now, are completely unaware of this terrible truth. That is about to change.

(Press Release (Feb. 7, 2007), Prelim. Inj. Hr'g Ex. 17 (Doc. No. 36-18) at 3.)

48. Independence Park Superintendent Dennis Reidenbach also added that:

> This project is a collaboration among the City of Philadelphia, the National Park Service, and so many others. With this commemoration, Independence National Historical Park will be at the forefront of national parks that address the issues of freedom and slavery. I could not be more pleased with the opportunity this project offers to teach and remember.

ADD53

(*Id.*)

<u>From 2006 to 2010, the City and Defendants Planned, Designed and Constructed the President's</u>
<u>House Pursuant to Cooperative Agreements</u>

49.     In 2006, the City and NPS entered into an agreement to establish an exhibit at the

site of the former President's House (the "2006 Cooperative Agreement"), located on

Independence Mall next to the Liberty Bell Center. (Doc. No. 36-3.) The 2006 Cooperative

Agreement provided that the parties "desire to establish an exhibit at the Park that "illuminates

the history of the site of the former President's House . . . (where Presidents George Washington

and John Adams lived and where at least nine enslaved Africans - kept by George Washington-

also lived) and its symbolic importance to the founding of the United States. (*Id.* at ¶ E.)

50.     The 2006 Cooperative Agreement was amended in 2007, 2008, and 2009. (*See*

Doc. Nos. 36-4, 36-5, 36-6.)

51.     Under the 2009 Third Amendment, the City was responsible for the "design,

fabrication, installation, and completion" of the President's House Project, titled "Freedom and

Slavery in Making a New Nation," and upon its completion the exhibit was to be "owned,

maintained, managed, and interpreted" by the NPS. (Doc. No. 36-6 at art. I, Sections B and C;

Attach. A, Section IV, Paragraph 4.)

52.     The 2006 Cooperative Agreement and its subsequent amendments provide that

the President's House together with the interpretative displays in it are all part of a single exhibit.

(Doc. No. 36-3 at Background Paragraphs E and F; also, Doc. No. 36-6 at Attachment C, Section

B.).

53.     The 2006 Cooperative Agreement and its Third Amendment also expressly call

for explaining the lives of enslaved people living at the President's House.  (*See*, *e.g.*, Doc. No.

36-3 at Background Paragraph E; Doc. No. 36-6 at Attachment A, Sections I—II.)  The

ADD54

agreements acknowledged that the exhibits not only "will commemorate the home of George Washington and John Adams during the first ten years of the federal government," but that equally important was the intention to "commemorate the enslaved Africans who resided in the Washington household."  (Doc. No. 36-6 Attachment C, Section B.)  Further, the Project Summary Sheet describes the project as an exhibit that will "commemorate all those who lived in the house while it was used as the executive mansion, including the nine enslaved Africans brought by George Washington from Mt. Vernon." (*Id.* at Attachment A, Section II.)

54.     The Agreement contained a Project Development Plan, which provided that "[s]ite interpretation will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved." (Doc. No. 36-6 at Attachment C, Section B.)

55.     Additionally, the City has an equal right with the NPS under these agreements to approve the final design of the President's House Project.  (Doc. No. 36-6 at Attach. A, Section IV(4) (stating that NPS "will participate in the final review and approval of the Project").)  A "core design requirement" mandated that "the footprint of the Slave Quarters must be conspicuously highlighted and a solemn 'sense of place' clearly established."  In addition, five of the six jointly agreed upon themes "that must be reflected in the final design" all centered on enslaved persons to highlight "how knowledge of the President's House and the presence of slavery was forgotten and recovered; why we must remember." (*Id.* at Attach. C, Section F, subsection D).

56.     In addition to shared design vision, the City made significant financial contributions to the President's House, due to the large national and local public interest in this

13

ADD55

exhibit.  The City paid $3.5 million toward the overall project in addition to securing grant funding from the Delaware River Port Authority and federal congressional appropriation in the SAFETY-LU Transportation Bill. Further, the rationale behind the City's contribution is spelled out in the agreement: "Providing funds for the Project and Research Dig fulfills the public purpose requirement because it enables the City to commemorate the symbolic and historical importance of the President[']s House for the City of Philadelphia, its citizens and all Americans nationwide, and by doing so, there is a public benefit inuring to the City." (Doc. No. 36-3 at Background Paragraph K.)

57.    The 2009 Agreement includes a provision requiring the NPS and City to "promptly use their best efforts to resolve the dispute in an informal fashion through communication and consultation, or other forms on non-binding alternative despite resolution that are mutually acceptable to the parties." (Doc. No. 36-6 at art. IX, Section A).

58.    While the term of the 2006 Agreement and subsequent amendments has expired, the Agreements contain survival clauses that extend the life of certain provisions.

59.    The 2009 Amendment includes Paragraph XII(Q), which provides that "[a]ny and all provisions which, by themselves or their nature, are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive and be enforceable after the expiration or termination of this Third Amendment." (Doc. No. 36-6 at ¶ XII(Q).) Paragraph C(7) provides that "It is the intent of both parties to be legally bound by this Cooperative Agreement as amended and both expressly waive the defense of lack of consideration." *Id.* at ¶ C(7).

ADD56

<u>From 2010 to 2026, the President's House Exhibit is Open to the Public and the City and</u>
<u>Defendants Continue to Collaborate Pursuant to the Cooperative Agreements</u>

60.     After design and construction, the President's House exhibit opened in 2010,
featuring a number of display panels depicting slavery and enslaved people, including Ona
Judge. (*See* Doc. No. 36-11 (photos of President's House before January 22, 2026).)
Construction continued on the site until 2015, as NPS and the City worked to finalize all
outstanding issues with the project.

61.     Additionally, in July and December 2015, the City entered into agreements
assigning the intellectual property rights of the President's House Project to the NPS (the "2015
IP Assignment Agreements"). (Doc. No. 36-7.)

62.     Specifically, the 2015 IP Assignment Agreements include an assignment for the
"Interpretative Works" of the President's House Project. (Doc. No. 36-7 at Recital (B).)

63.     The Schedule of Interpretative Works, attached as Exhibit A to the July 2015 IP
Assignment Agreement, reflects that many of the works expressly address slavery. (Doc. No. 36-
7 at Ex. A.)

64.     Under the 2015 IP Assignment Agreements, the City retained a license to use the
intellectual property and accepted an obligation to assist NPS in protecting the property rights.
These rights and obligations specifically survived the expiration of the Agreements.

65.     The transfer of the copyrights under the 2015 IP Assignment Agreements did not
include the authority to materially alter or destroy altogether the exhibit underlying the
copyright.

66.     In 2017, NPS issued the Foundation Document for Independence Park, a public
document that governs goals and themes of the Park.  (Doc. No. 36-8.)  President's House is a
"core component" of the Park, according to the NPS document, and the "Paradox of Freedom

ADD57

and Slavery" is a "statement" on the "significance" of the Park.  An interpretive theme for the Park is "Liberty: The Promises and the Paradoxes."  (*Id.*)

67.    In 2022, President's House was formally designated as a National Underground Railroad Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act, Pub. L. 105–203, July 21, 1998, 112 Stat. 678, codified at 54 U.S.C. §§ 308301-308304; *see also* https://www.nps.gov/subjects/undergroundrailroad/ntf-listings.htm (listing all Network sites, including President's House) (last accessed Feb. 6, 2026).

68.    The application for President's House to become a Network site describes in detail the story of Ona Judge's enslavement in the President's House in Philadelphia and her daring and successful escape to freedom. *See* Doc. No. 36-10 at 8.

69.    NPS granted the application and designated President's House a Network site in 2022.  *See id.*  President's House is still listed as a Network site on the National Park Service website as of February 6, 2026.

<u>On January 22, 2026, NPS Removes All President's House Panels That Reference Slavery.</u>

70.    On January 22, 2026, the City learned that Defendants, through the National Park Service, had removed all educational panels at the President's House site that reference slavery.

71.    On the same day, the City filed the Original Complaint and Motion for Preliminary Injunction in this case.

72.    On January 28, 2026, Defendants filed on the docket in this case an Affidavit from the Superintendent of Independence Park. The Affidavit states that the acting Director of NPS directed the Superintendent "to remove the video and exhibits on the interior and exterior of the walls of the President's House. However, the footprints in the concrete and the names on the Memorial Wall were to remain as-is." (Doc. No. 27-1 ¶ 4.)

ADD58

73.    The Superintendent was directed to remove the video and exhibits on January 22, 2026.  He therefore directed NPS staff to conduct the removal and "at or around 3:00 p.m., NPS employees removed all but one of the exhibits on the interior and exterior of the President's House walls using hand tools, including wrenches and crowbars, to remove bolts fastening the exhibits to the walls and pull the exhibits from the walls."  (Doc. No. 27-1 ¶ 6.)

74.    The one panel that was not removed on January 22 "is made of wood and located at the southern end of the site in a stand alone structure made of metal. NPS did not remove it on January 22, 2026 because additional tools were needed to do so." (Doc. No. 27-1 ¶ 7.)

75.    All of the panels and materials that were removed on January 22, 2026 are in storage in NPS custody at the National Constitution Center in Philadelphia. (Doc. No. 27-1 ¶ 8.)

76.    On information and belief, the removal was part of a larger effort by this administration, the Department of the Interior, and the National Park Service to erase all references to slavery and the civil rights movement throughout National Independence Historical Park as well as other sites nationwide. The City reasonably believes that NPS intends to remove additional materials both at President's House and in Independence Park and to replace the materials removed with "alternative" materials that will not be historically accurate and will attempt to bury the history of slavery, the connection to the Underground Railroad, and the civil rights movement at the site to comport with this administration's political narrative rather than objectively true history as understood by historians and archeologists, including NPS's own experts.

ADD59

## V.    CAUSES OF ACTION

### Count I – 5 U.S.C. § 702 – Unlawful Agency Action
#### *(All Defendants)*

77.    The preceding paragraphs are incorporated and realleged here.

78.    Section 702 of the Administrative Procedure Act permits challenge of agency action where a plaintiff is not seeking money damages.  5 U.S.C. § 702.  As explained by the Third Circuit Court of Appeals in *Treasurer of New Jersey v. U.S. Dept. of Treasury*, 684 F.3d 382 (3d Cir. 2012), Section 702 provides a general waiver of sovereign immunity for legal wrong, not limited to final agency action, where the sought relief is not money damages.  *See also, e.g., Air Marshal Assn. v. Sec'y of Dept. of Homeland Sec.*, No. 22-2254, 2025 SL 388814, at *4-5 (E.D. Pa. Feb. 4, 2025).

79.    Defendants Department of the Interior and National Park Service are "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1).

80.    Defendants' actions on January 22, 2026 breached the 1950 Cooperative Agreement and surviving and enforceable terms of the 2006 Cooperative Agreement and its Amendments.

81.    Defendants breached the Agreements by failing to obtain mutual consent and failing to consult with the City prior to its removal of all interpretative panels and ceasing of videos at President's House.

82.    Defendants breached the Agreements by removing virtually all references to slavery and enslaved persons, significantly altering the exhibit and its interpretive focus.

83.    Defendants' failure to conform to the terms of its agreement does not cause specific monetary damage to the City.  The only remedy to which the City is entitled is equitable,

ADD60

that the United States be enjoined to undo the harm it caused and comply with its contractual obligation to make changes to the buildings and grounds only by mutual agreement.

84.    Plaintiff therefore asks the Court to declare under 5 U.S.C. § 702 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House is unlawful agency action; provide preliminary relief under 5 U.S.C. § 705; preliminarily mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other applicable law, including the parties' contractual obligation that changes be made only by mutual agreement.

**Count II – APA 5 U.S.C. § 704, 706(2)**
**Arbitrary and Capricious Agency Action in Violation of the National Underground**
**Network to Freedom Act of 1998**
*(All Defendants)*

85.    The preceding paragraphs are incorporated and realleged here.

86.    Defendants' actions to remove the panels referencing slavery are arbitrary and capricious because the removal directly contradicts Congress's express purpose to preserve and recognize important historical sites of the Underground Railroad.

87.    Defendants Department of the Interior and National Park Service are "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). The removal of artwork and informational displays at the President's House site referencing slavery constitutes final agency action subject to review by this Court.

88.    Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

ADD61

89.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).  A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'"  *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

90.    "An agency acts arbitrarily and capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 189 (3d Cir. 2014) (*quoting State Farm*, 463 U.S. at 43).

91.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

92.    The National Underground Railroad Network to Freedom Act was passed in 1998.

93.    Congress enacted the National Underground Railroad Network to Freedom Act with the express purpose to "recognize the importance of the Underground Railroad, the sacrifices made by those who used the Underground Railroad in search of freedom from tyranny

ADD62

and oppression, and the sacrifices made by the people who helped them." PL 105–203, July 21, 1998, 112 Stat 678 at Section 2(b)(1).

94.     In its adoption, Congress found "the Underground Railroad bridged the divides of race, religion, sectional differences, and nationality; spanned State lines and international borders; and joined the American ideals of liberty and freedom expressed in the Declaration of Independence and the Constitution to the extraordinary actions of ordinary men and women working in common purpose to free a people."  P.L. 105-203, Section 2(a)(2).

95.     Congress also found that "the National Park Service can play a vital role in facilitating the national commemoration of the Underground Railroad." *Id.* at 2(a)(5).

96.     Congress mandated that the "Secretary [of the Interior] shall establish in the Service the National Underground Network to Freedom.  Under the national network, the Service shall – produce and disseminate appropriate educational materials, such as handbooks, maps, interpretive guides, or electronic information[.]"  54 U.S.C. § 308302.

97.     There is no statutory or other authority for the Secretary to remove and destroy Network sites after designation, and doing so runs counter to the express purpose of the Act.

98.     In 2022, NPS supported the application to designate the President's House as a Network to Freedom site.  Core to this submission is the fact that Ona Judge, one of the women held in slavery by the Washington family, escaped from them through the Underground Railroad.  Her story and that of the other individuals held in slavery by the Washingtons were central to the narrative and site interpretation at President's House, consistent with the early project development plan.  (2009 Am. to Coop. Agreement, Attachment C, Project Development Plan, Prelim. Inj. Hr'g Ex. 6 (Doc. No. 36-6 at 24-30).)

99.     The project development plan explains that "site interpretation will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved."

100.     The biographical information and explanation about slavery are what NPS removed when it stripped the panels from the site.  The erasure of Ona Judge's story, the very information that specifically qualified the President's House as a Network to Freedom site, unequivocally contradicts the express direction of Congress to *create*, not *destroy*, sites that educate the public about the Underground Railroad.

101.     Plaintiff therefore asks the Court to declare under 5 U.S.C. § 704 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House is arbitrary and capricious final agency action in violation of the National Underground Railroad Network to Freedom Act of 1998; provide preliminary relief under 5 U.S.C. § 705; preliminarily mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other applicable law.

## Count III – APA 5 U.S.C. § 704, 706(2)
## Arbitrary and Capricious Final Agency Action in Violation of Title 16 Sections 407m, 407n
### *(All Defendants)*

102.     The preceding paragraphs are incorporated and realleged here.

103.     Defendants' actions to remove the panels referencing slavery without any consultation with or agreement by the City of Philadelphia are arbitrary and capricious final agency action because they expressly violate the statutory mandate in Title 16 Sections 407m

ADD64

and 407n that changes on the buildings and grounds of Independence National Historical Park only be made with mutual agreement.

104.    Defendants Department of the Interior and National Park Service are "agenc[ies]" as defined in the APA, 5 U.S.C. § 551(1). The removal of artwork and informational displays at the President's House site referencing slavery constitutes final agency action subject to review by this Court.

105.    Final agency actions (1) "mark the 'consummation' of the agency's decision making process" and (2) are ones "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

106.    The removal of educational panels referencing slavery is final agency action because it reflects final decisions—in accord with presidential directives—to unilaterally rewrite history to suit the current Administration's preferred narrative.

107.    Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

108.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

109.    "An agency acts arbitrarily and capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 189 (3d Cir. 2014) (*quoting State Farm*, 463 U.S. at 43).

110.    Title 16, Section 407n directs that "no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts."

111.    President's House is part of the buildings and grounds that comprise Independence National Historical Site.

112.    The panels and displays that were removed are an integral part of the President's House, as illustrated by the care and work that went into the collaborative design and development of those materials.

113.    Defendants did not engage with any persons from the City of Philadelphia before unilaterally changing core components of the President's House.

114.    The City of Philadelphia does not agree with the National Park Service's unilateral removal of historical materials that are necessary context for the President's House.

115.    Plaintiff therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House without the mutual agreement violates the APA because it is final agency action that violates a statutory mandate; provide preliminary relief under 5 U.S.C. § 705; preliminarily

ADD66

mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other applicable law.

### Count IV – APA 5 U.S.C. §§ 704, 706(2)
### Arbitrary and Capricious Final Agency Action in Violation of Agency Policy Documents
#### *(All Defendants)*

116.    The preceding paragraphs are incorporated and realleged here.

117.    Defendants' actions are contrary to their own "Foundation Document," which describes the plan to manage and preserve the Independence National Historical Park.

118.    Under the APA, a "court shall … hold unlawful and set aside agency actions, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

119.    "An agency action qualifies as 'arbitrary' or 'capricious' if it is not 'reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). A court must therefore "ensure, among other things, that the agency has offered 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency cannot simply ignore 'an important aspect of the problem'" addressed by its action. *Id.* at 293.

120.    "An agency acts arbitrarily and capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

ADD67

agency expertise.'" *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 189 (3d Cir. 2014) (*quoting State Farm*, 463 U.S. at 43).

121.    Congress mandates that NPS prepare "general management plans" for each "unit," or park in the NPS System. 54 U.S.C. § 100502.

122.    To comply with this mandate, NPS issued a document called "Management Policies" and Director's Order No. 2 to guide its planning for each park.[3]

123.    The governing planning document for Independence Park is its Foundation Document, last amended in 2016.

124.    President's House is a "core component" of Independence Park, "especially in the paradox of the Washingtons bringing their enslaved people to work and live there." (*See* Independence National Historical Park Foundation Document (2017), Prelim. Inj. Hr'g Ex. 8 (Doc. No. 36-8)) at 11.)

125.    The "paradox of freedom and slavery" is a significance statement for the Park. (*Id.* at 15.)

126.    NPS considers (or considered until very recently) the "interpret[ation] of race and slavery in its historic context" at the President's House archeological site to be a "fundamental resource[] and value[]" of the Park. (*Id.* at 17.)

127.    The "fundamental value" of "partnerships and collaboration" is "best illustrated by Independence National Historical Park's close working relationship with the City of Philadelphia, which still owns the most iconic building Independence Hall and resources such as the Liberty Bell." (*Id.* at 18.)

---

[3] Management Policies, https://www.nps.gov/subjects/policy/upload/MP_2006_amended.pdf (last viewed Feb. 5, 2026); Director's Order No. 2, https://www.nps.gov/subjects/policy/upload/DO_2_1-11-2021.pdf (last viewed Feb. 5, 2026).

ADD68

128.    The "promises and the paradoxes" of liberty is one of only four interpretive themes of the Park. (*Id.* at 19.)

129.    NPS also instructs that "[u]nderstanding and considering the public's interest will inform and strengthen the entire planning portfolio," including by complying with various Management Policies and Director's Orders. (*See* Director's Order No. 2, *supra*, n.2, ¶ 3.6.)

130.    NPS Management Policies 2.1.3 and 2.3.1.5 expressly provide for public involvement for planning purposes, such as developing or changing the Foundation Document. (*See* Management Policies, *supra*, n.2.)

131.    The removal of the interpretive panels and signs at President's House expressly contravened these policies or directives.

132.    All interested parties are left completely in the dark as to why this decision was made, who made the decision, how this meticulously-researched exhibit fits within the parameters outlined in Executive Order 14253, and what the NPS has planned for the site.

133.    Plaintiff therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that Defendants' removal of the artwork and informational displays referencing slavery at the President's House without the mutual agreement violates the APA because it is final agency action that violates a statutory mandate; provide preliminary relief under 5 U.S.C. § 705; preliminarily mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with the APA and all other applicable law.

**Count V – Ultra Vires**
**Agency Action in Violation of Law**
*(All Defendants)*

134.    The preceding paragraphs are incorporated and realleged here.

27

ADD69

135.    Under this Court's traditional equitable jurisdiction, Plaintiff is entitled to equitable relief to prevent and restrain ongoing violations of statutory law by Defendants.

136.    Because such actions seek simply to halt or prevent a violation of federal law rather than the award of money damages, they do not ask the Court to imply a new cause of action. To the contrary, the ability to sue to enjoin unlawful actions by non-presidential federal actors is the creation of courts of equity and reflects a long history of judicial review of illegal executive action, tracing back to England. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

137.    Defendants took unilateral action that significantly affected the buildings and grounds of Independence National Historical Park.  This unilateral action violated the statutory mandate to only make such changes by mutual agreement.  Plaintiff does not agree with Defendants' actions.

138.    Plaintiff therefore asks the Court to declare that Defendants' removal of the artwork and informational displays referencing slavery at the President's House without the mutual agreement violates the express statutory direction to only make changes on the buildings and grounds of Independence National Historical Park only by mutual agreement; preliminarily mandate that Defendants restore the site to its status as of January 21, 2026; and permanently enjoin Defendants from removing the artwork and informational displays without complying with applicable law.

ADD70

## VI.    RELIEF SOUGHT

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and grant the following relief:

A.    A declaratory judgment declaring that Defendants' removal of the interpretative panels referencing slavery is unlawful;

B.    A temporary restraining order that enjoins Defendants from replacing the removed materials without mutual agreement;

C.    A preliminary injunction enjoining Defendants from taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site and requiring Defendants to take all necessary steps to ensure the safety, security, and preservation of any such items removed from the President's House Site on January 22, 2026.

D.    An order restoring the President's House Site to its status as of January 21, 2026.

E.    A permanent injunction prohibiting Defendants from removing the interpretative panels referencing slavery without complying with the APA and all applicable law; and

F.    Any other relief the Court deems just and proper.

Respectfully submitted,

Date:  <u>February 6, 2026</u>

Renee Garcia, City Solicitor
Anne Taylor, Chair | Litigation
Lydia Furst, Chief Deputy City Solicitor

*/s/ Ryan B. Smith*
Ryan B. Smith, Divisional Deputy City Solicitor
Bailey Axe, Deputy City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
(215) 410-8264
Ryan.Smith@phila.gov

*Attorneys for Plaintiff City of Philadelphia*

ADD71

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CITY OF PHILADELPHIA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 2:26-cv-434** |
| **DOUG BURGUM, SECRETARY OF THE INTERIOR, et al.,** | |
| **Defendants.** | |

## CERTIFICATE OF SERVICE

I, Ryan B Smith, do hereby certify that a true and correct copy of the foregoing Amended

Complaint was filed via the Court's electronic filing system and is available for downloading.


Date: February 6, 2026          BY:     */s/ Ryan B. Smith*
                                        Ryan B. Smith, Divisional Deputy City Solicitor
                                        City of Philadelphia Law Department
                                        1515 Arch Street, 15th Floor
                                        Philadelphia, PA 19102
                                        (215) 410-8264
                                        Ryan.Smith@phila.gov

                                        *Attorney for Plaintiff City of Philadelphia*

ADD72

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CITY OF PHILADELPHIA,** | |
| **Plaintiff,** | **Civil Action No. 2:26-cv-434** |
| **v.** | |
| **DOUG BURGUM, SECRETARY OF THE INTERIOR, et al.,** | |
| **Defendants.** | |

<u>**PLAINTIFF CITY OF PHILADELPHIA'S EXHIBITS MOVED INTO EVIDENCE IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**</u>

| Tab | Document |
|---|---|
| 1. | 1950 City-US Cooperative Agreement |
| 2. | 2003 U.S. House of Representatives Report 107-564 |
| 3. | 2006 City-US Cooperative Agreement |
| 4. | 2007 First Amendment to Cooperative Agreement |
| 5. | 2008 Second Amendment to Cooperative Agreement |
| 6. | 2009 Third Amendment to Cooperative Agreement |
| 7. | 2015 City-US Assignments of IP Rights |
| 8. | 2017 Independence National Historical Park Foundation Document (NPS) |
| 9. | 2026.01.22 – Screenshots of NPS Website |
| 10. | 2022 - Application and Approval for Presidents House in Underground Railroad Network |
| 11. | Photos of site (prior to January 22, 2026) |

| 12. | 2010 script for video media |
|-----|------------------------------|
| 13. | 2015 drawings and inventory list for IP Rights |
| 14. | 2005 Request for Qualification |
| 15. | 2006 Request for Proposals |
| 16. | 2006.08.21 Kelly/Maiello, Additional Information Proposal for Design, Fabrication, and Installation for THE PRESIDENT'S HOUSE: Freedom and Slavery in Making a New Nation |
| 17. | 2007.02.07 City-NPS Press Release |
| 18. | 2007.03.21 City-NPS Press Release |
| 19. | 2007.05.02 City-NPS Press Release |
| 20. | 2007.05.10 City-NPS Press Release |
| 21. | 2007.06.17 City-NPS Press Release |
| 22. | 2009.08.21 City-NPS Press Release |
| 23. | 2010.12.15 City-NPS Press Release |
| 24. | Photos of site (taken on January 28, 2026) |

ADD74

C
O
P
Y

THIS AGREEMENT, made and entered into this ___14th___ day

of ___July___, 1950, by and between the United States of America,

acting in this behalf by Oscar L. Chapman, Secretary of the Interior,

hereinafter referred to as the "Secretary," party of the first part,

and the City of Philadelphia, Commonwealth of Pennsylvania, hereinafter

referred to as the "City," party of the second part.

WITNESSETH:

WHEREAS, the Independence Hall group of historic structures

comprising Independence Hall, Congress Hall, Old City Hall, and asso-

ciated historic objects, located in Independence Square in the City of

Philadelphia, Commonwealth of Pennsylvania, are recognized as possessing

national significance as associated with, or the scene of, the adoption

of the Declaration of Independence by the Continental Congress, the

meeting place of that Congress, and seat of Government of the United

States during the Revolution and during the period 1790-1800, as well

as the meeting place of the Constitutional Convention of 1787: and

WHEREAS, the act of Congress approved June 28, 1948 (62 Stat.

1061) has provided for the establishment of the Independence National

Historical Park for the purpose of preserving for the benefit of the

American people the above-named and other nationally important historic

lands and structures in Philadelphia, Pennsylvania, associated with the

American Revolution and the founding and growth of the United States;

and

ADD75

WHEREAS, the Council of the City of Philadelphia by ordinance approved the 24th day of May 1950, has authorized the Mayor to execute and deliver this agreement on behalf of the City; and

WHEREAS, the Secretary in all matters hereinafter referred to will act through the National Park Service or such other body as may be legally substituted therefor: and

WHEREAS, it is the desire of the City to bring about the preservation of the said historic structures, objects, and grounds in Independence Square as a national historical park that they may be devoted to public use and to the perpetuation of the greatest traditions of the United States of America: and

WHEREAS, it is the desire of the Secretary to cooperate with the City in preserving the integrity of the above-mentioned historic structures, objects, and area, and to interpret them to the American people as a great national heritage:

NOW, THEREFORE, in consideration of the foregoing and pursuant to the authority contained in the act of Congress approved August 21, 1935 (49 Stat. 666), entitled "An Act to Provide for the Preservation of Historic American Buildings, Objects, and Antiquities of National Significance, and for Other Purposes," and the act of Congress approved June 28, 1948 (62 Stat. 1061), entitled "An Act to Provide for the Establishment of the Independence National Historical Park, and for Other Purposes," the said parties have convenanted and agreed, and by these presents do covenant and agree to and with each other and in consideration of the mutual promises herein expressed, as follows:

ADD76

ARTICLE I. The City will retain ownership of the Independ-
ence Hall group of structures and of the land whereon they are erected,
and the park area adjacent thereto known as Independence Sqaure, but
hereby agrees:

(a) To permit the Secretary to occupy them exclusively, ex-
cept as otherwise provided herein, during the term of this agreement
for the purpose of preserving, exhibiting, and interpreting them to the
American people and otherwise utilizing them and their adjacent grounds
for national historical park purposes.

(b) To permit the Secretary to have curatorial responsibility
for the care and display of such museum objects, furnishings, or exhibits
of historic interest as may be available in the Independence Hall group
of buildings for exhibit and interpretive purposes, including the right
to rearrange furniture and exhibits and to determine accession policy
for items to be utilized in the museum or interpretive program.

(c) To supply customary municipal services, including police
and fire protection, and water and sewer facilities without charge
therefor.

ARTICLE II. The Secretary hereby agrees, on behalf of the
United States:

(a) That he will occupy the grounds and buildings for the
purposes set forth in Article I of this agreement, and for no other
purposes, and that he will not sublet or assign to another person or
organization any part of the grounds or buildings without prior ap-
proval in writing by the City; that he will (as funds become available
through appropriations by the Congress) operate and maintain the grounds
and buildings and make all repairs thereto; remedy all defects in the
buildings or their equipment which may arise from any cause whatsoever,

including ordinary wear and tear; and undertake such work of restoration
or major alteration as may be mutually agreed upon under the provisions
of Article III (c).

The Secretary may apply such reasonable rules and regulations
therein as may be necessary properly to perform his functions.

(b)  That he will exercise reasonable care to prevent damage
to, or destruction of, any part of the grounds and buildings or their
appurtenances.

(c)  That he will provide public access to the museum room
of the buildings at all reasonable times, and will provide the serv-
ices of a competent person, or persons, to furnish information to the
visiting public.

ARTICLE III.  It is mutually understood and agreed:

(a)  That nothing herein contained shall be construed as
binding the Secretary to expend in any one fiscal year any sum in
excess of appropriations made by Congress for that fiscal year, or
to involve the United States in any contract or other obligation for
the future expenditure of money in excess of such appropriations.

(b)  That it is desirable to maintain, insofar as practicable,
the existing personnel of the City of Philadelphia which has for many
years exhibited and interpreted the Independence Hall group of struc-
tures and has acquired an intimate knowledge of the history of the
buildings as well as visitor reactions to them: that toward this and
the Secretary and the City will seek such legislation, ordinances, or
other authority necessary to facilitate the continued employment of
this experienced staff without serious loss of retirement benefits to
the individuals concerned.

In order to effectuate this objective when the necessary authority shall have been obtained:

(1)  The Secretary will employ such members of the present staff as are then below the age provided for automatic separation under the Federal Civil Service Retirement Act, and who have paid into the Municipal Pension Fund less than ten years or more than fifteen years.

(2)  Those members of the present staff who are then above the age provided for automatic separation under the Federal Civil Service Retirement Act and who have paid into the Municipal Pension Fund less than ten years or more than fifteen years shall be retired.

(3)  Those members of the present staff who have paid into the Municipal Pension Fund not less than ten years and not more than fifteen years shall continue to be employed by the City until they shall have severally completed fifteen years employment.  As each arrives at such point, he shall be retired if beyond the age provided for automatic separation under the Federal Civil Service Act, but otherwise he shall be employed by the Secretary:  Provided that during the period of employment by the City, the City will place these employees at the disposal of the Secretary, who will reimburse the City for their salaries:  Provided, further, that nothing herein contained shall obligate the City or the Secretary to retain the services of an incompetent or unfaithful employee.  Any future replacements of, or additions to, the existing personnel will be made by the employment of persons directly by the Secretary and at his option.

(c)  Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon.

(d)  That neither of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the buildings or grounds without the written consent of the other.  This section shall not be construed as prohibiting the placing of signs within the buildings for the information and direction of the public.  The design and location of any signs upon the exterior of the buildings to indicate that they are occupied and operated by the National Park Service acting in cooperation with the City, shall be subject to the approval of the City.

(e)  That it is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States, and to secure this result a high degree of cooperation is necessary with each other and with other bodies participating in the project; to wit, the Commonwealth of Pennsylvania, Christ Church, Carpenters' Company of Philadelphia, and Independence Hall Association, and the parties hereto pledge themselves to consult on all matters of importance to the program.

(f)  That nothing herein contained shall be held to deprive the Commonwealth of Pennsylvania or the City of Philadelphia of its civil and criminal jurisdiction in and over the said grounds and buildings.

(g)  That wherever in this agreement the Secretary is referred to, the term shall include his duly authorized representative or representatives.

(h) No member of or delegate to Congress or resident comis-

ADD80

sioner shall be admitted to any share or part of this agreement or to any benefit that may arise therefrom, but this restriction shall not be construed to extend to this agreement if made with a corporation or company for its general benefit.

(i) Upon the execution of this agreement, the present agreement between the parties hereto, dated March 25, 1943, providing for the designation of the Independence Hall Group as a national historic site, shall be terminated: Provided that the designation shall remain in effect until the establishment of the Independence National Historical Park.

(j) This agreement shall become effective upon its execution, but occupation, operation, and maintenance by the Secretary in accordance with Article II shall begin on July 1, 1950, or as soon thereafter as practicable. It shall continue in effect until such time as Congress enacts legislation inconsistent with its continuance or expressly providing for its termination.

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals (in quintuple) the day, month, and year aforesaid.

UNITED STATES OF AMERICA

By /s/ Oscar L. Chapman
Secretary of the Interior

CITY OF PHILADELPHIA

By /s/ Bernard Samuel
Mayor

CITY OF WASHINGTON ) 
 ) ss
DISTRICT OF COLUMBIA )

I hereby certify that on this 14th day of July, 1950, before me, the subscriber, a Notary Public in and for the District of Columbia, personally appeared Oscar L. Chapman, to me known and who by me duly sworn, did depose and say that he is the Secretary of the Interior of the United States of America, named as the party of the first part in the attached agreement; that he knows the seal of the Department of the Interior of the United States of America and that the seal affixed to said instrument is the official seal of the Department of the Interior and was affixed thereto by his order; that said instrument was signed and sealed on behalf of the United States of America by virtue of the authority contained in the act of June 28, 1948 (62 Stat. 1061), and that he acknowledged the said instrument to be the act and deed of the United States of America for the purpose therein expressed.

/s/ Lorin A. Davis
Notary Public

SEAL

My Commission expires:

Nov. 14, 1951.

ADD82



COMMONWEALTH OF PENNSYLVANIA        )
                                    :        ss:
CITY AND COUNTY OF PHILADELPHIA     )

BE IT REMEMBERED, That on this            day of            A.D.
1950, before me, the subscriber, a notary public in and for the Common-
wealth of Pennsylvania, residing in the City of Philadelphia, personally
appeared Bernard Samuel, personally known to me and to me known to be
the Mayor of the City of Philadelphia, who being duly sworn according to
law, deposes and says that he resides in the City of Philadelphia and is
the Mayor of the said City; that he affixed the seal of the said City of
Philadelphia hereto; that the seal so affixed hereto is the common or
corporate seal of the said City of Philadelphia; that the said agreement
was duly sealed and delivered by him as and for the act and deed of the
City of Philadelphia for the uses and purposes therein set forth; that
the said agreement was executed by him and the seal of the City of
Philadelphia affixed thereto under and by the authority of the ordinance
of Council approved on the 6th day of July A.D. 1949; that he signed his
name thereto by the same authority, and that the name of this deponent
subscribed to the said agreement as Mayor of the said City of Phila-
delphia in attestation of the due execution thereof is in deponent's
own proper handwriting.

/s/ Bernard Samuel
BERNARD SAMUEL

Sworn and subscribed before me the day and year aforesaid.
Witness my hand and notarial seal.

/s/ John W. Summers
Notary Public

Notary Public
My Commission Expires April 23rd, 1953

ADD83

# Clerk's Office, City Council

ROOM No. 492, CITY HALL

Philadelphia, *Mar 24,* 1950.

*This is to certify that the following is a true and correct copy of the original Ordinance passed by City Council and approved by the Mayor on the ......24 th...... day of ...Mar.............., 1950.*

## AN ORDINANCE

To authorize the making of an agreement with the United States of America to establish Independence National Historical Park and to transfer custody of the buildings therein to the National Park Service.

SECTION 1.   *The Council of the City of Philadelphia ordains,* That the Mayor is hereby authorized to enter into and execute and deliver on behalf of the City of Philadelphia, an agreement with the United States of America, to establish Independence National Historical Park and to transfer custody of the buildings therein to the National Park Service, in form as follows:

THIS AGREEMENT, made and entered into this day of         , 1950, by and between the United States of America, acting in this behalf by Oscar L. Chapman. Secretary of the Interior, hereinafter referred to as the "Secretary," party of the first part, and the City of Philadelphia, Commonwealth of Pennsylvania, hereinafter referred to as the "City," party of the second part.

WITNESSETH:

WHEREAS, The Independence Hall group of historic structures comprising Independence Hall, Congress Hall, Old City Hall, and associated historic objects, located in Independence Square in the City of Philadelphia, Commonwealth of Pennsylvania, are recognized as possessing national significance as associated with, or the scene of, the adoption of the Declaration of Independence by the Continental Congress, the meeting place of that Congress, and seat of Government of the United States during the Revolution and during the period 1790-1800, as well as the meeting place of the Constitutional Convention of 1787; and

ADD84

WHEREAS. The Act of Congress approved June 28, 1948 (62 Stat. 1061) has provided for the establishment of the Independence National Historical Park for the purpose of preserving for the benefit of the American people the above-named and other nationally important historic lands and structures in Philadelphia, Pennsylvania, associated with the American Revolution and the founding and growth of the United States; and

WHEREAS, The Council of the City of Philadelphia by ordinance approved the      day of        , 1950, has authorized the Mayor to execute and deliver this agreement on behalf of the City; and

WHEREAS, The Secretary in all matters hereinafter referred to will act through the National Park Service or such other body as may be legally substituted therefor; and

WHEREAS, It is the desire of the City to bring about the preservation of the said historic structures, objects and grounds in Independence Square as a national historical park that they may be devoted to public use and to the perpetuation of the greatest traditions of the United States of America; and

WHEREAS, It is the desire of the Secretary to co-operate with the City in preserving the integrity of the above-mentioned historic structures, objects, and area, and to interpret them to the American people as a great national heritage:

NOW, THEREFORE, in consideration of the foregoing and pursuant to the authority contained in the Act of Congress approved August 21, 1935 (49 Stat. 666), entitled "An Act to provide for the preservation of historic American buildings, objects and antiquities of national significance, and for other purposes." and the Act of Congress approved June 28, 1948 (62 Stat. 1061), entitled "An Act to provide for the establishment of the Independence National Historical Park, and for other purposes," the said parties have covenanted and agreed, and by these presents do covenant and agree to and with each other and in consideration of the mutual promises herein expressed, as follows:

ARTICLE I    The City will retain ownership of the Independence Hall group of structures and of the land whereon they are erected, and the park area adjacent thereto known as Independence Square, but hereby agrees:

(a) To permit the Secretary to occupy them exclusively, except as otherwise provided herein, during the term of this agreement for the purpose of preserving, exhibiting, and interpreting them to the American people and otherwise utilizing them and their adjacent grounds for national historical park purposes.

ADD85

(b) To permit the Secretary to have curatorial responsibility for the care and display of such museum objects, furnishings, or exhibits of historic interest as may be available in the Independence Hall group of buildings for exhibit and interpretive purposes, including the right to rearrange furniture and exhibits and to determine accession policy for items to be utilized in the museum or interpretive program.

(c) To supply customary municipal services, including police and fire protection, and water and sewer facilities without charge therefor.

ARTICLE II.   The Secretary hereby agrees, on behalf of the United States:

(a) That he will occupy the grounds and buildings for the purposes set forth in Article I of this agreement and for no other purposes, and that he will not sublet or assign to another person or organization any part of the grounds or buildings without prior approval in writing by the City; that he will (as funds become available through appropriations by the Congress) operate and maintain the grounds and buildings and make all repairs thereto; remedy all defects in the buildings or their equipment which may arise from any cause whatsoever, including ordinary wear and tear; and undertake such work of restoration or major alteration as may be mutually agreed upon under the provisions of Article III (c).

The Secretary may apply such reasonable rules and regulations therein as may be necessary properly to perform his functions.

(b) That he will exercise reasonable care to prevent damage to, or destruction of, any part of the grounds and buildings or their appurtenances.

(c) That he will provide public access to the museum room of the buildings at all reasonable times, and will provide the services of a competent person, or per to furnish information to the visiting public.

ARTICLE III,   It is mutually understood and agreed:

(a) That nothing herein contained shall be construed as binding the Secretary to expend in any one fiscal year any sum in excess of appropriations made by Congress for that fiscal year, or to involve the United States in any contract or other obligation for the future expenditure of money in excess of such appropriations.

(b) That it is desirable to maintain, insofar as practicable, the existing personnel of the City of Philadelphia which has for many years exhibited and interpreted the Independence Hall group of structures and has acquired an intimate knowledge of the history of the buildings as well as visitor reactions to them; that toward this end the Secretary and the City will seek such legislation, ordinances, or other authority necessary to facilitate the continued employment of this experienced staff without serious loss of retirement benefits to the individuals concerned.

In order to effectuate this objective when the necessary authority shall have been obtained:

(1) The Secretary will employ such members of the present staff as are then below the age provided for automatic separation under the Federal Civil Service Retirement Act, and who have paid into the Municipal Pension Fund less than ten years or more than fifteen years.

(2) Those members of the present staff who are then above the age provided for automatic separation under the Federal Civil Service Retirement Act and who have paid into the Municipal Pension Fund less than ten years or more than fifteen years shall be retired.

(3) Those members of the present staff who have paid into the Municipal Pension Fund not less than ten years and not more than fifteen years shall continue to be employed by the City until they shall have severally completed fifteen years employment. As each arrives at such point, he shall be retired if beyond the age provided for automatic separation under the Federal Civil Service Act, but otherwise he shall be employed by the Secretary: *Provided*, That during the period of employment by the City, the City will place these employees at the disposal of the Secretary, who will reimburse the City for their salaries: *Provided further*, That nothing herein contained shall obligate the City or the Secretary to retain the services of an incompetent or unfaithful employee. Any future replacements of, or additions to, the existing personnel will be made by the employment of persons directly by the Secretary and at his option.

(c) Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon.

(d) That neither of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the buildings or grounds without the written consent of the other. This section shall not be construed as prohibiting the placing of signs within the buildings for the information and direction of the public. The design and location of any signs upon the exterior of the buildings to indicate that they are occupied and operated by the National Park Service acting in co-operation with the City, shall be subject to the approval of the City.

(e) That it is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States, and to secure this result a high degree of co-operation is

431—3

necessary with each other and with other bodies participating in the project, to wit: the Commonwealth of Pennsylvania, Christ Church, Carpenters' Company of Philadelphia, and Independence Hall Association, and the parties hereto pledge themselves to consult on all matters of importance to the program.

(f) That nothing herein contained shall be held to deprive the Commonwealth of Pennsylvania or the City of Philadelphia of its civil and criminal jurisdiction in and over the said grounds and buildings.

(g) That wherever in this agreement the Secretary is referred to, the term shall include his duly authorized representative or representatives.

(h) No member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this agreement or to any benefit that may arise therefrom, but this restriction shall not be construed to extend to this agreement if made with a corporation or company for its general benefit.

(i) Upon the execution of this agreement, the present agreement between the parties hereto, dated March 25, 1943, providing for the designation of the Independence Hall Group as a national historic site, shall be terminated: *Provided*, That the designation shall remain in effect until the establishment of the Independence National Historical Park.

(j) This agreement shall become effective upon its execution, but occupation, operation, and maintenance by the Secretary in accordance with Article II shall begin on July 1, 1950, or as soon thereafter as practicable. It shall continue in effect until such time as Congress enacts legislation inconsistent with its continuance or expressly providing for its termination.

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals (in quintuple) the day, month, and year aforesaid.

> UNITED STATES OF AMERICA,
>
> By ....................................
> *Secretary of the Interior.*
>
> CITY OF PHILADELPHIA,
>
> By ....................................
> *Mayor.*

SECT. 2. The Mayor is hereby authorized to fill in all blanks in the form of agreement herein provided for and, when executed, to acknowledge the same and cause same to be duly recorded.

431—4

*Attest:*

*William W. Felton*

*Clerk of City Council.*

Contract No. 07-6001

# COOPERATIVE AGREEMENT BETWEEN

# THE CITY OF PHILADELPHIA

# AND

# THE NATIONAL PARK SERVICE

## FOR THE PRESIDENT'S HOUSE PROJECT AND ARCHEOLOGICAL RESEARCH DIG

September 1,     This COOPERATIVE AGREEMENT (the **"Agreement"**) is made as of this ___ ~~day of~~ 2006 (the **"Commencement Date"**), by and between **THE CITY OF PHILADELPHIA** (the **"City"**), acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA,** acting through the National Park Service of the United States Department of the Interior (the **"NPS"**).

## <u>BACKGROUND</u>

**A.**     On May 24, 1950, the City Council of Philadelphia approved an ordinance authorizing the City to enter into an agreement with the United States of America, by and through the Secretary of the Interior, to establish Independence National Historical Park and to transfer custody of the Independence Hall group of historic structures owned by the City and comprised of Independence Hall, Congress Hall, Old City Hall, and associated historic objects including the Liberty Bell, located in Independence Square in the City, to NPS.

**B.** On July 14, 1950, the City and the Secretary of the Interior entered into an agreement whereby the City authorized the Secretary to occupy the structures exclusively, except as otherwise provided in the July 14, 1950 Agreement, for the purpose of preserving, exhibiting and interpreting the structures and the historic objects to the public and utilizing them and the adjacent grounds for national historic park purposes. A copy of the Agreement dated July 14, 1950, is attached hereto and marked as Exhibit "A".

**C.**     The July 14, 1950 Agreement provides that the purpose of the parties is to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Park and in order to assist in the long term preservation and enhanced interpretation of the Independence National Historical Park and the Liberty Bell (collectively the **"Park"**), the City and NPS have engaged in a variety of cooperative activities including the design and construction of the Liberty Bell Center and related improvements to the Park.

**D.**     The Park (including Independence Hall, classified as a World Heritage Site in 1978) is an international treasure and icon that attracts visitors to Philadelphia from all over the

ADD89

world and the profile generated by the Park plays a major role in the awareness and economic vitality of the region.

     **E.**    In accordance with the Intergovernmental Cooperation Act, 31 U.S.C. §§ 6501-6508, the City of Philadelphia and the National Park Service desire to establish an exhibit at the Park that illuminates the history of the site of the former President's House, located directly north of the Liberty Bell Center, (where Presidents George Washington and John Adams lived and where at least nine enslaved Africans – kept by George Washington- also lived) and its symbolic importance to the founding of the United States (the **"President's House Exhibit"**). The President's House Exhibit, upon completion will be a part of the Liberty Bell Center.

     **F.**    The City and NPS intend to work together to complete the following: i) select a team of artists, designers, historians and other professionals (the **"Exhibit Team"**) to design, fabricate and install the President's House Exhibit; and, ii) construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the **"East West Walkway"**) (collectively referred to herein as the **"Project"**) and have agreed that the City will fund the Project to the extent set forth in this Agreement and contract for the President's House Exhibit. The City and NPS acknowledge that final Project designs are subject to the approval of the Superintendent of the Park and the Mayor of the City of Philadelphia, or their designees.

     **G.**    The City has committed One Million Five Hundred Thousand ($1,500,000.00) dollars in capital funding to support the Project (the **"City Funding"**) and One Hundred Forty-Three Thousand Dollars will be transferred to NPS for the East West Walkway.

     **H.**    Prior to installation of the President's House Exhibit, the City and NPS desire to conduct an archeological research excavation (the **"Research Dig"**) at the foot of the Liberty Bell Center at the Presidents' House site within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the Premises for installation of the President's House Exhibit and to determine if any archeological artifacts or features remain from the era in which Presidents Washington and Adams occupied the house and the City and NPS are committed to cooperate in the funding and selection of a qualified professional to conduct such Research Dig in accordance with this Agreement and applicable NPS policy and federal regulations including all applicable federal legislative mandates and agency policy concerning the protection and treatment of cultural resources.

     **I.**    To the extent necessary, the City shall provide funding in addition to the City Funding for the Research Dig and the NPS shall use such funding to conduct the Research Dig in accordance with Section 7 and Exhibit "C".

     **J.**    Any operation of the NPS, with either appropriated or donated funds, must preserve and protect the Park's resources for future generations, consistent with federal law and regulations, 16 U.S.C. §§ 1-3, 407m-8, 407n-407s.

ADD90

K.    Providing funds for the Project and Research Dig fulfills the public purpose requirement because it enables the City to commemorate the symbolic and historical importance of the Presidents' House for the City of Philadelphia, its citizens and all Americans nationwide, and by doing so, there is a public benefit inuring to the City.

**NOW, THEREFORE,** in consideration of the mutual promises contained in this Agreement, and intending to be legally bound by this Agreement, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16, U.S.C. 407(m) et seq., 16 U.S.C. 461, et seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

1.    **Background.**

The Background is incorporated into the Agreement as though fully set forth herein.

2.    **Ownership of Exhibit.**

Upon completion of the Exhibit in accordance with this Agreement, ownership of the Exhibit shall transfer to the NPS. NPS ownership of the Exhibit shall survive any termination of this Agreement. Ownership of the sidewalk and surrounding areas of the Exhibit shall remain with the current property holder.

3.    **Cooperation between NPS and the City.**

a.    The City and NPS shall cooperate in the planning, development and preparation of the design, fabrication and installation of the Exhibit including, but not limited to; (i) the selection of community leaders to assist City and NPS in the Exhibit, (ii) the selection of the Exhibit Team, and (iii) the preparation of completed design, fabrication and installation specifications and budgets, (iv) funding and selection of an archeological firm to conduct the Research Dig, and (v) funding of the East West Walkway. The City and NPS shall be in mutual agreement before issuing any RFP or other solicitation for consultants or design services under this Agreement.

b.    The City shall contract for, fund and pay the costs of the design, fabrication and installation for the Exhibit and provide funding for the East West Walkway except that the City's obligations under this Agreement with respect to the Project shall not exceed, in the aggregate, the City Funding. The City shall provide in any contract it enters into under this provision that the contracting party name the United States of America as an additional insured on any insurance policy and to the extent the City is provided an indemnity by a contracting party then the City shall take all reasonable steps to require that the contracting party extend to the United States of America such indemnity.

4.    **Management & Maintenance of the President's House Exhibit.**

a.    NPS agrees that it shall undertake all responsibility to manage, occupy, utilize, operate, repair, maintain, interpret and administer the Exhibit, which shall become property of the NPS in accordance with this Agreement and part of the Liberty Bell Center, in accord with current NPS policies and guidelines.

b.    The City, with cooperation of NPS will look for opportunities to utilize the President's House Exhibit for educational purposes.

5.    **Term.**

The initial term of this Agreement shall be for one year beginning upon the date of this Agreement set forth above (**"Initial Term"**).  The City may, at its sole option, amend the contract to add, on an annual basis, up to three (3) successive one-year terms (the **"Additional Term(s)"**).  Unless otherwise stated in any amendment to this Agreement, the same terms and conditions applicable in the Initial Term shall be applicable in the Additional Term(s).  The City shall give the NPS thirty (30) days written notice of its intent to amend the Agreement to add an Additional Term prior to each annual Additional Term.

6.    **Project Funding.**

The City has committed to making the City Funding available for the Project subject to all limitations on the allowability of cost items imposed by the City of Philadelphia Contract Cost Principles and Guidelines.

7.    **Research Dig and East West Walkway Cooperation and Funding.**

a.    Funding:

(i) Research Dig Funding:  The City shall transfer to NPS an initial Six Hundred Seventy-Four Thousand Nine Hundred and Ninety-Three Dollars and Fifty-Seven Cents ($674,993.57) to be used exclusively for the Research Dig (the **"Initial Research Dig Funding"**).  Upon written request and proper documentation provided to the City from NPS, the City shall make an additional Sixty-Seven Thousand Four Hundred Ninety-Nine Dollars ($67,499.00) available to NPS for the Research Dig (the **"Additional Research Funding"**).  The Initial and Additional Research Dig Funding shall be collectively referred to herein as the **"Research Dig Funding"**.  Such Research Dig Funding shall not exceed Seven Hundred Forty-Two Thousand Four Hundred Ninety-Two Dollars and Fifty-Seven Cents ($742,492.57).

(ii) East West Walkway Funding:  Upon written request and proper documentation provided to the City by NPS, the City shall transfer to NPS up to One Hundred Forty-Three Thousand Dollars ($143,000.00) (the **"East West Walkway Funding"**) for the

ADD92

East West Walkway of the Liberty Bell Center.

        (iii) The City shall transfer the Initial Research Dig Funding and East West Walkway Funding to NPS each in separate one lump sums and NPS shall maintain the Initial Research Dig Funding and East West Walkway funding in separate accounts and shall only disburse funds from said accounts in accordance with the terms hereof. The Additional Research Funding, if transferred to NPS, shall be maintained in the Initial Research Dig Funding account.

    b.    NPS shall conduct the Research Dig in accordance with the plans and specifications set forth in Exhibit "C" and this Section 7. NPS recognizes the City's expectation to be apprised of all phases of the Research Dig, and the NPS and City acknowledge that the following elements of the Research Dig will require review, comment and mutual agreement by NPS and the City: (i) the archeological firm selected for the Research Dig and their subcontractors; and (ii) the archeologist(s) conducting the Research Dig. Further, NPS shall provide the following to the City for review and comment: (i) descriptions, inventories, and analytic reports concerning any artifacts of historical significance discovered as a result of the Research Dig as such products become available during the course of the project; (ii) draft and final reports, and all other documents resulting from the Research Dig. In the event of a disagreement between the parties concerning the Project, the City and NPS agree to meet and resolve the disagreement between the parties.

    c.    NPS shall use reasonable efforts to commence the excavation phase of the Research Dig within ninety (90) days of receipt of the Research Dig Funding and diligently pursue substantial completion of the excavation phase of the Research Dig within one hundred sixty (160) days of receipt of the Research Dig Funding (unless otherwise agreed to by the City). The excavation phase of the Research Dig shall be deemed completed upon the last date that NPS has furnished the following to City: (i) a written statement from the lead archeologist monitoring the Research Dig that the excavation phase of the Research Dig has been completed in accordance with the plans approved by the City and in compliance with Applicable Laws; and (ii) a written statement from NPS's archeologist certifying that the excavation phase has been completed substantially in accordance with the plans.

    d.    The City and NPS acknowledge that NPS will enter into various contracts for the Research Dig and East West Walkway, and said contracts will obligate NPS to pay sums to third parties. NPS shall provide to the City a copy of each such fully executed contract related to the Research Dig and East West Walkway. NPS and the City acknowledge and agree that the City's obligation to allocate, transfer, or make disbursements shall be limited to the Research Dig Funding and East West Walkway Funding, and NPS shall disburse such funding in strict accordance with the following terms, conditions and procedures:

ADD93

(i)  In accordance with NPS payment procedures, NPS shall provide to the City each request for payment (**"Payment Request"**) made to NPS together with all bills, invoices, and/or other documents explaining the services or materials supplied for the Research Dig and East West Walkway and their costs, and such other supporting documents as the City may reasonably request from time to time, and NPS shall not make any payments which exceed the amounts of such bills, invoices and supporting documents;

(ii)  All bills, invoices, or other documents submitted with a Payment Request must be accompanied with a certification signed by the project managers of the Research Dig and East West Walkway stating: (a) the services and materials described in the bill, invoice, or document were satisfactorily received by NPS; (b) the listed price of such services and materials is accurate; and (c) the bill, invoice, or document is accurate and true in all other respects; and

(iii)  No Payment Request may exceed the total dollar amount of all bills, invoices and other supporting documents submitted to the City.  Upon completion of the Research Dig and East West Walkway, NPS shall provide access to the City and the Office of the Controller of the City of Philadelphia ("Office of the Controller") to inspect the work performed and to perform a final audit with respect to the Research Dig Funding and East West Walkway Funding.

e.  NPS shall not use the Research Dig or East West Walkway Funding in any way other than for payment of costs and expenses associated with the Research Dig and East West Walkway that are approved by the City, except insofar as the line item expenditures may be modified by mutual written agreement of the parties. NPS shall use the Research Dig and East West Walkway Funding in conformance with the City's Capital Eligibility Policy, in effect upon execution of this Agreement, a copy of which is attached as Exhibit B and is made a part hereto. The provisions of Exhibit B require the written approval of the City of Philadelphia Capital Program Office for the use and prior to the obligation of City capital funds for expenditures not clearly eligible according to the criteria of the City's Capital Eligibility Guidelines. Execution of this Agreement by the City shall constitute such written approval for the Research Dig and East West Walkway.

f.  The City and NPS understand and agree that the Research Dig Funding is solely available for the Research Dig, and any modifications to the scope of the Research Dig may be made only after obtaining written approvals from the City.

g.  Promptly following the substantial completion of the Research Dig or expiration or termination of this Agreement, NPS shall promptly return to City any Research Dig Funding not actually spent by NPS on the Research Dig.

h.  The City and NPS understand and agree that the East West Walkway Funding is solely available for the East West Walkway, and any modifications to the scope of

ADD94

the East West Walkway may be made only after obtaining written approvals from the City.

i.      Promptly following the substantial completion of the East West Walkway or expiration or termination of this Agreement, NPS shall promptly return to City any East West Walkway Funding not actually spent by NPS on the East West Walkway.

## 8.   Review and/or Concurrence of Plans.

The City's review, concurrence, and/or acceptance of any plans and specifications shall not constitute any representation, warranty or guaranty by City as to the substance or quality of the documents, or other matter or work reviewed, approved or accepted with respect to the Project or Research Dig. No person or firm should rely in any way on such approval, and at all times, NPS, its agents, contractors and subcontractors, must use their own independent judgment as to the accuracy and quality of all such documents and other matters.

## 9.   Research Dig Records and Reports.

a.      Maintenance of Records. NPS shall keep full, complete, and accurate books of account and other records in accordance with generally accepted accounting principles and promptly make them available for inspection and audit by the City or its designee, within the City of Philadelphia upon the City's request. Without limiting this Section 9, NPS shall keep detailed accounts of all its expenditures on the Research Dig, including but not limited to itemization of all costs related to the Project.

b.      Inspection by City. The City or its duly authorized representative shall have the right at all reasonable times and places to inspect and audit the NPS' books of account and other records maintained as required by this Agreement.

c.      Annual Account, Reports. NPS shall submit to the City, within 60 days after the completion of the Research Dig in accordance with this Agreement, a report which includes a description of the activities undertaken by NPS on, or with respect to, the Research Dig. In addition, NPS shall promptly submit to the City written reports regarding the activity and progress of the Research Dig. NPS shall submit minutes of regular progress meetings conducted during the design and construction phases of the Research Dig to the City to satisfy this reporting requirement.

## 10.  Assignment; Third Party Beneficiaries.

a.  Assignment.  NPS may not assign any of its rights or delegate any of its responsibilities under this Agreement to any entity without the express written consent of the City.

b.  Third Party Beneficiaries. In no event shall anything in this Agreement confer upon any other person or entity third party beneficiary rights against the City.

ADD95

11.     **Default; Remedies.**

    a.     NPS shall be in default of this Agreement if it shall:

       (i) fail to comply with any of the terms and conditions of this Agreement, including but not limited to utilizing the Research Dig Funding solely as required and set forth in this Agreement. If such failure continues for twenty (20) days after written notice thereof to NPS, provided, however, that if the nature of the default is such that the same cannot reasonably be cured within such twenty (20) day period, NPS shall not be deemed to be in default if NPS shall within such period commence such cure and thereafter diligently prosecutes the same to completion, but in no event for longer than forty-five (45) days after written notice to NPS; or

       (ii) vacate or abandon the Research Dig prior to its completion.

    b.     Upon the occurrence of any event of default set forth in this Section or elsewhere in this Agreement, the City may take all or any of the following actions:

       (i) immediately declare this Agreement terminated;

       (ii) suspend all allocations, disbursements and payments of the Research Dig Funding to NPS; and/or

       (iii) exercise any and all other remedies available at law, equity, and/or under this Agreement.

    c.     Within ten (10) days of the termination or cancellation of this Agreement by the City for any reason, NPS shall remit to the City a complete accounting of all Research Dig Funding monies received pursuant to this Agreement by NPS, and NPS will return to City all Research Dig Funding which has not been actually spent on or invoiced for the Research Dig. Final statements for payment must be submitted within sixty (60) days of termination.

    d.     No failure by the City to insist upon the strict performance of any term, covenant, agreement, provision, condition or limitation of this Agreement or to exercise any right or remedy consequent upon a breach of this Agreement, and no acceptance by the City of full or partial performance during the continuance of any such breach, shall constitute a waiver of any such breach or of such term, covenant, agreement, provision, condition or limitation. No breach may be waived except by a written instrument signed by the City. This Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach of this Agreement notwithstanding any waiver or a breach by the City.

12.    **Indemnification.**

a.    NPS shall cause its contractors, subcontractors, invitees or consultants to indemnify and hold harmless the City, and its officers, directors, employees and agents from and against any and all losses, claims, actions, damages, costs, expenses (including but not limited to court costs and attorney's fees), liabilities, and judgments, including but not limited to those in connection with loss of life, bodily injury, personal injury, or damage to property including but not limited to the Research Dig, directly or indirectly related to this Agreement, including without limitation the violation of any Applicable Law (defined below in Section 16), and/or occasioned wholly or in part by the negligence or fault of NPS's agents, contractors, subcontractors, invitees or consultants, relating to or arising from the Research Dig, and/or this Agreement. NPS contractors, subcontractors, invitees or consultants shall not be required to indemnify or hold harmless the City, its officers, directors, employees or agents from any claim resulting solely and exclusively from the independent negligent acts or omissions of the City, its officers, directors, employees or agents acting within the scope of their official duties.

b.    If any action or proceeding is brought against City by reason of any such claim, NPS shall cause its contractors, subcontractors, invitees or consultants, upon written notice from the City, at their sole cost and expense, including without limitation attorneys' fees and court costs, resist or defend such action or proceeding by counsel approved by the City in writing. No approval of counsel shall be required where the claim is resisted or defended by counsel of an insurance carrier obligated to resist or defend such claim.

c.    The indemnification obligations set forth in this Section 11 and the release by NPS set forth below in Section 12 survive the termination or expiration of this Agreement. These indemnification obligations and the release indemnification shall not be limited, reduced or modified by the types or amounts of insurance required by this Agreement.

13.    **Research Dig Release.**

a.    Except to the extent set forth herein, NPS shall release City, its officers, officials, employees, and agents from any and all claims, actions, damages, losses, costs, expenses, or liabilities of every kind which NPS may have at any time arising in connection with the Research Dig.

b.    The City shall have no liability arising in connection to the Research Dig to NPS or any one claiming through or under NPS, except for the negligent acts of the City or for the City's failure to transfer or disburse Research Dig Funding to NPS.

14.    **Insurance & Bonds.**

a.    During the Research Dig, NPS shall cause its contractors and suppliers to maintain in full force the types and minimum limits of insurance specified below. All

ADD97

insurance shall be obtained from reputable insurers authorized to do business in the Commonwealth of Pennsylvania and, except for professional liability insurance, shall be written on an "occurrence" basis and not a "claims made" basis. No work shall be performed pursuant to this Agreement until the required evidence of insurance has been furnished. The insurance company(ies) shall provide, by United States registered or certified mail, return receipt requested, postage paid, at least thirty (30) days prior written notice to the City in the event coverage is materially changed, canceled, or non-renewed. Certificates of insurance evidencing the required coverage shall be submitted to the Capital Program Director (1515 Arch Street, 11th Floor, Philadelphia, PA 19102) and the City's Risk Manager (1515 Arch Street, 14th Floor, Philadelphia, Pennsylvania 19102) upon execution of any of the contracts relating to the Research Dig. The City reserves the right to require NPS to furnish certified copies of the original policies of all insurance required under this Agreement at any time upon ten (10) days prior written notice to NPS. The City shall be named as additional insured on all the insurance policies required by this Agreement except the Workers Compensation and Employers Liability.

    (i)    <u>Workers Compensation And Employers Liability</u>

        (1)    Workers Compensation Statutory limits.
        (2)    Employer's Liability:
                (i)    One hundred thousand dollars ($100,000.00)
                (ii)   One hundred thousand dollars ($100,000.00) each employee - bodily injury by disease.
                (iii)  Five hundred thousand dollars ($500,000.00) policy limit - bodily injury by disease.

    (ii)   <u>Comprehensive General Liability Insurance</u>

        (1)    Limit of Liability - One Million Dollars ($1,000,000.00) per occurrence combined single limit for bodily injury (including death) and property damage liability.

        (2) Coverage: Premises operations; blanket contractual liability; personal injury liability (employee exclusion deleted); products and completed operations; independent contractors; employees as additional insureds; cross liability; broad form property damage (including loss of use) liability; and explosion, collapse, and underground hazards, care custody and control exemption excluded.

    (iii)   <u>Automobile Liability</u>

        (1) Limit of Liability - One Million Dollars ($1,000,000.00) per

occurrence combined single limit for bodily injury (including death) and property damage liability.

(iv)    <u>Umbrella Liability</u>

(1) Limit of liability: Minimum limits of Five Million Dollars ($5,000,000.00) per occurrence combined single limit for bodily injury (including death) and property damage liability in excess of subsections (ii) comprehensive general liability and (iii) automobile liability to bring total limit of liability to Six Million Dollars ($6,000,000.00).

(v)    <u>Professional Liability Insurance for Architectural and Engineering Services</u>

(1)    Limit of Liability: Two Million ($2,000,000) with a deductible not to exceed Fifty Thousand Dollars ($50,000).

(2)    Coverage: Errors and omissions including liability assumed under contract.

(3)    Coverage for occurrences happening during the performance of the services required under this Agreement shall be maintained in full force and effect under the policy or "tail" coverage for a period of at least two (2) years after completion of the services.

(4)    This insurance shall be obtained and maintained by the architects and engineers only, and each shall so obtain and maintain such insurance for the amount of its contract.

(vi)    <u>Builders Risk Insurance</u>

(1)    During the period of the Project, NPS shall require its contractor to maintain "all risk" builder's risk insurance in an amount equal to the anticipated completion value of the Project under construction or the amount of each contractor's or subcontractor's contract. The coverage will be required to remain in full force and effect during the construction of the Project.

b.    Performance and Payment Bonds. In addition to the insurance requirements as provided in this Section, NPS shall require its contractor(s) to maintain individual and corporate performance and payment bonds commensurate with the value of the work to be completed prior to the commencement of construction and value of all wages for labor and services and all bills for materials, supplies and equipment used in the performance of any such construction contract.

ADD99

c. The requirements of this Section 14 may be modified at the discretion of NPS and the City.

15.  **Binding on Successors.**

The terms, covenants and conditions contained in this Agreement shall extend to and be binding upon the parties hereto and their respective successors and assigns.

16.  **Governing Law: Waiver of Jury Trial.**

a.      This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania and the United States of America.

b.      City and NPS mutually waive the right to a jury trial in any action under this Agreement.

17.  **Compliance with Applicable Law.**

Throughout the term of this Agreement, NPS will observe and comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, courts, departments, commissions, boards or any other body exercising functions similar to those of any of the foregoing (the "Applicable Law"), which may be applicable to NPS, the National Park System, the Project, or the Agreement.

18.  **Anti-Deficiency Act.**

This Agreement and the obligations of the NPS hereunder shall be subject to the availability of funding, and nothing contained herein shall be construed as binding the NPS to expend in any one fiscal year any sum in excess of appropriations made by Congress or administratively allocated for the purpose of this Agreement for the fiscal year, or to involve NPS in any contract or other obligation for the further expenditure of money in excess of such appropriations or allocations.

19.  **Notices.**

All notices, requests, and other communications under this Agreement shall be in writing and shall be sent by United States registered or certified mail, return receipt requested, postage prepaid, or by overnight or hand delivery service with receipt requested, or by facsimile followed by hard copy forwarded as aforesaid and addressed as follows:

If addressed to the City:

> Office of the Mayor
> City Hall
> Philadelphia, PA 19102
> Attention: Chief of Staff

with copies to:

> City Solicitor
> City of Philadelphia
> 1515 Arch Street, 17th Floor
> Philadelphia, Pa 19102
> Attention: Divisional Deputy - Real Estate and Economic Development Notices for Construction Related Matters

and

> Capital Program Office
> City of Philadelphia
> 1515 Arch Street, 11th Floor
> Philadelphia, PA 19102
> Attention: Richard Tustin, Director

If addressed to NPS:

> Superintendent of National Park Services
> 313 Walnut Street
> Philadelphia, PA 19106

Or such other individual and/or address as the party to receive notice may from time to time designate by written notice to the other party in the manner above described.

**20.    Entire Agreement.**

This Agreement represents the entire agreement between the parties regarding the Project and Research Dig. Nothing contained herein shall be interpreted as amending or modifying the terms and conditions of the Agreement dated July 14, 1950, between the City and the Secretary of the Interior. This Agreement may be amended only by a written instrument mutually agreed upon and signed by the City and NPS.

**21.    Nondiscrimination.**

The City and NPS agree that neither party shall discriminate, nor permit discrimination, against any person because of race, color, religion, national origin or sex.  In the event of such discrimination, this agreement may be terminated by the non discriminating party forthwith.

{SIGNATURE PAGE ON FOLLOWING PAGE.}

ADD101

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this Agreement, the City and NPS have caused this Agreement to be executed by their duly authorized officers, under seal, as of the date first written above.

APPROVED AS TO FORM
Romulo L. Diaz, Jr.

Per: _____
Assistant City Solicitor

**THE CITY OF PHILADELPHIA:**
**THE OFFICE OF THE MAYOR**

By: _____
Joyce Wilkerson, Chief of Staff
Office of the Mayor

**CAPITAL PROGRAM OFFICE**

By _____
Richard Tustin, Director
Capital Program Office

**NATIONAL PARK SERVICE:**

By: _____
Dennis Reidenbach, Superintendent
Independence National Historical Park

# EXHIBIT "A"

## 1950 Agreement

THIS AGREEMENT, made and entered into this ___14th___ day
of ___July___, 1950, by and between the United States of America,
acting in this behalf by Oscar L. Chapman, Secretary of the Interior, —
hereinafter referred to as the "Secretary," party of the first part,
and the City of Philadelphia, Commonwealth of Pennsylvania, hereinafter
referred to as the "City," party of the second part.

WITNESSETH:

WHEREAS, the Independence Hall group of historic structures
comprising Independence Hall, Congress Hall, Old City Hall, and asso-
ciated historic objects, located in Independence Square in the City of
Philadelphia, Commonwealth of Pennsylvania, are recognized as possessing
national significance as associated with, or the scene of, the adoption
of the Declaration of Independence by the Continental Congress, the
meeting place of that Congress, and seat of Government of the United
States during the Revolution and during the period 1790-1800, as well
as the meeting place of the Constitutional Convention of 1787; and

WHEREAS, the act of Congress approved June 28, 1948 (62 Stat.
1061) has provided for the establishment of the Independence National
Historical Park for the purpose of preserving for the benefit of the
American people the above-named and other nationally important historic
lands and structures in Philadelphia, Pennsylvania, associated with the
American Revolution and the founding and growth of the United States;
and

WHEREAS, the Council of the City of Philadelphia by ordinance approved the 24th day of May 1950, has authorized the Mayor to execute and deliver this agreement on behalf of the City; and

WHEREAS, the Secretary in all matters hereinafter referred to will act through the National Park Service or such other body as may be legally substituted therefor: and

WHEREAS, it is the desire of the City to bring about the preservation of the said historic structures, objects, and grounds in Independence Square as a national historical park that they may be devoted to public use and to the perpetuation of the greatest traditions of the United States of America: and

WHEREAS, it is the desire of the Secretary to cooperate with the City in preserving the integrity of the above-mentioned historic structures, objects, and area, and to interpret them to the American people as a great national heritage:

NOW, THEREFORE, in consideration of the foregoing and pursuant to the authority contained in the act of Congress approved August 21, 1935 (49 Stat. 666), entitled "An Act to Provide for the Preservation of Historic American Buildings, Objects, and Antiquities of National Significance, and for Other Purposes," and the act of Congress approved June 28, 1948 (62 Stat. 1061), entitled "An Act to Provide for the Establishment of the Independence National Historical Park, and for Other Purposes," the said parties have convenanted and agreed, and by these presents do covenant and agree to and with each other and in consideration of the mutual promises herein expressed, as follows:

ARTICLE I. The City will retain ownership of the Independence Hall group of structures and of the land whereon they are erected, and the park area adjacent thereto known as Independence Square, but hereby agrees:

— — — (a) To permit the Secretary to occupy them exclusively, except as otherwise provided herein, during the term of this agreement for the purpose of preserving, exhibiting, and interpreting them to the American people and otherwise utilizing them and their adjacent grounds for national historical park purposes.

(b) To permit the Secretary to have curatorial responsibility for the care and display of such museum objects, furnishings, or exhibits of historic interest as may be available in the Independence Hall group of buildings for exhibit and interpretive purposes, including the right to rearrange furniture and exhibits and to determine accession policy for items to be utilized in the museum or interpretive program.

(c) To supply customary municipal services, including police and fire protection, and water and sewer facilities without charge therefor.

ARTICLE II. The Secretary hereby agrees, on behalf of the United States:

(a) That he will occupy the grounds and buildings for the purposes set forth in Article I of this agreement, and for no other purposes, and that he will not sublet or assign to another person or organization any part of the grounds or buildings without prior approval in writing by the City; that he will (as funds become available through appropriations by the Congress) operate and maintain the grounds and buildings and make all repairs thereto; remedy all defects in the buildings or their equipment which may arise from any cause whatsoever,

including ordinary wear and tear; and undertake such work of restoration or major alteration as may be mutually agreed upon under the provisions of Article III (c).

The Secretary may apply such reasonable rules and regulations therein as may be necessary properly to perform his functions.

(b) That he will exercise reasonable care to prevent damage to, or destruction of, any part of the grounds and buildings or their appurtenances.

(c) That he will provide public access to the museum room of the buildings at all reasonable times, and will provide the services of a competent person, or persons, to furnish information to the visiting public.

ARTICLE III. It is mutually understood and agreed:

(a) That nothing herein contained shall be construed as binding the Secretary to expend in any one fiscal year any sum in excess of appropriations made by Congress for that fiscal year, or to involve the United States in any contract or other obligation for the future expenditure of money in excess of such appropriations.

(b) That it is desirable to maintain, insofar as practicable, the existing personnel of the City of Philadelphia which has for many years exhibited and interpreted the Independence Hall group of structures and has acquired an intimate knowledge of the history of the buildings as well as visitor reactions to them; that toward this and the Secretary and the City will seek such legislation, ordinances, or other authority necessary to facilitate the continued employment of this experienced staff without serious loss of retirement benefits to the individuals concerned.

ADD107

In order to effectuate this objective when the necessary authority shall have been obtained:

(1)  The Secretary will employ such members of the present staff as are then below the age provided for automatic separation under the Federal Civil Service Retirement Act, and who have paid into the Municipal Pension Fund less than ten years or more than fifteen years.

(2)  Those members of the present staff who are then above the age provided for automatic separation under the Federal Civil Service Retirement Act and who have paid into the Municipal Pension Fund less than ten years or more than fifteen years shall be retired.

(3)  Those members of the present staff who have paid into the Municipal Pension Fund not less than ten years and not more than fifteen years shall continue to be employed by the City until they shall have severally completed fifteen years employment. As each arrives at such point, he shall be retired if beyond the age provided for automatic separation under the Federal Civil Service Act, but otherwise he shall be employed by the Secretary: Provided that during the period of employment by the City, the City will place these employees at the disposal of the Secretary, who will reimburse the City for their salaries: Provided, further, that nothing herein contained shall obligate the City or the Secretary to retain the services of an incompetent or unfaithful employee. Any future replacements of, or additions to, the existing personnel will be made by the employment of persons directly by the Secretary and at his option.

(c)  Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon.

ADD108

(d)  That neither of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the buildings or grounds without the written consent of the other.  This section shall not be construed as prohibiting the placing of signs within the buildings for the information and direction of the public.  The design and location of any signs upon the exterior of the buildings to indicate that they are occupied and operated by the National Park Service acting in cooperation with the City, shall be subject to the approval of the City.

(e)  That it is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States, and to secure this result a high degree of cooperation is necessary with each other and with other bodies participating in the project; to wit, the Commonwealth of Pennsylvania, Christ Church, Carpenters' Company of Philadelphia, and Independence Hall Association, and the parties hereto pledge themselves to consult on all matters of importance to the program.

(f)  That nothing herein contained shall be held to deprive the Commonwealth of Pennsylvania or the City of Philadelphia of its civil and criminal jurisdiction in and over the said grounds and buildings.

(g)  That wherever in this agreement the Secretary is referred to, the term shall include his duly authorized representative or representatives.

sioner shall be admitted to any share or part of this agreement or to any benefit that may arise therefrom, but this restriction shall not be construed to extend to this agreement if made with a corporation or company for its general benefit.

(i)  Upon the execution of this agreement, the present agreement between the parties hereto, dated March 25, 1943, providing for the designation of the Independence Hall Group as a national historic site, shall be terminated: Provided that the designation shall remain in effect until the establishment of the Independence National Historical Park.

(j)  This agreement shall become effective upon its execution, but occupation, operation, and maintenance by the Secretary in accordance with Article II shall begin on July 1, 1950, or as soon thereafter as practicable.  It shall continue in effect until such time as Congress enacts legislation inconsistent with its continuance or expressly providing for its termination.

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their seals (in quintuple) the day, month, and year aforesaid.

UNITED STATES OF AMERICA


By /s/ Oscar L. Chapman
    Secretary of the Interior

CITY OF PHILADELPHIA


By /s/ Bernard Samuel
    Mayor

COMMONWEALTH OF PENNSYLVANIA )
                             :              SS:
CITY AND COUNTY OF PHILADELPHIA )

BE IT REMEMBERED, That on this          day of          A.D.
1950, before me, the subscriber, a notary public in and for the Common-
wealth of Pennsylvania, residing in the City of Philadelphia, personally
appeared Bernard Samuel, personally known to me and to me known to be:
the Mayor of the City of Philadelphia, who being duly sworn according to
law, deposes and says that he resides in the City of Philadelphia and is
the Mayor of the said City; that he affixed the seal of the said City of
Philadelphia hereto; that the seal so affixed hereto is the common or
corporate seal of the said City of Philadelphia; that the said agreement
was duly sealed and delivered by him as and for the act and deed of the
City of Philadelphia for the uses and purposes therein set forth; that
the said agreement was executed by him and the seal of the City of
Philadelphia affixed thereto under and by the authority of the ordinance
of Council approved on the 6th day of July A.D. 1949; that he signed his
name thereto by the same authority, and that the name of this deponent
subscribed to the said agreement as Mayor of the said City of Phila-
delphia in attestation of the due execution thereof is in deponent's
own proper handwriting.

/s/ Bernard Samuel
    BERNARD SAMUEL

Sworn and subscribed before me the day and year aforesaid.
Witness my hand and notarial seal.

/s/ John W. Summers
    Notary Public

Notary Public
My Commission Expires April 23rd, 1953

# EXHIBIT "B"

## City of Philadelphia Capital Expenditure Eligibility Guidelines

POLICY STATEMENT                                    Issued March, 1992
EXPENDITURE ELIGIBILITY GUIDELINES
FOR CAPITAL FUNDING

The following guidelines provide criteria for determining whether expenditures or obligations can be funded through capital budget loan funds. They do not apply to capital appropriations funded from other than loan sources.

If a department/agency contemplates the use of capital funding for any expenditure that is not clearly eligible according to these criteria, it must contact the Capital Program Office for written approval prior to obligating funds. The Capital Program Office will review the request in conjunction with the City Controller's Office and the Accounting Bureau.

Generally, expenditures that result in the acquisition, construction or improvement of City owned tangible assets are eligible for capital funding:

- **Acquisition** refers to the purchase of land, buildings, equipment or machinery for City ownership:

  1. The cost of preparing plans and specifications, obtaining appraisals and legal assistance directly related to acquisition is an eligible capital expenditure. Planning studies, including master plan studies and feasibility studies, may be considered to be eligible for capital funding when such studies are an intrinsic part of a design or appraisal process which is required prior to acquisition of a tangible asset. Generally, studies funded through the capital budget must generate preliminary plans and acquisition cost estimates. Studies which are primarily focused upon improving operating performance are to be funded through the operating budget. Although a study may have a bearing on the ultimate design or specifications of a capital project, if its goal is to improve, consolidate, expand or otherwise change operations, it should not be funded through the capital budget.

  2. Equipment or machinery purchased with capital funds must have a useful life of at least 5 years and must cost at least $7,500. This requirement will normally exclude the use of capital funds to purchase office supplies and equipment. For example, stand alone personal computers (microcomputers or PC's) could not be purchased through loan funds. However, capital funds may be used to purchase minicomputers, mainframes and local area network (LAN) systems.

  3. Although vehicles might ordinarily be considered as equipment that is eligible for capital funding, current City policy requires that these purchases be made through The Philadelphia Municipal Authority.

ADD113

2 **POLICY STATEMENT** Issued March, 1992
**EXPENDITURE ELIGIBILITY GUIDELINES**
**FOR CAPITAL FUNDING**

- **Construction** refers to building, erecting or installing tangible assets that are owned by the City:

  1. Construction funded by the capital budget must result in the creation of a tangible asset with a useful life that is at least 5 years and cost at least $7,500.

  2. The cost of preparing plans and specifications that are required for construction purposes is an eligible capital expenditure. Planning studies, including master plan studies and feasibility studies, may be considered to be eligible for capital funding when such studies are an intrinsic part of a design process which is required prior to construction of a tangible asset. Generally, studies funded through the capital budget must generate preliminary plans and construction cost estimates. Studies which are primarily focused upon improving operating performance are to be funded through the operating budget. Although a study may have a bearing on the ultimate design or specifications of a capital project, if its goal is to improve, consolidate, expand or otherwise change operations it should not be funded through the capital budget.

  3. The cost of soil tests, borings and other architectural or engineering tests required to assure competent construction is an eligible capital expenditure.

  4. When constructing new facilities, the necessary cost of purchasing furniture and equipment to operate the facility may be an eligible capital expenditure. In these cases, the furniture and equipment must be durable items with a life expectancy in excess of 5 years and the department must obtain Capital Program Office approval prior to the purchase.

  5. Site preparation expenditures, such as demolition, that are directly attendant to a construction project, are eligible for capital funding. The removal of and/or testing for hazardous materials (including, but not limited to, PCB's and asbestos) is eligible for capital funding when directly related to an otherwise eligible construction project.

- **Improvements** refers to renovation, rehabilitation or reconstruction of buildings, structures, parkland, machinery, equipment or other tangible assets owned by the City. This includes landscape and pathway improvements to City owned public space.

  1. Improvements funded by the capital budget must result in extending the useful life of a building, structure, equipment, machinery or other tangible

POLICY STATEMENT
EXPENDITURE ELIGIBILITY GUIDELINES
FOR CAPITAL FUNDING

asset by at least 5 years and cost at least $7,500. This would exclude expenditures for routine maintenance and repairs which may not be funded through loan funds. For an improvement to be eligible for capital funding, it must substantially increase the asset value of the improved tangible asset and the improvement must have an expected life of at least 5 years. Projects which merely maintain or repair an asset cannot be funded through loan funds. This definition would specifically exclude the use of loan funds to clean and seal buildings. It would also exclude the use of capital funds to repair tangible assets even when those repairs require major expenditures. The project must substantially improve the asset and extend its useful life, beyond that inherent in its original design. Periodic overhauls or maintenance, as required to maintain the equipment or machinery as originally designed, are not eligible for capital funding.

2. Generally, improvement projects on property not owned by the City are not eligible for capital funding. However, under existing laws, the City is permitted to use capital funds for reconstruction or replacement of curbs and sidewalks located within the legally open right of way in conformance with The City Plan. Although the City has an interest in the sidewalks which allows it to use loan funds for their reconstruction or replacement, the City, given its limited resources, must establish reasonable criteria to determine when it will use its capital funds to reconstruct or replace pedestrian pathways on property not owned by the City. The following criteria have been established as a policy matter to determine when a sufficient public purpose, beyond the public interest served by reconstructing or replacing the pedestrian right of way, would be served by a curb and sidewalk project to warrant its funding through the capital budget:

   a. The site improvement project must be an integral component of a housing development or redevelopment project which has been approved by OHCD, or a commercial development or redevelopment project, which has been approved by the Commerce Department, or a street improvement project approved by the Streets Department or a water/sewer improvement project approved by the Water Department. To be eligible for capital funding, the site improvements must be incidental to a project which calls for revitalization of streets, water utilities, housing or commercial development and, ideally, eligible projects will leverage significant state, federal and/or private investment. Site improvements on property that is not owned by the City will not

4

**POLICY STATEMENT**                    Issued March, 1992
**EXPENDITURE ELIGIBILITY GUIDELINES**
**FOR CAPITAL FUNDING**

be eligible for capital funding unless they are incidental to a much
broader public improvement project as indicated above. Site
improvements that are part of a normal maintenance or repair
activity cannot be funded through the capital budget. Pursuant to
Section 11-503 of The Philadelphia Code the cost for normal
maintenance or repair of sidewalks and curbs is generally
assessed to the abutting land owner.

and

b. The site improvement project and its attendant housing, streets,
water/sewer, or commercial development or redevelopment plan
must be reviewed and approved by both the Capital Program
Office and the City Controller's Office. In order to be approved,
the plan must, as a minimum, describe how the area or
neighborhood targeted by the plan has previously deteriorated and
how implementation of the plan will arrest and reverse that
deterioration.

c. During the capital budget development process, when departments
are requesting site improvement project funding through the City
Planning Commission, the development or redevelopment plan
referred to above must be included for consideration. In order to be
included in the annual Recommended Capital Budget, the plan must
as a minimum describe how the area or neighborhood targeted by
the plan has previously deteriorated and how implementation of the
plan will arrest and reverse that deterioration.

3. The cost of preparing plans and specifications that are required for
improvement purposes is an eligible capital expenditure. Planning studies,
including master plan studies and feasibility studies, may be considered to
be eligible for capital funding when such studies are an intrinsic part of a
design process which is required prior to improving a tangible asset.
Generally, studies funded through the capital budget must generate
preliminary plans and construction cost estimates. Studies which are
primarily focused upon improving operating performance are to be funded
through the operating budget. Although a study may have a bearing on the
ultimate design or specifications of a capital project, if its goal is to
improve, consolidate, expand or otherwise change operations it cannot be
funded through the capital budget.

ADD116

5

**POLICY STATEMENT**                              Issued March, 1992
**EXPENDITURE ELIGIBILITY GUIDELINES**
**FOR CAPITAL FUNDING**

4. The cost of soil tests, borings and other architectural or engineering tests required to assure competent improvement implementation is an eligible capital expenditure.

5. When completing a major facility rehabilitation or renovation, the necessary cost of purchasing furniture and equipment to operate the facility may be an eligible capital expenditure. In these cases, the furniture and equipment must be durable items with a life expectancy in excess of 5 years and the department must obtain Capital Program Office approval prior to the purchase.

6. Site preparation expenditures, such as demolition, that are directly attendant to an improvement project, are eligible for capital funding. The removal of and/or testing for hazardous materials (including, but not limited to, PCB's and asbestos) is eligible for capital funding when directly related to making an otherwise eligible capital improvement. Finally, demolition may be eligible for capital funding when it is undertaken to create or expand available public space for park or recreation purposes.

If a department/agency wishes to request modifications to the above guidelines, it should submit a written request specifying the change to the Capital Program Office, the Accounting Bureau and the City Controller's Office.

ADD117

## EXHIBIT "C"

**Detailed Summary of NPS use of Research Dig Funding for the Research Dig**

# GOVERNMENT ESTIMATE
# ARCHEOLOGICAL SERVICES
# INDEPENDENCE NATIONAL HISTORICAL PARK
# ARCHEOLOGICAL INVESTIGATION OF THE
# PRESIDENT'S HOUSE SITE

## A. LABOR

| Labor Category | Wage Rate | Hours | Cost | |
|---|---|---|---|---|
| **Task 1: Logistics and Planning** | | | | |
| Senior Archeologist - GS 13/5 | $59.08 | 72 | $4,253.76 | |
| Project Archeologist - GS12/5 | $49.69 | 90 | $4,471.74 | |
| Civil Engineer - GS 14/5 | $69.82 | 144 | $10,054.08 | |
| Task Sub-Total | | 306 | ===> | $18,779.58 |
| | | | | |
| **Task 2: Bulk Excavation** | | | | |
| Senior Archeologist - GS 13/5 | $59.08 | 36 | $2,126.88 | |
| Project Archeologist - GS12/5 | $49.69 | 32 | $1,589.95 | |
| Civil Engineer - GS 14/5 | $69.82 | 36 | $2,513.52 | |
| Field Tech. Archeologist - GS11/5 | $41.45 | 144 | $5,969.38 | |
| Surveyor - GS 11/5 | $41.45 | 36 | $1,492.34 | |
| Task Sub-Total | | 284 | ===> | $13,692.07 |
| | | | | |
| **Task 3: Controlled Excavation** | | | | |
| Senior Archeologist - GS 13/5 | $59.08 | 216 | $12,761.28 | |
| Project Archeologist - GS12/5 | $49.69 | 108 | $5,366.09 | |
| Civil Engineer - GS 14/5 | $69.82 | 108 | $7,540.56 | |
| Field Tech. Archeologist - GS11/5 | $41.45 | 864 | $35,816.26 | |
| Surveyor - GS 11/5 | $41.45 | 378 | $15,669.61 | |
| CAD Operator - GS12/5 | $49.69 | 72 | $3,577.39 | |
| Task Sub-Total | | 1746 | ===> | $80,731.19 |
| | | | | |
| **Task 4: Site Restoration** | | | | |
| Project Archeologist - GS12/5 | $49.69 | 36 | $1,788.70 | |
| Field Tech. Archeologist - GS11/5 | $41.45 | 54 | $2,238.52 | |
| Civil Engineer - GS 14/5 | $69.82 | 36 | $2,513.52 | |
| Task Sub-Total | | 126 | ===> | $6,540.73 |
| | | | | |
| **Task 5: Laboratory Processing, Cataloging, and Analysis** | | | | |
| Senior Archeologist - GS 13/5 | $59.08 | 180 | $10,634.40 | |
| Project Archeologist - GS12/5 | $49.69 | 396 | $19,675.66 | |
| Photographer - GS12/5 | $49.69 | 135 | $6,707.61 | |

ADD119

| | | | | |
|---|---|---|---|---|
| Materials Specialist - GS 12/5 | $49.69 | 828 | $41,140.01 | |
| Lab Tech. Archeologist - GS 11/5 | $41.45 | 828 | $34,320.60 | |
| **Task Sub-Total** | | 2367 | ===> | $112,478.27 |

**Task 6: Technical Report Preparation**

| | | | | |
|---|---|---|---|---|
| Senior Archeologist - GS 13/5 | $59.08 | 216 | $12,761.28 | |
| Project Archeologist - GS12/5 | $49.69 | 486 | $24,147.40 | |
| Photographer - GS12/5 | $49.69 | 72 | $3,577.39 | |
| Materials Specialist - GS 12/5 | $49.69 | 486 | $24,147.40 | |
| Lab Tech. Archeologist - GS 11/5 | $41.45 | 486 | $20,144.70 | |
| Editor - 12/5 | $41.45 | 108 | $4,476.60 | |
| CAD Operator - GS12/5 | $49.69 | 144 | $7,154.78 | |
| Graphics - 12/5 | $49.69 | 216 | $10,732.18 | |
| **Task Sub-Total** | | 2214 | ===> | $107,141.72 |
| | | | | |
| **Labor Sub-Total** | | | ===> | **$339,363.57** |

## B. DIRECT EXPENSES

| Category | Unit Cost | Units | Cost | |
|---|---|---|---|---|
| | | | | |
| **Task 1: Logistics and Planning** | | | | |
| Reproduction | $0.35 | 500 | $175.00 | |
| Express Shipping (per package) | $12.00 | 10 | $120.00 | |
| **Task Sub-Total** | | | ===> | $295.00 |
| | | | | |
| **Task 2: Bulk Excavation** | | | | |
| Film & Processing (per roll) | $38.00 | 7 | $266.00 | |
| Field Supplies (per week) | $50.00 | 3 | $150.00 | |
| Excavation/Shoring Sub-Contract | | | $183,000.00 | |
| **Task Sub-Total** | | | ===> | $183,416.00 |
| | | | | |
| **Task 3: Controlled Excavation** | | | | |
| Conservation Services | | | $3,950.00 | |
| Film & Processing (per roll) | $38.00 | 34 | $1,292.00 | |
| Field Supplies (per week) | $75.00 | 6 | $450.00 | |
| Excavation/Shoring Sub-Contract | | | $54,000.00 | |
| **Task Sub-Total** | | | ===> | $59,692.00 |
| | | | | |
| **Task 4: Site Restoration** | | | | |
| Film & Processing (per roll) | $38.00 | 3 | $114.00 | |
| Field Supplies (per week) | $75.00 | 1 | $75.00 | |
| Lanscaping Sub-Contract | | | $18,000.00 | |
| Excavation Sub-Contract | | | $36,000.00 | |
| **Task Sub-Total** | | | ===> | $54,189.00 |
| | | | | |
| **Task 5: Laboratory Processing, Cataloging, and Analysis** | | | | |
| Funal Consultant | | | 11,500 | |
| Parasitology Consultant | | | 7750 | |

ADD120

| | | | | |
|---|---|---|---|---|
| Floral Consultant | | | 8000 | |
| Conservation Services | | | 7200 | |
| Film & Processing (per roll) | $38.00 | 36 | $1,368.00 | |
| Expendable Lab Supplies | | | $935.00 | |
| | | | ====> | $36,753.00 |
| **Task 6: Technical Report Preparation** | | | | |
| Reproduction | $0.35 | 3,500 | $1,225.00 | |
| Express Shipping (per package) | $12.00 | 5 | $60.00 | |
| **Task Sub-Total** | | | ====> | $1,285.00 |
| **Sub-Total Direct Cost** | | | ====> | **$335,630.00** |
| **TOTAL LABOR COST** | | | ====> | $339,363.57 |
| **TOTAL DIRECT COST** | | | ====> | $335,630.00 |
| **GRAND TOTAL** | | | | **$674,993.57** |

Draft estimate: 08/07/2006

ADD121

# FIRST AMENDMENT
## TO THE COOPERATIVE AGREEMENT
## BETWEEN
## THE CITY OF PHILADELPHIA
## AND
## THE NATIONAL PARK SERVICE
## FOR THE PRESIDENT'S HOUSE PROJECT AND
## ARCHEOLOGICAL RESEARCH DIG

**THIS FIRST AMENDMENT TO THE COOPERATIVE AGREEMENT** ("First Amendment") is made this _19_ day of July, 2007, by and between **THE CITY OF PHILADELPHIA** (the "**City**") acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA**, acting through the national park Service of the United States Department of the Interior (the "**NPS**").

## BACKGROUND

A.     On or about September 1, 2006, the City and NPS entered into the Cooperative Agreement (the "Agreement") to design, fabricate and install an exhibit at the Independence National Historic Park and the Liberty Bell Center (collectively, the "**Park**") to illuminate the history of the site of the former President's House, located directly north of the Liberty Bell Center (the "**President's House Exhibit**"), construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the "**East West Walkway**"), and conduct an archeological research excavation (the "**Research Dig**") at the foot of the Liberty Bell Center at the President's House within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the site for the installation of the President's House Exhibit.

B.     The City and NPS wish to amend certain sections of the Agreement, to extend the Term of the Agreement, and provide additional funding to complete the Research Dig.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this First Amendment, and intending to be legally bound by this First Amendment, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16 U.S.C. 407(m) et seq., 16 U.S.C. 461, et

ADD122

seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

1. **Background**

The Background is incorporated into this First Amendment as though fully set forth herein.

2. **Term**

In accordance with the terms of Section 5 of the Agreement, the Term of the Agreement is hereby extended for one (1) additional one (1) year Term, under the same terms and conditions as those found in the Agreement, except as modified by this First Amendment.

3. **Additional Funding**

The City shall transfer to NPS an additional Twenty-five Thousand Nine Hundred and Forty-eight Dollars ($25,948.00) (the "**Additional Funding**") for the completion of the Research Dig. The Additional Funding shall be used in accordance with Exhibit "A", attached hereto.

4. **No Further Modifications**

Except as modified by this First Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this First Amendment, the City and NPS have caused this First Amendment to be executed by their duly authorized officers, under seal, as of the date first written above.

APPROVED AS TO FORM
Romulo L. Diaz, Jr., City Solicitor

Per: _____

     Gemela N. McClendon
     Assistant City Solicitor

THE CITY OF PHILADELPHIA
THE OFFICE OF THE MAYOR

Per: _____

     Joyce Wilkerson, Chief of Staff
     Office of the Mayor

CAPITOL PROGRAMS OFFICE

By: _____

     Richard Tustin, Director
     Capitol Programs Office

NATIONAL PARK SERVICE

By: _____

     Dennis Reidenbach, Superintendent
     Independence National Historic Park

**EXHIBIT "A"**

**SCOPE OF SERVICES
AND
GOVERNMENT ESTIMATE**

ADD125

**MODIFICATION 2**

**ARCHEOLOGICAL SERVICES**
**INDEPENDENCE NATIONAL HISTORICAL PARK**
**ARCHEOLOGICAL INVESTIGATION OF THE PRESIDENT'S HOUSE**
**SITE**
**06/26/07**

**SCOPE OF SERVICES**

Please provide labor and materials to keep the archeological site open and available to the public from July 9 through July 31, 2007.

Provide 2 field technicians to open and close the site by removing and replacing tarpaulins over the ruins and inspecting them for condition. In addition, the technicians will close the site during the day at any time weather becomes inclement.

Provide the services of Dr. Cheryl LaRoche for a maximum of 56 hours for any necessary liason work between the archeology team and our various partners.

Update signage on the viewing platform.

Repair the viewing platform.

Continue to provide and service the temporary fence and the Porta Johns.

ADD126

GOVERNMENT ESTIMATE

# MODIFICATION 2

## ARCHEOLOGICAL SERVICES
## INDEPENDENCE NATIONAL HISTORICAL PARK
## ARCHEOLOGICAL INVESTIGATION OF THE
## PRESIDENT'S HOUSE SITE
## 6/21/2007

## Charge to Accounts: 4450-PRES-600

URS GROUP, INC, Contract GS-10F-0105K
Att. Eric S. McLaurin
URS Group, Inc.
9901 IH 10 West
Suite 350
San Antonio, TX 78230

### A. LABOR

| Labor Category | Wage Rate | Hours | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Program Manager (S. Tull) | $136.50 | 4 | $546.00 | |
| Senior Env. Professional / Field Director (D. Mooney) | $89.30 | 40 | $3,572.00 | |
| Dr. Cheryl LaRoche | $100.00 | 56 | $5,600.00 | |
| Field Technicians (2) | $45.00 | 184 | $8,280.00 | |
| **Task Sub-Total** | | 284 | =====> | $17,998.00 NTE |
| | | | | |
| **Labor Sub-Total** | | | =====> | **$17,998.00** NTE |

ADD127

**B. DIRECT EXPENSES**

| Category | Unit Cost | Units | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Travel | $400.00 | 3 | $1,200.00 | |
| Update Signs | | | $2,500.00 | |
| Repair Platform | | | $3,000.00 | |
| Rent/Service Fence & Porta Johns | | | $1,000.00 | |
| Field Supplies (per week) | $50.00 | 5 | $250.00 | |
| **Task Sub-Total** | | | =====> | $7,950.00 |
| | | | | |
| **Sub-Total Direct Cost** | | | =====> | **$7,950.00** |
| | | | | |
| **TOTAL  LABOR COST** | | | =====> | $17,998.00 |
| **TOTAL DIRECT COST** | | | =====> | $7,950.00 |
| | | | | |
| **GRAND TOTAL** | | | | **$25,948.00** CEILING PRICE |

ADD128

**FIRST AMENDMENT
TO THE COOPERATIVE AGREEMENT
BETWEEN
THE CITY OF PHILADELPHIA
AND
THE NATIONAL PARK SERVICE
FOR THE PRESIDENT'S HOUSE PROJECT AND
ARCHEOLOGICAL RESEARCH DIG**

**THIS FIRST AMENDMENT TO THE COOPERATIVE AGREEMENT** ("First Amendment") is made this *19* day of July, 2007, by and between **THE CITY OF PHILADELPHIA** (the "**City**") acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA**, acting through the national park Service of the United States Department of the Interior (the "**NPS**").

**BACKGROUND**

A.      On or about September 1, 2006, the City and NPS entered into the Cooperative Agreement (the "Agreement") to design, fabricate and install an exhibit at the Independence National Historic Park and the Liberty Bell Center (collectively, the "**Park**") to illuminate the history of the site of the former President's House, located directly north of the Liberty Bell Center (the "**President's House Exhibit**"), construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the "**East West Walkway**"), and conduct an archeological research excavation (the "**Research Dig**") at the foot of the Liberty Bell Center at the President's House within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the site for the installation of the President's House Exhibit.

B.      The City and NPS wish to amend certain sections of the Agreement, to extend the Term of the Agreement, and provide additional funding to complete the Research Dig.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this First Amendment, and intending to be legally bound by this First Amendment, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16 U.S.C. 407(m) et seq., 16 U.S.C. 461, et

ADD129

seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

1. **Background**

      The Background is incorporated into this First Amendment as though fully set forth herein.

2. **Term**

      In accordance with the terms of Section 5 of the Agreement, the Term of the Agreement is hereby extended for one (1) additional one (1) year Term, under the same terms and conditions as those found in the Agreement, except as modified by this First Amendment.

3. **Additional Funding**

      The City shall transfer to NPS an additional Twenty-five Thousand Nine Hundred and Forty-eight Dollars ($25,948.00) (the "**Additional Funding**") for the completion of the Research Dig. The Additional Funding shall be used in accordance with Exhibit "A", attached hereto.

4. **No Further Modifications**

      Except as modified by this First Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this First Amendment, the City and NPS have caused this First Amendment to be executed by their duly authorized officers, under seal, as of the date first written above.

APPROVED AS TO FORM
Romulo L. Diaz, Jr., City Solicitor

Per: _____

      Gemela N. McClendon
      Assistant City Solicitor

THE CITY OF PHILADELPHIA
THE OFFICE OF THE MAYOR

Per: _____

      Joyce Wilkerson, Chief of Staff
      Office of the Mayor

**CAPITOL PROGRAMS OFFICE**

By: _____

      Richard Tustin, Director
      Capitol Programs Office

**NATIONAL PARK SERVICE**

By: _____

      Dennis Reidenbach, Superintendent
      Independence National Historic Park

**EXHIBIT "A"**

**SCOPE OF SERVICES
AND
GOVERNMENT ESTIMATE**

**MODIFICATION 2**

**ARCHEOLOGICAL SERVICES**
**INDEPENDENCE NATIONAL HISTORICAL PARK**
**ARCHEOLOGICAL INVESTIGATION OF THE PRESIDENT'S HOUSE**
**SITE**
**06/26/07**

**SCOPE OF SERVICES**

Please provide labor and materials to keep the archeological site open
and available to the public from July 9 through July 31, 2007.

Provide 2 field technicians to open and close the site by removing and
replacing tarpaulins over the ruins and inspecting them for condition.  In
addition, the technicians will close the site during the day at any time
weather becomes inclement.

Provide the services of Dr. Cheryl LaRoche for a maximum of 56 hours
for any necessary liason work between the archeology team and our
various partners.

Update signage on the viewing platform.

Repair the viewing platform.

Continue to provide and service the temporary fence and the Porta
Johns.

ADD133

GOVERNMENT ESTIMATE

# MODIFICATION 2

## ARCHEOLOGICAL SERVICES
## INDEPENDENCE NATIONAL HISTORICAL PARK
## ARCHEOLOGICAL INVESTIGATION OF THE
## PRESIDENT'S HOUSE SITE
## 6/21/2007

## Charge to Accounts: 4450-PRES-600

URS GROUP, INC, Contract GS-10F-0105K
Att. Eric S. McLaurin
URS Group, Inc.
9901 IH 10 West
Suite 350
San Antonio, TX 78230

### A. LABOR

| Labor Category | Wage Rate | Hours | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Program Manager (S. Tull) | $136.50 | 4 | $546.00 | |
| Senior Env. Professional / Field Director (D. Mooney) | $89.30 | 40 | $3,572.00 | |
| Dr. Cheryl LaRoche | $100.00 | 56 | $5,600.00 | |
| Field Technicians (2) | $45.00 | 184 | $8,280.00 | |
| Task Sub-Total | | 284 | =====> | $17,998.00 NTE |
| | | | | |
| Labor Sub-Total | | | =====> | **$17,998.00** NTE |

ADD134

**B. DIRECT EXPENSES**

| Category | Unit Cost | Units | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Travel | $400.00 | 3 | $1,200.00 | |
| Update Signs | | | $2,500.00 | |
| Repair Platform | | | $3,000.00 | |
| Rent/Service Fence & Porta Johns | | | $1,000.00 | |
| Field Supplies (per week) | $50.00 | 5 | $250.00 | |
| **Task Sub-Total** | | | =====> | $7,950.00 |
| | | | | |
| **Sub-Total Direct Cost** | | | =====> | **$7,950.00** |
| | | | | |
| **TOTAL LABOR COST** | | | =====> | $17,998.00 |
| **TOTAL DIRECT COST** | | | =====> | $7,950.00 |
| **GRAND TOTAL** | | | | **$25,948.00** CEILING PRICE |

ADD135

# FIRST AMENDMENT
## TO THE COOPERATIVE AGREEMENT
### BETWEEN
## THE CITY OF PHILADELPHIA
### AND
## THE NATIONAL PARK SERVICE
## FOR THE PRESIDENT'S HOUSE PROJECT AND
## ARCHEOLOGICAL RESEARCH DIG

**THIS FIRST AMENDMENT TO THE COOPERATIVE AGREEMENT** ("First Amendment") is made this *19* day of July, 2007, by and between **THE CITY OF PHILADELPHIA** (the "City") acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA**, acting through the national park Service of the United States Department of the Interior (the "**NPS**").

## BACKGROUND

A.     On or about September 1, 2006, the City and NPS entered into the Cooperative Agreement (the "Agreement") to design, fabricate and install an exhibit at the Independence National Historic Park and the Liberty Bell Center (collectively, the "**Park**") to illuminate the history of the site of the former President's House, located directly north of the Liberty Bell Center (the "**President's House Exhibit**"), construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the "**East West Walkway**"), and conduct an archeological research excavation (the "**Research Dig**") at the foot of the Liberty Bell Center at the President's House within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the site for the installation of the President's House Exhibit.

B.     The City and NPS wish to amend certain sections of the Agreement, to extend the Term of the Agreement, and provide additional funding to complete the Research Dig.

**NOW, THEREFORE**, in consideration of the mutual promises contained in this First Amendment, and intending to be legally bound by this First Amendment, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16 U.S.C. 407(m) et seq., 16 U.S.C. 461, et

seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

1. **Background**

The Background is incorporated into this First Amendment as though fully set forth herein.

2. **Term**

In accordance with the terms of Section 5 of the Agreement, the Term of the Agreement is hereby extended for one (1) additional one (1) year Term, under the same terms and conditions as those found in the Agreement, except as modified by this First Amendment.

3. **Additional Funding**

The City shall transfer to NPS an additional Twenty-five Thousand Nine Hundred and Forty-eight Dollars ($25,948.00) (the "**Additional Funding**") for the completion of the Research Dig.  The Additional Funding shall be used in accordance with Exhibit "A", attached hereto.

4. **No Further Modifications**

Except as modified by this First Amendment, all other terms and conditions of the Agreement shall remain unchanged and in full force and effect.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this First Amendment, the City and NPS have caused this First Amendment to be executed by their duly authorized officers, under seal, as of the date first written above.

APPROVED AS TO FORM
Romulo L. Diaz, Jr., City Solicitor

Per: _Gemela N. McClendon_

     Gemela N. McClendon
     Assistant City Solicitor

**THE CITY OF PHILADELPHIA**
**THE OFFICE OF THE MAYOR**

Per: _Joyce Wilkerson_

     Joyce Wilkerson, Chief of Staff
     Office of the Mayor

**CAPITOL PROGRAMS OFFICE**

By: _Richard Tustin_

     Richard Tustin, Director
     Capitol Programs Office

**NATIONAL PARK SERVICE**

By: _Dennis Reidenbach_

     For Dennis Reidenbach, Superintendent
     Independence National Historic Park

**EXHIBIT "A"**

**SCOPE OF SERVICES
AND
GOVERNMENT ESTIMATE**

**MODIFICATION 2**

**ARCHEOLOGICAL SERVICES**
**INDEPENDENCE NATIONAL HISTORICAL PARK**
**ARCHEOLOGICAL INVESTIGATION OF THE PRESIDENT'S HOUSE**
**SITE**
**06/26/07**

**SCOPE OF SERVICES**

Please provide labor and materials to keep the archeological site open and available to the public from July 9 through July 31, 2007.

Provide 2 field technicians to open and close the site by removing and replacing tarpaulins over the ruins and inspecting them for condition. In addition, the technicians will close the site during the day at any time weather becomes inclement.

Provide the services of Dr. Cheryl LaRoche for a maximum of 56 hours for any necessary liason work between the archeology team and our various partners.

Update signage on the viewing platform.

Repair the viewing platform.

Continue to provide and service the temporary fence and the Porta Johns.

ADD140

GOVERNMENT ESTIMATE

# MODIFICATION 2

## ARCHEOLOGICAL SERVICES
## INDEPENDENCE NATIONAL HISTORICAL PARK
## ARCHEOLOGICAL INVESTIGATION OF THE
## PRESIDENT'S HOUSE SITE
## 6/21/2007

## Charge to Accounts: 4450-PRES-600

URS GROUP, INC, Contract GS-10F-0105K
Att. Eric S. McLaurin
URS Group, Inc.
9901 IH 10 West
Suite 350
San Antonio, TX 78230

### A. LABOR

| Labor Category | Wage Rate | Hours | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Program Manager (S. Tull) | $136.50 | 4 | $546.00 | |
| Senior Env. Professional / Field Director (D. Mooney) | $89.30 | 40 | $3,572.00 | |
| Dr. Cheryl LaRoche | $100.00 | 56 | $5,600.00 | |
| Field Technicians (2) | $45.00 | 184 | $8,280.00 | |
| **Task Sub-Total** | | 284 | =====> | $17,998.00 NTE |
| | | | | |
| **Labor Sub-Total** | | | =====> | $17,998.00 NTE |

ADD141

**B. DIRECT EXPENSES**

| Category | Unit Cost | Units | Cost | |
|---|---|---|---|---|
| **Archeological Services:** | | | | |
| Travel | $400.00 | 3 | $1,200.00 | |
| Update Signs | | | $2,500.00 | |
| Repair Platform | | | $3,000.00 | |
| Rent/Service Fence & Porta Johns | | | $1,000.00 | |
| Field Supplies (per week) | $50.00 | 5 | $250.00 | |
| **Task Sub-Total** | | | =====> | $7,950.00 |
| | | | | |
| **Sub-Total Direct Cost** | | | =====> | **$7,950.00** |
| | | | | |
| TOTAL  LABOR COST | | | =====> | $17,998.00 |
| TOTAL DIRECT COST | | | =====> | $7,950.00 |
| **GRAND TOTAL** | | | | **$25,948.00** CEILING PRICE |

ADD142

## SECOND AMENDMENT
## TO THE COOPERATIVE AGREEMENT
## BETWEEN
## THE CITY OF PHILADELPHIA
## AND
## THE NATIONAL PARK SERVICE
## FOR THE PRESIDENT'S HOUSE PROJECT AND
## ARCHEOLOGICAL RESEARCH DIG

**THIS SECOND AMENDMENT TO THE COOPERATIVE AGREEMENT** ("First Amendment") is made this 15 day of August, 2008, by and between **THE CITY OF PHILADELPHIA** (the "**City**") acting through its Office of the Mayor and its authorized departments, and the **UNITED STATES OF AMERICA**, acting through the national park Service of the United States Department of the Interior (the "**NPS**").

### BACKGROUND

A.      On or about September 1, 2006, the City and NPS entered into the Cooperative Agreement (the "Agreement") to design, fabricate and install an exhibit at the Independence National Historic Park and the Liberty Bell Center (collectively, the "**Park**") to illuminate the history of the site of the former President's House, located directly north of the Liberty Bell Center (the "**President's House Exhibit**"), construct a walkway connecting the Liberty Bell Center to the Market-Frankford El at Market and 5th Streets (the "**East West Walkway**"), and conduct an archeological research excavation (the "**Research Dig**") at the foot of the Liberty Bell Center at the President's House within the congressionally authorized boundaries of Independence National Historical Park in order to prepare the site for the installation of the President's House Exhibit.

B.      The City and NPS executed that certain First Amendment to the Cooperative Agreement ("**First Amendment**"), dated July 19, 2007, to extend the term of the Agreement, and provide additional funding to complete the Research Dig.

C.      The City and NPS now wish to further extend the Term of the Agreement.

ADD143

NOW, **THEREFORE**, in consideration of the mutual promises contained in this Second Amendment, and intending to be legally bound by this Second Amendment, and pursuant to the authority granted to NPS by 16 U.S.C. 6 and 16 U.S.C. 407(m) et seq., 16 U.S.C. 461, et seq., particularly 16 U.S.C. 462(h), and Section 814(g) of P.L. 104-333, the City and NPS mutually covenant and agree as follows:

1. **Background**

The Background is incorporated into this Second Amendment as though fully set forth herein.

2. **Term**

In accordance with the terms of Section 5 of the Agreement, the Term of the Agreement is hereby extended for one (1) additional one (1) year Term, under the same terms and conditions as those found in the Agreement, as modified by the First Amendment.

3. **No Further Modifications**

Except as modified by this Second Amendment, all other terms and conditions of the Agreement (as modified by the First Amendment) shall remain unchanged and in full force and effect.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

ADD144

**IN WITNESS OF THE MUTUAL PROMISES SET FORTH ABOVE,** and intending to be legally bound by this First Amendment, the City and NPS have caused this First Amendment to be executed by their duly authorized officers, under seal, as of the date first written above.

APPROVED AS TO FORM
Shelley R. Smith, City Solicitor

Per: _____
    Gemela N. McClendon
    Assistant City Solicitor

THE CITY OF PHILADELPHIA
THE OFFICE OF THE MAYOR

Per: _____
    Clarence Armbrister, Chief of Staff
    Office of the Mayor

CAPITOL PROGRAM OFFICE

By: _____
    Richard Tustin, Director
    Capitol Program Office

NATIONAL PARK SERVICE

By: _____
    Cynthia Mac Leod, Superintendent
    Independence National Historic Park

ADD145

Number _____

# THIRD AMENDMENT TO THE COOPERATIVE AGREEMENT

## BETWEEN

## NATIONAL PARK SERVICE
## UNITED STATES DEPARTMENT OF THE INTERIOR

## AND

## THE CITY OF PHILADELPHIA

## FOR

## PRESIDENT'S HOUSE PROJECT

This Third Amendment to the Cooperative Agreement ("**Third Amendment**") is made this *12* day of May 2009, between the City of Philadelphia ("**City**") and the National Park Service ("**NPS**").

**ARTICLE I.**        <u>**BACKGROUND**</u>

A. A detailed summary of the Project is attached to this Third Amendment as **Attachment "A"** ("**Summary Sheet**").

B. In furtherance of the July 14, 1950 Agreement between the United States of America and the City to cooperate in the preservation of Independence National Historical Park, and the Cooperative Agreement between the City and NPS as such Cooperative Agreement has been amended, the NPS and City now desire to further extend the Term of the Cooperative Agreement and to establish the obligations and understandings of the City and the NPS from the Commencement Date forward regarding the design, fabrication and installation of the Project, such that the City may accomplish its goal of donating the completed Project to NPS in accordance with Section 2 of the Cooperative Agreement, within parameters acceptable to the NPS, and in compliance with applicable laws, regulations, government policies and Park management plans.

C. The Project will be owned, maintained, managed, and interpreted by the NPS following completion of the Project and acceptance by the NPS.

**ARTICLE II.**        <u>**DEFINITIONS; ATTACHMENTS**</u>

A. Capitalized terms not otherwise defined in this Third Amendment, including the definitions set forth in the Summary Sheet, shall have the meanings set forth in the Cooperative Agreement as amended.

B. The following are Attachments to this Third Amendment and incorporated herein by reference:

**Attachment A:**  Project Summary Sheet
**Attachment B:**  Funding Obligations
**Attachment C:**  Project Development Plan
**Attachment D:**  Exhibit Team Insurance Requirements

## ARTICLE III.    COOPERATION OF THE PARTIES

Beginning on the Commencement Date, City and NPS agree to cooperate in the following manner so that the City may cause the design, fabrication, installation and completion of the Project in a manner suitable for acceptance of the Project by the NPS:

A. The NPS agrees to--

1. Provide timely review, comment and input in accordance with the Project Development Plan attached to this Third Amendment as **Attachment "C" ("Project Development Plan")** and the Project schedule as it may be amended, and in writing, approve or deny:

   a. Any contract between the City and any contractor, vendor, supplier, or professional services firm furnishing supplies or services to determine whether the contract is appropriate and consistent with the Cooperative Agreement as amended.

   b. All design plans, interpretive works, construction drawings, samples, specifications, mockets, engineering documents, environmental compliance documents, change orders, and cost estimates generated by the City or the City's contractors.

2. Monitor the general implementation of the Project, to include periodic inspection and tests for compliance with the requirements of the Cooperative Agreement as amended and the Commission Agreement as amended, any Project Design, Fabrication and Installation phases, project implementation plan or applicable special use permit, and relevant laws, regulations, and policies.

3. Provide Final Inspection in accordance with the Cooperative Agreement as amended and the Project Development Plan.

4. Notify the Partner of any change in NPS policy that may affect implementation of this Commission Agreement as amended.

5. Subject to the availability of appropriations, undertake NPS activities identified in the Cooperative Agreement as amended and the Project Development Plan.

6. Provide access to the Park in accordance with the Cooperative Agreement as amended and the Project Development Plan.

B. The City agrees to--

1. In reliance on review, comment and input required to be provided by NPS above, ensure that the Exhibit Team adheres to the Cooperative Agreement as amended including the Project Design Plan, the Programmatic Agreement between the NPS, City and others, dated March 15, 2006, and to donate to NPS the Project identified in the Cooperative Agreement as amended.  This donation is made by the City on its own volition and without compensation.

2. Contact, or cause the Exhibit Team to contact NPS in a timely manner with requests for access to the Park to accomplish the Project in accordance with law, the Cooperative Agreement as amended and the Project Design Plan.

3. Undertake and complete in a timely manner, at its sole cost and expense, the Project identified in this Cooperative Agreement as amended.

4. Submit copies of all plans, designs, and specifications and Project related materials to NPS for review, comment and approval or denial, in accordance with the Cooperative Agreement as amended and the Project Design Plan.

5. Execute any Third-Party Contract only after receiving written NPS approval.  "Third-Party Contract" shall mean any and all contracts between the City and a third-party executed after the Commencement Date, for work on the Project, including but not limited to design, engineering or interpretive services, and construction. Third-Party Contracts shall not include amendments to the Commission Agreement as amended.

6. Provide, in advance of entering into any Third-Party Contract, written certification that--

a. The third-party:

i. Has all required licenses to do the work contemplated by the agreement as required by applicable law;

ADD148

      ii.      Is not suspended or debarred from federal contracting; and

      iii.     Demonstrates relevant experience and competence to perform the work contemplated by in the Third-Party Contract.

   b.    The City:

      i.      Used competition in selecting the third-party to perform the work;

      ii.      Has taken measures to avoid or mitigate conflicts of interest; and

      iii.     Has incorporated provisions reflecting best practices in contract management and project administration into the Third-Party Contract.

7. Make the NPS an express third-party beneficiary of all Third-Party Contracts, and require that all Third-Party Contracts contain the following clause:

"The National Park Service is a third-party beneficiary of this contract, with all legal rights associated with that status, including the right to enforce the contract."

8. Following the Commencement Date, include the following requirements in any Third-Party Contract for the performance of any work or for fulfilling any obligation related to the Project:

"The Contractor agrees to—

a. Comply with all applicable laws, regulations, rules, orders, other legal requirements, and NPS policies;

b. Comply with the terms and conditions of any Project Development Plan, project implementation plan or special use permits relating to the Project;

c. Follow any NPS order to suspend work;

d. Obtain and provide all warranties that would be given in normal commercial practice from subcontractors, manufacturers or suppliers for work performed and materials furnished:

      i.      For a period of not less than one year; and

        ii.      Executed, in writing, for the benefit of the City and the United States;

e.     Be responsible for all damages to persons or property that occur as a result of the contractor's fault or negligence because of, or in any way growing out of or connected to the Project;

f.     Waive any defense to any claim of breach or negligence based on the contractor's alleged reliance on the Partner's or NPS' Project monitoring, inspections or tests. All monitoring, inspections or tests are for the sole benefit of the Partner and / or NPS and do not relieve the Contractor of responsibility for (i) providing adequate quality control measures, or (ii) ensuring against damage or loss prior to Project acceptance. In addition, such monitoring, inspections or test do not imply Project acceptance by either the Partner or NPS, nor does it affect the continuing rights of the Partner or NPS after Project acceptance.

g.     Neither the City's nor NPS' review, approval or acceptance of, nor City payment for, contractor services shall be construed to operate as a waiver of any rights of the City or NPS, nor of any cause of action that the City or NPS may have, and the Contractor shall be and remain liable to the City and the NPS in accordance with the terms of this contract and applicable law for all damages for which the Contractor is legally responsible.

h.     Have no recourse against the United States with respect to any aspect of construction activities and shall not lien any land, structures, fixtures, or improvements associated with this contract; and

i.     Be jointly and severally liable under this contract if the Contractor is comprised of more than one legal entity."

9.     Following the Commencement Date, in addition to the provisions of Section 8 (above), any Third-Party Contract for the provision of design or engineering services must contain the following provisions:

"The Contractor agrees--

a.     That it is solely responsible for the professional quality, technical accuracy, and the coordination of all designs, drawings, specifications, and other services furnished by the Contractor; and

---

      b.      To correct or revise any errors or deficiencies in its designs, drawings, specifications, and other services without any additional compensation.

      c.      That the final signed and sealed Final Construction Documents provided by the Contractor are the only true contract documents of record for this Project. By submission of the Final Construction Documents to the City, the Contractor warrants that all review comments have been resolved to the satisfaction of the Partner and incorporated into the Final Construction Documents."

10.    Cause the Exhibit Team to ensure that the Project's Final Design complies with:

      a.      All applicable laws, regulations, rules, orders, or other legal requirements;

      b.      All applicable building codes and environmental, cultural, safety, accessibility, and sustainable design requirements.

11.    Prior to initiating installation of the Project, demonstrate to NPS's reasonable satisfaction that all funds necessary to pay for the Project have been secured, and will remain available to pay City's expenses associated with the Project except that NPS acknowledges that, in accordance with Section III(A)(1) of the Project Summary Sheet attached as Attachment "A" hereto, funding for the Project, as designed as of the Commencement Date, has been fully secured.

12.    Undertake installation of the Project only when all necessary written NPS approvals required in the Cooperative Agreement as amended and the Project Design Plan have been obtained.

13.    Cause the Exhibit Team and as applicable, any entity or person entering into a Third-Party Contract, to maintain throughout the course of the Project the Performance and Payment Bonds requirements set forth in Attachment "D" of this Third Amendment, and immediately notify NPS in writing should any bond issued be canceled or withdrawn.

14.    Permit the NPS to monitor, inspect, and to at all times have access to the construction site and construction-related materials and documents.

15.    Promptly take reasonable steps at no cost to NPS, to address any concerns raised by NPS.  If reasonably requested by NPS, such reasonable steps may include suspension of the work on the Project.

16. Certify in writing that upon NPS' acceptance of the Project as complete, all right, title, and interest to any completed construction, improvements, installations, fixtures, or associated donations, are free and clear of all debts, liabilities, or obligations.

17. Consistent with the Partner's intent to donate the Project to the NPS as stated herein, waive any claim or right to any property interest, including use rights, or to compensation for any Project components donated to NPS by or on behalf of the Partner.

18. Comply with, and cause its contractors to comply with, the wage requirements of the Davis Bacon Act, 40 U.S.C. § 276(a) *et seq.*, and the relevant Department of Labor regulations, 29 C.F.R. Part 5.

19. Act in accordance with any Project Development Plan that attached to this Third Amendment.

C. The City and NPS jointly agree that--

1. The Project's overall cost is estimated to be approximately $8.5 million. The City's financial obligations are detailed in **Attachment "B"** (**"Financial Obligations"**).

2. In making certain programmatic and resource-related decisions, NPS is relying upon the City's promise to undertake and diligently pursue the Project in accordance with the Cooperative Agreement as amended.

3. Project land and facilities shall not be subject to liens by the City or any third-parties.

4. The attached Project Development Plan (Attachment C), as may be amended or supplemented by written agreement of the parties, addresses without limitation, deliverables, design elements, construction standards, mitigation measures, safety precautions, site access, construction monitoring, coordination between the parties, contractor requirements, and design modifications.

5. The City and NPS are not establishing a joint venture, a joint enterprise or other entity by entering into this Cooperative Agreement as amended, and neither is liable for the contracts or actions of the other party relating to this Cooperative Agreement as amended or otherwise.

6. NPS review and approval of documents pursuant to [Article III.A.1] of this Third Amendment shall not be construed to operate as a waiver of any rights of the NPS, nor a waiver of any cause of action that NPS may have arising under this Third Amendment or any Third-Party Contract.

ADD152

7.    In consideration of the City's offer to complete and donate the Project described herein to the NPS, the NPS agrees to allow the City access to NPS property at the times and for purposes identified herein.  In reliance on this Third Amendment the NPS will not seek Federal appropriations for the Project to be constructed by the City. Further, NPS is using appropriated funds to work with the City and to implement the Project. It is the intent of both parties to be legally bound by this Cooperative Agreement as amended and both expressly waive the defense of lack of consideration. The waiver of the defense of lack or failure of consideration shall inure to any assign, surety or insurer of the parties hereto.

## ARTICLE IV.        AUTHORITY

NPS enters into this Third Amendment pursuant to (a) 16 U.S.C. § 6, which authorize NPS to accept donations for purposes of the National Park System; (b) 43 U.S.C. § 1473a, which gives the Secretary authority to accept and use contributions for cooperative projects with other Federal, State, or private agencies; (c)16 U.S.C. § 1f, which authorizes the Secretary to enter into agreements with individuals and entities to share costs and services in support of NPS projects; and (d) 16 U.S.C. §§ 1-4 (the NPS Organic Act), which authorizes NPS to take actions that in furtherance of the mission of the National Park Service.

## ARTICLE V.        KEY OFFICIALS

A. Key Officials:  The personnel specified below are considered essential to successful coordination and communication between the City and NPS for the work to be performed under this Third Amendment. Upon written notice to the other party, either party may designate an alternate to act in the place of the designated Key Official, or designate a new Key Official.

**City**
Joan Schlotterbeck
Commissioner of Department of Public Property
City of Philadelphia
City Hall, Room 790
Philadelphia, PA 19107
Ph: 215-686-4430
Fx: 215-686-4498
joan.schlotterbeck@phila.gov

**NPS**
Cynthia MacLeod
Superintendent
Independence National Historical Park
143 S 3rd Street, Philadelphia, PA 19106

Ph: 215-597-7120
Fx: 215-597-0042
Cynthia_MacLeod@nps.gov

B. <u>Notices</u>: Any notice from one party to the other party required or provided in association with this Third Amendment shall be delivered in writing, by mail, personal delivery, electronic delivery or other appropriate means, to the first listed Key Official of the other party, at the address or contact number indicated in this Article, or at such other address or contact number for such Key Official as may be provided from time to time, and shall be considered delivered upon receipt at the office of such Key Official.

## ARTICLE VI.        <u>TERM OF THIRD AMENDMENT</u>

Unless modified by the parties in writing, or unless terminated by operation of the terms of this Cooperative Agreement as amended, this Cooperative Agreement as amended shall be in effect for a period of one (1) year beginning May 1, 2009 ("**Commencement Date**"). Nothing in this Article shall alter or affect the term of any bond or insurance coverage obtained in furtherance of the Project.

## ARTICLE VII.        <u>INSURANCE AND LIABILITY</u>

Prior to beginning the work authorized herein, the City shall provide the NPS with copies of Certificates of Insurance demonstrating that the Exhibit Team has acquired all insurance required in Attachment "D" of this Third Amendment, and City shall cause Exhibit Team members to immediately notify NPS if an insurance policy is canceled or terminates for any reason.

## ARTICLE VIII.        <u>INTELLECTUAL PROPERTY</u>

A. Subject to applicable law, NPS shall be assigned any and all rights, titles, and interests, in any and all copyrights and trademarks created as a result of, arising from, or relating to the Project, including any copyrightable design elements utilized in the Exhibit Team's bid proposals and any pre-existing copyrightable design elements belonging to the City or the Exhibit Team that are included in the final Project design. The preceding notwithstanding, the City is hereby given a non-exclusive, limited license to use such intellectual property for purposes related to the City's educational mission and to identify the Project in the City's marketing, advertisements and publicity about the City, the Project and the completed exhibit. This provision shall survive expiration or termination of this Cooperative Agreement as amended.

B. The City shall fully cooperate with the NPS in the protection and enforcement of any copyright and trademark rights resulting from activities and services performed in connection with the Project. This obligation includes timely execution, acknowledgment, and delivery to the NPS of all documents and papers that may be necessary to enable the NPS to utilize in any manner such copyright and trademark rights.

**ARTICLE IX.**        **DISPUTES; NONCOMPLIANCE; VENUE**

A.  The parties agree that in the event of a dispute between them, NPS and the City shall promptly use their best efforts to resolve the dispute in an informal fashion through communication and consultation, or other forms of non-binding alternative dispute resolution that are mutually acceptable to the parties.

B.  In the event that one party reasonably believes that the other party is not complying with the Cooperative Agreement as amended, notice of such alleged noncompliance must be provided to the allegedly noncompliant party.  Such party shall have thirty (30) days (cure period) after receipt of the notice to cure such alleged noncompliance, or if the alleged noncompliance cannot be cured within the cure period, the alleged noncompliant party shall obtain approval of a written remedial plan specifying the intent to cure the alleged noncompliance as promptly as is reasonably practical and within a deadline determined by mutual agreement.

C.  In the event that the alleged noncompliant party fails to cure the alleged noncompliance within the cure period or to diligently pursue the action detailed in the remedial plan, the NPS may, without first obtaining a judgment or declaration of breach by any court, board, arbitrator or any other adjudicator, exercise its rights available under law or seek any alternative or additional remedies available to it including termination of this Third Amendment.

D.  The parties agree that the venue to commence litigation of any disputes stemming from this Third Amendment as amended shall be a Federal court located in the Eastern District of Pennsylvania.

**ARTICLE X.**        **ACCOUNTING AND REPORTS**

The City and its contractors and subcontractors shall maintain accounting books and records under a system of accounts and financial controls meeting Generally Accepted Accounting Principles, and must permit the Department of the Interior or its designee, including the Comptroller General and Office of the Inspector General, to verify and audit the financial report from the books, correspondence, memoranda and other records of the City relating to this Third Amendment, during the period of this Third Amendment, and for such time thereafter as may be necessary to accomplish such verification. Such period shall be a minimum of three years after the Project is completed.

**ARTICLE XI.**        **COMPLIANCE WITH APPLICABLE LAW**

A.  This Third Amendment and performance hereunder is subject to all applicable laws and regulations whether now in force or hereafter enacted or promulgated.  This Third Amendment and performance hereunder is also subject to applicable government policies.  Nothing in this Third Amendment shall be construed as in any way limiting the general powers of the NPS for supervision, regulation, and control of its property under such applicable laws, regulations, and management policies. Nothing in this Third

Amendment shall be deemed inconsistent with or contrary to the purpose of or intent of any Act of Congress.

B.  In addition to other laws, regulations, and policies referenced in this Third Amendment, the City is on notice that, where applicable, it must comply with, and assist NPS in complying with additional laws, regulations, Executive Orders and policies including, but not limited to  the Americans with Disabilities Act (42 U.S.C. § 12101), Architectural Barriers Act (42 U.S.C. § 4151 *et seq.*), the Rehabilitation Act (29 U.S.C. § 701 *et seq.*, as amended), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, *et seq.*), the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. § 4801, *et seq.*), the National Environmental Policy Act (42 U.S.C. § 4321, *et seq.*), the Coastal Zone Management Act (16 U.S.C. § 1451 *et seq.),* Clean Air Act (42 U.S.C. § 7401 *et seq.),* the Safe Drinking Water Act (42 U.S.C. § 300, *et seq.),* the Endangered Species Act (16 U.S.C. § 1531 *et seq.*), the Wild and Scenic Rivers Act (16 U.S.C. § 1271, *et seq.*), the National Historic Preservation Act (16 U.S.C. § 470), the Archaeological and Historic Preservation Act (16 U.S.C. § 469), Strengthening Federal Environmental, Energy and Transportation Management (Exec. Order No. 13423), Notification of Violating Facilities (Exec. Order No.11738), Wetlands Protection (Exec. Order No. 11990), and Flood Hazards in Floodplains (Exec. Order No. 11988).

## ARTICLE XII.     <u>REQUIRED AND MISCELLANEOUS CLAUSES</u>

A.  Non-Discrimination:  All activities pursuant to or in association with this Third Amendment shall be conducted without discrimination on grounds of race, color, sexual orientation, national origin, disabilities, religion, age, or sex, as well as in compliance with the requirements of any applicable federal laws, regulations, or policies prohibiting such discrimination.

B.  NPS Appropriations:  Pursuant to 31 U.S.C. § 1341, nothing contained in this Third Amendment shall be construed to obligate the government to any current or future expenditure of funds in excess or advance of the availability of appropriations from Congress.  Nor does this Third Amendment obligate the government to spend funds on any particular project or purpose, even if funds are available.

C.  Lobbying with Appropriated Moneys (18 U.S.C. § 1913): No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, a jurisdiction, or an official of any government, to favor, adopt, or oppose, by vote or otherwise, any legislation, law, ratification, policy, or appropriation, whether before or after the introduction of any bill, measure, or resolution proposing such legislation, law, ratification, policy, or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to any such Member or official, at his request, or to Congress or such official, through the proper official channels, requests for any legislation, law, ratification, policy, or appropriations which they deem necessary for

ADD156

the efficient conduct of the public business, or from making any communication whose prohibition by this section might, in the opinion of the Attorney General, violate the Constitution or interfere with the conduct of foreign policy, counter-intelligence, intelligence, or national security activities. Violations of this section shall constitute violations of section 1352(a) of title 31. In addition, the related restrictions on the use of appropriated funds found in applicable law also apply. In addition, related restrictions on the use of appropriated funds and related legislation also apply.

D.  Release of Information:  The City must obtain prior government approval through the NPS Key Official for any public information releases which refer to the Department of the Interior, any bureau, a park or park unit, a government employee (by name or title), or this Third Amendment.  The specific text, layout, photographs, etc., of the proposed release must be submitted with the request for approval.

E.  Merger: This Third Amendment, including any attachments hereto and documents incorporated by reference herein, contains the sole and entire agreement of the parties with respect to the subject matter of this Third Amendment.

F.  Modifications:  This Third Amendment may be extended, renewed or amended only when agreed to in writing by the NPS and the City.

G.  Waiver: If a party fails to exercise any right or to insist that the other party comply with any obligation, no such failure or insistence shall be a waiver of a right of a party to demand strict compliance with each duty or obligation.  No custom or practice of the parties which varies from this Third Amendment shall constitute a waiver of the right of a party to demand exact compliance.  Waiver by one party of any particular default by the other party shall not affect or impair a party's rights in connection with any subsequent default of the same or of a different nature, nor shall any delay or omission of a party to exercise any rights arising from such default affect or impair the rights of that party as to such default or any subsequent default.  All waivers of any duty or obligation by a party must be express and evidenced in writing.

H.  Effect of Approval:  Any approval or consent given by the NPS regarding any contract or contractor, or by operation of inspection, or any other consent or approval given by the NPS under this Third Amendment, does not relieve the City or the City's contractors of responsibility for any errors or omissions, or from the responsibility to comply with the requirements of this Third Amendment.

I.  Effect of Acceptance:  Any acceptance by the NPS of the Project or any component thereof does not relieve the City or the City's contractors from liability for any known defect, or any latent defect, fraud, or gross mistake or negligence.

J.  Assignment: No part of this Third Amendment shall be assigned to any other party without prior written approval of the NPS and the Assignee.

K.  Counterparts.  This Third Amendment may be executed in counterparts, each of which shall be deemed an original (including copies sent to a party by facsimile transmission) as against the party signing such counterpart, but which together shall constitute one and the same instrument.

L.  No Lobbying for Federal Funds: The City must not seek appropriations from Congress to support any ongoing or proposed City activity or project relating to the subject matter of this Third Amendment or any amendments or sub-agreements hereto, including without limitation federal appropriations for construction, renovation, property acquisition, leasing, administration or operations.  Nothing in this paragraph is intended to preclude the City from applying for and obtaining a competitive or non-competitive grant of federal financial assistance from a federal agency or from undertaking otherwise lawful activities with respect to any project or proposal included in the President's budget request to Congress; nor should this paragraph be construed as requesting, authorizing or supporting advocacy by nonfederal entities before Congress.

M. Member of Congress: Pursuant to 41 U.S.C. § 22, no Member of Congress shall be admitted to any share or part of any contract or agreement made, entered into, or adopted by or on behalf of the United States, or to any benefit to arise thereupon.

N.  Agency:  The City is not an agent or representative of the United States, the Department of the Interior, or NPS, or the Park, nor will the City represent its self as such to third parties.  NPS employees are not agents of the City and will not act on behalf of the City.

O.  Non-Exclusive Agreement: This Third Amendment in no way restricts the City or NPS from entering into similar agreements, or participating in similar activities or arrangements, with other public or private agencies, organizations, or individuals.

P.  No Third-Party Beneficiaries: Unless expressly stated herein, nothing in this Third Amendment is intended to grant any rights or to provide any benefits to any third-party.

Q.  Survival:  Any and all provisions which, by themselves or their nature, are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive and be enforceable after the expiration or termination of this Third Amendment.  Any and all liabilities, actual or contingent, which have arisen during the term of and in connection with this Third Amendment shall survive expiration or termination of this Third Amendment.

R.  Partial Invalidity:  If any provision of this Third Amendment or the application thereof to any party or circumstance shall, to any extent, be held invalid or unenforceable, the remainder of this Third Amendment or the application of such provision to the parties or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby and each provision of this Third Amendment shall be valid and be enforced to the fullest extent permitted by law.

S.  Captions and Headings:  The captions, headings, article numbers and paragraph numbers appearing in this Third Amendment are inserted only as a matter of convenience and in no way shall be construed as defining or limiting the scope or intent of the provision of this Third Amendment, nor in any way affecting this Third Amendment.

T.  Drug Free Workplace Act: The City shall cause Third Party's to take comprehensive action to ensure the workplace is drug-free.

U.  Jointly Drafted:  This Third Amendment shall be deemed to have been jointly drafted by both parties and, in the event of a dispute, shall not be construed against either party.

V.  Further Assurances:  If requested by one party, the other party shall execute and deliver such other documents and take such other action as may be necessary to effect the terms of this Third Amendment.

*{The remainder of this page left blank intentionally; signature page attached.}*

**ARTICLE XIII.    AUTHORIZING SIGNATURES**

**IN WITNESS WHEREOF,** the parties hereto have caused this Contract to be executed by their duly authorized representatives as of the respective dates indicated:

APPROVED AS TO FORM                     **THE CITY OF PHILADELPHIA:**
Shelly R. Smith, City Solicitor         **THE OFFICE OF THE MAYOR**

Per: _Douglas Kubinski_                 By: _____
Deputy City Solicitor                        Clarence D. Armbrister
                                             Chief of Staff

                                        **DEPARTMENT OF PUBLIC**
                                        **PROPERTY**

                                        By: _Joan Schlotterbeck_ 4/30/09
                                            Joan Schlotterbeck
                                            Commissioner

                                        **NATIONAL PARK SERVICE:**

                                        By: _Cynthia MacLeod_
                                            Cynthia MacLeod
                                            Superintendent
                                            Independence National Historical
                                            Park

ADD160

**Attachment A – Project Summary Sheet**

**PROJECT SUMMARY SHEET**
**April 16, 2009**

I.   **PARK NAME/PROJECT NAME:** Independence National Historical Park, exhibit called "Freedom and Slavery in Making a New Nation" on the President's House Site in Philadelphia

II.  **PROJECT DESCRIPTION:** The project consists of planning, design, and construction of an outdoor exhibit on the site of the 1790-1800 President's House (Robert Morris Mansion) in Philadelphia. The exhibit will commemorate all those who lived in the house while it was used as the executive mansion, including the nine enslaved Africans brought by George Washington from Mt. Vernon. Washington lived here while serving as our First President. Our Second President, John Adams and his wife Abigail, also lived at this site prior to the capital moving to Washington, D.C. Unlike Washington, Adams never owned any slaves. The mansion was adjacent to what is now the new Liberty Bell Center in Block One of the Independence Mall. The project cost is estimated at $8.5 million, which is a design-build project that will incorporate archeological remains of the mansion into the exhibit; an additional $2 million endowment is planned and will be held by the Friends of Independence, our non-profit partner, for long-term maintenance.

III. **STAFF ASSESSMENT:**
     **A. Summary of DO #21:**
     In December 2004, the City of Philadelphia confirmed its October 2003 offer of a $1.5 million donation for the President's House Site to cover the costs related to completing the project. The donation was vetted and approved by the Washington Partnership Office in May 2005. Subsequently, as part of the SAFETY-LU Transportation Bill, the project received a $3.6 million earmark primarily through the efforts of Congressman Chaka Fattah. The City has committed an additional $2 million from its Capital Funds for the project. On February 18, 2009, the Delaware River Port Authority, under the direction of Pennsylvania Governor Ed Rendell, approved a grant of $3.5 million. This grant will go toward the additional costs for incorporating archeological remnants found during a public investigation conducted March-July, 2007, which are $1.4 million. The city held a design competition and the winning design includes an extensive dependence upon electronic technology, for which the park has required a $2 million endowment, which will also be funded out of the DRPA grant. The Design Development Phase of the Partnership Construction Process is nearly completed.

   1. General Agreement/Fundraising Agreement: The project is currently fully funded. The City of Philadelphia has taken the lead in an ongoing fundraising effort seeking public and private funds in a grassroots effort designed to raise awareness of the project as well as additional funds for the endowment. The City of Philadelphia will "float" the base cost of the project with reimbursement coming from DOT/ Penn DOT as the transportation funding may be spread out over 4 years.
   2. Feasibility Study: Independence National Historical Park has submitted a feasibility study waiver request for the fundraising campaign.
   3. Fundraising Plan: The Fundraising Plan is attached to the March, 2009, Fundraising Agreement. Funds raised will go toward the

endowment for maintenance of the site.  The Agreement is for one year, renewable each year.

4. Donor Recognition Plan: The Independence National Historical Park Donor Recognition Plan is attached to the Fundraising Agreement.

B. **Legal & Ethics Review:**  The non-federal donors, the City of Philadelphia and the Delaware River Port Authority, have been fully vetted.

C. **Planning & Compliance:**  Phase I, II and III archeological excavations are complete.  All Section 106 compliance and NEPA are complete. The City funded the archeological research dig, which occurred from March through July, 2007.

D. **Status in PMIS and Level of Review:**  PMIS # 95291, region reviewed, previous update 2-25-05; current update in progress to reflect the $8.5 million scope, not including the endowment.  (It is noted that the PMIS project was originally detailed as a $4.5 million project.

E. **Summary of Approved Budget Program:**  As noted under III A. above, all funding needed for the project is now either in hand or committed.  On August 1, 2008, the City issued a notice to proceed to the architect for the additional design work.

F. **Staffing and Operations Impact Analysis:**  The exhibit will be a site fixture and will be a self guided experience.  The park may occasionally create special programs, but there will be no requests for additional staff. There will be additional utility and maintenance costs, including maintaining the proper environment for the archeological remains.

G. **Summary of Development Advisory Board:**  The project has been approved in concept by the Development Advisory Board in November 2005, which stated there was no requirement to return to the DAB.

H. **Congressional Review/Approval Process:**  The project was encouraged by Congressional Staff comments in 2003.

IV. **OTHER INFORMATION:**

1. **History of the project:**  In April 2003, the park submitted a report to the Interior Appropriations Committee per a request in House Report 107-564: "Therefore, given the historical significance of this issue, the Committee urges the NPS to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy."  The report contained a conceptual design, interpretive themes and overview of planning and design process.  In October, 2005, the City issued a Request for Qualifications that brought applications from 21teams.  Each team included a designer/architect, general contractor, and interpretive specialists.  A Selection Committee made up of City and NPS personnel including the Superintendent of Independence National Historical Park, the Division Chief of Cultural Resources Management of Independence National Historical Park, the Mayor of the City of Philadelphia and the Director of the City of Philadelphia Capital Program Office, with the counsel of a 10 person Oversight Committee representing community groups selected 6 teams to which a Request for Proposals ("**RFP**") was issued on June 15, 2006.

2.    These teams prepared models and presentation boards of their designs. The models were displayed for public comment. The City and NPS took comments of the public and the Oversight Committee into consideration when selecting the finalist. The Selection Committee selected the a team headed by Kelly/Maiello, Inc. Architects and Planners.

Based on selection of the Exhibit Team by the Selection Committee, the City entered into a Commission Agreement for Design, Fabrication and Installation of  a Public Exhibit ("**Commission Agreement**") with Kelly/Maiello Management, LLC on October 5, 2007.  The Commission Agreement included the insurance   provisions attached to the Third Amendment as **Attachment "D"**.  Following   execution of the Commission Agreement, Kelly / Maiello, LLC subcontracted with entities and individuals on the Exhibit Team for design, fabrication and   installation of the Project.

3.    **Public Awareness Process:**  This project has significant visibility in the public, particularly in the African American community interested in expanding interpretation of slavery and memorialization of Washington's slaves.  There was a rally in 2002 of about 500 people sponsored by the Avenging the Ancestors Coalition; in early 2003, about 300 people attended a public meeting to review the concept plan.  According to the park briefing paper, "a substantial distrust of the NPS was exhibited."  The park staff believes that this project will continue to require "significant input from both the general public and …this country's leading historians as it moves forward."  NPS held a civic engagement forum in 2004 with about 300 in attendance.  Public comment confirmed the validity of the 5 identified themes for the commemoration as well as the public's support for beginning the project.  With the City, NPS held a forum in November 2005 to provide an update on the planning process.  About 200 attended and again voiced support for moving the process forward.  On June 5, 2006, NPS and the City held another public forum with noted African American historians to discuss the qualities of good interpretive sites and to introduce the 6 semi-finalist teams to the public.  About 300 people attended and expressed concern for diversity in the design teams and for generating local jobs.  In March, 2007 the public attended the opening ceremony for the archeological research dig.  Mayor Street participated. There was a public component of the dig that included a viewing platform and a webcam.  The platform was staffed by volunteers and NPS interpreters.  The site had over 300,000 visitors to the platform during the dig.  Archeologists found foundation remnants of the bow window of the main house, the kitchen dependency and a connecting service passage. The project concluded with another ceremony on July 31, 2007.  Heeding public sentiments, the City and NPS had Kelly Maiello amend their design to incorporate the newly-discovered features.  In December, 2007, NPS and the City held a public meeting to introduce the amended design. About 150 attended and approved the new design.  July 3, 2008, the Park Superintendent participated with ATAC in a public commemorative ceremony on the site.  NPS and the City have been issuing press releases to keep the public informed about the process.  In August 2008, we announced that Kelly Maiello will perform test borings on the site.

4.    **City/NPS Cooperation:** On or about September 1, 2006, The City and NPS entered into a Cooperative Agreement ("**Cooperative Agreement**") to address the responsibilities of the parties for the Project. The City and NPS entered into a First Amendment to the Cooperative Agreement, dated July 19, 2007 transferring additional funding to NPS for the Research Dig and to extend the term of the Cooperative Agreement for an additional year. The City and NPS entered into a Second Amendment to the Cooperative Agreement, dated August 15, 2008 to extend the term of the Cooperative Agreement by an additional year.

This project will be managed through a unique partnership with the City of Philadelphia. It has jointly been determined that the City holds a contract with Kelly/Maiello Management, LLC for the work using a Design/Build approach. In accordance with the Cooperative Agreement as amended, NPS will receive copies of all designs and for the work product prior to final acceptance and will participate in the final review and approval of the Project. NPS will own and manage the commemorative work at the conclusion of the process. This approach is particularly beneficial as the City has the ability to advance the SAFETY-LU funds and then seek reimbursement from DOT/Penn DOT.

5.    **Opening Date:** The City of Philadelphia and NPS have agreed to dedication ceremony before the end of 2010.

ADD165

**Attachment B – Financial Obligations**

ADD166

**Attachment B: Financial Obligations**

**Sources**

City of Philadelphia                                                        $3.5 million
- Initial funding for the project was jump-started by former Mayor John F. Street with a 2003 pledge of $2 million from Capital Funds
- The City of Philadelphia, under Mayor Michael Nutter, later committed an additional $1.5 million in Cultural Corridors Bonds.

Department of Transportation                                          $3.6 million
- In 2004, U. S. Congressmen Chaka Fattah and Robert A. Brady secured a multi-year federal grant of $3.6 million, intended to complete the funding for the project.

Delaware River Port Authority                                        $3.5 million
- $1.5 million will complete funds for design and construction work
- $2 million will be used to create a Project Maintenance Endowment (detailed in an agreement between the National Park Service and the Friends of Independence).

Total                                                                     $10.6 million

**Uses**

Design and Construction

| | |
|---|---:|
| RFP Services | $    10,000 |
| Owner's Representative | 547,500 |
| Design Competition | 74,000 |
| Feasibility Study on Arch. Dig | 25,000 |
| Archeological Excavation | 768,441 |
| Independence Park Sitework | 143,320 |
| Primary Design/Build Cost | 4,500,000 |
| Additional Design/Build Cost with Archeological Component | 2,468,000 |
| | $8,536,261 |

Endowment                                                            $2,063,739

Total                                                                    $10,600,000

ADD167

**Attachment C – Project Development Plan**

ADD168

**Attachment C to the Third Amendment to the Cooperative Agreement**
**Between**
**The City of Philadelphia and**
**National Park Service**
**for the**
**The President's House:   Freedom and Slavery in Making a New Nation Project**

### PROJECT DEVELOPMENT PLAN

A.    **Purpose**

The purpose of the Project Development Plan is to describe the process for the planning, design, development and construction of the Project beginning on the Commencement Date of the Third Amendment to the Cooperative Agreement.  The Plan sets forth standards for each stage of the Project and the roles and responsibilities of the National Park Service (NPS) and the City of Philadelphia (City) in this process.

B.    **Project Description**

The Project consists of design, fabrication and installation of the Exhibit an outdoor exhibit on the site of the 1790-1800 President's house (Robert Morris Mansion) in Philadelphia.  The exhibit will commemorate the home of George Washington and John Adams during the first ten years of the federal government, as well as commemorate the enslaved Africans who resided in the Washington household.  Site interpretation will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved. The Project will be owned, maintained, managed, and interpreted by the NPS. Collectively, the work, which is generally described below, will be known as the "Project."

1. While the project does not seek to recreate the original President's House that once stood at this site, the design establishes the physical boundaries of the original house using architectural fragments such as masonry exterior and interior, ground-level walls and fireplaces, metal framed front door and windows, and bluestone and marble pavers.
2. Also included, if a practical design can be achieved with no adverse impact on historic resources, is a 20' x 20' conditioned glass enclosure, framed around a submerged archeological excavation site approximately twelve feet below grade level, and a 10' x 15' metal and glass framed enclosure marking the site of the former "slaves' quarters."  LED screens, speakers and graphic panels are incorporated into the fragments to provide an interpretive experience for visitors.
3. A small landscaped area occupies a portion of the site and in-ground, recessed and surface mounted light fixtures provide general and accent lighting for the entire site.

**C.     Selection of Professional Consultants**

1.  The City has engaged an interdisciplinary Design Team for the project.  The team is headed by an architecture firm, Kelly/Maiello, with subcontractors including but not limited to a Mechanical, Electrical and Plumbing (MEP) engineer.  The MEP engineer has experience in designing and testing: HVAC, lighting, plumbing, and other systems to maximize energy performance, and has a working knowledge of American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHRAE) codes.

2.  The selection of the architect, Kelly/Maiello, was through a competitive process of evaluation of responses to a Request For Proposal [RFP] which stipulated the terms of the project and the forms of the submissions.

3.  The City and NPS also selected a team of community leaders (the Oversight Committee) who have participated in the selection and review process throughout the course of this project.

4.  The NPS has reviewed and approved, and will retain the right to review and approve, the individual consultant firms and individuals included within the Design Team. The City and the NPS have collaborated throughout the design process to develop the Project.  This collaboration is memorialized in a Cooperative Agreement executed on August 25, 2006 and amended July 19, 2007 and August 15, 2008, and is pending execution of the Third Amendment, which incorporates this Project Development Plan as Exhibit "C".

**D.     Programming and Design of the Project**

1.  During NPS's commitment to provide review, comment and approvals in accordance with the Cooperative Agreement as amended, NPS will provide input and guidance to the City on information relevant to completing the Project, including applicable federal, state and local regulations, NPS Management Policies 2006 9.1 - 9.4, published NPS standards generally applicable to similar facilities, all relevant documents, including plans, planning studies and planning documents, historical studies and park-specific documentation and other mutually agreed criteria.  Applicable published NPS standards include NPS-6, Interpretation and Visitor Services; the NPS-28, Cultural Resource Management; DO-42, Accessibility for Visitors with Disabilities in the NPS Programs, Facilities and Services; DO 50-B, Occupational Safety and Health; and, DO 52-A Communicating the National Park Service Mission.

2.  The NPS will review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended.  All review by the NPS will be reasonable and timely.

ADD170

3. In addition to documents previously provided, the City will cause the Exhibit Team to prepare schematic design documents, including value analysis for the Project, in accordance with the approved program. The NPS will review all previously submitted and future schematic design documents, design development documents, and construction documents.

**E. Data and Materials to Be Provided By NPS**

1. The NPS will be responsible for all compliance as required by the National Environmental Policy Act (NEPA) and the National Historic Preservation Act.

2. The NPS will provide all relevant studies including but not limited to Surveys, Archeology Reports, NPS exhibit and interpretive criteria.

3. The NPS will provide professional expertise for review, information, assistance and facilitation of the project.

**F. Core Design Requirements**

1. The design will conform to the Independence Mall Design Guidelines as appended to the RFP.

2. The following Core Design Requirements will be used throughout all stages of the design process:

   a. The outer boundaries or footprint of the President's House must be clearly demarcated.

   b. The footprint of the Slave Quarters must be conspicuously highlighted and a solemn "sense of place" clearly established.

   c. Documented interior rooms or spaces may be included in the design's ground plan to a level of detail that the designer determines will be understood by the public. Additional interpretive elements may provide expanded explanation of historical use of the property.

   d. Six substantive themes must be reflected in the final design. The first five listed below emerged from the preliminary Conceptual Design, and the sixth became clear in a Public Forum held in October 30, 2004:

      i. The house and the people who lived and worked there

      ii. The Executive Branch of the U.S. Government

      iii. The system and methods of slavery

      iv. African-American Philadelphia (including an emphasis on free African-Americans)

      v. The move to freedom

ADD171

      vi.   History lost and found (how knowledge of the President's House and the presence of slavery was forgotten and recovered; why we must remember"

e.   Five cultural values also emerged from the October 30, 2004 Public Forum:

      i.   Identity – Interpretation at this site offers an opportunity to put names and faces on a small fraction of the enslaved and free people of African descent who were part of the fabric of the life in the President's House. These enslaved individuals thus are symbols of the millions of people who were held in bondage during the 16th, 17th, 18th, and 19th centuries. What is known of the lives of those who were enslaved and worked in the President's House will be a backdrop of the story.

      ii.   Memory (a sense of influence of the past on the present) – The nation's first Executive Branch conducts the affairs of the government in the rooms of the house. At the same moment in the 18th century, the economic labor system that made it legal to enslave human beings was actively practiced in the house. By describing and honoring the enslaved people who lived at the site, we are commemorating and honoring the many enslaved people whose stories will never be known and told.

      iii.   Agency – The 18th century system of slavery was a complete economic, cultural and social world with people of African descent as full participants in the affairs of the time.

      iv.   Dignity – The enslaved population retained their dignity. George Washington's slaves adhered to an unwritten code of conduct that was as nuanced and demanding as the first president's well-known code of civility.

      v.   Truth – A factual account of how Washington's household used nuances of the Pennsylvania Gradual Abolition Act of 1780 to keep individuals in slavery while they were in Philadelphia rather than at the estate in Mt. Vernon, Virginia. The condition of those in bondage was maintained in order to sustain the political and social strata of society during the post-revolutionary era.

f.   As part of the landscaping of the first block of Independence Mall, an east-west walkway will be constructed that will connect the subway entrance on the southwest corner of Fifth and Market Streets to the President's House Site. Although the Design Team will not be responsible for the actual construction of the walkway, the walkway must be incorporated into the design of the President's House Exhibit so that the Exhibit receives the western end of this walkway.

ADD172

**G. Professional Standards Requirements.**

1. General

   a. This work shall consist of the preparation of Schematic Design, Design Development, and Construction Documents. All documents shall be prepared using the English System of Weights and Measurements, and requirements included in the RFP.

   b. All work performed shall comply with applicable laws, regulations and the NPS policies and guidelines.

   c. Design Team shall:

      (i) Prepare drawings for Design submissions using Auto-Cadd Systems, latest edition, and in accordance with the American Institute of Architects ("AIA") "CAD Layer Guidelines" or such other guidelines as reasonable determined by the City. Final drawings shall be provided on mylar as well as in electronic format. In addition to providing submissions in accordance with the Project Schedule, Design Team shall furnish four (4) sets of sealed plans for permitting purposes and permit applications, each with required supporting documentation.

      (ii) Incorporate appropriate energy conservation measures into its Design where applicable as reasonably determined by the City and consistent with the Final Design and Cost Proposal, and any agreed amendments thereto;

      (iii) Comply, to the extent applicable; with the Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101-12213 and all applicable regulations promulgated thereunder;

      (iv) With the assistance of the City as necessary, obtain sign-off of all utility service providers and the National Park Service;

      (v) Furnish cost estimates with the Design submission for each phase, which shall be organized in accordance with CSI format and incorporate contingencies and escalations appropriate to the Design development and Project Schedule;

      (vi) When required by law, have the Design services provided hereunder performed or reviewed, approved and sealed by architects or engineers duly licensed to practice in the Commonwealth of Pennsylvania.

   d. The City will submit all hard and electronic deliverables to: Doris Fanelli, Chief, Division of Cultural Resources Management, Independence National Historical Park, 143 South Third Street, Philadelphia, PA 19106 for review distribution or for deposit in the park's archives.

   e. The City is to perform oversight of design, fabrication and installation of the Project. This includes but is not limited to the following:

ADD173

    i.   Attendance at weekly construction meetings;
    ii.  Photo documenting work;
    iii. Reviewing shop drawings;
    iv. Reviewing test submittals;
    v.   Approving requests for payment;
    vi.  Insuring that the property party responds to requests for information;
    vii. Causing Exhibit Team designers to issue addenda,
    viii Reviewing change orders; and
    ix. Overseeing mechanical system testing.

2.  Quality Control

The City shall accomplish a Quality Control Review and shall cause Exhibit Team designers to make corrections prior to each submittal to the NPS. The NPS will review the drawing and specifications in a timely manner in accordance with the Cooperative Agreement as amended.

**H. Schematic Design Phase: The Schematic Design phase of the Project is completed.**

The City and NPS will confer on their review of Schematic Designs and convey said comments to Kelly/Maiello and incorporate resolutions into the Design Development phase of the project.

**I. Design Development Phase: The Design Development Phase of the Project is completed pending NPS concurrence.**

1.  The Exhibit Team designers have developed Design Development Documents based on the Schematic Design.

4.  The Exhibit Team designers will submit written responses to review commentswithin 15 calendar days of receipt of comments.

**J. Construction Document Phase**

1.  Construction Documents will be reviewed at 90% and 100% completion. At a minimum, construction documents shall include:

    a.     Project Overview Site Plan
    b.     Abbreviation Sheet/Symbol Sheet
    c.     Demolition Plan (Removal of trees, walks, building, pipes);
    d.     Layout and Grading Plan
    e.     Erosion Control Plans
    f.     Pedestrian Control Plans
    g.     Overall Floor Plan
    h.     Overall Roof Plan
    i.     Exterior Elevations

ADD174

| | |
|---|---|
| j. | Site/Building Sections |
| k. | Site/Building Details |
| l. | Typical Details and Schedules |
| m. | Plumbing Plans |
| n. | Electrical Plans |
| o. | HVAC Plans |
| p. | Landscape Plan and Details |
| q. | Division 1 Construction Specifications |
| r. | Divisions 2 through 16 Construction Specifications. (The A-E shall utilize and modify their own Divisions 2 through 16 Construction Specifications templates. Divisions 2 through 16 Construction Specifications format shall match the NPS Division I Construction Specifications format.) |
| s. | Contract Price Schedule or Construction Bid Schedule |
| t. | Final Product File |

2.  Design Team will prepare Class A Construction Cost Estimate based on the completed 100% Draft Construction Documents. Confirm that the project cost is within available funds.

3.  Design Team will prepare List of Required Submittals.

4.  Design Team will prepare Summary List of Operation and Maintenance Requirements as identified in individual construction specification sections.

5.  Design Team will finalize Constructability Analysis

6.  Deliverables - 100% Draft Construction Documents
    Design Team will submit 5 paper copies of the following documents for review:

| | |
|---|---|
| a. | Construction Drawings |
| b. | Construction Specifications |
| c. | Contract Price Schedule or Construction Bid Schedule |
| d. | Product File |
| e. | Class A Construction Cost Estimate |
| f. | List of Submittals |
| g. | List of Operation and Maintenance (O&M) Requirements |
| h. | Constructability Checklist |
| i. | Design Calculations |

NPS will submit copyist review of the 100% Draft Construction Documents to the City.

7.  The City will submit 100% Complete Construction Documents for review, comment and final approval by the NPS in accordance with the Commission Agreement as amended.

ADD175

**Attachment D – Exhibit Team Insurance Requirements**

ADD176

## Exhibit Team Insurance Requirements

a.    Provider shall maintain such insurance as is specified in this Article X.  That insurance shall be maintained by the Exhibit Team member designated at its sole expense.  All insurance shall be subject to the reasonable approval of the City as to coverages, terms and insurance carriers.  All required coverages must be with companies with a Best's rating of A VIII or better.  No "cut-through" endorsements will be permitted.  The following are minimum coverage limits for insurance required to be maintained under this Agreement and the designation alongside each coverage indicates who shall secure and maintain that insurance:

      1.    Commercial General Liability on an occurrence form with the following limits:

          (a)    General Aggregate - $2,000,000
          (b)    Products/Completed Operations - $1,000,000
          (c)    Each Occurrence - $1,000,000
          (d)    Personal and advertising injury - $1,000,000
          (e)    Fire damage (any one fire) - $50,000
          (f)    Medical Expense (any one person) - $5,000

The general aggregate must apply on a per location basis.  Such coverage shall include the following provisions:

          i.    coverage for operations and products/completed operations;
          ii.    coverage for liability arising from the acts of independent contractors;
          iii.    personal injury liability;
          iv.    coverage for property damage due to explosion, collapse or underground hazards(Excluded for KMI only);
          v.     broad form property damage coverage, including completed operations; and

      2.    Commercial Automobile Liability covering all owned, hired and non-owned vehicles with limits of $1,000,000 combined single limit each occurrence.  The Provider does not own any vehicles.

      3.    Commercial umbrella coverage of $5,000,000 which shall apply to the excess of Commercial General Liability (following form per project limit), commercial automobile liability and employer's liability coverages.

3.  <u>Professional Errors and Omissions Liability</u> with a
$1,000,000 annual aggregate limit and a $50,000 annual
aggregate deductible, covering claims arising from of
professional services in connection with the management
of the Project.

5.  <u>Employers' liability insurance</u> with limits of not less
than:

$500,000 Each Accident - Bodily Injury by Accident
$500,000 Each Employee - Bodily Injury by Disease
$500,000 Policy Limit - Bodily Injury by Disease

6.  <u>Builder's Risk/Installation Floater Insurance</u>

(a) <u>Coverage</u>: "All risks" in an amount equal to not less
than the full replacement cost of the work under the Agreement
(meaning work in replacement which is of like kind and quality).

(b) <u>Period of Coverage</u>: Anything herein to the contrary
notwithstanding, the Builder's Risk Insurance shall be procured
and maintained during the entire period of performance of the
Agreement until final acceptance of the Project by the City.

7.  <u>Performance/Payment Bonds</u>

As provided by the Act of 1967, December 20, P.L. 869 (8 P.S. §
193, et seq., as amended), the Provider shall cause DJK
(Keating) to provide, at the time of execution of the Agreement,
security for the faithful performance of the work and for
compliance with the Agreement in the form of a performance
bond, with a surety company approved by the City, in a sum
equal to 100% of the amount of the construction portion of
fabrication and installation including any contingency amount.
In addition, as provided by the Act of 1967, December 20, P.L.
869 (8 P.S. § 193, as amended), the Provider shall cause DJK to
provide, at the time of execution of the Agreement, a payment
bond, with a surety company approved by the City, in a sum one
hundred percent (100%) of the amount of the fabrication,
installation and/or construction portion of the fabrication and
installation cost including any contingency amount, conditioned
for the full payment of its Subcontractors furnishing labor and
materials in the performance of the Agreement.

b.    The insurance described in 1, 2 and 3 above shall include the
endorsement as additional insureds, without liability by such additional insureds for

ADD178

payment of the premiums thereof, and the following parties and each of their officers, directors, employees, agents and representatives:

> City of Philadelphia
> 1515 Arch Street, 14th Floor
> Philadelphia PA  19102
> Attention:  Risk Manager
>
> Department of the Interior
> National Park Service
> c/o Dennis Reidenbach, Superintendent
> Independence National Historic Park
> 313 Walnut Street
> Philadelphia, PA 19106

      c.      The Provider shall not cancel or permit to be canceled any of the insurance policies required without the prior written consent of City and the National Park Service (NPS).  The City, the NPS, and the other stakeholders identified by the City shall receive thirty (30) days prior written notice of cancellation, non-renewal or material reduction in coverage to any of the insurance policies required pursuant to this Agreement and each insurance policy and certificate thereof shall contain a valid provision or endorsement to that effect.  Not less than forty-five (45) days prior to the expiration of such policies, the Provider shall deliver to the City and NPS evidence that the relevant Exhibit Team member is seeking to have such policy/policies renewed or replaced in accordance with all of the provisions of this Agreement.

      d.      Original certificates of insurance must be submitted to the City's Risk Manager at the following address:

> City of Philadelphia
> Finance Department
> Division of Risk Management
> 1515 Arch Street, 14th Floor
> Philadelphia, PA 19102-1579
> (Fax No.: 215-686-1708).

A copy of the certificate of insurance shall be submitted to the Responsible Official. Both submissions must be made at least ten (10) days before work is begun.  The ten (10) day requirement for advance documentation of coverage may be waived in such situations where such waiver will benefit the City, but under no circumstances shall Provider actually begin work without providing the required evidence of insurance.

ADD179

10. The NPS has the right to approve all design and construction work for the entire project in accordance with the Cooperative Agreement as amended.

**N.  Amendments to the Development Plan**

The NPS and the City mutually understand and acknowledge that preparation of the comprehensive design for the project may cause either or both parties to recommend changes to this Development Plan.  Such revisions may be recommended by either party. Modifications, revisions, or additions to this Plan shall be made in writing and will become effective only upon the written approval of both parties.  Amendments must be dated and signed by the Key Official or other authorized representative to this Cooperative Agreement as amended.

```
 1                    UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF PENNSYLVANIA

 3    CITY OF PHILADELPHIA,
                                      Case No. 2:26-CV-00434-CMR
 4              Plaintiff,

 5    v.                              Philadelphia, Pennsylvania
                                      January 30, 2026
 6    DOUG BURGUM, Secretary Of The   10:38 a.m.
      Interior, et al,
 7
                Defendants.
 8

 9         TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
             BEFORE THE HONORABLE CYNTHIA M. RUFE
10              UNITED STATES DISTRICT COURT JUDGE

11
      APPEARANCES:
12    For the Plaintiff:            Bailey Axe, Esq.
                                    Renee Garcia, Esq.
13                                  Lydia M. Furst, Esq.
                                    Anne B. Taylor, Esq.
14                                  City of Philadelphia Law
                                    Department
15                                  1515 Arch Street, 15th Floor
                                    Philadelphia, PA 19102
16
      For the Defendant:            Gregory B. In Den Berken, Esq.
17                                  Mark J. Sherer, Esq.
                                    U.S. Attorney's Office for the
18                                  Eastern District of Pennsylvania
                                    615 Chestnut Street
19                                  Suite 1250
                                    Philadelphia, PA 19106
20
      Court Recorder:               Unknown
21
      Transcription Service:        Chris Hwang
22                                  Abba Reporting
                                    PO Box 223282
23                                  Chantilly, Virginia  20153

24    Proceedings recorded by electronic sound recording;
      transcript produced by transcription service.
25
```

1                          <u>**INDEX**</u>

2

3     <u>WITNESSES FOR PLAINTIFF</u>    <u>Direct</u>    <u>Cross</u>      <u>Redirect</u>    <u>Recross</u>

      Joyce Wilkerson                33        60

4     Edward Gillison                66

5     Valerie Gay                    96

6

7     <u>WITNESSES FOR DEFENDANT</u>

8     n/a

9

10    <u>EXHIBITS</u>                                        <u>OFFERED</u>      <u>RECD</u>

11        Defendant's 27-1                             111          111

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to order at 10:38 a.m.)

2               THE CLERK:  All rise.  Court is now in session for

3     the United States District Court of the Eastern District of

4     Pennsylvania.  The Honorable Judge Cynthia Rufe now presiding.

5               THE COURT:  Good morning, everyone.  Please be

6     seated.

7               ATTORNEYS (IN UNISON):  Good morning, Your Honor.

8               THE COURT:  As you well know, I am Judge Cynthia Rufe

9     and I have been assigned this case, which for the record we

10    will review the parties and counsel who are present.

11              And we will start with the City of Philadelphia.  And

12    as the Plaintiff represented by Renee Garcia, Chief Solicitor

13    of the Philadelphia Law Department.  And would you please

14    introduce your team of lawyers?

15              MS. GARCIA:  Thank you, Your Honor.  And good

16    morning.  I am Renee Garcia, the City solicitor representing

17    the City of Philadelphia.  I have next to me Bailey Axe, Lydia

18    First, and Anne Taylor.  All three are in the City Solicitor's

19    Office.  Thank you.

20              THE COURT:  Thank you.  The City has sued in civil

21    action 424 of 2026, a number of Defendants from the United

22    States Government.  Doug Burgum, Secretary of the Interior,

23    United States Department of the Interior, Jessica Bauer, an

24    acting director of the National Park Service and National Park

25    Service, United States Department of the Interior.

1          Each of these Defendants are represented by the same

2    lawyers.  Mr. In Den Berken?

3          MR. IN DEN BERKEN:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MR. IN DEN BERKEN:  Greg In Den Berken for the

6    federal Defendants.

7          MR. SHERER:  Good morning, Your Honor, Mark Sherer

8    also for the Defendants.

9          THE COURT:  Thank you.  Do you have any other

10   attorneys here that will be addressing the Court today?

11         MR. IN DEN BERKEN:  No, Your Honor.

12         THE COURT:  I know you have other assistants and the

13   like behind you.

14         MR. IN DEN BERKEN:  Correct, but no one here.

15         THE COURT:  Thank you.

16         Because we have been requested to and granted a

17   number of amici briefs, and I have limited it to briefs, it's

18   not been extended to giving testimony.  I don't feel the

19   appropriateness of that when we have able counsel to present

20   this case.

21         However, that may change in the future, but my

22   decision here is made without prejudice, but I'm very

23   interested, having reviewed each of the briefs that were

24   submitted and having that made part of the record, which it is

25   as a brief.

1    And argument will be permitted.  Where in the

2    proceedings, the argument flows will be determined as we see

3    how much evidence we can get through here because today is

4    about evidence.

5    This is a hearing.  Yes, there will be various bouts

6    of oral argument on legal issues, which abound in this

7    particular clash of titans.

8    However, we are going to get through any and all

9    evidence before we get to argument.  Now on behalf of I have

10    four amici, I'd like you to stand and tell me who you are

11    representing?

12    MS. MCCLELLAN:  Good morning, Your Honor, Kara

13    McClellan (phonetic) on behalf of amici Avenging the Ancestors

14    Coalition and Black Journey.

15    With me is Mary Katherine Roper (phonetic), Natalie

16    Ricon (phonetic), and Kate MacNamara Marsland.  And then also

17    present in the courtroom are members of Avenging the Ancestors

18    Coalition, including Mr. Michael Coard, the founder.

19    THE COURT:  Very good.  Thank you.

20    MS. MCCLELLAN:  Thank you.

21    THE COURT:  I have other amici.  I say amici, you say

22    amici, and there's several other ways to say it, too, but I

23    think I don't want to change my course at the moment.

24    So is there anyone else here representing any of the

25    other three amici, one of whom is the governor of Pennsylvania.

1    The most recent request that I approved came this morning or

2    yesterday and I am certain that I have -- I don't think I have

3    their motion printed out.  I can't find it.  This one?  Oh, all

4    the way over there, okay.  And that's the Democratic Caucus of

5    the Senate of Pennsylvania in support of the Plaintiff's motion

6    for preliminary injunction.

7             So that takes care of the amici.  Thank you for your

8    interest.

9             So let's see where we are.  We know that you are all

10   aware and those on the telephone phone in line must have been

11   made aware that there was a call in, audio only.  No videos are

12   presented from the Court.  Court is not approved for streaming

13   services either.

14            And of course, no recordings can take place.  And

15   I -- if you are in this courtroom or the additional adjunct

16   courtroom at 12B, all of you must follow those rules.

17            And the only laptops that were permitted were those

18   of the press, which I have asked to be seated closer to

19   witnesses here in the jury box.  And I hope that's

20   accommodating all of your requests.

21            We also have some more press that have called in.

22   And that is fine because this is an open courtroom.  It is a

23   public courtroom.  And if ever there was a public issue or 3 or

24   10 or more, it's this case.

25            And all of our proceedings are open.  We make our

1    decisions in the open.  Unless we have to write them down and

2    we'll make them in Court, and then, commit them to writing.

3         This is important that everyone hear the same

4    evidence the Court is, report it carefully, listen to it with

5    interest and please no responses, all right?  It's not a

6    townhall meeting.  And it's not a social gathering.  And I

7    thank you all for being as serious about this as I know we and

8    the parties are and their attorneys.

9         The additional matters that I want to address I will

10   do so as we move along.  I do know that this morning, I was

11   given a stipulation between the parties.

12        And that concerns the admission of certain documents

13   and other pieces of evidence that the parties agree to have

14   submitted to the Court.

15        Counsel, would you address these -- this stipulation,

16   please?  Ms. Garcia?

17        MS. GARCIA:  Sure, thank you, Your Honor.  We have 24

18   documents that we may not use all of them, but could be used

19   today.  We have three witnesses.

20        And yes, we have entered into a stipulation with the

21   United States that these documents be submitted for

22   authenticity, admissibility for the purposes of the preliminary

23   injunction only.  That's at the bottom of page 1.

24        And you do have up there, Your Honor, a binder with

25   the 24 documents in it.  And I believe your clerk has a binder

1    as well.  And we have a copy for the witness and of course the

2    Defendants have a copy of all the documents.

3            THE COURT:  Are these related to authenticity, but

4    also admissibility?

5            MS. GARCIA:  Yes, yes, Your Honor.

6            THE COURT:  So I don't expect any objections when any

7    of these documents are available?

8            MR. IN DEN BERKEN:  I think foundation will need be

9    to be established for each witness, Your Honor, but other than

10   that, the admissibility and authenticity are no issue.

11           THE COURT:  All right, I think that's an appropriate

12   way to proceed.

13           MS. GARCIA:  Thank you, Your Honor.

14           THE COURT:  And are you ready to proceed, Ms. Garcia?

15           MS. GARCIA:  Yes, Your Honor.

16           THE COURT:  You do have witnesses to present.  That's

17   why we re-scheduled this hearing from Wednesday.  And the

18   Government did have an additional day to respond to the

19   preliminary injunction complaint and we have reviewed all the

20   pleadings including the complaint.

21           The Government's response on the complaint will be

22   determined by my next order, because I don't think I'm going to

23   want to wait 60 days.  And we'll talk about that because this

24   is too pressing an issue.  This is the quincentennial

25   celebration being planned as we speak for the very site

1    inclusive of the very site that this case involves.

2            And this will not drag into the summer.  It will not

3    drag into the spring.  We will decide this promptly so that

4    everyone knows where they are and what they can do.  Please

5    proceed.

6            MS. GARCIA:  Your Honor, am I permitted to make an

7    opening statement to advise the Court what --

8            THE COURT:  You are.

9            MS. GARCIA:  -- we are going to proceed today?  Thank

10   you so much.  And thank you Your Honor for the short

11   adjournment.  Our witness was able to get in from California

12   yesterday at 1:00 a.m.  So she's here today.  Thank you.

13           Good morning, Your Honor.  I'm Renee Garcia.  I'm the

14   City Solicitor here on behalf of the City of Philadelphia.  The

15   City is here on its motion for preliminary injunction seeking

16   the restoration of the President's House in the Independence

17   National Historical Park.

18           As you will hear today, the City is irreparably

19   harmed by the destruction of the commemorative exhibit the

20   first federal property to feature a slave memorial.  And by the

21   Park Services own account, they have more damage to do at the

22   site.

23           The City has already submitted in support of its

24   complaint various of the contracting documents that illustrate

25   the extensive history between the City and the Park Service

1    associated with this site.

2            Indeed, the foundation of this collaboration between

3    the parties states back to an act of Congress from 1948.  For

4    the record, that's Title 16, Section 407, subsections (m) and

5    (n) establishing the Independence National Historical Park.

6            That act specifically authorizes the Secretary of the

7    Interior to enter into cooperative agreements with the City of

8    Philadelphia to preserve the park for the benefit of the

9    American people.

10            Pursuant to the act, the National Park Service and

11    the City of Philadelphia entered into a cooperative agreement

12    dated 1950.  And I quote from that agreement.

13            Quote, it is the purpose of both parties to this

14    agreement to develop a unified long range program of

15    preservation, development, protection, and interpretation for

16    the whole of Independence National Historical Park for the

17    inspiration and benefit of the people of the United States.

18            And to secure this result, a high degree of

19    cooperation is necessary with each other.  And the parties

20    hereto pledge themselves to consult on all matters of

21    importance to the program.  That's Article 3, Subsection (e) of

22    the 1950 agreement.

23            I submit to you this morning that the removal of the

24    exhibit at the President's House is of grave importance to the

25    program.

1          These pledges that the parties made in 1950 to the

2     public and to each other at the direction of Congress form the

3     bedrock of the relationship that made the restoration of the

4     President's House possible.

5          At each stage, the City, the Park Service, and the

6     community worked together to create a shared vision, a shared

7     message, a message that reflects the years of discovery,

8     research, soul searching, and reconciliation with a history

9     that is not as clean as we learned in grade school, a history

10    that is imperfect, a history that is flawed.

11         The central theme of the project commemoration of the

12    enslaved persons who lived in the Washington household was laid

13    out specifically in the 2006 cooperation agreement between the

14    parties amended three times and reinforced by the federal

15    government over and over, culminating in the President's House

16    designation as an underground railroad network site.

17         The Park Service has an ongoing obligation to

18    maintain and manage the site, and yes, interpret the site as

19    well, but the contract specifically proscribes that the site

20    interpretation will focus on the house and the people who lived

21    and worked there.

22         The executive branch of the United States government,

23    the systems and methods of slavery, African American

24    Philadelphia, and the move to freedom for the enslaved.  That's

25    the 2009 amendment, attachment C, the project development site,

1    Section B.

2            The Park Service does not have cart blanche to

3    interpret as they like.  They have no discretion.

4            To summarize the history, the President's House

5    project has been book ended by acts of Congress.  First, a

6    directive to the Interior and the City to collaborate on

7    preservation of the park, all the way through the 2022

8    designation of the site under the National Underground Railroad

9    Network to Freedom Act of 1998.  Those acts of Congress remain

10   effective as does the 1950 cooperation agreement.

11           It is clear that neither party has the ability to

12   unilaterally erect an exhibit or take down an exhibit,

13   particularly an exhibit of this significance.

14           For the Park Service to now destroy a commemorative

15   site that took 10 years, millions of dollars, and substantial

16   collaboration without so much as a conversation is the very

17   definition of an arbitrary and capricious action.

18           Your Honor, today, the City will present testimony

19   and documents that will illustrate the integral role that the

20   City played in supporting the design and development of the

21   President's House and will further illuminate the core

22   principal of this commemorative site that it exists to educate

23   the public about the inherent tension and the fact that the

24   first leader of our new country built upon core principles of

25   liberty had slaves.

1          You will hear from Joyce Wilkerson, former Chief of

2     Staff for Mayor John Street, a member of the oversight

3     committee from the project's inception.

4          Ms. Wilkerson will provide testimony detailing the

5     origins of the project dating back to the early 2000s,

6     beginning with community activism, encouraging the

7     interpretation and commemorization of the site to honor

8     enslaved persons who resided in President Washington's home.

9          She will explain that beginning in 2003, the City

10    took a leadership position in collaboration with the Park

11    Service to develop the contact -- content and raise funds for

12    the project.

13         The process included input from public advocates,

14    historians, academics, educational institutions, archeologists,

15    and federal and local elected officials amongst others.

16         The purpose was to uncover both literally and

17    figuratively the real truth about the persons who lived in the

18    first White House.

19         You will hear from Edward Gilleson, the Chief of

20    Staff for Mayor Michael Nutter, who carried this project

21    through a slog of four years of construction and technology

22    issues to its final close out in 2015.

23         He will explain that despite the issues, the parties

24    remain committed to finishing this project, the one they had

25    been tasked to complete for the people of the City and the

1    people of this country.

2        Both Ms. Wilson and Mr. Gilleson will testify that

3    they never thought this could happen, that the Park Service

4    after all the parties had worked towards would tear out the

5    very heart of the president's home.

6        Finally, you will hear from Val Gay, the chief

7    cultural officer for the City of Philadelphia.  Ms. Gay will

8    testify regarding the importance of the President's House and

9    the landscape of Philadelphia today as both an exhibit in its

10   own right and a National Underground Railroad Network site and

11   the impact the removal is having and will have on the City.

12       Ms. Gay will explain how this impact is especially

13   pronounced in the year that Philadelphia and these sites in

14   particular will host significant increased number of visitors

15   seeking to celebrate the semi quincentennial anniversary of the

16   founding of the United States of America.

17       You will see the shared press releases about the

18   project.  You will see the design documents.  You will see

19   requests for query documents showing the intention of the site.

20   You will see photos of the site before and after destruction.

21   All of this evidence will demonstrate that the City, which

22   invested and helped develop this important site and which has

23   statutory and contractual rights to consultation input and

24   approval before the changes are made is specifically harmed by

25   the United States' abrupt decision to remove essential

1    information from the President's House, thereby undermining the

2    very reason for this commemorative site.

3         Your Honor, after the City presents its evidence, we

4    will be prepared to argue on the legal merits in response to

5    Defendant's brief.

6         But just briefly, we submit that the City has

7    standing to pursue its claims grounded in the act of Congress

8    1948 and the cooperative agreement in 1950, the terms of which

9    can only be overwritten by Congress, the 2006 cooperative

10   agreement as amended requires the Park Service to maintain,

11   manage, and interpret the site, but not interpret as they want.

12        Interpret as required by the agreement.  The

13   obligations of which survive the expiration of the contract.

14        75 years of collaboration went out the window last

15   Thursday with no warning, no notice, and a clear violation of

16   these governing agreements.

17        Additionally, the Court has jurisdiction to hear

18   these claims.  28 USC §1348 instructs that district courts have

19   original jurisdiction over contract claims where the amount at

20   issue is under 10,000.

21        This is not a grant termination case seeking specific

22   performance that requires the federal government to spend

23   millions of dollars.  This is a case about a failure to

24   confirm -- conform to required collaboration.

25        The City will establish a substantial likelihood of

1  success on the contract claim brought under the Administrative

2  Procedures Act, Section 702, the City will plainly show the

3  Park Service breached the 1950 agreement.

4         On the other APA claims, the City will establish that

5  the Park Services action is a final agency action.  The

6  memorial is damaged and harmed to the City's legal rights to

7  the space flow from that action.

8         The evidence will demonstrate that the Park Service's

9  action is arbitrary and capricious, the National Underground

10  Network of Freedom Act specifically acknowledges that, and I

11  quote, underground railroad bridged the divides of race,

12  religion, sectional differences, and nationality, spanned state

13  lines and international borders, and joined American ideals of

14  liberty and freedom expressed in the Declaration of

15  Independence and the Constitution, both of which were signed

16  within striking distance of the House to the extraordinary

17  actions of men and women working in common purpose to free up

18  people.

19         It specifically directs the Secretary of the Interior

20  to develop a program highlighting and supporting sites involved

21  in the Underground Railroad.

22         President's House is one of these network to freedom

23  sites and the Park Service has now removed the essential

24  information and contravention of the direction of Congress and

25  with seemingly no consideration at all.

 1          That the Park Service did this without contacting the

 2     City let alone seeking agreement is also arbitrary and

 3     capricious in violation of Title 16, Section 407N, which is

 4     that 1948 Act.

 5          The City will establish irreparable harm.  The

 6     contents of the removed panels are critical context to share

 7     the story of the individuals enslaved at the President's home

 8     and their fight for freedom.

 9          The evidence will show that the balance of harms and

10     public interest favor immediate restoration of the President's

11     House.

12          At the close of evidence, the City will ask for entry

13     of injunction directing that the United States restore the

14     President's House because all four factors weigh in favor of

15     granting this relief.

16          And time is of the essence.  As you said, Your Honor,

17     as we near the festivities of the semi quincentennial.  Our 250

18     year old legacy holds the stories of all people of the United

19     States, living and gone.  And it belongs to Ona Judge just as

20     must as you and me.  Thank you.

21          THE COURT:  Thank you, Ms. Garcia.

22          Counsel, on behalf of the Defendants, would you like

23     to address the Court in argument now?

24          MR. IN DEN BERKEN:  Briefly, Your Honor.

25          THE COURT:  Please do.

1              MR. IN DEN BERKEN:  May it please the Court.

2              THE COURT:  Okay, I think there's a sign up there.

3    It works a little bit better when it's closer to your chin.

4              MR. IN DEN BERKEN:  There we go.  This better, Your

5    Honor?

6              THE COURT:  Very good.

7              MR. IN DEN BERKEN:  Under federal law, the National

8    Park Service is the shepherd of our nation's history and

9    property as far as federal parks are concerned.

10             They shepherd it, they safeguard its resources, and

11   properties for the safekeeping and interpretation of the

12   American people.  That includes our history.

13             Ultimately, the National Park Service is a decision

14   maker when it comes to what it displays and places on its

15   property.

16             Reasonable minds might obviously disagree what the

17   appropriate use of that finite space is, what topics, issues,

18   and questions of history need to be discussed, exhibited,

19   explained, and shown, but ultimately, the authority to make

20   that call is from the National Park Service.

21             Now I think it's hard to disagree after hearing my

22   friend's opening statement that what they've actually brought

23   today is fundamentally a contract claim.  Their claims are

24   rooted fundamentally in the 2006 cooperative agreement and

25   before that in 1950 original establishing cooperative

1    agreement.

2              What you haven't heard them say and what we also did

3    not see in any of the briefing or the complaint is the mention

4    that the 2006 cooperative agreement expired in 2010.  It has

5    been ineffective and completed for 16 years.

6              THE COURT:  Although you did hear the same argument I

7    did.  And there's such a thing as a survival clause --

8              MR. IN DEN BERKEN:  Absolutely.

9              THE COURT:  -- to these cooperation agreements.

10             MR. IN DEN BERKEN:  Absolutely, Your Honor.

11             THE COURT:  Plus the original intent of the

12   government, that is Congress not the executive branch, the

13   legislative branch.

14             MR. IN DEN BERKEN:  Absolutely, Your Honor.  And in

15   the 1950 agreement, the term and there's no dispute that the

16   1950 agreement is still in effect.  The 1950 agreement provides

17   that the Secretary has exclusive curatorial responsibility over

18   the display and the selection of the display of exhibits in the

19   national park.

20             There is no requirement on that exclusive

21   responsibility to confer or to get City or anyone else to sign

22   off.

23             The National Park Service routinely changes its

24   displays, revises them, takes them down, updates them, modifies

25   them.  Those are all exercises of their inherent statutory

1    authority and discretion to maintain and ensure the safekeeping

2    and presentation of federal resources.

3        In this case, the 2006 cooperative agreement has

4    expired, although Your Honor's absolutely correct that there

5    are survivability clauses in there and then, there are terms

6    they do survive the expiration of that contract.

7        It is unambiguous in that it provides that ownership

8    and responsibility, including all rights over the exhibit after

9    the completion lie within National Park Service.

10        Now I've heard a lot in this case about a requirement

11    to get signoff, to obtain input.  They are absolutely correct

12    that the 2006 February provides for those requirements, but

13    that was for the creation of the project.

14        It makes clear that at the completion of the project,

15    ownership of the exhibit, including all rights, titles, all

16    intellectual property rights would be transferred entirely to

17    the National Park Service.

18        Now the same inherent authority and discretion that

19    the Park Service exercised 20 years ago to enter into the 2006

20    cooperative agreement and embark on this project that establish

21    his exhibit and the President's House site is the exact same

22    authority and discretion that the National Park Service used

23    last week and decided to take it down.

24        THE COURT:  No, it's not.  It was unilateral.  No

25    notice.  No cooperation.  No intent to involve the City.  As

1    the other decisions had been made.  So don't stay it's the

2    same.

3            MR. IN DEN BERKEN:  But there's no requirement to do

4    that under the original agreement.

5            THE COURT:  You may ultimately prove that there's no

6    requirement, but don't try to argue to me that they did the

7    same thing because there was an awful lot of people's interest,

8    time, and money coming from the City, other organizations,

9    fundraising taxpayers that went into all of this creation of

10   part of the exhibit of the President's House.

11           And this is an act that was not in conformity with

12   what they had agreed to before.  So I expect to hear from the

13   Government as to why they changed their mind.

14           MR. IN DEN BERKEN:  I in no way mean to denigrate the

15   investment effort.  So I want to be original effort.  Both by

16   the City and the National Park Service.

17           THE COURT:  Well, it does sound cavalier, counsel.

18   They can do whatever they want.  Well, what is the premise of

19   changing what they want?  You can present evidence on that.

20   I'm expecting to hear some.

21           MR. IN DEN BERKEN:  I think my point is, Your Honor,

22   that inherently, they have to authority to make that decision.

23   And they get to do so on behalf of the public.  That is the

24   authority they exercised originally, it's the authority

25   exercised last week.

1        Now the fact that we are having an argument or a

2   debate about the meaning of the contractual term, the 1950

3   agreement, the 2006 cooperative agreement, re-enforces the

4   Government's exact point that this is a contract claim.

5        THE COURT:  Okay, so do you agree that there is a

6   current contract at least one clause that survives that the

7   City can sue on here?

8        MR. IN DEN BERKEN:  There are various contractual

9   provisions that have survived the expiration and termination of

10  2006 cooperative agreement.  And there is at least one contract

11  in 1950 establishing foundational agreement that remains in

12  effect, but the fact that we're having dispute over which term

13  applies, what it requires, does it require consultation, was it

14  in conformity therewith establishes that these are

15  fundamentally contract claims.

16       And under the Tucker Act, because what they are

17  seeking is specific performance, not monetary relief, specific

18  performance.  They want the government to comply with what they

19  assert are effective contractual provisions.  That means the

20  Tucker Act strips Your Honor of jurisdiction.  And this case

21  belong to the Court of federal claims.  Now that's a merits

22  argument, but --

23       THE COURT:  No, it's a -- it's a jurisdictional

24  argument, not a merits argument --

25       MR. IN DEN BERKEN:  Point taken.

1          THE COURT:  -- obviously, that we need to decide.

2          MR. IN DEN BERKEN:  But before we even get there,

3    there are standing issues.  There -- although they're not

4    jurisdiction issues as to the contractual nature of their claim

5    and specific performance requests, they lack standing.

6          Now in our brief, we cite the various and quote the

7    various specific contractual provisions that establish that

8    complete ownership of the exhibit, all rights, ultimately

9    transferred to the National Park Service.

10          Certainly, Your Honor.  Court's indulgence.

11          THE COURT:  No problem.

12          MR. IN DEN BERKEN:  On top of that, the City fails to

13    state actual claims under the APA.  What they've identified

14    here are not actual agency actions.  These steps were taken

15    pursuant to the day-to-day operations of the National Park

16    Service.  Changing exhibits, revising them, updating them, or

17    placing interpretive exhibits is ordinary course activity for

18    the National Park Service.

19          THE COURT:  It's frightening to think that that could

20    happen to Independence Hall tomorrow.  It's frightening to

21    think that the citizenry would not be involved in such an

22    important change, contract or not.

23          MR. IN DEN BERKEN:  I think fundamentally, changes to

24    the exhibit are one thing.  Changes to structures, properties,

25    or permanent placements are a separate matter.  Taking down

1    Independence Hall I don't think is equivalent to exhibit.

2              THE COURT:  I didn't say taken down.  The changing

3    the script of the tour guides would be a change, wouldn't it?

4    Because something's going on here, counsel.

5              MR. IN DEN BERKEN:  But Your Honor, I think --

6              THE COURT:  The script is changing, but not according

7    to historical fact.

8              MR. IN DEN BERKEN:  But I think, Your Honor, the

9    changes to scripts happen routinely.  And those aren't agency

10   actions that every member of the public can sue upon.

11             Taking -- changing the tour, choosing to emphasize

12   this part of Independence Hall versus that part, those are

13   interpretive decisions that the agency makes every day.

14   They're not subject to APA claims.

15             In addition, the City hasn't established that they

16   are final agency actions.  For that to occur as our brief lays

17   out, discreet actual legal consequences have to follow.

18             THE COURT:  You argued that in your brief.  I read

19   that with interest because you said there was no injury,

20   particular injury to the City of Philadelphia who is the

21   Plaintiff here.

22             MR. IN DEN BERKEN:  To have an injury, they have to

23   have a right.  They have signed over all ownership and title to

24   the exhibit to the National Park Service.

25             As a result, revisions, which were contemplated by

1    the contract, aren't an injury.  They have no standing and

2    there are no legal consequences that stem from taking down the

3    exhibit.

4            In addition, what they've challenged here is

5    inherently agency discretion.  Although we've heard about the

6    National Underground Railroad statute, they've cited no

7    provision of law, no regulation, no binding policy that they

8    assert the NPS here violated.

9            There are no -- there are no -- there's no framework

10   to check the agency's action here because there is no check in

11   this regard on the agency's action.

12           THE COURT:  So the executive branch has absolute

13   power?

14           MR. IN DEN BERKEN:  In the context of interpreting

15   and running the National Park Services property when it comes

16   to historical exhibits, curating them, deciding what to

17   display, that's a National Park Service discretionary ability.

18           THE COURT:  Then why now?  Why now exercise this

19   stark difference?

20           MR. IN DEN BERKEN:  Because this administration --

21           THE COURT:  The culture has changed?

22           MR. IN DEN BERKEN:  -- this administration decided to

23   issue the Executive Order that resulted in this action.

24           THE COURT:  Yes, the Executive Order, we'll get to

25   that.

1          MR. IN DEN BERKEN:  And fundamentally, the next

2   administration gets to revise that interpretation.  Ultimately,

3   the authority lies with the people.

4          THE COURT:  Oh, so it bounces back every four years,

5   is that what you're trying to tell me back and forth?

6          MR. IN DEN BERKEN:  What I'm saying, Your Honor, is

7   that the same authority that an administration exercised 20

8   years ago to enter into the agreement to embark on this choice.

9          THE COURT:  That was an act of Congress, not the act

10  of an executive.  The legislature.  So you have three branches

11  of government at work here working together.

12         MR. IN DEN BERKEN:  Your Honor, the National Park

13  Service was the one who entered into the 2006 cooperative

14  agreement.  There was no statute that required him to do that.

15         THE COURT:  It emanated from 1948 Congress.  And you

16  heard Ms. Garcia cite that.  You don't deal with that very well

17  in your brief because you're avoiding it.

18         MR. IN DEN BERKEN:  Your Honor, I --

19         THE COURT:  You're going to have to deal with it with

20  me.

21         MR. IN DEN BERKEN:  I'm happy to address the 1950

22  agreement.  In fact, I think it makes sense to do so right now.

23         If we turn to I think this is part of Exhibit 1 in

24  your binder, I would bring Your Honor's attention to clause

25  Article 1(a).

1    And I'm quoting here, the City will retain ownership

2    of the Independence Hall group structures and on the land

3    around the area erected and the park area adjacent thereto

4    known as Independence Hall Square, but hereby agrees, (a), to

5    permit the Secretary to occupy them exclusively except as

6    otherwise provided herein.

7    During the term of this agreement for the purposes of

8    preserving, exhibiting, and interpreting them to the American

9    people.  And otherwise utilizing them in their adjacent grounds

10   for national historical park purposes.

11   (b), to permit the Secretary to have curatorial

12   responsibility for the care and display of such museum objects,

13   furnishings, or exhibits of historic interest as may be

14   available in the Independence Hall group of buildings for

15   exhibit and interpretive purposes, including the right to

16   re-arrange furniture and exhibits to determine such a policy

17   for items to be utilized in the museum or an interpretive

18   program.

19   That 1950 agreement likewise places responsibility

20   for the exhibits, choosing which ones to display, how to

21   display them, updating them, changing them, removing them in

22   the hands of the National Park Service.

23   So even if we go under the terms of the 1950

24   agreement, which I submit reinforces our argument that these

25   are contract claims, there is still no actual violation here.

1    And therefore, no cognizable injury to the City.

2            THE COURT:  I understand that's your position.  And I

3    have a copy of that statute in addition to the one you just

4    provided.

5            And we will hear evidence as to how it relates to the

6    working contingent of local, state, and federal authorities for

7    so many years since 1950 on this exhibit especially up and

8    including 2015.

9            So I am imagine that the behavior of the parties in

10   conformance with what they all understood to be their

11   obligations and authority and responsibilities will come into

12   play here, especially if it's a contract term.

13           MR. IN DEN BERKEN:  If I may, Your Honor, I think

14   that's one of the problems that we're facing here.  Under

15   ordinary contractual principles of interpretation,

16   interpretation of contractual terms is limited to the four

17   corners of the contract.

18           You don't look to course of conduct or the meaning

19   that parties ascribe to it unless you have a contractual

20   ambiguity.  In this case --

21           THE COURT:  Well, don't forget, the pleading here on

22   several of the claims is arbitrary and capricious conduct on

23   behalf of your client.  And that has to be considered as well.

24           So you may say I don't have jurisdiction, they don't

25   have standing, nobody has any authority here except the park

1  commission, and then, why is the big question because why leads

2  to other bad inquiry, which I expect to get to in this

3  testimony.  That inquiry needs to be addressed or it will

4  happen again and again and again.

5          And I don't think that's how these statutes are

6  supposed to be operate.  With my cursory view of them and a

7  little bit of historical knowledge, that we can learn if we

8  don't already know it.

9          So we don't live in a vacuum, counsel.  And there is

10  no clear line of authority from an Executive Order to

11  destroying an exhibit.

12          MR. IN DEN BERKEN:  I think that raises to the next

13  point, Your Honor.  The exhibit is not destroyed.

14          THE COURT:  Well, you say so, but I haven't inspected

15  it yet.

16          MR. IN DEN BERKEN:  The fact --

17          THE COURT:  You hid it away in the national

18  Constitutional center where you say it's safe.  And I believe

19  it's safe there, but I have not inspected it yet.  That will

20  happen.

21          MR. IN DEN BERKEN:  I think the fact that Your Honor

22  is capable of ordering their restoration, their replacement,

23  their reinstallation and the fact that they are kept as we

24  established with sworn declaration of the superintendent of

25  Independence National Historical Park secure in the custody of

1    NPS, the fact that that harm that is asserted is redressable at

2    the conclusion of this case, Your Honor can work award relief.

3    There's is no -- that means by definition there is no

4    irreparable harm.  Your Honor's capable at the conclusion of

5    this case of --

6            THE COURT:  Counsel, if you are correct that there's

7    no standing for the City to bring this, and the Court has no

8    jurisdiction to decide this, then how can I correct any harm at

9    all?  So I can always do that then.  I don't understand your

10   argument.

11           MR. IN DEN BERKEN:  I think these are independent

12   elements, Your Honor.  If Your Honor disagrees about

13   jurisdiction, about standing, and that these claims are not

14   properly cognizable, that means you can proceed from likelihood

15   of success on the merits to the second element of the P.I.,

16   which is irreparable harm.

17           In this case, the fact that Your Honor can award

18   relief that would require the reinstallation of the plaques

19   means there is by definition no irreparable harm.

20           At the conclusion of this case, if Your Honor

21   proceeds and finds that this is a case for which there is so

22   now jurisdiction, it is cognizable and there is a later way to

23   proceed, relief at the conclusion is possible.  And as a

24   result, the drastic remedy of emergency injunctive relief at

25   this preliminary stage is not warranted.

1        Now the final elements of an injunction, especially

2  in the context of a federal government injunction, are the

3  balance of harm -- balance of equities and the public interest.

4        In this case, although as I said earlier, these are

5  issues that are important to many people.  And reasonable minds

6  can differ as to what needs to be displayed, what needs to be

7  shown, how it needs to be shown.

8        Ultimately, it is the National Park Service and

9  federal government's choice what to do there.  That choice is

10  obviously bounded and controlled by Congress and ultimately

11  accountable to the will of the people.

12        But on a day-to-day basis, it is the federal

13  government's choice of how to exercise that authority and

14  discretion.

15        And I think in the context of this case, and what

16  they're asking for is essentially an order requiring a co-equal

17  branch of government to speak in their preferred manner in a

18  way that he has chosen no longer to speak, counsel's

19  particularly in this context against issuing an injunction.  It

20  would compel the Government to speak in a way that it has

21  chosen not to.

22        Here, I think all these issues, all these points

23  counsel strongly against awarding an injunction.  I think as I

24  said before, this case can't proceed here.  They lack standing.

25  They haven't brought cognizable APA claims.

1          But even if Your Honor disagrees with all of that,

2     they still haven't shown irreparable harm or that the drastic

3     remedy of compelling a co-equal branch of government to speak

4     in a way that's chosen not to any more is appropriate.  For all

5     those reasons, Your Honor should deny Plaintiff's motion for

6     preliminary injunction.

7          THE COURT:  Very interesting.

8          MR. IN DEN BERKEN:  Thank you, Your Honor.

9          THE COURT:  I am holding argument from the amici

10    separately.  After the conclusion of at least the Plaintiff's

11    evidence and possibly both the Defense evidence if they should

12    choose to produce any.

13         So I would ask you to proceed, Ms. Garcia, with your

14    first witness?

15         MS. GARCIA:  Thank you, Your Honor.

16         UNIDENTIFIED SPEAKER:  Good morning, Your Honor, the

17    City of Philadelphia would like to call Joyce Wilkerson as our

18    first witness.

19         Your Honor, while this witness gets settled, may I

20    provide your civil deputy with a copy of the exhibits for the

21    witness stand?

22         THE COURT:  Good morning.  You may.

23         THE CLERK:  Please raise your right hand.

24                    JOYCE WILKERSON

25    called as a witness for the Plaintiff, having been duly sworn

1          testified as follows:

2                  THE CLERK:  Please state your name and spell your

3      last name for the record.

4                  THE WITNESS:  Joyce Wilkerson, W-I-L-K-E-R-S-O-N.

5                  THE COURT:  Please be seated.  Good morning.

6                  THE WITNESS:  Good morning.

7                  MS. AXE:   May I, Your Honor?

8                  THE COURT:  You may.

9                  MS. AXE:  Thank you.

10                         **DIRECT EXAMINATION**

11     BY MS. AXE:

12         Q    Could you please introduce yourself to the Court?

13         A    My name is Joyce Wilkerson.

14         Q    Good morning, Ms. Wilkerson.  Before we get to the

15     subject that brings us here today, I'd like to just briefly

16     cover your background.  Could you give the Court an

17     introduction to your educational background?

18         A    I was educated first at Mount Holyoake College,

19     dropped out, and ended up getting my degree from University of

20     Pennsylvania, and then a law degree from Bolt Hall School of

21     Law at Berkeley.

22         Q    Thank you.  And I want to talk briefly then about

23     your professional background.  Could you start -- could you

24     describe the beginning of your career?

25         A    I started out as a legal service lawyer in

1    Philadelphia.  I served representing public housing tenants as

2    a part of community legal services.

3        I then went to the Redevelopment Authority, where I

4    focused on the development of affordable housing.  And finally,

5    ended up in Records as Chief of Staff to John Street, who was

6    then counsel president in Philadelphia.  And when he became

7    Mayor, I become his Chief of Staff.

8        Q    And when did you become Chief of Staff when Mayor

9    Street became mayor?

10       A    I think it was in August of 2000.

11       Q    Okay, August of 2000.  Could you just provide the

12   Court with a brief snapshot of your roles and responsibilities

13   as Chief of Staff for Mayor Street?

14       A    I was responsible for coordinating the work in

15   government, working through the cabinet officers.  I chaired

16   the weekly cabinet meetings.  I spoke on behalf of the mayor in

17   public forums.  I communicated closely with the communication

18   director.  I worked with the finance director and budget

19   director.

20       I also had to direct responsibility for oversight of the

21   gas company that would at that point was in a point of crisis,

22   the Housing Authority, and a number of other city departments.

23       Q    Okay, I think you said one of your roles was

24   coordinating and being the voice of the mayor.  Do I have that

25   right?

1      A      That's correct.

2      Q      Okay.  Now I want to cut to the subject at the

3  hearing today.  Are you familiar with the President's House

4  site at the corner of 6th and Market?

5      A      Yes, I am.

6      Q      Okay.  And how do you first learn about the

7  historical significance at that site with respect to the

8  President's House?

9      A      I think I first learned through public communication

10  through press communication.  At that time, the City had worked

11  with the Park Service to move the Liberty Bell site from around

12  5th and Market Street up to 6th and Market Street.  And so,

13  there was a lot of focus on that.

14      At the same time, there was an amateur historian Ed

15  Lawler, who had written an article about that site, about the

16  President's House.

17      There had been a lot of confusion about the President's

18  House over time, where it was located, what parts of it.  And

19  Ed Lawler had written a definitive article that received a lot

20  of national attention in particular by historians.

21      There was -- a part of Ed's research highlighted the fact

22  that President Washington had kept Africans enslaved there.

23  And it is meticulous work.  He had actually identified where on

24  the site that was.

25      It was some of Ed's work that precipitated advocacy in the

1    community, Avenging the Ancestors Coalition that was led by

2    Michael Coard was, you know, was one of the voices and the

3    issue got increased public awareness.

4        And I was part of the public that learned more and more

5    about what had happened at the President's House site.  I had

6    not realized that Washington kept Africans enslaved there.  I

7    didn't understand the whole history and the Liberty Bell and

8    the juxtaposition to the Independence Hall, the Declaration,

9    the Constitution.  So it was as a result of the advocacy and

10   all the press about it that I became really aware of what was

11   happening and the significance of it.

12       Q    I want to just ground us in some dates here.  Do you

13   remember approximately what year that was when you first became

14   aware of it?

15       A    I think it was in 2002, 2003.  For me, it was the

16   Liberty Bell Pavilion opening, because the mayor was due to

17   speak at that opening.  And I think that's when I began

18   focusing more directly on it.

19       Q    Okay, and you're aware of this general community

20   interest, but during this time, were you aware of any specific

21   interest in developing and interpreting this site given this

22   history?

23       A    Yeah, so as the history became more and more clear,

24   there was concern that the Liberty Bell Pavilion interpretation

25   was not accurate and, you know, my understanding is that it was

1    an issue both within the Park Service as well as, you know, an

2    issue for the general public.

3        Also, that the Liberty Bell Pavilion site was adjacent to

4    a parcel that we now know as a result of Mr. Lawler's research

5    had been the site of the President's House and in fact the

6    location where enslaved Africans were kept.  All of that began

7    to crystallize during that period.

8        Q    Okay, I want to talk you're the Mayor's Chief of

9    Staff at this time, but you're also a Philadelphian.  Did you

10    have a personal interest in developing the site?

11        A    I'm a black person.  I'm a black woman.  You know, so

12    my history is the history -- is also the history of slavery in

13    the United States.  And so, I think that that made it

14    personally important.

15        And so, when Mayor Street was supposed to be going to

16    testify or present at the Liberty Bell Pavilion, I remember

17    going to him and saying, we can make this happen.

18        And for me, this was we can tell a fuller story, and then,

19    on a story about what happened in this country at the founding

20    of the country.

21        And I was also aware of the fact that the City had worked

22    collaboratively with the Park Service over time.  Just because

23    I was Chief of Staff, you know, I wasn't directly involved in

24    every little decision, but I knew that there were projects.

25    Where the City and the Park Service had worked collaboratively

 1   the City actually owned -- may still own Independence Hall.

 2   You know, we own the Liberty Bell.  And so you know, for those

 3   reasons, you know, there was this really close relationship or

 4   collaborative relationship.

 5       And so, when I went to him and I said we can make this

 6   happen, I knew that there was precedent for that.  And I also

 7   knew that it was important.

 8       It was important that we come to terms and that the Park

 9   Service, the advocates, the historians had all agreed that, you

10   know, it was finally time to tell an honest story about

11   American history and the founding of this country and the role

12   that slavery and enslaved Africans had in the -- as well as the

13   free Philadelphians in Philadelphia.

14       Q    And I just want to talk about this collaboration

15   piece.  When you're talking about a precedent for

16   collaboration, do you mean between the City and the National

17   Park Service?

18       A    Specifically, there were agreements, there were

19   documents in part because of the ownership overlap.  You know,

20   so Chestnut Street is a public street that runs through

21   Independence Park.  You know, the City has -- had ownership of

22   Independence Hall.  The Liberty Bell was our Liberty Bell.

23       You know, so that recognizing that there historically had

24   been a really close relationship agreements going back half a

25   century or more that reflected that relationship, the agreement

1    to collaborate on projects, you know, sign off, approvals.

2    That was very much the history of City and Park Service

3    operation over the decades.

4        Q    So let's talk about, you know, these concrete actions

5    that then happen.  You talked about this public interest.  So

6    what happened?  What is -- what actions are taken based by the

7    City based on the interest in developing this historical site?

8        A    I remember that it was the day close to the day when

9    the mayor was due to speak at this -- the opening of the

10   Liberty Bell Pavilion.  I remember going to him and saying we

11   can make this happen.

12       And he said write me a letter.  And so, it's like I wrote

13   a letter.  As I recall, it was addressed to Michael Coard.  And

14   it was committing a million and a half dollars.

15       It was our understanding that that was the gap in the

16   funding that was needed at the time, but it was committing the

17   money in order to make this happen.

18       And the this was -- that this was a fuller story,

19   recognizing the existence of nine enslaved African Americans,

20   recognizing the footprint of the President's House, recognizing

21   that slavery was critical and a crucial part of what was going

22   on in the development of this country economically, socially.

23       So that this was really important.  And it was because of

24   that that we committed the funds and made this -- made the City

25   elevated probably or made the City willing to really take an

1    aggressive role in moving this project forward.

2        Q    And you said that Mayor Street committed 1.5 million.

3    Were there at that point -- and what year are we talking about?

4    2000, 2003?  Do you --

5        A    I think it was 2003.

6        Q    Okay.  And this was I'm sorry just to go back, this

7    is when the Liberty Bell Pavilion Center's opening, correct?

8        A    Right.

9        Q    Okay.  Were there at that point additional sources of

10   funding that had already been secured for the interpretation of

11   that site?

12       A    Yes, it's my understanding that there were.  And the

13   reason that we came up with a million and a half is because we

14   were funding a gap.

15       We were aware that the federal -- that in particular,

16   Congressman Brady, Congressman Fattah were committing 3 and a

17   half million dollars.  And so, for us, we were trying to fill

18   the gap in order to assure that the project moved forward.

19       Q    And you know, so I want to talk about this intention

20   to move forward.  You talked a little bit about what the

21   general intention was.  Was the funding that was committed by

22   Mayor Street, was that tied to a specific vision of the site

23   development?

24       A    Yeah, it was -- for us, it was important that the

25   full story be told.  And we were very aware of the advocacy led

1   by Avenging the Ancestors led by Ed Lawler, an amateur

2   historian in Philadelphia.  There were any number of

3   organizations.

4        There was also the Park Service.  You know, so the Park

5   Service had made -- had come to terms with the fact that this

6   is a story that needed to be told on this site.  You know, when

7   it became clear that Washington held Africans enslaved, you

8   know, there was some interest in, you know, or willingness to

9   tell the story, but tell it elsewhere.

10       But my understanding is that the Park historians were part

11  of the team that said, no, this is a story that has to be told

12  here, that this -- there is no other site where that

13  story -- where this story can be told, the story of

14  enslavement, the role that slavery played in the economic and

15  social life in this country, the fact that it was happening at

16  the same time that the Declaration of Independence, the

17  Constitution were all being debated and decided, the fact that

18  George Washington who was a mover and shaker, held enslaved

19  Africans on that site, that that was a story that had to be

20  told there and it had to be told in a robust way and in an

21  honest way.

22       Q    Now you've described a number of different types of

23  stakeholders that were crucial to the interest and development

24  of the initial stages of this project.

25       Were there differences of opinion generally about the

 1  development, the design, the construction?  Could you speak a

 2  little bit to that and the involvement of the public?

 3      A    The -- by the time we became involved and by we, I

 4  mean, the City, that the issue of where the story be told was

 5  resolved.  And so, there was agreement that this site, the

 6  President's House site, was the appropriate place.

 7      The second part of your question was?

 8      A    Was there involvement from the public?

 9      Q    Yeah, the -- from the beginning, there was

10  involvement by the public.  The -- there were the amateur

11  historians, Ed Lawler, Avenging the Ancestors.

12      There was a focus by Blockson, Charles -- I think Charles

13  Blockson, who was a black historian.  He has a whole museum.

14  He had collected history over time of the free African American

15  community in Philadelphia as well as the story of enslavement

16  in Philadelphia.

17      You know, there were -- there was widespread interest.  It

18  even got to the point that I think the food critic for "The

19  Inquirer" was writing about, you know, the story.

20      Because one of the enslaved Africans, Hercules, was the

21  chef for George Washington.  So there's just broad, you know,

22  broad based understanding that this was important and more and

23  more people gravitated to the issue and were invested in the

24  issue.

25      And I think that carried throughout the project.  So we

1    had -- we established an oversight committee.  When we

2    developed the project, we paid, you know, we solicited

3    invitations for developers from around the country when we

4    narrowed down the list.  You know, we had exhibits created and

5    had those exhibited at the Constitution Center and allowed the

6    public to, you know, to actually weigh in?

7        Q    Yeah, so I want to walk back for just a second some

8    of those actions because you just previewed those for the

9    Court.

10       So one of the things that you talked about in getting this

11   off the ground, you have a -- you had a public interest.  You

12   have the public commitment.

13       Let's talk about how we get it built.  So the first thing

14   you mentioned was the formation of an oversight committee.

15   Could you explain more about that?

16       A    Well, let me back up.  So part of what I did was I

17   went to the Park Service and said that the City was willing to

18   take the lead on this, working collaboratively, because I

19   understood that, you know, this -- there was precedent for

20   this.  It was the way we had -- we the City had developed

21   projects before.

22       Part of the commitment was to have everybody at the table.

23   And so, there was an oversight committee that included the Park

24   Service, that included the City, that included Michael Coard

25   specifically.

 1      It included historians.  It included representatives of

 2   Congressman Brady's office, Congressman Fattah's office.  It

 3   included minority cultural organizations.

 4      So it was -- it was a group of -- we tried to identify all

 5   the stakeholders who were interested in and vested in having

 6   this project move forward.

 7      Q    You talked a little bit about the relationships of

 8   the public officials.  And I think you said that that included

 9   both City and federal representatives.  Why was that important?

10      A    It was important because they were all players,

11   right?  And the funding was being involved, you know, funding

12   was involved.

13      So there was about $3.5 million that the federal

14   government, you know, through Congressional appropriations was

15   committing.  You know, the Park Service was an integral partner

16   in it.

17      The City because, you know, a lot of these assets were

18   actually owned by the City.  And it was in our town.  So there

19   were a lot of official representatives involved.

20      Q    And let's talk a little bit about, you know, you

21   mentioned that you had approached the Park Service.  You had

22   offered that the City is going to take lead in the development

23   here.  Let's talk about how you staffed the project from the

24   City's end.

25      A    Well, I -- so I was Chief of Staff.  So I was

1   involved in a lot of stuff, but I had somebody in my office,

2   Hal Fitchhandler (phonetic), whose primary job was shepherding

3   the President's House project.

4       So we had Hal involved.  Our law department was involved.

5   We hired a consultant, Eraz McPherson (phonetic) to help us

6   move the project forward.  It was supported by the City.  It

7   was moved along by the City.

8       Q    Okay, and at some point as this project is

9   progressing, is there request for qualifications issued?

10      A    Yeah.  That's how you move these kinds of development

11  projects.  We issued -- we meaning the City and the Park

12  Service issued a request for qualifications.

13      It is an invitation for parties to come forward.  We

14  defined in the RFQ what the project was.  And it's an

15  invitation for interested parties to respond by stating their

16  vision of the project and also their qualifications to

17  implement the project.

18      Q    I'd like you to turn to Exhibit Tab 14 in the binder.

19  Ms. Wilkerson, we just discussed the RFQ that was issued.  Is

20  this document a copy of that RFQ that you just testified to?

21      A    No, this is the document.

22      Q    Okay.  And is the intention of the RFQ to define the

23  scope of the project?

24      A    Yes, it identifies what the project is, so that

25  parties know what it is that they're being asked to create.

1       Q    Okay, and what was the -- I'll have you set that

2   aside for a moment.  What was the selection process for

3   responsive submissions to the RFQ?

4       A    Everything that came in, we vetted it with the

5   oversight committee.  Also, with the Park Service, and it, you

6   know, we had people inside the City who were our law

7   department, our public property department were all involved.

8       But the public was, you know, was integrally involved in

9   part through the oversight committee.

10      Q    Okay, and you received responsive proposals to the

11  RFQ, correct?

12      A    Yes.

13      Q    Okay, and then, what happened?  How do you narrow

14  those proposals down?

15      A    So part of the review process is deciding

16  which -- you know, which responses best capture the sense of

17  what it is we're looking for and which teams that were advanced

18  had the qualifications in order to move the project forward.

19      As a result of that process, it was narrowed down from

20  perhaps 20 some odd initial responses to maybe I can't remember

21  exactly, probably 5, something like that.  5 responses that we

22  were interested in exploring further.

23      Q    And when in connection with exploring those further,

24  was there a request for proposal issued?

25      A    Yeah, that's normally the next step.  And so, with a

1    request for proposal, RFP, what you're looking for is a more

2    developed plan.  You know, exactly what are we talking about?

3    How do you envision addressing the issues?

4        And so, what we were looking for was, you know, one of the

5    commitments, one of the make it happen part of it was

6    identifying the footprint of the President's House.

7        Part of it was creating a memorial for the nine enslaved

8    Africans for Ona Judge, for Hercules, for Richmond, for Paris,

9    for the nine Africans who were enslaved there.

10       It was also important that the parties tell an accurate

11   and robust story about slavery and the interface between the

12   enslaved Africans and the role of free Africans in

13   Philadelphia.

14       And so, they were these various elements that had to be

15   addressed.  And so, that was what we were looking for in the

16   RFP.

17       Q    I want to have you turn to Exhibit Tab 15 please.  Is

18   this a copy of the RFP that you just discussed?

19       A    Yes, uh-huh.

20       Q    Okay.  Thank you.  I'm going to have you set that

21   document aside.  So you have the RFP issued.  You have the

22   semifinalist.  What was the selection process then for how to

23   determine how to move forward?

24       A    One of the things we did that was perhaps

25   unprecedented is the City actually put money on the table in

1  order to have the proposers create models of what they

2  envisioned.  And we had those models exhibited at the

3  Constitution Center.

4      Part of what we wanted, we wanted to have the public able

5  to see what it is, you know, to follow the project.  The public

6  had been so involved in creating the project.  We wanted to

7  make sure that the public had an opportunity to evaluate and

8  comment on what was envisioned for the President's House site.

9      And so, in addition to just having them see it, they were

10  invited to submit comments about the various proposals that

11  were submitted.

12      Q    And that, from the beginning stages, the involvement

13  and opportunity of the public was -- it was important for you

14  as the representative of the City?

15      A    It was credible.  I mean, it had been part -- it was

16  the public engagement that resulted in the moving forward with

17  the project to tell a complete story about the President's

18  House site and all that was involved there.

19      And so, throughout the project, in creating the oversight

20  committee in making the decision to, you know, exhibit the

21  various proposals and have public comment.  I mean, it was

22  just -- it was integral to every aspect of this project.

23      Q    So, eventually, after this public display and comment

24  period, is there a winning proposal selected?

25      A    There was.  The decision was made to move forward

1   with the Kelly Myale (phonetic) proposal for the President's

2   House.

3       Q    Okay.  And in connection with their response to the

4   RFP, had they put together a proposal for how they would

5   develop and interpret the site?

6       A    Yes.  They came up with a proposal that was actually

7   implemented that respected the request to have the building

8   footprint identified on the site.  There was a specific

9   memorial created.  It was important to everyone that the nine

10  enslaved Africans be memorialized on the site.

11      It was important that the story of enslavement be told and

12  the role of slavery and the creation of this nation, all of

13  those stories needed to be told on that site.  And it was

14  important that it be there because it -- there's no place else

15  where you can tell the story.  And the Kelly Myale project did

16  all of that.

17      Q    And I want to have you turn to Exhibit Tab 16,

18  please.  Is this a copy of the proposal that you just discussed

19  from the winning bid?

20      A    Yeah, I believe it is.

21      Q    Okay, I'm going to have you set that aside.  Winning

22  bid is selected.  Do you know if the mayor, Mayor Street and

23  the superintendent or some representative of NPS jointly

24  announced the winner?

25      A    Yes.  They announced that there was a -- there were

1  press releases.  Both the City and the Park Service were

2  working collaboratively.  And so, with the issuance of the RFQ,

3  the RFP, press releases, we were all doing it -- working

4  jointly in tandem.  And so, there were press releases about the

5  selection of the developer.

6      Q    I want to have you turn to Exhibit 17, please.  Do

7  you recognize this as the press release that you just testified

8  to announcing the winner?

9      A    Yes.

10     Q    And is that one that's jointly issued by the City and

11  by NPS?

12     A    Yes.

13     Q    Okay, thank you.  I'm going to have you set that

14  document aside.

15     Now during the selection process and through this

16  development, were you aware of any formal agreements entered

17  between the City and the federal government to ensure clarity

18  of roles relating to the project?

19     A    Yeah, there was a cooperative agreement that was

20  entered into -- I think I might have signed it.  Actually, it

21  was important that, you know, and it carried forward what had

22  been the practice.

23     And so, every decision that was made was made jointly.

24  And the agreement, you know, said there aren't any you know

25  that both the design and the solicitation --

1           MR. IN DEN BERKEN:  Objection Your Honor.

2           THE WITNESS:  Every --

3           MR. IN DEN BERKEN:  I think the agreement speaks for

4    itself.  I think unless she has a documents in front of her,

5    unless she can speak to them somehow, I don't think her

6    interpretation of the contract is admissible.

7           THE COURT:  If she was a party to these negotiations

8    and contracts, I will let her testify as to unanimity and who

9    was involved.  I think that's acceptable, so you may.

10          MR. IN DEN BERKEN:  Thank you, Your Honor.

11          THE WITNESS:  So the City was involved, the federal

12   Park Service.  And it carried forward what had been the

13   practice since, you know, the original cooperation agreement.

14   BY MS. AXE:

15   Q     So I'll have you turn to Exhibit Tab Number 3.  Is

16   this a copy of the 2006 agreement that you were just

17   referencing?

18   A     Yes, uh-huh.

19   Q     And I want you -- I'm not going to spend too much

20   time on this document, but I want you just to flip to the

21   signature block.  It's page 14 of 14 and on the bottom left?

22   A     I'm there.

23   Q     And is that your signature on behalf of the City of

24   Philadelphia?

25   A     Yes, it is.

1      Q    Okay, and if you look to the next page, there is an

2   exhibit, correct?

3      A    Correct.

4      Q    And is that a copy of the 1950 agreement that you

5   were just referencing?

6      A    Yes, it is.

7      Q    Okay, I'm going to have you set that aside.  Now

8   during your tenure as Chief of Staff, did you enter into an

9   amendment to the 2006 cooperative agreement?

10      A    Yes.

11      Q    Okay, and I'm going to have you turn to Exhibit Tab 4

12   please.  Okay, this agreement is dated from 2007.  Is this the

13   agreement that you remember entering into?

14      A    Yes, it is.

15      Q    Okay.  And I'm going to have you flip.  I don't have

16   a page number.  My apologies, but just if you can find the

17   signature page there.

18      A    I've got that.

19      Q    Okay.  And that's your signature there Ms. Wilkerson?

20      A    Yes, it is.

21      Q    On behalf of the City of Philadelphia?

22      A    Yes.

23      Q    Okay, what was the intention behind this amendment?

24      A    One of the things that -- during the course of the

25   project, I remember how Fitchhandler, my deputy, coming to me

1    saying that we got to make a decision about an excavation, an

2    archeological dig on the site.

3         And I remember asking him how much is it going to cost.

4    And he said between 6- and $700,000.  I read the -- I read the

5    analysis that had been done at the site.  And the archeologist

6    had said it was not likely that we would find anything.  The

7    site had been used for various other uses.  The site at one

8    point was public restrooms over where I think as a result of

9    the Lawler work, we understood that enslaved Africans had

10   lived.

11        I committed on behalf of the City to fund the

12   archeological dig.  It was important that we unearth the truth.

13   That was the whole purpose of this project was to tell the

14   truth.

15        And so, the City committed over $600,000.  And that was

16   reflected in some of the agreements and the amendment to

17   increase that amount as the actual costs became more clear.

18        Q    So you've talked about a number of components to what

19   this project, I'll use that in quotes specifically.  You

20   testified to a footprint of the executive mansion, a memorial,

21   an exhibit.  And now you have this architectural dig component,

22   too.  Do I have that correct?

23        A    Yes.

24        Q    Okay, so when generally if you recall did ground

25   break on the project?

1        A     I think ground was broken in 2007 as I recall.

2        Q     Okay, and I just want to talk little bit about the

3   archeological date.  Did that also commence in 2007?

4        A     Yes.

5        Q     Could you talk little bit more about the component of

6   the dig?  Were you there when that was getting started?

7        A     Yeah, I was there.  It was, you know, it was done by

8   contractors, by archeologists.  I think they were under

9   contract to the Park Service as I recall.

10       And there was a dig because of the interest, there was a

11  platform overlooking the dig that was created.  And during the

12  course of the dig that extended several months and it was

13  actually the time was extended even further because of the

14  public interest.

15       More than 300,000 people stood on the platform and looked

16  at the dig and interacted with the archeologists that were

17  talking about what it was that was found and the significance

18  of the site and the full story of what happened there.

19       Q     And throughout the process, this dig, how long did it

20  take do you know?

21       A     As I recall, it started in the early spring.  It was

22  extended into the summer because in part because of the

23  interest.  There were a number of things found that nobody had

24  anticipated.  Like I said, you know, it had been a public

25  toilet.  You know, nobody thought much of the site.  But you

1    know, as it turned out, there were considerable findings there.

2        Q    And you testified to this earlier, the interest in

3    keeping the public apprised of what was going on.  Do you

4    recall a series of or have you been aware of a series of press

5    releases issued in 2007?

6        A    Yeah, there were any number of press releases.  Like

7    I said, nobody had anticipated what it turned out was unearthed

8    at the site.

9        And so, at one point, the dig revealed that there was a

10   foundation to the kitchen where Hercules, the enslaved African,

11   had cooked.  There was the foundation that led from the kitchen

12   underground into the President's House.

13       What they found was part of the foundation for the bow

14   window that was added at Washington's direction to the house.

15   Nobody anticipated finding that.

16       And those things were important.  The bow became the

17   precursor for round rooms in the current White House.  I think

18   it is in part why we have an Oval Office now.  So the dig and

19   what was unearthed in the dig was important.  And as these

20   things were uncovered, there were press releases issued jointly

21   by the Park Service and the City.

22       Q    So I would like to -- I don't need to go over these

23   press releases, but I would like just very quickly to have you

24   look at Tabs 18, 19, 20, and 21 if you don't mind.  I can take

25   those in order, Your Honor, just for judicial efficiency.

1          THE COURT:  Please do.

2          MS. AXE:  Just Tab -- okay, thank you.

3   BY MS. AXE:

4      Q    All right, could I have you turn to Tab 18, please?

5      A    Okay.

6      Q    Is this a press release from March 21st of 2007?

7      A    Yes.

8      Q    Okay, and was this one of the press releases that you

9   were just testifying to?

10     A    This is one.

11     Q    Okay, and is the title of this the kickoff for the

12  President's House archeological dig?

13     A    Yes, it is.

14     Q    Okay.  And this was issued jointly by the City and

15  Independence National Historic Park?

16     A    Correct.

17     Q    Okay.  I'm going to have you turn to Tab 19.  Similar

18  question.  Is this a press release -- this is another one of

19  the press releases that you were generally testifying to?

20     A    Yes.

21     Q    This is from May 2nd, 2007, correct?

22     A    Correct.

23     Q    Issued jointly between the City and National Historic

24  Park?

25     A    Yes.

1        Q     Okay.  And is this about the archeological dig?

2        A     Yes, it is.

3        Q     Okay.  And I'm going to have you turn if you don't

4    mind to Exhibit 20.

5        A     Yes.

6        Q     Okay.  Is this a press release from May 10th, 2007?

7        A     Yes, it is.

8        Q     Okay.  This is also issued jointly between the City

9    and the federal government about the archeological dig?

10        A     Yes.

11        Q     And my apologies to the Court.  I know I'm moving

12    quickly, but I'm going to have you turn to Exhibit Tab 21,

13    please.

14        A     I'm there.

15        Q     Okay, and this is a press release from June 19th,

16    2007, correct?

17        A     Yes.

18        Q     Okay, also jointly issued?

19        A     Yes, it is.

20        Q     And this is to apprise the public of the next steps

21    for the President's House, correct?

22        A     Correct.

23        Q     Okay.  I'm going to have you set those documents

24    aside, please.  Now you end your time at least this tenure as

25    Chief of Staff, I know you have a subsequent professional

 1    history, but you end that period of your professional history

 2    in the end of 2007, correct?

 3        A    Correct.

 4        Q    Okay, what did you do after you left?  Just for the

 5    couple years after, what did you do after you left City

 6    government?

 7        A    I traveled, and then, I became the executive director

 8    of the Redevelopment Authority in New Orleans --

 9        Q    Okay.

10        A    -- in some of the post Katrina years.

11        Q    So you understood that the project wasn't finished

12    when you left City government, correct?

13        A    Correct.

14        Q    Okay.  Was it your understanding that the project

15    from the City's perspective would be continued to be run out of

16    the mayor's office?

17        A    Yes.

18        Q    Okay, and did you attend the opening or at least the

19    soft opening of the exhibit back in December of 2010?

20        A    Yeah, I came back from New Orleans in order to

21    attend, yeah.

22        Q    Okay, and that was at that point the culmination of

23    what you had initially started, correct?

24        A    Correct.

25        Q    Okay.  Last set of questions here, Ms. Wilkerson.  As

 1   you were entering into the agreements as you're developing this

 2   property, you're going to these public forums.

 3       Did you ever contemplate the possibility that the federal

 4   government would tear down all that was designed, built, and

 5   installed over the course of almost a decade worth of

 6   partnership in just a single afternoon?

 7       A    It never occurred me.  I thought that we had -- that

 8   it was progress that we had made and a commitment to telling

 9   the truth.

10       And that the whole project reflected close collaboration

11   between the advocates representing the community, the

12   historians investigating the facts, the federal government,

13   local government, you know, the City and its residents.  It

14   never occurred to me that all the work, the financial

15   commitment, the investments we had all made would ever be

16   destroyed.

17       That we would reach the point that we weren't telling the

18   story, telling the truth about what happened on that site and

19   the development of this country.  It never -- I don't think it

20   ever occurred to any of us that we would turn our backs on that

21   or that part, you know, the federal government would turn its

22   back on the commitments that were made to tell the truth.

23       Q    And the truth, again, just to put the point there is

24   that you were commemorating and recognizing the lives of nine

25   enslaved Africans, correct?

1    A    We were commemorating it, but we were also telling

2    the story of slavery and the role that slavery had in the

3    development of this country, and the fact that they both

4    happened and carried on, went on at the same time.  And that

5    was the story that I think everybody had agreed needed to be

6    told and were willing to tell the truth.

7    Q    Do you know, and maybe this beyond your knowledge,

8    but as the Chief of Staff from Mayor Street for seven years,

9    eight years, would the City have invested all of this, its

10   time, its commitment, its money into this project if that was

11   ever a possibly?

12   A    No, I mean, the money is important, but it wasn't as

13   important as the time and that the City put into it and the

14   commitments that it made.

15   Q    Thank you, Ms. Wilkerson.  I don't have any

16   questions, any additional questions right now.  The Defendants

17   might, but I thank you for your time.

18   A    Thank you.

19         THE COURT:  Thank you, Ms. Axe.

20         Do you have questions, counsel?

21         MR. IN DEN BERKEN:  Brief questions, Your Honor.

22         THE COURT:  Brief, then let's go ahead and we'll take

23   a brief recess after that.

24                          **CROSS-EXAMINATION**

25   BY MR. IN DEN BERKEN:

1    Q    Good afternoon, Ms. Wilkerson.

2    A    Hi.

3    Q    I understand you're joining us from California; is

4    that right?

5    A    I was stranded out in California.

6    Q    Well, hope you made it in all right.  And I imagine

7    that a little snow there currently than we do, but thank you

8    for joining us today.  You were Mayor Street's Chief of Staff

9    for seven years, is that what I heard?

10   A    I began in summer of 2000 and ended when his term

11   in -- of office ended at the end of the 2007, yeah.  2000 to

12   2007.

13   Q    And I heard you testify that you were or you played a

14   large role in the execution and formation of the original 2006

15   property agreement; is that right?

16   A    Yes.

17   Q    And you're familiar with that document?

18   A    Yes.

19   Q    If I could have you flip to Exhibit Tab 3, which is

20   the cooperative agreement.  I think we talked a little bit

21   earlier or you talked a little bit earlier about the

22   cooperative agreement and what went into it.  Do you know who

23   drafted this?

24   A    No.

25   Q    But you agree with me if you flip to page 14, is it

1    your signature on behalf of the City of Philadelphia, correct?

2        A    Yes.

3        Q    And I don't know what standard practice was, but

4    would you read every legal document you signed as Chief of

5    Staff --

6        A    No.

7        Q    -- Mayor Street?  Do you remember if you read this

8    one?

9        A    I don't remember.  I remember that it was the

10   agreement to work collaboratively with the federal Park Service

11   and that we would agree to jointly review and develop the

12   project.

13       Q    But you don't remember reading this before you signed

14   it?

15       A    I don't recall.  I don't remember.

16       Q    Could I have you flip to page 3 of the agreement?

17   And I think approximately at the middle part of that page, once

18   you get there, there's a Section 2 that says ownership of

19   exhibit.  You see that?

20       A    Yes, uh-huh.

21       Q    I'm going to read that.  If you could read along

22   silently while I read aloud.  I appreciate it.  Upon completion

23   of the exhibit, in accordance with this agreement, ownership of

24   the exhibit shall transfer to the NPS.  NPS ownership of the

25   exhibit shall survive any termination of this agreement,

1    ownership of the sidewalk and surrounding areas of the exhibit

2    shall remain with the current property holder.  Did I read that

3    correctly?

4        A    Yes.

5        Q    And if you flip to the next page, which is page 4,

6    there's a top section captioned management and maintenance of

7    the President House exhibit.  Do you see that?

8        A    Yes.

9        Q    I'm going to read again Subsection (a).  NPS agrees

10   that it shall undertake all responsibility to manage, occupy,

11   utilize, operate, repair maintain interpret, and administer the

12   exhibit, which shall become property of the NPS in accordance

13   with this agreement and part of the Liberty Bell Center in

14   accord with current NPS policies and guidelines.  Did I read

15   that correctly?

16       A    Yes.

17       Q    Turning away from this property agreement, during

18   your tenure as Chief of Staff, do you remember any other

19   collaborative endeavors that you undertook with the National

20   Park Service?

21       A    I don't remember any others.

22       Q    Do you remember the National Park Service ever

23   contacting you or the mayor to discuss or coordinate on

24   interpretive steps that they were taking?

25       A    I don't remember anything specifically.  There was

1  ongoing coordination, for example, with the dig.  You know, so

2  it was a close working relationship.  I don't remember anything

3  specifically.  We went through -- I don't remember anything

4  specifically.  I'd have to --

5     Q    What about unrelated to this project in general?  Do

6  you remember any approach or collaboration with the National

7  Park Service on Independence Mall, on the Liberty Bell Center,

8  Constitution area in general?

9     A    Yeah, I mean, there was always close collaboration.

10  I remember on the heels of 9/11 for example.  You know, there

11  was concern about what the security was going to be at the Park

12  Service.  Chestnut Street runs through the middle of the Park

13  Service.  You know, it's such a close relationship, there was

14  constant communication at various levels of government I'm

15  sure.

16     Q    Do you recall any communication about their

17  interpretive contact?  Like tours or displays, anything of that

18  sort?

19     A    Every -- I don't have any specific recollection of

20  that.

21     Q    Okay.

22     A    You know, beyond the whole development process,

23  right.  So we all agreed on what the project was going to be.

24  We were all involved in selecting what the project was going to

25  be.  We were all committed to having it be an interpretation of

1   the role of slavery in developing the country.  I mean, all of

2   those were constant themes and came up in various ways.

3      Q    Thank you for your time.  I have nothing further.

4           THE COURT:  Thank you.

5           Any redirect?

6           MS. AXE:  No, Your Honor.  Thank you very much.

7           THE COURT:  Thank you.  You may step down, Ms.

8   Wilkerson.

9           THE WITNESS:  Okay, thank you.

10       (Witness is dismissed)

11          THE COURT:  We are going to take a 10 minute recess

12  and then come back and hear your next witness.

13          MS. AXE:  Thank you.

14       (Recess taken at 12:06 p.m., recommencing at 12:27 p.m.)

15          THE CLERK:  All rise.  Court is now in session.  The

16  Honorable Judge Cynthia Rufe now presiding.

17          THE COURT:  Please be seated, everyone.  Good

18  afternoon.

19          MS. AXE:  Good afternoon.

20          MR. IN DEN BERKEN:  Good afternoon, Your Honor.

21          THE COURT:  The City of Philadelphia may call its

22  next witness.

23          MS. AXE:  Thank you, Your Honor.  We would like to

24  call Edward Gillison to the stand.

25          THE CLERK:  Please raise your right hand.

1          EDWARD GILLISON

2     called as a witness for the Plaintiff, having been duly sworn

3                    testified as follows:

4          THE CLERK:  Please state your full name and spell

5     your last name for the record?

6          THE WITNESS:  Edward Gillison, G-I-L-L-I-S-O-N.

7          THE COURT:  Please be seated.

8                    **DIRECT EXAMINATION**

9     BY MS. AXE:

10         Q    Good afternoon.  Could you please introduce yourself

11    to the Court?

12         A    Yes, good afternoon, Your Honor.  Edward Gillison,

13    former a lot of different things I'm sure you'll hear about.

14         Q    What is your current title, Mr. Gillison?

15         A    I currently work with the Defender's Association of

16    Philadelphia.  I am the director of employee and labor

17    relations now.

18         Q    Okay.  I want to take a step backwards.  Could you

19    just briefly summarize your educational background?

20         A    Sure.  I'm native Philadelphian.  You can't start

21    with Philadelphia without saying where you went to high school.

22    I went to University City High, West Philadelphia born and

23    raised.  I won't do the rest.  We also -- I went to the

24    University of Pennsylvania as an undergraduate.  I -- once I

25    graduated, I went to Syracuse University for law school.

1    In between, I was a case worker.  I started out in social

2  work.  And once I went to law school, came back, I came back to

3  the Defender's Office where I worked for the next 20 years

4  doing mostly capital cases and special defense cases.

5    Q    And at some point, did you join City government?

6    A    Yes, Michael Nutter, a friend of mine, decided to run

7  and win for the City of -- the mayor for the City of

8  Philadelphia and asked me to join him.  So I was with him from

9  day 1, which was 2008.

10    Q    What was your first role with Mayor Nutter in 2008?

11    A    I was the deputy mayor for public safety.  In that

12  role, the where -- the way that the Nutter administration was

13  comprised, he had four or he started with four then went to

14  five managing directors for a particular area.

15    I ended up being the deputy mayor and managing director

16  for public safety.  That meant that police, fire, prisons,

17  office of emergency management, the courts at the time because

18  we ended up reviewing their budget.  So I was the person that

19  was -- that they would present the budget to and go through at

20  the District Attorney's Office and my former office, the

21  Defenders would all come through me in order to make sure we

22  would get and go through and get the approvals going forward.

23    Q    And after you were deputy mayor, did you hold another

24  role within the Nutter administration?

25    A    Yes, because no good deed goes unpunished.  Busy

```
 1    people get to do busy things.  The first Chief of Staff was

 2    Clay Armbrister, another friend that I grew up.  We went to

 3    Penn together along with Michael.  He was the first Chief of

 4    Staff.  When Clay decided to leave, he left in 2010, Michael

 5    had an interim while he tried to figure out who he wanted to be

 6    Chief of Staff and came to me and said he wanted me to take the

 7    Chief of Staff role, while not giving up my deputy mayor role

 8    for public safety.

 9        And so, I was Chief of Staff/deputy mayor for public

10    safety at the same time.  So I was first among equals.

11            THE COURT:  I guess that's a double thank you for

12    your service.

13            THE WITNESS:  Yes, absolutely.  And my wife still to

14    this day says there's got to be a way that you are underpaid

15    because you work two jobs or three jobs and you only got one

16    salary.

17    BY MS. AXE:

18        Q    Well, I want to talk just about one of those jobs,

19    which was your time as Chief of Staff for then Mayor Nutter.

20    So you became Chief of Staff you said in 2010.  We heard

21    earlier a little bit about Ms. Wilkerson's duties and

22    responsibilities during her time as Chief of Staff, but

23    different administration.  Could you describe your roles and

24    responsibilities as Mayor Nutter's Chief of Staff?

25        A    Yes.  Again, we had an inner team of five deputy
```

1    mayors.  We also had five persons that were also integral so

2    there was 10 of us that ended up being the inner team.

3        And I as Chief of Staff, you were the person that was the

4    cabinet.  But we had an inner cabinet and an outer cabinet.  So

5    the executive team was managed by the Chief of Staff, as well

6    as making sure that everybody played well together going

7    forward.

8        So, yes, the Chief of Staff's role is to keep all the

9    other deputy mayors both on point with the mayor's vision.  And

10   also, I would actually speak for the mayor if there was a

11   something that was going on that needed attention.  The last

12   person in the room with the mayor at any particular time would

13   be the Chief of Staff.

14       Q    Okay, now I want to take you to the subject of

15   today's proceeding, which relates to the President's House

16   project.  When do you first learn about the President's House

17   site if you recall?

18       A    Clay said to me you thought you had a lot of things

19   to do when you were just doing deputy mayor stuff.  So I'm

20   leaving you a couple of things that need your attention.  And

21   one of them is going to be the President's House.

22       And so, I was aware of the President's House obviously.

23   It was something that we had invested a lot of time energy in,

24   but I was not as aware, but he said there's a file that you'll

25   get.

1        And I got my briefing.  Kathy Loney (phonetic) was Clay's

2   executive assistant and she sat me down and kind of poured over

3   a lot of the open projects that were going on.

4        We were still reeling from the Great Recession at the

5   time.  So we were -- people don't remember it too much today,

6   but it was something that had a major effect on the Nutter

7   administration.

8        When we came in, we for six months we -- everybody loved

9   us.  And then, the bottom fell out in July to August of 2008.

10  Lehman Brothers went under.  And at that point, the entire

11  economy went down.  The City of Philadelphia was about to go

12  bankrupt.  And yet, we couldn't act like it because we didn't

13  want to cause concern.

14       So we're still coming out of that particular time.  And

15  Clay is telling me, yeah, there's a lot of things that we're

16  still investing in.  And President's House became one of the

17  things that I had to keep on my radar.

18       Q    Okay, so President's House becomes part of your

19  portfolio of work.  Although you had been generally familiar

20  with the project in Philadelphia, correct?

21       A    Correct.

22       Q    Okay.  And did you know -- let's -- before your role

23  specifically, what was just sort of the general information

24  that you knew about the project?

25       A    I think that I became the way or the same way that

1    Joyce became aware of it.  When the Independence -- when the

2    Liberty Bell was going to get moved, there was a big hoopla in

3    Philadelphia all about that.  And there was a lot of things

4    that were being discovered.

5        Philadelphia is a place, I love it to my core, but we

6    always have a lot of things that are amazing that are in plain

7    sight that we don't have an appreciation for.

8        This was something that we discovered as a City during

9    that move.  And the entire Independence Mall, I always used to

10    chide with people and would say do you remember what

11    Independence Mall looked like prior to the '30s and '40s and

12    '50s.  There are pictures.

13        And they said, yeah, it was just a whole bunch of houses

14    and everything.  Yeah, it did -- wasn't a mall.  It wasn't

15    until afterwards that people started -- the City and the

16    federal government decided to make it into a mall that it

17    really began its current look where the City owned it all and

18    now they became a cooperation between the federal government

19    and the City to make it what it is today.  And it's one of the

20    most beautiful places I think in the country.

21        Q    Uh-huh.  So let's take you to that mall.  You're

22    Chief of Staff in 2010.  You heard some testimony from Ms.

23    Wilkerson earlier about the exhibit opening in December of

24    2010.  Is that your memory?

25        A    I believe so.  I was not able to go, but Clay

 1    actually came back and Clay was there along with the mayor.  I

 2    remember them going down.  I was unable to go because there was

 3    another fire for me to put out.  So that's what I remember

 4    about that day.  I was not there.

 5        Q    Was it your -- you talked about sort of the -- your

 6    portfolio of general responsibilities.  You're aware that the

 7    City, while you were Chief of Staff, is it still putting out

 8    press releases about various things of public interest?

 9        A    Absolutely.

10        Q    Okay.  So I'm going to represent to you.  I have a

11    set of exhibits in a binder.  Counsel and I have already

12    stipulated to their authenticity.  I just want to have you turn

13    to Exhibit 23.  Oh, I'm sorry.  Yes, Exhibit 23.  And this is a

14    press release from December of 2010.  Do I have that right?

15    Are your looking at that document?

16        A    I am.

17        Q    Okay, and this is about the President's House site

18    opening in Philadelphia; is that correct?

19        A    Yes.

20        Q    Okay.  And this is jointly issued by the City and

21    NPS, correctly?

22        A    That's correct.

23        Q    Okay.  And this would have been issued while you were

24    Chief of Staff, correct?

25        A    That's correct.

1     Q    Okay.  So the exhibit opens.  There's a press

2   release.  It's announced to the public.  December 15th, 2010.

3   It's opening.  Is that the end of the project --

4     A    Oh, God.

5     Q    -- from the state's perspective?

6     A    I wish it were.

7     Q    Okay.  So --

8     A    The answer was no.

9     Q    Okay.  So, 2010, it opens to the public, but no,

10   that's not the end of the project.  And I want to talk a bit

11   more about that.  So there is work left to be done at the site.

12   Could you talk a little bit more about that, please?

13     A    Yes.  One of the things that was going on is that

14   there was constant issues.  We wanted to make sure that we were

15   transmitting to the Park Service, our partners, we were

16   transmitting what we said we were going to do in the agreement.

17        And that was to have a first class understanding and

18   recitation of what happened at that site.  So there was a whole

19   lot of different things.  And there was a punch list that was

20   given to me to -- for me to in essence follow along.

21        And I began a series of communications with Cynthia.  She

22   was the head of the Park Service at the time, where there would

23   be issues that were brought up that we thought were actually

24   closed out and they would say, look, hold on, that's really not

25   correct.  This is not closed out.  We need somebody to have

1    some attention to it.  They would bring it to my attention.

2        I would then sit down with the team, the team in the City

3    had law department, had the CPO James Lowe (phonetic), capital

4    projects I'm sorry Your Honor.  Capital projects office.

5        There was a number of different people.  I even had people

6    in the government that I had gotten to know and trust on

7    different buildings that I was -- we were doing in our

8    administration, Gary Knapp (phonetic) from public property as

9    well.  They would all have different ways of informing what was

10   going on and how.

11       I wanted to be able to really give the mayor's view.  And

12   it was always, Edward, get it done and get it done right.  And

13   so, that was my marching orders.

14       And I worked with my partners to make sure that that's

15   what's going to -- that was going to happen.  It didn't happen

16   overnight.

17       As a matter of fact, it didn't happen for me until I was

18   literally walking out the building.  We transmitted I think my

19   last letter is somewhere around 2015.

20       Q    Okay.

21       A    So I had five years of working with --

22       Q    Yeah, let's back up.

23       A    -- this project.

24       Q    Yeah, so we have 2010, project opened.  You're

25   walking out the door, project can completion.  That's -- so you

 1   were working on this for five years.

 2       A    Correct.

 3       Q    Between 2010 and 2015.

 4       A    That is correct.

 5       Q    Okay.  So I want to talk a bit about what happens

 6   during that five year period, but first, you mentioned a name

 7   here.  You said Cynthia.  Is that Cynthia I'm going to

 8   mispronounce her last name, so I apologize, McLeod (phonetic)?

 9       A    Yes, I think that's the way it is.  I would just say

10   Cynthia at the point.  We ended up having such an --

11       Q    McLeod.

12       A    -- McLeod, yeah.  We ended up having a lot of

13   relationship with one another because one thing that most

14   people don't recall, even though it was another thing that was

15   part of my life, was the Pope was coming.  And the Pope took

16   place and part of that was this site.

17       And it was important especially to the mayor, especially

18   to the citizens of Philadelphia that we were going to work with

19   the Secret Service and the federal government to be able to put

20   that on.

21       And that was another part of the collaboration, Your

22   Honor, that we had with them.  And if you think that the

23   President's House, we had meetings and whatever, that was

24   something that I got to know them and they got to know me

25   because whenever there was a problem, my phone rang.

1    My phone started with being a Blackberry.  When I started

2    the office, I think we ended with somewhere would Samsung.  So

3    I'm not sure.

4    But literally, that's what my job was as Chief of Staff

5    was to really try to use the punchlist, go through it, and if

6    Cynthia had a problem, she would call me.  If I had a problem

7    or if I needed something, I would call her.

8    We ended up having a very good relation to the point that

9    in some of the letters, I know that she would jab me if she

10    didn't think she was getting the response that she wanted and I

11    would jab back because I would say, well, we need this and we

12    need that.  It was collaboration the entire time.

13    Q    So you're on a first name basis with Cynthia?

14    A    Yes.

15    Q    And she's just, to get her title, she was the

16    superintendent of the Independence National Historic Park, do I

17    have that right?

18    A    I believe so, yes.

19    Q    Okay.  And you're taking friendly jabs at each other?

20    A    Yeah.

21    Q    Because you want to get this project done, correct?

22    A    Yes.

23    Q    And this is a -- you considered it a partnership,

24    correct?

25    A    Yes.

1         Q      Okay.  And finishing the project, doing it right,

2    that was important both to the Nutter administration as well as

3    the City, correct?

4         A      Absolutely.

5         Q      Okay.  You talked a little bit about some of the

6    other historical context here.  You had the Pope coming.  And

7    we'll talk about that in a second.  But the site itself had

8    significant value, correct?

9         A      Absolutely.  Learning that from the work that Joyce

10   had done with the Street administration.  I mean, no

11   administration stands alone.  It always is built on the

12   previous administration.

13       Joyce had done wonderful work, yeoman's work.  Any work

14   that I -- you know, you don't know until you actually sit down

15   and start seeing some of the evidence of what was going on.

16   And so, we were taking the promise that Mayor Street had made

17   and were trying to make sure that it became reality.

18       And they invested quite a lot of money.  And again, we

19   invested continually sums of money to make it right even during

20   the time when we were scraping like bottom to make sure it

21   could happen.  I mean, you have to think that I was going to

22   Rob Debeaux (phonetic) --

23              THE COURT:  Scraping bottom means money?

24              THE WITNESS:  Yeah, money.  Yeah, scraping the -- I

25   was asked -- I'm looking at the --

1          THE COURT:  You weren't still digging in other words?

2          THE WITNESS:  Yeah, that's true.  I'm sorry, but

3   yeah, I'm looking at the finance director saying, Rob, I just

4   need additional -- like this is going to be 5,000 here.  It's

5   going to -- we need more money.  We've got to get this done.

6          The things that were causing a lot of problems was,

7   you know, the monitors may or may not -- didn't -- I'm sorry.

8      Q    No, no, no.  I appreciate that, but I want

9   to -- let's talk about where that money's going.

10     A    Okay.

11     Q    And how you finish out this project.  So what work

12  still needs to be done.  Could you talk to that?  And again,

13  we're talking past 2010 here.

14     A    Yes.  Yeah, from 2010 all the way through 2015, there

15  was always something left.  The biggest thing that caused me

16  the most problems was the monitors.

17      The City and the Park Service had approved certain

18  monitors.  And the monitors were used for the interpretation.

19  The actors had been filmed.  And so, part of the site was to be

20  able to have people speaking to the people at the site in first

21  person, right?  First -- so if you -- and sometimes the vantage

22  point of the work would be from like within the kitchen.

23      So Hercules has a particular part of one of the monitors

24  where he's speaking from the kitchen and he's at the site.

25  That's why this is a unique site.  And that's why it was so

1    important to say these things were happening at this place.

2        So when he's speaking, he's like in the kitchen and you're

3    looking down.  And you're in the kitchen.  There's no other

4    thing that's like that to happen.  And yet, the monitors kept

5    failing.

6        There was one thing about the extreme temperatures, if you

7    can imagine that, extreme temperatures in Philadelphia were

8    causing the monitors to freeze up.

9        And so, they didn't work.  And the worst thing that we

10   were getting and of course we're -- I'm representing a

11   political institution, a human institution, we would get calls

12   from people, yes, Michael, I know.  I took calls from you that

13   would say this doesn't look right and I would say I'm sorry we

14   will get to do it and we will handle it.

15       So the public was always integral to what we were doing.

16   The Park Service was integral.  Yes, Congressman Brady would

17   even say we put money up.  Remember, we're -- you know, we have

18   say in this, too.

19       So I'm taking calls from everybody just to make sure.  And

20   we're trying to shepherd this to make sure that we're

21   reflecting the best that we can do as a City at this site.

22       Q    Okay, so you talked about the monitors.  Were there

23   other sort of I'd say more infrastructure issues?  What else

24   did the City, you know, do to get this ready?

25       A    Well, the -- you had heard from Joyce that there was

 1    the observation that was looking down and the ruins underneath

 2    were glass enclosed.

 3         They had to be protected because they would completely

 4    degrade -- the degradation would happen if they were not

 5    temperature and humidity controlled.

 6         I learned more about temperature and humidity control for

 7    soil samples than I ever thought I would do in law school.  I

 8    mean, I didn't really think that was part of the deal.

 9         But the glass was breaking, which would then cause the

10    humidity to penetrate, which would then cause the ruins and the

11    foundations that had been preserved to actually degradate or

12    degrade, I'm sorry.

13         So, as a result, we had to do something.  So I'm on the

14    phone with Daniel Keating (phonetic).  And I'm on the phone

15    with Kelly.  And I'm on the phone saying what are we doing?

16    How are we doing it?

17         And Jim Lowe is always -- and he's my point person to say

18    let me know what's happening.  If you need my juice to get

19    things done or get people to pay attention, I'll get on the

20    phone.  I don't have a problem with that.  And that's how I was

21    kept abreast of what was going on and how.

22         So whenever something -- I mean, down to the point where I

23    got a call about from Cynthia that the pavers that were put in

24    had failed.  And so, we needed to get new pavers and they

25    wanted to know what I was going to do about it.

1    Q    So let's talk a little bit about this because these

2  aren't just aesthetic things, correct?  This is how the public

3  is going to engage with the exhibits.

4    A    Exactly right.

5    Q    Correct?  Okay, so you have television monitors to

6  tell the story, correct?

7    A    Correct.

8    Q    You have the glass so that you can look at the

9  architectural dig, correct?

10    A    Correct.

11    Q    You have pavers so that people can access the site,

12  correct?

13    A    Correct.

14    Q    And you're devoting City resources in order to put on

15  you heard some testimony I apologize this question just

16  meandered, but from Ms. Wilkerman at the beginning that the

17  intention behind the site back in 2007 was it was a memorial

18  and an exhibit.  Was that still your understanding in 2010?

19    A    Yes.

20    Q    Okay, and all these components have to get it right

21  for this memorial and exhibit and archeological site, correct?

22    A    That's correct.

23    Q    Okay.  So you're working through the City or through

24  these issues.  And I think you mentioned that it's City

25  resources that are going to fund it?

82

```
 1        A    Yes.
 2        Q    Okay.  And this is from let's say early 2011 on,
 3   would that be accurate?
 4        A    I would -- well, Clay was working with it prior so.
 5        Q    Okay.
 6        A    I mean, I'm just continuing what had been done just
 7   like Clay continued what Joyce had done.  I was continuing what
 8   Clay had done.  And you know, we just keep passing it on.
 9        Q    So --
10             THE COURT:  Excuse me, counsel, can you clarify is
11   Clay --
12             THE WITNESS:  Clay Armbirster was the --
13             THE COURT:  Armbirster.
14             THE WITNESS:  -- Chief of staff from 28 to 2010.
15             THE COURT:  So he's Clarence.
16             THE WITNESS:  Clarence, yes, Clarence Armbirster.
17             THE COURT:  Okay.
18             THE WITNESS:  I'm sorry.
19   BY MS. AXE:
20        Q    Now eventually, at some point, we're getting towards
21   the home stretch, correct?
22        A    Amen.
23        Q    Okay.  So I want to take you back to spring of 2015.
24   There is eventually going to be that the City is going to have,
25   you know, complete on the project, correct?
```

1      A    That was the hope, yes.

2      Q    Okay.

3      A    We were always trying to get to completion.

4      Q    Yeah.  And I want to take a step back, too.  When you

5  were working on these issues, do you ever go down to the site?

6      A    Oh, yes.

7      Q    Okay.  Why was that important?

8      A    I'm a person that believes that I have to be in an

9  environment to actually see for myself what's going on.  It's

10  an old trial lawyer habit.  I tried a lot of cases that I had

11  to be in the space where I was in order to make sure I

12  understood what was going on.  Context is everything.

13      Q    Okay, so you were familiar with the site?

14      A    Yes.

15      Q    As this project is being completed, you were familiar

16  with the way that it looked, correct?

17      A    Yes.

18      Q    You're familiar with the -- I'm going to call it hard

19  scape, the hard infrastructure there, correct?

20      A    Yes.

21      Q    You're familiar with the exhibit itself, correct?

22      A    Yes, I am.

23      Q    Okay.  You're familiar with the videos --

24      A    The videos.

25      Q    -- that we play on the monitors, correct?

1    A    Yes.

2    Q    You're familiar with the memorial that was etched

3  into the stone, correct?

4    A    That's right.

5    Q    Okay.  And you're familiar with the observation

6  points to look at the dig, correct?

7    A    That's correct.

8    Q    Okay, I want to show you if -- with the Court's

9  indulgence.  I just want to get this into the record, Your

10  Honor, for what the site looked like as it's nearing

11  completion.

12    So I'm going to have you turn to Exhibit Tab 11.

13  Defendants and the City have entered into a stipulation

14  regarding the authenticity of the documents in this binder.

15    I will represent to you that these photos were taken in

16  April of 2015.  What I'd like you to do is just spend a moment

17  looking through these pictures.  And I'm going to ask you a few

18  questions after you do so.

19    A    Okay.

20    Q    And as you look through, just let me know when you've

21  when you've reached the end of the photos?

22    A    Hercules and the names.  Absalom Jones.  Yes, I'm

23  done.

24    Q    Okay, now I'm going to ask you a few follow-up

25  questions about these photos.  Like I said, these were taken in

1    April of 2015 of the site.  Do these photos, do they look

2    accurate in your memory of walking through the site?

3        A    Yes.

4        Q    Okay.  And as you look through them, would it be fair

5    to say that so some of these photos display signs of the

6    exhibit?

7        A    That's correct.

8        Q    And some of these photos display placards with

9    different artists drawings on them, correct?

10       A    That's correct.

11       Q    Okay.  And I don't want to go through all of the

12   photos.  We'll have the Court look at those later, but these

13   photos, many of them talk about the history of the site,

14   correct?

15       A    That's right.

16       Q    And that a lot of these photos talk about the

17   enslaved individuals that are at that site, correct?

18       A    That is also correct.

19       Q    Okay.  And you noticed at one point -- and so, the

20   photos provide some information to the public, correct?

21       A    Uh-huh.

22       Q    About the history; is that correct?

23       A    That's correct.

24       Q    Okay.  And some of the photos exhibit just

25   information about the executive mansion, the building itself,

1  correct?

2      A    That's correct.

3      Q    Okay.  And we'll get an inventory in just a second,

4  but there's a photo for example of a wall with names etched on

5  to the side.  Do you know whose names those were?

6      A    Yes, those were the nine Africans that were had been

7  enslaved there.

8      Q    Okay.  Now I'm going to have you set that aside.  And

9  I'm going to go to Exhibit 12 in the binder.  I'm going to

10  represent to you that this was a script of the video media that

11  would have played on the television monitors.  Do you have any

12  reason to doubt that?

13      A    No, no.

14      Q    Okay.

15      A    I know the art -- the artist who wrote this.

16      Q    And who's the artist that wrote this?

17      A    Lorraine Kerry (phonetic).  She's a classmate of

18  mine.  Elementary school.

19      Q    And then, I'm also going to have you go to Exhibit 13

20  if you don't mind.

21      A    All right.

22      Q    Okay, so I'm going to represent to you -- I'm going

23  to ask you a couple of questions here.  I'm going to represent

24  to you that this -- at Exhibit 13, this was an inventory of

25  what was at the site and some of the design plans.  And this

1    inventory was put together by the City in advance of an

2    intellectual property agreement.

3        So the first thing I'm going to have you do is page

4    through Exhibit 13.  Take a moment and let me know when you're

5    finished.

6        A    I do recall these.  This probably would have been in

7    Jim Lowe's files.  Okay.

8        Q    Okay.  And just looking through these photos, do

9    these look the same as what you saw at Exhibit 11, what you

10   remember seeing at this site?

11       A    Yes.

12       Q    Okay.  And this is just an inventory --

13       A    That's -- yes..

14       Q    -- of what's there?

15       A    That's correct.

16       Q    Okay, thank you.  I'm going to have you set that

17   aside.  I want talk to you about and an I.P. agreement.  Back

18   in 2015, were you aware of an I.P. agreement that was entered

19   into between the City and the federal government?

20       A    Yes, one of the things that was left that came about,

21   which is why we ended up having to do the 2012 matter that you

22   had at Exhibit 13 was intellectual property rights was

23   important to the National Park Service as being part of this

24   because they wanted to be able to have an opportunity at some

25   point to monetize the things that were happening as a way to

1  support the site.

2      We were transferring additional monies to them through an

3  endowment that had been done to be able to help maintain the

4  site going forward, but there -- the I.P. rights were -- was

5  something that they needed in order to make sure that they

6  would be able to kind of, you know, take a picture and then,

7  sell it, and then, make money and to be able to do things.

8      That -- so that was a source of a couple of different

9  meetings that we had to make sure that we could do.  And I

10  remember there being a problem.  I didn't know the nature of

11  the problem until I got to a meeting and they said that one of

12  the artists could not be located.  So they could not get a

13  signature that said that we could use that.

14      But I said, well, I mean, we can't locate him.  What do we

15  need to do?  And I follow my instructions from my lawyers when

16  they said we have to represent that we used all best efforts in

17  order to make sure that we did what we could.

18      And that's what you'll be signing to.  And I says okay.

19  As long as you guys did that, I will follow your instructions.

20  So the City Solicitor gave me the advice.  I followed the

21  advice and that was part of the documentation that I

22  transmitted to the Park Service going forward.

23      Q    So that last piece, the I.P. agreement, so you fixed

24  the let's say some of the aesthetic issues, the infrastructure

25  issues.  You have the agreement in place.  It's a lot of work

1    and resources that went into that, correct?

2         A    Absolutely.

3         Q    Okay.  And I think you mentioned -- I just want to go

4    back to this briefly, you mentioned an endowment.  What was

5    that?

6         A    It was money that was -- that we had promised or

7    someone had promised.  I know that we, when I say we, I go back

8    to being that, you know, I speak for the City.

9         But we had promised that part of what we would transmit to

10   the Park Service would be money so that they'd be able to

11   maintain.

12        And I think it was about $1,000,000 plus maybe 1.5

13   million.  And so, part of the -- during the time that I was

14   Chief of Staff, there was an interesting getting the money to

15   the, you know, the Park Service wanted the money.  And we would

16   hold back.

17        And we would say, well, we're not at the point where

18   you're accepting what we're thinking is done.  So let's hold

19   back.

20        And I think even one time, we came up with an agreement

21   that we would transmit half of the money to them if they ended

22   up saying that we had done everything that we could do that we

23   made it right.

24        And so, I think there's a letter that I may have written

25   that was something to that, like I'll give you half right now,

1    and then, as soon as we get this other piece done, I'll get the

2    other half.  But it was -- it's part of a way of making sure

3    that we were honoring our commitments to one another.

4        Q    And that's the spirit, right?

5        A    Yeah, it's the spirit, yeah.

6        Q    You understood this collaboration?

7        A    Absolutely.

8        Q    Okay.  When you came on board, you said that you were

9    given a file relating to the President's House, correct?

10       A    Yeah, Kathy would have given me a lot of things to

11   look over to make sure that I was up to speed since I would now

12   be the person entering into and also executing on behalf of the

13   mayor and the City.

14       Q    So you understood at that point that and I know that

15   you -- this pre-dated your service as Chief of Staff, but you

16   may have been aware that there were a series of cooperative

17   agreements, correct, between the City and the federal

18   government --

19       A    Oh, yeah.

20       Q    -- for the development?  Okay.

21       A    Yes.

22       Q    I want to have --

23       A    For the development of Independence Hall.  I mean,

24   I'm a Philadelphian.  My wife worked for Park Service, so she

25   actually told me how -- what was going on down there when I was

1    dating her.

2        So, no, there's a lot of -- this is a small city.  It's a

3    big -- I would say Philadelphia's is a big town.  And you know,

4    there's always a way for someone to have some relationship to

5    what's going on, no matter what it is.

6        And so, yeah, so I was aware of the cooperative nature of

7    the City and the Park and the Independence Hall for many, many,

8    many years.

9        Q    So I want to take you to Exhibit 6.  This is the

10   Third Amendment to the cooperative agreement.  I'll represent

11   to you, again we stipped as to the authenticity.  I'll

12   represent to you that this was entered into in 2009.  Do you

13   have any memory of this document or this had been something

14   that would have likely made it into your files?

15       A    It would have been in the file because I see that on

16   page 15 of 15, it's Clay's signature.

17       Q    Okay, and Clay again was your predecessor as chief of

18   staff?

19       A    Yes, yes.  I'm sorry, Clarence Armbrister, yes.

20       Q    Okay.  And I want you to flip to page 9 of

21   the -- there's page numbers at the bottom.

22       A    Uh-huh.

23       Q    And specifically, I'm interested in Article 8.

24       A    Okay.

25       Q    And is this -- I want you to just -- I'm going to

1    read part of this paragraph if you don't mind.  And I want you

2    to follow along and make sure that I have read it accurately.

3        I'm going to start in the middle of the paragraph 1, 2, 3,

4    4, 5, 6 lines down.  And I'm going to start with the City is

5    hereby given a nonexclusive limited license to use such

6    intellectual property for purposes related to the City's

7    educational mission and to identify the project in the City's

8    marketing, advertisements, and publicity about the City, the

9    project, and the completed exhibit.

10       This provision shall survive expiration for termination of

11   this cooperative agreement as amended.  Did I have that right?

12       A    Yes.

13       Q    When you were working with NPS, again, to close out

14   the project, was that your understanding that the spirit of

15   this provision here?

16       A    Yes.

17       Q    Okay.  And I want to read just the next sentence that

18   is at paragraph B of Article 8.  The City shall fully cooperate

19   with the NPS in the protection and enforcement of any copyright

20   entry mark rights resulting from activities and services

21   performed in connection with the project.  Do I have that

22   correct?

23       A    Yes.

24       Q    Okay.  And that is -- does that accord with your

25   general understanding of the City is going to continue to work

```
 1    with the Park Service?

 2         A    Oh, absolutely.

 3         Q    Okay, now just going back briefly to this endowment,

 4    when does the endowment expire?

 5         A    As far as I know, it doesn't.

 6         Q    Just in perpetuity; is that correct?

 7         A    I mean, I don't have any knowledge it does.  I say

 8    here right now that it expires.

 9         Q    Okay.

10         A    So I think the money was given to support the

11    project.

12         Q    Got it.  And just a final set of questions for you

13    here.  You did a lot of work in those five years; correct?  Did

14    you ever contemplate the possibility that the federal

15    government would tear down all that was designed built

16    installed, including under your tenure over at this point it's,

17    you know, over a decade in a single afternoon.

18         A    You know, that question respond -- gets an emotional

19    response from me.  And I don't want to curse in Court.  I am an

20    attorney still, so I want to make sure I keep that.  But this

21    really, the answer is, no, I would never have imagined

22    especially given the traditions that we have maintained with

23    the Park Service.

24         I don't think people really understand that as a City, we

25    really have partners that we work with.  When the Pope decided,
```

1    you know, we went to Italy to get the Pope to come.  One of the

2    places the Pope wanted to come to was Independence Hall.

3        We ended up, you know, we're -- Michael called Cynthia

4    saying he wants to -- if he comes, he's coming there.  And they

5    were like they all we'll make it happen.  Well, you know we

6    always have each other back.

7        And so, when the Pope came, we had a thing right out here

8    on the mall.  The integral part of when the Secret Service

9    wanted to divide the City because of security issues, which we

10   had to deal with, we put up gates.

11       The parts of the area that was enclosed to be part

12   of -- to make sure that the Pope was able to see a lot of the

13   City in a secure area, he was residence out at the seminary at

14   City Avenue and Lancaster.  Took helicopters to get to the

15   prison, helicopters to sometime come in town.

16       When he was in the area and got within the security

17   perimeter, he was here at Independence Hall.  He walked out and

18   he was able to see all the things that were part of the

19   Independence and the Liberty Bell.

20       Well, part of the places that I am -- I believe that he

21   walked through was this site because it's right there.  It's an

22   integral part of our story.

23       I could not imagine that anybody would decide after all

24   that it took together and that we always had each other's back,

25   that they would overnight tear it down.  I just -- it boggles

1    my imagination.

2        And that's a visceral issue for me.  There was just too

3    much that went into from attack and Michael's work and Joyce's

4    work, and the mayor's work, and the Congress people's work,

5    Congressman Fattah, Congressman Brady.  There just a lot of

6    people that put a lot of money, a lot of effort.

7        And it was all done because we collaborated with one

8    another.  That was the tradition.  That's the context of this

9    particular site.

10       And I cannot imagine in answer directly to your question

11   that that would ever have been just tossed aside at a stroke of

12   anybody's pen.  And that's all I'll say about that.

13       Q    Thank you, Mr. Gillison.  I don't have any other

14   questions right now.  Defendants may have some, but I'll take

15   my seat.  Thank you.

16            THE COURT:  Thank you.

17            MR. IN DEN BERKEN:  I have no questions, Your Honor.

18            THE COURT:  Thank you.  You may step down.  Thank

19   you.

20            THE WITNESS:  Thank you.

21       (Witness is excused)

22            MS. GARCIA:  Your Honor, the City calls Valerie Gay.

23            THE COURT:  Very well.

24            THE CLERK:  Please raise your right hand.

25                      VALERIE GAY

1    called as a witness for the Plaintiff, having been duly sworn

2                          testified as follows:

3             THE CLERK:  Please state your full name and spell

4    your last name for the record?

5             THE WITNESS:  Sure.  Valerie Gay.  People call me Val

6    Gay, G-A-Y.

7             THE COURT:  Thank you.  Please be seated.

8             THE WITNESS:   Thank you.

9             THE COURT:  Counsel?

10                        **DIRECT EXAMINATION**

11   BY MS. GARCIA:

12        Q    And good afternoon, Ms. Gay.  Can you please briefly

13   introduce yourself to the Court?

14        A    Sure.  Good afternoon, my name is Valerie Gay or Val

15   Gay.

16        Q    And are you currently employed by the City of

17   Philadelphia?

18        A    I am.

19        Q    What's your title?

20        A    My title is chief cultural officer for the City of

21   Philadelphia and executive director of Creative Philadelphia,

22   which is the City's Office of Arts and Culture.

23        Q    Okay.  And what is the office that's called Creative

24   Philadelphia?

25        A    Sure.  So as the City's office of arts and culture,

1  we oversee just that, activities in the City, but also we

2  steward over a thousand pieces of public art, including

3  monuments, memorials, statues, murals, et cetera.  We're also

4  overseeing part of the mural arts.

5      Q    Okay, and in your role, are you also doing any work

6  with or collaboration with entities that are working on tourism

7  or visitors in the City of Philadelphia?

8      A    Sure, yes.  They are our partners if you will.  Many

9  of the activities that we do in the City, we do in

10 collaboration and partnership.

11     Q    When do you start as the chief cultural officer of

12 the City?

13     A    Sure, I was appointed in April 2024.

14     Q    Okay.  And how does your position fit within the

15 structure of City government?

16     A    Yes, I am a member of the mayor's cabinet.

17     Q    So you report directly to the mayor?

18     A    Yes, I do.

19     Q    Okay.  So Ms. Gay, can you just give us a brief

20 overview of your professional background let's say going from

21 like 2004 to 2024?

22     A    Sure.  So in 2004, the middle of 2004, I left my

23 career as a banker.  I was a wealth manager with PNC Advisors

24 and I went to Temple University, where I ultimately became the

25 Assistant Dean for institutionalize advancement for the college

1    of education.

2         In 2012, I left there and I succeeded Lorene Kerry

3    (phonetic) as the executive director of Art Sanctuary.

4         In 2019, I left there and became the chief experience

5    officer and deputy director of audience engagement at the

6    Barnes Foundation.  And then in 2024, was appointed by Mayor

7    Parker to my current position.

8         Q    Okay, and what is your educational background?

9         A    Sure.  I too am a native Philadelphian.  So I must

10   say I am a graduate of the Philadelphia High School for Girls,

11   class of uh-huh.

12        And then from there, I spent one-half of my undergrad time

13   at Johns Hopkins Peabody Conservatory, the other half at the

14   University of the Arts here.

15        My degrees are in music.  I then while at Temple, attained

16   a Masters degree in vocal performance and then a post grad

17   degree or certificate in vocal performance at Temple.

18        Q    So you mentioned that you are a native Philadelphian?

19        A    I am.

20        Q    Are you familiar with the President's House site in

21   Independence National Historical Park?

22        A    I am.

23        Q    When did you first become aware of the President's

24   House site?

25        A    I think it was around 2008, 2000 -- late maybe 2007,

1    2008, somewhere around that time period.

2         Q    Okay, and are you aware of the connection between the

3    site and this history of enslaved persons who lived there?

4         A    Yes.

5         Q    Okay.  And did you become aware of that around that

6    same time, 2007 or 2008?

7         A    Yes.

8         Q    Okay.  When was the last time you visited the

9    President's House site?

10        A    This morning.

11        Q    Okay.  So, Ms. Gay, I'm going to ask you to turn to

12   Exhibit 24.  That's the very last tab in the binder.  These are

13   a series of photos that were taken two days ago at President's

14   House.  And I will just take -- I'll ask you just take a moment

15   to look through those and just let me know when you're done.

16        A    Yes.

17        Q    Okay, do these photos accurately represent what

18   President's House looks like today?

19        A    Yes.

20        Q    Okay.  So prior to your visit this morning, do you

21   remember when was the last time before that, that you visited

22   President's House?

23        A    Yes.

24        Q    When was that?

25        A    July 4th, 2025.

1        Q    Okay, is it fair to say that you're pretty familiar

2    with President's House and what it looked like prior to the

3    removal versus after the removal?

4        A    Yes.

5        Q    Okay.  Ms. Gay, from your perspective as chief -- as

6    Philadelphia's Chief Cultural Officer, why does the President's

7    House site matter to Philadelphia today?

8        A    The site represents a fuller telling of our founding

9    of our history that allows the convergence of history and the

10   present day.  And so, it is important I think for us all to

11   know the truth and to be able to digest the truth, the

12   unburnished truth regardless of its perception of either

13   positive or a negative connotations.

14        But that is important for all of us, and particularly for

15   Philadelphia, which is the birth place of our country, to tell

16   the truth.

17        It is this -- it is a place where as we saw this morning,

18   folks from around the country can come and spend time with

19   grappling with our history, our imperfect history.

20        That then I think imbues to us as individuals our own

21   responsibilities, our own expectations of our own imperfections

22   and how those can become and help us become better.

23        Q    And as the chief cultural officer, do you think it's

24   important for the site to include artwork and words that tell

25   the specific stories of the enslaved people who live there?

1        A    Yes.

2        Q    Why?

3        A    I think it's important because we need to know who

4   was here.  So if it's not important for them to be known, it's

5   not important for us to know about any anything else in terms

6   of our founding.

7        They are as important as the founding fathers, who were

8   there.  They are as important as us understanding the humanity

9   that it took to create this nation, that the people who created

10  our -- the words that we live by were fallible human beings who

11  were not necessarily career politicians.  They were people who

12  became leaders in our country.

13       They were ordinary people like all of us.  And the people

14  who were enslaved there were also human beings, whose lives

15  were important.  And actually, one could argue helped to found

16  this county.

17       Q    Uh-huh, are you aware of any connection between

18  President's House and the Underground Railroad Network?

19       A    Yes.

20       Q    Okay.  How is President's House relevant to the

21  Underground Railroad?

22       A    Well, just knowing that the -- that the President's

23  House is a part of this entire network to tell the full story.

24  It is really important.  Philadelphia plays a really important

25  role in the Underground Network.  It was form for many

1   insulated Africans a beacon of freedom.

2      And for President's House to be so close, physically close

3   to the founding of this county, is it's I don't think that it's

4   importance could be overstated.

5      Q    Are you aware of whether any of the insulated

6   Africans who lived at the President's House escaped to freedom?

7      A    Yes.

8      Q    On that site?

9      A    Yes.

10     Q    Okay, and can you tell the Court about that, please?

11     A    Sure.  So two folks that we know of escaped to

12  freedom.  One was Hercules.  We've heard a lot about Hercules,

13  but he did not escape from Philadelphia as we understand.  We

14  understand that he escaped from Virginia.

15     But the other is Oney Judge or Ona Judge, who escaped and

16  if I am correct in 1796.  And she lived to 1848.  So about 52

17  years in freedom.

18     She was the maid of Martha Washington, and therefore, was

19  what we call a dowager slave, meaning that upon Mrs.

20  Washington's death, she would automatically become the property

21  of the estate and would be passed down to Mrs. Washington's

22  heirs.  And in this case, her granddaughter, Mrs. Washington's

23  granddaughter.

24     And so, Ona Judge prepared a meal and escaped and was able

25  to get to New Hampshire, and was able to really -- she married

1    a free black man there.  She had three children.  She was able

2    to live a life of freedom.

3        And how we know that a lot of this is because she actually

4    told people when she was 75 years old.  She talked about her

5    freedom.  She talked about even though President Washington

6    searched for her for many years, she was through the aid of

7    others, was able to escape.

8        Also, I should mention that because of the Fugitive Slave

9    Act, which I believe was enacted and signed by President

10   Washington in 1793, she was actively a fugitive even though she

11   was in a free state.

12       Q    Do visitors come to Philadelphia specifically to

13   visit Underground Railroad sites?

14       A    Yes, absolutely.

15       Q    Okay.  All right, so shifting a little bit to recent

16   events, when did you learn that panels referencing slavery and

17   enslaved persons were being removed from President's House?

18       A    I received a text message from someone that had an

19   Instagram post.  I believe it was from WHYY showing the removal

20   of the panels.

21       Q    Okay, so this would have been on?

22       A    Last Thursday.

23       Q    Thursday of last week?

24       A    Yes.

25       Q    Okay, did anyone from the National Park Service reach

1    out to discuss potential changes to the President's House

2    before the panels were removed?

3        A    No.

4        Q    Are you aware of any City personnel getting outreach

5    from NPS to discuss potential changes before the panels were

6    removed?

7        A    No.

8        Q    Okay.  When you learned that the panels were removed,

9    what were your first thoughts?

10       A    I actually thought I was having a concussive

11   nightmare because I was sick in bed actually.  And I remember

12   opening my phone.  It had just hit my head, opened my phone,

13   and I saw this.  And it just didn't make sense.  And then, I

14   felt sick to stomach and couldn't believe it was actually

15   happening.

16       Q    Are you involved in preparations for the semi

17   quincentennial celebration taking place in Philadelphia this

18   year?

19       A    Yes.

20       Q    Are you aware of how many visitors are expected in

21   2016?

22       A    A lot.  It depends on who you talk to.  It could be

23   as many as 1.5 million.

24       Q    Okay, and can you give a little overview of what kind

25   of events are planned for 2026 in Philadelphia?

1    A    Sure.  We will celebrate in many ways both here down

2    here in the historic district, as well as across the entire

3    City.  So there will be activities.  There will be lots of

4    block parties, really getting the residents involved, as well

5    as art activations happening all over the City.

6    Are -- there's amazing organization called Art Philly that

7    will have an arts festival or Wawa Welcome America.  We'll also

8    have I forget how many days of activities, as well as any

9    number of parades and again block parties.

10    There will be superblock parties that happen all over the

11    City.  And so, this is an opportunity for us to celebrate

12    Philadelphia.

13    Q    Okay.  Do the sites in and around Independence

14    National Historic Park have a role in the celebrations?

15    A    Yes, absolutely.

16    Q    And can you explain what that role is?

17    A    Sure.  In many respects, just being there as Mr.

18    Gillison just said, this is one of the most beautiful areas in

19    the country.

20    And as we think about civic engagement and civic actives,

21    every year around July 4th, this entire area becomes animated

22    and become a part of the celebrations.

23    And so, just even the mall itself, Independence Center,

24    the President's House, and then, across the street with

25    Philadelphia Independence Visitor Center, that whole area

1    becomes amplified.

2        Q    Are you aware of any plans specifically for

3    President's House in relation to semi quincentennial

4    celebrations?

5        A    No.

6        Q    Okay.  Does the removal of the panels that we

7    discussed have any impact on the planned events around 2026?

8        A    I'm not sure.  I think so in that were there any

9    sites specific activities planned for that?  I don't know.  But

10   having them be removed absolutely impacts all of our

11   activities.  Our parades go right by -- the President's House

12   on Market Street is generally where the parade is.

13       And so, literally, every street if you think about 5th

14   Street and 6th Street and Market Street, that kind of H if you

15   will, President's House sits right there.  Oftentimes that

16   site, that corner intersection is a spot where everything stops

17   and there is celebration right there.

18       So not having the panels as a part of it, it's -- we are

19   bereft.  The activity, the backdrop if you will is bereft.

20       Q    So, as a native Philadelphian, and now a City

21   official, can you speak to what the semi quincentennial means

22   as far as memorializing, celebrating, and also providing an

23   opportunity for education for the City of Philadelphia?

24       A    Sure.  I would say this is an amazing opportunity for

25   us to educate ourselves, our -- all of the visitors in the

1    especially the residents of Philadelphia.

2        50 years ago, when we celebrated our bicentennial is when

3    we took the opportunity, the amazing opportunity, to expand our

4    knowledge base about our country.

5        So, 50 years ago, the African American Museum at that

6    point was named something slightly different was established.

7    It was there that we got to learn more about free and enslaved

8    Philadelphians during that time period.

9        We got to learn about our collective history.  I remember

10   as a child going to the African American Museum and learning

11   all of these things and coming back home and telling my parents

12   what I learned.

13       And I remember my mother asking me questions.  Well, I

14   asked -- I just assumed she knew.  And she said that she

15   didn't.  And I was shocked because at that time, my mother was

16   the smartest person I knew.  And I couldn't understand how she

17   had never heard of this girl named Phyllis Wheatly (phonetic)

18   for example.

19       And I remember talking in my 10 year old mind like how

20   could she not know these things?  And finally, my mother as I

21   recall, I didn't know what that look was then, but I recognize

22   it now was almost shame.  And she said, sweetie, when I was in

23   school, they didn't teach us about this.  They told us that we

24   didn't have any history.

25       And I remember then that it was my job to go to school and

1    pay attention, so that I could come back home and teach my

2    parents about our history.

3        That's what the bicentennial did for not just me, but

4    millions I know of other folks who perhaps have like I do a

5    history whose ancestors were enslaved, but also who were not,

6    who people who come from around the world to learn about this

7    human institution that happened the founding again of this

8    country.

9        And that if we bring it forward 50 years, now this year to

10   the semi quincentennial, we have an opportunity to continue to

11   tell the truth and hold both things.

12       I would say the memorial that's out there, that's still

13   out there right now, there are two lines there that I think

14   embody all of this.

15       It says something like the devastating effect of slavery

16   affects race relations to this day.  Yet we must all strive to

17   embody the ideals held or to hold the -- strive for the ideals

18   embodied by the Declaration of Independence and the U.S.

19   Constitution.

20       Those two things are so important.  And this is a special

21   year that allows us to hold both and celebrate and be

22   reflective at the same time.

23       Q    Thank you, Ms. Gay.

24            MS. GARCIA:  Your Honor, this -- those -- that's all

25   the questions I have for this witness at this time.

1          THE COURT:  Thank you.  Will be there be any cross?

2          MR. IN DEN BERKEN:  No cross, Your Honor.

3          THE COURT:  Thank you.  You may step down.

4          THE WITNESS:  Thank you.

5      (Witness is excused)

6          MS. AXE:  Your Honor at this time, that concludes the

7  City's evidence.  Would Your Honor like us to move in to the

8  record our exhibits?

9          THE COURT:  Yes, I'd like to hear if there are any

10  objections to the authenticated exhibits authenticated by

11  stipulation?

12          MR. IN DEN BERKEN:  No, Your Honor.

13          THE COURT:  All of your exhibits are admitted then.

14          MS. AXE:  Thank you Your Honor.

15          THE COURT:  As the foundations have been laid in any

16  event by your witness' testimony.  And the Court has already

17  viewed these.  They will be filed in the docket.

18          MS. AXE:  Understood, Your Honor.  We will do so.

19  Thank you.

20          THE COURT:  Okay.  With that, you rest as to the

21  preliminary injunction?

22          MS. AXE:  We rest as to the evidence.  I understand

23  that you will hear argument, but our evidence is presented and

24  we rest on that respect.  Thank you, Your Honor.

25          THE COURT:  Very well, Ms. Axe.  Let's turn to the

1    Defense and ask what evidence you'd like to present.  I think

2    you said you weren't going to, but you still are able to.

3            MR. IN DEN BERKEN:  Your Honor, as we previewed on

4    Monday's conference call, the government is not presenting any

5    witnesses.  We'll be relying on the declaration of Mr. Simms,

6    which is ECF 27-1.  And that will be the only document or

7    materials we will offer.

8            THE COURT:  That is in this group, isn't it?

9            MR. IN DEN BERKEN:  It was filed on the docket.  I'm

10   not sure if it's in the -- it's on the exhibit binder that

11   counsel prepared for you.

12           THE COURT:  If it's not in the exhibit binder itself,

13   I'd like it to be filed.

14           MR. IN DEN BERKEN:  It's filed.  It's ECF 27-1.  It's

15   attached to our opposition brief.

16           THE COURT:  It's attached to your brief, but it's not

17   in the record here yet unless you ask me to -- for it to be.

18   So that's what I'm asking you.

19           MR. IN DEN BERKEN:  In that case, Your Honor, we

20   would move for the admission of ECF 27-1 into the record.

21           THE COURT:  And name it, please, because I have to

22   hear out your adversaries here on this.

23           MR. IN DEN BERKEN:  It is the Declaration of Steven

24   Simms ECF Number 27-1 executed on January 27, 2026.

25           MS. AXE:  We have no objection to that admission,

1    Your Honor.  Thank you.

2            THE COURT:  All right, the Stevens Simms declaration

3    attached to the responsive brief of the government to the

4    preliminary injunction, I have reviewed it.  And there is no

5    objection.  It will be admitted.

6        (Defendant's Exhibit 27-1 admitted into evidence)

7            MR. IN DEN BERKEN:  Thank you, Your Honor.

8            THE COURT:  All right.  Anything else from the

9    government --

10            MR. IN DEN BERKEN:  No.

11            THE COURT:  -- besides argument?

12            MR. IN DEN BERKEN:  Nothing further except argument.

13            THE COURT:  All right.  I am aware of the hour.  I

14    would love to just go through argument, but I have a very grave

15    interest in hearing the arguments if they are requested by each

16    of the amici.  And I'm not going to rush anybody through lunch,

17    yet the day is going to be long enough.

18            So that I will hear you out.  Which of the Amici

19    would like to present argument today and please tell me.  Would

20    that be you, Ms. McClellan?

21            MS. MCCLELLAN:  Yes that's correct, Your Honor.

22            THE COURT:  Is there anyone here yet from the

23    governor of Commonwealth of Pennsylvania's Office that wishes

24    to argue?  I see no one.

25            So I would accept your argument when we get back.

1    I'd like you to argue on behalf of your client.  Of course,

2    that's not factual.  That's an argument, but you can use your

3    own set of criteria to develop that argument.

4         Then, I would like to hear from the government, your

5    argument.  And then, the City of Philadelphia.  The record for

6    now will be closed except for certain things that could still

7    happen.  That is subsequential briefing based on the evidence

8    presented.

9         And also, my inspection, which I tried to give you a

10   heads up this morning.  I intend to inspect the original

11   exhibit pieces that were removed and the present site.  I have

12   not done so, because I thought it was more important that I

13   start with the briefing arguments and evidence.

14        So these things have to happen.  I'm hoping they'll

15   happen by Monday, but today, we will finish with the arguments.

16   All right?  And we'll get back to you.

17        I don't want this to be a long break, but there are

18   many people here.  Are you already to argue in 30 minutes?

19             MR. IN DEN BERKEN:  Yes, Your Honor.

20             MS. GARCIA:  Yes, Your Honor.

21             THE COURT:  Is that too brief a break for you?

22             MS. MCCLELLAN:  That's fine, Your Honor.

23             THE COURT:  Yeah, it's the way I roll.

24   Unfortunately, that's the lunch hour I get.  There's no lunch

25   involved in it either, but in 30 minutes, when we come back

1    here and hear first you, Ms. McClellan, and you Mr. In Den

2    Berken.  And then who's arguing?

3                MS. TAYLOR:  Ms. Taylor.

4                THE COURT:  Thank you, Ms. Taylor, okay.  We're in

5    brief recess.

6                MR. IN DEN BERKEN:  Thank you.

7          (Recess taken at 1:38 p.m., recommencing at 2:20 p.m.)

8                THE CLERK:  All rise.  Court is now in session, the

9    Honorable Judge Cynthia Rufe now presiding.

10                THE COURT:  Good afternoon, everyone.  Please be

11    seated.

12                ATTORNEYS (IN UNISON):  Good afternoon, Your Honor.

13                THE COURT:  Thank you.  All right, we're ready to

14    hear argument on the testimony and evidence presented as well

15    as the briefing on the preliminary injunction motion filed by

16    the City against the Defendants.

17                And Ms. McClellan, on behalf of your client, would

18    you please and your client is Avenging the Ancestors Coalition.

19                MS. MCCLELLAN:  And the Black Journey.

20                THE COURT:  And the Black Journey, LLC.

21                MS. MCCLELLAN:  Thank you, Your Honor.  So we've

22    heard today about the establishment of the President's House

23    slavery memorial exhibit as a partnership between the City of

24    Philadelphia and the National Park Service.

25                And what amici had really introduced through our

1    brief is the reality as we heard as well that this was a three-
2    way partnership between the National Park Service, between the
3    City of the Philadelphia and the public.

4              There was a recognition of the public interest at
5    ensuring history is told.  Avenging the Ancestor's Coalition
6    was formed as a result of a historical discovery that there
7    were nine people held in slavery at the President's House site
8    by President George Washington.

9              And as the founder Michael Coard often says, ATAC of
10   Avenging the Ancestors Coalition was founded to ensure that we
11   heard the truth, the whole truth, and nothing but the truth.

12             As others have described today and we can stick with
13   the beam of hearing about different schools, he is a graduate
14   of Masterman and he became enraged when he learned about this
15   history because he had gone to one of the best schools in the
16   country and never learned this history.

17             And it upset him because it made clear that this
18   history had actually been suppressed.  Hundreds of others were
19   moved when they found out about this history.  And they worked
20   with the ATAC to make sure that this history would be told.

21             They wanted a recognition in the historical record of
22   the nine people who lived at the site and who were held as
23   slaves.

24             And 15,000 people signed a petition that was actually
25   delivered to Independence Park in 2002 asking for a recognition

1    of this history.  ATAC sent letters to the mayor of

2    Philadelphia and to Congress people representing Philadelphia

3    asking for a recognition of this history.

4           And it had an impact.  The mayor, Mayor John Street

5    at the time, actually responded saying I wasn't aware of this

6    history.

7           And in fact, I'm going to kick off an oversight

8    committee to look into this.  And I'm going to start the

9    process of raising the funding by committing the City to 1.5

10   million dollars.

11          And then we know Congressman Fattah and Congressman

12   Brady also committed 3.5 million dollars, all specifically

13   recognizing that the story of the nine people held in slavery

14   must be told at this site.

15          So this was a three-way partnership.  The purpose was

16   recognized repeatedly by public officials including City

17   counsel, who passed resolution saying that the story must be

18   told at this site and the Pennsylvania General Assembly.

19          Through the partnership, the City and National Park

20   Service established a steering committee.  And they also

21   through a cooperative agreement as we've heard about today

22   built in a process for the public to be heard.

23          They ensured that on the oversight committee, there

24   would be community members representing including ATAC and

25   Michael Coard, who were part of the oversight committee, but

1  also through a process that provided opportunity for public

2  input repeatedly.

3          In fact, in 2003, there was a public meeting in which

4  300 people attended to talk about the concept of the plan.  And

5  there was public comment.  And it was through this process that

6  the themes and the values of the exhibit were identified.

7          In 2004, there was another civic engagement form in

8  which 300 people attended.  In 2005, there was an update on the

9  planning.  200 people attended and they were all in support of

10  moving forward.

11          And then ultimately, in 2007, NPS and the City held a

12  public meeting to introduce the design.  And there were 150

13  people attending who approved the design moving forward.

14          This was the recognition of the public interest and

15  their being an exhibit at this site.  It was included

16  specifically in the cooperative agreement as you can see in

17  Exhibit 6 on page 18 and on page 25, which specify the

18  opportunities for community input.

19          And it was with the National Park Service at every

20  step of the way.  And in fact, it's worth quoting the letter

21  that after receiving ATAC's communication, the National Park

22  Service chief historian wrote to who was then superintendent of

23  Independence Park explaining why it was urgent to recognize

24  this history and if I could may quote just for a second from

25  that letter.

1          NPS' historian recognized, and I'll quote, "the

2    contradiction and the founding of the country between freedom

3    and slavery becomes palpable what one actually crosses through

4    a slave quarter site what entering a shrine to a major symbol

5    of the abolition movement".

6          How better to establish the proper historical context

7    for understanding that Liberty Bell that by talking about the

8    institution of slavery?  And not the institution as generalized

9    phenomenon, but as lived by George Washington's own slaves.

10          So 24 years later, after this deliberative process

11    that involved the public, the National Park Service, and the

12    City of Philadelphia working together without warning, there's

13    abrupt removal of this -- of the interpretive panels that make

14    up this exhibit with crowbars placing them into a pickup truck.

15    This is the opposite of the deliberative process that we saw

16    play out over eight years due to oversight committee and the

17    collaborative process.

18          And in fact, we know from the Defendant's declaration

19    that the only reason that the memorial was not removed was

20    because they did not have the appropriate tools at the time.

21          Under Executive Order 14253, staff at the National

22    Park Service were instructed to post QR codes asking for

23    comments.  And we know from reporting that as of July, there

24    were 13 comments received, only 13 comments.  And all were

25    positive.

1      ATAC wrote to National Park Service asking about were

2   there plans for removal, trying to understand what was coming.

3   They never received a response.

4      In fact, everyone was left in the dark even after the

5   September deadline when the removal was supposed to incur.

6   Suddenly, there was a change in plans on January 22nd in terms

7   of the removal, occurred much later than the earlier identified

8   date and without warning and without any opportunity for

9   comment and conversation with the City as we've heard, with

10  ATAC and with others who had reached out asking for an

11  explanation of what was coming.

12      To be clear, Defendant's removal of the interpreted

13  panels is clearly a final agency decision.  The interpretive

14  panels as their name so states are the way that you can

15  interpret the exhibit.  Without them, the substance of the

16  exhibit is removed.

17      And this removal has occurred through a process in

18  which there was no explanation, no reasoning given.  And it is

19  truly a legal and practical concrete harm whose consequences

20  are ongoing every day.

21      There is a harm when people visiting the site cannot

22  access this information.  There's a harm to all of us as

23  Americans when we cannot learn this history.

24      And as ATAC and Black Journey had described, there is

25  a particular harm to people of African descent to have the

1    history of their ancestors removed in this abrupt and cavalier

2    way.

3          The degradation of the substantive materials at a

4    nationally significant site is disrupting reliance interests of

5    hundreds of thousands of people who visit the site on the eve

6    of our country's 250th anniversary of the birth of this country

7    at the very site in the City that is the birth place of

8    American democracy.

9          To be clear, this is like pulling pages out of a

10   history book with a razor in terms of the erasure of history.

11   And history does not change based on who is put in political

12   office.

13         Still, there has not been no contemporaneous reason,

14   explanation for the removal 24 years after the exhibit was

15   first beginning to be designed and thought about.  And in

16   contrast with the 8 year process through which it was put

17   together.

18         The public interest is surely harmed by this erasure.

19   This again is the first monument to enslaved people on federal

20   law.

21         And its removal is a violation of the law, in

22   particular, the National Underground Railroad Network to

23   Freedom Act, which recognized that this was a site that needed

24   to be protected and preserved because of its history.

25         I want to make clear that, again, the removal of

1    discussions of slavery, the censoring of this core aspect of

2    our country's history, harms all Americans.

3         But the site also included stories of resistance of

4    the abolitionist movement.  It told the stories of Bishop

5    Richard Allen, of Reverend Absalom Jones.  These were all core

6    to the panels and they are a part of what has been removed.

7    These are stories that it harms the public interest when they

8    are not told.

9         So all of this begs the question, why can't we know

10   this history?  We still have not heard a reasoned explanation

11   of why the panels and the stories of the nine people have been

12   removed.

13        Repeatedly, it was recognized that the stories had to

14   be told at this specific site where the history occurred.  And

15   the refusal to provide reasons for why it cannot be told and

16   told here is in direct violation of the Administrative

17   Procedure Act, which requires reasoning and not such an abrupt

18   reversal, but a reasoned explanation accounting for, again, the

19   reliance interest and the statutory purpose.

20        So, in conclusion, the City has established

21   likelihood of success on the merits.  It's clear that the

22   balance of equities require an injunction and that the public

23   interest is harmed an irreparable harm.  Thank you, Your Honor.

24        THE COURT:  Thank you.  Anyone else from amici?  Then

25   we will turn to the Defense.

1      MR. IN DEN BERKEN:  Your Honor, if I may, as this is

2  the City's motion, I would appreciate an opportunity to at

3  least respond to their arguments.  Now if you'd be okay with

4  switching the arguments or provided brief rebuttal, either

5  would be acceptable, but that's the request I would make.

6      THE COURT:  I think I'll give you a brief rebuttal.

7      MR. IN DEN BERKEN:  Thank you, Your Honor.

8      THE COURT:  Is that your water?  Okay.

9      MR. IN DEN BERKEN:  Actually, this is not my water.

10  May I proceed?

11      THE COURT:  Yes, you may.

12      MR. IN DEN BERKEN:  May it please the Court.  What we

13  heard today was the President's House and its history is

14  important and meaningful to many people for many reasons.

15      It evokes strong emotions, strong feelings, and tells

16  an important tail.  But fundamentally, none of the evidence

17  presented here today changes the law and ultimately only re-

18  enforces the Government's arguments.

19      At this point, it is undeniable that the City is

20  asserting contractual rights.  It is asserting claims that are

21  based on contractual provisions.

22      And what they are seeking here is specific

23  performance on the contractual rights they say they have.

24  Binding precedent says they cannot do that.

25      The City cannot assert such claims under the APA.

1    The Tucker Act precludes subject matter jurisdiction for such

2    claims no matter how they are labelled, no matter how they are

3    dressed up if the substance of the claim sounds in contract,

4    which these claims do, they must be brought in the Court of

5    federal claims.

6         In any event, even if that hurdle was overcome, the

7    contracts here, the substance of provisions that are invoked

8    have expired.  We heard testimony about the project closeout,

9    the handoff.

10        Now that term is important, the handoff, the close

11   out was because there was a termination of the actual substance

12   of provisions when the project was completed.  At that point,

13   the exhibit was transferred to the National Park Service.

14        And under the agreement, 2006 cooperative agreement,

15   which is contained binder of exhibits, the very first substance

16   of provision, Section 2, it specifies that complete and

17   unconditional ownership of the exhibit shall lie with the

18   National Park Service after project closeout.

19        Numerous additional provisions in the amendments as

20   well as the original agreement specify unambiguously that the

21   exhibit will become the property, the unconditional property of

22   the Park Service.

23        I'm quoting here from Article 1, Section C in the

24   Third Amendment to the (indiscernible) cooperative agreement.

25   Quote, the project will be owned, maintained, managed and

1    interpreted by the NPS following completion of a project and

2    acceptance by the City.

3            This is Article 3(b)(1).  Quote, City agrees, quote,

4    sorry, this is the quoted language, to donate to NPS the

5    project identified in the property agreement as amended.  This

6    donation is made by the City of its own volition without

7    compensation.

8            There are other provisions in which the City agrees

9    to certify in writing upon NPS' acceptance of the project as

10   complete that all right, title, and interest to any completed

11   construction, improvements, installations, fixtures or

12   associated donations are free and clear of all debts,

13   liabilities, or obligations.

14           They agree that, quote, NPS will own and manage the

15   commemorative work at the conclusion of the process.  I

16   understand as I said before that the President House is

17   important, tells an important story.

18           And the beauty of our country and the technology in

19   modern day is that this is not the only source of that history.

20   The history will endure.

21           I think what we heard here today confirms that there

22   are many people making sure that those stories will continue to

23   be told, but they have no right to compel the Government to

24   tell the story for them if the Government chooses not to.

25           At this point, the National Park Service has elected

 1    to take the exhibit down.  That is a discretionary act that is

 2    an interpretive step as part of their complete ownership of

 3    this project.

 4        There are no provisions that they have cited, no

 5    specific contractual provisions that the removal of the exhibit

 6    violates.  This is exactly what the contract said.  At the

 7    conclusion of the project NPS will own the exhibit.

 8        Now in addition to the Tucker Act hurdle, even if

 9    these were cognizable APA claims, there is no agency action

10    here as defined under 5 USC 55-113.

11        This is the operation of a program.  On a regular

12    basis, the Park Service updates, maintains, changes, eliminates

13    and makes other edits to its interpretive exhibits, its tours,

14    its displays.  Every time they are changed, but they are not

15    subject to an APA claim.  They are not subject to notice and

16    comment rule making.

17        If the National Park Service decides that in light of

18    current developments, it makes more sense to do this versus

19    that, that is their prerogative.

20        THE COURT:  I'm sorry, in light of what current

21    developments?  I haven't heard any evidence on the change in

22    current developments.  What are you talking about?

23        MR. IN DEN BERKEN:  Like --

24        THE COURT:  Just clarify.

25        MR. IN DEN BERKEN:  -- like my point there, Your

```
 1    Honor, is that if the Park Service makes a determination of
 2    that kind.
 3              THE COURT:  Yeah, but how do they make that?  And did
 4    they make that here?
 5              MR. IN DEN BERKEN:  I have --
 6              THE COURT:  That determination?  Don't
 7    they -- wouldn't they have had to make that determination or
 8    were they told to make that determination?
 9              MR. IN DEN BERKEN:  Other than public reports from
10    the Department of Interior public statements as to why this
11    action was taken, I believe the only reported explanation is
12    that it was pursuant to the Executive Order.  That was their
13    determination.  They were following the Executive Order.  And
14    they determined it was --
15              THE COURT:  Whose interpretation of the Executive
16    Order?  Was it the Park Service superintendent or was it higher
17    up in that?  You didn't cover any of that, counsel.  So I
18    imagine there's a reason.
19              MR. IN DEN BERKEN:  I think the reason is, Your
20    Honor, that we have no burden here today.  We are not the
21    movant.  We as 3rd Circuit and Supreme Court precedent
22    established have no burden of proof here.  The burden for the
23    extraordinary remedy of a preliminary injunction lies squarely
24    with the movant.  That is why we have not presented evidence
25    here.
```

1          Now if Your Honor disagrees and this case proceeds on

2      the normal regular pace, under APA review, there would come a

3      time when there needs to be provided an explanation.  We are

4      not there at this stage and it's our position based on all the

5      fatal infirmities that we've laid out in the claims that the

6      City asserts that we're not -- we should not get there, Your

7      Honor.

8          THE COURT:  But what you told me is the discretionary

9      functions of the National Park Service gives it an absolute

10     right to change its mind despite years of collaboration and

11     cooperation and communication with the City of Philadelphia and

12     various people of Philadelphia who got this exhibit together

13     and produced it and maintained it and promoted it and paid for

14     it.

15         You have said they have discretion so they can change

16     their mind.  How is that not reviewable for arbitrary and

17     capriciousness if you don't have any valid reason to do it?

18         MR. IN DEN BERKEN:  Because Your Honor, the

19     negotiations, the collaboration, that itself was an exercise in

20     discretion.  By itself, it was of the kind for many, many years

21     the Park Service exercised that discretion to have that

22     collaboration.

23         And now, they have elected in this particular

24     instance not to.  Both of those --

25         THE COURT:  Well, it's curious, isn't it, because you

1    have to look motivation and meaningful avoidance of harm.  And

2    you don't acknowledge any harm.  I get that from the blanket

3    position you're taking, but how do you discount the harm to the

4    truth?

5           MR. IN DEN BERKEN:  I think, ultimately, as we say in

6    our brief, that is an issue for the political process.

7    Ultimately, there's always accountability in our system to

8    democracy.  There's always --

9           THE COURT:  I'd like to believe that, but I have to

10   ask you another question because it has to do with your

11   accountability, your client's accountability.

12          And I'm going to quote here from President Trump's

13   Tweet in 2017.  When he was reacting to the removal of the

14   Robert E. Lee statute in Charlottesville, Virginia.

15          Quote, Sad to see the history and culture of our

16   great country being ripped apart with the removal of our

17   beautiful statues and monuments.  You can't change history, but

18   you can learn from it.  Robert E. Lee, Stonewall Jackson.

19   Who's next?  Washington, Jefferson?  So foolish.

20          Also the beauty that is being taken out of our

21   cities, towns, and parks will be greatly missed and never able

22   to be comparably replaced, exclamation point in bold.

23          Does this represent the Government's position on

24   irreparable harm?

25          MR. IN DEN BERKEN:  I think President Trump's private

```
 1    tweets in 2014 are not indicative of --
 2              THE COURT:  2017.
 3              MR. IN DEN BERKEN:  2017, Your Honor, I'm not
 4    familiar with the tweet.  Don't know the context.  I am not
 5    here today to defend or speak about tweets.
 6              THE COURT:  But you talked about the Executive Order
 7    that he entered last year.
 8              MR. IN DEN BERKEN:  Because that's the --
 9              THE COURT:  And this emanates from that Executive
10    Order, does it not?
11              MR. IN DEN BERKEN:  As the Department of Interior as
12    stated in public statements, yes.
13         Q    But somehow, it's sensible now?  It wasn't
14    sensible then or maybe it was.  Whatever his reaction, he
15    created the Executive Order.  His administration backs it.  And
16    after a number of months without any notice, still continuing
17    to collaborate and cooperate and communicate with the City,
18    boom, it's gone.  It's gone overnight.
19              Well, in the morning of one day last Thursday.  So
20    how do you reconcile the point of the Executive Order with the
21    change in history that President Trump was complaining about in
22    his tweet in 2017?  That's not that long ago by the way.
23              MR. IN DEN BERKEN:  Your Honor, I neither drafted the
24    Tweet nor the E.O. I do not think they need to be reconciled.
25    I think ultimately for purposes of what we are here for today,
```

1   the answer remains the same.

2        THE COURT:  Well, if you read the Executive Order,

3   you can see how it's the same for him and the president is

4   doing and saying the same thing, counsel.  You are now in a

5   position of representing his administration.  That's the

6   question I'm posing to you.  Is that where this comes from?  Is

7   it a desire to change history?

8        MR. IN DEN BERKEN:  I have no insight into the

9   subjective motivations for the decision.  What I can tell Your

10  Honor is exactly what the Interior Department has said in

11  public statements.

12       Consistent with that Executive Order, they conducted

13  a review.  And pursuant to that review, a decision was made to

14  remove the tablets.

15       THE COURT:  For purpose to change history by

16  providing or by hiding any written word or spoken word or

17  physical facility to teach it?

18       MR. IN DEN BERKEN:  Your Honor --

19       THE COURT:  That had been in existence for some

20  years?

21       MR. IN DEN BERKEN:  Your Honor, under APA review,

22  even if these were cognizable claims, we don't probe into the

23  subjective motivations for certain actions.  We don't question

24  the subjective individual intentions of one particular decision

25  maker.  Review under the APA's on the record --

1          THE COURT:  Well, what's the review for then that you

2    suggest has to happen in the Court of claims?  What is that

3    review for?

4          MR. IN DEN BERKEN:  It's --

5          THE COURT:  If not to figure out is this correct?  Is

6    this legal?  Is this right?  Would they do anything differently

7    than I'm asking you now, counsel?

8          MR. IN DEN BERKEN:  I think, Your Honor, at that

9    point, we would have an administrative record on which we could

10   determine whether there was that reason decision making

11   process.

12         We are at such a preliminary stage of this case,

13   there is no administrative record.  We are at a --

14         THE COURT:  Okay, so what are they going to review?

15   How can you say it's an administrative process, we have to

16   review that in another court?  How can you say that when you

17   don't have any record?  You don't have a record.  You just have

18   the act.  Aren't you stuck with dealing with the act?

19         MR. IN DEN BERKEN:  Which act, Your Honor?

20         THE COURT:  The act of removing something that was

21   approved by the Park Service, the City of Philadelphia, its

22   taxpayers, and a number of organizations who funded it.

23         MR. IN DEN BERKEN:  Your Honor, ultimately, the

24   question of where this claim should go and should this claim

25   proceed has to be based on substantive federal law.

1    And our position is, as we explain in our brief, that

2    ultimately, the answer is their contractual claims cannot be

3    asserted here.  That doesn't mean there is no recourse.  It

4    means that, ultimately, that's the process they were -- they

5    need to follow.

6    Now I understand that we are at a very preliminary

7    stage and there are questions that Your Honor has, that the

8    City has, but they are answered for the most part by the same

9    contracts they invoke.

10    What they have asked for today and the only purpose

11    of the hearing today is to determine is the extraordinary

12    drastic remedy of the preliminary injunction appropriate?

13    It's not a trial on the merits.  It's not on the

14    record review under the APA.  It's a P.I. hearing.  The showing

15    we to make is like (indiscernible) on the merits, irreparable

16    harm, and the balance of the equities and public interest.

17    The fact that they there are fatal jurisdictional

18    hurdles that they cannot overcome, the fact that the contracts

19    are expired, they explicitly award ownership, title, and

20    interpretative rights to the National Park Service, the fact

21    that those claims belong in the court of federal claims, the

22    fact that there's no provision that they have cited that this

23    violates, the fact that this is not agency action and contrary

24    to amici's argument is also not final.  There are no specific

25    legal results that have stemmed from this action for purposes

1  of the City.

2         They have saved face the legal consequences.  They

3  face no liability.  There are no ramifications.  Not legal

4  ramifications for this removal.  Therefore, it's not final

5  agency action.

6         THE COURT:  So no one can be held accountable for

7  what happened?  No one?

8         MR. IN DEN BERKEN:  Not under the APA, Your Honor.

9  Ultimately, the voters and the electorate will be the decision

10  makers here.  And that is what the APA contemplates, the fact

11  that only discrete final agency action be subject to review.

12         THE COURT:  How is this not final, counsel?

13         MR. IN DEN BERKEN:  It's not final because under

14  Bennett v. Spear, as we laid out in our brief, there is a

15  specific definition of final.

16         And that definition provides, and I quote, first the

17  action was marked the consummation of the agency's decision

18  making process.  It must not be tentative or interlocutory.

19         And two, the action on must be one by which rights or

20  obligations have been determined or from which legal

21  consequences will flow.

22         Cases interpreting that second condition have

23  explained that the action has to impose obligations,

24  prohibitions, restrictions, or give rise to direct and

25  appreciable legal consequences.

1          The City waived all rights and title in the exhibit

2     when they transferred it.  Its removal imposes no prohibitions

3     on it.  No restrictions.  It imposes no obligations.  And it

4     gives them no direct and appreciable legal consequences.

5          They face no liability.  They are not detrimentally

6     affected in a way where they face liability for a claim.

7     Therefore, under the APA, there is no final agency action.

8          Now even if they could show a likelihood of success

9     on the merits, they have a chilling irreparable harm.  That

10    requires harm that cannot be remedied at the conclusion of this

11    case.  It requires something that is by its nature intangible

12    and cannot be rectified.

13         Here, the fact that Your Honor is -- would be able to

14    order the panels restored and installed shows that there is no

15    immediate urgency.  There is no irreparable harm.

16         That brings us to the balance of the equities in the

17    public interest.  And as I alluded in my opening statement,

18    here, what they are seeking is an order that would compel

19    co-equal branch of government to speak in a way that is elected

20    not to speak.

21         The Supreme Court has made clear time after time that

22    the federal government, quote, has the right to speak for

23    itself.  This is Pleasant Grove City v. Summum, 555 U.S. 460 at

24    467.  And this is also a quote, to select a view it wants to

25    express.

1    THE COURT:  Counsel, talk about, please, your

2  position for your client on the impact of a survival clause in

3  the cooperative agreement that is the Third Amendment on the

4  obligations and rights of the parties.  This is in reference to

5  claim 1.

6    MR. IN DEN BERKEN:  So the survivability clause

7  specified that rights of obligations that by their nature are

8  expected or anticipated to continue after the termination of

9  the contract will continue.

10    There are various terms in the contract that

11  explicitly address survivability.  They say this term will

12  survive.  And there are various that I think by implications

13  do.

14    The nice thing is we have an answer in this

15  particular case as to how it relates because if we go to the

16  2006 cooperative agreement, the original unamended version,

17  this is Section 2, ownership of the exhibit.  Upon completion

18  of the exhibit in accordance with this agreement, ownership of

19  the exhibit shall transfer to the NPS.  NPS ownership of the

20  exhibit shall survive any termination of this agreement.

21    THE COURT:  Is that the second or the third

22  amendment?

23    MR. IN DEN BERKEN:  That is the original 2006

24  agreement, not any of the amendments.

25    THE COURT:  Well, the later amendment has a survival

1    clause in it, too.  They all do.

2            MR. IN DEN BERKEN:  Yes, Your Honor, but that

3    ultimately doesn't change that explicit term.  I can see that

4    there are numerous provisions that by their nature would

5    survive termination of the contract.  The problem is they

6    haven't invoked it.

7            THE COURT:  Do you agree, counsel, that all of the

8    contract or most of the contract clauses in these cooperation

9    agreements, which existed alongside the collaboration that the

10   entities that we've been hearing evidence about today were

11   performing, all emanate from the 1948 Congressional Act to

12   provide for the establishment of the Independence National

13   Historical Park and for other purposes?

14           MR. IN DEN BERKEN:  Yes, Your Honor.

15           THE COURT:  Okay.  And isn't there a provision,

16   Section 2 of that act, which explicitly states that there will

17   be no changes except by mutual agreement between the Secretary

18   of the Interior and the other parties to contracts.

19           MR. IN DEN BERKEN:  Are you quoting the statute, Your

20   Honor, or the --

21           THE COURT:  I'm quoting the statute, the act.  I

22   could read the entire section for you to put it in context.

23   Section 2, in furtherance of the general purpose of this act as

24   prescribed in Section 1 hereof, the Secretary of the Interior

25   is authorized to enter into cooperative agreements with the

1  City of the Philadelphia to assist in the preservation and

2  interpretation of the property known as the Independence Hall

3  National historic site.  That's the entire property not just

4  the building.

5        And with the Carpenters Company of Philadelphia for

6  Carpenters Hall.  To assist in the preservation and

7  interpretation of those facilities in connection with the

8  Independence National Historical Park.

9        It goes on to say such agreement shall contain but

10  shall not be limited to provisions that the Secretary of the

11  Interior through the National Park Service shall have the right

12  of access at all reasonable times to all public portions of the

13  property now within Independence Hall national historic site

14  and to Carpenters Hall for the purpose of conducting visitors

15  through such buildings and grounds and interpreting them to the

16  public, that no changes are alterations shall be made in the

17  property within the Independence Hall national historic site

18  including its buildings and grounds or in Carpenters Hall

19  except by mutual agreement between the Secretary of the

20  interior and the other parties to the contracts, which of

21  course are the City of Philadelphia and others.

22        MR. IN DEN BERKEN:  And pursuant to that statute, two

23  years later, the City of Philadelphia and the National or the

24  Department of Interior entered into the 1950 cooperative

25  agreement that to this day endures.

1          That term that Your Honor quoted about no material

2     alterations appears in that contract.  And it indeed reads any

3     work or restoration or any major alterations or repairs to any

4     of the buildings shall not be under taken until the plan for

5     such work shall be mutually agreed upon.

6          Your Honor --

7          THE COURT:  That's accurate.

8          MR. IN DEN BERKEN:  -- consistent with the statute,

9     it's buildings.  This was not a building.  This is an outdoor

10    exhibit.  The project description specifically lays out --

11         THE COURT:  Oh, no.

12         MR. IN DEN BERKEN:  -- that it is not intended to be

13    --

14         THE COURT:  No, it's a structure.

15         MR. IN DEN BERKEN:  -- it --

16         THE COURT:  It's a structure.

17         MR. IN DEN BERKEN:  That is not the definition in the

18    project, Your Honor.

19         THE COURT:  I beg to differ, counsel.  Because you

20    can't treat it like changing the definition of what this bricks

21    and mortar are because you want to do something do with its

22    information.

23         You just can't go back and forth with the projects

24    like that.  Where does the Liberty Bell fit in?  Where does the

25    National Constitutional Center fit in?  Where is Carpenters

 1   Hall today and the Independence Hall site?  Well, yes, they're

 2   buildings, so nothing can happen to them.

 3            MR. IN DEN BERKEN:  I think, Your Honor, in those

 4   cases, that provision comes into operation.  At that point

 5   reparations or alterations need mutual consent.  The fact that

 6   an exhibit, which is how --

 7            THE COURT:  You had that mutual assent and consent

 8   term in each of the subsequent amendments and a survival clause

 9   in each of those cooperative agreements as amended.

10            Nowhere did it say the President's House is not a

11   building and doesn't fall in this -- into this definition.  So

12   we're going to treat it differently because it wasn't treated

13   differently, counsel.

14            MR. IN DEN BERKEN:  Your Honor, I would refer you to

15   the 2006 cooperative agreement and how it approaches and

16   describes the project.

17            And there is a definition in the background section,

18   this is background section Subsection (f).  The City and NPS

19   intend to work together to complete the following.  Select a

20   team of designers, historians, and other professionals, the

21   exhibit team to design, fabricate, and install the President

22   House exhibit.

23            It then proceeds to explain what that consists of and

24   at no point does it contemplate that it will be a property or a

25   structure much like Independence Hall or Constitution Hall that

1    is a property for purposes of the 1950 agreement.

2              In addition, this is not the argument that the

3    Government has asserted.  Their rights they invoke or the City

4    has asserted, the rights they invoke are under a 2006

5    agreement.  I have not heard them invoke the 1950 agreement

6    substantively.

7              In addition, that provision about mutual assent, as I

8    said, it applies to property.  This -- these are exhibits.

9              THE COURT:  Why did you refer to 16 United States

10   code Section 407, please?

11             MR. IN DEN BERKEN:  I do not have Title 16 in front

12   of me, Your Honor.

13             THE COURT:  Well, let me quote it.

14             MR. IN DEN BERKEN:  Please.

15             THE COURT:  Including buildings and grounds and it's

16   not an exhaustive list.  It says so.

17             MR. IN DEN BERKEN:  I am not --

18             THE COURT:  Including buildings and grounds, counsel.

19             MR. IN DEN BERKEN:  I'm not familiar with what the

20   statute itself says.  You quoted --

21             THE COURT:  Well, how can you not --

22             MR. IN DEN BERKEN:  -- buildings and grounds.

23             THE COURT:  -- apply all the statutes that are at

24   issue here?  Picking and choosing what you want to interpret as

25   you think the Executive Order says you must does not lend

1    itself to rule of law interpretation, does not give consistency

2    to history.

3              And it can't be that you practice law like that.  It

4    can't be that you practice running the government like that

5    because everyone needs rule of law and consistency to believe

6    in it.  And what does the Park Service's behavior here leave us

7    to believe?

8              MR. IN DEN BERKEN:  I think different people can draw

9    different conclusions, but I think ultimately, what we are left

10   with is the law that we need to apply in this case.  They have

11   brought APA claims.  And binding precedent says you cannot

12   disguise contract claims as APA claims.

13             Ultimately, we end where I begin -- began, which is

14   all the evidence we heard today reinforces the importance of

15   the exhibits and many people.  But ultimately, it doesn't

16   change the conclusions of law in this case, which they have

17   brought contractual claims.  They cannot do some of the APA,

18   their claims are barred.

19             The provisions they invoke do not establish any

20   contractual liability.  They actually belie it.  They establish

21   that the exhibit belongs to the National Park Service.

22             Even if they could overcome that hurdle, there is no

23   irreparable harm here because Your Honor can order the

24   reinstallation of the exhibit.  It is not harm that requires

25   the extraordinary remedy of a preliminary injunction.

1        And that brings us to the final element, the balance

2   of the equities and the public interest.  Although many people

3   feel strongly about this one way, other people may disagree or

4   feel strongly another way.  Ultimately, it is in this context

5   that the Government gets to choose the message it wants to

6   convey.  Compelling them --

7            THE COURT:  That's the most dangerous statement you

8   are making.  That is horrifying to listen to.  It changes on

9   the whim of someone in charge?

10           MR.  IN DEN BERKEN:  Your Honor --

11           THE COURT:  I'm sorry, that's not what we elected

12  anybody for.

13           MR.  IN DEN BERKEN:  Your Honor, the message that the

14  Government chooses to convey is for the Government to choose.

15  I don't get to choose what that message is.  And it's our

16  position that the City doesn't either.

17           THE COURT:  It would seem to me there has to be some

18  acknowledgement and respect for history.  And as if we didn't

19  hear enough credible evidence this morning, of how that respect

20  has been earned and the acknowledgement has been deserved, I

21  can't help but think that the moving target of what's

22  acceptable and what is not is a bane on our country's

23  existence, counsel.  And no citizen should be subjected to that

24  kind of whim.

25           So we either go with what's true and proven to be

1    true, or we just abandon all truth and let anybody in charge

2    say what they want to say about everything.  First Amendment

3    right maybe, but not when it affects other's rights.

4         And I keep thinking about this kind of situation all

5    over the world.  This is not a new and unique thing except here

6    in the United States of America.  And I cited the back and

7    forth on the Confederate General Robert E. Lee.

8         And I think that it's telling because you can go to

9    almost any country and say, well, what if that happened there?

10   And there's deniers everywhere.

11        So just take this as an example.  So there's a

12   monument to the United States soldiers who liberated the

13   concentration camp of Dachau.  What if they just decided to

14   tear down that monument like it didn't happen and it wasn't a

15   site of the Holocaust terror?

16        What are we doing here?  I have to ask that question

17   in almost every case.  What are we doing here?  Are we seeking

18   truth and justice?  Are we playing with words and partitioning

19   sections of cooperation agreements and statutes to achieve and

20   end that is not desired by almost every American?

21        And it's not a question of what I want to believe or

22   what citizens want to believe.  It's a question of what's been

23   proven to be true?

24        And now we can't count on anything because everything

25   gets rewritten and revised.  You can't erase history once

1    you've learned it.  It doesn't work that way.

2          So magic interpretation that this belongs in the APA

3    and in another court, but I still have the authority to

4    resurrect the monuments and put them back.  You are talking

5    both sides of your mouth, counsel, because you don't want to

6    argue that.  You don't want to the district court or me as the

7    judge in the District Court.  I don't think it's personal.  You

8    don't want this review here.  It's too close to the people.

9          MR. IN DEN BERKEN:  Your Honor, if I may, these are

10   disjunctive arguments.  If you disagree with the likelihood of

11   success in the merits argument, and you hold that there is APA

12   jurisdiction, you must still find irreparable harm.  Those

13   arguments are in the alternative or cumulative because you

14   need -- they need all of them to prevail on their motion.

15         They're not inconsistent.  They are entirely

16   consistent because Your Honor would need to find both those

17   elements at the very least are met to issue them the relief

18   that they've requested.

19         So if Your Honor disagrees and finds that she can

20   proceed with the case, the Court can proceed, in that case, you

21   have the ability to redress the harm and still in this context

22   there be no irreparable harm.

23         THE COURT:  Just let me get this straight.  Is the

24   Government asserting the unqualified right to modify this

25   monument any way in it chooses?  Even today?

1          MR. IN DEN BERKEN:  I think there is no legal

2    statutory regulatory or binding policy guidance that the City

3    has cited that prevent that decision if it were made.

4          I'm sure there could be other impediments that have

5    not been briefed, that I am not privy to, but nothing that the

6    City has cited would be at bar at this stage.

7          THE COURT:  There's something else that was covered

8    basically in argument, but also in evidence to a certain degree

9    because I think it's a contingent problem.

10         What is the Government's position on the claims in

11   the Claims 2 and 3 concerning the National Underground Network

12   to Freedom Act and how that applies here or doesn't apply?

13   Does it interfere with your reasoning or the City's reasoning

14   because I didn't hear anything from you on that.

15         MR. IN DEN BERKEN:  They invoke the National

16   Underground RAILROAD FREEDOM ACT in a cursory fashion to say

17   that it has a statutory purpose about preservation and

18   education.

19         The Government has no quibble or disagreement with

20   that frame or that -- the description of the statute.  It

21   contains no substantive provisions however preventing changes

22   to sites so designated.  It describes a purpose.  It imposes no

23   binding restrictive obligations that are applicable here.

24         THE COURT:  I don't think you're adversaries agree

25   with you.  I know I will hear them out on that.  I think we're

 1  pretty much done here.

 2          MR. IN DEN BERKEN:  There's nothing further, Your

 3  Honor.

 4          THE COURT:  There is one part of that, though,

 5  counsel.  You said there's no obligation to do anything?

 6          MR. IN DEN BERKEN:  There is no substantive provision

 7  that applies in this context to restrict any of the actions

 8  that the City has complained about.  They invoke none either.

 9          THE COURT:  What about the Secretary's obligation to

10  provide educational materials about it, the National

11  Underground Network to Freedom?

12          MR. IN DEN BERKEN:  Consistent with that general

13  statutory purpose is my understanding that that is ongoing.

14  This -- removing --

15          THE COURT:  But that's an obligation.

16          MR. IN DEN BERKEN:  Correct, but removing any

17  particular site or -- it doesn't even remove the site because

18  the site remains.

19          Removing any particular exhibit or interpretive

20  program, display, brochure does not in any way undercut that

21  statutory purpose.  And to hold differently, if every site

22  designated as a National Underground Railroad Network Freedom

23  site had to be --

24          THE COURT:  Yeah, I thought you were going to say

25  that they're not buildings, Your Honor.  They're just plaques.

1  So we can take them apart any time we want.  That's what I

2  thought you were going to say.  I'm glad you didn't.

3          MR. IN DEN BERKEN:  What I'm saying, Your Honor, is

4  that there are numerous sites designated and the law is not

5  that not that no site once designated shall become etched in

6  stone, cannot be altered forevermore.  That is not something

7  that appears in the statute.

8          And they cite no substantive provision that is

9  actually violated here.  They cite the general statutory

10  purpose.  That by itself cannot impose --

11          THE COURT:  That is an -- that was a question posed

12  as an analogy, counsel.  I heard your answer.  Thank you.

13          MR. IN DEN BERKEN:  For all those reasons, Your

14  Honor, it's the Government's position that the motion for

15  preliminary injunction should be denied.  Thank you.

16          THE COURT:  Thank you.

17          MS. TAYLOR:  Good afternoon, Your Honor.

18          THE COURT:  Ms. Taylor, good afternoon.

19          MS. TAYLOR:  So the City is here seeking an

20  injunction that directs the Park Service to restore the panels

21  and other that were removed from the President's House.

22          We understand that as a Plaintiff, we carry a high

23  burden when we are seeking affirmative action from the

24  Government rather than just a stasis.

25          And we respectfully ask that the Court after this

1   hearing entertain proposed findings of fact and conclusions of

2   law, so we can more clearly establish our right to that relief

3   based on the record.

4        Because of the urgency as Your Honor has already

5   previewed, we respect -- we respectfully request that these

6   submissions be on an expedited basis.

7        Today, however, as I stand here, we are asking that

8   the Court at least issue an order that directs the Park Service

9   not to take down anything further.

10       The affidavit submitted by the acting director of the

11  NATIONAL INDEPENDENCE HISTORICAL PARK suggests that but for the

12  weather and the tools, the National Park Service would remove

13  what limited substantive information remains in the President's

14  House.

15       And we ask that that be stopped from happening and

16  that, further, the Court specifically order that no harm come

17  to the panels.

18       As we understand it, they're not held at the

19  Constitution Center itself but at a storage facility adjacent

20  to the Constitution Center that is in the Park Service custody.

21  So that order would bind the Park Service to protect those

22  materials during the pendency of our larger ask for

23  reinstatement.

24       With that said, why are we entitled to this relief?

25  Obviously, and in first had -- I do want to address the

1    jurisdictional issues raised by counsel.

2            One of our three entitlements to relief is grounded

3    in contract.  And yes, the Tucker Act does apply to contracts

4    who have a value over $10,000.

5            The decisional law referenced in the United States

6    brief arises out of the last year of litigation primarily

7    around grant agreements and whether or not the, you know,

8    contentions that the Government has arbitrarily and

9    capriciously stopped the flow of money to programs that are

10   essential to the functions of many different things across our

11   country.

12           This is not that case.  The contracts at issue, and

13   I'll get into the weeds on those in a bit, but the contracts at

14   issue are not about values of money that the City says the Park

15   Service must take action to restore a flow of money to the

16   City.

17           We are saying under these contracts, this exhibit

18   should be maintained as it is, was, and built together to be.

19   That is a claim over which this Court has original jurisdiction

20   under 28 USC 1346(a)(2).

21           I believe that it colloquially called the little

22   Tucker Act, which basically reserves small claims, nonmonetary

23   large claims expressly to the jurisdiction of this Court.  I

24   think this Court may not concern itself with jurisdiction.

25           Under 5 USC 702, this Court can hear claims against

 1      the United States where the release sought is injunctive.  We

 2      are not seeking money.  We are seeking action.  This Court has

 3      jurisdiction under that specific prong of the Administrative

 4      Procedure Act.

 5              So turning to the contracts, what contracts are we

 6      talking about?  Many of these have already been previewed.  And

 7      I apologize in advance, but I do want to read specific

 8      provisions into the record because I believe they are important

 9      for the Court's consideration.

10              I'll direct the Court's attention first to Article 3

11      of the 1950 agreement.  Article 3, Section C specifically says

12      any work of restoration or any major alterations or repairs to

13      any of the buildings shall not or shall not be undertaken until

14      the plans for such work shall have been mutually agreed upon.

15              Provision D continues.  That neither of the parties

16      to this agreement will erect or place or permit the erection or

17      placement of any monument, marker, tablet or other memorial in

18      or upon the buildings or grounds without the written consent of

19      the other.

20              And then, provision (e) in that same Article 3, that

21      it is the purpose of both parties to this agreement to develop

22      a unified long range program of preservation, development,

23      protection, and interpretation for the whole Independence

24      National Historical Park for the inspiration and benefit of the

25      people of the United States.

1          And to secure this result, a high degree of

2     cooperation is necessary with each other and with other bodies

3     participating in the project.  To wit, the Commonwealth of

4     Pennsylvania, Christ Church, Carpenters Company of

5     Philadelphia, and Independence Hall Association.  And the

6     parties hereto pledge themselves to consult on all matters of

7     importance to the program.

8          The United States has already conceded that the 1950

9     agreement has not been done away by an act of commerce, which

10    is the only way that this can be invalidated.

11         Those provisions standing alone direct mutual

12    agreement, direct mutual written assent to changes to the

13    Independence National Historical Park.

14         And the everything the Court heard today manifested

15    what that agreement looks like, what that mutual looks like

16    when it is done properly.

17         It might take a long time, but it is collaboration,

18    cooperation, stakeholder engagement, critical engagement by the

19    public, by all the government entities to come together to do

20    something.  That is the type of cooperative collaborative

21    behavior that is directed by the still controlling 1950

22    agreement.

23         And yes, I will -- the United States point is fairly

24    made.  We did not expressly say this in our papers.  Your

25    Honor, we had a few hours to file while this was happening.

1    So to the extent it is helpful to the Court, we can

2    certainly, you know, file an amended pleading that more clearly

3    conforms with the arguments I'm presenting to the Court, which

4    is also why I'm talking very slowly and making statutory pin

5    cites.

6    Next on the agreement front and in the City's claim

7    about the development of these agreements, I turn the Court's

8    attention you -- the Court has heard a lot of testimony about

9    the development of these agreements.  One provision in

10   particular I would submit is important for the Court's

11   consideration.

12   In the 2006 cooperation agreement, Provision 15 in

13   that agreement binding on successors.  The language of that

14   provision states the terms, covenants, and conditions contained

15   in this agreement shall extend and be binding upon the parties

16   hereto and their respective successors and assigns.

17   So what does -- what really are the terms, covenants,

18   and conditions?  And we would submit core to the terms,

19   covenants, and conditions of the development of this site, is

20   that it shared the truth.  It educate the truth of the facts

21   that the first president of our country intentionally housed

22   enslaved persons at his house in and in his household.

23   And not only that, the educational pieces and this

24   didn't come through the testimony, but it is in the submission

25   documents, particularly the National Park Service's submission

1    for recognition as a network to freedom site under the National

2    Underground Railroad Network to Freedom Act of 1998.

3           That submission details how not only did the first

4    president of the United States keep people in slavery in the

5    house, he and his household specifically moved people in and

6    out of the state of Pennsylvania so that the six month

7    provision by which under Pennsylvania law, individuals would be

8    freed if they stayed six continuous months in the state of

9    Pennsylvania.

10          Our first president moved members of his household,

11   enslaved persons of his household, out of state specifically so

12   that provisions would not then free the people who were held in

13   slavery in his household.

14          This is important history and this is part of the

15   history that was understood in 2006 when the terms, covenants,

16   and conditions contained in the agreement were agreed to be

17   binding upon successors and assigns.

18          What those conditions are is made -- among those

19   conditions are made even more clear in Exhibit 6 submitted to

20   the Court, the 2009 amendment.

21          I would direct the Court's attention to the project

22   development plan.  You heard testimony about that.  Its

23   Attachment C to the 2009 amendment.

24          The project description in that plan specifically

25   states site interpretation will focus on the house and the

1    people who lived and worked there, the executive branch of the

2    U.S. government, the systems and methods of slavery, African

3    American Philadelphia, and the move to freedom for the

4    enslaved.

5         That is what this house is about. Those are the

6    agreements that bounded the purpose and contents and narrative

7    and what was everyone's goal to explain and to educate.

8         And you heard incredibly moving testimony about what

9    the power of that education can be when that history is

10   otherwise not taught. And that this offers an offered and

11   continues to offer a unique place and way for people to learn

12   that history.

13        Within all that, we submit that as for Count 1, we

14   have the provisions in these contracting documents, the

15   guidance given under the 1950s agreement and all 1950 agreement

16   and all the work done since then, shows what had to have been

17   done to make a change of this magnitude on the grounds of the

18   Independence National Historical Park.

19        None of that was done. You certainly heard Ms. Gay

20   as the chief cultural officer for the City of Philadelphia

21   never got a call about this.

22        And also, frankly, the affidavit submitted by

23   Regional Director Simms shows that. He by his -- if I recall

24   his affidavit correctly, I believe he got a call the morning of

25   the 26th. And by the or the 22nd, by the afternoon, the panels

1    were gone.

2           That does not show any sort of engagement in the very

3    least with the effort at mutual agreement that is meant to be

4    done in.  And it certainly violates all with the provisions

5    that carry forward about what this exhibit is meant to show.

6    That's just our first claim.

7           I would like to talk to the Court briefly through our

8    second claim, which is a more standard APA arbitrary and

9    capricious action.

10          So in terms of standing to make a claim, and this is

11   specifically under the National Underground Network to Freedom

12   Act of 1998.  The City in the first instance as does every

13   litigant has to establish that we have standing to make this

14   claim.

15          And aside from the contractual -- residual

16   contractual interest we have in the site being as it was

17   contemplated and that we still have an Independence National

18   Historical Park, I would also submit that the United States has

19   already expressly recognized that the City particularly has

20   public benefit that inures from the creation of the President's

21   House.

22          And for that, I would Court -- direct the Court's

23   attention back to Exhibit 1, which is the 2006 agreement and

24   provision K and the recitals there, the background recitals.

25          It's the -- you know, both parties signed this, but

1    that the President's House and participating in and funding the

2    President's House for the City enables the City to commemorate

3    the symbolic and historical importance of the President's House

4    for the City of Philadelphia, its citizens, and all Americans

5    nationwide.

6          And by doing so, there is a public benefit inuring to

7    the City.  The City has standing to contend that the National

8    Park Service engaged in arbitrary and capricious agency action

9    when it took steps that absolutely wiped the basis and reason

10   why the President's House became and interpreted how the

11   President's House has such a powerful space in the Underground

12   Railroad.

13         So I should also touch briefly on I would say in at

14   least in their briefing, the United States did not particularly

15   argue that this doesn't have the hallmarks of final agency

16   action.

17         I would submit that decisively taking down all of the

18   information explaining the space is the type of culmination of

19   an administrative decision making process that is the hallmarks

20   of finality for purposes of final agency action.

21         And then, touching on the other element, the City's

22   legal interests are adversely affected by this.  Grounded, A,

23   in the contract, and B, in the interruption in our public

24   benefit, which has been completely done away with by removal of

25   this information from the public sphere.

1      So in terms of final agency action, this is one that

2   we are certainly happy to build out more for the Court in

3   findings and conclusions, but those two pieces as we sit here

4   today that has the hallmarks of final agency action that the

5   City has been specifically harmed by.

6      In terms of the arbitrary and capricious nature of

7   it, I would like to bring the Court's attention to the National

8   Underground Railroad Network to Freedom Act that was passed by

9   Congress in 1998.  It is public law 105-203.  And I believe it

10  was enacted on July 21st, 1998.

11     In the findings and purposes, so Congress defining

12  this act, Congress states the Underground Railroad bridged the

13  divides of race, religion, sectional differences and

14  nationality spans state lines and international borders and

15  joins the American ideals of liberty and freedom expressed in

16  the Declaration of Independence in the Constitution to the

17  extra ordinary actions of ordinary men and women working in

18  common purpose to free up people.

19     Congress then further found the National Park Service

20  can play a vital role in facilitating the national

21  commemoration of the Underground Railroad.  That was in 1998.

22     In 2022, the Park Service submitted a very detailed

23  application to have the President's House specifically

24  recognized as a Network to Freedom site under this statute.

25     And the application by the Park Service is Exhibit

1    10.   That was submitted to the Court without objection.   And I

2    would particularly invite the Court, it's a long narrative

3    submission that really explains the historical import and

4    connection of the President's House with the Underground

5    Railroad.

6          But I would particularly direct the Court's attention

7    to the narratives starting at page 8, which is the story of Ona

8    Judge.

9          And as you heard Ms. McClellan explain, Ona Judge was

10   part of the dower (sic) estate for Martha Washington.   So

11   Martha Washington, and this is gross, inherited Ona Judge's

12   property upon the demise of her husband.   And then, Ona Judge

13   would pass as property to Mrs. Washington's children upon Mrs.

14   Washington's demise.   That is how Ona Judge got to

15   Philadelphia.

16         The narrative story of Ona Judge working in the

17   White -- in the President's House at the time that George

18   Washington was president and Martha Washington, his wife, had

19   Ona Judge go in and out of the state so she remained in bondage

20   in contravention of the laws or just complying with the laws of

21   Pennsylvania, so she would not be freed as Pennsylvania would

22   otherwise dictate for somebody who lived in the state.

23         That she then partnered with the free African

24   American community in Philadelphia to facilitate her escape

25   from slavery, all of that critical story telling about the

1    start of our country is in the application by the National Park

2    Service to get this designation for it to be a Network to

3    Freedom site.

4         All of that information is in the panels that are

5    part -- critical part of the exhibit.  And all of that Congress

6    directed that the National Park Service can play a vital role

7    in facilitating the national commemoration.

8         Congress directs the Park Service to create and not

9    destroy sites that educate the public about the Underground

10   Railroad.  The action that day was expressly in contravention

11   of the statutory instruction to create, not destroy, and

12   frankly, was arbitrary and capricious.  And we submit we have a

13   likelihood of success on the merits of that claim.

14        The other APA claim that we bring, which Your Honor

15   has previewed by quoting a language of Title 168 Section

16   407(m), again, this is a -- this was the statute by which or

17   the legislation by which the Independence National Historical

18   Park was founded.  That remains good law.

19        And that also instructs that, specifically, no

20   changes or alterations shall be made in the property within the

21   Independence Hall National Historical site including a

22   buildings and grounds or in Carpenter's Hall except by mutual

23   agreement between the Secretary of the Interior and the other

24   parties to the contracts.

25        As the Court has heard, none of that happened here.

1    And we submit that we will == we have a likelihood of success

2    in the merits of that claim.

3         I do want to touch on one point raised by the United

4    States in it briefing.  And that specifically is the contention

5    that the removal of all this information is simply a curatorial

6    decision that is entirely the purview of the United States.

7    It's a discretionary function that the National Park Service

8    can just do.

9         So one piece to raise the Court's attention or one

10   case I would draw to the Court's attention, in 2020, the 3rd

11   Circuit Court of Appeals issued the Gentile v. Securities and

12   Exchange Commission opinion that it specifically looked into or

13   not looked into, addressed the reservation of jurisdiction or

14   the reservation of matters that can be appropriately examined

15   through the Administrative Procedure Act.

16        And so, in that case, it looked at it's for the

17   Administrative Procedure Act, it's the reservation at 570 -- 5

18   USC 701(a)(2).

19        What the 3rd Circuit said is that that section, that

20   discretionary reservation is construed narrowly.  And it

21   includes action such as decisions to refrain from enforcement

22   or investigative activity, decisions implicating intelligence

23   and national security concerns, and the spending of lump sum

24   appropriations.

25        That category of discretion that is removed from the

1    purview of review under the Administrative Procedure Act is

2    wholly different than the actions that are issued here before

3    the Court.

4             We respectfully submit that doesn't -- that

5    discretionary exception does not apply here.  And that we have

6    a likelihood of success on the merits of our claims.

7             With that, and understanding we have the burden to

8    prove every element for a preliminary injunction, I would like

9    to turn to address the irreparable harm.

10            And to establish irreparable harm, we have to

11   identify an injury that is actual and imminent, not merely

12   speculative.  And that we have to show that the harm is

13   happening now that it's not in the indefinite future, but that

14   it is immediate and that it is irreparable.

15            Your Honor, I lost track of the numbers things I

16   started writing down is as our witness were testifying.  I

17   would simply submit the harm, the taking down of everything

18   that makes the building, that makes the windows, the walls, the

19   suggestion, you know, the President's House monument or

20   exhibit, whatever word we use for it, it is a ghost of a

21   building that allows insight into the past.

22            The reason it's built the way it is is so you have a

23   sense that a house stood here, but not just a house school

24   here.  People lived here.  And this is what it lived like.

25            I found it particularly striking when Mr. Gillison

1    was testifying about what happened when he watched Hercules be

2    performed as this is my job, this is what I'm doing.

3        And the vantage point into what life was like at the

4    time and contextualizing this place that is a ghost of a house

5    and making it real and making that lived experience real.

6        Those videos, that information is all critical to the

7    house having really any meaning because otherwise, it's an

8    interesting architectural phenomenon that you walk by and you

9    don't know why it's there.

10       It's essential to the President's House being the

11   President's House.  So in terms of irreparable harm, every day

12   that that's not there, people walk by and they don't know.  And

13   there is not a way for them to travel absent the information

14   being put back up.

15       There's not a way for them to travel to the site and

16   understand and have that very specific site experience of

17   looking down at the, you know, no one knew that the foundation

18   of the building was going to be there when they started

19   excavating, but it is and it adds incredible additional

20   architectural and curatorial value to the space.  That is

21   irreparable harm.

22       And further, I would note, and again, I think this is

23   something we can go into more detail in supplemental briefing,

24   but generally speaking, in preliminary injunctions on the

25   irreparable harm prong, the fact of there is some way this can

 1   be rectified later is frankly usually in a connotation of

 2   somebody can later seek money damages.

 3        That's as I have litigated these cases at least this

 4   is me standing here.  I should do more research, but generally

 5   speaking, the premise in that type of irreparable harm is you

 6   can sue for money after the fact because you've been hurt and

 7   so then it is not irreparable.

 8        Here, the irreparable is every person who passes by

 9   and won't get the opportunity to learn, see, and feel what that

10   is, what President's House was meant to be, that is

11   irreparable.

12        I would also like to touch on the balance of the

13   harms and the public interest.  And this is an interesting case

14   because the public is on all sides of it.

15        We are the public, the federal government is the

16   public.  The public was intimately involved in the building of

17   the site and the attendance at various community meetings to

18   provide input on what the site should be.

19        So in each preliminary injunction case, the Court

20   must balance the competing harms of injury and must consider

21   the effect on each part of the granting or withholding of the

22   requested relief.

23        In exercising their sound discretion, courts of

24   equity should pay particular regard for the public consequences

25   in employing the extraordinary remedy of injunction.

1          And that I am reading from <u>Winter v. National</u>

2  <u>Resources Defense Council</u>, 555 U.S. at 7 or at 7.  And that's A

3  2008 Supreme Court case.

4          The United States cannot plausibly argue that it

5  would be harmed by restoration of an exhibit in the development

6  of which the sovereign participated.

7          And the United States cannot plausibly argue that the

8  public interest favors the removal of this collaboratively

9  developed exhibit and in contravention of its designation as an

10  Underground Railroad Network to Freedom site.

11          I also want to note that the United States is

12  incorrect that this application for relief represents the City

13  seeking to compel Government speech.

14          And counsel referenced the <u>Pleasant Grove v. City</u>

15  case.  That case arose in the context of a group of private

16  actors affiliated with a particular church going to a city I

17  guess municipality that owned a public park, petitioning to put

18  a monument with their specific religion precepts in the park.

19  The park contained various other monuments, one of which was a

20  10 commandments monument that had been there for 40 years

21          <u>Pleasant Grove</u> denied the request.  Those Plaintiffs

22  then sued and said that their First Amendment rights to equal

23  participation in a public forum were being impeded by the

24  government's refusal.

25          The Supreme Court's analysis of that case was

1    specific to the facts of that case in that it was a public park

2    wholly owned by the municipality at issue.

3          The Supreme Court also looked at what it meant to

4    have a public forum versus something that was a permanent

5    installation.

6          And it said in that case, where the government wholly

7    owns the site, that forcing the placement of different

8    religious precepts was in fact government speech.

9          That is not the space or the issue that's before the

10   Court.  The National Independence Historical Park has always

11   been a jointly collaboratively, all of those words we have said

12   so many times.

13         This space is not as purely federally owned space.

14   The space has a long history and a statutory history of overlay

15   of collaboration.  This is not a forced speech case.  It's

16   simply not.

17         Instead, it is a case where abrupt, painful, and

18   without notice removal of critical information that only came

19   to light -- we are just 24, 26 years past when this first came

20   to light.  This is still new information.  This is incredibly

21   important.

22         And we submit that the balance of harms in the public

23   interest and for all of the reasons and evidence and

24   participation by amici, all of this, amici, I can never

25   pronounce that word, all of it shows that the balance of harms

 1   and the public interest strongly favor the entry of restraints

 2   and the restoration of this site.

 3        With that, I would ask that the Court enter temporary

 4   restraints to stop any further destruction from occurring and

 5   specifically order the preservation of the panels as they

 6   exist.  And I look forward to a submission that will establish

 7   why this site should be restored.

 8        THE COURT:  Counsel, could you also tell me what the

 9   City's position is on the status quo because in your complaint

10   and briefing, you did say we want the Court to preserve the

11   status quo?

12        MS. TAYLOR:  Yeah, well, and that's --

13        THE COURT:  And your request right now is a bit

14   different.

15        MS. TAYLOR:  It is different.  And so, Your Honor,

16   what I would say, again, we started briefing before they had

17   come down.

18        And so, to the extent the Court or certainly the

19   government needs a more clear pleading with more clear requests

20   for relief, we're happy to turn that around as quickly as

21   possible.

22        I certainly recognize what I have specifically argued

23   is a somewhat refined version of what we submitted necessarily

24   but in haste last Thursday.

25        THE COURT:  Well, it's a consideration because we do

 1   like clarity --

 2           MS. TAYLOR:  Uh-huh.

 3           THE COURT:  -- in the legal pleadings.  And the

 4   Government would have another chance to answer, respond to

 5   that.  And that's only fair.

 6           And we could get to the true issues, but I think the

 7   evidence that was presented today has opened doors to a number

 8   of issues that we might want more briefing on.  But I'd like to

 9   give the parties an opportunity to actually amend pleadings if

10   they choose to.

11           MS. TAYLOR:  Yeah, Your Honor, we're happy to do

12   that.  And understanding this is an expedited matter of

13   significant concern, I think we could certainly get amended

14   application, it's Friday, maybe just as my team sits there so

15   they don't get too twitchy at me.  Could we by maybe Wednesday

16   morning have the updated application?

17           I would submit, Your Honor, that would just conform

18   to the arguments we've made today.  And the evidence --

19           THE COURT:  Wouldn't be anything new?

20           MS. TAYLOR:  -- would be the same.  But I would also

21   again renew the ask based on everything Your Honor heard today

22   and for the reasons that I have stated that at the very least,

23   a temporary restraint on any other further action is warranted.

24           It's going to stay cold.  It may be that there's no

25   opportunity to take further things down, but just in case, I

1    think that would be prudent and warranted by our submission and

2    the evidence before the Court.

3         THE COURT:  Well, rushing through amended pleadings,

4    additional briefing would not be necessary if there was a

5    simple agreement between the parties that no more removals will

6    occur, especially since I've been told by the parties that

7    there's a question of damage if it's attempted.

8         Not to forget that I need to have a joint examination

9    of the panels and information, even the videos that have been

10   removed, that I would like counsel to participate in or your

11   named representatives because we want to be sure we know what

12   we're dealing with.

13        That's appropriate and that can take place wherever

14   it is located, but first, I was Told It Was At The National

15   Constitution Center.  And then, today, I heard no, it's not

16   really.  It's in a building for the Park Service.

17        MS. TAYLOR:  Yes.

18        THE COURT:  Which is a party here.  So I'm not

19   content with that.

20        MS. TAYLOR:  Your Honor, and I would defer to counsel

21   for the United States on that.  I was just sharing my

22   understanding of it.

23        THE COURT:  Thank you very much.

24        MS. TAYLOR:  Uh-huh.  Anything further Your Honor?

25        THE COURT:  No, thank you.

```
1           MS. TAYLOR:   Thank you.

2           THE COURT:   Okay.  Let me get back to counsel for the

3   Defendants.  What can we do about a preservation order because

4   I am inclined to the status quo is how is it now as opposed to

5   status quo how was it a week ago or eight days ago?

6           But I need to see the panels.  And I'd like that to

7   be arranged through your client, who apparently does have

8   custody.

9           MR. IN DEN BERKEN:  So --

10          THE COURT:  Why was I told it was in National

11  Constitution Center?

12          MR. IN DEN BERKEN:  -- Your Honor, as I said twice on

13  the status conference call on Monday and as is reflected in the

14  affidavit of Mr. Simms, the sentence in that declaration is

15  they are in NPS custody and being stored at the National

16  Constitution Center.

17          I am not personally familiar with the exact --

18          THE COURT:  I don't know how that works.

19          MR. IN DEN BERKEN:  -- relationship with between the

20  location where they are stored and the National Constitution

21  Center.  What I do know is that Mr. Simms will refer to it as

22  at the National Constitution Center.

23          THE COURT:  Okay.

24          MR. IN DEN BERKEN:  There was never any

25  representation that they were in NCC custody.  To be very
```

1    clear, they are in custody and have been in Park Service

2    custody at all Park Service times.

3          THE COURT:  Well, they couldn't exactly grant custody

4    to something they may not particularly solely own, but I'm glad

5    to hear that.  Let's 'get that straight.  This is not a problem

6    for me.  I want though to facilitate my inspection.  And I'd

7    like it to be Monday.

8          MR. IN DEN BERKEN:  That will be possible, Your

9    Honor.

10          THE COURT:  Okay.  You set it up.  Tell counsel.

11    Amici can come in if want.  And we'll make sure we take

12    pictures.

13          MR. IN DEN BERKEN:  Certainly.

14          THE COURT:  And as to the amendment to the pleadings,

15    which I think is often a good idea in any case to add or drop

16    claims, clarify what those claims are, do you have any problem

17    with me setting up a schedule for that?

18          MR. IN DEN BERKEN:  It would be my great preference

19    that they amend because many of the arguments I heard today did

20    not appear in the briefs or the causes of action that are pled

21    currently, Your Honor.

22          THE COURT:  I think all of us need to have that

23    clarity.  I talked about rule of law, you know.  And that means

24    we have rules, we have laws, and we have understandings about

25    them.

1          And that applies to litigation materials as well as

2    everything else.  So we will be setting that up with you,

3    counsel, but I'd like to hear Monday morning at some point if

4    we're not snowed in again.

5          But I'd also like to be sure that nothing more will

6    change from right now until I have ordered, I have reached a

7    decision on the preliminary injunction about the removal of any

8    further materials.  Can you agree to that, counsel?

9          MR. IN DEN BERKEN:  I will have to confer with my

10    client, but my belief is that should be possible.

11          THE COURT:  I'd like that.  But on the other hand, I

12    can also enter an order to that effect.  And yet, I don't like

13    to have things escalate where they could be done in a

14    professional manner differently.

15          MR. IN DEN BERKEN:  I would ask for the opportunity

16    to consult with my client, but if there is not an ability to

17    come to an understanding like that, I will promptly inform the

18    Court.

19          THE COURT:  Okay, let us all know in writing what the

20    response is and I'll know then whether or not I have to enter

21    an order, because I will, all right.

22          Is there anything else from anyone?  I told you I

23    would decide this promptly, but I am going to give everyone a

24    chance to do what I just discussed with you.

25          And I do appreciate a most interesting case and

1   important case.  And I am happy to be working with you to reach

2   amicable resolutions and understandings that move us forward.

3   Right now, I've got a legal job to do and I'm going to do it.

4   All right?  Thank you, everyone.

5          MR. IN DEN BERKEN:  Thank you, Your Honor.

6          MS. GARCIA:  Thank you.

7      (Proceedings concluded at 3:47 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **CERTIFICATE**

2

3

4          I, Chris Hwang, court approved transcriber, certify

5     that the foregoing is a correct transcript from the official

6     electronic sound recording of the proceedings in the above-

7     entitled matter.

8

9

10

11        /s/ *Chris Hwang*

12     _____          February 3, 2026

13     Chris Hwang                      Date

14     Court Reporter

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CITY OF PHILADELPHIA,

       Plaintiff,

    v.

DOUG BURGUM, SECRETARY OF THE
INTERIOR, *et al.*,

       Defendants.

Case No. 26-cv-434

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHAEL VELCHIK
Senior Counsel to the Assistant
Attorney General

DAVID METCALF
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

GREGORY B. IN DEN BERKEN
Assistant United States Attorney

*Counsel for Defendants*

ADD353

# TABLE OF CONTENTS

Page

INTRODUCTION ..........................................................................................................1

FACTS AND PROCEDURAL HISTORY ............................................................ 2

I.     Background ........................................................................................... 2

II.    Procedural History ............................................................................ 3

LEGAL STANDARD ............................................................................................. 4

ARGUMENT ........................................................................................................... 6

I.     This Court Lacks Jurisdiction .......................................................... 6

     A.    The City Lacks Standing............................................................... 6

     B.    Counts 1 and 2 Are Contractual Claims and Thus Barred by the Tucker Act.................................................................................... 14

II.    The City Has Not Shown a Likelihood of Success on the Merits......................... 19

     A.    The City Fails to State Cognizable APA Claims .......................... 19

          1.    The City fails to challenge "agency action" under the APA. ............ 19

          2.    The alleged agency action that the City challenges here is not final under the APA...........................................................20

          3.    The City challenges conduct committed to agency discretion by law. .......................................................................... 21

     B.    The City's Ultra Vires Claim is Foreclosed ................................ 25

III.   The City Has Not Established Irreparable Harm ................................ 26

IV.   The Public Interest and Balance of the Equities Counsel Against Issuing an Injunction ....................................................................... 28

V.    Any Further Injunctive Relief Should Be Stayed Pending Appeal ....................... 30

CONCLUSION.........................................................................................................31

i

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Acierno v. New Castle Cty.*,
  40 F.3d 645 (3d Cir. 1994) ............................................................. 5

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000)........................................................... 27

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) ........................................................ 14

*Almond Bros. Lumber Co. v. United States*,
  721 F.3d 1320 (Fed. Cir. 2013) ..................................................... 23

*Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*,
  890 F.3d 445 (3d Cir. 2018) .......................................................... 13

*Am. Sci. & Eng'g, Inc. v. Califano*,
  571 F.2d 58 (1st Cir. 1978) ........................................................... 15

*Armstrong v. Exceptional Child Ctr. Inc.*,
  575 U.S. 320 (2015) ....................................................................... 26

*Bennett v. Spear*,
  520 U.S. 154 (1997)................................................................... 20, 21

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988)........................................................................ 18

*Chemours Co. FC, LLC v. United States Env't Prot. Agency*,
  109 F.4th 179 (3d Cir. 2024) ........................................................ 21

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).......................................................................... 6

*Coggeshall Dev. Corp. v. Diamond*,
  884 F.2d 1 (1st Cir. 1989) ............................................................. 18

*Comm'n v. Texas*,
  605 U.S. 665 (2025) ....................................................................... 26

*Davis Enters. v. U.S. E.P.A.*,
  877 F.2d 1181 (3d Cir.1989)..................................................... 22, 25

ADD355

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018) ......................................................... 5

*Ferring Pharms, Inc. v. Watson Pharms., Inc.*,
   765 F.3d 205 (3d Cir. 2014) ......................................................... 5

*Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*,
   830 F.3d 515 (D.C. Cir. 2016) ..................................................... 26

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) ...................................................... 19

*Guided Walking Tours v. Indep. Visitor Ctr. Corp.*,
   454 F. App'x 118 (3d Cir. 2011) ............................................ 22, 23

*Hahn v. United States*,
   757 F.2d 581 (3d Cir. 1985) .................................................. 15, 18

*HAPCO v. City of Phila.*,
   482 F. Supp. 3d 337 (E.D. Pa. 2020) ............................... 5, 26, 27

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................. 22, 25

*Horne v. Dep't of Agric.*,
   576 U.S. 350 (2015) .................................................................. 11

*Horses of Cumberland Island v. Haaland*,
   No. 23-cv-1592, 2024 WL 5430835 (N.D. Ga. Nov. 8, 2024) ....... 24

*Indep. Equip. Dealers Ass'n v. E.P.A.*,
   372 F.3d 420 (D.C. Cir. 2004) ................................................... 20

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ..................................................... 17

*Kamdem-Ouaffo v. Task Mgmt. Inc.*,
   792 F. App'x 218 (3d Cir. 2019) .................................................. 5

*Keller v. State Bar of Cal.*,
   496 U.S. 1 (1990) ...................................................................... 29

*Lance v. Coffman*,
   549 U.S. 437 (2007) .................................................................. 13

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) .................................................................. 22

iii

*Local 2855, AFGE (AFL-CIO) v. United States,*
   602 F.2d 574 (3d Cir. 1979) ......................................................... 22

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ..................................................................... 7

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) .............................................................. 19, 20

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.,*
   823 F.3d 184 (3d Cir. 2016) .................................................. 12, 27

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923) ................................................................... 12

*Matal v. Tam,*
   582 U.S. 218 (2017) .................................................................. 29

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) .................................................................. 14

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982) ................................................... 15

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010) .................................................................... 4

*Nken v. Holder,*
   556 U.S. 418 (2009) ............................................................. 4, 29

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) .................................................................... 20

*Penn. ex rel. Creamer v. U.S. Dep't of Agric.,*
   469 F.2d 1387 (3d Cir. 1972) ..................................................... 28

*Pleasant Grove City v. Summum,*
   555 U.S. 460 (2009) ......................................................... 1, 29, 30

*Qureshi v. U.S. Citizenship & Immigr. Serv.,*
   No. 08-cv-2281, 2010 WL 1390846 (M.D. Pa. Mar. 31, 2010) ..................................... 18

*Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs,*
   343 F.3d 199 (3d Cir. 2003) ...................................................... 22

*Reilly v. City of Harrisburg,*
   858 F.3d 173 (3d Cir. 2017) ........................................................ 5

iv

*Robbins v. U.S. Bureau of Land Mgmt.*,
   438 F.3d 1074 (10th Cir. 2006) ................................................................. 14, 18

*S. Broad St. Assocs.-Tenant, L.P. v. U.S. Dep't of Agric.*,
   No. 08-cv-4646, 2009 WL 301936 (E.D. Pa. Feb. 4, 2009) ........................... 17

*Sea-Land Serv., Inc. v. Brown*,
   600 F.2d 429 (3d Cir. 1979) ............................................................ 14, 15, 17, 18

*Sec. Sav. Bank, SLA v. Dir., Off. of Thrift Supervision*,
   798 F. Supp. 1067 (D.N.J. 1992) ................................................................... 18

*Qureshi v. Admin. Appeals Off. (AAO) of U.S. Citizenship & Immigr. Servs. (USCIS)*,
   408 F. App'x 611 (3d Cir. 2010) ............................................................. 17, 18

*Shapiro v. U.S. Dep't of Agric.*,
   No. 25-cv-998, 2025 WL 3473291 (M.D. Pa. Dec. 3, 2025) ....................... 15, 17

*Sharp v. Weinberger*,
   798 F.2d 1521 (D.C. Cir. 1986) .................................................................... 17

*Shurtleff v. City of Bos., Massachusetts*,
   596 U.S. 243 (2022) ...................................................................................... 29

*Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ...................................................................... 17

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .................................................................................... 7, 12

*Sprague Elec. Co. v. Tax Court*,
   340 F.2d 947 (1st Cir. 1965) ......................................................................... 15

*Star Alaska v. United States*,
   14 F.3d 36 (9th Cir. 1994) ....................................................................... 18, 27

*State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
   108 F.4th 194 (3d Cir. 2024) ...................................................................... 5, 28

*Sustainability Inst. v. Trump*,
   No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) .............................. 26

*Town of Milton, Mass. v. FAA.*,
   87 F.4th 91 (1st Cir. 2023) ........................................................................... 12

*United States Conf. of Cath. Bishops v. U.S. Dep't of State*,
   770 F. Supp. 3d 155 (D.D.C. 2025) ............................................................... 17

ADD358

*United States v. Miller,*
    145 S. Ct. 839 (2025) ............................................................................ 14

*United States v. Texas,*
    599 U.S. 670 (2023) .............................................................................. 6

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) ............................................................................. 13

*Vera Inst. of Just. v. U.S. Dep't of Just.,*
    No. 25-cv-1643, 2025 WL 1865160 (D.D.C. July 7, 2025) ....................... 17

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs,*
    714 F.3d 186 (4th Cir. 2013) ................................................................ 19

*Vorchheimer v. Philadelphian Owners Ass'n,*
    903 F.3d 100 (3d Cir. 2018) ........................................................... 10, 11

*Webster v. Doe,*
    486 U.S. 592 (1988) ............................................................................ 22

*Wilderness Soc. v. Norton,*
    434 F.3d 584 (D.C. Cir. 2006) .............................................................. 24

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................... 4, 5, 10, 16

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ................................................................................. 29

## STATUTES

5 U.S.C. § 551(13) ..................................................................................... 19

5 U.S.C. § 701(a)(2) .................................................................................. 21

5 U.S.C. § 702 ............................................................................... 14, 19, 21

5 U.S.C. § 704 ............................................................................................ 20

16 U.S.C. § 407n ............................................................................... *passim*

28 U.S.C. § 1346(a)(2) .............................................................................. 14

28 U.S.C. § 1491(a)(1) .............................................................................. 14

54 U.S.C. §§ 308301-04 ............................................................................ 23

54 U.S.C. § 308302 .................................................................................... 26

ADD359

# RULES

Fed. R. Civ. P. 65(b)(2).....................................................................................4

# OTHER AUTHORITIES

8 Fed. Reg. 7,283 (dated May 14, 1943; published June 1, 1943) .....................8

Aileen Clarke & Sam Morris, *Here Are the Signs the Trump Administration
    Removed from Independence Park*, PHILA. INQUIRER (Jan. 22, 2026),
    https://www.inquirer.com/news/philadelphia/inq2/independence-park-trump-
    signage-remove-presidential-house-20260122.html ...................................27

H.R. Rep. No. 80-1819 (1948)............................................................................8

Nat'l Park Serv., *Director's Order No. 2*,
    https://www.nps.gov/subjects/policy/upload/DO_2_1-11-2021.pdf
    (last visited Feb. 13, 2026) ...........................................................................24

Nat'l Park Serv., *Management Policies 2006*,
    https://www.nps.gov/subjects/policy/upload/MP_2006_amended.pdf
    (last visited Feb. 13, 2026) ...........................................................................24

Nat'l Park Serv., *TractsNet Public 1.5*,
    https://arcg.is/0q90Lj1 (last visited Feb. 13, 2026) ......................................9

S. Rep. No. 80-1622 (1948)................................................................................8

*Temporary Restraining Order*,
    Black's Law Dictionary (12th ed. 2024) .........................................................3

ADD360

# INTRODUCTION

The President's House Site is located at Sixth and Market Streets in Philadelphia and shows, through partial reconstruction of floors and exterior walls, the historic residence of Presidents George Washington and John Adams while Philadelphia was the capital of the United States. The President's House is part of Independence National Historical Park and is owned, managed, maintained, and operated by the National Park Service ("NPS"). As with any national park or museum, reasonable minds might differ about what to display in the limited space available. But this is fundamentally a question of Government speech. The Federal government "has the right to speak for itself" and "to select the view it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).

The Court should deny the City of Philadelphia's ("the City") amended motion for a preliminary injunction and temporary restraining order. First and foremost, the City is unlikely to succeed on the merits of this case because it lacks standing, has not identified any final agency action, and the Tucker Act deprives this Court of jurisdiction over claims that rely on contractual rights—which the City's claims do. Even on the merits, the City has no legal right to compel government speech based on agreements that have already expired and which, by their own terms, expressly transferred all ownership and control of the relevant exhibits to the Federal government. What's more, the City cannot meet its burden of showing irreparable harm. Defendants are preserving the exhibits at issue so they may be re-displayed at the conclusion of this litigation should the Court so order. Finally, the public interest and balance of the equities strongly weigh against issuing any injunction. Such interests are especially weighty where, as here, the City effectively seeks to compel the Federal government to engage in speech that it does not

wish to convey. The Court should therefore deny the City's motion for a preliminary injunction.

## FACTS AND PROCEDURAL HISTORY

### I.    Background

On January 22, 2026, Steven Sims—the then-Acting Regional Director of the NPS and Superintendent of Independence National Historical Park, which includes the President's House—was directed by the Acting Director of the NPS to remove the video and exhibits on the interior and exterior of the walls of the President's House. *See* ECF No. 27-1 (Declaration of Steven Sims) ¶ 4. Sims directed the Acting Superintendent of Independence National Historical Park to direct NPS staff to take this action. *Id.* ¶ 5. At or around 3:00 p.m., NPS employees removed all but one of the exhibits on the interior and exterior of the President's House walls using hand tools, including wrenches and crowbars, to remove bolts fastening the exhibits to the walls and pull the exhibits from the walls. *Id.* ¶ 6. The removal took approximately two and a half hours. *Id.* NPS planned to remove the remaining sign once it obtained the necessary tools and weather conditions improved, *id.* ¶ 7, but those plans have been paused in light of the Court's restraining order (ECF No. 37 ¶ 5). The videos were turned off and the exhibits were removed. ECF No. 27-1 ¶ 8. They are in NPS custody and have been secured and placed in storage at the National Constitution Center, where they will remain pending the outcome of this lawsuit. *Id.*

The panels and video exhibit for the President's House project were created as a result of a cooperative effort between the City and the NPS. *See* ECF Nos. 36-3 to 36-6 (2006 Cooperative Agreement and amendments). The cooperative agreements underlying this effort provide that the exhibits were to be funded by the City and

ADD362

donated to the NPS. *See, e.g.*, ECF No. 36-3 at Background Discussion & § 2; *see also* ECF No. 36-6 art. I.C. The agreements contain no covenant or promise by the NPS to maintain the exhibit in perpetuity. The City further waived any claim or property interest (including the right to use or receive compensation) for the project components that it donated to NPS. ECF No. 36-6 art. III.B.17. The land on which the exhibit sits is owned by the Federal government and subject to no lien by the City. *Id.* art. III.C.3. And the cooperative agreements, as amended, expired one year after May 1, 2009. *Id.* art. VI.

## II.    Procedural History

On January 22, 2026, the City of Philadelphia filed this case to challenge Defendants' removal of the President's House exhibits. *See* ECF No. 1. The City's complaint asserted three claims under the Administrative Procedure Act (*id.*), and the City simultaneously filed a motion for a preliminary injunction seeking an order (1) directing Defendants to restore the President's House Site to its status as of January 21, 2026; (2) enjoining Defendants from "taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site"; and (3) requiring Defendants "to take all necessary steps to ensure the safety, security, and preservation of any such items removed from the President's House Site on January 22, 2026." ECF No. 2 (Proposed Order) at 1.

Defendants filed their opposition to the City's motion on January 28 (ECF No. 27) and the Court held a hearing on the motion on January 30 (*see* ECF Nos. 40, 45-1). In a post-hearing order dated February 2, the Court directed the City to file an amended complaint and amended motion for a preliminary injunction on or before February 6 and instructed Defendants to respond to the amended motion on or before February 13. ECF No. 37. In that same order, the Court also restrained Defendants from any "further

ADD363

removal and/or destruction of the President's House site . . . until further order of the Court." *Id.* ¶ 5; *see Temporary Restraining Order*, Black's Law Dictionary (12th ed. 2024). *But see* Fed. R. Civ. P. 65(b)(2), (d)(1) (describing mandatory contents and maximum duration of restraining orders).

The City filed its amended complaint (ECF No. 44) and amended motion (ECF No. 45) on February 6. Its amended complaint asserts four APA claims and an ultra vires claim. *See* ECF No. 44. The City's amended motion adds a request for a temporary restraining order that would bar Defendants from making any further changes to the President's House site, including "the installation of replacement materials, without the mutual agreement of the City of Philadelphia." ECF No. 45 at 1. And the amended motion adds the same request for relief with respect to the City's motion for a preliminary injunction. *Id.* at 2.

## LEGAL STANDARD

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). Instead, injunctions "may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must establish that (1) "he is likely to succeed on the merits" of his claim; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) an injunction is in the public interest. *Id.* at 20. The last two factors "merge when"—as here—"the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"A movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits (which

4

requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *HAPCO v. City of Phila.*, 482 F. Supp. 3d 337, 348 (E.D. Pa. 2020) (Rufe, J.) (cleaned up) (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). The court considers the remaining two factors only if the first two factors are met. *Id.* at 348-49. But "[t]he failure to establish any element renders a preliminary injunction inappropriate." *Ferring Pharms, Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (cleaned up).

"In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *HAPCO*, 482 F. Supp. 3d at 348 (cleaned up). The requisite feared injury or harm must be *irreparable*—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." *Id.* at 360 (emphasis added) (citing *Kamdem-Ouaffo v. Task Mgmt. Inc.*, 792 F. App'x 218, 221 (3d Cir. 2019)). And "[t]he movant[] must establish entitlement to relief by clear evidence." *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (citing *Winter*, 555 U.S. at 22); *see also Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024) ("Because 'a preliminary injunction is an extraordinary and drastic remedy,' the movant bears the burden of making '*a clear showing*.'" (citation omitted)).

Where—as here—the movant seeks "a mandatory preliminary injunction that will alter the status quo," that party "bears a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994).

ADD365

## ARGUMENT

This Court should deny the City's motion for a temporary restraining order and preliminary injunction because the Court lacks jurisdiction and the City is unlikely to succeed on the merits. In particular, the City lacks standing, filed suit in a court that lacks jurisdiction over the City's contractual claims, and has not asserted viable claims for relief. Further, the City's contractual claims fail on the merits because the agreements it cites are no longer in effect and by their express terms transferred all relevant ownership rights to the Federal government long ago. And the City's motion should be denied for the independent reason that it cannot show any injury, much less irreparable harm. Finally, the public interest and balance of the equities counsel against issuing injunctive relief here, where the City seeks to censor Government speech on a topic of national significance as the Federal government seeks to celebrate its 250th birthday. The City cannot compel the Federal government to convey a message against its will, and certainly not on the basis of inapplicable and expired agreements.

## I.    This Court Lacks Jurisdiction

### A.    The City Lacks Standing

Article III, Section 2 of the Constitution limits federal-court jurisdiction to "Cases" and "Controversies." A case or controversy exists only if a plaintiff has standing to sue—which is "a bedrock constitutional requirement." *United States v. Texas*, 599 U.S. 670, 675 (2023). Standing doctrine "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system" and prevents "the judicial process from being used to usurp the powers of the political branches." *Id.* at 675-76 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).

ADD366

To establish standing, a plaintiff must show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To show an "injury in fact," the plaintiff must establish that it "suffered an invasion of a legally protected interest" that is "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical." *Id.* at 339 (cleaned up). An injury is concrete if it is "real" and "actually exist[s]," and an injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Id.* at 339-40.

The City alleges numerous injuries in its amended submissions, but none suffices to establish an injury in fact.

*First*, the City contends that it was injured because Defendants allegedly violated the 1950 Agreement and the statutory provision underlying that agreement, 16 U.S.C. § 407n. *See* Am. Compl. ¶¶ 13-19, 77-83, 103, 110-113; Pl.'s Br. at 26-27, 33-34, 37-38. But that contention is based on the City's fundamental misreading of § 407n.

As relevant here, § 407n authorizes the Secretary of the Interior to enter into a cooperative agreement with the City "to assist in the preservation and interpretation of the property known as the Independence Hall National Historic Site . . . , in connection with the Independence National Historical Park." Section 407n further instructs that this agreement must specify "that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, . . . except by mutual agreement" of the parties.

Section 407n thus distinguishes between "the Independence Hall National Historic Site" and "the Independence National Historical Park." Although § 407n says

ADD367

that its cooperative agreements are "in connection with" the *Park*, it specifies that the cooperative agreement with the City is directed at the *Site*. And the mandatory "no changes or alterations" term is likewise limited to "the property within the Independence Hall National Historic *Site*." 16 U.S.C. § 407n (emphasis added).

Crucially, the President's House is *not* part of the "Independence Hall National Historic Site" referenced in § 407n.[1] Five years before Congress enacted § 407n, the Department of the Interior designated the "Independence Hall National Historic Site" as a national historic site under federal law. *See* 8 Fed. Reg. 7,283 (dated May 14, 1943; published June 1, 1943). That designation included a specific definition: "All those lots, pieces, or parcels of land which are now owned by the City of Philadelphia, located within the block bounded by Walnut, Fifth, Chestnut, and Sixth Streets, known as Independence Square, in the City of Philadelphia, Commonwealth of Pennsylvania." *Id.*

Congress relied on that definition in drafting § 407n. *See, e.g.*, H.R. Rep. No. 80-1819, at 8 (1948); S. Rep. No. 80-1622, at 6 (1948). The preamble of the 1950 Agreement—entered into pursuant to § 407n—also incorporates this definition of the relevant property. *See* ECF No. 36-1 at 1 (describing "the Independence Hall group of historic structures comprising Independence Hall, Congress Hall, Old City Hall, and associated historic objects, located in Independence Square in the City of Philadelphia, Commonwealth of Pennsylvania").

---

[1]    The City alleges that the "President's House is part of the buildings and grounds that comprise *Independence National Historical Site*," Am. Compl. ¶ 111 (emphasis added), but that exact term does not appear in § 407n or the 1950 Agreement.

So the "Independence National Historical Site" is limited to Independence Square:



Nat'l Park Serv., *TractsNet Public 1.5*, https://arcg.is/0q9oLj1 (last visited Feb. 13, 2026) (interactive map application; click "Zoom to" in bottom left "nps_tracts" window to view lot). But it does not cover the President's House site, which is located a block north on the corner of Sixth and Market Streets.[2] By extension, neither § 407n nor the 1950 Agreement covers the President's House site—and all of the City's assertions about purported violations of the 1950 Agreement and § 407n thus collapse.

*Second*, the City relies on the 2006 Cooperative Agreement and amendments to argue that it holds "a recognized property right in the public benefit that inured to the

---

[2]    It also makes sense that § 407n covers only Independence Square—because the City owns that land. Not so for the land on which the President's House sits, which is owned by the Federal government.

ADD369

City . . . in the construction and contents of the President's House as it was fulsomely described in the contracting documents." Pl.'s Br. at 21; *see also id.* at 30 (asserting that this alleged "public benefit" is the City's "intangible property"); *id.* at 38 ("NPS's action has infringed or eviscerated an intangible property right of the City."); Am. Compl. ¶ 56. And it argues that the alleged "infringement" of this "intangible property right establishes the City's standing." Pl.'s Br. at 28. But these assertions cannot be squared with the plain terms of the agreements.

The City specifically agreed to "[c]ertify in writing that upon NPS' acceptance of the Project as complete, *all right, title, and interest* to any completed construction, improvements, installations, fixtures, or associated donations, *are free and clear of all debts, liabilities, or obligations.*" ECF No. 36-6 (Third Amendment to 2006 Cooperative Agreement) art. III.B.16 (emphasis added). What's more, the City "*waive[d] any claim or right to any property interest*, including use rights, or to compensation for any Project components donated to NPS." *Id.* art. III.B.17 (emphasis added). Those express terms trump the City's contrary allegations. *See Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018) (if a plaintiff's "own exhibits contradict her allegations in the complaint, the exhibits control").

Put simply, nothing in the 2006 Cooperative Agreement or amendments suggests that the exhibit would stay in place in perpetuity or that the City would retain any authority over the exhibit (or any right to the exhibit whatsoever) after the project was completed. Quite the opposite. The 2006 Cooperative Agreement unambiguously provided, under a section titled "Ownership of Exhibit," that, "[u]pon completion of the Exhibit in accordance with this Agreement, ownership of the Exhibit shall transfer to the NPS." ECF No. 36-3 § 2 (quoted text highlighted in the City's filing). The same section

ADD370

specified that "NPS ownership of the Exhibit shall survive any termination of this Agreement." *Id.* And a separate section titled "Management & Maintenance of the President's House Exhibit" provided that "NPS agrees that it shall undertake all responsibility to manage, occupy, utilize, operate, repair, maintain, ***interpret and administer*** the Exhibit, which shall become property of the NPS in accordance with this Agreement." *Id.* § 4.a (emphasis added). Nor does the contract provide the City with any enforcement mechanism for any purported rights it claims here.

A host of other provisions further reflect the parties' agreement that the NPS would have complete control over the exhibit upon its completion—without any involvement by the City:

- "The Project will be owned, maintained, managed, and interpreted by the NPS following completion of the Project and acceptance by the NPS." ECF No. 36-6 art. I.C.

- The City agreed "to donate to NPS the Project identified in the Cooperative Agreement as amended. This donation is made by the City on its own volition and without compensation." *Id.* art. III.B.1

- "NPS will own and manage the commemorative work at the conclusion of the process." *Id.* at attach. A (Project Summary Sheet) § IV.4

- "The Project will be owned, maintained, managed, and interpreted by the NPS." *Id.* at attach. C (Project Development Plan) § B.

The agreements thus unambiguously establish that the NPS obtained complete and unconditional ownership of the exhibit. And ownership of property comes with the "rights to possess, use, and dispose of" the property. *Horne v. Dep't of Agric.*, 576 U.S.

ADD371

350, 361-62 (2015). Here, the NPS's removal of the plaques was an exercise of those traditional ownership rights.[3]

*Third*, the City at various points invokes alleged injuries to the public. *See, e.g.*, Pl.'s Br. at 42 ("Every moment that the President's House remains in its current state, the City's citizenry . . . is denied access to the honest and accurate commemoration and representation that advocates fought long to recognize."); *id.* at 43 (same assertion with respect to "Philadelphia resident[s] or visitor[s]"). But the City cannot invoke the rights of the public to sue the Federal government. "[I]t is the United States, and not the state, which represents [citizens] as parens patriae, when such representation becomes appropriate." *Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923); *see also Town of Milton, Mass. v. FAA.*, 87 F.4th 91, 96 (1st Cir. 2023) ("municipalities cannot assert that they have been injured because of an alleged injury to their residents"); *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 193 (3d Cir. 2016) (similar).

*Fourth*, while the City continues to allege a vague violation of the purpose of the National Underground Railroad Network to Freedom Act and has now added allegations about supposed agency-policy violations, the City fails to articulate any sort of particularized injury based on those specific alleged violations. *See Spokeo*, 578 U.S. at

---

[3]    The City now acknowledges that "the term of the 2006 Agreement and subsequent amendments has expired," but argues that it continues to impose relevant obligations based on the survival clause. Am. Compl. ¶ 58. The amended complaint does not actually specify these alleged surviving obligations, but the amended brief suggests that the City means the 2009 amendment's "Project Development Plan" and its terms about interpretation of the site. *See* Pl.'s Br. at 27, 30-31. Yet those general terms cannot plausibly be construed to trump the numerous specific provisions discussed above that gave NPS unqualified ownership and interpretive authority over the site.

ADD372

339-40 (standing requires a "particularized" injury, meaning that it "must affect the plaintiff in a personal and individual way" (citation omitted)).

*        *        *

The City has not identified any invasion of a legally protected interest by Defendants. Its allegations about 16 U.S.C. § 407n and the 1950 Agreement are predicated on a fundamental misunderstanding of what they cover. As for the rights that the City invokes under the 2006 Cooperative Agreement and amendments, those either expired years ago or are contradicted by the agreements' express terms. And where a plaintiff's asserted injury depends on a contractual provision that it cannot enforce, dismissal for lack of standing is warranted. *See Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 455 (3d Cir. 2018).

In the absence of any enforceable statutory or contractual right, the City stands in the same position as any other member of the public who disagrees with the Government's curatorial decisions about what to display on exhibit. But as the Supreme Court has repeatedly clarified, members of the public lack standing to challenge government speech or compel the Federal government to speak a particular message. *See, e.g.*, *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982) (no standing where only harm is "the psychological consequence . . . produced by observation of conduct with which one disagrees"); *Lance v. Coffman*, 549 U.S. 437, 441 (2007) (surveying the "lengthy pedigree" of courts' "refusal to serve as a forum for generalized grievances"). The City therefore lacks standing.

ADD373

### B.    Counts 1 and 2 Are Contractual Claims and Thus Barred by the Tucker Act

The Federal government enjoys sovereign immunity. Federal courts thus generally lack jurisdiction over "suits against the United States absent Congress's express consent." *United States v. Miller*, 145 S. Ct. 839, 849 (2025). The APA provides a limited waiver of sovereign immunity for claims "seeking relief other than money damages." 5 U.S.C. § 702. But the APA's waiver "comes with an important carve-out": it does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.* One such limitation—the Tucker Act—is applicable here. Under the Tucker Act, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act "impliedly forbids" bringing "contract actions" against "the government in a federal district court." *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted).[4] And Congress has explicitly barred district-court jurisdiction over such claims. 28 U.S.C. § 1346(a)(2) ("[T]he district courts shall not have jurisdiction of any civil action or claim against the

---

[4]    *See also Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) (holding the same); *Sea-Land Serv., Inc. v. Brown*, 600 F.3d 429, 433-43 (3d Cir. 1979) (same).

ADD374

United States founded upon any express or implied contract with the United States [unless it is for $10,000 or less].").

Here, although styled as APA claims, Counts 1 and 2 in the City's Amended Complaint are contractual and thus barred under the Tucker Act. A plaintiff may not maintain an APA claim where "the essence of the action is in contract"—and a plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Court*, 340 F.2d 947, 948 (1st Cir. 1965)); *see also Sea-Land*, 600 F.2d at 433 (endorsing *Califano*'s reasoning). In *Sea-Land*, the Third Circuit rejected the plaintiff's attempt to obtain specific-performance-type relief on a government contract via APA-styled pleading. 600 F.2d at 433-34. And the Third Circuit has stressed that plaintiffs may not, by creative APA pleading, "circumvent limitations on district court jurisdiction created by the Tucker Act." *Hahn v. United States*, 757 F.2d 581, 589 (3d Cir. 1985).

To evaluate whether a plaintiff's claim sounds in contract, courts thus look to substance rather than labels. *See, e.g., Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *Shapiro v. U.S. Dep't of Agric.*, No. 25-cv-998, 2025 WL 3473291, at *4 (M.D. Pa. Dec. 3, 2025) (discussing analytical framework). Specifically, courts examine both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968 (citation omitted); *see also Shapiro*, 2025 WL 3473291, at *4. Here, both prongs establish that Counts 1 and 2 are foreclosed by the Tucker Act.

First, the source of the City's alleged rights is fundamentally contractual. Indeed, the City admits that its Count 1 is actually a breach-of-contract claim. Am. Compl. ¶¶ 80-84; *see also* Pl.'s Br. at 23 (labeling Count 1 as the City's "Breach of Contract

ADD375

Claim"), 26 (describing Count 1 as "the City's claim grounded in the cooperative agreements between the United States and the City of Philadelphia"). As for Count 2, although the City styles that claim as an APA claim for an alleged violation of the National Underground Railroad Network to Freedom Act, it repeatedly relies on contractual terms for its theory in support of that claim. *See, e.g.*, Am. Compl. ¶¶ 98-100 (relying on 2009 amendment to 2006 Cooperative Agreement). The City even points to the 2006 Cooperative Agreement as the source of its alleged "intangible property *right*" underlying this claim. Pl.'s Br. at 28 (emphasis added); *see also id.* at 30 (invoking alleged "public benefit" derived from 2006 Cooperative Agreement in support of Count 2), 31 (invoking 2009 amendment to 2006 Cooperative Agreement in support of Count 2). And the City invokes the 1950 Agreement to argue that its claims do not challenge conduct committed to agency discretion. *Id.* at 36-37; *see also* ECF No. 45-1 (Jan. 30, 2026 Hr'g Tr.) at 154:15-155:7, 155:22-24 (invoking 2006 Cooperative Agreement for original APA claim allegedly based on National Underground Network to Freedom Act of 1998).

Second, the core remedy sought by the City is contractual. As the City acknowledges, it seeks specific performance. Pl.'s Br. at 23 n.2 (specifying "specific performance" as "the remedy sought here"); *id.* at 25 (arguing that "the City's claims based upon the several agreements . . . are solely limited to non-monetary specific performance"); *see also* Am. Compl. ¶ 84 (requesting order requiring Defendants' compliance with "the parties' contractual obligation"). And as the City also acknowledges, "specific performance is a contract remedy." Pl.'s Br. at 25. Such relief departs from the standard APA remedy of setting aside the agency's action or remanding for further consideration. The City seeks affirmative relief predicated on an alleged

16

ADD376

contractual right—which confirms the contractual nature of the claims and precludes jurisdiction. *See, e.g.*, *Sea-Land*, 600 F.2d at 433-43 (APA does not waive sovereign immunity for claims that arise out of a contract and seek specific performance).[5]

The City offers two arguments in response. Neither withstands scrutiny.

First, the City argues (at 25) that its "contractual claims . . . do not implicate any monetary damages or recompense" but "are solely limited to non-monetary specific performance," and points out that the Court of Federal Claims cannot award specific performance. But the unavailability of that remedy in the Court of Federal Claims has no bearing on this Court's jurisdiction. *See, e.g.*, *Sea-Land*, 600 F.2d at 433; *4900 S. Broad St. Assocs.-Tenant, L.P. v. U.S. Dep't of Agric.*, No. 08-cv-4646, 2009 WL 301936, at *3 (E.D. Pa. Feb. 4, 2009) ("The fact that plaintiff may be unable to secure such relief in the Court of Federal Claims does not grant this Court jurisdiction to hear, as an independent action, a claim for relief that is part and parcel of a contractual dispute with the

---

5    *See also, e.g.*, *Qureshi v. Admin. Appeals Off. (AAO) of U.S. Citizenship & Immigr. Servs. (USCIS)*, 408 F. App'x 611, 615 (3d Cir. 2010) ("Because [petitioner's] promissory estoppel claim sought specific performance, not money damages, the District Court correctly concluded that this claim was subject to the Tucker Act and that the Act precluded jurisdiction over [petitioner's] claim." (citing *Sea-Land*, 600 F.2d at 432)); *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) (APA's waiver of sovereign immunity "does not run to actions seeking declaratory relief or specific performance in contract cases" because "the Tucker Act impliedly forbid[s] such relief" (citing cases)); *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985) ("a complaint involving a request for specific performance must be resolved by the Claims Court"); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985); *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) ("Such a request for an order that the government 'must perform' on its contract is one that 'must be resolved by the Claims Court.'" (quoting *Ingersoll-Rand*, 780 F.2d at 80)); *Shapiro*, 2025 WL 3473291, at *6 (specific performance is a "classic contractual remedy" (citation omitted)); *Vera Inst. of Just. v. U.S. Dep't of Just.*, No. 25-cv-1643, 2025 WL 1865160, at *13 (D.D.C. July 7, 2025) (plaintiff's specific-performance request "mark[ed] the claim as essentially contractual").

ADD377

government."). And the unavailability of that remedy is not limited to the Court of Federal Claims: this Court cannot award specific performance either. *See Sea-Land*, 600 F.2d at 433.[6]

Second, the City (at 24-25) argues that the Supreme Court's decision in *Bowen v. Massachusetts*, 487 U.S. 879 (1988), supports taking a "practical" approach to sovereign immunity to somehow find jurisdiction for the City's contract claims. But *Bowen* "did not involve a contract and it did not address the 'impliedly forbids' limitation on the APA's waiver of sovereign immunity" in § 702. *N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994); *see also Sec. Sav. Bank, SLA v. Dir., Off. of Thrift Supervision*, 798 F. Supp. 1067, 1078 (D.N.J. 1992). So *Bowen* has no bearing here.

*      *      *

The City cannot use APA labels to "circumvent limitations on district court jurisdiction created by the Tucker Act," *Hahn*, 757 F.2d at 589, and § 702's waiver does not apply to claims that sound in contract. Because Counts 1 and 2 are fundamentally contract-based and seek specific-performance-type relief, they fall within the Tucker Act's exclusive remedial scheme and must be dismissed for lack of jurisdiction.

---

[6]    *See also, e.g., Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) ("Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations."); *Robbins*, 438 F.3d at 1082 (adopting *Sea-Land*'s and *Coggeshall*'s holdings); *Qureshi v. U.S. Citizenship & Immigr. Serv.*, No. 08-cv-2281, 2010 WL 1390846, at *2 (M.D. Pa. Mar. 31, 2010) ("federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations" (citation omitted)), *aff'd sub nom.*, 408 F. App'x 611.

## II.    The City Has Not Shown a Likelihood of Success on the Merits

### A.    The City Fails to State Cognizable APA Claims

#### 1.    The City fails to challenge "agency action" under the APA.

The City's amended complaint continues to challenge the NPS's removal of the exhibit panels at the President's House site. But the APA allows only for review of "agency action." 5 U.S.C. §§ 702, 704. The NPS's curatorial decisions are not "agency action" within the meaning of the statute.

Under the APA, a plaintiff "must identify some 'agency action' that affects him in the specified fashion." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990). The APA carefully defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see id.* § 701(b)(2). And each of the key terms within that definition ("rule," "order," "license," "sanction," and "relief") is likewise defined. *Id.* § 551(4), (5), (8), (10), (11). Significantly, the APA does not authorize "general judicial review of the [agency's] day-to-day operations," *Lujan*, 497 U.S. at 899, or cover "all conduct such as, for example, constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). After all, permitting judicial review of every decision made in the course of an agency's daily activities would bring the government to a standstill.

The City asserts that "[t]he removal of artwork and informational displays at the President's House site" qualifies as agency action under the APA. Am. Compl. ¶¶ 87, 104. But the NPS routinely revises or removes art or informational displays at its sites. This falls under the "wide variety of activities that comprise the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land*

19

*Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006). Such actions do not qualify as a rule, order, license, sanction, or relief under the APA and are thus not "agency action."

To hold otherwise would subject nearly everything an agency does to APA review. *Cf. Indep. Equip. Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) ("the term [agency action] is not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency" (Roberts, J.) (cleaned up)). This would subject every change to a Park sign, exhibit, pamphlet, interpretive display, or even landscaping to challenge in court. The City's view of the law cannot be squared with the Supreme Court's admonition that the APA does not permit "general judicial review of the [agency's] day-to-day operations." *Lujan*, 497 U.S. at 899; *see also id.* at 894 (APA does not provide for judicially managed "systematic improvement" absent final agency action); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004) (APA's limitations serve to prevent "injecting the judge into day-to-day agency management"). The City thus has not challenged cognizable "agency action" under the APA. The City's contrary legal interpretation would produce absurd consequences, potentially subjecting every curatorial decision—from displaying a painting to rotating a seasonal sculpture exhibit—to APA-style review.

### 2. The alleged agency action that the City challenges here is not final under the APA.

Review under the APA is further limited to "*final* agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704 (emphasis added). But the NPS's actions here do not qualify as "final agency action" either.

In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court articulated two necessary conditions for agency action to be final under the APA: "First, the action must

ADD380

mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 178 (cleaned up). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177-78 (citations omitted). To satisfy the second condition, the agency's action generally must impose "obligations, prohibitions, or restrictions" or "give rise to . . . direct and appreciable legal consequences." *Chemours Co. FC, LLC v. United States Env't Prot. Agency*, 109 F.4th 179, 184 (3d Cir. 2024) (cleaned up).

Here, the City's claims fail under *Bennett*'s second condition. Nowhere does the City explain how the NPS's removal of the panels determined any rights or obligations for or caused legal consequences to the City. As explained above, the City lacks any statutory or contractual rights in light of 16 U.S.C. § 407n's inapplicability, the expiration of the agreements, and the transfer of custody and rights to the Federal government. Further, the Federal government remains at liberty to take down or reinstall these displays—or make any other curatorial decisions at this or other parks. But a decision to take down an exhibit—whether to conduct restoration, install a different artwork, or communicate a different message—is not final agency action subject to judicial review under the APA.

### 3.    The City challenges conduct committed to agency discretion by law.

Even if the removal of the panels qualified as final agency action, the City's claims would still not be cognizable under the APA. The APA's waiver of sovereign immunity in 5 U.S.C. § 702 does not apply (and courts thus lack jurisdiction over an APA claim) if the claim involves "agency action [that] is committed to agency discretion by law." 5 U.S.C.

ADD381

§ 701(a)(2). And the conduct challenged here—the NPS's removal of exhibit panels—falls squarely within § 701(a)(2)'s carve-out for discretionary action.

Section 701(a)(2) precludes review where the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Section 701(a)(2) applies if judicial review would require the court to substitute its own judgment for the agency's judgment on matters committed to professional, managerial, or policy discretion, and where Congress has supplied no judicially manageable criteria. *Id.* at 830-32, 837-38; *see also Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (reaffirming *Heckler*'s "no meaningful standard").

The Third Circuit has further refined this standard and held that § 701(a)(2) applies if agency action (1) "involves broad discretion"; (2) "is the product of political or managerial choices that are not readily subject to judicial review"; and (3) does not "violate a constitutional, statutory, or regulatory command." *Const. Guided Walking Tours v. Indep. Visitor Ctr. Corp.*, 454 F. App'x 118, 122 n.2 (3d Cir. 2011) (cleaned up) (quoting *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 203, 205 (3d Cir. 2003)); *see also Davis Enters. v. U.S. E.P.A.*, 877 F.2d 1181, 1184 (3d Cir.1989); *Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574, 581 (3d Cir. 1979).

Consistent with this analysis, the Supreme Court has found agency action unreviewable where an agency exercised discretion over how best to advance broad statutory objectives. *See Lincoln v. Vigil*, 508 U.S. 182, 193 (1993) (allocation of lump-sum appropriations was committed to agency discretion by law because it required a complicated balancing of factors that were particularly within an agency's expertise,

ADD382

including proper ordering of its priorities); *see also Almond Bros. Lumber Co. v. United States*, 721 F.3d 1320, 1326 (Fed. Cir. 2013) (authorization for the U.S. Trade Representative to enter into agreements with foreign countries was committed to agency discretion in part because the negotiation and determination of international agreements "is a paradigmatic example of 'a complicated balancing of a number of factors which are peculiarly within the USTR's expertise" (cleaned up)).

Here, interpretive signage at the President's House involves discretion, is the product of managerial choices that are not readily subject to judicial review, and does not "violate a constitutional, statutory, or regulatory command." *Const. Guided Walking Tours*, 454 F. App'x at 122 n.2. Interpretive signage reflects judgments about visitor experience, educational framing, and narrative scope—all subjects within the discretion of the agency to address.

The City identifies no statute, regulation, or binding policy that requires the NPS to present a particular historical narrative, retain specific interpretive themes, or maintain signage. Although the City continues to invoke the National Underground Railroad Network to Freedom Act, 54 U.S.C. §§ 308301-04, that statute does not mandate that sites designated under its provisions have any interpretive component. Nor does the City offer any support for its theory that federal sites may not be altered once designated under that statute—which is refuted by the statute's text and the

23

ADD383

relevant application materials.[7] And while the City now invokes various agency

documents, none of those contains any legally enforceable standards either. The NPS's

Management Policies, the Director's Order, and the "Foundation Document" that the

City invokes (Pl.'s Br. at 34-36) all lack binding force and are purely internal

management documents.[8] Such documents do not impose enforceable constraints on

agency action. *See Horses of Cumberland Island v. Haaland*, No. 23-cv-1592, 2024 WL

5430835, at *11 (N.D. Ga. Nov. 8, 2024) (holding that 2006 NPS Management Policies

were non-binding manual of internal guidance that could not support APA claim); *see

also The Wilderness Soc. v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (similar).

---

[7]  *See, e.g.*, Nat'l Park Serv., *Application Instructions: National Underground Railroad Network to Freedom Application* (last updated Jan. 21, 2026), https://www.nps.gov/subjects/undergroundrailroad/application-instructions.htm#onthisPage-14 ("Historic sites and properties included in the Network are not bound by any legal requirements to comply with Federal historic preservation laws, based on their inclusion in the Network alone."); *see also* Nat'l Park Serv., *National Underground Railroad Network to Freedom Application and Partner Requests Instructions* (OMB Control No. 1024-0232) at 2, https://www.reginfo.gov/public/do/DownloadDocument?objectID=125173401 (last visited Feb. 13, 2026) ("Inclusion in the Network does not guarantee that a threatened site will be protected or that preservation will occur.").

[8]  *See, e.g.*, Nat'l Park Serv., *Director's Order No. 2* at § 2, https://www.nps.gov/subjects/policy/upload/DO_2_1-11-2021.pdf (last visited Feb. 13, 2026) (explaining that the order "is intended only to improve the internal management of the NPS, and is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person"); Nat'l Park Serv., *Management Policies 2006* at 4, https://www.nps.gov/subjects/policy/upload/MP_2006_amended.pdf (last visited Feb. 13, 2026) ("The policies contained within this document are intended only to improve the internal management of the National Park Service; they are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its departments, agencies, instrumentalities or entities, its officers or employees, or any other person.").

ADD384

The absence of governing constraints means there is no meaningful legal standard by which a court can evaluate the NPS's interpretive judgment here. Indeed, the City does not contend that Congress mandated particular content, that the NPS's regulations require inclusion of specific historical topics, that the NPS violated a binding rule or adopted policy, or that the NPS misinterpreted its legal authority. And the City cannot evade § 701(a)(2) by labeling a discretionary decision "arbitrary and capricious"—because a claim is cognizable under § 706 only if the action is reviewable in the first place. *Heckler*, 470 U.S. at 828. Accordingly, this is exactly the kind of action that is the product of "managerial choices that are not readily subject to judicial review." *Davis Enters.*, 877 F.2d at 1184.

The City's reliance on expired contracts and inapplicable statutes does not alter this analysis. As discussed above, the 2006 Cooperative Agreement expired years ago, imposes no relevant continuing obligations, was not incorporated into statute or regulation, and expressly transferred all ownership and management authority to the NPS. And neither 16 U.S.C. § 407n nor the 1950 Agreement governs the President's House Site. These materials thus do not constrain agency discretion and do not constitute "law" for the purposes of § 701(a)(2). At most, they provide historical background—but they do not provide enforceable standards capable of guiding judicial review. And as discussed above, even if there were any relevant continuing contractual obligations, the Tucker Act precludes review in any event.

### B.     The City's Ultra Vires Claim is Foreclosed

The City's final claim—its new ultra vires claim—is likewise foreclosed. As the Supreme Court explained last year, ultra vires review is "strictly limited" and "applies only when an agency has taken action entirely 'in excess of its delegated powers and

contrary to a *specific prohibition*' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted).

To assert a cognizable ultra vires claim, the City must allege that Defendants acted in "patent"—or "obvious"—violation of statutory authority, *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) (citing cases), and "contrary to a *specific* [statutory] *prohibition*," *Nuclear Regul. Comm'n*, 605 U.S. at 681 (cleaned up). But here, the City has alleged violations only based on statutory provisions that are either inapplicable (16 U.S.C. § 407n) or that do not even contain a prohibition (54 U.S.C. § 308302).

Ultra vires review also remains subject to "implied statutory limitations" like the Tucker Act. *See Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324-27 (2015); *see also Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) (citing *Armstrong* and observing that "it appears unlikely that Plaintiffs' ultra vires claims, which allege the Government violated the Constitution when it terminated or suspended Plaintiffs' grants, would provide a detour around the Tucker Act"). The City invokes its purported "intangible property right," Pl.'s Br. at 38—which it derives from its alleged contractual rights—in support of its ultra vires claim. Accordingly, the Tucker Act separately forecloses the City's ultra vires claim.

## III.    The City Has Not Established Irreparable Harm

A litigant seeking injunctive relief must "'articulate and adduce proof of actual or imminent harm which cannot otherwise be compensated by money damages . . . to sustain its substantial burden of showing irreparable harm.'" *HAPCO*, 482 F. Supp. at 360 (citation omitted). "The preliminary injunction standard requires the plaintiff to

ADD386

make a clear showing that 'it is more likely than not to suffer irreparable harm in the absence of preliminary relief.'" *Id.* at 360-61.

This time around, the City argues that irreparable harm exists here based on the President House exhibits' "tremendous cultural and emotional significance for the community." Pl.'s Br. at 39. Indeed, the City's arguments establish that its theory of irreparable harm is based entirely on alleged harm suffered by the City's residents and the public. *See, e.g.*, *id.* at 41-42 (relying on Philadelphia's population and visitors); *id.* at 42 ("Every moment that the President's House remains in its current state, the City's citizenry . . . is denied access to the honest and accurate commemoration and representation that advocates fought long to recognize."); *id.* at 43 (same assertion with respect to "Philadelphia resident[s] or visitor[s]").

But the City cannot rely on alleged injuries to its residents or the public in a suit against the United States. *See, e.g.*, *Maiden Creek*, 823 F.3d at 193. Rather, the City must show "that it specifically *and personally* risks irreparable harm." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (emphasis added). The City does assert (at 43) that it is personally "deprived of the opportunity to honestly and accurately tell its story during the unique opportunity afforded by the semiquincentennial," but that is plainly wrong. The City remains free to tell whatever story it wants—using its own property. And high-resolution photographs of the exhibits remain accessible on the internet.[9]

---

[9]    *See, e.g.*, Aileen Clarke & Sam Morris, *Here Are the Signs the Trump Administration Removed from Independence Park*, PHILA. INQUIRER (Jan. 22, 2026), https://www.inquirer.com/news/philadelphia/inq2/independence-park-trump-signage-remove-presidential-house-20260122.html.

ADD387

The evidence further establishes that the extraordinary remedy of an injunction is neither necessary nor appropriate here.

First, as the Superintendent of the Park has explained, the exhibits are being held in storage and will remain there pending the outcome of this case. ECF No. 27-1 (Sims Decl.) ¶ 8. An injunction is thus not required to ensure the safety, security, and preservation of the removed exhibits.

Second, the removal of the exhibits is not irreversible. At the conclusion of this lawsuit, and if ordered to do so, the NPS could re-hang the exhibits and turn the television monitors back on. And although the Court has questioned "the integrity of the exhibits regarding their amenability to being restored to their original condition," ECF No. 39 at 1, the NPS has the exhibit designs and can create new copies of any potentially damaged exhibits should that become necessary. *See* Supplemental Declaration of Steven Sims (attached as Exhibit A) ¶¶ 3-4. In other words, any alleged harm from the removal of the exhibits is not irreparable. *See, e.g., Del. State Sportsmen's Ass'n*, 108 F.4th at 205 ("[C]hallengers have shown no harms beyond ones that can be cured after final judgment. That finding alone suffices to support the District Court's denial of a preliminary injunction." (citing *Penn. ex rel. Creamer v. U.S. Dep't of Agric.*, 469 F.2d 1387, 1388 (3d Cir. 1972) (per curiam))). This is independently fatal to the City's motion for a preliminary injunction.

## IV.    The Public Interest and Balance of the Equities Counsel Against Issuing an Injunction

Finally, the public interest and balance of the equities weigh strongly against the issuance of injunctive relief here. Where a plaintiff seeks preliminary relief against the Federal government, the last two factors—public interest and balance of the equities—

ADD388

merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the City seeks extraordinary relief that would prohibit the Federal government from conveying its preferred message and, what is worse, compel the Federal government to speak a message that it does not wish to convey.

"A government entity has the right to speak for itself." *Pleasant Grove*, 555 U.S. at 467 (internal quotation marks omitted). In choosing what message to convey in limited display space, the Government must necessarily make decisions about what to include and what to exclude. *Matal v. Tam*, 582 U.S. 218, 234 (2017) ("When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others."). Inevitably, others may disagree with these decisions. But "[i]f every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in private sector, and the process of government as we know it radically transformed." *Keller v. State Bar of Cal.*, 496 U.S. 1, 12-13 (1990). "Indeed, it is not easy to imagine how government could function if it lacked this freedom." *Pleasant Grove*, 555 U.S. at 468.

If the City disagrees with the Federal government's speech, the appropriate solution is political. "The Constitution . . . relies first and foremost on the ballot box . . . to check the government when it speaks." *Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 252 (2022). But courts may not enjoin or compel the speech of co-equal branches of government. *See, e.g., Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015) (coordinate branch of government "may not force the President himself to contradict his earlier statement"). The Government is "ultimately accountable to the electorate and the political process for its advocacy," and "[i]f the citizenry objects,

ADD389

newly elected officials later could espouse some different or contrary position." *Pleasant Grove*, 555 U.S. at 468-69.

The City's arguments to the contrary (at 44-45) fail to grapple with these principles. Although the City acknowledges "that the federal government cannot be mandated to participate in speech to which it objects," it posits that this principle "does not apply to the facts of this case." Pl.'s Br. at 45. But it does. The City's entire case is predicated on the interpretive and symbolic importance of the President's House exhibits—in other words, *their message and expressive value*. And the City now seeks to compel the Federal government to engage in speech that it no longer wants to convey. Nothing prevents the City or any other State, local, or private entity from engaging in their own speech—using their own property. But granting its extraordinary request to compel the Federal government to speak would violate fundamental separation-of-powers principles.

For these reasons, the public interest and balance of the equities weigh strongly against issuing injunctive relief here.

## V.    Any Further Injunctive Relief Should Be Stayed Pending Appeal

If the Court nonetheless issues any further injunctive relief, Defendants request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at least administratively stayed for seven days to allow Defendants to seek an emergency expedited stay from the court of appeals if an appeal is authorized.

ADD390

**CONCLUSION**

The Court should vacate its restraining order (ECF No. 37 ¶ 5) and deny the City's amended motion for a temporary restraining order and preliminary injunction. And because there is no subject-matter jurisdiction here, the Court should dismiss this case.

Dated:  February 13, 2026                    Respectfully submitted,

BRETT A. SHUMATE                          DAVID METCALF
Assistant Attorney General                United States Attorney
Civil Division

                                          */s/ Gregory B. David*_____
MICHAEL VELCHIK                           GREGORY B. DAVID
Senior Counsel to the Assistant           Assistant United States Attorney
Attorney General                          Chief, Civil Division

                                          */s/ Gregory B. in den Berken*_____
                                          GREGORY B. IN DEN BERKEN
                                          Assistant United States Attorney
                                          Eastern District of Pennsylvania
                                          615 Chestnut Street, Suite 1250
                                          Philadelphia, PA 19106
                                          Phone:   (215) 861-8200
                                          Email:    gregory.indenberken@usdoj.gov

                                          *Counsel for Defendants*

ADD391

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 13, 2026, a true and correct copy of Defendants' foregoing Opposition to Plaintiff's Amended Motion for Preliminary Injunction and Temporary Restraining Order was filed electronically via the Court's CM/ECF system and served via CM/ECF on all counsel of record.

*/s/ Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN

ADD392

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CITY OF PHILADELPHIA,

       Plaintiff,

    v.

DOUG BURGUM, SECRETARY OF THE
INTERIOR, *et al.*,

       Defendants.

Case No. 26-cv-434

## **SUPPLEMENTAL DECLARATION OF STEVEN SIMS**

I, Steven Sims, declare as follows.

1.    I am an adult and competent to give this declaration, which is based on my personal knowledge. If called upon, I would testify to these facts under penalty of perjury.

2.    I am an employee of the U.S. National Park Service ("NPS") and the Superintendent of Independence National Historical Park in Philadelphia, which includes the President's House Site.

3.    NPS has the designs for the President's House exhibits. With those designs, NPS can readily order replacements of any or all exhibits if necessary.

4.    NPS staff estimate that the cost to replace all the exhibits would be approximately $20,000. They advise that production and shipping would take roughly three weeks.

ADD394

I declare under penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C. § 1746(2).

Executed on February 13, 2026.

STEVEN SIMS

Digitally signed by STEVEN SIMS
Date: 2026.02.13 15:09:48 -05'00'

_____

Steven Sims
Superintendent
Independence National Historical Park
U.S. National Park Service

ADD395

# EXHIBIT A

ADD396

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CITY OF PHILADELPHIA,<br><br>       Plaintiff,<br><br>    v.<br><br>DOUG BURGUM, SECRETARY OF THE INTERIOR, *et al.*,<br><br>       Defendants. | Case No. 26-cv-434 |

**DECLARATION OF STEVEN SIMS**

I, Steven Sims, declare as follows.

1.    I am an adult and competent to give this declaration, which is based on my personal knowledge. If called upon, I would testify to these facts under penalty of perjury.

2.    I am an employee of the U.S. National Park Service ("NPS"). Since November 2023 I have served as the Superintendent of Independence National Historical Park in Philadelphia, which includes the President's House Site. In April 2025 I was detailed to serve as the Acting NPS Regional Director for Interior Region 1 and will return as Superintendent of Independence National Historical Park on February 1, 2026.

3.    As Superintendent, my role is to implement the mission of the National Park Service to "preserve unimpaired the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations."

4.      On January 22, 2026, I received direction from the acting Director of the NPS to remove the video and exhibits on the interior and exterior of the walls of the President's House. However, the footprints in the concrete and the names on the Memorial Wall were to remain as-is.  I was directed to effectuate this removal on the same day.

5.      I directed the Acting Superintendent of Independence National Historical Park to direct park staff to take this action.

6.      At or around 3:00 p.m., NPS employees removed all but one of the exhibits on the interior and exterior of the President's House walls using hand tools, including wrenches and crowbars, to remove bolts fastening the exhibits to the walls and pull the exhibits from the walls. The removal took approximately two and a half hours.

7.      The remaining sign is made of wood and located at the southern end of the site in a stand alone structure made of metal.  NPS did not remove it on January 22, 2026 because additional tools were needed to do so.  When and if NPS removes the sign, it will be stored with the other panels.

8.      The videos are turned off and the panels removed and secured. They are in NPS custody and have been placed into storage at the National Constitution Center. They will remain in storage at this location pending the outcome of this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct. *See* 28 U.S.C. § 1746(2).

ADD398

Executed on January _27_, 2026.

STEVEN SIMS    Digitally signed by STEVEN SIMS
Date: 2026.01.27 15:00:39 -05'00'

Steven Sims
Acting Regional Director, IR1
U.S. National Park Service

ADD399