## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## CONCISE SUMMARY OF THE CASE

Pursuant to 3rd Cir. LAR 33.3, counsel are required to file a concise summary of the case within **14** days of the date of docketing of the Notice of Appeal. Total statement is limited to no more than 2 pages, single-spaced. Counsel may utilize this form or attach a 2 page statement encompassing the information required by this form.

SHORT CAPTION: City of Philadelphia v. U.S. Dep't of Interior

USCA NO.: 26-1348

LOWER COURT or AGENCY and DOCKET NUMBER:
 26-cv-434 (E.D. Pa.)

NAME OF JUDGE: Cynthia M. Rufe

Specify who is suing whom, for what, and the subject of this action. Identify (1) the nature of the action; (2) the parties to this appeal; (3) the amount in controversy or other relief involved; and (4) the judgment or other action in the lower court or agency from which this action is taken:

1. Nature of Action: The City of Philadelphia brought APA claims and an ultra vires claim against the Federal Government in connection with removal of exhibits at the President's House in Independence National Historical Park.

2. Parties: Defendants-Appellants are the U.S. Department of Interior; the Secretary of the Interior; the Director of the National Park Service; and the National Park Service. Plaintiff-Appellee is the City of Philadelphia.

3. Relief: The City seeks injunctive and declaratory relief.

4. Judgment/Order: This appeal is from the district court's memorandum opinion and order granting the City's motion for a preliminary injunction.

LIST and **ATTACH** a copy of each order, judgment, decision or opinion which is involved in this appeal. If the order(s) or opinion(s) being appealed adopt, affirm, or otherwise refer to the report and recommendation of a magistrate judge or the decision of a bankruptcy judge, the report and recommendation or decision shall also be attached.

The rulings on appeal are the district court's February 16, 2026 memorandum opinion (D. Ct. ECF No. 53) and order (D. Ct. ECF No. 54).

Provide a short statement of the factual and procedural background, which you consider important to this appeal:

On January 22, 2026, the National Park Service removed slavery-focused panels and videos from the President's House—a federal historic site in Independence National Historical Park in Philadelphia—as part of a plan to replace them with new materials. That same day, the City of Philadelphia filed this lawsuit to challenge the removal of the materials. The City also moved for a preliminary injunction seeking immediate restoration of the materials.

The Government opposed, arguing (among other things) that the City lacks standing, that the City's claims are contractual and thus subject to the Tucker Act, that the challenged actions are not reviewable under the APA, and that the City's requested relief would improperly compel the Government to engage in speech that it does not wish to convey. The Government also emphasized that the City's claims were based on a fundamental misinterpretation of 16 U.S.C. § 407n, and that stressed that there was no basis to grant the City's extraordinary request for a mandatory injunction. As confirmed by a sworn declaration from the Park's Superintendent, NPS was securely storing the materials pending the outcome of the case and could reinstall them if ordered to.

On February 16, 2026, the district court issued a mandatory preliminary injunction that required the Government to immediately reinstall the exhibits. The Government appealed and sought an emergency administrative stay and a stay pending appeal. On February 20, this Court (Hardiman, J.) granted the administrative stay in part and referred the request for a stay pending appeal to a motions panel.

Identify the issues to be raised on appeal:

The issues raised by the Government include:
I. Whether the district court erred in finding that the City has standing.
II. Whether the district court erred in holding that this case involves final agency action under the APA.
III. Whether the district court erred in holding that the agency action at issue is not committed to agency discretion by law.
IV. Whether the Tucker Act bars the City's claims and requested relief.
V. Whether the district court misinterpreted 16 U.S.C. § 407n and the contracts at issue and erred in finding that the City established a likelihood of success.
VI. Whether the district court erred in finding that the City established a likelihood of irreparable harm.

This is to certify that this Concise Summary of the Case was electronically filed with the Clerk of the U.S. Court of Appeals for the Third Circuit and a copy hereof served to each party or their counsel of record

this __23__ day of __February__,20__26__ .

/s/ Gregory B. in den Berken
_____
Signature of Counsel

Rev. 07/2015

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| **CITY OF PHILADELPHIA,** |
| **Plaintiff,** |
| **v.** |
| **DOUG BURGUM, *et al*.,** |
| **Defendants.** |

**CIVIL ACTION NO. 26-434**

## <u>MEMORANDUM OPINION</u>

**Rufe, J.**                                                    **February 16, 2026**

> *All history was a palimpsest, scraped clean and reinscribed exactly
> as often as was necessary. In no case would it have been possible,
> once the deed was done, to prove that any falsification had taken
> place.*
>
> George Orwell, *1984*[1]

As if the Ministry of Truth in George Orwell's *1984* now existed, with its motto "Ignorance is Strength," this Court is now asked to determine whether the federal government has the power it claims—to dissemble and disassemble historical truths when it has some domain over historical facts. It does not.

The President's House is a component of Independence National Historical Park that commemorates the site of the first official presidential residence and the people who lived there, including people enslaved by President George Washington. On January 22, 2026, the National Park Service ("NPS") removed panels, displays, and video exhibits that referenced slavery and information about the individuals enslaved at the President's House.

Plaintiff City of Philadelphia ("the City") filed this lawsuit under the Administrative Procedures Act ("APA") against the Secretary of the Interior Doug Burgum, the Department of

---

[1] George Orwell, *1984* at 40 (Penguin Random House LLC, 75th anniversary ed. 2023) (1949).

the Interior, the Acting Director of NPS Jessica Bowron, and NPS, claiming, *inter alia*, that Defendants' removal of the displays is unlawful agency action, arbitrary and capricious, and, alternatively, *ultra vires*.

The City has moved for a preliminary injunction, and after initial briefing by the parties and *amicus* briefs in support of the motion filed by *amici curiae* Commonwealth of Pennsylvania Governor Josh Shapiro, Avenging the Ancestors Coalition ("ATAC") and the Black Journey, and Members of the Democratic Caucus of the Senate of Pennsylvania, the Court held a hearing on January 30, 2026. At the hearing, the City presented evidence. Defendants did not. The Court entertained oral argument from the parties as well as from *amici* ATAC and the Black Journey. The Court then entered a Post-Hearing Order permitting amended briefing and directing that "No further removal and/or destruction of the President's House site will be permitted until further order of the Court."[2]

In turn, the City filed an Amended Complaint and an Amended Motion for Preliminary Injunction and Temporary Restraining Order ("TRO").[3] In the Amended Motion, the City seeks a preliminary injunction to restore the President's House exhibit as it existed on January 21, 2026, and seeks a TRO to temporarily enjoin Defendants from damaging items from the President's House site or making any further alterations to the President's House.[4] Defendants have filed an Opposition,[5] and that Opposition has been considered herein.

---

[2] Post-Hearing Order [Doc. No. 37].

[3] Am. Compl. [Doc. No. 44]; Pl.'s Am. Mot. Prelim. Inj. & TRO ("Pl.'s Am. Mot.") [Doc. No. 45].

[4] Pl.'s Am. Mot. at 1 [Doc. No. 45].

[5] Defs.' Opp'n to Pl.'s Am. Mot. [Doc. No. 52].

# I.   BACKGROUND

In 1948, Congress passed legislation (the "1948 legislation") establishing Independence
National Historical Park "for the purpose of preserving for the benefit of the American people as
a national historical park certain historical structures and properties of outstanding national
significance located in Philadelphia, Pennsylvania, and associated with the American Revolution
and the founding and growth of the United States."[6] In addition to establishing the Park, the
statute authorized the Secretary of the Interior "to enter into cooperative agreements with the city
of Philadelphia to assist in the preservation and interpretation of the property known as
Independence Hall National Historic Site."[7] Such cooperative agreements "shall contain, but
shall not be limited to, provisions that . . . no changes or alterations shall be made in the property
within the Independence Hall National Historic Site, including its buildings and grounds, or in
Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other
parties to the contracts."[8]

In 1950, pursuant to the 1948 legislation, the City entered into an agreement with the
Secretary of the Interior to cooperate in the preservation of the Independence National Historical
Park (the "1950 Agreement").[9] Under the 1950 Agreement, the City retained ownership of the
Independence Hall structures, land, and park area adjacent to Independence Hall.[10] The Secretary
of the Interior, through NPS, was granted an exclusive right to occupy the area "for the purpose
of preserving, exhibiting, and interpreting them to the American people and otherwise utilizing

---

[6] An Act To Provide for the Establishment of the Independence National Historical Park and for Other Purposes,
Pub. L. No. 80-795, 62 Stat. 1061 (codified as amended at 16 U.S.C. §§ 407m, 407n).

[7] 16 U.S.C. § 407n.

[8] *Id.*

[9] Pl.'s Ex. 1, 1950 City-US Cooperative Agreement ("1950 Agreement") [Doc. No. 36-1].

