**No. 26-1348**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

City of Philadelphia,

*Appellee,*

*v.*

Secretary U.S. Department of Interior; U.S. Department of
Interior; Director National Park Service; National Park Service,

*Appellants.*

Appeal from the February 16, 2026 Memorandum Opinion
& Order Granting Appellee's Motion for Preliminary Injunction
in Case No. 26-cv-434-CMR in the United States District Court
for the Eastern District of Pennsylvania (Hon. Cynthia M. Rufe)

## APPELLANTS' BRIEF AND
## JOINT APPENDIX VOLUME I (JA1–JA45)

BRETT A. SHUMATE
Assistant Attorney General

MICHAEL VELCHIK
Senior Counsel to the Assistant
Attorney General

DAVID METCALF
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

GREGORY B. IN DEN BERKEN
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8200

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION ................................................. 3

STATEMENT OF THE ISSUES.................................................... 3

STATEMENT OF RELATED CASES............................................ 4

STATEMENT OF THE CASE ........................................................ 5

I.    Legal and Factual Background ............................................. 5

    A.    Independence National Historical Park's Statutory
        Framework................................................................... 5

    B.    The 1950 Agreement ................................................. 7

    C.    The President's House and the 2006 Cooperative
        Agreement ...................................................................8

    D.    Executive Order 14,253 and Removal of the President's
        House Exhibits ......................................................... 10

II.   Procedural History........................................................... 11

SUMMARY OF ARGUMENT ......................................................14

STANDARD OF REVIEW ...........................................................16

ARGUMENT.................................................................................17

I.    The City's Claims Are Not Justiciable...................................19

    A.    The City Lacks Standing............................................19

    B.    The Tucker Act Strips Jurisdiction Over Count II .................... 26

    C.    The City Has No Viable Cause of Action .................................31

        1.    The City fails to challenge final agency action under
            the APA.................................................................31

2.    The City challenges conduct committed to agency discretion by law. ........................................... 33

3.    The City's ultra vires claim is not cognizable. ................. 36

II.    The City Has Not Established a Likelihood of Success ...................... 36

A.    Count III, Arbitrary-and-Capricious Action in Violation of 16 U.S.C. § 407n, Fails Because Neither § 407n Nor the Relevant Agreements Bar Removal of the Exhibits .................. 37

1.    Section 407n's text is limited to the Independence Hall National Historic Site. .............................................. 37

2.    The district court's contrary interpretation is erroneous. ................................................................ 39

3.    The City's "scope-expands-with-time" theory is meritless. ................................................................. 43

4.    The relevant agreements confirm NPS's authority. ........ 44

B.    Counts II and IV Fail Because Neither the Network to Freedom Act Nor the Agency Guidance Documents Impose Enforceable Constraints on NPS's Curatorial Decisions ................................................................................. 46

1.    The Network to Freedom Act imposes no preservation or interpretive mandate. ........................... 47

2.    The Foundation Document and Management Policies do not create enforceable rights. .................................... 49

3.    The district court's reliance on the *State Farm* framework was error. ...................................................... 51

C.    Count V Fails Because There Is No Specific Statutory Prohibition That Can Support Ultra Vires Relief ...................... 54

III.    The City Has Not Shown Irreparable Harm ....................................... 55

IV.    The Injunction's Mandatory Nature and Overbreadth Independently Require Vacatur ......................................................... 56

V.     The Equities Support the Government...............................................60

CONCLUSION .................................................................................. 63

COMBINED CERTIFICATIONS ............................................................... 65

JOINT APPENDIX ................................................................................ 66

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acierno v. New Castle Cty.*,
40 F.3d 645 (3d Cir. 1994) ........................................................ 57

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) ....................................................... 55

*ADP, LLC v. Rafferty*,
923 F.3d 113 (3d Cir. 2019) ........................................................17

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ...................................................... 27

*Am. Sci. & Eng'g, Inc. v. Califano*,
571 F.2d 58 (1st Cir. 1978) ........................................................ 27

*Armstrong v. Exceptional Child Ctr. Inc.*,
575 U.S. 320 (2015) ................................................................ 36

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................ 32

*Burke v. City of Charleston*,
139 F.3d 401 (4th Cir. 1998) ..................................................... 20

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ........................................................... 57, 59

*Camfield v. United States*,
167 U.S. 518 (1897) ................................................................ 45

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
698 F. Supp. 3d 39 (D.D.C. 2023) ...............................................51

*Chemours Co. FC, LLC v. United States Env't Prot. Agency*,
109 F.4th 179 (3d Cir. 2024) ..................................................... 33

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .................................................. 53

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .............................................. 20, 25

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................ 22, 24

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984) .................................................. 34

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) .................................................. 36

*Davis Enters. v. U.S. E.P.A.*,
    877 F.2d 1181 (3d Cir. 1989) ........................................ 33

*Davis v. Latschar*,
    202 F.3d 359 (D.C. Cir. 2000) ....................................... 34

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ................................................. 53

*Dep't of Educ. v. Brown*,
    600 U.S. 551 (2023) ................................................. 23

*Elrod v. Burns*,
    427 U.S. 347 (1976) ..................................................61

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ................................................. 52

*Essintial Enter. Sols., LLC v. U.S. Small Bus. Admin.*,
    166 F.4th 380 (3d Cir. 2026) .....................................17, 43

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................. 35

*Finkelman v. Nat'l Football League*,
    810 F.3d 187 (3d Cir. 2016) ......................................... 22

*Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*,
    830 F.3d 515 (D.C. Cir. 2016) ....................................... 54

*Freeman v. Quicken Loans, Inc.,*
566 U.S. 624 (2012)..................................................................................41

*Gatter v. Nimmo,*
672 F.2d 343 (3d Cir. 1982) ...................................................................50

*Const. Guided Walking Tours v. Indep. Visitor Ctr. Corp.,*
454 F. App'x 118 (3d Cir. 2011) ...............................................................33

*Haaland v. Brackeen,*
599 U.S. 255 (2023) ................................................................................19

*Hahn v. United States,*
757 F.2d 581 (3d Cir. 1985) ...........................................................28, 32

*Heckler v. Chaney,*
470 U.S. 821 (1985) ...............................................................................33

*Hope v. Warden York Cnty. Prison,*
972 F.3d 310 (3d Cir. 2020) ................................................................. 18

*Horne v. Dep't of Agric.,*
576 U.S. 350 (2015) ............................................................................ 45

*Horses of Cumberland Island v. Haaland,*
No. 23-cv-1592, 2024 WL 5430835 (N.D. Ga. Nov. 8, 2024) .................50

*Hoxworth v. Blinder, Robinson & Co.,*
903 F.2d 186 (3d Cir. 1990) ................................................................. 57

*Indep. Equip. Dealers Ass'n v. EPA,*
372 F.3d 420 (D.C. Cir. 2004) ............................................................. 32

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.,*
510 U.S. 1301 (1993).............................................................................60

*Kamal v. J. Crew Grp., Inc.,*
918 F.3d 102 (3d Cir. 2019).................................................................. 23

*Lewis v. Gov't Emps. Ins. Co.,*
98 F.4th 452 (3d Cir. 2024) ................................................................. 22

*Local 2855, AFGE (AFL-CIO) v. United States,*
602 F.2d 574 (3d Cir. 1979) ..........................................................33, 34

vi

*Logic Tech. Dev. LLC v. FDA,*
  84 F.4th 537 (3d Cir. 2023)...............................................................52

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024)............................................................................43

*Loving v. IRS,*
  742 F.3d 1013 (D.C. Cir. 2014) .....................................................50

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ...........................................................................21

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ...........................................................................31

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.,*
  823 F.3d 184 (3d Cir. 2016) ....................................................... 25, 44

*Mallet & Co. Inc. v. Lacayo,*
  16 F.4th 364 (3d Cir. 2021) .............................................................17

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012)..................................................................... 26, 27

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982) .........................................................28

*Mass. v. Mellon,*
  262 U.S. 447 (1923) ..................................................................... 24, 56

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,*
  463 U.S. 29 (1983)......................................................... *passim*

*Murthy v. Missouri,*
  603 U.S. 43 (2024) ............................................................................20

*Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey,*
  80 F.4th 215 (3d Cir. 2023)..............................................................16

*National Institutes of Public Health v. American Public Health Ass'n,*
  (*NIPH*), 145 S. Ct. 2658 (2025)...................................................... 29

*Nken v. Holder,*
  556 U.S. 418 (2009) ..........................................................................60

vii

*Organized Fishermen of Fla. v. Hodel,*
  775 F.2d 1544 (11th Cir. 1985)................................................................. 34

*Penn. ex rel. Creamer v. U.S. Dep't of Agric.,*
  469 F.2d 1387 (3d Cir. 1972)................................................................... 56

*Pennsylvania Dep't of Hum. Servs. v. United States,*
  897 F.3d 497 (3d Cir. 2018) .................................................................... 50

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009)................................................................................61

*Pub. Int. Legal Found. v. Sec'y Commonwealth of Pa.,*
  136 F.4th 456 (3d Cir. 2025) ..................................................................17

*Qureshi v. Admin. Appeals Off. (AAO) of U.S. Citizenship & Immigr. Servs. (USCIS),*
  408 F. App'x 611 (3d Cir. 2010) ............................................................30

*Ramos v. Att'y Gen. United States,*
  No. 25-2946, 2025 WL 2950133........................................................60, 62

*Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs,*
  343 F.3d 199 (3d Cir. 2003)................................................................... 33

*Robbins v. U.S. Bureau of Land Mgmt.,*
  438 F.3d 1074 (10th Cir. 2006) .............................................................. 27

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995).................................................................................61

*Rubin v. Islamic Republic of Iran,*
  583 U.S. 202 (2018) ..........................................................................41, 55

*Schweiker v. Hansen,*
  450 U.S. 785 (1981) ................................................................................ 50

*Sea-Land Serv., Inc. v. Brown,*
  600 F.2d 429 (3d Cir. 1979)................................................................... 27

*Shapiro v. U.S. Dep't of Agric.,*
  No. 25-cv-998, 2025 WL 3473291 (M.D. Pa. Dec. 3, 2025)..................... 28

*Sharp v. Weinberger*,
798 F.2d 1521 (D.C. Cir. 1986) ................................................................30

*Shurtleff v. City of Bos., Mass.*,
596 U.S. 243 (2022) .................................................................................... 62

*Sierra Club v. Morton*,
405 U.S. 727 (1972) .................................................................................... 24

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) .....................................................................................41

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)......................................................................................21

*Sprague Elec. Co. v. Tax Court*,
340 F.2d 947 (1st Cir. 1965)...................................................................... 27

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024)............................................................. *passim*

*Sturgeon v. Frost*,
587 U.S. 28 (2019)...................................................................................... 42

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .................................................................................... 23

*Sustainability Inst. v. Trump*,
No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ......................... 55

*Town of Milton, Mass. v. FAA*,
87 F.4th 91 (1st Cir. 2023).......................................................................... 24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .................................................................................... 25

*Trenton Threatened Skies, Inc v. FAA*,
90 F.4th 122 (3d Cir. 2024)........................................................................ 53

*Trump v. New York*,
592 U.S. 125 (2020)..................................................................................... 20

*United States v. Rutherford*,
120 F.4th 360 (3d Cir. 2024) ..................................................................... 40

*United States v. Texas,*
 599 U.S. 670 (2023) ..................................................................19

*Valley Forge Christian Coll. v. Ams. United for Separation of Church &*
 *State, Inc.,*
 454 U.S. 464 (1982) ..................................................................19

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs,*
 714 F.3d 186 (4th Cir. 2013) .................................................. 32

*Vorchheimer v. Philadelphian Owners Ass'n,*
 903 F.3d 100 (3d Cir. 2018) ................................................... 45

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.,*
 576 U.S. 200 (2015) ..................................................................61

*The Wilderness Soc. v. Norton,*
 434 F.3d 584 (D.C. Cir. 2006) ............................................... 50

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) ............................................................. 18, 29

*Wis. Cent. Ltd. v. United States,*
 585 U.S. 274 (2018) ................................................................. 43

*Yaw v. Del. River Basin Comm'n,*
 49 F.4th 302 (3d Cir. 2022) ....................................................21

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
 576 U.S. 1 (2015) .....................................................................61

## STATUTES

5 U.S.C. § 551(13) .........................................................................31

5 U.S.C. § 701(a)(2) ..................................................................... 33

5 U.S.C. § 702 ..........................................................................26, 31

5 U.S.C. § 704 ............................................................................... 32

5 U.S.C. § 706(2) ..................................................................... 58, 59

16 U.S.C. §§ 407m........................................................................ 6

x

16 U.S.C. § 407n ................................................................. *passim*

16 U.S.C. § 407q ............................................................... 42, 60

28 U.S.C. § 1292(a)(1) ............................................................ 3

28 U.S.C. § 1331 ................................................................... 3

28 U.S.C. § 1346(a)(2) ........................................................... 27

28 U.S.C. § 1491(a)(1) ........................................................... 27

54 U.S.C. § 100302(a)(3) ................................................. 7, 42, 60

54 U.S.C. §§ 308301-04 ......................................................... 46

54 U.S.C. § 308302 ........................................................... 47, 48

Pub. L. No. 80-795, 62 Stat. 1061 (1948) ...................................... 6

## OTHER AUTHORITIES

8 Fed. Reg. 7,283 (dated May 14, 1943; published June 1, 1943) ...... 5, 38, 44

Exec. Order 14,253, *Restoring Truth and Sanity to American History*,
   90 Fed. Reg. 14,563 (Mar. 27, 2025) ................................... 10, 11

Appellant's Brief, *In re Friends of Marconi Plaza*,
   No. 1104 CD 2021 (Pa. Commw. Ct. 2022), 2022 WL 20505710 ............. 62

Appellant's Reply Brief, *In re Friends of Marconi Plaza*,
   No. 1104 CD 2021 (Pa. Commw. Ct. 2022), 2022 WL 20505711 ............. 62

**INTRODUCTION**

The President's House Site sits on federal land in the heart of Philadelphia's Independence National Historical Park. It is owned, managed, and operated by the National Park Service. In January 2026, NPS decided to remove slavery-focused interpretive panels and videos from the Site. The City of Philadelphia—which years ago donated the exhibits to NPS, waived all property rights, and watched the governing agreements expire—sued to block the removal and force NPS to put everything back. The district court obliged. It entered a mandatory preliminary injunction ordering immediate restoration of the Site to its pre-removal condition, barring any future changes without the City's written consent, and directing NPS to keep the Site's videos running, its grounds cleared of snow and debris, and its exhibits in continuous operation—all "FORTHWITH."

That injunction is extraordinary by any measure. It installs a municipality as co-manager of a federal historic site. It dictates what the Federal Government must display on its own property. And it imposes granular operational mandates—snow removal, video-monitor maintenance, and debris clearance—that no party even asked for.

The injunction should not have been entered. As a threshold matter, the City's claims are not justiciable. The City donated the exhibits, waived

all property rights, and has no cognizable injury. And the APA does not authorize judicial review of NPS's curatorial decisions—operational choices about what to display at federal sites—because no statute, regulation, or binding policy prescribes what NPS must present. Without law to apply, there is nothing for a court to review.

The injunction also rests on a fundamental legal error. The district court read 16 U.S.C. § 407n—a provision that protects City-owned Independence Square from unilateral federal alteration—as granting the City a veto over the entire 55-acre Park, including federally owned land a block away. But that misreading collapses under the statute's text, which draws a clear distinction between "the Independence Hall National Historic Site" (Independence Square) and "the Independence National Historical Park." And it produces an absurd result: a municipality that owns no property at the President's House would possess a judicially enforceable veto over every curatorial decision at a site managed, funded, and owned by the United States.

The City's other claims fare no better. The Network to Freedom Act imposes no enforceable duty to retain particular exhibits. The NPS Foundation Document is an internal planning guide that does not create legal rights. And no specific statutory prohibition supports ultra vires

2

review. Even if any claim survived, the remedy would be vacatur and remand—not the specific-performance-style restoration order imposed by the district court. The injunction requires NPS to reinstall every panel, maintain video monitors, and clear snow—none of which tracks any violation the court identified. At bottom, the City asks this Court to compel the Federal Government to speak a message it has chosen not to convey on its own property—harms the City itself recognized as grave when the shoe was on the other foot and it argued that being forced to display a statue on City property constituted "compelled speech" and "a grave intrusion on the City's property rights." The Court should vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

The City invoked 28 U.S.C. § 1331 as the basis for subject-matter jurisdiction, JA742, but (as discussed below) the Government disputes that the district court has subject-matter jurisdiction. The district court entered a preliminary injunction on February 16, 2026. JA4-45. The Government appealed the next day. JA1-2. This Court thus has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in concluding that it has subject-matter jurisdiction (including whether the City established Article

III standing, whether the Tucker Act bars Count II, and whether the City's claims present questions cognizable under the APA and as an ultra vires challenge). (Raised at JA784-803.)

2.　Whether the district court erred in concluding that the City demonstrated a likelihood of success on its claims. (Raised at JA797-804.)

3.　Whether the district court erred in finding that the City showed a likelihood of suffering irreparable harm. (Raised at JA804-06.)

4.　Whether the district court's mandatory preliminary injunction is properly tailored to the claims of relief it relied on.

5.　Whether the balance of equities and the public interest support the injunction. (Raised at JA806-08.)

### STATEMENT OF RELATED CASES

This case has not previously been before this Court. The Government is aware of the following cases involving similar issues: *Gilbert Baker Found. v. U.S. Dep't of the Interior*, No. 26-cv-1317 (S.D.N.Y. filed Feb. 17, 2026), and *Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, No. 26-cv-10877 (D. Mass. filed Feb. 17, 2026).

## STATEMENT OF THE CASE

### I.    Legal and Factual Background

### A.    Independence National Historical Park's Statutory Framework

In 1943, the Secretary of the Interior designated the "Independence Hall National Historic Site" as a national historic site. 8 Fed. Reg. 7,283 (dated May 14, 1943; published June 1, 1943). The designation was precise: it encompassed "[a]ll those lots, pieces, or parcels of land which are now owned by the City of Philadelphia, located within the block bounded by Walnut, Fifth, Chestnut, and Sixth Streets, known as Independence Square." *Id.* The "Independence Hall National Historic Site" (Independence Square) is approximately five acres of City-owned land and contains Independence Hall, Congress Hall, and Old City Hall:



Nat'l Park Serv., *TractsNet Public 1.5*, https://arcg.is/0q90Lj1 (last visited

Mar. 27, 2026) (interactive map application; click "Zoom to" in bottom left

"nps_tracts" window to view lot).

