# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

No. 26-1348

## CITY OF PHILADELPHIA,

Plaintiff/Appellee,

V.

## SECRETARY U.S. DEPARTMENT OF INTERIOR; U.S. DEPARTMENT OF INTERIOR; DIRECTOR NATIONAL PARK SERVICE; NATIONAL PARK SERVICE

Defendant/Appellants.

## BRIEF OF APPELLEE THE CITY OF PHILADELPHIA

Appeal from the February 16, 2026 Order (ECF No. 54) granting the City of Philadelphia's Amended Motion for Preliminary Injunction, issued by the United States District Court for the Eastern District of Pennsylvania, the Honorable Cynthia M. Rufe, No. 26-cv-434

CITY OF PHILADELPHIA LAW DEPARTMENT
RENEE GARCIA, CITY SOLICITOR

By: Anne Taylor, Chair | Litigation
Kelly Diffily, Senior Attorney | Appeals Unit
Lydia Furst, Chief Deputy City Solicitor
Ryan B. Smith, Divisional Deputy City Solicitor
Bailey Axe, Deputy City Solicitor
1515 Arch Street, 14th Floor
Philadelphia, PA 19102-1595
*Attorneys for Appellee the City of Philadelphia*

Date: April 27, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................v

COUNTERSTATEMENT OF JURISDICTION ......................................................1

COUNTERSTATEMENT OF THE ISSUES PRESENTED ON APPEAL.............2

COUNTERSTATEMENT OF THE STANDARD OF REVIEW ...........................3

INTRODUCTION ..................................................................................................4

COUNTERSTATEMENT OF THE CASE...............................................................6

    I.     Facts...............................................................................................6

          A.     1948: Congress passes legislation establishing Independence Park and authorizing Cooperative Agreements between the City and the Federal Government at and around the Park. ........................... 6

          B.     1950: the City and the Federal Government enter into a Cooperative Agreement committing to consult on all matters of importance to Independence Park............................. 6

          C.     Early 2000s: The history of President's House comes to light and a broad coalition forms to demand commemoration. .................................................................. 7

          D.     2003: The City of Philadelphia invests in the project................ 8

          E.     2005-2006: Design of President's House Commences. ............ 8

          F.     2006-2009: the City and the Federal Government enter into a series of Cooperative Agreements for President's House.................................................................................. 9

          G.     2010: President's House, the first federal property to feature a slave memorial, opens to the public........................... 11

          H.     2015: the President's House Site is formally completed......... 11

          I.     2017: NPS issues the current "Foundation Document" for Independence National Historical Park .................................. 12

J.     2022: the President's House is designated as an Underground Railroad Network to Freedom Site................... 13

K.     January 22, 2026: The panels are abruptly removed. .............. 14

II.     Procedural History.................................................................14

A.     The Preliminary Injunction Motion and Hearing. ................... 15

B.     The District Court's Ruling. .................................................... 16

SUMMARY OF ARGUMENT .................................................................19

ARGUMENT .................................................................................................21

I.     Preliminary injunction factors.................................................21

II.     The City presented justiciable claims. ................................22

A.     The City has standing................................................................ 22

B.     The Tucker Act does not divest the District Court of subject matter jurisdiction over Counts I or II........................ 27

1.     National Underground Railroad Network to Freedom Act. ............................................................... 27

2.     The Cooperative Agreements ........................................ 28

C.     Removing core components of President's House is a reviewable final agency action................................................. 32

1.     The Federal Government took final agency action. ...... 32

2.     The decision is not committed to unreviewable agency discretion under Section 701(a)(2).................... 33

III.     The District Court correctly found that the City established its entitlement to a Preliminary Injunction................................37

A.     The City has shown a likelihood of success on the merits. ..... 37

1.     The City has a likelihood of success on the merits of its National Underground Railroad Network to Freedom Act Claim (Count II). .................................... 37

2. The City has a likelihood of success on the merits of its 1948 Act claim (Count III). ................................. 41

3. The City has a likelihood of success on the merits of its claim that the Federal Government violated the Independence Park Foundation Document (Count IV). ................................................................. 43

4. The City alternatively established that the Federal Government's actions were *ultra vires* ......................... 49

5. The failure of the Federal Government to adhere to the parameters of the Cooperative Agreements provides an alternative basis to affirm (Count I). ........... 50

B. The District Court correctly found that the City established irreparable harm in the absence of restraints. ....... 51

C. The District Court correctly found that the equities favor the City. ................................................................. 53

D. The scope of the preliminary injunction is appropriate. .......... 55

CONCLUSION ................................................................................. 56

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Am. Pub. Health Ass'n,
606 U.S. ____, 145 S. Ct. 2658 (2025) ......................................................30

Bennett v. Spear,
520 U.S. 154 (1997) ................................................................... 32, 33

Burke v. City of Charleston,
139 F.3d 401 (4th Cir. 1998) ...............................................................23

Chamber of Commerce,
949 F.3d 116 (3d Cir. 2020) ................................................................21

Com. of Mass. v. Mellon,
262 U.S. 447 (1923) ...........................................................................52

Davis Enterprises v. U.S. E.P.A.,
877 F.2d 1181 (3d Cir. 1989) ......................................................... 35, 47

Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland
Sec.,
108 F.4th 194 (3d Cir. 2024) .................................................... 3, 52, 53

Dep't of Ed. v. Cal.,
604 U.S. 650 (2025) ...........................................................................30

Dep't of Homeland Sec. v. Regents of the Univ. of California,
591 U.S. 1, 140 S.Ct. 1891 (2020) ................................................. 34, 48

Encino Motorcars, LLC v. Navarro,
136 S. Ct. 2117 (2016) ................................................................. 38, 48

F.C.C. v. Fox Television Stations, Inc.,
556 U.S. 502 (2009) ....................................................... 38, 41, 46, 48

Fair Share v. Law Enforcement Assistance Admin.,
758 F.2d 708 (D.C. Cir. 1985) ..................................................... 35, 47

Franklin v. Mass.,
505 U.S. 788 (1992) ......................................................................32

Gentile v. Sec. & Exch. Comm'n,
974 F.3d 311 (3d Cir. 2020) ................................................... 34, 36

Heckler v. Chaney,
470 U.S. 821 (1985) ......................................................................36

Hondros v. United States Civil Serv. Comm'n,
720 F.2d 278 (3d Cir. 1983) ................................................... 35, 47

Hope v. Warden York Cnty. Prison,
972 F.3d 310 (3d Cir. 2020) .........................................................26

Hoxworth v. Blinder,
903 F.2d 186 (3d Cir. 1990) .........................................................55

Huertas v. Bayer US LLC,
120 F.4th 1169 (3d Cir. 2024) .....................................................24

In re Friends of Marconi Plaza,
287 A.3d 965 (Pa. Cmwlth. 2022)................................................54

In re Horizon Healthcare Servs. Inc. Data Breach Litigation,
846 F.3d 625 (3d Cir. 2017) .........................................................22

In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices
& Liab. Litig.,
903 F.3d 278 (3d Cir. 2018) .........................................................24

INS v. Yueh-Shaio Yang,
519 U.S. 26 (1996) ................................................................. 35, 45

Kos Pharma., Inc. v. Andrx Corp.,
369 F.3d 700 (3d Cir. 2004) .........................................................27

Leslie v. Attorney General of U.S.,
611 F.3d 171 (3d Cir. 2010) .........................................................45

Lincoln v. Vigil,
508 U.S. 182 (1993) ......................................................................34

Logic Tech. Dev. LLC v. United States Food & Drug Admin.,
84 F.4th 537 (3d Cir. 2023) ................................................................32

Loving v. IRS,
742 F.3d 1013 (D.C. Cir. 2014) ................................................... 47, 48

Lujan v. Defs. of Wildlife,
504 U.S. 555 (1992) ................................................................22

M.B. v. Quarantillo,
301 F.3d 109 (3d Cir. 2002) .......................................................... 35, 47

Megapulse Inc. v. Lewis,
672 F.2d 959 (D.C. Cir. 1982) ................................................ 29, 30, 32

Morton v. Ruiz,
415 U.S. 199 (1974) ................................................................ 35, 47

Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.,
463 U.S. 29 (1983) ................................................................ 38, 46

Nicini v. Morra,
212 F.3d 798 (3d Cir. 2000) ..........................................................50

Pacito v. Trump,
169 F.4th 895 (9th Cir. 2026) ................................................ 29, 30, 31

Physicians for Soc. Responsibility v. Wheeler,
956 F.3d 634 (D.C. Cir. 2020) .................................................. 35, 47

Prometheus Radio Project v. F.C.C.,
373 F.3d 372 (3d Cir. 2004) ..........................................................38

Reilly v. City of Harrisburg,
858 F.3d 173 (3d Cir. 2017) ...................................................... 21, 22

Revak v. Nat'l Mines Corp.,
808 F.2d 996 (3d Cir. 1986) ..........................................................38

Robbins v. Reagan,
780 F.2d 37 (D.C. Cir. 1985) .............................................. 34, 35, 47

Satanic Temple, Inc. v. Saucon Valley Sch. Dist.,
   671 F. Supp. 3d 555 (E.D. Pa. 2023)................................................................27

Schweiker v. Hansen,
   450 U.S. 785 (1981) ...........................................................................................48

Shapiro v. U.S. Dep't of Agric.,
   2025 WL 3473291 (M.D. Pa. Dec. 3, 2025), appeal pending, No. 26-
   1014 (3d Cir.). ....................................................................................................31

Summers v. Earth Island Inst.,
   555 U.S. 488 (2009) ...........................................................................................26

Summit Power Grp., LLC v. United States,
   139 Fed. Cl. 369 (2018)......................................................................................30

The Wilderness Soc. v. Norton,
   434 F.3d 584 (D.C. Cir. 2006) ...........................................................................49

Town of Milton v. FAA,
   87 F. 4th 91 (1st Cir. 2023) ................................................................................52

United States ex rel. Accardi v. Shaughnessy,
   347 U.S. 260 (1954) ...........................................................................................45

Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,
   586 U.S. 9 (2018) ...............................................................................................34

Yaw v. Del. River Basin Comm'n,
   49 F.4th 302 (3d Cir. 2022).................................................................................24

**STATUTES**

Act of June 28, 1948, Pub. L. No. 80-795, 62 Stat. 1061, 1061–62,
   codified as amended at 16 U.S.C. §§ 407m-n .....................................................6

