**No. 26-1348**

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

City of Philadelphia,

*Appellee,*

*v.*

Secretary U.S. Department of Interior; U.S. Department of Interior; Director National Park Service; National Park Service,

*Appellants.*

Appeal from the February 16, 2026 Memorandum Opinion
& Order Granting Appellee's Motion for Preliminary Injunction
in Case No. 26-cv-434-CMR in the United States District Court
for the Eastern District of Pennsylvania (Hon. Cynthia M. Rufe)

### APPELLANTS' REPLY BRIEF

BRETT A. SHUMATE
Assistant Attorney General

MICHAEL VELCHIK
Senior Counsel to the Assistant
Attorney General

DAVID METCALF
United States Attorney

GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

GREGORY B. IN DEN BERKEN
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8200

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................... 6

ARGUMENT ................................................................................. 7

I.   The City's Claims Are Not Justiciable.................................. 7

   A.   The City Lacks Standing............................................. 7

   B.   The Tucker Act Bars Counts I and II..........................14

II.   The City Has Not Established a Likelihood of Success ......17

   A.   Section 407n's Text Forecloses Count III ...................17

   B.   Counts II, IV, and V Independently Fail Because NPS's Interpretive Choices Are Not Reviewable Under the APA ........21

III.   The City Has Not Shown Irreparable Harm.......................27

IV.   The Injunction's Mandatory Nature, Overbreadth, and the Equities Independently Require Vacatur ..........................29

   A.   The City Has Not Met the Heightened Standard for Mandatory Injunctive Relief .................................... 29

   B.   The Injunction's Scope Far Exceeds Any Claimed Violation ...................................................................30

   C.   The Equities Decisively Favor the Government.......................32

CONCLUSION ........................................................................... 35

COMBINED CERTIFICATIONS .................................................36

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Acierno v. New Castle Cty.*,
 40 F.3d 645 (3d Cir. 1994) ...............................................................38

*Adams v. Freedom Forge Corp.*,
 204 F.3d 475 (3d Cir. 2000) ............................................................36

*Armstrong v. Exceptional Child Ctr. Inc.*,
 575 U.S. 320 (2015) ..........................................................................34

*Burke v. City of Charleston*,
 139 F.3d 401 (4th Cir. 1998) ............................................................14

*Califano v. Yamasaki*,
 442 U.S. 682 (1979) ..........................................................................38

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ..........................................................................19

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
 108 F.4th 194 (3d Cir. 2024)................................................... 35, 36

*Dep't of Educ. v. Brown*,
 600 U.S. 551 (2023) ..........................................................................21

*Dinerstein v. Google, LLC*,
 73 F.4th 502 (7th Cir. 2023) ...........................................................21

*Encino Motorcars, LLC v. Navarro*,
 579 U.S. 211 (2016)........................................................................... 33

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009)...........................................................................31

*Hahn v. United States*,
 757 F.2d 581 (3d Cir. 1985) ........................................................... 23

*Hope v. Warden York Cnty. Prison,*
   972 F.3d 310 (3d Cir. 2020) ........................................................ 25, 26, 38

*Hoxworth v. Blinder, Robinson & Co.,*
   903 F.2d 186 (3d Cir. 1990) ................................................................... 38

*Huertas v. Bayer US LLC,*
   120 F.4th 1169 (3d Cir. 2024 ................................................................. 18

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.,*
   510 U.S. 1301 (1993) ............................................................................... 41

*Kamal v. J. Crew Grp., Inc.,*
   918 F.3d 102 (3d Cir. 2019) ................................................................... 21

*Kos Pharm., Inc. v. Andrx Corp.,*
   369 F.3d 700 (3d Cir. 2004) ................................................................... 37

*Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit,*
   507 U.S. 163 (1993) ................................................................................. 31

*Loving v. IRS,*
   742 F.3d 1013 (D.C. Cir. 2014) ......................................................... 32, 33

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................................ 17, 19

*Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.,*
   823 F.3d 184 (3d Cir. 2016) ................................................................... 21

*Mass. v. Mellon,*
   262 U.S. 447 (1923) ........................................................................... 21, 35

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982) ................................................................ 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,*
   463 U.S. 29 (1983) ........................................................................... *passim*

*Murthy v. Missouri,*
   603 U.S. 43 (2024) ................................................................................. 20

*Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey,*
   80 F.4th 215 (3d Cir. 2023) ................................................................... 20

iii

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................40

*Nuclear Regul. Comm'n v. Texas,*
    605 U.S. 665 (2025) ...............................................................34

*Pa. Dep't of Hum. Servs. v. United States,*
    897 F.3d 497 (3d Cir. 2018) ...................................................32

*Pacito v. Trump,*
    169 F.4th 895 (9th Cir. 2026) ........................................... 23, 24

*Penn. ex rel. Creamer v. U.S. Dep't of Agric.,*
    469 F.2d 1387 (3d Cir. 1972) ..................................................36

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009) .............................................................41, 43