[10] *Id.* at 3.

them and their adjacent grounds for national historical park purposes."[11] The 1950 Agreement

also designated curatorial responsibilities to the Secretary.[12] Under the 1950 Agreement, the City

and the federal government cooperated for decades to preserve, maintain, and expand

Independence National Historical Park.[13]

At the turn of this century, historians identified the location of the first official residence

of the President of the United States, where Presidents Washington and Adams lived during their

terms.[14] This historical research also identified information about nine enslaved Africans whom

President Washington owned, brought to the official presidential residence, and rotated in and

out of Pennsylvania, a practice which prevented enslaved individuals from petitioning for their

freedom under Pennsylvania law.[15] Etched into a wall within the President's House exhibit are

the names of those nine enslaved individuals: Oney Judge, Austin, Christopher Sheels, Giles,

Hercules Posey, Joe Richardson, Moll, Paris, and Richmond.[16] Of those nine, Oney Judge

escaped the house in 1796, eventually making her way to New Hampshire.[17] Hercules also

eventually escaped his enslavement after he was brought to Mount Vernon.[18]

Based on these revelations, the United States House of Representatives in 2003 urged

NPS to commemorate the lives of slaves who were owned by President Washington and who

---

[11] *Id.* at 3.

[12] *Id.*

[13] *See* Pl.'s Ex. 3, 2006 City-US Cooperative Agreement ("2006 Agreement") at 1 [Doc. No. 36-3].

[14] *See* Pl.'s Ex. 14, Request for Qualifications Professional Services Contract ("RFQ") at 2-3 [Doc. No. 36-15]; 1/30/26 Hr'g Tr. at 35-36, 38 [Doc. No. 45-1].

[15] Pl.'s Ex. 10, Application and Approval For President's House in Underground Railroad Network ("Network to Freedom Application and Approval") at 7 [Doc. No. 36-10].

[16] *Id.* at 6.

[17] *Id.* at 14-17.

[18] Pl.'s Ex. 12, 2010 Script for Video Media at 17 [Doc. No. 36-13].

lived on site.[19] Specifically, the House urged NPS "to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy."[20] The House also directed NPS to submit a report detailing the actions taken toward the realization of this project.[21]

According to the testimony of Joyce Wilkerson, Chief of Staff for the City to Mayor John Street from 2000 to 2007, the City became aware of the significance of the President's House site through the emergent historical research and public advocacy.[22] Ms. Wilkerson led the City's involvement in the project.[23] In 2003, the new Liberty Bell Pavilion opened adjacent to the site that would become the President's House. The juxtaposition of the newly placed Liberty Bell and the recently uncovered history of slavery at that spot motivated the City to collaborate with NPS to tell a "fuller story" because "it was finally time to tell an honest story about American history and the founding of this country and the role that slavery and enslaved Africans had . . . as well as the free [African-American] Philadelphians."[24]

To tell this fuller story, the City committed $1.5 million of City funds towards commemoration efforts for the President's House in 2003.[25] Intending to fill gaps in funding the project, this monetary commitment reflected the City's prominent role in moving this project forward" to ensure "the full story be told."[26] In 2005, Congress appropriated $3.6 million for

---

[19] Pl.'s Ex. 2, 2003 House of Representatives Report 107-564 at 46-47 [Doc. No. 36-2].

[20] *Id*. at 47.

[21] *Id*.

[22] 1/30/26 Hr'g Tr. at 34-36, 58 [Doc. No. 45-1].

[23] *Id.* at 44-48.

[24] *Id.* at 37-38.

[25] *Id.* at 39-40.

[26] *Id.*

"Independence National Historic[al] Park scenic enhancement and pedestrian walkways improvement project in conjunction with the [P]ark's Executive Mansion Exhibit."[27] Around that time, NPS and the City began to collaborate by jointly issuing a Request for Qualifications ("RFQ") document for contractors and later by convening an Oversight Committee comprised of stakeholders such as representatives of advocacy groups, historians, and community activists.[28] NPS and the City also agreed that NPS would organize an excavation of the President's House site, with City-approval needed for NPS to select an archeological firm.[29] As the excavation proceeded, NPS was to provide recurring reports regarding its historical findings.[30]

In 2006, pursuant to the founding Congressional legislation, the City and NPS entered into an agreement (the "2006 Cooperative Agreement" or "2006 Agreement") to establish an exhibit at the site of the President's House to "illuminate[] the history of the site of the former President's House."[31] The 2006 Cooperative Agreement established terms of cooperation between the City and NPS "in the planning, development and preparation of the design, fabrication and installation" of the President's House Exhibit.[32] The Agreement established that, upon completion of the Exhibit, ownership of the Exhibit would transfer to NPS.[33] The Agreement also identified that the City's provision of funds for the President's House project fulfilled a public purpose "because it enables the City to commemorate the symbolic and historical importance of the President's House for the City of Philadelphia, its citizens, and all

---

[27] Pl.'s Ex. 17, 2/27/07 City-NPS Press Release ("2/27/07 Press Release") at 2 [Doc. No. 36-18]; Pub. L. No. 109-59, 119 Stat. 1304 (2005).

[28] RFQ [Doc. No. 36-15]; 2/7/07 Press Release at 2 [Doc. No. 36-18].

[29] 2006 Agreement at 5 [Doc. No. 36-3]; Network to Freedom Application and Approval at 20 [Doc. No. 36-10].

[30] 2006 Agreement at 5 [Doc. No. 36-3].

[31] 2006 Agreement at 2 [Doc. No. 36-3].

[32] Id. at 3.

[33] Id.

Americans nationwide, and by doing so, there is a public benefit inuring to the City."[34] The 2006 Cooperative Agreement ensured its "terms, covenants and conditions" extended to and bound the parties and their successors.[35]

The 2006 Cooperative Agreement was subject to a one-year term, which was renewable at the City's option.[36] The 2006 Agreement was then amended and extended in 2007 (the "First Amendment"), 2008 (the "Second Amendment"), and 2009 (the "Third Amendment").[37] The First Amendment provided nearly $26,000 in additional funds to the project from the City.[38] Otherwise, the 2006 Agreement remained unchanged and in full force.[39] The Second Amendment extended the 2006 Agreement, and all other terms and conditions of the 2006 Agreement, as modified by the First Amendment, remained unaltered.[40]

The Third Amendment designated the City as responsible for the "design, fabrication, installation, and completion" of the President's House Project, which would be "owned, maintained, managed, and interpreted" by NPS upon its completion.[41] The City agreed to "undertake and complete in a timely manner, at its sole cost and expense, the Project."[42] The Third Amendment included a Project Development Plan, which was created at the direction of Congressional legislation, to facilitate the objectives of all parties. This Plan specifies that the

---

[34] *Id.*

[35] *Id.* at 12.

[36] *Id.* at 4.

[37] *See* Pl.'s Ex. 4, 2007 First Amendment to Cooperative Agreement ("First Amendment") [Doc. No. 36-4]; Pl.'s Ex. 5, 2008 Second Amendment to Cooperative Agreement ("Second Amendment") [Doc. No. 36-5]; Pl.'s Ex. 6, 2009 Third Amendment to Cooperative Agreement ("Third Amendment") [Doc. No. 36-6].

[38] First Amendment ¶¶ 2-3 [Doc. No. 36-4].

[39] *Id.* ¶ 4.

[40] Second Amendment ¶¶ 2-3 [Doc. No. 36-5].

[41] Third Amendment at 1-2 [Doc. No. 36-6].

[42] *Id.* at 2, Attach. C.

interpretation of the site "will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved."[43] The Project Development Plan also states that "NPS will review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended."[44] The Third Amendment permits amendment or supplementation to the Project Development Plan "by written agreement of the parties."[45]

The Third Amendment institutes a term of one year beginning May 1, 2009.[46] Under this term, the Third Amendment expired on May 1, 2010. However, the Third Amendment also contained a Survival Clause, which states:

> Q. Survival: Any and all provisions which, by themselves or their nature, are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive and be enforceable after the expiration or termination of this Third Amendment. Any and all liabilities, actual or contingent, which have arisen during the term of and in connection with this Third Amendment shall survive expiration or termination of this Third Amendment.[47]

Under the Survival Clause, certain provisions in the 2006 Agreement extend beyond May 1, 2010.

As set forth in the 2006 Agreement and amendments, the City made significant financial contributions to the President's House, including $3.5 million toward the overall project.[48] The project was also funded by the Department of Transportation ($3.6 million) and the Delaware River Port Authority ($3.5 million).[49]

---

[43] *Id.* at Attach. C.

[44] *Id.*

[45] *Id.* at 7.

[46] *Id.* at 9.

[47] *Id.* at 13.

[48] *Id.* at Attach. B.

[49] *Id.*; 12/15/10 Press Release at 3 [Doc. No. 36-24].