Five years later, Congress enacted legislation to establish

Independence National Historical Park—a broader entity that today spans

approximately 55 acres—"for the purpose of preserving for the benefit of

the American people as a national historical park certain historical

structures and properties of outstanding national significance located in

Philadelphia, Pennsylvania, and associated with the American Revolution

and the founding and growth of the United States." Pub. L. No. 80-795, § 1,

62 Stat. 1061, 1061 (1948) (codified at 16 U.S.C. §§ 407m *et seq.*). The Park

was to include both City-owned land (Independence Square) and land to be

acquired by the Federal Government.

Section 407m authorized the Secretary of the Interior to acquire

various properties for the Park. A companion provision, § 407n, authorized

the Secretary "to enter into cooperative agreements with the city of

Philadelphia to assist in the preservation and interpretation of the property

known as the Independence Hall National Historic Site . . . , in connection

with the Independence National Historical Park." Section 407n further

required that such agreements specify "that no changes or alterations shall

6

be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts."

Congress thus drew a clear distinction between the "Independence Hall National Historic Site"—the five-acre, City-owned block—and the "Independence National Historical Park"—the broader Park. As the text makes clear, the mutual-agreement requirement in § 407n applies to the former and not the latter.

Section 407q separately vests the Federal Government with exclusive authority over the Park: "[t]he administration, protection, and development of the park shall be exercised under the direction of the Secretary of the Interior by the National Park Service." More broadly, the NPS's Organic Act provides that the NPS Director "shall have the supervision, management, and control of [National Park] System units." 54 U.S.C. § 100302(a)(3).

## B.    The 1950 Agreement

In 1950, the City and the Secretary of the Interior entered into a cooperative agreement pursuant to § 407n. JA235. The 1950 Agreement addresses the City's ownership of "the Independence Hall group of structures and of the land whereon they are erected, and the park area

7

adjacent thereto known as Independence Square." JA237. It provides that the City retained ownership of Independence Square while granting the Secretary an exclusive right to occupy the area for park purposes. JA237-38.

Article III(e) of the 1950 Agreement states that "it is the purpose" of the parties "to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park" and that the parties "pledge themselves to consult on all matters of importance to the program." JA240. The 1950 Agreement remains in effect today.

### C.    The President's House and the 2006 Cooperative Agreement

The President's House Site is located at Sixth and Market Streets in Philadelphia—a block north of Independence Square, on land owned by the Federal Government. The Site shows, through partial reconstruction of floors and exterior walls, the historic residence of Presidents George Washington and John Adams while Philadelphia was the capital of the United States.

In the early 2000s, historians discovered that President Washington housed slaves at the President's House while he lived there. Community advocacy led to a collaborative effort between the City and NPS to

8

commemorate the Site's history. In 2006, the City and NPS entered into a cooperative agreement to establish an exhibit at the Site. JA252. The 2006 Agreement was amended in 2007, 2008, and 2009. JA285-358.

The 2006 Agreement and amendments are unambiguous about ownership and control of the exhibit. The 2006 Agreement specifies, under a section titled "Ownership of Exhibit," that "[u]pon completion of the Exhibit in accordance with this Agreement, ownership of the Exhibit shall transfer to the NPS" and that "NPS ownership of the Exhibit shall survive any termination of this Agreement." JA254. A separate section titled "Management & Maintenance of the President's House Exhibit" provides that "NPS agrees that it shall undertake all responsibility to manage, occupy, utilize, operate, repair, maintain, interpret and administer the Exhibit, which shall become property of the NPS." JA255.

The 2009 Third Amendment further provides that "[t]he Project will be owned, maintained, managed, and interpreted by the NPS following completion of the Project and acceptance by the NPS." JA309. The City agreed "to donate to NPS the Project identified in the Cooperative Agreement as amended" and that "[t]his donation is made by the City on its own volition and without compensation." JA311. The City also "waive[d]

9

any claim or right to any property interest, including use rights, or to compensation for any Project components donated to NPS." JA315.

The Third Amendment includes a Project Development Plan stating that Site interpretation "will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved." JA332. The 2006 Agreement (including the amendments) expired on May 1, 2010. *See* JA255, JA317.

The City contributed approximately $3.5 million toward the project. *See* JA330. The President's House exhibit opened in December 2010. JA717. The City later transferred an endowment and intellectual-property rights related to the project to NPS. *See* JA344.

In 2022, NPS designated the President's House as a site in the National Underground Railroad Network to Freedom program.

### D.   Executive Order 14,253 and Removal of the President's House Exhibits

On March 27, 2025, the President issued Executive Order 14,253, "Restoring Truth and Sanity to American History." 90 Fed. Reg. 14,563. The order directs the Secretary of the Interior to "take action, as appropriate and consistent with applicable law," to ensure that public monuments and similar properties within the Department's jurisdiction

"focus on the greatness of the achievements and progress of the American people." *Id.* § 4(a)(iii).

On January 22, 2026, the Acting Director of NPS directed the removal of the interpretive panels and video exhibits at the President's House. JA59. NPS staff removed most of the exhibits using hand tools. *Id.* The videos were turned off. *Id.* The removed materials were secured and placed in storage at the National Constitution Center. *Id.* NPS has the designs for all exhibits and can readily produce replacements if necessary—at a cost of approximately $20,000 with a turnaround of roughly three weeks. JA812.

## II.    Procedural History

The City filed this lawsuit the same day the exhibits were removed, January 22, 2026, and simultaneously moved for a preliminary injunction seeking their immediate restoration. The Government opposed, arguing that the City lacks standing, that its claims are barred by the Tucker Act and are not cognizable under the Administrative Procedure Act, and that the requested relief would improperly compel Government speech. The Government also submitted a sworn declaration from the Park's Superintendent confirming that the materials were being securely stored

11

pending the outcome of the case and could be reinstalled if ordered. *See* JA59.

The district court held a hearing on January 30, 2026. The City presented testimony from three witnesses. The court then directed the City to file an amended complaint and amended motion for a preliminary injunction.

The Government filed its amended opposition on February 13, emphasizing its statutory-interpretation argument that § 407n applies only to the Independence Hall National Historic Site—not to the President's House or the broader Park.

Three days later, on President's Day—a federal holiday—the district court issued a mandatory preliminary injunction requiring immediate compliance. JA4-45.

The injunction requires the Government to "restore the President's House Site to its physical status as of January 21, 2026." JA4. It bars the Government from making "any and all further changes" to the site, including installing "replacement materials," without the City's "mutual agreement." JA4-5. It directs the Government to provide "immediate, continuing, and proper maintenance" to the site and mandates that video monitors and recordings "**SHALL** remain operable." JA5. And it orders the

Government to maintain the site "in a clean and accessible manner, cleared of debris, snow, ice and/or any other impediment to public access." *Id.* These provisions were to be followed "immediately, that is **FORTHWITH**." *Id.*

The district court based its injunction in large part on an expansive interpretation of § 407n, concluding that the City has "a statutory right and expectation to mutual agreement *on any changes or alterations to the Park.*" JA22 (emphasis added). The court also found that the City was likely to prevail on its arbitrary-and-capricious claims based on the Network to Freedom Act and NPS guidance documents as well as its ultra vires claim. JA30-45.

The Government timely appealed on February 17, 2026. JA1-2. The Government moved the district court for a stay pending appeal, which the court denied. JA55-56.

The Government then moved this Court for an emergency administrative stay and stay pending appeal (Doc. 8), which were (respectively) granted in part and referred to a motions panel (Doc. 11). The partial administrative stay remains in effect.

## SUMMARY OF ARGUMENT

The district court's extraordinary injunction should be vacated for five independent reasons.

*First*, the City's claims are not justiciable. The City lacks Article III standing because it has no legally protected interest in exhibits that it donated to, and which are owned entirely by, the Federal Government. The City's remaining theories of injury—loss of a "public benefit," tourism harm, two-decade-old expenditures, and an interest in "honestly telling its own history"—are too speculative, too derivative, or too disconnected from the challenged conduct to satisfy Article III. And the City's primary claim of a statutory right under 16 U.S.C. § 407n rests on a fundamental misreading of the statute: § 407n's mutual-agreement requirement applies only to the Independence Hall National Historic Site (Independence Square), not to the President's House or the 55-acre Park. The Tucker Act further strips jurisdiction over Count II, which is a contractual claim dressed in APA garb. And the APA does not provide a cause of action here because NPS's curatorial decisions are neither "final agency action" nor subject to judicial review—they are operational management choices committed to agency discretion by law.

*Second*, the City cannot establish a likelihood of success on the merits. Count III fails because § 407n's text does not cover the President's House—and the district court's contrary interpretation renders distinct statutory terms superfluous, contravenes the fixed-meaning canon, and would grant a municipality veto power over 55 acres of federal property. The relevant cooperative agreements further confirm NPS's unconditional ownership and authority. And Counts II and IV fail because neither the Network to Freedom Act nor the NPS Foundation Document imposes judicially enforceable constraints on NPS's interpretive decisions. The district court erroneously applied the *State Farm* reasoned-explanation framework to an operational curatorial decision—an approach that would subject every change to a park sign, exhibit, or pamphlet to judicial review. And Count V fails because ultra vires relief requires violation of a *specific statutory prohibition*, which the City has not identified.

*Third*, the City has not shown irreparable harm. The exhibits were securely stored, replaceable at modest cost, and capable of reinstallation. The City's asserted harms—like "erasure," loss of "public trust," and impairment of "public memory"—are too indeterminate, derivative of harm to the public (which the City cannot invoke against the United States), or remediable after final judgment.

15

*Fourth*, the injunction is untethered to the violations found. The district court declined to rest its injunction on the City's breach-of-contract claim yet then entered a specific-performance-style order on the remaining counts—ordering site restoration, imposing a municipal-veto regime, and mandating snow removal, video-monitor operability, and debris clearance that no party alleged were at issue. But the proper APA remedy for the arbitrary-and-capricious claims (Counts II and IV) is vacatur and remand, not restoration and perpetual co-management. The injunction's scope vastly exceeds the likely violations found.

*Fifth*, the equities favor the Government. The injunction intrudes on the Government's exclusive statutory authority to administer the Park and compels the Government to display expressive exhibits that it has chosen not to display. These are serious harms—harms that the City itself has recognized when the roles were reversed and it argued in separate litigation that being forced to display a statue on City property constituted "compelled speech" and "a grave intrusion on the City's property rights."

## STANDARD OF REVIEW

1.      This Court reviews a district court's subject-matter jurisdiction de novo. *Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 218 (3d Cir. 2023).

16

2.    Standing is likewise reviewed de novo, although underlying factual determinations are reviewed for clear error. *Pub. Int. Legal Found. v. Sec'y Commonwealth of Pa.*, 136 F.4th 456, 461 (3d Cir. 2025).

3.    This Court reviews a district court's factual findings for clear error, its legal rulings de novo, and its ultimate decision to issue an injunction for abuse of discretion. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 198 (3d Cir. 2024). A preliminary injunction that relies on "an erroneous view of the applicable law" constitutes an abuse of discretion. *ADP, LLC v. Rafferty*, 923 F.3d 113, 120 (3d Cir. 2019). Indeed, the Court "must reverse if the district court has proceeded on the basis of an erroneous view of the applicable law." *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 379 n.17 (3d Cir. 2021) (citation omitted).

4.    This Court conducts de novo review of a district court's statutory interpretation, including any underlying arbitrary-and-capricious analysis under the APA. *Essintial Enter. Sols., LLC v. U.S. Small Bus. Admin.*, 166 F.4th 380, 384 (3d Cir. 2026).

## ARGUMENT

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain any injunction, the plaintiff must establish that (1) it will likely succeed on the merits; (2) it will likely suffer irreparable harm without an injunction; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. And an even stricter standard applies for mandatory injunctions that alter the status quo. To obtain such an injunction, the plaintiff bears a "particularly heavy burden"—it must show "a substantial likelihood of success on the merits and that [its] right to relief is indisputably clear." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (cleaned up). And as a threshold matter, the plaintiff must establish that the court has subject-matter jurisdiction. *Nat'l Shooting Sports Found.*, 80 F.4th at 218.

The district court's injunction fails at every step. The City's claims are not justiciable. The City cannot show a likelihood of success on the merits—much less the "indisputably clear" right to relief required for the mandatory injunction it obtained. The City has not established irreparable harm. The injunction is overbroad and untethered to any likely violation the district court actually found. And the equities overwhelmingly favor the Government. Each of these deficiencies is independently dispositive. And

because the injunction rests on "an erroneous view of the applicable law," it constitutes an abuse of discretion requiring reversal. *ADP*, 923 F.3d at 120.

## I.    The City's Claims Are Not Justiciable

### A.    The City Lacks Standing

Article III, Section 2 of the Constitution limits the federal judicial power to "Cases" and "Controversies." A case or controversy exists only if a plaintiff has standing to sue, which is "a bedrock constitutional requirement" rooted in "[the] separation of powers." *United States v. Texas*, 599 U.S. 670, 675 (2023). Standing doctrine protects "the Judiciary's proper—and properly limited—role in our constitutional system" and prevents "the judicial process from being used to usurp the powers of the political branches." *Id.* at 675-76. And it ensures that federal courts do not become "forums for the ventilation of public grievances" better addressed through the democratic process. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982).

To establish standing, a plaintiff must show that it suffered an injury in fact that is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (cleaned up). To qualify as an injury in fact, the asserted injury must be "legally and judicially cognizable," *Texas*, 599

19

U.S. at 676, and "concrete, particularized, and imminent rather than conjectural or hypothetical." *Trump v. New York*, 592 U.S. 125, 131 (2020).

At the preliminary-injunction stage, the plaintiff must make a "clear showing" that it can establish each element of standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter*, 555 U.S. at 22). So "mere allegations" are not enough; the plaintiff must "produce evidence" to satisfy its burden. *Nat'l Shooting Sports Found.*, 80 F.4th at 219. Because the City sought (and the district court awarded) forward-looking, mandatory injunctive relief, the City had to make a clear showing—using evidence—of a "real and immediate threat" of future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983).

None of the City's asserted injuries meets that standard.

Start with the City's assertion that it suffered an injury to its "property interest." Doc. 19 (Stay Opp.) at 8. There is no dispute that the President's House and the exhibits—as well as the land on which it sits—are owned entirely by the Federal Government. *See, e.g.*, JA309; Stay Opp. at 16. That means the City has no relevant property interest in the exhibits. *Cf. Burke v. City of Charleston*, 139 F.3d 401, 406 (4th Cir. 1998) (artist who sold mural lacked standing to challenge ordinance restricting display of mural).

20

Although the district court concluded otherwise, JA23, the City's historic expenditures do not establish standing either. To establish standing, an injury must be "fairly traceable to the challenged conduct of the defendant" and "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). As the court observed, the City incurred the costs at issue "to establish and maintain the project." JA23. That was nearly two decades ago when the project was getting started. *See* JA330. These costs were thus not "fairly traceable" to the Government's January 2026 removal of the exhibits. And no possible resolution in this case will restore those funds to the City. So both traceability and redressability are absent.

The City further insists that it has standing because it "suffered injury through the loss of the public benefit inuring to the City." Stay Opp. at 11. But Article III requires a "concrete, particularized" injury. *Trump,* 592 U.S. at 131. Loss of a vague "public benefit" does not fit that mold. *Cf. Yaw v. Del. River Basin Comm'n*, 49 F.4th 302, 321 (3d Cir. 2022) (rejecting argument that cognizable injury existed because plaintiffs "offer[ed] no legal support for the[ir] broad assertions").

21

Nor does the City's asserted tourism injury establish standing. The City posits that it has standing because removal of the exhibits would harm tourism in Philadelphia during this summer's semiquincentennial celebrations. *E.g.*, Stay Opp. at 13. The district court agreed with that view. JA23. But this theory has no evidentiary support and is inherently too speculative to satisfy Article III. Any sort of conclusion about tourism effects requires speculating about the intent of countless third parties and other factors, like the Site's importance to tourists' travel plans and the effects of NPS's planned replacement signage. The alleged injury is thus based on a "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013), and hinges on "the unfettered choices made by independent actors," *Lujan*, 504 U.S. at 562—which means it fails to support standing. *See Yaw*, 49 F.4th at 317 ("plaintiffs do not allege an injury-in-fact when they rely on a chain of contingencies or mere speculation" (cleaned up)); *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 461 (3d Cir. 2024) ("[W]e can only speculate—and speculation is not enough to sustain Article III standing." (quoting *Finkelman v. Nat'l Football League*, 810 F.3d 187, 200 (3d Cir. 2016))). The district court credited this theory based on five pages of testimony from the City's Chief Cultural Officer, *see* JA23 n.99, but that testimony never established that the panels' removal

harmed the City's tourism—only that the witness expected high visitor turnout for 2026 and found the removal distressing, JA164-68.

The 1950 Agreement's pledge that the parties will "consult on all matters of importance to the program," JA240, cannot support standing either. Even assuming that vague language were enforceable, at most it would support a procedural right. But the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009); *see also Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) ("litigant who asserts" such a procedural right must establish "that it has a concrete interest that is affected by the deprivation" (quoting *Summers*, 555 U.S. at 496-97)). A "bare procedural violation, divorced from any concrete harm," is insufficient. *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 114 (3d Cir. 2019) (cleaned up). Here, the City has not identified any concrete interest affected by a violation of the procedural pledge in Article III(e) of the 1950 Agreement.

Nor does the City's alleged harm to its "ability to honestly tell its own history" satisfy standing. Stay Opp. at 9; *see* JA23 (district court crediting this theory). For one, neither the City nor the district court offer any

authority for the notion that such an amorphous injury is a cognizable Article III harm. Even if it was, it blinks reality to say that the City's ability to truthfully and accurately share its history was affected by the Government's removal of the exhibits. The City has ample communication channels, resources, and property that it can use to share whatever aspect of its history it chooses—including the history surrounding the President's House. Its failure to do so does not provide standing. *See, e.g.*, *Clapper*, 568 U.S. at 416 (rejecting self-inflicted harm as injury in fact).