   16 U.S.C § 407m........................................................................... 31, 42, 43

   16 U.S.C. § 407n........................................................................... 17, 36, 41, 42

28 U.S.C. § 1292(a) .....................................................................................................1

28 U.S.C. § 1331 ..........................................................................................................1

28 U.S.C. § 1491(a)(1) ................................................................17

31 U.S.C. §§ 6301-08 ................................................................29

5 U.S.C. § 551 ................................................................ 32, 33

5 U.S.C. § 701(a)(2) ................................................................ 33, 34, 35

5 U.S.C. § 704 ................................................................ 32, 33

5 U.S.C. § 706(1) ................................................................49

5 U.S.C. § 706(2) ................................................................ 34, 49

54 U.S.C. § 100101 ................................................................ 33, 36, 46

Act of Dec. 19, 2014, Pub. L. No. 113-287, 128 Stat 3094 (2014), codified at 54 U.S.C. §§ 308301- 308304 ................................................................ 39, 40

    54 U.S.C. § 308302 ................................................................39

Pub. L. No. 105-203, 112 Stat. 678 (1998) ................................................................39

## REGULATIONS

36 C.F.R. § 1.1 ................................................................ 33, 36, 46

## OTHER AUTHORITIES

Br. for Def.-Appellee, St. Bernard Par. Gov't v. United States, 2018 WL 1438313 (9th Cir. Mar. 13, 2018) ................................................................29

H.R. 490, 2001-2002 Pa. Gen. Assemb., Reg. Sess. (Pa. 2002) ................................................................8

H.R. Rep. No. 107-564 (U.S. 2003) ................................................................8

Phila. Council Res. 020521 (Sept. 12, 2002) ................................................................8

# COUNTERSTATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over this interlocutory appeal of the District Court's grant of the City of Philadelphia's motion for a preliminary injunction pursuant to 28 U.S.C. § 1292(a).

**COUNTERSTATEMENT OF THE ISSUES PRESENTED ON APPEAL**

1. Did the District Court act within its discretion in granting a preliminary injunction directing the Federal Government Appellants to restore the President's House Site to its prior physical status, before they dismantled and removed virtually all slavery-related interpretive panels?

Answered below:  Yes.

Suggested answer:  Yes.

**COUNTERSTATEMENT OF THE STANDARD OF REVIEW**

This Court's standard of review of an order denying a preliminary injunction is governed by a tripartite standard of review. The District Court's findings of fact are reviewed for clear error; its legal conclusions are assessed *de novo*; and the ultimate decision to grant or deny the injunction is reviewed for abuse of discretion. Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec., 108 F.4th 194, 198 (3d Cir. 2024). "At this early stage, [this Court] review[s] deferentially because [the grant or] denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing that is the responsibility of the district judge." Id.

## INTRODUCTION

On January 22, 2026, employees of the National Park Service removed nearly all of the panels and videos of the President's House exhibit that explained "the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved." JA332 (City Ex. 6, 2009 Amd. to 2006 Agrmt. ("2009 Agrmt."), Attachment C). Within hours, these integral components of the President's House were gone, stored in a warehouse space below the National Constitution Center. JA59 (Sims Decl. at ¶ 8); JA720-39 (City Ex. 24, 1/28/2026 Site Photos).

The Federal Government refers to this removal as an act of curation. It is not. The record clearly establishes that the President's House was developed as a coherent whole. The panels may contain words and images, but that content—partially restored only by Court Order—is an essential component of the President's House as a memorial site.

The Federal Government argues that the City lacks standing, and that the City presents no justiciable claim. Not so. The City made a significant investment in time and money in the design and construction of the President's House, and derives a federally-acknowledged public benefit from its existence. The record establishes that the City has a right to consultation about significant changes to the Park, and that the Federal Government's actions violated this right. The record also establishes that the

excised panels are integral to the designation of the President's House as a Network to Freedom site and are core components of the Park pursuant to its own Foundation Document. Indeed, there is no evidence to the contrary.

Considering the weight of evidence and authority, the District Court properly found that the City is likely to succeed on the merits, that that it experiences irreparable harm from the panels' removal, and that the balancing of the equities—particularly where the Federal Government put on virtually no evidence—favors the City. Accordingly, this Court should affirm the District Court and maintain the restraints in place while the parties litigate the City's claims at the trial level.

**COUNTERSTATEMENT OF THE CASE**

I.      **Facts**

     A.      **1948: Congress passes legislation establishing Independence Park and authorizing Cooperative Agreements between the City and the Federal Government at and around the Park.**

In 1948, Congress passed legislation establishing Independence National Historical Park ("Independence Park") "[f]or the purpose of preserving for the benefit of the American people … certain historical structures and properties of outstanding national significance … associated with the American Revolution and the founding and growth of the United States." Act of June 28, 1948, Pub. L. No. 80-795, §§ 1-2, 62 Stat. 1061, 1061–62, codified as amended at 16 U.S.C. §§ 407m-n (the "1948 Act"). Congress instructed that the Secretary of the Interior to enter agreements with the City to "assist in preservation and interpretation of the property," which agreements "shall … [state] that no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement" of the parties. Id. at § 407n.

     B.      **1950: the City and the Federal Government enter into a Cooperative Agreement committing to consult on all matters of importance to Independence Park.**

Within two years, in 1950, the Interior Secretary and the City entered into a Cooperative Agreement. JA235-48 (City Ex. 1, 1950 Agrmt.).

The agreement contemplated a "high degree of cooperation" between the

6

parties as to "develop[ment] [of] a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park," and required "consult[ation] on all matters of importance" to the Park. JA240 (Id., Art. III(e)). It is still in effect. JA241 (Id., Art. III(j)).

### C. Early 2000s: The history of President's House comes to light and a broad coalition forms to demand commemoration.

In 1997, the National Park Service ("NPS") and the Philadelphia community developed a Master Plan for redesign of parts of Independence Park, including construction of the Liberty Bell Center and related facilities. JA596 (City Ex. 14, RFQ at 3). As those plans progressed, new historical research identified the location of the executive mansion occupied between 1790 and 1800 by Presidents Washington and Adams (the "President's House"). (Id.). In 2002, independent scholar Edward Lawler, Jr. published research confirming that George and Martha Washington enslaved nine persons while living there. (Id.); JA95-97 (1/30/2026 Hearing N.T. ("N.T.") 35:14–36:11, 37:3-7).

Public outcry followed. JA702 (City Ex. 17, 2/27/2007 Press Release). Community advocacy groups—including Amicus Avenging the Ancestors Coalition, Generations Unlimited, and the Ad Hoc Historians—formed and pressed NPS to commemorate both the President's House and the history of slavery there. JA597 (RFQ at 4); JA95-96, JA100-01, JA174-75 (N.T. 35:25-36:3, 40:19-41:21, 114:23-115-3). These groups emphasized that interpretation of the Liberty Bell and the nation's founding was incomplete without acknowledging slavery at the site. (Id.).

7

Elected officials at all levels of government also called for commemoration. JA104, JA155 (N.T. 44:1-3, 95:2-6). In 2002, the U.S. House Appropriations Committee urged NPS to appropriately honor the site. JA251 (City Ex. 2, H.R. Rep. No. 107-564 (U.S. 2003) at 47). That same year, both the Pennsylvania House and Philadelphia City Council passed resolutions calling for memorialization of the enslaved persons who lived at the President's House. See H.R. 490, 2001-2002 Pa. Gen. Assemb., Reg. Sess. (Pa. 2002), *available at* https://www.palegis.us/legislation/bills/text/PDF/2001/0/HR0490/PN3509; Phila. Council Res. 020521 (Sept. 12, 2002), *available at* https://phila.legistar.com/legislation.aspx.

**D. 2003: The City of Philadelphia invests in the project.**

In October 2003, the City committed $1.5 million toward commemoration and later committed an additional $2 million to fund development of the President's House Site. JA99-100 (N.T. 39:13-17, 40:2-5); JA325, JA330 (City Ex. 6, 2009 Agrmt., Attach. A-B). Two years later, Congress appropriated $3.6 million for the project. (Id.).

**E. 2005-2006: Design of President's House Commences.**

By 2005, NPS had become a full and enthusiastic partner with the City in creating a permanent outdoor commemorative exhibit on the President's House footprint. JA597 (RFQ). To that end, the City and NPS jointly issued a nationally distributed Request for Qualifications. JA594-610 (Id.). The RFQ reflected themes and requirements developed through prior public engagement—including the

8

"national importance [of telling the Site's story] in an honest, inspiring, and informative way"—and emphasized the project as "one of the top interpretive opportunities that the National Park Service has to offer." JA595, JA602-03 (Id., 2, 9-10). The City and NPS also jointly convened an Oversight Committee of key community, cultural, and governmental stakeholders to guide development and to represent the public interest. JA597 (Id., 4); JA702 (2/27/2027 Press Release).

Following the RFQ process, the City and NPS partnered to issue a Request for Proposal to select a final design. JA611-32 (City Ex. 15, RFP). The City provided funding for the semi-finalists to create three-dimensional models of their proposals for public display. JA620 (Id., 10); JA107-08 (N.T. 47:20-48:22); JA703 (2/27/2007 Press Release). Nearly 1,000 visitors completed evaluation cards, which were reviewed by the Oversight Committee and posted on the City's website. (Id.).

**F.     2006-2009: the City and the Federal Government enter into a series of Cooperative Agreements for President's House.**

In 2006, authorized by the 1948 Act and the 1950 Cooperative Agreement, the City and NPS entered into another Cooperative Agreement to establish the President's House exhibit. JA252-84 (City Ex. 3, 2006 Agrmt.). The parties expressed their "desire to establish an exhibit at the Park that illuminates the history of the site of the former President's House … [(]where at least nine enslaved Africans – kept by George Washington – also lived) and its symbolic importance to the founding of the United States[.]" JA253 (Id., 2, ¶ E). They also expressly agreed to joint approval of all project designs. JA253 (Id., 2, ¶ F). The Agreement

acknowledges the "historical importance of the President's House for the City of Philadelphia, its citizens, and all Americans nationwide" and that the project confers a "public benefit inuring to the City." JA254 (Id., 3, ¶ K).

The City and the Federal Government entered into a series of amendments that extended the term of the 2006 Cooperative Agreement and addressed issues that arose during the design, archeological dig, and construction of the Exhibit. JA255 (Id., p. 4, ¶ 5); (City Exs. 4-6, 2007-09 Agrmts.).