*Ramos v. Att'y Gen. United States,*
    No. 25-2946, 2025 WL 2950133 ..............................................41

*Shurtleff v. City of Bos.,*
    596 U.S. 243 (2022) ...............................................................43

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................... 17, 18

*Sturgeon v. Frost,*
    587 U.S. 28 (2019) ..................................................................34

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................21

*Summit Power Grp., LLC v. United States,*
    139 Fed. Cl. 369 (2018) ..........................................................24

*Town of Milton, Mass. v. FAA,*
    87 F.4th 91 (1st Cir. 2023) .....................................................35

*United States v. N.Y. Rayon Importing Co.,*
    329 U.S. 654 (1947) ................................................................24

*The Wilderness Soc. v. Norton,*
    434 F.3d 584 (D.C. Cir. 2006) ................................................32

iv

*Wis. Cent. Ltd. v. United States,*
  585 U.S. 274 (2018)................................................................ 26

*Yaw v. Del. River Basin Comm'n,*
  49 F.4th 302 (3d Cir. 2022) .................................................19

## STATUTES

5 U.S.C. § 706(2).................................................................... 39

16 U.S.C. § 407n.......................................................... *passim*

16 U.S.C. § 407q.............................................................. 20, 33

54 U.S.C. § 100302(a)(3)........................................................ 33

54 U.S.C. § 308302 ................................................................ 23

54 U.S.C. § 308303(b)(1)........................................................ 23

54 U.S.C. § 308303(b)(3) ................................................... 23, 24

## OTHER AUTHORITIES

8 Fed. Reg. 7,283 (dated May 14, 1943; published June 1, 1943)................20

Appellant's Brief, *In re Friends of Marconi Plaza,*
  No. 1104 CD 2021 (Pa. Commw. Ct. 2022), 2022 WL 20505710............. 62

## INTRODUCTION

The City's brief reveals more by what it concedes and ignores than by what it argues. The City admits (at 42) that the Government's interpretation of 16 U.S.C. § 407n is "facially compelling." It disclaims a parens patriae theory on appeal—even though its amended preliminary-injunction motion grounded its injuries in harm to its "citizenry" and "approximately 1.6 million residents." ECF No. 45 at 41-42. It asks this Court to revive Count I, which the district court correctly held is barred by the Tucker Act. And it offers no answer to the Government's arguments that the district court's interpretation of § 407n violates the surplusage and different-language canons and produces absurd results. It simply ignores these points.

That silence is fatal. Without a viable § 407n theory, the district court's standing analysis collapses and the City's remaining standing theories fail on their own terms. The Tucker Act independently bars Counts I and II because both claims rest on contractual rights and seek specific performance. The City's *State Farm* theories cannot function without a legal standard against which to measure NPS's curatorial choices—and the City identifies none. The City's alleged irreparable harm derives from public injuries that a municipality cannot assert against the United States. And the

injunction's mandatory scope vastly exceeds any violation the district court found.

The City obtained an extraordinary mandatory injunction that hinges on a flawed statutory theory and derivative injuries that the City cannot assert. This Court should vacate.

## ARGUMENT

## I. The City's Claims Are Not Justiciable

The City's justiciability arguments come up short. The district court's standing theory was primarily based on its expansive—and flawed—reading of 16 U.S.C. § 407n. Without that broad interpretation, the City's standing hinges on theories that the district court treated as makeweights: a property right, decade-old expenditures, loss of a "public benefit," tourism harm, and the City's interest in "honestly telling its own history." Each fails on its own terms. And the Tucker Act is an independent bar to Counts I and II. Those claims rely on contractual rights and seek specific performance— meaning they are beyond district-court jurisdiction. The district court thus correctly held that the Tucker Act bars Count I and the same analysis bars Count II.

### A. The City Lacks Standing

The district court's standing analysis relied primarily on its expansive reading of 16 U.S.C. § 407n. According to the court, § 407n gives the City "a

statutory right and expectation to mutual agreement on any changes or alterations to the Park." JA22. As explained in the Government's opening brief (at 37-46) and below (at 14-18), that is wrong. And without § 407n, the City must defend standing on theories that the district court treated as makeweights. Each one fails.

*1. The City has no cognizable property interest.* The City argues (at 23) that its "interests in the President's House run far deeper than those of the artist" in *Burke v. City of Charleston*, 139 F.3d 401 (4th Cir. 1998), because its "financial and resource investments in the project … spanned over a decade." But those facts do not make a difference. The City donated the exhibits to NPS and "waive[d] any claim or right to any property interest, including use rights, or to compensation for any Project components donated to NPS." JA315. *Burke*'s holding—that an "inchoate interest in the display of a work [one] creates but then sells to another does not confer Article III standing," 139 F.3d at 406—thus applies here. The City does not own the land on which the President's House sits. Nor does the City have any remaining property interest in the exhibits.