The President's House exhibit opened in December 2010.[50] On December 15, 2010, the City and NPS jointly issued a press release announcing the opening of the "President's House: Freedom and Slavery in the Making of a New Nation."[51] The City's involvement in the President's House, however, continued.

Everett Gillison served as the Chief of Staff for Mayor Michael Nutter beginning in 2010.[52] Mr. Gillison managed the project on behalf of the City during his tenure. Mr. Gillison testified to his cooperation with NPS on the President's House, primarily through communication and cooperation with then-Superintendent of Independence National Historical Park, Cynthia MacLeod.[53] Ms. MacLeod would notify Mr. Gillison of any maintenance, improvements, or other action to be taken by the City, and Mr. Gillison would coordinate with her to address such issues and to provide any needed funding.[54] Certain of the primary improvements were to the site's video monitors and the temperature and humidity controls of the President's House ruins, which are fragile.[55]

Mr. Gillison was tasked to "get it done and get it done right."[56] He testified that the completion of the President's House, between 2010 and 2015 was accomplished through a partnership between the City and NPS.[57] He also recognized the crucial role of the public in identifying issues with, maintaining, and promoting the site.[58] The City continued funding the

---

[50] 12/15/10 Press Release at 1 [Doc. No. 36-24].

[51] *Id.*

[52] 1/30/26 Hr'g Tr. at 68 [Doc. No. 45-1].

[53] *Id.* at 72-92.

[54] *Id.* at 76-82.

[55] *Id.* at 78-80.

[56] *Id.* at 74.

[57] *Id.* at 76.

[58] *Id.* at 79.

9

site and further established an approximately $1.5 million endowment to maintain the site going

forward.[59] This endowment was later transferred to NPS after completion of the site in 2015 and

continues to this day.[60] That endowment did not expire or terminate. In early 2016, the City and

NPS finalized an agreement that assigned the intellectual property of the President's House

Project to NPS.[61]

In 2017, NPS issued a Foundation Document for Independence National Historical

Park.[62] The Foundation Document sets forth basic guidance for the Park, describes its purpose,

its reason for inclusion in the national park system, its significance, and its fundamental values

and resources, and sets forth legal and policy requirements, special mandates, and administrative

commitments that apply to the park.[63] Independence National Historical Park's Foundation

Document describes the President's House as "where George Washington and John Adams and

their households lived and worked during their terms as the first and second presidents of the

United States . . . [and] is interpreted by the park, especially in the paradox of the Washingtons

bringing their enslaved people to work and live there."[64] NPS specifically identifies this

"Paradox of Freedom and Slavery" as crucially significant to Independence National Historical

Park.[65]

In describing the "fundamental" archeological resources of the park, NPS describes

archeological investigations at the President's House site "which revealed physical connections

---

[59] *Id.* at 88-89.

[60] *Id.* at 93.

[61] Pl.'s Ex. 7, 2015 City-US Assignment of IP Rights ("IP Rights Assignment") [Doc. No. 36-7].

[62] Pl.'s Ex. 8, 2017 Independence National Historical Park Foundation Doc. ("Foundation Doc.") [Doc. No. 36-8].

[63] *See generally id.*

[64] *Id.* at 5.

[65] *Id*. at 9.

to the enslaved in President George Washington's household. This information was used to guide future development at the site. Based on these discoveries, the park designed its first community-based exhibition at the President's House archeological site that interprets race and slavery in its historic context."[66] The Foundation Document also identifies "Pioneering Partnerships and Collaboration" as a "fundamental value" of the park, noting "[t]he dynamic role of partnerships at the park is best illustrated by Independence National Historical Park's close working relationship with the City of Philadelphia."[67]

NPS's Foundation Document also details "Interpretive Themes" for the park, including "Liberty: The Promises and Paradoxes," explaining that "[t]he promises of liberty and equality granted in the founding documents present a paradox: not only are they ideals to strive for but they are unfulfilled promises for people who struggle to be fully included as citizens of our nation."[68]

In April 2022, the President's House was nominated to be a National Underground Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act of 1998.[69] The Act directs NPS to establish a "National Underground Railroad Network to Freedom" ("Network to Freedom") program and to "produce and disseminate appropriate educational materials," and authorizes the Secretary of the Interior to enter into cooperative agreements and to make grants in furtherance of the goals of preservation and restoration of historic buildings associated with the Underground Railroad.[70]

---

[66] *Id*. at 11.

[67] *Id*. at 12.

[68] *Id*. at 13.

[69] Network to Freedom Application and Approval [Doc. No. 36-10]; National Underground Railroad Network to Freedom Act of 1998, Pub. L. No. 105-203, 112 Stat. 678 (1998) (current version at 54 U.S.C. §§ 308301-308304).

[70] 54 U.S.C. §§ 308302(a), 308302(b).

The President's House was nominated as a Network to Freedom site because it was the location where Oney Judge escaped to freedom.[71] In September 2022, the Superintendent of the Independence National Historical Park consented to the site's inclusion in the Network to Freedom.[72] NPS thereafter designated the President's House as a National Underground Railroad Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act.

On March 27, 2025, the President issued Executive Order ("EO") 14253—"Restoring Truth and Sanity to American History."[73] EO 14253 provides, in relevant part:

**Section 1.** *Purpose and Policy.* Over the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth. This revisionist movement seeks to undermine the remarkable achievements of the United States by casting its founding principles and historical milestones in a negative light.

. . . .

It is the policy of my Administration to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing. Museums in our Nation's capital should be places where individuals go to learn—not to be subjected to ideological indoctrination or divisive narratives that distort our shared history.

. . . .

**Sec. 4**. *Restoring Truth in American History.*

(a) The Secretary of the Interior shall:

. . . .

(iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar

---

[71] Network to Freedom Application and Approval at 1 [Doc. No. 36-10].

[72] *Id.* at 28.

[73] Exec. Order No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.[74]

On January 22, 2026, as admitted by Defendants, NPS removed 34 educational panels from the Presidents House that referenced slavery, and further, deactivated video presentations that accompany these educational panels.

## II.    STANDING

The City alleges APA violations under 5 U.S.C. § 702 and § 706, and alternatively that NPS's conduct was *ultra vires*.[75] Before considering the merit of those claims, the Court examines standing and other threshold issues.

The City argues that it has standing based upon the public benefit that inured to it, at its expense and through its leadership, once the President's House exhibit was completed.[76] The City also argues that it suffered an injury because Defendants' removal of slavery-related panels ran afoul of the requirements for mutual agreement in the 1948 legislation, 1950 Agreement, and 2006 Agreement.[77] Defendants, by contrast, contend that the 1948 legislation and 1950 Agreement did not create a legally protected interest as to the President's House. The provisions therein, Defendants insist, only required mutual agreement for changes to the Independence Hall National Historic *Site*—a term that Defendants read not to encompass the President's House.[78]

---

[74] *Id.* §§ 1, 4.

[75] Am. Compl. ¶¶ 77-138 [Doc. No. 44].

[76] Mem. L. Supp. Pl.'s Am. Mot. at 28-29 [Doc. No. 45].

[77] 1/30/26 Hr'g Tr. at 154 [Doc. No. 45-1]; Am Compl. ¶¶ 110-13 [Doc. No. 44].

[78] Defs.' Opp'n to Pl.'s Am. Mot. at 7-9 [Doc. No. 52].

Defendants also deny the 2006 Agreement as a basis for standing and argue that the City's property interest in the project ceased under the Third Amendment.[79]

Federal court jurisdiction is limited to "Cases" and "Controversies."[80] A plaintiff must have standing to sue in order for an action to be a case or controversy.[81] Standing requires a plaintiff show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[82] An injury in fact requires an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[83] An injury is concrete if it is "real" and "actually exist[s]," and an injury is particularized if it "affect[s] the plaintiff in a personal and individual way."[84]

The City's interest in the President's House is not only as a representative of the public. The President's House resulted from decades of cooperation between the City and the federal government, enshrined by Congressional legislation, Foundation Documents, and funding.

Congress envisioned that collaboration when establishing Independence National Historical Park in the 1948 legislation.[85] The legislation authorizes the Secretary of the Interior "to enter into cooperative agreements with the city of Philadelphia to assist in the preservation and interpretation of the property," and requires that such cooperative agreements include a term that states "no changes or alterations shall be made in the property within the Independence Hall

---

[79] *Id.* at 10.

[80] U.S. Const. art. III, § 2.

[81] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

[82] *Id*.

[83] *Id*. at 339 (internal quotation marks omitted).

[84] *Id*. at 339-40 (internal quotation marks omitted).

[85] *See* 16 U.S.C. §§ 407m, 407n.

National Historic Site, including its buildings and grounds . . . except by mutual agreement."[86]

As anticipated, the parties then executed a series of cooperative agreements.