Most of the injuries asserted by the City also fall short because they are derivative rather than personal injuries. The City has consistently invoked alleged harm to its residents, students, tourists, and the public. *E.g.*, ECF No. 45 at 42. But Article III requires that the City establish a *personal* injury. *See, e.g.*, *Lujan*, 504 U.S. at 560 n.1 ("the injury must affect the plaintiff in a personal and individual way"); *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) (injury in fact "requires that the party seeking review be [it]self among the injured"). And as a municipality, the City cannot bootstrap injuries of third parties and pass them off as its own. "[I]t is the United States, and not the state, which represents [citizens] as parens patriae, when such representation becomes appropriate." *Mass. v. Mellon*, 262 U.S. 447, 486 (1923); *see also Town of Milton, Mass. v. FAA*,

24

87 F.4th 91, 96 (1st Cir. 2023) ("municipalities cannot assert that they have been injured because of an alleged injury to their residents"); *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 193 (3d Cir. 2016) (similar).

The district court's standing analysis rested primarily on its expansive interpretation of 16 U.S.C. § 407n. According to the court, § 407n gives the City "a statutory right and expectation to mutual agreement on any changes or alterations to the Park." JA22. That interpretation is wrong for the reasons discussed in detail in Part II.A below—§ 407n applies only to Independence Square, not to the President's House or the entire Park. Because the City's asserted statutory injury depends on that misreading, the district court's primary basis for standing collapses.

There is another standing problem specific to the relief obtained here. Standing is not "dispensed in gross"; it must be assessed with respect to each form of relief sought. *TransUnion LLC v. Ramirez,* 594 U.S. 413, 431 (2021). To obtain the mandatory, forward-looking injunction the district court entered—requiring restoration, barring future changes, and imposing ongoing maintenance obligations—the City had to demonstrate standing to obtain *that specific* relief. *See Lyons*, 461 U.S. at 105-06 (standing for damages does not establish standing for injunctive relief; plaintiff must

25

show "real and immediate" threat of future injury). The City made no such showing. It did not demonstrate that any future action by NPS would violate its rights, or that it had redressable injuries based on a cognizable legal interest sufficient to warrant the sweeping operational mandates included in the injunction (paragraphs 4 and 5). The district court's failure to scrutinize the City's standing to justify those specific forms of relief was itself reversible error.

The City bore a "particularly heavy burden" here because it sought mandatory relief altering the status quo. *Hope*, 972 F.3d at 320. Its failure to make a clear evidentiary showing of a concrete, particularized, and imminent future injury independently warrants vacatur.

### B.   The Tucker Act Strips Jurisdiction Over Count II

The APA provides a limited waiver of the Federal Government's sovereign immunity for claims "seeking relief other than money damages." 5 U.S.C. § 702. But the APA's waiver "comes with an important carve-out": it does not apply "'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). This exception "prevents plaintiffs from exploiting

26

the APA's waiver to evade limitations on suit contained in other statutes."

*Id.*

One such limitation—the Tucker Act—is applicable here. Under the Tucker Act, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The Tucker Act "impliedly forbids" bringing "contract actions" against "the government in a federal district court." *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted); *see also Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1082 (10th Cir. 2006) (holding the same); *Sea-Land Serv., Inc. v. Brown*, 600 F.2d 429, 433-43 (3d Cir. 1979) (same). Congress has explicitly barred district-court jurisdiction over such claims. 28 U.S.C. § 1346(a)(2).

A plaintiff may not maintain an APA claim where "the essence of the action is in contract"—and a plaintiff "cannot 'by the mystique of a different form of complaint' make it otherwise." *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 63 (1st Cir. 1978) (quoting *Sprague Elec. Co. v. Tax Court*, 340 F.2d 947, 948 (1st Cir. 1965)). In *Sea-Land*, this Court endorsed that reasoning and rejected the plaintiff's attempt to obtain specific-

performance-type relief on a government contract via APA-styled pleading. 600 F.2d at 433-34. So litigants may not, by creative APA pleading, "circumvent limitations on district court jurisdiction created by the Tucker Act." *Hahn v. United States*, 757 F.2d 581, 589 (3d Cir. 1985).

To evaluate whether a plaintiff's claim sounds in contract, courts look to substance rather than labels. *See, e.g.*, *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *Shapiro v. U.S. Dep't of Agric.*, No. 25-cv-998, 2025 WL 3473291, at 4 (M.D. Pa. Dec. 3, 2025). Specifically, courts examine both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968.

Here, although styled as APA claims, Counts I and II in the City's amended complaint are contractual and thus barred under the Tucker Act. The district court agreed that "the Tucker Act impliedly forbids the City from obtaining relief" on Count I because it "undeniably sounds in contract." JA29. But rather than dismiss that claim, the court noted that it would "not rest" its injunction on that claim "as pleaded." *Id.* And it ultimately based its injunction in part on Count II. *See* JA31-32.

But Count II is equally contractual. Both prongs of the *Megapulse* framework establish this.

28

First, the source of the City's alleged rights is fundamentally contractual. The City admits that its Count I is a breach-of-contract claim. JA758; ECF No. 45 at 23, 26. As for Count II, although the City styles that claim as an APA claim for alleged violation of the National Underground Railroad Network to Freedom Act, it repeatedly relies on contractual terms for its theory in support of that claim. *See, e.g.*, JA761-62. And the City specifically pointed to the 2006 Cooperative Agreement as the source of its alleged "intangible property right" underlying Count II. ECF No. 45 at 28; *see also id.* at 30-31.

The district court held that the Tucker Act does not bar Count II. JA29. It relied on *National Institutes of Public Health v. American Public Health Ass'n* (*NIPH*), 145 S. Ct. 2658 (2025), for the proposition that claims alleging officials "acted contrary to their statutory mandate" are "the stuff of APA litigation." JA29. But *NIPH* actually supports the Government here. There, the plaintiffs challenged the Government's termination of federal grants governed by specific statutory frameworks that imposed independent substantive and procedural requirements on the termination process. The plaintiffs' rights were thus based on a statute—not on contracts. Here, the opposite is true. The Network to Freedom Act—the only statute the City invokes for Count II—imposes no site-specific

29

obligation that NPS could have violated by removing the exhibits. The Act contains no retention mandate, no interpretive requirement, and no prohibition on altering designated sites. *See infra* Part II.B.1. That explains why the City principally leveraged the 2006 Cooperative Agreement for Count II. *See* JA761-62; ECF No. 45 at 28, 30-31. But a plaintiff cannot evade the Tucker Act by citing a statute that imposes no relevant obligations while relying entirely on contractual terms for the claim's substance. *See Hahn*, 757 F.2d at 589.

Second, the core remedy sought by the City is contractual. The City seeks an order compelling NPS to restore and maintain the exhibits in accordance with the 2006 Cooperative Agreement's terms—including the Project Development Plan's interpretive-focus language and the obligation to "maintain" the project. *See, e.g.*, JA762. That is specific performance. And as the City itself acknowledged below, "specific performance is a contract remedy." ECF No. 45 at 25. The City thus seeks affirmative relief predicated on alleged contractual rights—which confirms the contractual nature of the claims and precludes jurisdiction. *See, e.g.*, *Sea-Land*, 600 F.2d at 433-43; *Qureshi v. Admin. Appeals Off. (AAO) of U.S. Citizenship & Immigr. Servs. (USCIS)*, 408 F. App'x 611, 615 (3d Cir. 2010); *Sharp v. Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.). This

independently confirms what the first *Megapulse* prong establishes: Count II is a contractual claim dressed up with a statutory label. But the Tucker Act bars it regardless of how the City styles its pleading.

The City cannot use APA labels to "circumvent limitations on district court jurisdiction created by the Tucker Act." *Hahn*, 757 F.2d at 589. Because Count II is fundamentally contract-based and seeks specific-performance-type relief, it falls within the Tucker Act's exclusive remedial scheme and must be dismissed for lack of jurisdiction.

## C.    The City Has No Viable Cause of Action

The City's claims independently fail at the threshold because they do not present questions cognizable under the APA or as ultra vires challenges.

### 1.    The City fails to challenge final agency action under the APA.

The APA allows only for review of "agency action." 5 U.S.C. §§ 702, 704. But the NPS's decisions about what to display at its own sites are not "agency action" within the meaning of the statute. The APA carefully defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Crucially, the APA does not authorize "general judicial review of the [agency's] day-to-day operations," *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990), or cover "all conduct such as, for

31

example, constructing a building, operating a program, or performing a contract," *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). The term "agency action" is "not so all-encompassing as to authorize us to exercise judicial review over everything done by an administrative agency." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.).

NPS routinely revises or removes art and informational displays at its sites as part of the ordinary business of managing national parks. Subjecting every such decision to APA review would bring the government to a standstill. The City's view of the law would subject every change to a Park sign, exhibit, pamphlet, interpretive display, or even landscaping to challenge in court—a result that "cannot be squared with the Supreme Court's admonition" against "general judicial review" of agency operations. *Lujan*, 497 U.S. at 899.

Review under the APA is also limited to "final agency action." 5 U.S.C. § 704. Agency action is final only if it "mark[s] the consummation of the agency's decisionmaking process" and "determine[s] rights or obligations" or gives rise to "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Here, NPS's removal of the panels determined no rights or obligations of the City—because the City has none. And a curatorial

decision to remove an exhibit is not the kind of action that gives rise to "direct and appreciable legal consequences." *Chemours Co. FC, LLC v. United States Env't Prot. Agency*, 109 F.4th 179, 184 (3d Cir. 2024).

### 2. The City challenges conduct committed to agency discretion by law.

The APA's waiver of sovereign immunity does not apply if the claim involves "agency action [that] is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This provision precludes review where the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). This Court has held that § 701(a)(2) applies if agency action (1) "involves broad discretion"; (2) "is the product of political or managerial choices that are not readily subject to judicial review"; and (3) does not "violate a constitutional, statutory, or regulatory command." *Const. Guided Walking Tours v. Indep. Visitor Ctr. Corp.*, 454 F. App'x 118, 122 n.2 (3d Cir. 2011) (cleaned up) (quoting *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 203, 205 (3d Cir. 2003)); *see also Davis Enters. v. U.S. E.P.A.*, 877 F.2d 1181, 1184 (3d Cir. 1989); *Local 2855, AFGE (AFL-CIO) v. United States*, 602 F.2d 574, 581 (3d Cir. 1979).

NPS's interpretive decisions at the President's House satisfy all three conditions. Interpretive signage reflects judgments about visitor experience, educational framing, and narrative scope—paradigmatic managerial choices within NPS's expertise. The Secretary has "especially broad discretion on how to implement his statutory mandate" under the Organic Act. *Davis v. Latschar*, 202 F.3d 359, 365 (D.C. Cir. 2000); *see also Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (courts should not "replace the Park Service as the manager of the Nation's parks or endow the judiciary with the competence to judge how much protection of park lands is wise"); *Organized Fishermen of Fla. v. Hodel*, 775 F.2d 1544, 1550 (11th Cir. 1985) ("The task of weighing the competing uses of federal property has been delegated by Congress to the Secretary of the Interior.").

The City identified no statute, regulation, or binding policy that requires NPS to present a particular historical narrative or maintain specific signage. And the City cannot evade § 701(a)(2) by labeling a discretionary decision "arbitrary and capricious"—because a claim is cognizable under § 706 only if the action is reviewable in the first place. *Heckler*, 470 U.S. at 828.

34

This absence of judicially manageable standards is fatal to every theory the City advances on the merits. The City invoked *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and argued that NPS was required to provide a "reasoned explanation" before removing the exhibits. But a reasoned explanation must be measured *against* something. In *State Farm*, the agency's decision was evaluated against the Safety Act's mandate to issue standards that were "reasonable, practicable and appropriate." 463 U.S. at 46. In *Fox*, the reversal was measured against the Communications Act's "public interest" standard. 556 U.S. at 515-16. Here, there is no comparable yardstick. Section 407n does not apply to the President's House. The Network to Freedom Act imposes no site-specific interpretive mandate. The Foundation Document is an internal planning guide that does not create enforceable rights. And the Organic Act gives the Secretary "especially broad discretion." *Davis*, 202 F.3d at 365. Without a substantive standard against which to evaluate NPS's interpretive choices, a court conducting *State Farm* review would have to substitute its own judgment about what should be displayed at a federal site—which is precisely the kind of policy determination that § 701(a)(2) reserves to the agency. *See infra* Part II.B.

35

### 3. The City's ultra vires claim is not cognizable.

The City's ultra vires claim asserts that NPS acted outside its statutory authority by removing the exhibits without the City's consent, in alleged violation of § 407n. *See* JA767-68. But ultra vires review has strict limits that the City cannot satisfy.

Ultra vires review is "strictly limited" and "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). As discussed below in Part II.C, no statute specifically prohibits NPS from removing interpretive materials at President's House. And ultra vires review remains subject to "implied statutory limitations" like the Tucker Act. *See Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320, 324-27 (2015). Because the City derives its purported rights from contractual agreements, the Tucker Act independently forecloses any ultra vires claim.

## II. The City Has Not Established a Likelihood of Success

Even if the City's claims were cognizable, the City has not shown a likelihood of success on the merits. Indeed, under the heightened standard for mandatory injunctions, the City's right to relief must be "indisputably clear." *Hope*, 972 F.3d at 320. It is anything but.

36

### A. Count III, Arbitrary-and-Capricious Action in Violation of 16 U.S.C. § 407n, Fails Because Neither § 407n Nor the Relevant Agreements Bar Removal of the Exhibits

The linchpin of the district court's preliminary injunction is its interpretation of 16 U.S.C. § 407n as conferring upon the City "a statutory right and expectation to mutual agreement on *any changes or alterations to the Park*." JA22 (emphasis added). That reading vastly expands the statute's text and contravenes fundamental principles of statutory interpretation. Without that misinterpretation, the City's claims—and the injunction—cannot stand. And because the preliminary injunction rests on this "erroneous view of the applicable law," it must be reversed. *ADP*, 923 F.3d at 120.

### 1. Section 407n's text is limited to the Independence Hall National Historic Site.

As relevant here, § 407n authorizes the Secretary of the Interior to enter into a cooperative agreement with the City "to assist in the preservation and interpretation of the property known as the Independence Hall National Historic Site . . ., in connection with the Independence National Historical Park." The statute further provides that this agreement must specify "that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, . . . except by mutual agreement" of the parties.

37

Section 407n thus distinguishes between two separate things: "the Independence Hall National Historic Site" and "the Independence National Historical Park." Although § 407n says that its cooperative agreements are "in connection with" *the Park*, it specifies that the cooperative agreement with the City is directed at *the Site*. And the mandatory "no changes or alterations" term is likewise limited to "the property within the Independence Hall National Historic Site." 16 U.S.C. § 407n.

The "Independence Hall National Historic Site" referenced in § 407n has a specific and fixed meaning. Five years before Congress enacted § 407n, the Department of the Interior designated the "Independence Hall National Historic Site" as a national historic site under federal law. 8 Fed. Reg. 7,283 (dated May 14, 1943; published June 1, 1943). That designation included a precise definition: "All those lots, pieces, or parcels of land which are now owned by the City of Philadelphia, located within the block bounded by Walnut, Fifth, Chestnut, and Sixth Streets, known as Independence Square, in the City of Philadelphia, Commonwealth of Pennsylvania." *Id.* Congress relied on that definition in drafting § 407n. *See, e.g.*, H.R. Rep. No. 80-1819, at 8 (1948); S. Rep. No. 80-1622, at 6 (1948). The preamble of the 1950 Agreement—entered into pursuant to § 407n—also incorporates this definition. JA235.

38

The "Independence Hall National Historic Site" is thus limited to Independence Square—the five-acre, City-owned block containing Independence Hall, Congress Hall, and Old City Hall. But the President's House is not within Independence Square. It is located a block north, on the corner of Sixth and Market Streets, on land owned by the Federal Government. By extension, § 407n's mutual-agreement requirement does not apply to the President's House—and NPS's removal of the exhibits without the City's signoff did not violate any right conferred by that statute.

That result makes practical sense. Section 407n was designed to protect property that the City owns—Independence Square—from unilateral federal alterations. But it would be bizarre to read that same provision as granting the City veto power over federal property that the City has never owned, particularly given that the City expressly waived any property interest in the President's House exhibits under the 2006 Cooperative Agreement and its amendments. *See* JA315.

### 2. The district court's contrary interpretation is erroneous.

The district court's reasoning—which expands the City's rights under § 407n to cover the entire Park—is flawed at every step.

*First*, the court found that § 407n is "ambiguous" on the geographic scope of the mutual-agreement requirement because the statute also

39

references Carpenters' Hall—"which is not part of the Independence Square block." JA23-24. But the court conducted no interpretive work before declaring ambiguity. That gets the analysis backwards: an ambiguity determination comes after a court exhausts the traditional tools of statutory construction, not before. *See United States v. Rutherford*, 120 F.4th 360, 380 n.28 (3d Cir. 2024). And the court never identified which statutory term it found ambiguous. JA24.

What's more, there is no ambiguity. Section 407n authorizes the Secretary to enter into cooperative agreements with two parties to manage two specific properties: (1) "with the city of Philadelphia to assist in the preservation and interpretation of the property known as the Independence Hall National Historic Site"; and (2) "with the Carpenters' Company of Philadelphia to assist in the preservation and interpretation of Carpenters' Hall." The statute then requires that both agreements contain specific provisions, including "that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts." 16 U.S.C. § 407n. So the statute authorizes agreements to manage two properties not owned by the Federal Government—Independence Square

and Carpenters' Hall—and draws a clear distinction between the two. There is nothing ambiguous about that.

*Second*, the court's construction renders § 407n's distinct terms superfluous. "[O]ne of the most basic interpretive canons" instructs that a statute "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018). But by the district court's read, § 407n's distinct terms "Independence Hall National Historic Site" and "Independence National Historical Park" end up meaning the same thing. The court's interpretation also "runs afoul of the usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'" *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004); *see also Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 637 (2012) ("[v]ague notions of statutory purpose provide no warrant for expanding [a statutory term] beyond the field to which it is unambiguously limited").

*Third*, the district court erroneously construed § 407n as authorizing the 2006 Cooperative Agreement and its amendments. *See* JA22, JA32-33. But the only cooperative agreements with the City that § 407n authorizes are those directed at "the property known as the Independence Hall

41

National Historic Site." The 2006 Cooperative Agreement and amendments were directed at the President's House project—a separate property on separate land.

*Fourth*, the district court's interpretation is overbroad. It transforms the City's authority from a right to supervise changes to the City's own five-acre property into a right to supervise and veto changes to the entire 55-acre Park—including over 40 historic structures on Federal property. That vast expansion cannot be squared with the Federal Government's exclusive statutory authority over the Park. Federal law provides that "[t]he administration, protection, and development of the park shall be exercised under the direction of the Secretary of the Interior by the National Park Service," 16 U.S.C. § 407q, and that the Director of NPS "shall have the supervision, management, and control of [National Park] System units," 54 U.S.C. § 100302(a)(3); *see also Sturgeon v. Frost*, 587 U.S. 28, 38 (2019) (the Secretary "has broad authority under the National Park Service Organic Act . . . to administer both lands and waters within all system units in the country"). None of these authorities contemplates a municipal veto power over the Federal Government's management of its own property.