The final Amendment (in 2009) stressed the parties' agreement to cooperate in the design, fabrication, installation and completion of the President's House in accordance with the joint Project Development Plan. JA310-16, JA322-38 (2009 Agrmt. at Art. III & Attach. C, Project Plan). That Plan, which could be modified only "by written agreement of the parties," specified that site "interpretation" must focus on six themes, which included the people who lived and worked at the house and the systems and methods of slavery. JA315, JA332, JA334-35 (Id., Art. III(C)(4), Project Plan). The Agreement also included a Survival clause that obliged the Federal Government to "maintain[]" the exhibit following its completion. JA309, JA321 (Id., Art. I(C), Art. XII(Q)). JA310-16, JA32-38 (2009 Agrmt. at Art. III & Attach. C, Project Dev. Plan). Finally, the parties agreed that the venue for any disputes stemming from the 2009 Amendment "shall be a Federal court located in the Eastern District of Pennsylvania." JA318 (Id., Art. IX(D)).

**G.    2010: President's House, the first federal property to feature a slave memorial, opens to the public.**

In December 2010, the President's House opened to the public. JA717-19 (City Ex. 23, 12/15/2010 Press Release). In a joint press release, the City and the Federal Government stressed the collaborative nature of the project and characterized it as one of "major international importance because it recognizes the broader picture of the people who participated in this nation's early history, including enslaved and free people of African descent." (Id.).

However, despite the ceremonial introduction, the President's House was not yet finished. The City would work and provide additional funding for another five years—even when it was itself facing dire financial straits—to ensure completion in accordance with the expectations and demands of the public. JA130, JA133-42 (N.T. 70:4-17, 73:9-82:8).

**H.    2015: the President's House Site is formally completed.**

The President's House was completed in 2015.



The final project reflected over a decade of public collaboration and executed the original vision: to "commemorate all those who lived in the house while it was used as the executive mansion, including the nine enslaved Africans brought by George Washington from Mt. Vernon." JA325 (2009 Agrmt., Attach. A); JA498-531 (City Ex. 11, Pre-Removal Site Photos).

Key to the site design is the footprint of the house that allows visitors to walk through the first floor as it was laid out in the late 18th century. JA717-19 (City Ex. 23, 12/15/2010 Press Release); JA602 (RFQ at 9). Interpretive panels and visual exhibits provided historical context, and video reenactments depicted the experiences of the enslaved persons in Washington's household. (Id.); JA532-56 (City Ex. 12, Script). A glass vitrine structure houses elements of the 18th-century structure uncovered during a 2007 archeological dig. JA718 (12/15/2010 Press Release). Near the Liberty Bell Center entrance, the site also includes a memorial listing the names of the enslaved Africans, intended as a place of reflection. (Id.).

I. **2017: NPS issues the current "Foundation Document" for Independence National Historical Park**

In September 2017, the Park Service issued its current Foundation Document. JA375-464 (City Ex. 8, Foundation Doc.). The Foundation Document, an instrument that defines the purpose, core principles, and policy framework for NPS' management of Independence Park, identifies the President's House Exhibit as one of the Park's "Core Components." JA385 (Id., 5). It describes the site as an "archeological resource" that is "fundamental" to the Park and recognizes the

"significance" of the Exhibit's exploration of the "Paradox of Freedom and Slavery" to the Park. JA389, JA391 (Id., 9, 11). The Foundation Document also touts NPS's "close working relationship with the City of Philadelphia"—as "fundamental" to the Park's success. JA392 (Id., 12).

### J. 2022: the President's House is designated as an Underground Railroad Network to Freedom Site.

In 2022, the President's House was nominated for inclusion in the National Park Service's National Underground Railroad Network to Freedom program. JA468-97 (City Ex. 10, Network to Freedom App.). The nomination documented the site's connection to Ona Judge, who escaped from enslavement at the President's House in 1796. JA468, JA472-73, JA475-477 (Id., 1, 5-6, 8-10). The nomination also recognized the site's historical significance as the location where President Washington lived and at which, in addition to Ona Judge, he enslaved eight other people and waged efforts to recapture Judge after her escape. JA472-73, JA481-85 (Id., 5-6, 14-18).

Then-superintendent of Independence Park Cynthia MacLeod formally consented to the designation on behalf of NPS in September 2022. JA495 (2022 MacLeod Letter). Since that time, the President's House has been listed as a Network to Freedom site. Id.; see also NPS, *Explore Network to Freedom Listings, Underground Railroad*, *available at* www.nps.gov/subjects/undergroundrailroad/ntf-listings.htm.

**K.     January 22, 2026: The panels are abruptly removed.**

On January 22, 2026, employees of NPS removed nearly all of the communally-developed and jointly paid-for panels and videos that explained and gave context to the complicated history of the Site. JA59 (Sims Decl. at ¶¶ 6-8); JA332 (2009 Agrmt., Attach. C). Within hours, that essential context was gone, stored in a warehouse space below the National Constitution Center. JA59 (Sims Decl. at ¶ 8); JA720-740 (1/28/2026 Site Photos). NPS did this without having made any outreach to or consultation with the City of Philadelphia. JA163-64 (N.T. 103:25-104:7).



**II.     Procedural History**

The City of Philadelphia filed its initial Complaint and Motion for Preliminary Injunction on January 22, 2026, the same day the Federal Government abruptly

removed nearly all the display panels and explanatory material from the President's House. JA50 (Docket, ECF 1-2). On January 28, 2026, the Federal Government responded to the City's Motion. JA52 (Id., ECF 27).

### A. The Preliminary Injunction Motion and Hearing.

On January 30, 2026, the District Court held an evidentiary hearing and heard arguments on the Motion for Preliminary Injunction. JA61- 232 (N.T.). The City presented documentary evidence and testimony from three witnesses, Joyce Wilkerson (former Chief of Staff for then-Mayor John Street), Everett Gillison (former Chief of Staff for then-Mayor Michael Nutter from), and Valerie Gay (current Chief Cultural Officer for Mayor Cherelle L. Parker). JA93-169 (Id., 33-109). The Federal Government chose not to present evidence, opting to rely solely on two short declarations of Steven Sims, Superintendent of Independence Park. JA170 (Id., 110:3-7). Neither explains the Government's motivation for its decision to remove all interpretive material. JA58-60, JA812-13 (Sims Initial & Supp. Decl.). Nor did the Government present evidence of whether it intends to install a different exhibit, or leave the site stripped of interpretive content altogether. (Id.).

The District Court granted the City leave to file an Amended Complaint and an Amended Motion for a Preliminary Injunction to conform with the hearing evidence, which the City filed shortly after the hearing. JA53 (Docket, ECF 37, Order); JA741-70 (Amd. Compl.); JA53 (Docket, ECF 45, Amd. PI Mtn.). The Amended Complaint asserts four claims under the Administrative Procedure Act

(Counts I-IV), as well as a claim that the Federal Government engaged in *ultra vires* action (Count V). JA758-68 (Amd. Compl. ¶¶ 77-138).[1] Relying on and incorporating the claims in that operative complaint, the Amended Motion sought an order, among other things, directing the Federal Government to restore the President's House Site to its status as of January 21, 2026, and prohibiting further changes to the Site without City approval.

## B. The District Court's Ruling.

The District Court granted the City's Motion on February 16, 2026. JA6-45 (Mem. Op.); JA4-5 (Order).

The Court first concluded that the City had standing. JA18-26 (Mem. Op. 13-21). It determined that the framework of the 1948 Act, together with the series of cooperative agreements the parties entered into, gave rise to a right to consultation and mutual agreement on changes within the Park, including to President's House. (Id.). The Court further found that Federal Government's unilateral removal of nearly all interpretive material injured that legally protected interest and harmed the City's tourism interests, its multi-million investment in the project and the honest promotion of its own history. (Id.).

Next, the District Court held that it had jurisdiction over three of the City's

---

[1] The Amended Complaint names Doug Burgum, Secretary of the Interior; the United States Department of the Interior; Jessica Bowron, acting Director of the National Park Service; and the National Park Service (referred to collectively as the "Federal Government" or "Defendants") as Defendants to this action. JA743 (Amd. Compl. ¶¶ 9-12).

16

four APA claims (Counts II–IV). JA28-29 (Id., 23–24). However, it concluded the Tucker Act, 28 U.S.C. § 1491(a)(1), divested the Court of jurisdiction to consider Count I because it was grounded in the Cooperative Agreements. (Id.). The Court further deemed the removal of materials from the President's House Site, as set forth in Counts II-IV, was reviewable. JA26-28 (Id., 21–23). It found that the removal constituted final agency action because it marked the completion of the Federal Government's unilateral decision-making process and carried legal consequences. (Id.). The Court further found the action was not committed to agency discretion because 16 U.S.C. § 407n and the parties' agreements placed constraints on NPS's decision-making and supplied judicially manageable standards. JA28 (Id., 23).

The District Court then held that the City is likely to succeed on Counts II-V. JA30-40 (Id., 25–35). First, it found that absent a reasoned explanation for the Federal Government's about-face, the removal likely violated the National Underground Railroad Network to Freedom Act by eliminating the story of Ona Judge, interpretation central to the site's designation. JA31-32 (Id., 26–27). The Court also concluded that the Federal Government acted contrary to the 1948 Act, which required consultation and mutual agreement before major alterations. JA32-34 (Id., 27–29). The Court further held that the removal conflicted with NPS's Foundation Document on Independence Park. JA34-38 (Id., 29–33). Finally, the Court held that the City is likely to succeed on its *ultra vires* claim (Count V) because the Federal Government acted in excess of its authority by unilaterally

removing the panels. JA38-40 (<u>Id.</u>, 33–35).

Next, the District Court held that the City demonstrated irreparable harm, in that removal deprived the City of its ability to accurately tell its own history and undermined the public trust. JA41-43 (<u>Id.</u>, 36–38). It also found that remaining site elements faced a risk of substantial damage. JA43 (<u>Id.</u>, 38).

Finally, the Court found that the equities favored a preliminary injunction. JA44-45 (<u>Id.</u>, 39–40). The Court stressed that there is a public interest in accessing an accurate telling of history and having governmental agencies abide by the law. (<u>Id.</u>). It also rejected the Federal Government's claim that restoring the Site would infringe on its speech, noting it could convey its desired message elsewhere. (<u>Id.</u>).