The City's invocation of the parties' "shared understanding that the Government would 'maintain' the Exhibit, inclusive of its jointly developed interpretive themes," City's Br. at 23-24, does not change this analysis. The

8

2006 Cooperative Agreement's language that the Government will "maintain[]" the exhibits, JA309, is a contractual obligation on the part of NPS. It does not provide a property interest to the City. Nor can it—because the City expressly "waive[d]" such an interest. JA315. And to the extent the City suggests that it seeks to enforce NPS's contractual obligation to maintain the exhibits, the Tucker Act bars that path. *See infra* Part I.B.

2. *The City's historic expenditures cannot establish standing*. The City's historic expenditures of funds cannot establish standing because traceability and redressability are absent. Article III requires that the injury be "fairly traceable to the challenged conduct" and "likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). The City's investments were made between 2003 and 2010—nearly two decades before NPS's removal of the exhibits. Those costs thus cannot be traced to the challenged conduct, and no resolution of this case will return that money to the City.

The City tries to defend its expenditure-based theory by reframing the redress it seeks as "restoration" of an asserted "reasonable expectation of President's House being maintained in the manner in which it was collaboratively designed and built." City's Br. at 24. But that does not work.

Either the expenditures themselves are the injury (in which case traceability and redressability are absent), or they are not (in which case they cannot supply standing).

The decision cited by the City on this point (at 24)—*Huertas v. Bayer US LLC*, 120 F.4th 1169 (3d Cir. 2024)—actually illustrates the relevant distinction. That case involved consumers who alleged that they purchased a product worth less than what they had bargained for. In such cases, standing is based on a present economic injury—an inflated purchase price—which a court can remedy through damages. But the City stands in no comparable position to those plaintiffs. It was not deceived into funding the exhibits at inflated prices. It invested the funds years ago with full knowledge that ownership would transfer to NPS and that the agreements would expire.

*3. The City's "public benefit" theory is too vague.* The City leans on a recital in the 2006 Cooperative Agreement stating that the project conferred "a public benefit inuring to the City," and argues that the Government's acknowledgement of that benefit establishes the City's standing. City's Br. at 24. But a contractual recital does not transform a generalized civic interest into a "concrete and particularized" Article III injury. *Spokeo*, 578 U.S. at 338-40. After all, standing requires that the

10

injury "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. The observation that everyone in a city benefits from a federal exhibit does not satisfy that requirement. *See Yaw v. Del. River Basin Comm'n*, 49 F.4th 302, 321 (3d Cir. 2022) (broad assertions of injury without legal support cannot supply Article III standing because "an injury in law is not an injury in fact").

*4. The City's tourism theory remains speculative.* The City rests its tourism theory on testimony from the City's Chief Cultural Officer, which addressed expected semiquincentennial turnout and her personal reaction to the exhibits' removal. City's Br. at 25 (citing JA163-68). But she did not testify that any tourist would alter their travel plans because of the removal, that City revenue would fall, or that any particular City interest would be impaired. Without such evidence, the City's tourism theory depends on guesswork about the actions and intentions of numerous third parties—which is the kind of "speculative chain of possibilities" that fails to satisfy Article III. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013); *Lujan*, 504 U.S. at 562.

The City responds (at 25) that the burden fell on the Government to put on contrary evidence about replacement signage. But that gets it backwards. As the party seeking a preliminary injunction, the City had the

11

burden of making a "clear showing" of standing—with evidence. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *see also Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 219 (3d Cir. 2023) ("bare allegations are not enough; the [movant] must produce evidence" to satisfy standing at the preliminary-injunction stage). And that burden never shifted to the Government.

5. *The City's "tell its own history" theory remains amorphous.* The City says it "blinks reality" to assert that the City can communicate its history through other channels because "there is only one President's House." City's Br. at 26. But that argument conflates uniqueness with cognizable injury. And it is telling that the City still fails to cite any authority for the notion that alleged harm to "the ability of the City to tell its history," *id.*, is a cognizable Article III injury.

6. *Most of the City's asserted injuries are derivative.* The City now disclaims any reliance on a parens patriae theory of standing. *Id.* at 52. But that is inconsistent with its arguments before the district court. The City's amended preliminary-injunction motion framed the harm as falling on "the City's citizenry — the history of many of whom is inextricably linked to the history of slavery" and who were allegedly "denied access to the honest and accurate commemoration and representation that advocates fought long to

recognize." ECF No. 45 at 42; *see also id.* at 41 (City invoking its "approximately 1.6 million residents" in arguing injury). Those are derivative injuries that a municipality cannot assert against the United States. *Mass. v. Mellon*, 262 U.S. 447, 486 (1923); *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 193 (3d Cir. 2016).

7. *The 1950 Agreement's procedural pledge is unavailing.* The City argues that the 1950 Agreement's procedural pledge to "consult on all matters of importance," JA240, confers standing here because "[t]he City invested significant public resources," City's Br. at 25-26. But that misunderstands the doctrine. A procedural right can support standing only if the plaintiff "has a 'concrete interest that is affected by the deprivation' of the claimed right." *Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496-97 (2009)). So the procedural right must be tied to a concrete interest that is independently sufficient under Article III. Decade-old expenditures that are neither traceable to the alleged procedural violation nor redressable cannot supply that concrete interest. *See, e.g.*, *Dinerstein v. Google, LLC*, 73 F.4th 502, 519 (7th Cir. 2023) (a "bare breach of contract, divorced from any concrete harm" does not establish standing (cleaned up)); *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 111 (3d Cir. 2019) (similar).