First, the City and the Secretary of the Interior entered into the 1950 Agreement. In doing

so, they consented to terms that recognized the City's ownership interests in components of

Independence National Historic Park and the corresponding need for bilateral decision-making.

The 1950 Agreement provides that the City "retain[s] ownership of the Independence Hall group

of structures and of the land whereon they are erected and the park area adjacent thereto known

as Independence Square."[87] It then adds that:

- "Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon."[88]

- "[N]either of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the building or grounds without the written consent of the other."[89]

- "[I]t is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States, and to secure this result a high degree of cooperation is necessary with each other . . . and the parties hereto pledge themselves to consult on all matters of importance to the project."[90]

The 1950 Agreement indisputably remains in effect. By its terms, it "shall continue in effect until

such time as Congress enacts legislation inconsistent with its continuance or expressly providing

for its termination."[91]

---

[86] 16 U.S.C. § 407n.

[87] 1950 Agreement at 3 [Doc. No. 36-1].

[88] *Id.* at 5.

[89] *Id.* at 6.

[90] *Id.*

[91] *Id.* at 7.

The City and NPS deepened their collaboration by concluding the 2006 Cooperative Agreement and its subsequent amendments. The 2006 Cooperative Agreement, as modified by the Third Amendment, incorporates the Project Development Plan, which specifies that the site's interpretation would "focus on the house and the people who lived and worked there, . . . the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved."[92] The Plan also stated that NPS would "review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended."[93]

Although the 2006 Agreement, as updated by the Third Amendment, ceased as of May 1, 2010,[94] the terms in its Project Development Plan remained effective under the Third Amendment Survival Clause. The Survival Clause states that "provisions which, by themselves or their nature are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive."[95] Because the President's House project was not contemplated to be completed by the expiration of the Third Amendment, it was reasonably expected that terms relating to the Project Development Plan would remain in effect to ensure that the commemorative exhibit was realized in accordance with the parties' initial plan. While the Third Amendment granted NPS the right to interpret the exhibit after it was completed, it is the Project Development Plan that established the interpretive framework that NPS would employ. Profound alterations to that framework, seen here in the effort to remove all references to slavery, African-American Philadelphia, and the move to freedom for the enslaved, would, under the Project Development Plan, require the written approval of both the City and NPS. Accordingly, the

---

[92] Third Amendment at Attach. C [Doc. No. 36-6].

[93] *Id.* at 9.

[94] *Id.* at 13.

[95] *Id.* at 13.

evidence presented to the Court to date proves the 2006 Cooperative Agreement and amendments provide inclusive rights to the City, which continue and remain in full force and effect today.

Further, the 1948 legislation authorized the 2006 Cooperative Agreement and subsequent amendments. While these agreements do not explicitly contain a term that "no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds . . . , except by mutual agreement between the Secretary of the Interior and"[96] the City, the Department of the Interior, through NPS, is statutorily required to include such a term. The agency lacks authority or discretion to delete or ignore this term. Accordingly, this Court must apply that term to the parties' working relationship, pursuant to the 1948 legislation.[97] Such a fundamental term that is required by Congress is also reasonably expected to remain in effect under the Survival Clause.

Under the terms of the 1950 Agreement, 2006 Cooperative Agreement and amendments thereto, and 16 U.S.C. § 407n authorizing the agreements, the City has a statutory right and expectation to mutual agreement on any changes or alterations to the Park, including the President's House, to written agreement for placement of any monument or memorial, and to consultation on all matters of importance to the Park. Removal of the President's House displays invaded this legally protected interest.

This interest is concrete, particularized, and actual. The City is particularly identified as a party in the 1950 Agreement and 1948 legislation, and the City owns certain subject land and

---

[96] 16 U.S.C. § 407n.

[97] *See, e.g., McClain v. Delaware Cnty. Tax Claim Bur.*, 344 A.3d 1149, 1157 (Pa. Commw. Ct. 2025) (holding that to the extent an agreement did not comport with the relevant statute, the agreement violated the statute, and stating that "[t]he terms of the contract must yield to the mandates of the statute").

17

buildings in the Park, as well as the defining landmarks of the Park—Independence Hall and the Liberty Bell.[98] The removal affects the City in a personal and individualized way. The injury impacts not just the City's statutory rights, but also the City's tourism,[99] use of approximately $5 million of the City's funds to establish and maintain the project,[100] and its promotion of its history in advance of the 250th anniversary of the founding of the United States of America.[101] Accordingly, the City has established it has Article III standing.[102]

The Court is not persuaded by Defendants' contention that the City's interest is restrained to the portion of the Park that is Independence Hall National Historic *Site*. Although that term was defined in 1943 to encompass the Independence Square land bound by Walnut, Fifth, Chestnut, and Sixth Streets,[103] the City's agreement is still required for changes that occur within the Park's broader territory. After all, § 407n also mandates that the Secretary of the Interior obtain approval from contractual parties for alterations to Carpenters' Hall, which is not part of

---

[98] *See* 1/30/26 Hr'g Tr. at 38 [Doc. No. 4-1]; 1950 Agreement at 3 [Doc. No. 36-1].

[99] *See* 1/30/26 Hr'g Tr. at 104-08 [Doc. No. 45-1].

[100] *See, e.g.*, *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 262 (6th Cir. 2009) (concluding that the plaintiff school districts, which expended funds to comply with federal education standards, established an injury in fact to challenge those standards).

[101] The Court notes that the government described this celebration as the "250th birthday" of the federal government, Defs.' Opp'n Mot. Prelim. Inj. at 6 [Doc. No. 27], but the signing of the Declaration of Independence on July 4, 1776 did not, in fact, create the federal government. Even the Articles of Confederation, establishing a central government, were not adopted by the Continental Congress until 1777. Indeed, the federal government as currently established is more appropriately traced to the adoption of the Constitution in 1789.

[102] *See City of Lafayette, La. v. SEC*, 481 F.2d 1101, 1103 n.3 (D.C. Cir. 1973) ("The Cities satisfy the standing requirement by alleging injury in fact and a non-frivolous claim that the 1935 Act requires consideration of the Cities' contentions in an acquisition proceeding."); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) ("In this Circuit we have found standing for a city suing an arm of the federal government when a harm *to the city itself* has been alleged.").

[103] *See* Independence Hall National Historic Site. 8 Fed. Reg. 7207, 7283 (June 1, 1943).

the Independence Square block.[104] The region of the Park that is subject to bilateral decision-making is therefore ambiguous.[105]

As the Court finds, the legislative record and understanding of § 407n by the parties resolve that ambiguity. The House Report summarizing § 407n states that the underlying bill was amended to "provide for the establishment of a suitable Advisory Commission" representing entities including Pennsylvania and the City of Philadelphia.[106] The reason for this Commission, the Report clarifies, is "to coordinate for the preservation and exhibition" of the Park's "various areas for the benefit and inspiration of the people of the United States."[107] Moreover, NPS and the City have consistently relied upon § 407n as a source of statutory authority for conducting cooperative agreements that relate to the development of the President's House.[108] Defendants' argument ignores both these cooperative agreements and the mission of the 1948 legislation to provide for the commemoration of "Independence Hall, Carpenters' Hall, and *surrounding historic sites and buildings*," a portion of which are owned by the City.[109] The Court declines to adopt an interpretation that would effectively divide the park in two.

Courts also apply a prudential standing analysis, which requires "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory

---

[104] 16 U.S.C. § 407n; Foundation Doc. [Doc. No. 36-8].

[105] *See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 473 n.27 (1985) (noting that a statute is ambiguous if it is "reasonably susceptible of different interpretations"); *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (observing that courts should consider legislative history only where the statutory language is ambiguous).

[106] H.R. Rep. No. 80-1819 at 4 (1948).

[107] *Id.*

[108] *See United States v. Hayes*, 555 U.S. 415, 418 (2009) (preferring an interpretation that favors the statute's manifest purpose).

[109] H.R. Rep. No. 80-1819 at 1 (1948).

provision or constitutional guarantee invoked in the suit."[110] The zone of interests test applies to suits under the APA,[111] and "is most usefully understood as a gloss on the meaning of [5 U.S.C.] § 702."[112] Under that provision, a party has standing to bring a suit under the APA if it suffered a "legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action within the meaning of a relevant statute."[113] The interest may reflect "aesthetic, conservational, and recreational" values, and standing may stem from them.[114]

The 1948 statute explicitly refers to, authorizes, and prescribes requirements for cooperative agreements between the City and the federal government. In developing this legislation, the House of Representatives stated in one House Report that "[t]he proposed Independence National Historical Park is one part of an integrated three-part program of improvement to be shared alike by the city of Philadelphia, the State of Pennsylvania, and the Federal Government, for the preservation and exhibition of these sites and buildings."[115] Further, in reference to the cooperative agreements, the Report describes the need for the agreements for the project to include land still owned by the City, and that the agreements "will provide the basis for an integrated program shared equally by the city, State, and Nation in a manner appropriate to the broad national and patriotic objectives implicit in the entire project."[116] This reflects an intent for the city to have a shared interest in the exhibition of the sites.