### 3. The City's "scope-expands-with-time" theory is meritless.

So far, the City's sole defense of the district court's capacious statutory interpretation has been that the "Independence Hall National Historic Site" was "subsumed" into the Park over time, and that this somehow expanded the City's narrow statutory right over the Site into a broad right over the entire Park. Stay Opp. at 15-17. That theory has no basis in the statute and flouts fundamental principles of statutory interpretation.

"[E]very statute's meaning is fixed at the time of enactment." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018); *accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (observing that this is "the whole point of having written statutes"); *Essintial*, 166 F.4th at 384 ("we look to the ordinary, contemporary, common public meaning of the words at issue at the time the law was passed" (cleaned up)). The City points out that § 407m authorized the Secretary to acquire properties and provided that the Park would not be established until enough land had been acquired. But § 407m's cross-reference to § 407n concerns the *process* for establishing the Park through cooperative agreements—it says nothing about expanding the *scope* of the mutual-agreement requirement beyond the properties specified in § 407n's text.

43

The City also invokes Article III(i) of the 1950 Agreement, which says that the parties' agreement designating the site as a national historic site "shall be terminated . . . upon the establishment of the Independence National Historical Park." JA241. But Article III(i) merely terminated the parties' previous agreement—it had no effect on the Interior Department's definition of the Site, *see* 8 Fed. Reg. 7,283, and necessarily could not alter the meaning of a statutory term. Nor does the parties' cooperative history alter the analysis—because course of conduct cannot change the meaning of a statute. *See Wis. Cent.*, 585 U.S. at 284

### 4.    The relevant agreements confirm NPS's authority.

Even setting aside the statutory text, the agreements on which the City relies do not support its claims.

The 1950 Agreement was entered into pursuant to § 407n and is directed at Independence Square—not the President's House. Its preamble references "the Independence Hall group of historic structures comprising Independence Hall, Congress Hall, Old City Hall, and associated historic objects, located in Independence Square." JA235. It imposes no obligations on NPS with respect to the President's House.

The 2006 Cooperative Agreement and its amendments are likewise unavailing. Those agreements expired in May 2010. *See* JA255, JA317. And

44

as detailed in the Statement of the Case above (at 9-10), the agreements' express terms unambiguously establish that NPS obtained complete and unconditional ownership of the exhibits upon their completion—and that the City "waive[d] any claim or right to any property interest, including use rights, or to compensation for any Project components donated to NPS." JA315. These express terms defeat any contrary allegations. *See Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 112 (3d Cir. 2018). And the Federal Government, like any other property owner, enjoys the "rights to possess, use, and dispose of" its property. *Horne v. Dep't of Agric.*, 576 U.S. 350, 361-62 (2015); *see also Camfield v. United States*, 167 U.S. 518, 524 (1897) (Federal Government "has, with respect to its own lands, the rights of an ordinary proprietor").

The survival clause in the 2006 Agreement does not change anything. That clause preserves only provisions that "by themselves or their nature, are reasonably expected to be performed after the expiration or termination" of the agreement. JA321. The City has relied on the Project Development Plan's language that interpretation "will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved." JA332. But that

language describes interpretive *focus*—it does not prohibit removal of the exhibits and it cannot override the specific and unconditional ownership-transfer provisions discussed above. Nor can the City's invocation of NPS's obligation to "maintain" the project conjure a perpetual-display mandate. The duty to "maintain" is a general management obligation that accompanies ownership, not a promise that the exhibits will forever remain in place regardless of the owner's wishes. And even if relevant contractual obligations survived, the Tucker Act would preclude this Court's jurisdiction over those claims. *See supra* Part I.B.

### B. Counts II and IV Fail Because Neither the Network to Freedom Act Nor the Agency Guidance Documents Impose Enforceable Constraints on NPS's Curatorial Decisions

Counts II and IV are both arbitrary-and-capricious claims under the APA. Count II alleges that NPS violated the National Underground Railroad Network to Freedom Act of 1998, 54 U.S.C. §§ 308301-04. Count IV alleges that NPS departed from its own Foundation Document and Management Policies. The district court held that both claims were likely meritorious under the framework of *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983), finding that NPS reversed longstanding policy without a reasoned explanation. JA35-38. But that analysis was flawed at every level: the underlying sources of law are not enforceable, the

*State Farm* framework does not apply to operational curatorial decisions, and the district court's reasoning cannot be sustained.

### 1.    The Network to Freedom Act imposes no preservation or interpretive mandate.

The Network to Freedom Act directs NPS to establish a program to "produce and disseminate appropriate educational materials" and authorizes the Secretary to enter into cooperative agreements and make grants. 54 U.S.C. §§ 308302(a), (b). But nothing in the statute mandates that a designated site must maintain specific exhibits, retain specific interpretive themes, or preserve particular signage.

Indeed, the statute's own implementing documents expressly refute that notion. NPS's application instructions provide that "[h]istoric sites and properties included in the Network are not bound by any legal requirements to comply with Federal historic preservation laws, based on their inclusion in the Network alone." Nat'l Park Serv., *Application Instructions: National Underground Railroad Network to Freedom Application*, https://perma.cc/SFS3-PQ3B (last updated Jan. 21, 2026; captured Mar. 27, 2026). Similarly, the program's application materials state: "Inclusion in the Network does not guarantee that a threatened site will be protected or that preservation will occur." Nat'l Park Serv., *National Underground Railroad Network to Freedom Application and Partner*

47

*Requests Instructions* (OMB Control No. 1024-0232) at 2,

https://perma.cc/5J7Z-TFMV (captured Mar. 27, 2026).

The district court's ruling on Count II hinges on its reading of the statute. The court reasoned that NPS's removal of interpretive content "runs counter to Congressional directives and to the Act's legislative intent." JA32. But the Act contains no site-specific, judicially enforceable duty to retain particular panels, videos, or educational materials at any designated site. And the site remains designated under the Network to Freedom program—NPS did not alter the designation itself. By inferring a retention obligation that the statute's text does not impose, the district court committed legal error that infects its entire analysis on Count II. *See ADP*, 923 F.3d at 120.

The district court also found that NPS "failed to consider" the Congressional directives underlying the Network to Freedom Act and the site's designation under the program. JA32. But *State Farm*'s "failed to consider" prong applies only where the agency has overlooked factors "which Congress has intended it to consider." 463 U.S. at 43. The Network to Freedom Act does not tell NPS to consider anything when making site-level interpretive decisions. It directs NPS to establish a program and produce educational materials. 54 U.S.C. § 308302. It does not prescribe

48

decision-making criteria for what content to display, retain, or remove at any particular site. An agency cannot "entirely fail[] to consider" factors that no statute requires it to consider in the first place.

### 2. The Foundation Document and Management Policies do not create enforceable rights.

The district court held that NPS's removal of the exhibits conflicted with the Foundation Document's interpretive themes and significance statements—including the "Paradox of Freedom and Slavery"—and that NPS failed to provide a reasoned explanation for departing from its own planning guidance. JA34-38. But the documents the court relied on do not create enforceable obligations.

NPS's Management Policies expressly disclaim any enforceable effect: "The policies contained within this document are intended only to improve the internal management of the National Park Service; they are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." Nat'l Park Serv., *Management Policies 2006* (as amended) at 4, https://perma.cc/3556-43ES. Director's Order No. 2 contains an identical disclaimer. JA802. The Foundation Document, which sits below these policies in NPS's planning hierarchy, is likewise an internal planning guide

49

that provides "basic guidance for planning and management decisions." JA382. So the documents are not a source of judicially enforceable rights.

Courts have consistently held that these kinds of management documents are non-binding and cannot support an APA claim. *See The Wilderness Soc. v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) ("the conclusion is inescapable that the Management Policies is a nonbinding, internal agency manual intended to guide and inform Park Service managers and staff"); *Horses of Cumberland Island v. Haaland*, No. 23-cv-1592, 2024 WL 5430835, at *11 (N.D. Ga. Nov. 8, 2024) (same); *see also Pennsylvania Dep't of Hum. Servs. v. United States*, 897 F.3d 497, 513 (3d Cir. 2018) (agency manual "was not binding" because it "satisf[ies] none of the criteria which have been developed by the courts to determine whether agency regulations have the force of law" (quoting *Gatter v. Nimmo*, 672 F.2d 343, 347 (3d Cir. 1982))); *Schweiker v. Hansen*, 450 U.S. 785, 789-90 (1981) ("[T]he Claims Manual is not a regulation. It has no legal force, and it does not bind the [agency].").

The district court acknowledged that the Foundation Document may lack "binding force" but held that it nonetheless provides "an adequate basis upon which to consider NPS's change in policy." JA35-36. In doing so, the court relied on *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014), and

50

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*, 698 F. Supp. 3d 39, 74-75 (D.D.C. 2023). JA35. But *Loving* involved the IRS's reversal of a longstanding interpretive position—announced in Congressional testimony—that directly governed the legal obligations of tax-return preparers who had structured their businesses in reliance on it. The D.C. Circuit's holding that the IRS must explain such a reversal rested on the existence of concrete reliance interests created by a position with real-world legal consequences. The Foundation Document is categorically different. It is an internal planning guide that NPS itself characterizes as providing only "basic guidance for planning and management decisions," JA382—not a decision document, and not a source of enforceable rights. Nobody structured its legal affairs based on the Foundation Document's interpretive themes, and no legal consequences flowed from its provisions. If every internal agency document—no matter how explicitly it disclaims legal force—can serve as a *State Farm* baseline then the disclaimer language is meaningless and agencies would be bound by every planning document they produce.

### 3. The district court's reliance on the *State Farm* framework was error.

The district court held that NPS acted arbitrarily and capriciously by reversing its prior interpretive position without a "reasoned explanation."

JA35 (citing *Fox*, 556 U.S. at 515). The court also invoked *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 217 (2016), and this Court's decision in *Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 549 (3d Cir. 2023), to support its conclusions on this point. JA36. But that was wrong for several reasons.

The threshold problem is that *State Farm*'s framework cannot function without a legal standard against which to evaluate the agency's explanation. Each of the cases the district court relied on illustrates this point. In *State Farm*, the yardstick was the Safety Act's mandate to issue "reasonable, practicable and appropriate" standards. 463 U.S. at 46. In *Fox*, it was the Communications Act's "public interest" standard. 556 U.S. at 515-16. In *Encino Motorcars*, it was the FLSA's overtime provisions. 579 U.S. at 217. Here, there is no yardstick.

Even if the framework applied, the district court's analysis was flawed. The court relied on *Logic Tech* for the proposition that agencies must explain policy reversals even when the prior position lacks the force of law. But *Logic Tech* involved an agency's reversal of a specific regulatory determination that directly governed a private party's legal obligations. *See* 84 F.4th at 549. That is categorically different from a decision about what interpretive materials to display at a national park. Nothing in *Logic Tech*

52

suggests that every internal agency document—including those that expressly disclaim creating enforceable rights—can serve as a baseline against which future agency conduct is measured under the APA.

The district court also improperly assessed the Government's rationale. The court found that the Government's "only proffered rationale" was Executive Order 14,253 and then turned the EO against the Government. JA36. But agencies are entitled to a presumption of regularity. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Trenton Threatened Skies, Inc v. FAA*, 90 F.4th 122, 131 (3d Cir. 2024). And a "court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Com. v. New York*, 588 U.S. 752, 780-81 (2019). Nor may a court "set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id.*

The district court's treatment of the EO was flawed for an additional reason. The court reasoned that the EO *contradicts* the exhibits' removal because it seeks to prevent "replac[ing] objective facts with a distorted narrative," and the court characterized the removal as "dismantling objective historical truths." JA36. But that reasoning collapses the

distinction between a speech choice and a truth claim. NPS never asserted that the exhibits' historical facts were inaccurate. It chose not to display particular interpretive content at a particular site—and the historical record remains intact in NPS's own program files, publicly available scholarship, and photographs of the exhibits accessible online. By deciding for itself what the EO requires and concluding that NPS got its own mandate wrong, the district court did precisely what *State Farm* forbids: it "substitute[d] its judgment for that of the agency." 463 U.S. at 43. Choosing what to present is not the same as denying what occurred. And conflating the two is not a basis for arbitrary-and-capricious review.

### C. Count V Fails Because There Is No Specific Statutory Prohibition That Can Support Ultra Vires Relief

Ultra vires review is "strictly limited" and "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n*, 605 U.S. at 681. The City must show a "patent"—or "obvious"—violation of statutory authority. *Fla. Health Scis. Ctr., Inc. v. Sec'y of Health & Hum. Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016).

The City has identified no such prohibition. Its ultra vires theory rests on the same statutory provisions that underlie its other claims—16 U.S.C. § 407n and the Network to Freedom Act—neither of which supports relief

54

as discussed above. Ultra vires review also remains subject to "implied statutory limitations" like the Tucker Act. *See Armstrong*, 575 U.S. at 324-27; *see also Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *2 (4th Cir. June 5, 2025) (citing *Armstrong* and observing that "it appears unlikely that Plaintiffs' ultra vires claims . . . would provide a detour around the Tucker Act"). Because the City (and the district court, JA39-40) derives the purported rights from contractual agreements, the Tucker Act separately forecloses its ultra vires claim.

## III.   The City Has Not Shown Irreparable Harm

Even if the City could demonstrate a likelihood of success, the injunction must still be vacated because the City failed to show irreparable harm. A preliminary injunction should issue "only in limited circumstances"—to preserve the parties' positions until trial, not "just to prevent harm." *Del. State Sportsmen's Ass'n*, 108 F.4th at 203. And if the movant "has shown no harms beyond ones that can be cured after final judgment," that "alone suffices" to deny relief. *Id.* at 205.

The City's theory of irreparable harm is that removal of the exhibits constitutes "erasure" that "undermines public trust" and "compromises the integrity of public memory." JA41. But the City must show that *it* "specifically and *personally* risks irreparable harm." *Adams v. Freedom*

*Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (emphasis added). The City's harms are overwhelmingly derivative of alleged harms to the public—injuries that a municipality may not invoke against the United States. *See Mellon*, 262 U.S. at 486; *Town of Milton*, 87 F.4th at 96.

The record also establishes that the harm is not irreparable. As the Park's Superintendent declared under oath, the exhibits were being held securely in storage and would remain there pending the outcome of the case. JA59. NPS has the designs for all exhibits and can readily produce replacements if necessary—at a cost of approximately $20,000 with a turnaround of roughly three weeks. JA812. Where the challenged condition is reversible—where items are preserved and can be returned—any alleged harm can, by definition, be "cure[d] after final judgment" and thus cannot support an injunction. *Del. State Sportsmen's Ass'n*, 108 F.4th at 205; *see also Penn. ex rel. Creamer v. U.S. Dep't of Agric.*, 469 F.2d 1387, 1388 (3d Cir. 1972) (per curiam).

## IV. The Injunction's Mandatory Nature and Overbreadth Independently Require Vacatur

The district court's injunction is not merely a prohibitory order maintaining the status quo—it is an extraordinary mandatory injunction that restructures the Federal Government's management of its own property. Even if the City had established some likelihood of success on

some claim *and* had established some form of irreparable harm, the injunction would still require vacatur because it is not properly tailored.

A party seeking "a mandatory preliminary injunction that will alter the status quo" bears "a particularly heavy burden in demonstrating its necessity." *Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994). The district court's injunction—which requires full site restoration, bars any changes without the City's consent, mandates video-monitor operability, and directs snow and debris removal, all "**FORTHWITH**," JA4-5—goes far beyond preserving the status quo. The City's right to this sweeping mandatory relief is anything but "indisputably clear." *Hope*, 972 F.3d at 320.

What's more, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," and "the scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). This Court has held that "even assuming likely success and irreparable injury," an injunction "must be vacated" if the district court "made no attempt whatsoever to tailor its scope appropriately." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 198-99 (3d Cir. 1990).

57

Here, the district court declined to rest the injunction on Count I (the breach-of-contract claim), acknowledging that "the Tucker Act impliedly forbids the City from obtaining relief" on that count. JA29. The court then proceeded to enter a sweeping injunction purportedly based on Counts II through V. But Counts II and IV—the Network to Freedom Act and Foundation Document claims—cannot support the specific-performance-style injunction the court entered.

Consider the mismatch. If NPS's removal of the exhibits was arbitrary and capricious because it violated the Network to Freedom Act (Count II) or departed from the Foundation Document without adequate explanation (Count IV), the appropriate APA remedy would be to "hold unlawful and set aside" the agency action and remand for the agency to provide a reasoned explanation. 5 U.S.C. § 706(2). But the district court ordered full restoration of the site to its pre-removal condition and then imposed a prospective municipal-veto regime and operational mandates having nothing to do with any statutory or policy violation.

Paragraphs 4 and 5 of the injunction are particularly untethered to any violation found. Paragraph 4 orders the Government to provide "immediate, continuing, and proper maintenance" and mandates that video monitors and recordings "**SHALL** remain operable." JA5. Paragraph 5

58

orders the Government to "maintain the President's House Site in a clean and accessible manner, cleared of debris, snow, ice and/or any other impediment to public access." *Id.* No count in the amended complaint—and no portion of the district court's opinion—identifies a failure to maintain the site, keep it clean, remove snow, or ensure video monitors are functioning. These provisions are operational mandates that bear no relationship to the removal of interpretive panels that was the only agency action challenged.

Similarly, the injunction's prohibition on the Government making "any and all further changes" without the City's "mutual agreement" effectively grants the City the veto authority that the district court derived from its erroneous reading of § 407n. Even if some claims survived, the injunction's scope cannot exceed "the extent of the violation established." *Califano*, 442 U.S. at 702. An APA violation based on a failure to explain a policy change does not warrant a judicially imposed regime of municipal co-management over federal property.

The district court also failed to consider less burdensome alternatives. *See Winter*, 555 U.S. at 24. The court could have ordered NPS to continue preserving the exhibits pending litigation—which NPS was already doing voluntarily, JA59—without mandating full reinstallation and an ongoing

59

operational regime. The sweeping, all-or-nothing nature of the injunction is an abuse of discretion.

## V.    The Equities Support the Government

The public interest and balance of the equities weigh strongly against the injunction. Where a plaintiff seeks preliminary relief against the Federal Government, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, they decisively favor the Government.