In its accompanying Order, the District Court ordered the Federal Government to restore President's House to its status as of January 21, 2026. It also enjoined it from making further changes without the City's agreement; directed the Federal Government not to damage any remaining elements and to ensure the safety of all items it had removed; and to properly maintain and keep President's House operable. JA4-5 (2/16/2026 Order). The Federal Government appealed, and this Court stayed the injunction in part during the pendency of this appeal. JA1.

# SUMMARY OF ARGUMENT

The District Court, based upon the evidence presented by the parties, did not abuse its discretion in issuing the preliminary injunction now before this Court. That evidence was of a collaborative process to design and construct President's House, at the end of which it—comprised of its walls, archeological site, and interpretive panels—was designated a Network to Freedom site. And because the Federal Government did not introduce any evidence, the question is solely whether the City's evidence established that removal of all the panels, leaving a denuded President's House, is arbitrary and capricious or in violation of cooperative agreements. It did.

The City's standing to bring its claims is grounded in its significant investment of time and money to create President's House. The City did this work for the specific benefit of the City, expressly acknowledged by the Federal Government, which further made commitments to maintain President's House consistent with the agreed-upon interpretation parameters. The City also has a statutory right to consultation and mutual agreement before significant changes to the Park and the program are made. None of which happened here. Now, on the eve of the City's Semiquincentennial celebration, President's House is only partially restored, and only by Court Order. The harm to the City is real, concrete, and particularized.

The Court has jurisdiction to hear these claims. The Tucker Act does not

divest the Court of jurisdiction, and the statutes and policies cited by the City provide appropriate parameters to inform judicial review. This is a narrow case with specific interests – a finding for the City would not, as the Federal Government suggests, "subject every change to a park sign, exhibit, or pamphlet to judicial review." Appellants' Br. at 15.

The City has demonstrated irreparable harm. The Semiquincentennial celebration happens but once. This year, where the City is expecting more than a million visitors and is relying on President's House as part of its programming, the removal of these panels irreparably harms the City.

The City also established that the equities favor restoration for the duration of litigation. The evidence clearly establishes that – at the President's House – the Federal Government must act consistent with the agreed-upon interpretation parameters, that changes must be made in consultation with and with agreement of the City, and that the panels are essential components of the President's House Foundation Document and designation as a Network to Freedom site.

Finally, the scope of the injunction is appropriate to the claims made. Restoration is consistent with a finding that removal of the panels violated the Federal Government's obligations. Consultation is consistent with a finding that the City has both statutory and agreed-upon rights to consultation before major changes to the Park or the program. To the extent the mandate to shovel was excessive, that has been mooted by the weather or can be excised by this Court.

**ARGUMENT**

This Court should affirm the District Court's decision granting the City's request for a preliminary injunction. First, the City has standing to bring its claims, the jurisdiction for which is clear. Second, the record establishes the City's entitlement to a preliminary injunction – the City has a demonstrated a likelihood of success on the merits of its claims, that it is irreparably harmed by the panels' removal, and that the equities favor relief during the pendency of the litigation. Third, the injunction's scope is appropriate for the nature of the City's claims. This Court, considering the law and the record, should affirm.

## I. Preliminary injunction factors.

In order for a district court to issue a preliminary injunction, the moving party must show: (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm in the absence of an injunction; (3) that granting a preliminary injunction will not result in greater harm to the non-moving party and other interested persons; and (4) that a preliminary injunction is in the public interest. See Chamber of Commerce, 949 F.3d 116, 133 (3d Cir. 2020). If the first two factors are met, this Court will "consider the remaining two . . . and determin[e] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017). In exercising its sound discretion while balancing the four factors, the court should consider that "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the

merits can be while still supporting some preliminary relief." Id.

## II.    The City presented justiciable claims.

Though the Federal Government argues to the contrary, the District Court properly found that the City has standing to contest the removal of the panels, and that it presents justiciable claims. These issues are addressed in turn.

### A.    The City has standing.

Given the City's significant investment in time and money, and demonstrated reliance interest in the President's house, the District Court had ample basis to conclude the City established standing.

To establish Article III standing, the City must demonstrate an "'injury in fact,' or an 'invasion of a legally protected interest' that is 'concrete and particularized.'" In re Horizon Healthcare Servs. Inc. Data Breach Litigation, 846 F.3d 625, 633 (3d Cir. 2017) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)). Second, there must be a "causal connection between the injury and the conduct complained of." Id. Finally, standing requires "a likelihood 'that the injury will be redressed by a favorable decision.'" Id.

The District Court thoroughly reviewed the statutory framework for Independence Park and the decades of cooperative agreements to properly find that the City has "inclusive rights" to the President's House property, as well as a right to mutual agreement to changes to the whole of Independence Park. JA19-22 (Mem. Op. at 14-17). The Court also correctly determined that the unilateral, sudden

22

removal of panels integral to President's House undermined the City's investment of more than a decade of resources and millions of public dollars (made in reliance on the parties' shared understanding of the project's core themes and components) and also harmed the City's tourism interests, and ability to honestly tell its own history. JA22-23 (Id., 17-18). Those injuries are particularly acute because 2026 is the 250th anniversary (Semiquincentennial) of the founding of the United States and the City is sponsoring a yearlong calendar of celebratory activities for both residents and the more than million tourists expected to join the celebrations. (Id.).

The Federal Government suggests that because it now owns the President's House, the City has no property interest to contest its reduction to bare walls, relying on the Fourth Circuit's opinion in Burke v. City of Charleston, 139 F.3d 401 (4th Cir. 1998). Appellant's Br. at 20. In Burke, an artist commissioned by a restaurant owner to paint a mural on a historic building but who sold the artwork to the owner lacked standing to challenge the City of Charleston's decision to disallow the mural. See Burke, 139 F.3d at 405-07. Here, the City's interests in the President's House run far deeper than those of the artist in Burke. The City's financial and resource investments in the project—inclusive of the physical structure and the panels— spanned over a decade. And it made those investments in reasonable expectation of receiving the benefits it conferred indefinitely. Namely, maintaining the cohesive exhibit would have "enable[d] the City to commemorate the symbolic and historical importance of the President's House for the City of Philadelphia, its citizens, and all

Americans nationwide[.]" JA254 (2006 Agrmt., Background, ¶ K). And the Federal Government acknowledged that benefit and the parties' shared understanding that the Government would "maintain" the Exhibit, inclusive of its jointly developed interpretive themes, in both the 2006 Cooperative Agreement and the subsequent amendments thereto. (Id.); JA309, JA325-28, JA332-38 (2009 Agrmt., Art I(C), Attachs. A & C).

The Federal Government argues that the City's expenditure of public funds does not confer standing because "no possible resolution in this case will restore those funds to the City." Appellant's Br. at 21. But that is not the redress the City seeks. Again, the record conclusively establishes that the City financed the project in reasonable expectation of President's House being maintained in the manner in which it was collaboratively designed and built. This suit seeks restoration of that interest. Cf. Huertas v. Bayer US LLC, 120 F.4th 1169, 1174 (3d Cir. 2024), citing In re Johnson & Johnson Talcum Powder Products Mktg., Sales Practices & Liab. Litig., 903 F.3d 278, 290 (3d Cir. 2018).

The Federal Government discounts its own acknowledgement that the City benefits from the existence of the President's House, arguing that the removal of this public benefit is not a concrete, particularized injury. Appellant's Br. at 21. The Federal Government passingly cites Yaw v. Del. River Basin Comm'n, 49 F.4th 302, 321 (3d Cir. 2022) in support of this argument. But there, plaintiffs failed to establish standing because they presented no evidence of harm. Here, the City has

established that it spent money to design and build President's House, the ongoing existence of which benefits the City. And the loss of which is a concrete and particularized harm sufficient to confer standing.

The Federal Government discounts the testimony about how removal of the panels harms the City's tourism industry during the Semiquincentennial celebration, suggesting it requires "speculating about the intent of countless third parties and other factors, like the Site's importance to tourists' travel plans and the effects of NPS's planned replacement signage." Appellant's Br. at 22-23. But there is no evidence in the preliminary injunction record about replacement signage because the Federal Government chose not to present it. By contrast, the City's witness, Chief Cultural Officer Val Gay, testified to the effects of the Government's excision of critical explanatory components of President's House on tourism. JA163-68 (N.T. 103:12–109:22). The Federal Government did not put on contrary evidence, and Ms. Gay's testimony is sufficient to establish specific, concrete and imminent harm to the City in the absence of restoration.

The Federal Government attempts to diminish its commitment in the still-operative 1950 Cooperative Agreement to "consult on all matters of importance to the [Independence Park] program" as merely procedural, such that the City cannot establish standing. Appellant's Br. at 23, <u>citing</u> JA240 (1950 Agrmt., Art. III(e)). However, the authority it cites suggests just the opposite. Although the Federal Government correctly states that "deprivation of a … a procedural right *in vacuo*—is

insufficient to create Article III standing," far more than that is at stake here. <u>Id.</u>, citing <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 496 (2009). The City invested significant public resources—millions of public dollars and a decade of staff time—in order to support the design and construction of President's House. It did so to ensure the public benefit to the City of having this commemoration would remain intact. And the undermining of this investment is assuredly a concrete interest, about which the City's procedural right to consultation was sufficiently harmed to establish standing.

The Federal Government dismisses the suggestion that the removal affects the ability of the City to tell its history because the City can use other communication channels to do so. Appellant's Br. at 23-24. But there is only one President's House. To borrow the Federal Government's turn of phrase, "it blinks reality" to suggest the City can equally communicate the complicated history of the President's House away from the place with the literally unearthed, physical linkage to the enslaved individuals in Washington's household that Ms. Gay testified visitors specifically come to see. JA163 (N.T. 103:12-14).

Finally, there is no merit to the Federal Government's suggestion that the City bore a higher evidentiary burden to establish standing because it purportedly sought a mandatory injunction that alters the *status quo*. Appellant's Br. at 26. First, <u>Hope v. Warden York Cnty. Prison</u>, 972 F.3d 310, 320 (3d Cir. 2020), holds no such thing. <u>Hope</u> only states that the proponent of a mandatory injunction has a heightened

burden to prove the *elements of a preliminary injunction*, not standing. Anyway, the City did not seek a mandatory injunction. Instead, it sought to *maintain* the *status quo* as this Court has defined it: "the last, peaceable, noncontested status of the parties." Kos Pharma., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). Unlike a mandatory injunction, which seeks "relief [that] *cannot be undone even if the defendant prevails at a trial on the merits*," Satanic Temple, Inc. v. Saucon Valley Sch. Dist., 671 F. Supp. 3d 555, 566 (E.D. Pa. 2023) (emphasis added), any relief granted here can be undone if the Federal Government prevails at trial.