13

## B.    The Tucker Act Bars Counts I and II

Counts I and II rely on contractual rights and seek specific performance against the United States—which is foreclosed by the Tucker Act and this Court's precedent. The City now argues (at 27-28) that its reliance on the cooperative agreements for Count II does not render that claim contractual. And it tries to revive Count I (at 28-31) by arguing that cooperative agreements are not actually contracts under the Tucker Act. Both moves fail.

Count II is contractual. The City argues that this claim is "undisputedly based in statute" and that the cooperative agreements "merely serve as evidence of the parties' shared understanding" of the project. City's Br. at 28. But nothing in the National Underground Railroad Network to Freedom Act, 54 U.S.C. §§ 308301-04, imposes site-specific requirements about what NPS must display. The Act contains no retention mandate, no interpretive requirement, and no prohibition on altering designated sites. Nor does anything in the Act support the City's demands that *these* particular exhibits be displayed. So the City cannot get what it wants from the statute—which explains why it must invoke the cooperative agreements for Count II. But calling the agreements mere "evidence" when they actually form the basis for the claim is the kind of end-run around the

14

Tucker Act that *Hahn v. United States*, 757 F.2d 581, 588 (3d Cir. 1985), forbids.

Count I is likewise contractual. The City styled it as an APA claim, JA758, but admitted below that it is a "Breach of Contract Claim," ECF No. 45 at 23, 25. The claim alleges violations of the 1950 Agreement and 2006 Cooperative Agreement and amendments. JA758-59. And the City conceded that "specific performance"—which it seeks—"is a contract remedy." ECF No. 45 at 25. The district court was thus right to hold that the Tucker Act "impliedly forbids the City from obtaining relief" on Count I. JA29.

The City now asks this Court to hold that "cooperative agreements are not 'contracts' for Tucker Act purposes" and to revive Count I. City's Br. at 29. But the out-of-circuit decision that the City relies on—*Pacito v. Trump*, 169 F.4th 895 (9th Cir. 2026)—is unavailing. There, consistent with *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), the court observed that "if rights and remedies are *contractually* based then only the Court of Federal Claims [has jurisdiction], even if the plaintiff formally seeks injunctive relief." *Pacito*, 169 F.4th at 925 (cleaned up). The court ultimately determined that the plaintiffs' APA claim was cognizable because it sought to enforce a statutory mandate—not a contractual right. *Id.* at

15

923-30. Here, however, the City admits that Count I is contractual—and the City seeks a contractual remedy. *Pacito*'s own terms thus place that claim in the Court of Federal Claims. And the same is true for Count II once that claim is stripped of its statutory façade.

*Summit Power Grp., LLC v. United States*, 139 Fed. Cl. 369 (2018), on which the City leans (at 30), does not change the analysis either. In *Summit*, the Court of Federal Claims held that it lacked jurisdiction because the plaintiff-guarantors sought only declaratory relief about whether they owed money—not money damages or specific performance. *Id.* at 372-74. The case thus stands for the proposition that some cooperative-agreement disputes cannot be brought in the Court of Federal Claims when no monetary relief is sought. It says nothing about district courts having jurisdiction over disputes seeking specific performance on a cooperative agreement.

The City further argues that the 2009 Third Amendment's forum-selection clause reflects the Government's understanding that the 2006 Cooperative Agreement was not subject to the Tucker Act. City's Br. at 31-32 (citing JA318). But that is irrelevant. After all, a contractual provision cannot confer subject-matter jurisdiction or waive sovereign immunity. *Cf. United States v. N.Y. Rayon Importing Co.*, 329 U.S. 654, 660 (1947)

("officers of the United States possess no power through their actions to waive an immunity of the United States or to confer jurisdiction on a court in the absence of some express provision by Congress").

## II. The City Has Not Established a Likelihood of Success

Even setting aside justiciability, the injunction cannot stand because the City has not shown a "substantial likelihood of success on the merits" or that its right to relief "is indisputably clear" as required for a mandatory injunction. *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (cleaned up). The City's defense of 16 U.S.C. § 407n rests on a contextual gloss that cannot override the statutory text. And its remaining APA theories cannot function without a legal standard against which to measure NPS's curatorial choices—but the City identifies none.

### A.    Section 407n's Text Forecloses Count III

The district court's injunction mainly relies on its conclusion that 16 U.S.C. § 407n grants the City "a statutory right and expectation to mutual agreement on any changes or alterations to the Park." JA22. The Government's opening brief explained (at 37-46) why that is wrong: § 407n's mutual-agreement requirement is limited to "the Independence Hall National Historic Site"—Independence Square—and does not cover the President's House or the broader Park.