---

[110] *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted).

[111] *Id*. at 163 (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970); *Barlow v. Collins*, 397 U.S. 159 (1970)).

[112] *Clarke v. Secs. Indus Ass'n*, 479 U.S. 388, 400 n.16 (1987).

[113] 5 U.S.C. § 702.

[114] *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970).

[115] H.R. Rep. No. 80-1819 at 5 (1948) (emphasis added).

[116] *Id.* at 8.

The City, specifically named in the 1948 legislation and House Report, and party to the 1950 and 2006 Agreements, and its subsequent amendments, is within the class of aggrieved persons who suffered a legal wrong from agency action and is within the zone of interests contemplated by the 1948 legislation. The City has both Article III and prudential standing.

## III.   JURISDICTION AND REVIEWABILITY

The City next argues that it has established that NPS's removal of slavery-related displays is a final agency action under the APA and that no other statutes preclude judicial review by this Court.[117] Defendants disagree, contending that a final agency action has not occurred, that NPS's conduct was committed to discretion, and that the City's claims are barred by the Tucker Act.[118] The Court addresses the first three APA-related arguments before turning to the Tucker Act.

5 U.S.C. § 702 of the APA waives sovereign immunity for "actions for non-monetary relief against an agency,"[119] so sovereign immunity does not bar the City's claims, so long as the plaintiff shows those claims are valid under the APA. To do so, the plaintiff must challenge a "final agency action for which there is no other adequate remedy in court," demonstrate that "[no] statute precludes judicial review," and must establish that agency action is not "committed to agency discretion by law."[120]

Here, the City has challenged a final agency action. An agency "action," as defined by the APA, "includes the whole or part of an agency rule, order, license, sanction, relief, or the

---

[117] Mem. L. Supp. Pl.'s Am. Mot. at 24-25, 29 [Doc. No. 45].

[118] Defs.' Opp'n to Pl.'s Am. Mot. at 14-25 [Doc. No. 52].

[119] *Treasury of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 398 (3d Cir. 2012) (internal citations omitted).

[120] *Bennett* 520 U.S. at 175 (citing 5 U.S.C. §§ 704, 701(a)).

equivalent or denial thereof, or failure to act."[121] This broad definition "is meant to cover comprehensively every manner in which an agency may exercise its power."[122] Removing the displays from the President's House is an exercise of the Department of the Interior and NPS's agency powers. And, contrary to Defendants' arguments, the dismantling of the President's House is not an unreviewable act of "day-to-day operations"[123] but rather a jarring alteration to the integrity of the site. Therefore, it is agency action.

An agency action is final if "the action . . . mark[s] the 'consummation' of the agency's decisionmaking process . . . . And second, the action . . . [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.' "[124] The removal of displays is clearly the consummation of a decision-making process—a unilateral one. The action also occasions legal consequences. The President's House resulted from collaboration between the City and NPS, as envisioned by the 1948 Congressional legislation and carried out in the parties' course of dealing through joint agreements, the RFQ document, press releases, and the sustained maintenance of the completed site. The removal of the slavery displays therefore undermines the City's statutory and long-running interests in the completion of Independence National Historical Park and the President's House. Further, NPS's removal of the displays interferes with tourism to the City, the City's intention to represent its own history, and the

---

[121] 5 U.S.C. §§ 551(13), 701(b)(2).

[122] *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 478 (2001) (citing *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980)).

[123] Defs.' Opp'n to Pl.'s Am. Mot. at 20 [Doc. No. 52].

[124] *Bennett*, 520 U.S. at 177-78 (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)) (citation omitted).

City's contribution of approximately $5 million to unearth, present, and maintain that history.[125] The City has thereby established finality as well.

Next, no exception to APA reviewability applies. No statute precludes judicial review, and this action is not committed to agency discretion by law. Neither 16 U.S.C. § 407n nor the agreements between the City and the government assign discretion to the Department of the Interior or NPS to unilaterally transform the purpose, interpretation, and exhibits at the President's House. Because § 407n imposes judicially administrable standards on NPS's unilateral decision-making, the Court need not substitute its discretion for that of the agency.[126]

The Court must next address whether the Tucker Act constitutes a complete or partial bar to the Court's review of the City's APA claims under 5 U.S.C. § 702 and § 706.

The Tucker Act states that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon . . . any express or implied contract with the United States."[127] Pursuant to the Tucker Act, litigants may seek monetary relief in the Court of Federal Claims, but not equitable relief, as "the Claims Court does not have the general equitable powers of a district court to grant prospective relief."[128] Crucially, the Tucker Act "impliedly forbids" district courts from reviewing APA claims if the "source of the rights upon which the plaintiff bases its claims" is contractual rather than statutory, constitutional, or predicated upon any other legal ground.[129]

---

[125] *See* 1/30/26 Hr'g Tr. at 88-89, 104-08 [Doc. No. 45-1]; Third Amendment at Attach. B [Doc. No. 36-6].

[126] *See Hecker v. Chaney*, 470 U.S. 821, 830 (1985).

[127] 28 U.S.C. § 1491(a)(1).

[128] *Bowen v. Mass*., 487 U.S. 879, 905 (1988); *see also* 14 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 3657 (4th ed. 2025) (noting that the Tucker Act "confers jurisdiction over claims against the United States for money damages").

[129] *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

The Supreme Court recently provided guidance to determine when the Tucker Act forecloses a district court's jurisdiction over a claim challenging a federal policy. Reviewing a district court's ruling declaring unlawful and vacating policies that forbade grants related to diversity, equity, and inclusion, gender identity, and COVID-19, a majority of the Court found the district court had jurisdiction to determine that the manner in which the government terminated the grants violated the APA.[130] As in that case, the City claims that public officials "have acted contrary to their statutory mandate and in conflict with statutory . . . requirements . . . . This is the stuff of APA litigation."[131] As an exception, however, the Court agrees with Defendants that the Tucker Act impliedly forbids the City from obtaining relief for its "Breach of Contract Claim"[132] under 5 U.S.C. § 702 (Amended Complaint, Count 1), since that claim requests specific performance because NPS "breached the Agreements,"[133] a presentation that undeniably sounds in contract. The Court therefore will not rest its instant decision on the § 702 claim as pleaded.

Apart from the City's claim under 5 U.S.C. § 702, the Court concludes that it has jurisdiction to review the City's APA claims.

## IV.    LEGAL STANDARD

When considering whether to grant a motion for a preliminary injunction, courts must consider four factors under Federal Rule of Civil Procedure 65: (1) likelihood of success on the merits; (2) likelihood of irreparable harm to the movant in the absence of relief; (3) balance of

---

[130] *Nat'l Insts. of Pub. Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661-62 (2025) (Barrett, J., concurring in the judgment).

[131] *Am. Pub. Health Ass'n v. Nat'l Insts. of* Health, 786 F.Supp.3d, 237, 262 (D. Mass. 2025), *aff'd in part, Nat'l Insts. of Pub. Health*, 145 S. Ct. at 2858.

[132] Mem. L. Supp. Pl.'s Am. Mot. at 23 [Doc. No. 45].

[133] Am. Compl. ¶ 81 [Doc. No. 44].

the harms between the plaintiff on one hand and the defendants on the other; and (4) the public interest.[134] When the government is the defendant, the third and fourth factors may be considered together.[135] Generally, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[136]

The issues of likelihood of success on the merits and irreparable harm are considered first, as they are the "most critical."[137] If the movant satisfies its burden on these factors, the court considers whether "the balance of equities tips in [the movant's] favor" and whether "an injunction is in the public interest."[138]  The court then assesses "whether the balance of all four factors warrants granting preliminary relief."[139]

## V.   DISCUSSION

### A.      Plaintiff is Likely to Succeed on the Merits

The Court proceeds to consider the City's three APA claims that allege arbitrary and capricious agency action, as well as its *ultra vires* claim. Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[140] The City has demonstrated a likelihood of success on the claim that NPS's removal of the panels and further changes to the President's House without any consultation with, notification of, or cooperation with the City are arbitrary and capricious and that Defendants' actions are in excess of their authority.

---

[134] *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 178 (3d Cir. 2018); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[135] *Smith v. City of Atl. City*, 138 F.4th 759, 779 (3d Cir. 2025).

[136] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[137] *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (internal quotation marks omitted).

[138] *Winter*, 555 U.S. at 20.

[139] *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (brackets omitted).

[140] 5 U.S.C. § 706(2)(A).