The injunction intrudes on the Government's exclusive statutory authority to administer the Park. Federal law vests "administration, protection, and development" of the Park in the Secretary of the Interior acting through NPS. 16 U.S.C. § 407q. The Organic Act gives NPS "supervision, management, and control" of all National Park System units. 54 U.S.C. § 100302(a)(3). The district court's injunction overrides that authority and substitutes judicial management for agency discretion. That intrusion qualifies as irreparable harm. *See, e.g.*, *INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers); *see also Ramos v. Att'y Gen. United States*, No. 25-2946, 2025 WL 2950133, at *3 (3d Cir. Oct. 17, 2025) (Bove, J., concurring in denial of stay pending appeal).

The injunction also improperly compels the Federal Government to speak. It requires the display and operation of expressive exhibits at a marquee national historic site when the Government has chosen not to display those exhibits. "Permanent monuments displayed on public property typically represent government speech," and "[a] government entity has the right to speak for itself." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467, 470 (2009). It is "entitled to say what it wishes," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and may "select the views that it wants to express," *Summum*, 555 U.S. at 467-68; *see also Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210 (2015) (describing *Summum* as "reject[ing] the premise that the involvement of private parties in designing the monuments was sufficient to prevent the government from controlling which monuments it placed in its own public park"); *cf. Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 30 (2015) (coordinate branch of government "may not force the President himself to contradict his earlier statement"). The injunction contravenes these principles by compelling the Government to convey a particular interpretive message at its own site. Such compelled speech and interference with speech rights inflict irreparable harm. *See generally Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion).

61

The City dismissed these harms in the district court and again in its stay opposition here. But the City itself has recognized the gravity of these injuries when the roles were reversed. Just a few years ago, when a state court ordered the City to display a Christopher Columbus statue on City property, the City argued that the injunction "represent[ed] a grave intrusion on the City's property rights and its rights against compelled speech." Appellant's Br. at *27-29, *In re Friends of Marconi Plaza*, No. 1104 CD 2021 (Pa. Commw. Ct. 2022), 2022 WL 20505710. The City contended that the injunction improperly "compel[led] the City to display a [s]tatue it does not wish to display, and convey a message that it does not endorse" and thus "intrude[d] on the City's First Amendment rights." *Id.* at *28; *see also* Appellant's Reply Br. at *15-16, *In re Friends of Marconi Plaza*, No. 1104 CD 2021 (Pa. Commw. Ct. 2022), 2022 WL 20505711 (similar).

The City was right then. And the same principles apply now. If the City disagrees with the Government's decisions about what to display at the President's House, the appropriate remedy is political, not judicial. "The Constitution . . . relies first and foremost on the ballot box . . . to check the government when it speaks." *Shurtleff v. City of Bos., Mass.*, 596 U.S. 243, 252 (2022). The Government is "ultimately accountable to the electorate

and the political process for its advocacy," and "[i]f the citizenry objects, newly elected officials later could espouse some different or contrary position." *Summum*, 555 U.S. at 468-69.

The City's indeterminate harms do not outweigh these significant and concrete harms to the Government. The City's assertions about the erasure of history—however strongly felt—do not qualify as the kind of particular, actual, imminent irreparable harm that justifies overriding the Government's rights to manage its own property and control its own speech.

## CONCLUSION

The Court should vacate the district court's preliminary injunction and remand with instructions to dismiss for lack of subject-matter jurisdiction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DAVID METCALF
United States Attorney

MICHAEL VELCHIK
Senior Counsel to the
Assistant Attorney General

*/s/ Gregory B. David/LYJ*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

/s/ *Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Phone:  (215) 861-8200
Email:  gregory.indenberken@usdoj.gov

March 27, 2026

## COMBINED CERTIFICATIONS

I certify that:

1.      I am a member in good standing of the bar of this Court.

2.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,998 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

3.      This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface in 14-point Georgia font using Microsoft Word for Microsoft 365.

4.      The electronic version of this brief is identical to the paper copies.

5.      The electronic version of this brief was scanned using Trellix Endpoint Security version 10.7.18 and no virus was detected.

6.      On March 27, 2026, I filed this brief via the Court's CM/ECF system and thus served it on all parties' counsel registered to receive electronic notices.

*/s/ Gregory B. in den Berken*

March 27, 2026                    Gregory B. in den Berken

**JOINT APPENDIX**

**TABLE OF CONTENTS**

**Document**                                                                      **Page**

**VOLUME I (JA1–JA45, bound with Appellants' Brief)**

1. Notice of Appeal, ECF No. 58 (Feb. 17, 2026)                                   JA1

2. Order Granting Amended Motion for Preliminary
   Injunction, ECF No. 54 (Feb. 16, 2026                                          JA4

3. Memorandum Opinion, ECF No. 53 (Feb. 16, 2026)                                 JA6

**VOLUME II (JA46–JA813)**

4. District-Court Docket Sheet                                                    JA46

5. Declaration of Superintendent Steven Sims, ECF No. 27-1
   (Jan. 28, 2026)                                                                JA57

6. Transcript of January 30, 2026 Preliminary-Injunction
   Hearing, ECF No. 60 (Feb. 18, 2026)                                            JA61

7. Plaintiff's Preliminary-Injunction Exhibits, ECF Nos. 36
   through 36-28 (Jan. 30, 2026)                                                  JA233

8. Amended Complaint for Declaratory and Injunction Relief,
   ECF No. 44 (Feb. 6, 2026)                                                      JA741

9. Defendants' Opposition to Plaintiff's Amended Motion for
   Preliminary Injunction and Temporary Restraining Order,
   ECF No. 52 (Feb. 13, 2026)                                                     JA771

10. Supplemental Declaration of Superintendent Steven Sims,
    ECF No. 52-1 (Feb. 13, 2026)                                                  JA811

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CITY OF PHILADELPHIA,

      Plaintiff,

      v.

DOUG BURGUM, SECRETARY OF THE
INTERIOR; UNITED STATES
DEPARTMENT OF THE INTERIOR;
JESSICA BORWON, ACTING DIRECTOR
OF THE NATIONAL PARK SERVICE; and
NATIONAL PARK SERVICE, UNITED
STATES DEPARTMENT OF THE
INTERIOR,

      Defendants.

Case No. 26-cv-434

## NOTICE OF APPEAL

Defendants hereby appeal this Court's February 16, 2026 memorandum opinion

(ECF No. 53) and order (ECF No. 54) to the United States Court of Appeals for the Third

Circuit.

Dated: February 17, 2026

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

MICHAEL VELCHIK
Senior Counsel to the Assistant
Attorney General

Respectfully submitted,

DAVID METCALF
United States Attorney

*/s/ Gregory B. David*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

JA1

Case 2:26-cv-00434 Document 3 Page: 80 Date Filed: 03/20/26

/s/ Gregory B. in den Berken
GREGORY B. IN DEN BERKEN
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Phone:    (215) 861-8200
Email:    gregory.indenberken@usdoj.gov

*Counsel for Defendants*

2

JA2

## CERTIFICATE OF SERVICE

I certify that on February 17, 2026, a true and correct copy of Defendants' Notice of Appeal was filed electronically via the Court's CM/ECF system and served via CM/ECF on all counsel of record.

/s/ Gregory B. in den Berken
GREGORY B. IN DEN BERKEN

JA3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| |
|---|
| **CITY OF PHILADELPHIA** |
| **Plaintiff,** |
| **v.** |
| **DOUG BURGUM,** *et al.*, |
| **Defendants.** |

**CIVIL ACTION NO. 26-434**

### PRELIMINARY INJUNCTION ORDER

**AND NOW,** this 16th day of February 2026, upon consideration of Plaintiff's Amended Motion for Preliminary Injunction and Temporary Restraining Order [Doc. Nos. 45, 2], Defendants' Opposition thereto [Doc. Nos. 52, 27], and after hearing and oral argument thereon, including giving consideration to the amended briefing of the Parties and briefing and arguments of *amici curiae*, it is hereby **ORDERED**:

1. For the reasons stated in the accompanying Memorandum Opinion, the Amended Motion for Preliminary Injunction [Doc. Nos. 45, 2] is **GRANTED**. The alternative relief for the Amended Motion for Temporary Restraining Order is hereby **DISMISSED AS MOOT**.

2. Defendants Doug Burgum, United States Department of the Interior, Jessica Bowron, and National Park Service are hereby **ORDERED** to restore the President's House Site to its physical status as of January 21, 2026.

3. Defendants are hereby **ENJOINED** from taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site, are **ORDERED** to take all necessary steps to ensure the safety, security, and preservation of any such items that had been removed from the President's House Site on January 22, 2026, and are **ENJOINED** from making any and all further changes to the President's House Site, including the installation of

JA4

replacement materials, without mutual agreement of the City of Philadelphia during the pendency of this litigation or until further Order of the Court.

4.      Defendants are hereby **ORDERED** to provide immediate, continuing, and proper maintenance to the Site, its exhibits, grounds, artifacts, video monitors, and recordings which **SHALL** remain operable.

5.      Defendants are hereby **ORDERED** to maintain the President's House Site in a clean and accessible manner, cleared of debris, snow, ice and/or any other impediment to public access.

All terms and conditions of this Order for preliminary injunctive relief must be followed immediately, that is **FORTHWITH.**

BY THE COURT:

**/s/ Cynthia M. Rufe**

_____

**CYNTHIA M. RUFE, J.**

JA5

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**CITY OF PHILADELPHIA,**

    **Plaintiff,**

    **v.**

**DOUG BURGUM,** *et al.*,

    **Defendants.**

**CIVIL ACTION NO.  26-434**

## MEMORANDUM OPINION

**Rufe, J.**                                                                                          **February 16, 2026**

> *All history was a palimpsest, scraped clean and reinscribed exactly*
> *as often as was necessary. In no case would it have been possible,*
> *once the deed was done, to prove that any falsification had taken*
> *place.*
>
> George Orwell, *1984*[1]

As if the Ministry of Truth in George Orwell's *1984* now existed, with its motto "Ignorance is Strength," this Court is now asked to determine whether the federal government has the power it claims—to dissemble and disassemble historical truths when it has some domain over historical facts. It does not.

The President's House is a component of Independence National Historical Park that commemorates the site of the first official presidential residence and the people who lived there, including people enslaved by President George Washington. On January 22, 2026, the National Park Service ("NPS") removed panels, displays, and video exhibits that referenced slavery and information about the individuals enslaved at the President's House.

Plaintiff City of Philadelphia ("the City") filed this lawsuit under the Administrative Procedures Act ("APA") against the Secretary of the Interior Doug Burgum, the Department of

---

[1] George Orwell, *1984* at 40 (Penguin Random House LLC, 75th anniversary ed. 2023) (1949).

JA6

the Interior, the Acting Director of NPS Jessica Bowron, and NPS, claiming, *inter alia*, that Defendants' removal of the displays is unlawful agency action, arbitrary and capricious, and, alternatively, *ultra vires*.

The City has moved for a preliminary injunction, and after initial briefing by the parties and *amicus* briefs in support of the motion filed by *amici curiae* Commonwealth of Pennsylvania Governor Josh Shapiro, Avenging the Ancestors Coalition ("ATAC") and the Black Journey, and Members of the Democratic Caucus of the Senate of Pennsylvania, the Court held a hearing on January 30, 2026. At the hearing, the City presented evidence. Defendants did not. The Court entertained oral argument from the parties as well as from *amici* ATAC and the Black Journey. The Court then entered a Post-Hearing Order permitting amended briefing and directing that "No further removal and/or destruction of the President's House site will be permitted until further order of the Court."[2]

In turn, the City filed an Amended Complaint and an Amended Motion for Preliminary Injunction and Temporary Restraining Order ("TRO").[3] In the Amended Motion, the City seeks a preliminary injunction to restore the President's House exhibit as it existed on January 21, 2026, and seeks a TRO to temporarily enjoin Defendants from damaging items from the President's House site or making any further alterations to the President's House.[4] Defendants have filed an Opposition,[5] and that Opposition has been considered herein.

---

[2] Post-Hearing Order [Doc. No. 37].

[3] Am. Compl. [Doc. No. 44]; Pl.'s Am. Mot. Prelim. Inj. & TRO ("Pl.'s Am. Mot.") [Doc. No. 45].

[4] Pl.'s Am. Mot. at 1 [Doc. No. 45].

[5] Defs.' Opp'n to Pl.'s Am. Mot. [Doc. No. 52].

2

JA7

## I.   BACKGROUND

In 1948, Congress passed legislation (the "1948 legislation") establishing Independence National Historical Park "for the purpose of preserving for the benefit of the American people as a national historical park certain historical structures and properties of outstanding national significance located in Philadelphia, Pennsylvania, and associated with the American Revolution and the founding and growth of the United States."[6] In addition to establishing the Park, the statute authorized the Secretary of the Interior "to enter into cooperative agreements with the city of Philadelphia to assist in the preservation and interpretation of the property known as Independence Hall National Historic Site."[7] Such cooperative agreements "shall contain, but shall not be limited to, provisions that . . . no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts."[8]

In 1950, pursuant to the 1948 legislation, the City entered into an agreement with the Secretary of the Interior to cooperate in the preservation of the Independence National Historical Park (the "1950 Agreement").[9] Under the 1950 Agreement, the City retained ownership of the Independence Hall structures, land, and park area adjacent to Independence Hall.[10] The Secretary of the Interior, through NPS, was granted an exclusive right to occupy the area "for the purpose of preserving, exhibiting, and interpreting them to the American people and otherwise utilizing

---

[6] An Act To Provide for the Establishment of the Independence National Historical Park and for Other Purposes, Pub. L. No. 80-795, 62 Stat. 1061 (codified as amended at 16 U.S.C. §§ 407m, 407n).

[7] 16 U.S.C. § 407n.

[8] *Id.*

[9] Pl.'s Ex. 1, 1950 City-US Cooperative Agreement ("1950 Agreement") [Doc. No. 36-1].

[10] *Id.* at 3.

JA8

them and their adjacent grounds for national historical park purposes."[11] The 1950 Agreement also designated curatorial responsibilities to the Secretary.[12] Under the 1950 Agreement, the City and the federal government cooperated for decades to preserve, maintain, and expand Independence National Historical Park.[13]

At the turn of this century, historians identified the location of the first official residence of the President of the United States, where Presidents Washington and Adams lived during their terms.[14] This historical research also identified information about nine enslaved Africans whom President Washington owned, brought to the official presidential residence, and rotated in and out of Pennsylvania, a practice which prevented enslaved individuals from petitioning for their freedom under Pennsylvania law.[15] Etched into a wall within the President's House exhibit are the names of those nine enslaved individuals: Oney Judge, Austin, Christopher Sheels, Giles, Hercules Posey, Joe Richardson, Moll, Paris, and Richmond.[16] Of those nine, Oney Judge escaped the house in 1796, eventually making her way to New Hampshire.[17] Hercules also eventually escaped his enslavement after he was brought to Mount Vernon.[18]

Based on these revelations, the United States House of Representatives in 2003 urged NPS to commemorate the lives of slaves who were owned by President Washington and who

---

[11] *Id*. at 3.

[12] *Id.*

[13] *See* Pl.'s Ex. 3, 2006 City-US Cooperative Agreement ("2006 Agreement") at 1 [Doc. No. 36-3].

[14] *See* Pl.'s Ex. 14, Request for Qualifications Professional Services Contract ("RFQ") at 2-3 [Doc. No. 36-15]; 1/30/26 Hr'g Tr. at 35-36, 38 [Doc. No. 45-1].

[15] Pl.'s Ex. 10, Application and Approval For President's House in Underground Railroad Network ("Network to Freedom Application and Approval") at 7 [Doc. No. 36-10].

[16] *Id.* at 6.

[17] *Id.* at 14-17.

[18] Pl.'s Ex. 12, 2010 Script for Video Media at 17 [Doc. No. 36-13].

4

JA9

lived on site.[19] Specifically, the House urged NPS "to appropriately commemorate the concerns raised regarding the recognition of the existence of the Mansion and the slaves who worked in it during the first years of our democracy."[20] The House also directed NPS to submit a report detailing the actions taken toward the realization of this project.[21]

According to the testimony of Joyce Wilkerson, Chief of Staff for the City to Mayor John Street from 2000 to 2007, the City became aware of the significance of the President's House site through the emergent historical research and public advocacy.[22] Ms. Wilkerson led the City's involvement in the project.[23] In 2003, the new Liberty Bell Pavilion opened adjacent to the site that would become the President's House. The juxtaposition of the newly placed Liberty Bell and the recently uncovered history of slavery at that spot motivated the City to collaborate with NPS to tell a "fuller story" because "it was finally time to tell an honest story about American history and the founding of this country and the role that slavery and enslaved Africans had . . . as well as the free [African-American] Philadelphians."[24]

To tell this fuller story, the City committed $1.5 million of City funds towards commemoration efforts for the President's House in 2003.[25] Intending to fill gaps in funding the project, this monetary commitment reflected the City's prominent role in moving this project forward" to ensure "the full story be told."[26] In 2005, Congress appropriated $3.6 million for

---

[19] Pl.'s Ex. 2, 2003 House of Representatives Report 107-564 at 46-47 [Doc. No. 36-2].

[20] *Id*. at 47.

[21] *Id*.

[22] 1/30/26 Hr'g Tr. at 34-36, 58 [Doc. No. 45-1].

[23] *Id.* at 44-48.

[24] *Id.* at 37-38.

[25] *Id.* at 39-40.

[26] *Id.*

5

"Independence National Historic[al] Park scenic enhancement and pedestrian walkways improvement project in conjunction with the [P]ark's Executive Mansion Exhibit."[27] Around that time, NPS and the City began to collaborate by jointly issuing a Request for Qualifications ("RFQ") document for contractors and later by convening an Oversight Committee comprised of stakeholders such as representatives of advocacy groups, historians, and community activists.[28] NPS and the City also agreed that NPS would organize an excavation of the President's House site, with City-approval needed for NPS to select an archeological firm.[29] As the excavation proceeded, NPS was to provide recurring reports regarding its historical findings.[30]

In 2006, pursuant to the founding Congressional legislation, the City and NPS entered into an agreement (the "2006 Cooperative Agreement" or "2006 Agreement") to establish an exhibit at the site of the President's House to "illuminate[] the history of the site of the former President's House."[31] The 2006 Cooperative Agreement established terms of cooperation between the City and NPS "in the planning, development and preparation of the design, fabrication and installation" of the President's House Exhibit.[32] The Agreement established that, upon completion of the Exhibit, ownership of the Exhibit would transfer to NPS.[33] The Agreement also identified that the City's provision of funds for the President's House project fulfilled a public purpose "because it enables the City to commemorate the symbolic and historical importance of the President's House for the City of Philadelphia, its citizens, and all

---

[27] Pl.'s Ex. 17, 2/27/07 City-NPS Press Release ("2/27/07 Press Release") at 2 [Doc. No. 36-18]; Pub. L. No. 109-59, 119 Stat. 1304 (2005).