**B.      The Tucker Act does not divest the District Court of subject matter jurisdiction over Counts I or II.**

The Federal Government argues that the Tucker Act strips jurisdiction over Count II (the City's APA claim arising under the National Underground Network to Freedom Act), Appellant's Br. at 26-31, and the District Court found that the Tucker Act precluded jurisdiction over Count I (the City's claim arising out of the Cooperative Agreements). The Federal Government is incorrect as to the former, and the City respectfully suggests the District Court, lacking access to rapidly-developing decisional law, was incorrect as to the latter. The City addresses each of these in turn.

**1.      National Underground Railroad Network to Freedom Act.**

The Federal Government suggests that the District Court had no jurisdiction to consider Count II, the City's National Underground Railroad Network to Freedom Act claim, because its essence is "contractual." Appellant's Br. at 28. But the City is

not seeking to vindicate any contractual rights by way of this claim.

That the City references the cooperative agreements in its Amended Motion does not convert Count II to one based in contract. (ECF 45, Amd. PI Mtn. Memo. at 28). Indeed, the agreements' contents (and those of the Foundation Document and the application for designation as a Network to Freedom site) merely serve as evidence of the parties' shared understanding of the core components of the project as it was created. Specifically, these materials show that both parties understood that the contents of President's House panels are essential to its integrity as a site and its designation as a Network to Freedom site. Use of this evidence does not convert the City's Network to Freedom claim, undisputedly based in statute, into a contractual claim. In short, the Tucker Act has no effect on the Court's jurisdiction to consider this claim.

### 2. The Cooperative Agreements

In Count I, the City alleged the Federal Government's unilateral removal of the panels violated various terms of the 1950 Cooperative Agreement as well as the 2006 Agreement and its amendments, a claim cognizable under Section 702 of the APA. Those agreements required mutual consent, consultation with the City before acting, and stewardship of the nationally important asset that is the President's House, none of which happened. JA758-59 (Amd. Compl. §§ 77-84).

The District Court concluded that the Tucker Act divested it of jurisdiction to consider this Count. However, the District Court did not have the benefit of recent

decisional law, specifically applicable to cooperative agreements like the ones at issue here. With the benefit of that persuasive authority, this Court should conclude that cooperative agreements are not "contracts" for Tucker Act purposes and consider the merits of this claim.

Last month, in Pacito v. Trump, the Ninth Circuit Court of Appeals held that cooperative agreements do not constitute the types of contracts for which exclusive jurisdiction lies with the Court of Federal Claims. 169 F.4th 895, 924-30 (9th Cir. 2026). At issue were APA claims by refugee application processing and resettlement organizations challenging the termination of their cooperative agreements with the United States. Id. at 907. Applying the District of Columbia Circuit's analysis in Megapulse Inc. v. Lewis, 672 F.2d 959, 967 (D.C. Cir. 1982), the Pacito Court determined the matter was not at its essence a contract claim because the federal government chose to proceed via cooperative agreement rather than by contract, and plaintiffs did not seek money damages as relief. Id.

First examining the source of the rights alleged by plaintiffs, the Ninth Circuit explained that cooperative agreements are categorically different than procurement contracts. Id. at 925-26 (citing 31 U.S.C. §§ 6301-08 (defining "procurement contracts," "grant agreements," and "cooperative agreements")). The court noted that in other matters the federal government has argued that certain cooperative agreements are *not* Tucker Act contracts, depriving the Court of Federal Claims of jurisdiction over plaintiffs' claims. Id. at 927 (citing Br. for Def.-Appellee at 3, St.

29

<u>Bernard Par. Gov't v. United States</u>, 2018 WL 1438313 (9th Cir. Mar. 13, 2018)).

The Ninth Circuit did not sanction such forum shopping:

[t]he Government cannot have its cake and eat it too by insisting that cooperative agreement *are not* Tucker Act contracts when it does not want to litigate in the [Court of Federal Claims] but that they *are* Tucker Act contracts when—as in this case—it would rather be there.

<u>Id.</u> The court found that the sources of the rights that plaintiffs claimed were the statute governing the program at issue and permitting the agency to "proceed by cooperative agreement rather than by contract," as well as the cooperative agreements themselves. <u>Id.</u>

Next, the Ninth Circuit turned to the second element of the <u>Megapulse</u> analysis: the type of relief sought. The court found that the plaintiffs did not seek money damages and that the cooperative agreements did not contemplate money damages as compensation for termination. <u>Id.</u> at 927-28 & n.14 (<u>citing</u> <u>Summit Power Grp., LLC v. United States</u>, 139 Fed. Cl. 369, 374 (2018) (collecting cases, noting that cooperative agreements that "do not contemplate payment of money as a remedy for breach" are outside of the Court of Federal Claims' jurisdiction)). Consequently, the cooperative agreements were not contracts subject by the Tucker Act to the exclusive jurisdiction of the Court of Federal Claims but were instead reviewable in the district court under the APA. <u>Id.</u> at 928. The <u>Pacito</u> court distinguished the Supreme Court's recent expedited, per curiam decisions in <u>Dep't of Ed. v. Cal.</u>, 604 U.S. 650 (2025), and <u>NIH v. Am. Pub. Health Ass'n</u>, 606 U.S.

30

____, 145 S. Ct. 2658 (2025), explaining that each involved enforcement of an obligation to pay grant money. Id. at 928-29.[2]

The same result is warranted here. Section 407m of the 1948 Act provides for the creation of Independence Park and Section 407n expressly empowers the Secretary of the Interior to enter into cooperative agreements with the City. And the 1950 Agreement, by which the City has a right to be consulted in matters of importance to "the whole [of] Independence … Park," is still an extant cooperative agreement. JA240 (1950 Agrmt., Art. III(e)). The 2006 Agreement as amended contains the Project Plan, reflecting the parties' agreement and shared commitment to the core components and themes of the project. JA310-16, JA322-38 (2009 Agrmt., Art. III & Attach. C). The 2006 Agreement and subsequent amendments have expired but certain provisions survive the end of the term by their plain language, including the federal government's commitment to "maintain" the project after taking ownership of it. JA309, JA321, JA332 (Id., Art. I(C), XII(Q), Project Plan at B). The 2009 Amendment also expressly provides that the parties intend to be bound by it, JA316 (id., Art. III(C)(7)), and that the venue for all disputes "shall be a Federal court located in the Eastern District of Pennsylvania," reflecting the Federal Government's understanding that the Agreement was *not* subject to the

---

[2] Another case pending before this Court presents a similar question regarding the application of the Tucker Act. See Shapiro v. U.S. Dep't of Agric., No. 1:25-CV-00998, 2025 WL 3473291, at *5 (M.D. Pa. Dec. 3, 2025), *appeal pending*, No. 26-1014 (3d Cir.).

31

Tucker Act, JA318 (id., Art. IX(D)). No part of the 1950 or 2006 agreements provides direct, procurement-contract-like benefits to the Federal Government, nor do the agreements provide for money damages if the Government fails to comply. The source of the City's rights for Count I are cooperative agreements entered into pursuant to Section 407n of the 1948 Act. And the City seeks only equitable relief – not monetary damages. The City's claim passes both elements of the Megapulse test.

Thus, Count I is an alternative basis for affirmance.

## C. Removing core components of President's House is a reviewable final agency action.

The Federal Government is also wrong that the decision to strip President's House is unreviewable. It claims its conduct is merely "curatorial" and part of the ordinary day-to-day management of national parks and therefore committed to agency discretion by law. Appellant's Br. at 2, 15, 31-35. Not so.

### 1. The Federal Government took final agency action.

The APA limits court review to "agency action" that is "final." 5 U.S.C. §§ 551(13), 704. Establishing that agency conduct is "final agency action" requires showing that it marks the culmination of the agency's decision-making process, and that legal consequences flow from the action. See Logic Tech. Dev. LLC v. United States Food & Drug Admin., 84 F.4th 537, 551 (3d Cir. 2023), citing Bennett v. Spear, 520 U.S. 154, 177-78 (1997). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin v. Mass., 505 U.S. 788, 797 (1992).

Here, the Federal Government's wholesale removal of virtually all slavery-related interpretive panels at President's House is a discrete, final decision with immediate consequences for the preservation and interpretation of a core historic resource within Independence Park. JA27 (Mem. Op. at 22). Nothing in the record evidence suggests this was a "tentative" or "interlocutory" act. Bennett, 520 U.S. at 177. Instead, the removal marked a major change in the *status quo*, departing from the Park's own governing policies and decades of NPS commitment to explaining slavery in its historic context. JA383, 385, 389, 391 (Foundation Doc.); JA331-39 (2009 Coop. Agrmt., Attach. C, Project Dev. Plan). The decision has clear legal consequences. It alters how the agency fulfills its statutory obligations under the Organic Act, including the duty to conserve historic resources and to manage park units in a manner that does not derogate from their established purposes. See 54 U.S.C. §§ 100101(a), (b)(2); see also 36 C.F.R. § 1.1. Removal also infringes upon the City's long-running financial, statutory and agreement interests in the creation and sustained maintenance of the completed President's House. It eviscerates the public benefit—the intangible property—of the City. The dismantling of President's House is therefore final agency action under 5 U.S.C. §§ 551(13) and 704.

### 2. The decision is not committed to unreviewable agency discretion under Section 701(a)(2).

Next, the District Court properly rejected the Federal Government's claim that judicial review is barred by the exception set forth in Section 701(a)(2) for "agency action committed to agency discretion by law." 5 U.S.C. § 701(a)(2); JA28 (Mem.

33

Op. at 23).