17

*1. The City effectively concedes the statutory text.* The City admits that the Government's reading is "facially compelling, in that it relies on Section 407n's reference to the Historic Site." City's Br. at 42. That concession is hard to square with the notion that the City established that its "right to relief is indisputably clear" as required for the mandatory injunction that it sought and obtained. *Hope*, 972 F.3d at 320 (cleaned up). Section 407n unquestionably distinguishes between "the Independence Hall National Historic Site" and "the Independence National Historical Park." 16 U.S.C. § 407n. And it directs that the mutual-agreement requirement attaches only to the Site.

*2. The City's contextual gloss does not overcome the text.* Having conceded the text, the City pivots to "additional context": the Site was supposedly "subsumed by Independence Park by operation of statute and agreement," which allegedly expanded the mutual-agreement requirement to cover the entire Park. City's Br. at 42-43. That argument fails for the reasons developed in the Government opening brief (at 43-46). Statutory meaning is fixed at enactment. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). And Article III(i) of the 1950 Agreement merely terminated *the parties'* prior designation agreement upon the Park's establishment. JA241. It had no effect on the Interior Department's

definition of the Site, *see* 8 Fed. Reg. 7,283, and necessarily could not modify the statute.

The City also leans (at 43) on the 1950 Agreement's language that "it is the purpose" of the parties "to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park" and that the parties "pledge themselves to consult on all matters of importance to the program." JA240. That language of the parties' "purpose," JA240, is hortatory. It does not transform a statutory mutual-agreement obligation regarding a specific City-owned five-acre block into a veto power over the broader Park. Nor could such an interpretation of the 1950 Agreement be squared with 16 U.S.C. § 407q, which instructs that "[t]he administration, protection, and development of the park shall be exercised under the direction of the Secretary of the Interior by the National Park Service."

*3. The City's theory cannot be confined to the City.* Section 407n authorizes the Secretary to enter into cooperative agreements with two parties to manage two specific properties: (1) "with the city of Philadelphia to assist in the preservation and interpretation of the property known as the Independence Hall National Historic Site"; and (2) "with the Carpenters' Company of Philadelphia to assist in the preservation and interpretation of

Carpenters' Hall." The mutual-agreement clause covers both properties: "no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts." 16 U.S.C. § 407n.

But both these properties have long since been absorbed into the Park. Under the City's "subsumed by Independence Park" theory, the Carpenters' Company's mutual-agreement right would thus have expanded too—giving a private fraternal organization that owns a single Park property a co-equal veto over every NPS decision across all 55 acres of federal Parkland. And that veto authority would also cover the City-owned Independence Square. None of that is supported by § 407n's text—and it would make no sense. The City's interpretation collapses by its own terms.

4. *The City offers no answer to the Government's statutory arguments.* The Government's opening brief explained (at 41) that the district court's interpretation of § 407n collapses two distinct statutory terms—"Independence Hall National Historic Site" and "Independence National Historical Park"—into one, thus violating the surplusage canon. The Government also explained (at 41) that the district court's

interpretation violates the different-language/different-meaning canon and produces an absurd result (at 2, 42). The City has no answer to any of these points. It simply ignores them.

**B.      Counts II, IV, and V Independently Fail Because NPS's Interpretive Choices Are Not Reviewable Under the APA**

Counts II, IV, and V all challenge NPS's curatorial decision under different legal labels: Count II as a violation of the Network to Freedom Act, Count IV as a departure from NPS's Foundation Document under *State Farm*, and Count V as ultra vires action. The City's brief largely treats these claims as variations on the same theme—which illustrates the fundamental problem. None of the sources the City identifies supplies the legal standard that *State Farm* review requires. Without a yardstick, there is no APA claim.

*1. The Network to Freedom Act imposes no site-specific obligation.* The City's lead argument on Count II is that NPS "disregarded Congress's mandate to preserve and interpret Underground Railroad history" by removing the panels. City's Br. at 40. But the City cannot identify any provision of the Act that requires NPS to retain particular exhibits, preserve particular interpretive themes, or seek anyone's consent before altering a designated site. The statute directs NPS to "establish" the Network and

21

"produce and disseminate appropriate educational materials." 54 U.S.C. § 308302. It says nothing about what must be displayed at any particular site. Nor does it bar removal of materials. As the Government's opening brief explained (at 47-48), the Act contains no retention mandate, no interpretive requirement, and no prohibition on altering designated sites.

Rather than dispute that reading of the Act, the City pivots to the application materials underlying the President's House designation. It argues that those materials make the removed exhibits "part of the site." City's Br. at 40-41. But application materials are not law and cannot impose obligations that the Act does not impose.