1.      Arbitrary and Capricious Claims

Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[141]

The City alleges that the government acted in an arbitrary and capricious fashion (1) in violation of the National Underground Network to Freedom Act of 1998, (2) in violation of the 1948 legislation codified at 16 U.S.C. §§ 407m-n, and (3) in violation of NPS's own Foundation Document. The government's only provided rationale for the action is EO 14253, and there is no record evidence that Defendants notified, consulted with, or sought mutual agreement from the City.

a.      *Arbitrary and Capricious in Violation of the National Underground Railroad Network to Freedom Act of 1998*

The National Underground Railroad Network to Freedom Act of 1998 required the Secretary of the Interior to establish a national network of Underground Railroad sites and to "produce and disseminate appropriate educational materials."[142] The Congressional statutory directive to identify and commemorate sites along this Network to Freedom was explicitly motivated by the United States' Congressional intent to "preserve and protect" the sites.[143] In 2022, NPS supported the inclusion of the President's House site in the Network to Freedom, thereby recognizing the escape of Oney Judge in a manner consistent with the Third

---

[141] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[142] 54 U.S.C. § 308302.

[143] H.R. Rep. 105-559 at 4 (1998).

Amendment's Project Development Plan. The Project Development Plan stated that the

President's House interpretation would highlight "the move to freedom for the enslaved."[144]

In removing displays from the President's House, NPS removed educational materials

about Oney Judge, her escape to freedom, and her life in New Hampshire after she escaped.[145]

By removing this information, NPS conceals crucial information linking the site to the Network

to Freedom. Moreover, Defendants' removal of the displays discounted the purpose of the

Network: to preserve and protect historical sites like that of Oney Judge's bondage and escape.

Although Defendants argue that the National Underground Network to Freedom Act of

1998 does not expressly preclude alterations to sites in the Network,[146] their decision to excise

Oney Judge's story from the Network runs counter to Congressional directives and to the Act's

legislative intent. Because, on this preliminary record, Defendants failed to consider those all-

important aspects of their decision, the City is likely to prevail on its claim that Defendants'

agency action was arbitrary and capricious in violation of the National Underground Railroad

Network to Freedom Act of 1998.

        b.     *Arbitrary and Capricious in Violation of 16 U.S.C. §§ 407m, 407n*

The City also alleges the removal was arbitrary and capricious in violation of the 1948

Congressional legislation. The 1948 legislation established Independence National Historical

Park and authorized the Secretary of the Interior to engage in cooperative agreements. Under 16

U.S.C. § 407n, those cooperative agreements are required to reflect the understanding that "no

changes or alterations shall be made in the property within the Independence Hall National

Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual

---

[144] Third Amendment at Attach. C [Doc. No. 36-6].

[145] *See generally* Network to Freedom Application and Approval [Doc. No. 36-10].

[146] Defs.' Opp'n to Pl.'s Am. Mot. at 23-24 [Doc. No. 52].

agreement between the Secretary of the Interior and the other parties to the contracts."[147] The

1950 Agreement and the related 2006 Cooperative Agreement and subsequent amendments were

created pursuant to this legislation. However, the government did not seek agreement from the

City, nor did the government notify the City of its intended actions.

The terms of the 1950 Agreement require that: "any work of restoration or any major

alterations or repairs to any of the buildings shall not be undertaken until the plans for such work

have been mutually agreed upon"; that "neither of the parties to this agreement will erect or

place, or permit the erection or emplacement of any monument, marker, tablet or other memorial

in or upon the buildings or grounds without the written consent of the other"; and that the parties

"pledge themselves to consult on all matters of importance to the program."[148]

As an initial matter, the removal of the interpretive heart of a core component of

Independence National Historical Park—its display of slavery—denies the importance of the

2006 Cooperative Agreements and amendments to preserve this history to educate the public.

By failing to consult with the City on this significant decision, Defendants likely violated the

terms of the 1950 Agreement.

Defendants' removal of the President's House displays also disregards the 2006

Agreement and amendments thereto. The Third Amendment contained the Project Development

Plan, which, as discussed, this Court finds to remain in full force and effect through the Third

Amendment's Survival Clause. That Plan states that site interpretation will focus on people who

lived and worked at the President's House as well as the move to freedom for the enslaved.[149]

---

[147] 16 U.S.C. § 407n. To the extent Defendants argue that § 407n cannot support an arbitrary and capricious
challenge because its scope is limited to the Independence Hall National Historic *Site*, this Court disagrees. *See
supra* § 2 (discussing standing).

[148] 1950 Agreement [Doc. No. 36-1].

[149] Third Amendment at Attach. C [Doc. No. 36-6].

Alteration of this term requires written agreement of the parties.[150] Here, there has been no written alteration of the Plan. As such, the removal violated the agreed-upon interpretive framework and, by extension, the 2006 Cooperative Agreement and amendments.

In sum, the record indicates that Defendants failed to consider statutorily authorized and directed Agreements between the City and the government, and the government's obligations thereto, all in violation of the 1948 legislation. Defendants' professed rationale, EO 14253, specifically directs the Secretary of the Interior to take action "as appropriate and consistent with applicable law."[151] It does not and cannot confer to Defendants any authority to violate or disregard Congressional intent. The City is likely to prevail on its claim that Defendants' agency action was arbitrary and capricious in disregarding applicable law that mandated mutual assent.

> c.    *Arbitrary and Capricious in Violation of NPS Foundation Document for Independence National Historical Park*

NPS's Foundation Document is the governing document for Independence National Historical Park. The Foundation Document, which describes the Park's purpose, significance, values, and interpretive themes, specifically identifies the paradoxical nature of the Liberty Bell and Independence Hall representing freedom for the colonists while the history of President Washington at the President's House relied substantially on slavery.[152] The "Paradox of Freedom and Slavery" is one of the enumerated statements of significance about the Park.[153] "Pioneering Partnerships and Collaboration," specifically with the City, is an explicitly listed fundamental value of the Park.[154] The second enumerated "Interpretive Theme" is "Liberty: The Promises and

---

[150] *Id.*

[151] Exec. Order No. 14253, 90 Fed. Reg. 14563, 14564 (Mar. 27, 2025).

[152] Foundation Doc. at 5, 9 [Doc. No. 36-8].

[153] *Id.* at 9.

[154] *Id.* at 12.

Paradoxes," which recognizes the ideals of the founding era both as aspirational and as false promises for people who "struggle to be fully included as citizens of our nation."[155] The removal of displays recognizing the paradox of slavery and freedom at the President's House therefore conflicts with NPS's own interpretive themes and directives about the site.

The Foundation Document clearly emphasizes the role of slavery and the importance of recognizing paradoxes at Independence National Historical Park. The President's House is also identified as a significant component of the Park. Removing the President's House displays represents a sharp turnaround in agency policy, for which no "reasoned explanation" has been provided.[156] Indeed, Defendants have provided no record evidence showing NPS's "awareness that it is changing its position" regarding the truthfulness of the display materials.[157] The removals disregard the still-controlling Foundation Document.

Defendants argue in supplemental briefing that their policy reversal does not amount to arbitrary and capricious agency action because the Foundation Document lacks binding force."[158] The Court is not convinced. Defendants cite one district court case and one D.C. Circuit case in support of their position.[159] However, more recent cases in the D.C. Circuit have embraced the notion that agencies are accountable to explain drastic shifts in policy even when the "changed policy ar[ises] from an action without the force of law."[160] A recent Supreme Court case also

---

[155] *Id.* at 13.

[156] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[157] *Id.*

[158] Defs.' Opp'n to Pl.'s Am. Mot. at 24 [Doc. No. 52].

[159] *Horses of Cumberland Island v. Haaland*, No. 23-cv-1592, 2024 WL 5430835, at *11 (N.D. Ga. Nov. 8, 2024); *The Wilderness Soc. v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006).

[160] *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (reviewing an agency's reasons for departing from a policy based on Congressional testimony and a "guidance" document); *Ctr. Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 74-75 (D.C. Cir. 2023).

supports this trend.[161] In light of that case law, the preliminary nature of relief sought, and absence of any "highly technical" decisions "that are in the agency's province of expertise,"[162] the Court finds the Foundation Document to be an adequate basis upon which to consider NPS's change in policy.

Defendants' only proffered rationale for NPS's policy shift is EO 14253. But EO 14253 does not offer a reasoned explanation for NPS's removal of the displays. The government shrugs off NPS's action as within its power and discretion, but that action violates the expressed intention of the same EO the government claims motivated it. EO 14253 seeks to prevent revisionist attempts to "replace[] objective facts with a distorted narrative."[163] NPS's action did the opposite, by dismantling objective historical truths.