[28] RFQ [Doc. No. 36-15]; 2/7/07 Press Release at 2 [Doc. No. 36-18].

[29] 2006 Agreement at 5 [Doc. No. 36-3]; Network to Freedom Application and Approval at 20 [Doc. No. 36-10].

[30] 2006 Agreement at 5 [Doc. No. 36-3].

[31] 2006 Agreement at 2 [Doc. No. 36-3].

[32] *Id*. at 3.

[33] *Id*.

6

JA11

Americans nationwide, and by doing so, there is a public benefit inuring to the City."[34] The 2006 Cooperative Agreement ensured its "terms, covenants and conditions" extended to and bound the parties and their successors.[35]

The 2006 Cooperative Agreement was subject to a one-year term, which was renewable at the City's option.[36] The 2006 Agreement was then amended and extended in 2007 (the "First Amendment"), 2008 (the "Second Amendment"), and 2009 (the "Third Amendment").[37] The First Amendment provided nearly $26,000 in additional funds to the project from the City.[38] Otherwise, the 2006 Agreement remained unchanged and in full force.[39] The Second Amendment extended the 2006 Agreement, and all other terms and conditions of the 2006 Agreement, as modified by the First Amendment, remained unaltered.[40]

The Third Amendment designated the City as responsible for the "design, fabrication, installation, and completion" of the President's House Project, which would be "owned, maintained, managed, and interpreted" by NPS upon its completion.[41] The City agreed to "undertake and complete in a timely manner, at its sole cost and expense, the Project."[42] The Third Amendment included a Project Development Plan, which was created at the direction of Congressional legislation, to facilitate the objectives of all parties. This Plan specifies that the

---

[34] *Id.*

[35] *Id.* at 12.

[36] *Id.* at 4.

[37] *See* Pl.'s Ex. 4, 2007 First Amendment to Cooperative Agreement ("First Amendment") [Doc. No. 36-4]; Pl.'s Ex. 5, 2008 Second Amendment to Cooperative Agreement ("Second Amendment") [Doc. No. 36-5]; Pl.'s Ex. 6, 2009 Third Amendment to Cooperative Agreement ("Third Amendment") [Doc. No. 36-6].

[38] First Amendment ¶¶ 2-3 [Doc. No. 36-4].

[39] *Id.* ¶ 4.

[40] Second Amendment ¶¶ 2-3 [Doc. No. 36-5].

[41] Third Amendment at 1-2 [Doc. No. 36-6].

[42] *Id.* at 2, Attach. C.

JA12

interpretation of the site "will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved."[43] The Project Development Plan also states that "NPS will review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended."[44] The Third Amendment permits amendment or supplementation to the Project Development Plan "by written agreement of the parties."[45]

The Third Amendment institutes a term of one year beginning May 1, 2009.[46] Under this term, the Third Amendment expired on May 1, 2010. However, the Third Amendment also contained a Survival Clause, which states:

> Q. Survival: Any and all provisions which, by themselves or their nature, are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive and be enforceable after the expiration or termination of this Third Amendment. Any and all liabilities, actual or contingent, which have arisen during the term of and in connection with this Third Amendment shall survive expiration or termination of this Third Amendment.[47]

Under the Survival Clause, certain provisions in the 2006 Agreement extend beyond May 1, 2010.

As set forth in the 2006 Agreement and amendments, the City made significant financial contributions to the President's House, including $3.5 million toward the overall project.[48] The project was also funded by the Department of Transportation ($3.6 million) and the Delaware River Port Authority ($3.5 million).[49]

---

[43] *Id.* at Attach. C.

[44] *Id.*

[45] *Id.* at 7.

[46] *Id.* at 9.

[47] *Id.* at 13.

[48] *Id.* at Attach. B.

[49] *Id.*; 12/15/10 Press Release at 3 [Doc. No. 36-24].

The President's House exhibit opened in December 2010.[50] On December 15, 2010, the City and NPS jointly issued a press release announcing the opening of the "President's House: Freedom and Slavery in the Making of a New Nation."[51] The City's involvement in the President's House, however, continued.

Everett Gillison served as the Chief of Staff for Mayor Michael Nutter beginning in 2010.[52] Mr. Gillison managed the project on behalf of the City during his tenure. Mr. Gillison testified to his cooperation with NPS on the President's House, primarily through communication and cooperation with then-Superintendent of Independence National Historical Park, Cynthia MacLeod.[53] Ms. MacLeod would notify Mr. Gillison of any maintenance, improvements, or other action to be taken by the City, and Mr. Gillison would coordinate with her to address such issues and to provide any needed funding.[54] Certain of the primary improvements were to the site's video monitors and the temperature and humidity controls of the President's House ruins, which are fragile.[55]

Mr. Gillison was tasked to "get it done and get it done right."[56] He testified that the completion of the President's House, between 2010 and 2015 was accomplished through a partnership between the City and NPS.[57] He also recognized the crucial role of the public in identifying issues with, maintaining, and promoting the site.[58] The City continued funding the

---

[50] 12/15/10 Press Release at 1 [Doc. No. 36-24].

[51] *Id.*

[52] 1/30/26 Hr'g Tr. at 68 [Doc. No. 45-1].

[53] *Id.* at 72-92.

[54] *Id.* at 76-82.

[55] *Id.* at 78-80.

[56] *Id.* at 74.

[57] *Id.* at 76.

[58] *Id.* at 79.

JA14

site and further established an approximately $1.5 million endowment to maintain the site going forward.[59] This endowment was later transferred to NPS after completion of the site in 2015 and continues to this day.[60] That endowment did not expire or terminate. In early 2016, the City and NPS finalized an agreement that assigned the intellectual property of the President's House Project to NPS.[61]

In 2017, NPS issued a Foundation Document for Independence National Historical Park.[62] The Foundation Document sets forth basic guidance for the Park, describes its purpose, its reason for inclusion in the national park system, its significance, and its fundamental values and resources, and sets forth legal and policy requirements, special mandates, and administrative commitments that apply to the park.[63] Independence National Historical Park's Foundation Document describes the President's House as "where George Washington and John Adams and their households lived and worked during their terms as the first and second presidents of the United States . . . [and] is interpreted by the park, especially in the paradox of the Washingtons bringing their enslaved people to work and live there."[64] NPS specifically identifies this "Paradox of Freedom and Slavery" as crucially significant to Independence National Historical Park.[65]

In describing the "fundamental" archeological resources of the park, NPS describes archeological investigations at the President's House site "which revealed physical connections

---

[59] *Id.* at 88-89.

[60] *Id.* at 93.

[61] Pl.'s Ex. 7, 2015 City-US Assignment of IP Rights ("IP Rights Assignment") [Doc. No. 36-7].

[62] Pl.'s Ex. 8, 2017 Independence National Historical Park Foundation Doc. ("Foundation Doc.") [Doc. No. 36-8].

[63] *See generally id.*

[64] *Id.* at 5.

[65] *Id.* at 9.

to the enslaved in President George Washington's household. This information was used to guide future development at the site. Based on these discoveries, the park designed its first community-based exhibition at the President's House archeological site that interprets race and slavery in its historic context."[66] The Foundation Document also identifies "Pioneering Partnerships and Collaboration" as a "fundamental value" of the park, noting "[t]he dynamic role of partnerships at the park is best illustrated by Independence National Historical Park's close working relationship with the City of Philadelphia."[67]

NPS's Foundation Document also details "Interpretive Themes" for the park, including "Liberty: The Promises and Paradoxes," explaining that "[t]he promises of liberty and equality granted in the founding documents present a paradox: not only are they ideals to strive for but they are unfulfilled promises for people who struggle to be fully included as citizens of our nation."[68]

In April 2022, the President's House was nominated to be a National Underground Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act of 1998.[69] The Act directs NPS to establish a "National Underground Railroad Network to Freedom" ("Network to Freedom") program and to "produce and disseminate appropriate educational materials," and authorizes the Secretary of the Interior to enter into cooperative agreements and to make grants in furtherance of the goals of preservation and restoration of historic buildings associated with the Underground Railroad.[70]

---

[66] *Id.* at 11.

[67] *Id.* at 12.

[68] *Id.* at 13.

[69] Network to Freedom Application and Approval [Doc. No. 36-10]; National Underground Railroad Network to Freedom Act of 1998, Pub. L. No. 105-203, 112 Stat. 678 (1998) (current version at 54 U.S.C. §§ 308301-308304).

[70] 54 U.S.C. §§ 308302(a), 308302(b).

The President's House was nominated as a Network to Freedom site because it was the location where Oney Judge escaped to freedom.[71] In September 2022, the Superintendent of the Independence National Historical Park consented to the site's inclusion in the Network to Freedom.[72] NPS thereafter designated the President's House as a National Underground Railroad Network to Freedom site pursuant to the National Underground Railroad Network to Freedom Act.

On March 27, 2025, the President issued Executive Order ("EO") 14253—"Restoring Truth and Sanity to American History."[73] EO 14253 provides, in relevant part:

> **Section 1.** *Purpose and Policy.* Over the past decade, Americans have witnessed a concerted and widespread effort to rewrite our Nation's history, replacing objective facts with a distorted narrative driven by ideology rather than truth. This revisionist movement seeks to undermine the remarkable achievements of the United States by casting its founding principles and historical milestones in a negative light.
>
> . . . .
>
> It is the policy of my Administration to restore Federal sites dedicated to history, including parks and museums, to solemn and uplifting public monuments that remind Americans of our extraordinary heritage, consistent progress toward becoming a more perfect Union, and unmatched record of advancing liberty, prosperity, and human flourishing. Museums in our Nation's capital should be places where individuals go to learn—not to be subjected to ideological indoctrination or divisive narratives that distort our shared history.
>
> . . . .
>
> **Sec. 4**. *Restoring Truth in American History.*
>
> (a) The Secretary of the Interior shall:
>
> . . . .
>
> (iii) take action, as appropriate and consistent with applicable law, to ensure that all public monuments, memorials, statues, markers, or similar

---

[71] Network to Freedom Application and Approval at 1 [Doc. No. 36-10].

[72] *Id.* at 28.

[73] Exec. Order No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

12

JA17

properties within the Department of the Interior's jurisdiction do not contain descriptions, depictions, or other content that inappropriately disparage Americans past or living (including persons living in colonial times), and instead focus on the greatness of the achievements and progress of the American people or, with respect to natural features, the beauty, abundance, and grandeur of the American landscape.[74]

On January 22, 2026, as admitted by Defendants, NPS removed 34 educational panels from the Presidents House that referenced slavery, and further, deactivated video presentations that accompany these educational panels.

## II.  STANDING

The City alleges APA violations under 5 U.S.C. § 702 and § 706, and alternatively that NPS's conduct was *ultra vires*.[75] Before considering the merit of those claims, the Court examines standing and other threshold issues.

The City argues that it has standing based upon the public benefit that inured to it, at its expense and through its leadership, once the President's House exhibit was completed.[76] The City also argues that it suffered an injury because Defendants' removal of slavery-related panels ran afoul of the requirements for mutual agreement in the 1948 legislation, 1950 Agreement, and 2006 Agreement.[77] Defendants, by contrast, contend that the 1948 legislation and 1950 Agreement did not create a legally protected interest as to the President's House. The provisions therein, Defendants insist, only required mutual agreement for changes to the Independence Hall National Historic *Site*—a term that Defendants read not to encompass the President's House.[78]

---

[74] *Id.* §§ 1, 4.

[75] Am. Compl. ¶¶ 77-138 [Doc. No. 44].

[76] Mem. L. Supp. Pl.'s Am. Mot. at 28-29 [Doc. No. 45].

[77] 1/30/26 Hr'g Tr. at 154 [Doc. No. 45-1]; Am Compl. ¶¶ 110-13 [Doc. No. 44].

[78] Defs.' Opp'n to Pl.'s Am. Mot. at 7-9 [Doc. No. 52].

Defendants also deny the 2006 Agreement as a basis for standing and argue that the City's property interest in the project ceased under the Third Amendment.[79]

Federal court jurisdiction is limited to "Cases" and "Controversies."[80] A plaintiff must have standing to sue in order for an action to be a case or controversy.[81] Standing requires a plaintiff show that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[82] An injury in fact requires an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[83] An injury is concrete if it is "real" and "actually exist[s]," and an injury is particularized if it "affect[s] the plaintiff in a personal and individual way."[84]

The City's interest in the President's House is not only as a representative of the public. The President's House resulted from decades of cooperation between the City and the federal government, enshrined by Congressional legislation, Foundation Documents, and funding.

Congress envisioned that collaboration when establishing Independence National Historical Park in the 1948 legislation.[85] The legislation authorizes the Secretary of the Interior "to enter into cooperative agreements with the city of Philadelphia to assist in the preservation and interpretation of the property," and requires that such cooperative agreements include a term that states "no changes or alterations shall be made in the property within the Independence Hall

---

[79] *Id.* at 10.

[80] U.S. Const. art. III, § 2.

[81] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

[82] *Id.*

[83] *Id.* at 339 (internal quotation marks omitted).

[84] *Id.* at 339-40 (internal quotation marks omitted).

[85] *See* 16 U.S.C. §§ 407m, 407n.

14

JA19

National Historic Site, including its buildings and grounds . . . except by mutual agreement."[86]

As anticipated, the parties then executed a series of cooperative agreements.

First, the City and the Secretary of the Interior entered into the 1950 Agreement. In doing so, they consented to terms that recognized the City's ownership interests in components of Independence National Historic Park and the corresponding need for bilateral decision-making. The 1950 Agreement provides that the City "retain[s] ownership of the Independence Hall group of structures and of the land whereon they are erected and the park area adjacent thereto known as Independence Square."[87] It then adds that:

- "Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon."[88]

- "[N]either of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the building or grounds without the written consent of the other."[89]

- "[I]t is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States, and to secure this result a high degree of cooperation is necessary with each other . . . and the parties hereto pledge themselves to consult on all matters of importance to the project."[90]

The 1950 Agreement indisputably remains in effect. By its terms, it "shall continue in effect until such time as Congress enacts legislation inconsistent with its continuance or expressly providing for its termination."[91]

---

[86] 16 U.S.C. § 407n.

[87] 1950 Agreement at 3 [Doc. No. 36-1].

[88] *Id.* at 5.

[89] *Id.* at 6.

[90] *Id.*

[91] *Id.* at 7.

The City and NPS deepened their collaboration by concluding the 2006 Cooperative Agreement and its subsequent amendments. The 2006 Cooperative Agreement, as modified by the Third Amendment, incorporates the Project Development Plan, which specifies that the site's interpretation would "focus on the house and the people who lived and worked there, . . . the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved."[92] The Plan also stated that NPS would "review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended."[93]

Although the 2006 Agreement, as updated by the Third Amendment, ceased as of May 1, 2010,[94] the terms in its Project Development Plan remained effective under the Third Amendment Survival Clause. The Survival Clause states that "provisions which, by themselves or their nature are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive."[95] Because the President's House project was not contemplated to be completed by the expiration of the Third Amendment, it was reasonably expected that terms relating to the Project Development Plan would remain in effect to ensure that the commemorative exhibit was realized in accordance with the parties' initial plan. While the Third Amendment granted NPS the right to interpret the exhibit after it was completed, it is the Project Development Plan that established the interpretive framework that NPS would employ. Profound alterations to that framework, seen here in the effort to remove all references to slavery, African-American Philadelphia, and the move to freedom for the enslaved, would, under the Project Development Plan, require the written approval of both the City and NPS. Accordingly, the

---

[92] Third Amendment at Attach. C [Doc. No. 36-6].

[93] *Id.* at 9.

[94] *Id.* at 13.

[95] *Id.* at 13.

16

JA21

evidence presented to the Court to date proves the 2006 Cooperative Agreement and amendments provide inclusive rights to the City, which continue and remain in full force and effect today.

Further, the 1948 legislation authorized the 2006 Cooperative Agreement and subsequent amendments. While these agreements do not explicitly contain a term that "no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds . . . , except by mutual agreement between the Secretary of the Interior and"[96] the City, the Department of the Interior, through NPS, is statutorily required to include such a term. The agency lacks authority or discretion to delete or ignore this term. Accordingly, this Court must apply that term to the parties' working relationship, pursuant to the 1948 legislation.[97] Such a fundamental term that is required by Congress is also reasonably expected to remain in effect under the Survival Clause.

Under the terms of the 1950 Agreement, 2006 Cooperative Agreement and amendments thereto, and 16 U.S.C. § 407n authorizing the agreements, the City has a statutory right and expectation to mutual agreement on any changes or alterations to the Park, including the President's House, to written agreement for placement of any monument or memorial, and to consultation on all matters of importance to the Park. Removal of the President's House displays invaded this legally protected interest.

This interest is concrete, particularized, and actual. The City is particularly identified as a party in the 1950 Agreement and 1948 legislation, and the City owns certain subject land and

---

[96] 16 U.S.C. § 407n.

[97] *See, e.g., McClain v. Delaware Cnty. Tax Claim Bur.*, 344 A.3d 1149, 1157 (Pa. Commw. Ct. 2025) (holding that to the extent an agreement did not comport with the relevant statute, the agreement violated the statute, and stating that "[t]he terms of the contract must yield to the mandates of the statute").

17

buildings in the Park, as well as the defining landmarks of the Park—Independence Hall and the Liberty Bell.[98] The removal affects the City in a personal and individualized way. The injury impacts not just the City's statutory rights, but also the City's tourism,[99] use of approximately $5 million of the City's funds to establish and maintain the project,[100] and its promotion of its history in advance of the 250th anniversary of the founding of the United States of America.[101] Accordingly, the City has established it has Article III standing.[102]

The Court is not persuaded by Defendants' contention that the City's interest is restrained to the portion of the Park that is Independence Hall National Historic *Site*. Although that term was defined in 1943 to encompass the Independence Square land bound by Walnut, Fifth, Chestnut, and Sixth Streets,[103] the City's agreement is still required for changes that occur within the Park's broader territory. After all, § 407n also mandates that the Secretary of the Interior obtain approval from contractual parties for alterations to Carpenters' Hall, which is not part of

---

[98] *See* 1/30/26 Hr'g Tr. at 38 [Doc. No. 4-1]; 1950 Agreement at 3 [Doc. No. 36-1].