The Supreme Court has long recognized a "strong presumption" of judicial review under the APA for one suffering a legal wrong because of agency action. Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv., 586 U.S. 9, 23 (2018); see also Dep't of Homeland Sec. v. Regents of the Univ. of California, 591 U.S. 1, 140 S.Ct. 1891, 1905 (2020). To honor that presumption of review, the Supreme Court has directed courts to read the Section 701(a)(2) exception "quite narrowly." Dep't of Homeland Sec., 140 S.Ct. at 1905. That narrow construction is compelled by the structure of the APA itself: Section 706(2)(A) directs courts to set aside agency action that is "an abuse of discretion," and thus agency action cannot be insulated from review merely because it involves discretion. See Weyerhaeuser, 586 U.S. at 23 (observing obvious tension between Section 701(a)(2) and Section 706(2)(A)).

Accordingly, Section 701(a)(2) should be applied only in "rare circumstances" where a court would have "no meaningful standard against which to judge the agency's exercise of discretion." Lincoln v. Vigil, 508 U.S. 182, 191 (1993); Gentile v. Sec. & Exch. Comm'n, 974 F.3d 311, 318 (3d Cir. 2020). Notably, "[t]he mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely nonreviewable under the 'committed to agency discretion by law' exception." Robbins v. Reagan, 780 F.2d 37, 45 (D.C. Cir. 1985).

Courts have found judicially manageable standards in a wide variety of sources including statutes, but also in administrative agencies' regulations, formal

and informal policy statements, internal guidance, manuals and cooperative agreements. See INS v. Yueh-Shaio Yang, 519 U.S. 26, 32 (1996) (agencies self-limit discretion "by announc[ing] and follow[ing] – by rule or by settled course of adjudication – a general policy" and are subject to review for "irrational departure" therefrom); Morton v. Ruiz, 415 U.S. 199, 235 (1974) (Bureau of Indian Affairs bound by procedures in its manual); Physicians for Soc. Responsibility v. Wheeler, 956 F.3d 634, 643 (D.C. Cir. 2020) ("formal and informal policy statements" are permissible source of standards); M.B. v. Quarantillo, 301 F.3d 109, 112 (3d Cir. 2002) (stating an agency's announced policy cabins otherwise unfettered discretion, and irrational departures are reviewable); Davis Enterprises v. U.S. E.P.A., 877 F.2d 1181, 1185 (3d Cir. 1989) ("when agency regulations or internal policies provide sufficient guidance," agency decisions are reviewable); Robbins, 780 F.2d at 48 (rejecting Section 701(a)(2) reviewability challenge in part based on internal policy shift; "agency's change in direction from a previously announced intention is a danger signal that triggers [judicial] scrutiny"); Fair Share v. Law Enforcement Assistance Admin., 758 F.2d 708, 709, 711-12 (D.C. Cir. 1985) (two federal agencies bound by requirements contained only in a memorandum of understanding between them); Hondros v. United States Civil Serv. Comm'n, 720 F.2d 278, 294-95 (3d Cir. 1983) (personnel officer's official memoranda established agency policy that restricted agency discretion and permitted judicial review).

The classes of agency decisions governed by a "tradition of nonreviewability"

are few, including decisions to refrain from enforcement or investigative activity, decisions implicating intelligence and national security concerns, and the spending of lump-sum appropriations. See Gentile, 974 F.3d at 318, citing Heckler v. Chaney, 470 U.S. 821, 838 (1985). The Federal Government's decision to remove the essential panels without consulting with the City is a far cry from those rare situations where an agency's discretion was unbounded.

Indeed, the Federal Government's conduct here is subject to judicial review because it is constrained by concrete, judicially manageable standards. First, 16 U.S.C. § 407n and the ensuing cooperative agreements with the City obligated the Federal Government to get the City's consent before making changes to the President's House. JA240 (1950 Agreement, art. III(e)). This commitment to cooperative action is further defined in Independence Park's Foundation Document, which touts NPS's "close working relationship with the City of Philadelphia" as "fundamental" to the Park's success. JA392 (Foundation Doc.). The Foundation Document also identifies the President's House's interpretation of race and slavery in its historic context as a "core" and "fundamental" component of the Park. JA383, 385, 389, 391 (Foundation Doc.). The removal of the President's House panels ran afoul of all of those standards. It additionally departed from the National Park Service Organic Act's requirement that park management "shall not be exercised in derogation of the values and purposes for which the System units have been established." 54 U.S.C. §§ 100101(a), (b)(2); see also 36 C.F.R. § 1.1.

Together, these statutory, regulatory and policy mandates impose substantive limits on agency discretion and supply standards against which the permissibility of the Federal Government's conduct can be measured. The District Court's conclusion that its departure from those governing principles is subject to review under the APA is amply supported.

Nothing presented by the Federal Government compels a contrary conclusion. And as articulated above, the Federal Government's actions are measurable against a number of standards, none of which suggests that such removal is an action within the Federal Government's discretion.

## III. The District Court correctly found that the City established its entitlement to a Preliminary Injunction.

Having established why the City is properly before the Court on all of its claims, the City now addresses the elements of a preliminary injunction, demonstrating why the District Court should be affirmed.

### A. The City has shown a likelihood of success on the merits.

The City addresses the merits of the claims on which the District Court found for the City in the order in which those claims were presented. The City then addresses why this Court, guided by recent decisional law, should also find for the City on its claim grounded in the Cooperative Agreements (Count I).

#### 1. The City has a likelihood of success on the merits of its National Underground Railroad Network to Freedom Act Claim (Count II).

Basic demands of reasoned decision-making require an agency to "cogently

explain why ... discretion [was exercised] in a given manner." <u>Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.</u>, 463 U.S. 29, 48 (1983) ("State Farm"). This means an agency is expected to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" <u>Id.</u> at 43, 52. In particular, when agency action constitutes a shift or change in policy, the agency must: (a) acknowledge the change; (b) explain any rejection of earlier factual determinations or circumstances that supported the old policy; and (c) give due consideration to serious reliance interests that the old policy engendered. <u>See</u> <u>F.C.C. v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 515 (2009); <u>see also</u> <u>Encino Motorcars, LLC v. Navarro</u>, 136 S. Ct. 2117, 2125 (2016); <u>Revak v. Nat'l Mines Corp.</u>, 808 F.2d 996, 1002 (3d Cir. 1986), <u>abrogated on other grounds by</u>, <u>Mullins Coal Co., Inc. of Virginia v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor</u>, 484 U.S. 135 (1987) ("an agency cannot change an established course of conduct without articulating a reasoned analysis.").

A sudden and unexplained change that does not take account of these factors is necessarily arbitrary and capricious under the APA. <u>See</u> <u>State Farm</u>, 463 U.S. at 46 (treatment of nondetachable seatbelts was arbitrary because the agency had changed its stance regarding them without explaining why); <u>Prometheus Radio Project v. F.C.C.</u>, 373 F.3d 372, 421 (3d Cir. 2004) (holding that FCC acted arbitrarily by repealing rule without any discussion of the effect of its decision on minority television station ownership thus "entirely fail[ing] to consider an

38

important aspect of the problem").

Here, as the District Court correctly found, NPS's removal of the President's House panels—done unilaterally and with no explanation—violated the National Underground Railroad Network to Freedom Act and constituted arbitrary and capricious agency action under the APA. JA31-32 (Mem. Op. 26-27).

Congress established the Network to Freedom program through passage of the National Underground Railroad Network to Freedom Act of 1998. See Pub. L. No. 105-203, 112 Stat. 678 (1998); see also Act of Dec. 19, 2014, Pub. L. No. 113-287, 128 Stat 3094 (2014), codified at 54 U.S.C. §§ 308301- 308304. The legislation serves to preserve and promote sites, programs, and facilities with verified connections to the historic Underground Railroad, a network of safe houses and routes used by enslaved persons to escape to freedom from the late 1700s to the mid-1800s. Id. The Act directs NPS to administer the program and to produce educational materials commemorating those sites. 54 U.S.C. § 308302.

Just over three years ago, NPS recognized the President's House site's public benefit and its qualification as a Network to Freedom site based in large part on the site's connection to Ona Judge, who escaped from enslavement at the President's House in 1796. JA468, JA472-73, JA475-477 (Network to Freedom App. at 1, 5-6, 8-10). The application underscored the importance of the means by which the site was holistically commemorated—inclusive of the chosen interpretive text panels, images, signage (both digital and analog), the on-display archaeological excavation,

39

the engraved stone marker listing the persons enslaved there and the overall archeological design—chosen to explore Judge's escape and other aspects of resistance to slavery and escape. JA492 (Id., 25). Based on that version of the President's House site, then-superintendent of Independence Park Cynthia MacLeod formally consented to the President's House's inclusion on the Network to Freedom registry in September 2022. JA495.

By reversing course and removing the exhibit's core interpretive content without explanation, NPS disregarded Congress's mandate to preserve and interpret Underground Railroad history. See 54 U.S.C. §§ 308301- 308304. Nothing about removal of the panels comports with the statutory directive to NPS to administer and support the Network to Freedom program.

The Federal Government's arguments to the contrary rest on their unsupported premise that the panels are simply curatorial while the hardscape of the President's House is not. Notably, the Federal Government states "nothing in the statute mandates that a designated site must maintain specific exhibits, retain specific interpretive themes, or preserve particular signage." Appellant's Br. at 47. And it argues that the statute "does not prescribe decision-making criteria for what content to display, retain, or remove at any particular site." Id. at 49. But the record— including the application for designation as a Network to Freedom site—establishes the removed panels are part of the site, that they are not disposable signage, transitory content, or a rotating exhibit. JA492 (Network to Freedom App. at 25). In

40

removing integral parts of President's House, the Federal Government thus took affirmative steps to unmake the site with zero explanation therefore, actions which are contrary to the express directive to administer and support the program. Because the Federal Government has misconstrued the nature of the President's House (and provided no countervailing evidence), it entirely failed to consider an important aspect of the problem. Consequently, the District Court appropriately analyzed the Federal Government's actions through the State Farm and F.C.C. v. Fox framework and, in the absence of any evidence to the contrary, found that the City established a likelihood of success on the merits of this claim.

### 2. The City has a likelihood of success on the merits of its 1948 Act claim (Count III).

There is no disagreement that 16 U.S.C. § 407n provides that "no changes or alterations shall be made" "except by mutual agreement" of the parties. It is also uncontested that the Federal Government did not consult the City, much less get its agreement, to remove the panels. Instead, the Government acted unilaterally and without any reasoned explanation. Accordingly, the District Court correctly determined that the City is likely to succeed on Count III, which asserts the removal was arbitrary and capricious in violation of Section 407n of the 1948 Act that established Independence Park.