The Act's structure confirms that no restriction on alterations applies here. Where Congress wanted to restrict alterations to Network to Freedom property, it said so expressly. Section 308303(b)(1) provides that grants awarded under the Act must specify that "no change or alteration may be made in property for which the grant is used except with the agreement of the property owner and the Secretary." And § 308303(b)(3) requires that grants specify that "conversion, use, or disposal of the property for purposes contrary to the purposes of this chapter" would require returning

grant funds.[1] Congress thus identified the limited circumstances in which alterations to Network to Freedom property are restricted. That explicit direction further supports the conclusion that there is no additional implicit restriction outside of that limited circumstance. *See, e.g.*, *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168 (1993) ("*Expressio unius est exclusio alterius.*").

The President's House is not grant-funded property under the Act. So no statutory provision restricts NPS's curatorial decisions there. NPS's own application instructions confirm this conclusion: "[h]istoric sites and properties included in the Network are not bound by any legal requirements to comply with Federal historic preservation laws, based on their inclusion in the Network alone." Gov't Br. at 47-48 (citations omitted). The City's reading would convert a discretionary designation into a permanent statutory lock-in—an outcome the Act's text does not support and that this Court should not engineer.

2. *The Foundation Document does not create enforceable rights*. The City's theory on Count IV is that NPS departed from its own Foundation Document without a reasoned explanation as *Motor Vehicle Mfrs. Ass'n v.*

---

[1] The Act expressly assigns to the Secretary the authority to determine whether a use is "contrary to the purposes of this chapter." 54 U.S.C. § 308303(b)(3) ("as determined by the Secretary").

*State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983), and *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), require. City's Br. at 43-49. But the documents on which that argument depends disclaim any enforceable effect. NPS's Management Policies state that they "are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." Nat'l Park Serv., *Management Policies 2006* (as amended) at 4, https://perma.cc/3556-43ES (captured Mar. 27, 2026). The Foundation Document sits below the Management Policies in NPS's planning hierarchy and is, by its own terms, "basic guidance for planning and management decisions." JA382. Internal planning guides are not a source of judicially enforceable rights. *The Wilderness Soc. v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) ("the conclusion is inescapable that the MANAGEMENT POLIC[I]ES is a nonbinding, internal agency manual"); *Pa. Dep't of Hum. Servs. v. United States*, 897 F.3d 497, 513 (3d Cir. 2018) (agency manual not binding where it lacked criteria for force of law).

    *3. The City's reliance on Loving fails.* The City defends its Foundation Document theory by leaning on *Loving v. IRS*, 742 F.3d 1013 (D.C. Cir. 2014). City's Br. at 47-48. *Loving* held that the IRS could not reverse a longstanding interpretive position about its statutory authority without

24

reasoned explanation. *Id.* at 1021. But the IRS's prior position in *Loving* governed the legal obligations of tax-return preparers—people who structured their businesses in reliance on the IRS's stated position. *Id.* The reliance interest there was concrete and legally cognizable. The City attempts to manufacture an analogous reliance interest by pointing to its decade-old expenditures on the project. City's Br. at 48. But those expenditures preceded the Foundation Document by more than a decade. The City did not commit money in reliance on the 2017 Foundation Document; the Document was issued years after the project was complete. JA382. *Loving* does not authorize courts to invent reliance interests where none exist.

*4. State Farm review needs a yardstick.* The deeper problem with the City's *State Farm* theory is structural. *State Farm* asks whether an agency provided a reasoned explanation for its decision. 463 U.S. at 43. But a reasoned explanation must be measured against a legal standard. In *State Farm* itself, the yardstick was the Safety Act's mandate to issue "reasonable, practicable and appropriate" standards. *Id.* at 46. In *Fox*, the yardstick was the Communications Act's public-interest standard. 556 U.S. at 515-16. In *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016), it was the FLSA's overtime provisions. 579 U.S. at 217. Here, the City has

25

identified none. Section 407n does not apply to the President's House. The Network to Freedom Act imposes no site-specific mandate. The Foundation Document disclaims enforceable effect. And the Organic Act gives the Secretary "broad authority … to administer both lands and waters within all system units in the country." *Sturgeon v. Frost*, 587 U.S. 28, 38 (2019). As the Government explained in its opening brief (at 51-54), without a yardstick, there is no legal standard against which to measure NPS's explanation—and *State Farm* review is structurally unavailable.

*5. Count V (ultra vires) fails for the same reasons.* Ultra vires review applies only where an agency has acted "entirely 'in excess of its delegated powers and contrary to a specific prohibition' in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). The City has identified no such specific prohibition. The City's ultra vires theory rests on the same § 407n and Network to Freedom Act provisions that fail to support Counts II and III. City's Br. at 49-50. Because those provisions impose no site-specific duty, they cannot supply the "specific prohibition" that ultra vires review requires. And to the extent the City's ultra vires theory derives from the cooperative agreements—as the district court found, JA39-40—the Tucker Act independently forecloses the claim. *See Armstrong v. Exceptional Child*

*Ctr. Inc.*, 575 U.S. 320, 324-27 (2015) (ultra vires review remains subject to "implied statutory limitations"); *see supra* Part I.B.

## III.   The City Has Not Shown Irreparable Harm

A preliminary injunction is reserved for cases where the plaintiff demonstrates harm that cannot "be cured after final judgment." *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 205 (3d Cir. 2024). The City has not made that showing.