It is not disputed that President Washington owned slaves. *Amici* ATAC and the Black Journey summarize their roles at the President's House:

> The people who [President Washington] held in slavery include: [Oney] Judge (Staines), who was held in slavery as a maid to Martha Washington; Austin, [Oney]'s brother; Christopher [Sheels], who was held in slavery as President Washington's body servant; Giles, who was held in slavery as a carriage driver and driver of wagons; Hercules Posey, who was held in slavery as a chef to the Washingtons; Joe Richardson, who was held in slavery as a coachman; Moll, who was held in slavery as a nanny for Martha Washington's grandchildren; Paris, who was held in slavery as a stable worker; and Richmond, who was the son of Hercules and held in slavery as a chimney sweep.[164]

---

[161] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 217 (2016) (examining a change in policy that was originally disseminated in an opinion letter).

[162] *Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 549 (3d Cir. 2023).

[163] Exec. Order No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

[164] ATAC & The Black Journey Amicus Br. at 5-6 [Doc. No. 25]. The record evidence submitted at the January 30, 2026 hearing supports this factual summary as to the nine individuals. *See* Network to Freedom Application and Approval [Doc. No. 36-10]; Pl.'s Ex. 11, Photos of Site [Doc. Nos. 36-11. 36-12]; Pl.'s Ex. 12, 2010 Script for Video Media [Doc. No. 36-13].

Some escaped to freedom, including Oney Judge. The President's House displays recognized Oney Judge and focused on how her struggle for freedom represented this country's progress away from the horrors of slavery and into an era where the founding ideals of "Life, Liberty and the pursuit of Happiness"[165] could be embodied for every American.

And yet, in its argument, the government claims it alone has the power to erase, alter, remove and hide historical accounts on taxpayer and local government-funded monuments within its control. Its claims in this regard echo Big Brother's domain in Orwell's *1984*, where:

> The largest section of the [government's] Records Department . . . consisted simply of persons whose duty it was to track down and collect all copies of books, newspapers, and other documents which had been superseded and were due for destruction. A number of the *Times* [a newspaper] which might, because of changes in political alignment, or mistaken prophesies uttered by Big Brother, have been rewritten a dozen times still stood on the files bearing its original date, and no other copy existed to contradict it. Books, also, were recalled and rewritten again and again, and were invariably reissued without any admission that any alteration had been made. Even the written instructions [for workers in the Records Department] . . . never stated or implied that an act of forgery was to be committed; always the reference was to slips, errors, misprints, or misquotations which it was necessary to put right in the interests of accuracy.[166]

The government here likewise asserts truth is no longer self-evident, but rather the property of the elected chief magistrate and his appointees and delegees, at his whim to be scraped clean, hidden, or overwritten. And why? Solely because, as Defendants state, it has the power. At oral argument, Defendants insisted:

> Although many people feel strongly about this one way, other people may disagree or feel strongly another way. Ultimately, it is in this context that the Government gets to choose the message it wants to convey.
>
> . . . .

---

[165] The Declaration of Independence para. 2 (U.S. 1776).

[166] George Orwell, *1984* at 40 (Penguin Random House LLC, 75th anniversary ed. 2023) (1949).

. . . [T]he message that the Government chooses to convey is for the Government to choose. I don't get to choose what that message is. And it's our position that the City doesn't either.[167]

An agency, whether the Department of the Interior, NPS, or any other agency, cannot arbitrarily decide what is true, based on its own whims or the whims of the new leadership, regardless of the evidence before it. Accordingly, the City is likely to prevail on its claims that the removal was arbitrary and capricious.

### 2. *Ultra Vires* Claim

In addition to its APA claims, the City presents an *ultra vires* claim, which it urges the Court to consider, should the Court find that relief does not lie under the APA.[168] Defendants deny that an *ultra vires* claim is cognizable because of the Tucker Act's implied prohibition on such a claim and because of the absence of strict statutory guardrails.[169]

Prior to the enactment of the APA, there had existed "a right to equitable relief where an agency's action was *ultra vires*—that is, unauthorized by any law and . . . in violation of the rights of the individual."[170]  There are strict boundaries to non-statutory *ultra vires* review. It "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to *a specific prohibition*' in a statute."[171] *Ultra vires* review is unavailable if a statutory review scheme provides a meaningful and adequate opportunity for judicial review for aggrieved persons or a statutory scheme forecloses all other opportunities for judicial review.[172] Accordingly, the City's *ultra vires* claim is as an alternative ground for relief under which the

---

[167] 1/30/26 Tr. at 141 [Doc. No. 45-1].

[168] Mem. L. Supp. Pl.'s Am. Mot. at 37-38 [Doc. No. 45].

[169] Defs.' Opp'n to Pl.'s Am. Mot. at 25-26 [Doc. No. 52].

[170] *Nuclear Regul. Comm'n v. Tex.*, 605 U.S. 665, 680 (2025).

[171] *Id*. (quoting *Ry. Clerks v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 660 (1965)).

[172] *Id*.

City argues that Defendants committed *ultra vires* action by unilaterally removing displays from the President's House in contravention of 16 U.S.C. § 407n.

Meritorious *ultra vires* claims are rare, but have succeeded when a claim challenges action "based on unexplained and obvious deviations from statutory text, and when the government's interpretation of its statutory authority would 'lead[] to an absurd result.' "[173] *Ultra vires* review protects parties from statutory violation by an agency that directly contravenes congressional authorization and intent.

Here, § 407n authorizes the Secretary of the Interior to enter into cooperative agreements with the City in connection with the establishment and maintenance of Independence National Historical Park. The agreements were required to include a term that no alterations to the Independence Hall National Historic Site, including its buildings and grounds, were permitted absent mutual agreement of the parties to the agreement. The Secretary of the Interior entered into the 1950 Agreement without including that precise term. However, a similar term was included[174] and the parties, until recently, had complied with the statutory directive.

Congress specifically limited the authority of the Department of the Interior and NPS to unilaterally alter or control Independence National Historic Park. The agencies do not have the authority to flout that Congressional directive. The decision to unilaterally strip away a core component of Independence National Historic Park without seeking or obtaining mutual

---

[173] *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *9 (D.C. Cir. Sept. 25, 2025) (Pan., J., concurring) (citation omitted).

[174] The 1950 Agreement stated that "Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon." 1950 Agreement at 5 [Doc. No. 36-1]. The government argues, but does not brief, that the President's House is not a "building" subject to the term in the 1950 Agreement. 1/30/26 Hr'g Tr. at 137 [Doc. No. 45-1]. Regardless, the 1948 legislation requires the term include, but not limit itself to, the buildings and grounds of Independence Hall National Historic Site. *See* 16 U.S.C. § 407n.

agreement from the City is an "unexplained and obvious deviation from statutory text."[175] There is a specific statutory requirement for the Secretary of the Interior, as he enters into cooperative agreements regarding the Independence Hall National Historic Site, to include the stipulation that no alterations can be made without mutual agreement of the parties.

Defendants have completely ignored their legislatively imposed duties. They have disregarded statutory authority, compelled by Congress, by taking unilateral action without seeking agreement from the City of Philadelphia. An agency, part of the Executive branch, is not entitled to act solely as it wishes. Rather, it is the Legislative branch which authorizes agency action, and the Executive branch must comply with that direction.

Defendants' actions impede the separation of powers instituted by the Constitution. Here, the Executive branch is directing a Congressionally created and funded agency to take "measures incompatible with the expressed or implied will of Congress."[176] It is in this posture that the executive's "power is at its lowest ebb, for then he can rely upon only his own constitutional powers minus any constitutional powers of Congress over the matter."[177]

Defendants acted in excess of their authority as agencies authorized by Congress within the executive branch. Even in the event that the Court were to find that the APA does not provide a meaningful and adequate opportunity for judicial review, the City has demonstrated a likelihood of success on its *ultra vires* claim.

### B.     Likelihood of Irreparable Harm in the Absence of Relief

The City argues that it will incur various forms of irreparable harm if the displays are not restored and safeguarded. Among the harms the City alleges are a loss of access to historical

---

[175] *Fed. Educ. Ass'n* 2025 WL 2738626, at *9 (Pan., J., concurring).

[176] *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

[177] *Id.*

truth, an undermining of the public trust, and an inability to recount its own story in preparation for the semiquincentennial.[178] Defendants contend that those asserted injuries do not suffice, either because they are not particularized to the City or because they can be remedied if the displays are restored in a final judgment.[179]

The City must demonstrate that is "more likely than not" to suffer irreparable harm absent a preliminary injunction.[180] "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages."[181] "Furthermore, a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a 'clear showing of *immediate* irreparable harm.' "[182]

The harm at issue in this case must account for the significance of the slavery-related displays that NPS removed. As the federal government itself recognized, "the President's House and its history is important and meaningful to many people for many reasons."[183] The President's House has resulted from years of advocacy, engagement by the public, and cooperation between the City and the government. As the City argues, the removal of interpretive displays and exhibits "constitutes erasure, undermines public trust, and compromises the integrity of public memory."[184]

---

[178] Mem. L. Supp. Pl.'s Am. Mot. at 39-43 [Doc. No. 45].