[99] *See* 1/30/26 Hr'g Tr. at 104-08 [Doc. No. 45-1].

[100] *See, e.g.*, *Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*, 584 F.3d 253, 262 (6th Cir. 2009) (concluding that the plaintiff school districts, which expended funds to comply with federal education standards, established an injury in fact to challenge those standards).

[101] The Court notes that the government described this celebration as the "250th birthday" of the federal government, Defs.' Opp'n Mot. Prelim. Inj. at 6 [Doc. No. 27], but the signing of the Declaration of Independence on July 4, 1776 did not, in fact, create the federal government. Even the Articles of Confederation, establishing a central government, were not adopted by the Continental Congress until 1777. Indeed, the federal government as currently established is more appropriately traced to the adoption of the Constitution in 1789.

[102] *See City of Lafayette, La. v. SEC*, 481 F.2d 1101, 1103 n.3 (D.C. Cir. 1973) ("The Cities satisfy the standing requirement by alleging injury in fact and a non-frivolous claim that the 1935 Act requires consideration of the Cities' contentions in an acquisition proceeding."); *City of Olmsted Falls v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002) ("In this Circuit we have found standing for a city suing an arm of the federal government when a harm *to the city itself* has been alleged.").

[103] *See* Independence Hall National Historic Site. 8 Fed. Reg. 7207, 7283 (June 1, 1943).

18

JA23

the Independence Square block.[104] The region of the Park that is subject to bilateral decision-making is therefore ambiguous.[105]

As the Court finds, the legislative record and understanding of § 407n by the parties resolve that ambiguity. The House Report summarizing § 407n states that the underlying bill was amended to "provide for the establishment of a suitable Advisory Commission" representing entities including Pennsylvania and the City of Philadelphia.[106] The reason for this Commission, the Report clarifies, is "to coordinate for the preservation and exhibition" of the Park's "various areas for the benefit and inspiration of the people of the United States."[107] Moreover, NPS and the City have consistently relied upon § 407n as a source of statutory authority for conducting cooperative agreements that relate to the development of the President's House.[108] Defendants' argument ignores both these cooperative agreements and the mission of the 1948 legislation to provide for the commemoration of "Independence Hall, Carpenters' Hall, and *surrounding historic sites and buildings*," a portion of which are owned by the City.[109] The Court declines to adopt an interpretation that would effectively divide the park in two.

Courts also apply a prudential standing analysis, which requires "that a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory

---

[104] 16 U.S.C. § 407n; Foundation Doc. [Doc. No. 36-8].

[105] *See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 473 n.27 (1985) (noting that a statute is ambiguous if it is "reasonably susceptible of different interpretations"); *In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (observing that courts should consider legislative history only where the statutory language is ambiguous).

[106] H.R. Rep. No. 80-1819 at 4 (1948).

[107] *Id.*

[108] *See United States v. Hayes*, 555 U.S. 415, 418 (2009) (preferring an interpretation that favors the statute's manifest purpose).

[109] H.R. Rep. No. 80-1819 at 1 (1948).

19

provision or constitutional guarantee invoked in the suit."[110] The zone of interests test applies to suits under the APA,[111] and "is most usefully understood as a gloss on the meaning of [5 U.S.C.] § 702."[112] Under that provision, a party has standing to bring a suit under the APA if it suffered a "legal wrong because of agency action, or [is] adversely affected or aggrieved by agency action within the meaning of a relevant statute."[113] The interest may reflect "aesthetic, conservational, and recreational" values, and standing may stem from them.[114]

The 1948 statute explicitly refers to, authorizes, and prescribes requirements for cooperative agreements between the City and the federal government. In developing this legislation, the House of Representatives stated in one House Report that "[t]he proposed Independence National Historical Park is one part of an integrated three-part program of improvement to be shared alike by the city of Philadelphia, the State of Pennsylvania, and the Federal Government, for the preservation and exhibition of these sites and buildings."[115] Further, in reference to the cooperative agreements, the Report describes the need for the agreements for the project to include land still owned by the City, and that the agreements "will provide the basis for an integrated program shared equally by the city, State, and Nation in a manner appropriate to the broad national and patriotic objectives implicit in the entire project."[116] This reflects an intent for the city to have a shared interest in the exhibition of the sites.

---

[110] *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted).

[111] *Id*. at 163 (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150 (1970); *Barlow v. Collins*, 397 U.S. 159 (1970)).

[112] *Clarke v. Secs. Indus Ass'n*, 479 U.S. 388, 400 n.16 (1987).

[113] 5 U.S.C. § 702.

[114] *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970).

[115] H.R. Rep. No. 80-1819 at 5 (1948) (emphasis added).

[116] *Id.* at 8.

20

The City, specifically named in the 1948 legislation and House Report, and party to the 1950 and 2006 Agreements, and its subsequent amendments, is within the class of aggrieved persons who suffered a legal wrong from agency action and is within the zone of interests contemplated by the 1948 legislation. The City has both Article III and prudential standing.

## III.    JURISDICTION AND REVIEWABILITY

The City next argues that it has established that NPS's removal of slavery-related displays is a final agency action under the APA and that no other statutes preclude judicial review by this Court.[117] Defendants disagree, contending that a final agency action has not occurred, that NPS's conduct was committed to discretion, and that the City's claims are barred by the Tucker Act.[118] The Court addresses the first three APA-related arguments before turning to the Tucker Act.

5 U.S.C. § 702 of the APA waives sovereign immunity for "actions for non-monetary relief against an agency,"[119] so sovereign immunity does not bar the City's claims, so long as the plaintiff shows those claims are valid under the APA. To do so, the plaintiff must challenge a "final agency action for which there is no other adequate remedy in court," demonstrate that "[no] statute precludes judicial review," and must establish that agency action is not "committed to agency discretion by law."[120]

Here, the City has challenged a final agency action. An agency "action," as defined by the APA, "includes the whole or part of an agency rule, order, license, sanction, relief, or the

---

[117] Mem. L. Supp. Pl.'s Am. Mot. at 24-25, 29 [Doc. No. 45].

[118] Defs.' Opp'n to Pl.'s Am. Mot. at 14-25 [Doc. No. 52].

[119] *Treasury of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 398 (3d Cir. 2012) (internal citations omitted).

[120] *Bennett* 520 U.S. at 175 (citing 5 U.S.C. §§ 704, 701(a)).

21

JA26

equivalent or denial thereof, or failure to act."[121] This broad definition "is meant to cover comprehensively every manner in which an agency may exercise its power."[122] Removing the displays from the President's House is an exercise of the Department of the Interior and NPS's agency powers. And, contrary to Defendants' arguments, the dismantling of the President's House is not an unreviewable act of "day-to-day operations"[123] but rather a jarring alteration to the integrity of the site. Therefore, it is agency action.

An agency action is final if "the action . . . mark[s] the 'consummation' of the agency's decisionmaking process . . . . And second, the action . . . [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.' "[124] The removal of displays is clearly the consummation of a decision-making process—a unilateral one. The action also occasions legal consequences. The President's House resulted from collaboration between the City and NPS, as envisioned by the 1948 Congressional legislation and carried out in the parties' course of dealing through joint agreements, the RFQ document, press releases, and the sustained maintenance of the completed site. The removal of the slavery displays therefore undermines the City's statutory and long-running interests in the completion of Independence National Historical Park and the President's House. Further, NPS's removal of the displays interferes with tourism to the City, the City's intention to represent its own history, and the

---

[121] 5 U.S.C. §§ 551(13), 701(b)(2).

[122] *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 478 (2001) (citing *F.T.C. v. Standard Oil Co. of Cal.*, 449 U.S. 232, 238 n.7 (1980)).

[123] Defs.' Opp'n to Pl.'s Am. Mot. at 20 [Doc. No. 52].

[124] *Bennett*, 520 U.S. at 177-78 (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948); *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)) (citation omitted).

22

JA27

City's contribution of approximately $5 million to unearth, present, and maintain that history.[125] The City has thereby established finality as well.

Next, no exception to APA reviewability applies. No statute precludes judicial review, and this action is not committed to agency discretion by law. Neither 16 U.S.C. § 407n nor the agreements between the City and the government assign discretion to the Department of the Interior or NPS to unilaterally transform the purpose, interpretation, and exhibits at the President's House. Because § 407n imposes judicially administrable standards on NPS's unilateral decision-making, the Court need not substitute its discretion for that of the agency.[126]

The Court must next address whether the Tucker Act constitutes a complete or partial bar to the Court's review of the City's APA claims under 5 U.S.C. § 702 and § 706.

The Tucker Act states that the "Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon . . . any express or implied contract with the United States."[127] Pursuant to the Tucker Act, litigants may seek monetary relief in the Court of Federal Claims, but not equitable relief, as "the Claims Court does not have the general equitable powers of a district court to grant prospective relief."[128] Crucially, the Tucker Act "impliedly forbids" district courts from reviewing APA claims if the "source of the rights upon which the plaintiff bases its claims" is contractual rather than statutory, constitutional, or predicated upon any other legal ground.[129]

---

[125] *See* 1/30/26 Hr'g Tr. at 88-89, 104-08 [Doc. No. 45-1]; Third Amendment at Attach. B [Doc. No. 36-6].

[126] *See Hecker v. Chaney*, 470 U.S. 821, 830 (1985).

[127] 28 U.S.C. § 1491(a)(1).

[128] *Bowen v. Mass.*, 487 U.S. 879, 905 (1988); *see also* 14 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 3657 (4th ed. 2025) (noting that the Tucker Act "confers jurisdiction over claims against the United States for money damages").

[129] *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

23

JA28

The Supreme Court recently provided guidance to determine when the Tucker Act forecloses a district court's jurisdiction over a claim challenging a federal policy. Reviewing a district court's ruling declaring unlawful and vacating policies that forbade grants related to diversity, equity, and inclusion, gender identity, and COVID-19, a majority of the Court found the district court had jurisdiction to determine that the manner in which the government terminated the grants violated the APA.[130] As in that case, the City claims that public officials "have acted contrary to their statutory mandate and in conflict with statutory . . . requirements . . . . This is the stuff of APA litigation."[131] As an exception, however, the Court agrees with Defendants that the Tucker Act impliedly forbids the City from obtaining relief for its "Breach of Contract Claim"[132] under 5 U.S.C. § 702 (Amended Complaint, Count 1), since that claim requests specific performance because NPS "breached the Agreements,"[133] a presentation that undeniably sounds in contract. The Court therefore will not rest its instant decision on the § 702 claim as pleaded.

Apart from the City's claim under 5 U.S.C. § 702, the Court concludes that it has jurisdiction to review the City's APA claims.

## IV.   LEGAL STANDARD

When considering whether to grant a motion for a preliminary injunction, courts must consider four factors under Federal Rule of Civil Procedure 65: (1) likelihood of success on the merits; (2) likelihood of irreparable harm to the movant in the absence of relief; (3) balance of

---

[130] *Nat'l Insts. of Pub. Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2661-62 (2025) (Barrett, J., concurring in the judgment).

[131] *Am. Pub. Health Ass'n v. Nat'l Insts. of* Health, 786 F.Supp. 3d, 237, 262 (D. Mass. 2025), *aff'd in part, Nat'l Insts. of Pub. Health*, 145 S. Ct. at 2858.

[132] Mem. L. Supp. Pl.'s Am. Mot. at 23 [Doc. No. 45].

[133] Am. Compl. ¶ 81 [Doc. No. 44].

24

JA29

the harms between the plaintiff on one hand and the defendants on the other; and (4) the public interest.[134] When the government is the defendant, the third and fourth factors may be considered together.[135] Generally, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[136]

The issues of likelihood of success on the merits and irreparable harm are considered first, as they are the "most critical."[137] If the movant satisfies its burden on these factors, the court considers whether "the balance of equities tips in [the movant's] favor" and whether "an injunction is in the public interest."[138]  The court then assesses "whether the balance of all four factors warrants granting preliminary relief."[139]

## V.    DISCUSSION

### A.    Plaintiff is Likely to Succeed on the Merits

The Court proceeds to consider the City's three APA claims that allege arbitrary and capricious agency action, as well as its *ultra vires* claim. Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[140] The City has demonstrated a likelihood of success on the claim that NPS's removal of the panels and further changes to the President's House without any consultation with, notification of, or cooperation with the City are arbitrary and capricious and that Defendants' actions are in excess of their authority.

---

[134] *Osorio-Martinez v. Att'y Gen.*, 893 F.3d 153, 178 (3d Cir. 2018); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[135] *Smith v. City of Atl. City*, 138 F.4th 759, 779 (3d Cir. 2025).

[136] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

[137] *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) (internal quotation marks omitted).

[138] *Winter*, 555 U.S. at 20.

[139] *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (brackets omitted).

[140] 5 U.S.C. § 706(2)(A).

JA30

### 1.    Arbitrary and Capricious Claims

Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."[141]

The City alleges that the government acted in an arbitrary and capricious fashion (1) in violation of the National Underground Network to Freedom Act of 1998, (2) in violation of the 1948 legislation codified at 16 U.S.C. §§ 407m-n, and (3) in violation of NPS's own Foundation Document. The government's only provided rationale for the action is EO 14253, and there is no record evidence that Defendants notified, consulted with, or sought mutual agreement from the City.

### a.    *Arbitrary and Capricious in Violation of the National Underground Railroad Network to Freedom Act of 1998*

The National Underground Railroad Network to Freedom Act of 1998 required the Secretary of the Interior to establish a national network of Underground Railroad sites and to "produce and disseminate appropriate educational materials."[142] The Congressional statutory directive to identify and commemorate sites along this Network to Freedom was explicitly motivated by the United States' Congressional intent to "preserve and protect" the sites.[143] In 2022, NPS supported the inclusion of the President's House site in the Network to Freedom, thereby recognizing the escape of Oney Judge in a manner consistent with the Third

---

[141] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[142] 54 U.S.C. § 308302.

[143] H.R. Rep. 105-559 at 4 (1998).

JA31

Amendment's Project Development Plan. The Project Development Plan stated that the President's House interpretation would highlight "the move to freedom for the enslaved."[144]

In removing displays from the President's House, NPS removed educational materials about Oney Judge, her escape to freedom, and her life in New Hampshire after she escaped.[145] By removing this information, NPS conceals crucial information linking the site to the Network to Freedom. Moreover, Defendants' removal of the displays discounted the purpose of the Network: to preserve and protect historical sites like that of Oney Judge's bondage and escape.

Although Defendants argue that the National Underground Network to Freedom Act of 1998 does not expressly preclude alterations to sites in the Network,[146] their decision to excise Oney Judge's story from the Network runs counter to Congressional directives and to the Act's legislative intent. Because, on this preliminary record, Defendants failed to consider those all-important aspects of their decision, the City is likely to prevail on its claim that Defendants' agency action was arbitrary and capricious in violation of the National Underground Railroad Network to Freedom Act of 1998.

> b. *Arbitrary and Capricious in Violation of 16 U.S.C. §§ 407m, 407n*

The City also alleges the removal was arbitrary and capricious in violation of the 1948 Congressional legislation. The 1948 legislation established Independence National Historical Park and authorized the Secretary of the Interior to engage in cooperative agreements. Under 16 U.S.C. § 407n, those cooperative agreements are required to reflect the understanding that "no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual

---

[144] Third Amendment at Attach. C [Doc. No. 36-6].

[145] *See generally* Network to Freedom Application and Approval [Doc. No. 36-10].

[146] Defs.' Opp'n to Pl.'s Am. Mot. at 23-24 [Doc. No. 52].

agreement between the Secretary of the Interior and the other parties to the contracts."[147] The 1950 Agreement and the related 2006 Cooperative Agreement and subsequent amendments were created pursuant to this legislation. However, the government did not seek agreement from the City, nor did the government notify the City of its intended actions.

The terms of the 1950 Agreement require that: "any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work have been mutually agreed upon"; that "neither of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the buildings or grounds without the written consent of the other"; and that the parties "pledge themselves to consult on all matters of importance to the program."[148]

As an initial matter, the removal of the interpretive heart of a core component of Independence National Historical Park—its display of slavery—denies the importance of the 2006 Cooperative Agreements and amendments to preserve this history to educate the public. By failing to consult with the City on this significant decision, Defendants likely violated the terms of the 1950 Agreement.

Defendants' removal of the President's House displays also disregards the 2006 Agreement and amendments thereto. The Third Amendment contained the Project Development Plan, which, as discussed, this Court finds to remain in full force and effect through the Third Amendment's Survival Clause. That Plan states that site interpretation will focus on people who lived and worked at the President's House as well as the move to freedom for the enslaved.[149]

---

[147] 16 U.S.C. § 407n. To the extent Defendants argue that § 407n cannot support an arbitrary and capricious challenge because its scope is limited to the Independence Hall National Historic *Site*, this Court disagrees. *See supra* § 2 (discussing standing).

[148] 1950 Agreement [Doc. No. 36-1].

[149] Third Amendment at Attach. C [Doc. No. 36-6].

JA33

Alteration of this term requires written agreement of the parties.[150] Here, there has been no written alteration of the Plan. As such, the removal violated the agreed-upon interpretive framework and, by extension, the 2006 Cooperative Agreement and amendments.

In sum, the record indicates that Defendants failed to consider statutorily authorized and directed Agreements between the City and the government, and the government's obligations thereto, all in violation of the 1948 legislation. Defendants' professed rationale, EO 14253, specifically directs the Secretary of the Interior to take action "as appropriate and consistent with applicable law."[151] It does not and cannot confer to Defendants any authority to violate or disregard Congressional intent. The City is likely to prevail on its claim that Defendants' agency action was arbitrary and capricious in disregarding applicable law that mandated mutual assent.

### c.  Arbitrary and Capricious in Violation of NPS Foundation Document for Independence National Historical Park

NPS's Foundation Document is the governing document for Independence National Historical Park. The Foundation Document, which describes the Park's purpose, significance, values, and interpretive themes, specifically identifies the paradoxical nature of the Liberty Bell and Independence Hall representing freedom for the colonists while the history of President Washington at the President's House relied substantially on slavery.[152] The "Paradox of Freedom and Slavery" is one of the enumerated statements of significance about the Park.[153] "Pioneering Partnerships and Collaboration," specifically with the City, is an explicitly listed fundamental value of the Park.[154] The second enumerated "Interpretive Theme" is "Liberty: The Promises and

---

[150] Id.