The Federal Government contends that the District Court erred in holding that 16 U.S.C. § 407n likely requires the City's mutual agreement for changes to the whole of Independence Park because that requirement applies only to the

41

Independence Hall National Historic Site, the parameters of which were defined in 1943. Appellant's Br. at 37-39. This argument is admittedly facially compelling, in that it relies on Section 407n's reference to the Historic Site. But the Federal Government's contention fails upon closer inspection because, as the parties acknowledged in 1950, the Historical Site was subsumed by Independence Park by operation of statute and agreement.

Additional context supports the City's position. The term "Independence Hall National Historic Site" is not defined in the statute, but is used to differentiate the then-existing Site from the to-be-created Park and other properties. In Section 407m, Congress authorized the Secretary of the Interior, "following the consummation of [an] agreement[] with the city of Philadelphia . . . as prescribed in section 407n," to acquire certain properties so they could be combined and together preserved as Independence Park. Id. at § 407m. This instruction included the proviso that the Park would not officially be established until the federal government obtained ownership of key listed sites and most of the surrounding land. Id.

There is no statutory suggestion or instruction, however, that the City's entitlement to mutual agreement about significant changes to a Park that comprises the heart of the City's historic district expired as the Independence Hall Site became Independence Park. Instead, the nearly-contemporaneous 1950 Agreement, which remains in force today, illustrates the shared, broad understanding that the Congressionally-directed mutual agreement requirement applies to the entire Park.

That Agreement specifically provides:

> [I]t is the purpose of both parties to this agreement to develop a **unified**, long-range program of preservation, development protections, and interpretation **for the whole Independence National Historical Park** for the inspiration and benefit of the people of the United States, and to secure this result **a high degree of cooperation is necessary with each other** and with other bodies participating in the project . . . and the parties hereto **pledge themselves to consult on all matters of importance to the program**.

JA240 (1950 Agrmt., art. III(e)) (emphasis added)). The import of this is further highlighted by the explanation in that Agreement that the Historic Site designation was transitional, to "be terminated . . . upon the establishment of the Independence National Historical Park." JA241(Id. art. III(i)).

Together, the plain language and purpose of the 1948 Act, along with the 1950 Agreement, confirm that Independence Hall became a component of Independence Park, and that the parties' mutual-agreement obligations continued as part of that unified preservation framework comprised of "certain historical structures and properties of outstanding national significance located in Philadelphia, Pennsylvania, and associated with the American Revolution and the founding and growth of the United States[.]" 16 U.S.C § 407m; JA420. Consistent with this interpretation, the District Court's finding for the City should be affirmed.

> **3.    The City has a likelihood of success on the merits of its claim that the Federal Government violated the Independence Park Foundation Document (Count IV).**

The Federal Government additionally acted arbitrarily and capriciously by abandoning its own governing policies and Independence Park's Foundation

Document, which designate the President's House as a core resource and emphasize interpreting the paradox of freedom and slavery. JA389, JA391 (Foundation Doc. at 9, 11); JA34-38 (Mem. Op. 29-33). The Federal Government reversed course and acted in direct contravention of its expressed intentions for the President's House site as laid out in the Foundation Document. It did so without acknowledging the change, providing a reasoned explanation, or considering the City's and the public's reliance interests, in violation of settled administrative law. Accordingly, the City is likely to succeed on the merits of Count IV.

Each national park has a "Foundation Document," which defines the park's purpose, core principles, and policy framework: providing, in short, a "single, shared understanding of what is most important about the park. JA382 (Foundation Doc. at 2); see also NPS website, *Foundation Documents*, available at https://www.nps.gov/subjects/parkplanning/foundation-documents.htm (last viewed 4/23/2026). The current Foundation Document for Independence Park issued in September 2017 and lays out "Core Components" -- elements it declared that "typically do not change over time" and "are expected to be used in future planning." JA383 (Id., 3). Within that framework, the Document also identifies "Fundamental Resources and Values," defined as attributes "closely related to [the] park's legislative purpose" that therefore "warrant primary consideration" because they are "essential to achieving the purpose of the park and maintaining its significance," and "Significance Statements," which "describe the distinctive nature of the park and why an area is

important within a global, national, regional, and systemwide context." (Id.).

Independence Park's Foundation Document identifies the community-based exhibition at the President's House as a Core Component of the Park. JA385 (Id., 5). It highlights as Fundamental Resources and Values both the archaeological discoveries that physically link the site to the enslaved individuals in Washington's household, which in turn led to the collaborative development of the interpretive exhibit contextualizing race and slavery, and the close collaboration with the City of Philadelphia. JA391 (Id., 11, 12). The Document also recognizes the "Paradox of Freedom and Slavery"— the contradiction between a "nation conceived in liberty but once bound by legalized slavery"—as a formal Significance Statement. JA389 (Id., 9).

It is a basic principle of administrative law that an agency must adhere to the rules, policies, and positions it has adopted, even if it was not required to adopt them in the first place. See United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 265 (1954); Leslie v. Attorney General of U.S., 611 F.3d 171, 175, 180 (3d Cir. 2010); see also Yang, 519 U.S. at 32 (agencies self-limit discretion "by announc[ing] and follow[ing] – by rule or by settled course of adjudication – a general policy"). Here, the Federal Government unilaterally removed integral panels that it had jointly developed with the City and had itself identified as a Core Component and Fundamental Resource of the Park closely linked to its legislative purpose. Doing so effected a stark departure from established policy and deviated

45

from its obligation under the Organic Act to manage park units consisted with their established purposes. See 54 U.S.C. §§ 100101(a), (b)(2); see also 36 C.F.R. § 1.1. It was therefore required to provide a reasoned explanation for the dramatic change of course, but it failed to do so. See F.C.C. v. Fox, 556 U.S. at 515; State Farm, 463 U.S. at 48. The District Court had ample reason to conclude the City was likely to succeed on its claim that NPS arbitrarily and capriciously departed from its own long-established policies, as set forth in the Park's Foundation Document.

The Federal Government seeks to downplay its departure from the Foundation Document, claiming it is a "management" document that does not create enforceable obligations and thus cannot support an APA claim. Appellant's Br. at 49-51. That argument fails.

To begin, the Government's assertion that a completely separate document—its 2006 Management Policies—disclaim any creation of judicially enforceable rights is immaterial. The City does not rely on the Management Policies. Rather, Count IV relies on the Park's Foundation Document, which declares core policy positions that NPS specifically stated were "not [expected to] change over time" but were "expected to be used in future planning and management efforts." JA383. That language reflects NPS intended to guide and cabin its future decisionmaking in accordance with those core principles, at least absent a reasoned explanation for changing course.

Moreover, even if the Foundation Document is an "internal" document that

does not create "enforceable legal duties," as the Federal Government contends, the District Court correctly found that NPS was still required to articulate a reasoned basis for departing from its previously stated approach for the President's House site to survive APA arbitrary and capricious review. JA35 (Mem. Op. at 30-31). A significant body of caselaw, including numerous decisions of this Court, extend the established maxim requiring agencies to adhere to their own rules, policies, internal manuals and the like. See, e.g., Morton, 415 U.S. at 235 (Bureau of Indian Affairs manual); Wheeler, 956 F.3d at 643 ("formal and informal policy statements" are permissible source of standards); Loving v. IRS, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (IRS's departure from prior position that it lacked authority to regulate tax-return preparers, memorialized in Congressional hearing testimony and IRS "guidance document," reviewable); M.B., 301 F.3d at 112 (an agency's announced policy cabins otherwise unfettered discretion, and irrational departures are reviewable); Davis Enterprises, 877 F.2d at 1185 ("when agency regulations or internal policies provide sufficient guidance," agency decisions are reviewable); Robbins, 780 F.2d at 48 ("agency's change in direction from a previously announced intention is a danger signal that triggers [judicial] scrutiny"); Fair Share, 758 F.2d at 711-12 (memorandum of understanding between federal agencies bound them); Hondros, 720 F.2d at 294-95 (internal memoranda established agency policy). Thus, while such internal policies may not themselves create enforceable rights, they nonetheless guide the agency's exercise of discretion and, as here, supply standards

against which the Court can assess reasoned decisionmaking or the lack thereof.

In situations where, as here, a prior policy has "engendered serious reliance interests," the agency must take those interests into account and if still changing policy, must provide a "reasoned explanation" therefor. F.C.C. v. Fox, 556 U.S. at 515-16; Dep't of Homeland Sec., 140 S.Ct. at 1915-16 (agency must "weigh any [reliance] interests against competing policy concerns"). If the agency "failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." Encino Motorcars, 579 U.S. at 221. No evidence of such analysis is in this record, rendering the Federal Government's action clearly arbitrary and capricious.

The Federal Government faults the District Court for relying on one of these cases (Loving), claiming the D.C. Circuit only required the IRS to justify the reversal of its position there because tax preparers had structured their businesses in reliance on it and that no such reliance interests are at issue here. That is incorrect. As explained above, the City committed millions of dollars and more than a decade of staffing resources in reliance on the parties' shared understanding of the project's core themes and components. It defies reason to suggest that the City would have done so if it believed there was any risk the Federal Government would unweave the fabric of the President's House exhibit just fifteen years after it opened.

The other cases the Federal Government cites do not advance its case. Schweiker v. Hansen, 450 U.S. 785, 789 (1981), addressed whether an internal

agency manual had independent legal force or could support an estoppel claim against the Government; it did not involve judicial review under the APA. The out-of-circuit case <u>The Wilderness Soc. v. Norton</u>, 434 F.3d 584, 587 (D.C. Cir. 2006), was brought under 5 U.S.C. § 706(1), the APA provision governing *failure* to act that permits a court to "compel agency action unlawfully withheld or unreasonably delayed." It did not, as here, ask the Court to conduct arbitrary and capricious review of affirmative agency action under 5 U.S.C. § 706(2) and thus does not bear on whether the Federal Government's unexplained departure from the Foundation Document is arbitrary and capricious.

In short, having established clear guiding principles for the President's House site, NPS could not simply abandon them without explanation, and its failure to do so is the hallmark of arbitrary and capricious action. The City is therefore likely to succeed on the merits of Count IV.

### 4. The City alternatively established that the Federal Government's actions were *ultra vires*.

The District Court correctly found in the alternative that NPS's unilateral action was *ultra vires*. Section 407n and the parties' agreements require mutual cooperation and prohibit unilateral alterations to core park resources. JA38-40 (Mem. Op. 33-35). By dismantling the exhibit without consultation, NPS exceeded its statutory authority, entitling the City to equitable relief it requests in Count V.