The City's irreparable-harm theory is that removal of the panels causes "erasure," undermines "public trust," and impairs "the City's ability to tell its history" to semiquincentennial visitors. City's Br. at 51-52. Those harms are derivative of harm to the public—precisely the kind of injury that a municipality cannot invoke against the United States. *Mellon*, 262 U.S. at 486; *Town of Milton, Mass. v. FAA*, 87 F.4th 91, 96 (1st Cir. 2023). The City's parens-patriae disclaimer (at 52) does not solve that problem. Whether or not the City labels its theory as parens patriae, the substance of the injuries it relies on runs through harm to the City's residents and visitors—not to the City itself. *See supra* Part I.A.

The City emphasizes that its harm is "particularly acute" because of this summer's semiquincentennial celebrations. City's Br. at 51-52. To be sure, there is urgency here—but that does not avail the City. The

semiquincentennial does not transform derivative public injuries into personal injuries to the City. Indeed, the City's own witness testified to expected turnout and her personal reaction to the panels' removal—not to any concrete way the City itself would be impaired. JA163-68. The semiquincentennial thus supplies a deadline rather than a cognizable harm. *Cf. Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000) (movant must show that it "specifically and *personally* risks irreparable harm" (emphasis added)).

The record also establishes that the exhibits are securely stored, that NPS retains the designs, and that replacements can be produced for approximately $20,000 with a three-week turnaround. JA59, JA812. Where the challenged condition is reversible—where items are preserved and can be returned if the plaintiff prevails—any harm can, by definition, be "cured after final judgment." *Del. State Sportsmen's Ass'n*, 108 F.4th at 205; *Penn. ex rel. Creamer v. U.S. Dep't of Agric.*, 469 F.2d 1387, 1388 (3d Cir. 1972) (per curiam).

The City says that it has "presented actual evidence of its ongoing reliance on President's House as a public benefit." City's Br. at 53. But "actual evidence" of reliance is not the same as actual evidence of irreparable harm. The evidence at the preliminary-injunction hearing

28

consisted of expectations about future tourism and the Cultural Officer's personal reactions to the removal. JA163-68. Neither establishes that the City—as opposed to its residents or visitors—will suffer harm that final judgment cannot redress.

## IV. The Injunction's Mandatory Nature, Overbreadth, and the Equities Independently Require Vacatur

Even assuming likelihood of success and irreparable harm, the injunction must be vacated. It is mandatory rather than prohibitory, vastly overbroad in scope, and runs against the public interest. Each of these defects independently requires reversal.

### A. The City Has Not Met the Heightened Standard for Mandatory Injunctive Relief

The City now argues that the injunction merely preserved "the last, peaceable, noncontested status of the parties" and was therefore not mandatory. City's Br. at 27 (quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). That characterization cannot be reconciled with the injunction's actual terms. The order requires NPS to "restore the President's House Site to its physical status as of January 21, 2026." JA4. It mandates that "video monitors and recordings SHALL remain operable." JA5. It directs the Government to keep the site "in a clean and accessible manner, cleared of debris, snow, ice and/or any other impediment to public access." *Id*. All "FORTHWITH." *Id*. An order requiring affirmative

reinstallation of exhibits, operation of video equipment, and snow removal is not prohibitory. It is the paradigm of a mandatory injunction. *See Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) (mandatory injunction "is intended to alter, rather than maintain, the status quo").

The "particularly heavy burden" for mandatory injunctions therefore applies—and the City must show that its right to relief is "indisputably clear." *Hope*, 972 F.3d at 320. For the reasons developed throughout this brief, it is anything but.

### B.   The Injunction's Scope Far Exceeds Any Claimed Violation

"[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And vacatur is required if the district court "made no attempt whatsoever to tailor [the injunction's] scope appropriately." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 198 (3d Cir. 1990).

The district court declined to rest its injunction on Count I, acknowledging that "the Tucker Act impliedly forbids the City from obtaining relief" on that count. JA29. It then entered a sweeping injunction purportedly based on Counts II through V. But the proper APA remedy for arbitrary-and-capricious claims is "vacatur and remand" so the agency can

provide a reasoned explanation. *See* 5 U.S.C. § 706(2). It is not specific performance. By ordering "restoration" of the site and prohibiting any future changes without the City's consent, the district court imposed the precise contract remedy that it correctly held the Tucker Act forecloses on Count I—just relabeled as APA relief. The City makes no serious attempt to defend the match between the violations found and the relief ordered.

The injunction's operational mandates—that NPS maintain "operable" video monitors, JA5, and keep the site cleared of "debris, snow, ice and/or any other impediment to public access," *id.*—do not track any violation the district court identified. No count in the amended complaint alleged that NPS failed to clear snow or maintain video monitors. No portion of the district court's opinion found such a failure. The City concedes that the snow-clearance mandate "to the extent it is found to be overbroad, can be narrowly stricken." City's Br. at 20, 55. But that concession exposes the larger problem: the district court entered operational mandates without regard to whether any party alleged—much less proved—operational misconduct.