[179] Defs.' Opp'n to Pl.'s Am. Mot. at 26-28 [Doc. No. 52].

[180] *Reilly*, 858 F.3d at 179.

[181] *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000).

[182] *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (internal quotation marks omitted).

[183] 1/30/26 Hr'g Tr. at 121 [Doc. No. 45-1].

[184] *Id*. at 40-41.

Similarly, *amici* Members of the Democratic Caucus of the Senate of Pennsylvania warn of irreparable harm to their constituents because "this sudden loss of rich history and Defendants' rejection of the true historical narratives about black history in America is causing deep constituent harm and anxiety."[185] Unilateral action by the executive branch that flouts Congressional directives, cooperative agreements with the City, and decades of multilateral collaboration irrevocably degrades the public's trust in the government.

The President's House represents the City "fulfilling an obligation to tell the truth—the whole, complicated truth."[186] Removal of the crucial interpretive materials strips the site of that truth and deprives the public of educational opportunities designed to be free and accessible. As *amici* ATAC and the Black Journey contend, that abrupt elimination of "historically significant educational material" is like "pulling pages out of a history book with a razor."[187]

The Court agrees with *amici*. The removed displays were not mere decorations to be taken down and redisplayed; rather, they were a memorial to "men, women, and children of African descent who lived, worked, and died as enslaved people in the United States of America," a tribute to their struggle for freedom, and an enduring reminder of the inherent contradictions emanating from this country's founding.[188] Each person who visits the President's House and does not learn of the realities of founding-era slavery receives a false account of this country's history.

In addition, every day the President's House lacks interpretive material to express the City's intention to invest years of time, millions of dollars, and countless individual and

---

[185] Members of Democratic Caucus of the Senate of Pa. Amicus Br. at 3, 6-7 [Doc. No. 34].

[186] 2/7/2007 Press Release [Doc. No. 36-18].

[187] ATAC & The Black Journey Amicus Br. at 16 [Doc. No. 25]; 1/30/26 Hr'g Tr. at 119.

[188] *See* Pl.'s Ex. 11, Photos of Site at 28 [Doc. Nos. 36-11. 36-12] ("Memorial" erected at the President's House site and co-signed by the City of Philadelphia and the National Park Service).

collective efforts, the City of Philadelphia is deprived of the ability to honestly and accurately tell the story of its own history—as the government puts it: to "tell[] an important [tale]."[189] Indeed, the government's removal of displays from the President's House implicates federalism concerns raised by *amicus* Governor Shapiro. He argues that the dismantling of the President's House, in contravention of the City's designated role in its development, embodies the federal administration's effort to transgress the principles of federalism that limit federal executive power.[190] The Tenth Amendment, the Governor notes, assigns all powers unenumerated by the federal Constitution to state governments and, by implication, to local governments.[191] The Governor urges that the federal government's disregard of the City's role in creating the President's House, and of Pennsylvania's interest in conveying its history,[192] therefore undermines state sovereignty in favor of an unchecked rewriting of this country's history.[193]

Finally, the remaining displays and memorials at the President's House would likely sustain substantial damage if removed. They are etched in concrete or preserved within a glass structure, such that removal would result in irreparable harm to the integrity of the site. But the risk of harm to the City is not just physical. If the President's House is left dismembered throughout this dispute, so too is the history it recounts, and the City's relationship to that history. Worse yet, the potential of having the exhibits replaced by an alternative script—a plausible assumption at this time—would be an even more permanent rejection of the site's

---

[189] 1/30/26 Hr'g Tr. at 121 [Doc. No. 45-1].

[190] Gov. Shapiro's Amicus Br. at 6-11 [Doc. No. 23].

[191] *Id*. at 7 [Doc. No. 23]; U.S. Const., amend. X.

[192] Gov. Shapiro's Amicus Br. at 3-4, Ex. A [Doc. No. 23] (highlighting the markers of slavery across Pennsylvania meant to provide a fulsome account of the Commonwealth's history).

[193] *Id.* at 4-5 (noting the federal government's contemporaneous efforts to reinstall a monument to a confederate general in Washington, D.C.).

historical integrity, and irreparable. For the foregoing reasons, the City has met its burden to establish irreparable harm.

### C.    The Balance of Harms and the Public Interest

Where, as here, the government is the sole defendant, the Court may consider the third and fourth prongs of a preliminary injunction analysis together.[194]

In its favor, the City has established that the government's actions to remove displays from the President's House are likely contrary to law. And, as courts recognize, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.' "[195] Further, with the parties accepting the displays as historically accurate, there is a public interest in the preservation and exhibition of that history.[196]

Defendants, for their part, raise only one argument for why an injunction would be inequitable. They argue there is a public interest in upholding the federal government's right to convey its preferred speech.[197] Restoration of the President's House does not infringe upon the government's free speech, nor is the government prevented from conveying whatever message it wants to send by wiping away the history of the greatest Founding Father's management of persons he held in bondage. President Washington's house would not merit designation as a historic site if he had not commanded the army that won the Revolutionary War, whose presence presiding over the Constitutional Convention graced it with the gravitas and spirit necessary to

---

[194] *Smith*, 138 F.4th at 779.

[195] *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) ("[T]here is generally no public interest in the perpetuation of unlawful agency action."); *New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025) (denying government's stay request and being mindful that state plaintiffs in an APA challenge were likely to succeed on the merits and that there is no public interest in unlawful agency action).

[196] *See Sayler Park Vill. Council v. U.S. Army Corps of Eng'rs*, No. C-1-02-832, 2002 WL 32191511, at *1 (S.D. Ohio Dec. 30, 2002).

[197] Defs.' Opp'n to Pl.'s Am. Mot. at 28-30 [Doc. No. 52].

the creation of our government's foundational document, and his restraint and modesty radiated strength and wisdom that defines the ideal chief executive to this day. The government can convey a different message without restraint elsewhere if it so pleases, but it cannot do so to the President's House until it follows the law and consults with the City.

The City has shown that the balance of harms and the public interest tip in the City's favor. The Motion for Preliminary Injunction will be granted.

## VI. CONCLUSION

For the reasons stated above, the Motion for Preliminary Injunction will be granted. The preliminary injunction will remain in place pending further litigation in this matter. There can be no prejudice to Defendants' restoration of the status quo as of January 21, 2026, which requires that Defendants reinstall all panels, displays, and video exhibits that were previously in place. Defendants shall further prevent any additions, removals, destruction, or further changes of any kind to the President's House site, except in the event that a mutual written agreement is reached between Defendants and the City of Philadelphia. An order will be entered.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **CITY OF PHILADELPHIA** <br> **Plaintiff,** <br> **v.** <br> **DOUG BURGUM, *et al.*,** <br> **Defendants.** | **CIVIL ACTION NO. 26-434** |

## PRELIMINARY INJUNCTION ORDER

**AND NOW,** this 16th day of February 2026, upon consideration of Plaintiff's Amended

Motion for Preliminary Injunction and Temporary Restraining Order [Doc. Nos. 45, 2],

Defendants' Opposition thereto [Doc. Nos. 52, 27], and after hearing and oral argument thereon,

including giving consideration to the amended briefing of the Parties and briefing and arguments

of *amici curiae*, it is hereby **ORDERED**:

1.      For the reasons stated in the accompanying Memorandum Opinion, the Amended

Motion for Preliminary Injunction [Doc. Nos. 45, 2] is **GRANTED**. The alternative relief for the

Amended Motion for Temporary Restraining Order is hereby **DISMISSED AS MOOT**.

2.      Defendants Doug Burgum, United States Department of the Interior, Jessica

Bowron, and National Park Service are hereby **ORDERED** to restore the President's House Site

to its physical status as of January 21, 2026.

3.      Defendants are hereby **ENJOINED** from taking any action to damage any

exhibits, panels, artwork, or other items from the President's House Site, are **ORDERED** to take

all necessary steps to ensure the safety, security, and preservation of any such items that had

been removed from the President's House Site on January 22, 2026, and are **ENJOINED** from

making any and all further changes to the President's House Site, including the installation of

replacement materials, without mutual agreement of the City of Philadelphia during the pendency of this litigation or until further Order of the Court.

4.      Defendants are hereby **ORDERED** to provide immediate, continuing, and proper maintenance to the Site, its exhibits, grounds, artifacts, video monitors, and recordings which **SHALL** remain operable.

5.      Defendants are hereby **ORDERED** to maintain the President's House Site in a clean and accessible manner, cleared of debris, snow, ice and/or any other impediment to public access.

All terms and conditions of this Order for preliminary injunctive relief must be followed immediately, that is **FORTHWITH.**

BY THE COURT:

**/s/ Cynthia M. Rufe**
_____
**CYNTHIA M. RUFE, J.**