[151] Exec. Order No. 14253, 90 Fed. Reg. 14563, 14564 (Mar. 27, 2025).

[152] Foundation Doc. at 5, 9 [Doc. No. 36-8].

[153] Id. at 9.

[154] Id. at 12.

29

Paradoxes," which recognizes the ideals of the founding era both as aspirational and as false promises for people who "struggle to be fully included as citizens of our nation."[155] The removal of displays recognizing the paradox of slavery and freedom at the President's House therefore conflicts with NPS's own interpretive themes and directives about the site.

The Foundation Document clearly emphasizes the role of slavery and the importance of recognizing paradoxes at Independence National Historical Park. The President's House is also identified as a significant component of the Park. Removing the President's House displays represents a sharp turnaround in agency policy, for which no "reasoned explanation" has been provided.[156] Indeed, Defendants have provided no record evidence showing NPS's "awareness that it is changing its position" regarding the truthfulness of the display materials.[157] The removals disregard the still-controlling Foundation Document.

Defendants argue in supplemental briefing that their policy reversal does not amount to arbitrary and capricious agency action because the Foundation Document lacks binding force."[158] The Court is not convinced. Defendants cite one district court case and one D.C. Circuit case in support of their position.[159] However, more recent cases in the D.C. Circuit have embraced the notion that agencies are accountable to explain drastic shifts in policy even when the "changed policy ar[ises] from an action without the force of law."[160] A recent Supreme Court case also

---

[155] *Id*. at 13.

[156] *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

[157] *Id*.

[158] Defs.' Opp'n to Pl.'s Am. Mot. at 24 [Doc. No. 52].

[159] *Horses of Cumberland Island v. Haaland*, No. 23-cv-1592, 2024 WL 5430835, at *11 (N.D. Ga. Nov. 8, 2024); *The Wilderness Soc. v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006).

[160] *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (reviewing an agency's reasons for departing from a policy based on Congressional testimony and a "guidance" document); *Ctr. Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 74-75 (D.C. Cir. 2023).

JA35

supports this trend.[161] In light of that case law, the preliminary nature of relief sought, and absence of any "highly technical" decisions "that are in the agency's province of expertise,"[162] the Court finds the Foundation Document to be an adequate basis upon which to consider NPS's change in policy.

Defendants' only proffered rationale for NPS's policy shift is EO 14253. But EO 14253 does not offer a reasoned explanation for NPS's removal of the displays. The government shrugs off NPS's action as within its power and discretion, but that action violates the expressed intention of the same EO the government claims motivated it. EO 14253 seeks to prevent revisionist attempts to "replace[] objective facts with a distorted narrative."[163] NPS's action did the opposite, by dismantling objective historical truths.

It is not disputed that President Washington owned slaves. *Amici* ATAC and the Black Journey summarize their roles at the President's House:

> The people who [President Washington] held in slavery include: [Oney] Judge (Staines), who was held in slavery as a maid to Martha Washington; Austin, [Oney]'s brother; Christopher [Sheels], who was held in slavery as President Washington's body servant; Giles, who was held in slavery as a carriage driver and driver of wagons; Hercules Posey, who was held in slavery as a chef to the Washingtons; Joe Richardson, who was held in slavery as a coachman; Moll, who was held in slavery as a nanny for Martha Washington's grandchildren; Paris, who was held in slavery as a stable worker; and Richmond, who was the son of Hercules and held in slavery as a chimney sweep.[164]

---

[161] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 217 (2016) (examining a change in policy that was originally disseminated in an opinion letter).

[162] *Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 549 (3d Cir. 2023).

[163] Exec. Order No. 14253, 90 Fed. Reg. 14563 (Mar. 27, 2025).

[164] ATAC & The Black Journey Amicus Br. at 5-6 [Doc. No. 25]. The record evidence submitted at the January 30, 2026 hearing supports this factual summary as to the nine individuals. *See* Network to Freedom Application and Approval [Doc. No. 36-10]; Pl.'s Ex. 11, Photos of Site [Doc. Nos. 36-11. 36-12]; Pl.'s Ex. 12, 2010 Script for Video Media [Doc. No. 36-13].

31

JA36

Some escaped to freedom, including Oney Judge. The President's House displays recognized

Oney Judge and focused on how her struggle for freedom represented this country's progress

away from the horrors of slavery and into an era where the founding ideals of "Life, Liberty and

the pursuit of Happiness"[165] could be embodied for every American.

And yet, in its argument, the government claims it alone has the power to erase, alter,

remove and hide historical accounts on taxpayer and local government-funded monuments

within its control. Its claims in this regard echo Big Brother's domain in Orwell's *1984*, where:

> The largest section of the [government's] Records Department . . . consisted simply of persons whose duty it was to track down and collect all copies of books, newspapers, and other documents which had been superseded and were due for destruction. A number of the *Times* [a newspaper] which might, because of changes in political alignment, or mistaken prophesies uttered by Big Brother, have been rewritten a dozen times still stood on the files bearing its original date, and no other copy existed to contradict it. Books, also, were recalled and rewritten again and again, and were invariably reissued without any admission that any alteration had been made. Even the written instructions [for workers in the Records Department] . . . never stated or implied that an act of forgery was to be committed; always the reference was to slips, errors, misprints, or misquotations which it was necessary to put right in the interests of accuracy.[166]

The government here likewise asserts truth is no longer self-evident, but rather the property of

the elected chief magistrate and his appointees and delegees, at his whim to be scraped clean,

hidden, or overwritten. And why? Solely because, as Defendants state, it has the power. At oral

argument, Defendants insisted:

> Although many people feel strongly about this one way, other people may disagree or feel strongly another way. Ultimately, it is in this context that the Government gets to choose the message it wants to convey.
>
> . . . .

---

[165] The Declaration of Independence para. 2 (U.S. 1776).

[166] George Orwell, *1984* at 40 (Penguin Random House LLC, 75th anniversary ed. 2023) (1949).

JA37

. . . [T]he message that the Government chooses to convey is for the Government to choose. I don't get to choose what that message is. And it's our position that the City doesn't either.[167]

An agency, whether the Department of the Interior, NPS, or any other agency, cannot arbitrarily decide what is true, based on its own whims or the whims of the new leadership, regardless of the evidence before it. Accordingly, the City is likely to prevail on its claims that the removal was arbitrary and capricious.

### 2. *Ultra Vires* Claim

In addition to its APA claims, the City presents an *ultra vires* claim, which it urges the Court to consider, should the Court find that relief does not lie under the APA.[168] Defendants deny that an *ultra vires* claim is cognizable because of the Tucker Act's implied prohibition on such a claim and because of the absence of strict statutory guardrails.[169]

Prior to the enactment of the APA, there had existed "a right to equitable relief where an agency's action was *ultra vires*—that is, unauthorized by any law and . . . in violation of the rights of the individual."[170]  There are strict boundaries to non-statutory *ultra vires* review. It "applies only when an agency has taken action entirely 'in excess of its delegated powers and contrary to *a specific prohibition*' in a statute."[171] *Ultra vires* review is unavailable if a statutory review scheme provides a meaningful and adequate opportunity for judicial review for aggrieved persons or a statutory scheme forecloses all other opportunities for judicial review.[172] Accordingly, the City's *ultra vires* claim is as an alternative ground for relief under which the

---

[167] 1/30/26 Tr. at 141 [Doc. No. 45-1].

[168] Mem. L. Supp. Pl.'s Am. Mot. at 37-38 [Doc. No. 45].

[169] Defs.' Opp'n to Pl.'s Am. Mot. at 25-26 [Doc. No. 52].

[170] *Nuclear Regul. Comm'n v. Tex.*, 605 U.S. 665, 680 (2025).

[171] *Id*. (quoting *Ry. Clerks v. Ass'n for Benefit of Non-Contract Emps.*, 380 U.S. 650, 660 (1965)).

[172] *Id*.

33

JA38

City argues that Defendants committed *ultra vires* action by unilaterally removing displays from the President's House in contravention of 16 U.S.C. § 407n.

Meritorious *ultra vires* claims are rare, but have succeeded when a claim challenges action "based on unexplained and obvious deviations from statutory text, and when the government's interpretation of its statutory authority would 'lead[] to an absurd result.' "[173] *Ultra vires* review protects parties from statutory violation by an agency that directly contravenes congressional authorization and intent.

Here, § 407n authorizes the Secretary of the Interior to enter into cooperative agreements with the City in connection with the establishment and maintenance of Independence National Historical Park. The agreements were required to include a term that no alterations to the Independence Hall National Historic Site, including its buildings and grounds, were permitted absent mutual agreement of the parties to the agreement. The Secretary of the Interior entered into the 1950 Agreement without including that precise term. However, a similar term was included[174] and the parties, until recently, had complied with the statutory directive.

Congress specifically limited the authority of the Department of the Interior and NPS to unilaterally alter or control Independence National Historic Park. The agencies do not have the authority to flout that Congressional directive. The decision to unilaterally strip away a core component of Independence National Historic Park without seeking or obtaining mutual

---

[173] *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, at *9 (D.C. Cir. Sept. 25, 2025) (Pan., J., concurring) (citation omitted).

[174] The 1950 Agreement stated that "Any work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon." 1950 Agreement at 5 [Doc. No. 36-1]. The government argues, but does not brief, that the President's House is not a "building" subject to the term in the 1950 Agreement. 1/30/26 Hr'g Tr. at 137 [Doc. No. 45-1]. Regardless, the 1948 legislation requires the term include, but not limit itself to, the buildings and grounds of Independence Hall National Historic Site. *See* 16 U.S.C. § 407n.

34

agreement from the City is an "unexplained and obvious deviation from statutory text."[175] There is a specific statutory requirement for the Secretary of the Interior, as he enters into cooperative agreements regarding the Independence Hall National Historic Site, to include the stipulation that no alterations can be made without mutual agreement of the parties.

Defendants have completely ignored their legislatively imposed duties. They have disregarded statutory authority, compelled by Congress, by taking unilateral action without seeking agreement from the City of Philadelphia. An agency, part of the Executive branch, is not entitled to act solely as it wishes. Rather, it is the Legislative branch which authorizes agency action, and the Executive branch must comply with that direction.

Defendants' actions impede the separation of powers instituted by the Constitution. Here, the Executive branch is directing a Congressionally created and funded agency to take "measures incompatible with the expressed or implied will of Congress."[176] It is in this posture that the executive's "power is at its lowest ebb, for then he can rely upon only his own constitutional powers minus any constitutional powers of Congress over the matter."[177]

Defendants acted in excess of their authority as agencies authorized by Congress within the executive branch. Even in the event that the Court were to find that the APA does not provide a meaningful and adequate opportunity for judicial review, the City has demonstrated a likelihood of success on its *ultra vires* claim.

### B.    Likelihood of Irreparable Harm in the Absence of Relief

The City argues that it will incur various forms of irreparable harm if the displays are not restored and safeguarded. Among the harms the City alleges are a loss of access to historical

---

[175] *Fed. Educ. Ass'n* 2025 WL 2738626, at *9 (Pan., J., concurring).

[176] *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

[177] *Id*.

35

truth, an undermining of the public trust, and an inability to recount its own story in preparation for the semiquincentennial.[178] Defendants contend that those asserted injuries do not suffice, either because they are not particularized to the City or because they can be remedied if the displays are restored in a final judgment.[179]

The City must demonstrate that is "more likely than not" to suffer irreparable harm absent a preliminary injunction.[180] "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages."[181] "Furthermore, a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future. Rather, the moving party must make a 'clear showing of *immediate* irreparable harm.' "[182]

The harm at issue in this case must account for the significance of the slavery-related displays that NPS removed. As the federal government itself recognized, "the President's House and its history is important and meaningful to many people for many reasons."[183] The President's House has resulted from years of advocacy, engagement by the public, and cooperation between the City and the government. As the City argues, the removal of interpretive displays and exhibits "constitutes erasure, undermines public trust, and compromises the integrity of public memory."[184]

---

[178] Mem. L. Supp. Pl.'s Am. Mot. at 39-43 [Doc. No. 45].

[179] Defs.' Opp'n to Pl.'s Am. Mot. at 26-28 [Doc. No. 52].

[180] *Reilly*, 858 F.3d at 179.

[181] *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000).

[182] *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (internal quotation marks omitted).

[183] 1/30/26 Hr'g Tr. at 121 [Doc. No. 45-1].

[184] *Id*. at 40-41.

36

JA41

Similarly, *amici* Members of the Democratic Caucus of the Senate of Pennsylvania warn of irreparable harm to their constituents because "this sudden loss of rich history and Defendants' rejection of the true historical narratives about black history in America is causing deep constituent harm and anxiety."[185] Unilateral action by the executive branch that flouts Congressional directives, cooperative agreements with the City, and decades of multilateral collaboration irrevocably degrades the public's trust in the government.

The President's House represents the City "fulfilling an obligation to tell the truth—the whole, complicated truth."[186] Removal of the crucial interpretive materials strips the site of that truth and deprives the public of educational opportunities designed to be free and accessible. As *amici* ATAC and the Black Journey contend, that abrupt elimination of "historically significant educational material" is like "pulling pages out of a history book with a razor."[187]

The Court agrees with *amici*. The removed displays were not mere decorations to be taken down and redisplayed; rather, they were a memorial to "men, women, and children of African descent who lived, worked, and died as enslaved people in the United States of America," a tribute to their struggle for freedom, and an enduring reminder of the inherent contradictions emanating from this country's founding.[188] Each person who visits the President's House and does not learn of the realities of founding-era slavery receives a false account of this country's history.

In addition, every day the President's House lacks interpretive material to express the City's intention to invest years of time, millions of dollars, and countless individual and

---

[185] Members of Democratic Caucus of the Senate of Pa. Amicus Br. at 3, 6-7 [Doc. No. 34].

[186] 2/7/2007 Press Release [Doc. No. 36-18].

[187] ATAC & The Black Journey Amicus Br. at 16 [Doc. No. 25]; 1/30/26 Hr'g Tr. at 119.

[188] *See* Pl.'s Ex. 11, Photos of Site at 28 [Doc. Nos. 36-11. 36-12] ("Memorial" erected at the President's House site and co-signed by the City of Philadelphia and the National Park Service).

37

JA42

collective efforts, the City of Philadelphia is deprived of the ability to honestly and accurately tell the story of its own history—as the government puts it: to "tell[] an important [tale]."[189] Indeed, the government's removal of displays from the President's House implicates federalism concerns raised by *amicus* Governor Shapiro. He argues that the dismantling of the President's House, in contravention of the City's designated role in its development, embodies the federal administration's effort to transgress the principles of federalism that limit federal executive power.[190] The Tenth Amendment, the Governor notes, assigns all powers unenumerated by the federal Constitution to state governments and, by implication, to local governments.[191] The Governor urges that the federal government's disregard of the City's role in creating the President's House, and of Pennsylvania's interest in conveying its history,[192] therefore undermines state sovereignty in favor of an unchecked rewriting of this country's history.[193]

Finally, the remaining displays and memorials at the President's House would likely sustain substantial damage if removed. They are etched in concrete or preserved within a glass structure, such that removal would result in irreparable harm to the integrity of the site. But the risk of harm to the City is not just physical. If the President's House is left dismembered throughout this dispute, so too is the history it recounts, and the City's relationship to that history. Worse yet, the potential of having the exhibits replaced by an alternative script—a plausible assumption at this time—would be an even more permanent rejection of the site's

---

[189] 1/30/26 Hr'g Tr. at 121 [Doc. No. 45-1].

[190] Gov. Shapiro's Amicus Br. at 6-11 [Doc. No. 23].

[191] *Id*. at 7 [Doc. No. 23]; U.S. Const., amend. X.

[192] Gov. Shapiro's Amicus Br. at 3-4, Ex. A [Doc. No. 23] (highlighting the markers of slavery across Pennsylvania meant to provide a fulsome account of the Commonwealth's history).

[193] *Id.* at 4-5 (noting the federal government's contemporaneous efforts to reinstall a monument to a confederate general in Washington, D.C.).

historical integrity, and irreparable. For the foregoing reasons, the City has met its burden to establish irreparable harm.

### C. The Balance of Harms and the Public Interest

Where, as here, the government is the sole defendant, the Court may consider the third and fourth prongs of a preliminary injunction analysis together.[194]

In its favor, the City has established that the government's actions to remove displays from the President's House are likely contrary to law. And, as courts recognize, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.' "[195] Further, with the parties accepting the displays as historically accurate, there is a public interest in the preservation and exhibition of that history.[196]

Defendants, for their part, raise only one argument for why an injunction would be inequitable. They argue there is a public interest in upholding the federal government's right to convey its preferred speech.[197] Restoration of the President's House does not infringe upon the government's free speech, nor is the government prevented from conveying whatever message it wants to send by wiping away the history of the greatest Founding Father's management of persons he held in bondage. President Washington's house would not merit designation as a historic site if he had not commanded the army that won the Revolutionary War, whose presence presiding over the Constitutional Convention graced it with the gravitas and spirit necessary to

---

[194] *Smith*, 138 F.4th at 779.

[195] *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *see also Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025) ("[T]here is generally no public interest in the perpetuation of unlawful agency action."); *New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025) (denying government's stay request and being mindful that state plaintiffs in an APA challenge were likely to succeed on the merits and that there is no public interest in unlawful agency action).

[196] *See Sayler Park Vill. Council v. U.S. Army Corps of Eng'rs*, No. C-1-02-832, 2002 WL 32191511, at *1 (S.D. Ohio Dec. 30, 2002).

[197] Defs.' Opp'n to Pl.'s Am. Mot. at 28-30 [Doc. No. 52].

the creation of our government's foundational document, and his restraint and modesty radiated strength and wisdom that defines the ideal chief executive to this day. The government can convey a different message without restraint elsewhere if it so pleases, but it cannot do so to the President's House until it follows the law and consults with the City.

The City has shown that the balance of harms and the public interest tip in the City's favor. The Motion for Preliminary Injunction will be granted.

## VI.    CONCLUSION

For the reasons stated above, the Motion for Preliminary Injunction will be granted. The preliminary injunction will remain in place pending further litigation in this matter. There can be no prejudice to Defendants' restoration of the status quo as of January 21, 2026, which requires that Defendants reinstall all panels, displays, and video exhibits that were previously in place. Defendants shall further prevent any additions, removals, destruction, or further changes of any kind to the President's House site, except in the event that a mutual written agreement is reached between Defendants and the City of Philadelphia. An order will be entered.

JA45