The Federal Government argues that the City's *ultra vires* claim is precluded from review because the Tucker Act divests the Court of jurisdiction to consider the

claim, resting on the same arguments it advanced regarding the City's claims arising out of the failure to adhere to the Cooperative Agreements and failure to conform to the National Underground Network to Freedom Act of 1998. Appellant's Br. at 55. But as established above, neither of these claims are subject to the jurisdictional limitations of the Tucker Act. Consequently they, and the City's associated *ultra vires* claim, are properly before the Court. Given the Federal Government's failure to present any evidence of how its decision to abruptly remove the panels comports with either its obligations under the Cooperative Agreements or Congressional instruction in the National Underground Network to Freedom Act of 1998, its actions were *ultra vires*. This claim is an alternative basis on which the City has a likelihood of success on the merits of its claim, and the District Court should be affirmed.

### 5. The failure of the Federal Government to adhere to the parameters of the Cooperative Agreements provides an alternative basis to affirm (Count I).

Finally, as an alternative basis for affirmance, the City is likely to prevail on Count I,[3] its APA claim that the Federal Government violated the terms of the Cooperative Agreements when the agency removed the President's House panels.

The Cooperative Agreements expressly provide for consultation and cooperation between the City and the Federal Government in Park decisions. JA235-36, JA238-41 (1950 Agrmt.), JA310-16, JA332-38 (2009 Agrmt. at Art. III &

---

[3] This Court may affirm the District Court's order on any ground supported by the record. See Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000) (en banc).

Attach. C). In particular, via the 1950 agreement, the parties committed to "consult[ation] on all matters of importance" to the whole of Independence Park. JA240 (Id., Art. III(e)). Later, the 2009 Amendment to the 2006 Agreement stressed the parties' agreement to cooperate in the design, fabrication, installation and completion of the President's House in accordance with the joint Project Development Plan. JA310-16, JA322-38 (2009 Agrmt. at Art. III & Attach. C, Project Plan). That Plan, which could be modified only "by written agreement of the parties," specified that site "interpretation" must focus on six themes, which included the people who lived and worked at the house and the systems and methods of slavery. JA315, JA332, JA334-35 (Id., Art. III(C)(4), Project Dev. Plan). The Agreement also included a Survival clause that obligates the Federal Government to "maintain[]" the exhibit following its completion. JA309, JA321 (Id., Art. I(C), Art. XII(Q)). JA310-16, JA32-38 (Id.).

The record clearly established that the Federal Government did not meet these obligations. The record also reflects that the Federal Government summarily removed all content, which action comports neither with the obligation to interpret the site consistent with the agreed-upon themes nor with the obligation to maintain it. The City has a likelihood of success on the merits of this claim.

**B.     The District Court correctly found that the City established irreparable harm in the absence of restraints.**

The City has demonstrated—with record evidence—specific irreparable harm caused to it by the removal of essential components of the President's House. As the

District Court correctly observed, "the harm at issue in this case must account for the significance of the slavery-related displays that NPS removed." JA41 (Mem. Op. at 36). The President's House, in the words of Philadelphia Mayor John Street, represented the City "fulfilling an obligation to tell the truth – the whole, complicated truth." JA702 (2/27/2007 Press Release). Indeed, the City's efforts were explicitly acknowledged within signage on site. JA528 (Pre-Removal Site Photo). Further, this harm is particularly acute as the City is on the cusp of hosting the Semiquincentennial celebration of the signing of the Declaration of Independence and expects a surge (up to 1.5 million) visitors this year. JA164 (N.T. 104:20-23). Every moment that the President's House remains in its current state, the City is denied its interest in the honest and accurate commemoration and representation of its history – a story that it will be unable to tell to the influx of Semiquincentennial visitors without a preliminary injunction. This is not a financial harm that can be later remedied with money damages.

The Federal Government's citations to Commonwealth of Massachusetts v. Mellon, 262 U.S. 447 (1923), and Town of Milton v. FAA, 87 F. 4th 91 (1st Cir. 2023), are unavailing. Appellant's Br. at 56. In both Mellon and Milton, the government sought to assert the rights of its citizens. See Mellon, 262 U.S. at 482-83; 485-86; Milton, 87 F. 4th at 94. Here, the City does not proceed as *parens patriae* but instead seeks to vindicate its own rights, the successful result of which would also benefit the public. Delaware State Sportsmen's Association, 108 F.4th

194, also cited by the Federal Government cites, actually supports the City's case on irreparable harm. Appellant's Br. at 55-56. Unlike the plaintiffs there, who argued they were presumptively harmed by alleged constitutional violations and otherwise presented limited evidence of any actual harm, Id. at 204-05, the City has presented actual evidence of its ongoing reliance on President's House as a public benefit, particularly before the Semiquincentennial celebration. The City does not argue for a presumption of harm – it has demonstrated it in the record, as the District Court found. This Court should affirm.

C.     **The District Court correctly found that the equities favor the City.**

The District Court found that the City established the balance of equities favors the City because there is a substantial public interest in having the Federal Government follow the law (which, by abruptly removing the panels, it had not) and a public interest in the preservation and exhibition of accurate history. The District Court further concluded that the Federal Government had not established its speech was compelled by restoration of the site. Though the Federal Government argues to the contrary, it is incorrect.

The Federal Government's argument on the equities starts by suggesting they favor the Federal Government because the relief sought constitutes a putative invasion of its sole prerogative to fundamentally change Independence Park. Appellant's Br. at 60-61. But as established above, the Federal Government does not have the unfettered ability to unilaterally unmake the President's House. And

requiring the Federal Government to comply with applicable statutory directives and policies does not cause it irreparable harm.

Turning to the Federal Government's other argument, restoration of President's House does not force it to engage in speech. Appellant's Br. at 61-63. Asking a court to instruct the Federal Government to continue to abide by agreements it made with the City, and to abide by its own internal standards and policies, before pulling down panels that it endorsed for years is hardly compelling it to engage in speech. While the Federal Government highlights the City's briefing in another case in state court, the result there demonstrates why the Federal Government is wrong. In In re Friends of Marconi Plaza, 287 A.3d 965, 978 (Pa. Cmwlth. 2022), the Pennsylvania Commonwealth Court made clear it was not forcing the City to keep a statue of Christopher Columbus up against the City's will. Rather, the Court told the City it had to follow its own policies for removal before doing so. Here the City seeks essentially the same result; the Federal Government should have to abide by its own agreements and internal policies before it can make any changes to President's House.

For these reasons, the Federal Government cannot establish that the District Court's grant of a preliminary injunction requiring it to return to the pre-removal *status quo* will result in greater harm to it than refusing the injunction. The City has amply demonstrated that the equities favor the City, and affirmance of the issued injunction.

**D. The scope of the preliminary injunction is appropriate.**

Finally, the entered injunction does not impose "a prospective municipal-veto regime and operational mandates having nothing to do with any statutory or policy violation." Appellants' Br. at 58. The scope of the injunction is appropriate given the claims on which the City has a likelihood of success on the merits.

In Hoxworth v. Blinder, the district court entered an injunction that required a defendant to repatriate some assets of that defendant's non-party corporate parent to protect a corpus of potential future monetary damages, and prohibited defendants from transferring any funds in the normal course of business without court approval. 903 F.2d 186, 188 (3d Cir. 1990). This injunction was vacated because there was no evidence linking the scope of the injunction to the claims in the case. Id. at 198-99.

Hoxworth stands in marked contrast to the evidence before the District Court, which supports the scope and terms of the injunction. Restoration of the panels is appropriate relief for the failure to meet the statutory instruction and policy documents of the National Underground Railroad Network to Freedom Act designation and the Park's Foundation Document. The requirement to consult prior to making changes is appropriate relief for the City's statutory and agreement-based claims. And the mandate to clear the snow, to the extent it is found to be overbroad, can be narrowly stricken from the injunction while allowing the remaining terms— none of which (as in Hoxworth) interfere with every business operation of the defendants, and all of which are tied to the claims brought and supported by the record—to stand.

**CONCLUSION**

For the foregoing reasons, Plaintiff-Appellee, the City of Philadelphia respectfully requests that this Court affirm the District Court's order granting the City's motion for a preliminary injunction.

Respectfully submitted,

CITY OF PHILADELPHIA LAW DEPARTMENT
RENEE GARCIA, CITY SOLICITOR

*/s/ Anne B. Taylor*

By: Anne B. Taylor, Chair | Litigation
Kelly Diffily, Senior Attorney | Appeals Unit
Lydia Furst, Chief Deputy City Solicitor
Ryan B. Smith, Divisional Deputy City Solicitor
Bailey Axe, Deputy City Solicitor
1515 Arch Street, 17th Floor
Philadelphia, PA 19102-1595
*Attorneys for Appellee the City of Philadelphia*

Date: April 27, 2026

## CERTIFICATION OF BAR MEMBERSHIP AND OF COMPLIANCE WITH RULE 32(a) AND REQUIREMENTS FOR ELECTRONIC FILING

1. Pursuant to the Third Circuit Local Appellate Rule 46.1(e), I hereby certify that I am a member of the bar of this Court.

2. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains **12,868 words** excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

3. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

4. Pursuant to the Third Circuit Local Appellate Rule 31.1(c), I hereby certify that the text of the electronic filing is identical to the text in the hard, paper copies of the brief.

5. Pursuant to Third Circuit Local Appellate Rule 31.1(c), I hereby certify that a virus detection program was performed on this electronic filing using CrowdStrike Falcon Sensor, and that no virus was detected.

*/s/ Anne B. Taylor*
Anne B. Taylor, Chair | Litigation
City of Philadelphia Law Department

Date: April 27, 2026

# CERTIFICATE OF SERVICE

I, Anne B. Taylor, hereby certify that I caused to be served today the foregoing **Brief for Appellee** upon the persons and in the manner indicated below:

Electronically, via CM/ECF:

Gregory B. David, Esq.
Mark J. Sherer, Esq.
Gregory B. in den Berken, Esq.
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
*Attorneys for Appellants U.S. Department of Interior, Secretary U.S. Department of Interior, Director National Park Service, National Park Service*

*/s/ Anne B. Taylor*
Anne B. Taylor, Chair | Litigation
City of Philadelphia Law Department

Date: April 27, 2026