The injunction's prohibition on "any and all further changes" without the City's "mutual agreement," JA4-5, effectively grants the City the veto power that the district court derived from its erroneous reading of § 407n.

31

Even if the City had established likelihood of success on the underlying claims, the proper remedy would be vacatur—not a perpetual co-management regime over federal property a block north of Independence Square.

The City's only response is the rhetorical observation that "the scope of the injunction is appropriate given the claims on which the City has a likelihood of success on the merits." City's Br. at 55. That conclusory statement does not address the mismatch. An APA violation premised on an inadequate explanation does not warrant a permanent municipal veto, mandated video-monitor operation, or judicially supervised snow clearance.

## C.    The Equities Decisively Favor the Government

Where preliminary relief runs against the Federal Government, the equities and public-interest factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). They decisively favor the Government here.

Federal law vests the "administration, protection, and development" of the Park in the Secretary acting through NPS, 16 U.S.C. § 407q, and gives NPS "supervision, management, and control" of all System units, 54 U.S.C. § 100302(a)(3). The injunction overrides that authority and substitutes judicial supervision—and municipal veto power—for agency discretion.

32

That intrusion is itself irreparable. *See INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers); *Ramos v. Att'y Gen.*, No. 25-2946, 2025 WL 2950133, at *3 (3d Cir. Oct. 17, 2025) (Bove, J., concurring in denial of stay).

The City's response is to argue that "requiring the Federal Government to comply with applicable statutory directives and policies does not cause it irreparable harm." City's Br. at 53-54. That assumes its own conclusion: that the statutory directives the City invokes actually apply. They do not, as explained above (at II.A and II.B). And even if some violation existed, the proper remedy would be a tailored order—not the sweeping mandatory regime the district court entered.

The injunction also forces NPS to display expressive content at a marquee historic site that the Government has chosen not to display. The Supreme Court has held that "[p]ermanent monuments displayed on public property typically represent government speech," and that the government "is entitled to say what it wishes" and "select the views that it wants to express." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68, 470 (2009) (cleaned up). The City attempts to deflect by characterizing the injunction as merely requiring the Government to "abide by agreements it made with the City." City's Br. at 54. But the relief ordered is not

33

contractual enforcement, which the district court correctly held is barred by the Tucker Act. JA29. The injunction compels the Government to display particular interpretive content on its own property. That is compelled speech.

The City knows this. When the roles were reversed and a state court ordered the City to display a Christopher Columbus statue, the City argued that the order "represent[ed] a grave intrusion on the City's property rights and its rights against compelled speech," because it "compel[led] the City to display a [s]tatue it does not wish to display, and convey a message that it does not endorse." Appellant's Br. at *27-29, *In re Friends of Marconi Plaza*, No. 1104 CD 2021 (Pa. Commw. Ct. 2022), 2022 WL 20505710. The City's response now is that *Marconi Plaza* actually supports it because the court there "made clear it was not forcing the City to keep a statue of Christopher Columbus up against the City's will" but "told the City it had to follow its own policies for removal." City's Br. at 54. That distinction cannot be squared with the City's own briefing in *Marconi Plaza*, which framed the compelled-display order itself—not the policy-compliance dimension—as the constitutional injury. The City was right then. And it cuts decisively against the relief the City now seeks.

"The Constitution ... relies first and foremost on the ballot box ... to check the government when it speaks." *Shurtleff v. City of Bos.*, 596 U.S. 243, 252 (2022). If the City disagrees with NPS's curatorial decisions, the appropriate forum is the political process—not a district court's mandatory injunction. *Summum*, 555 U.S. at 468-69.

## CONCLUSION

The Court should vacate the district court's preliminary injunction and remand with instructions to dismiss for lack of subject-matter jurisdiction.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

DAVID METCALF
United States Attorney

MICHAEL VELCHIK
Senior Counsel to the
Assistant Attorney General

*/s/ Gregory B. David/MJS*
GREGORY B. DAVID
Assistant United States Attorney
Chief, Civil Division

*/s/ Gregory B. in den Berken*
GREGORY B. IN DEN BERKEN
Assistant United States Attorney
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Phone:  (215) 861-8200
Email:  gregory.indenberken@usdoj.gov

May 11, 2026

## COMBINED CERTIFICATIONS

I certify that:

1.      I am a member in good standing of the bar of this Court.

2.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,319 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

3.      This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface in 14-point Georgia font using Microsoft Word for Microsoft 365.

4.      The electronic version of this brief is identical to the paper copies.

5.      The electronic version of this brief was scanned using Trellix Endpoint Security version 10.7.18 and no virus was detected.

6.      On May 11, 2026, I filed this brief via the Court's CM/ECF system and thus served it on all parties' counsel registered to receive electronic notices.

*/s/ Gregory B. in den Berken*

May 11, 2026                                    Gregory B. in den Berken