**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 26-1348
_____

CITY OF PHILADELPHIA

v.

SECRETARY U.S. DEPARTMENT OF INTERIOR; U.S.
DEPARTMENT OF INTERIOR; DIRECTOR NATIONAL
PARK SERVICE; NATIONAL PARK SERVICE,
                                        Appellants
_____

On Appeal from the District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:26-cv-00434)
District Judge: Honorable Cynthia M. Rufe
_____

Argued June 2, 2026

Before: HARDIMAN, RESTREPO, and PHIPPS, *Circuit
Judges*

(Filed: June 18, 2026)

---

OPINION OF THE COURT

---

HARDIMAN, *Circuit Judge*.

On May 14, 1787, the Federal Convention began at the Pennsylvania State House—later known as Independence Hall. The first question the delegates had to answer was whether to revise the Articles of Confederation or to scrap them in favor of a new charter of government. The resolution issued by the Commissioners to the Annapolis Convention in September 1786 suggested a broad mandate that would enable the delegates to "render the constitution of the Federal Government adequate to the exigencies of the Union." But the Continental Congress was not so bold. On February 21, 1787, it authorized the Federal Convention "for the sole and express purpose of revising the Articles of Confederation."

During the sweltering summer of 1787, the delegates eventually chose the bold course, endorsing a relatively strong federal government akin to the Virginia Plan rather than the more decentralized New Jersey Plan. Yet the stronger federal government established by the United States Constitution was still a government of limited, enumerated powers. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405–07 (1819). And as amended, those powers not delegated to the United States were left "to the States . . . or to the People." U.S. Const. amend. X.

The inherent friction between the Federal Government and the States (and their municipalities) is as old as this

Republic itself. That friction led to this civil action by the City of Philadelphia against the Secretary of the Interior, Doug Burgum. As chief executive of the National Park Service (NPS), Secretary Burgum ordered the removal of exhibits from the President's House in Independence National Historical Park. The City responded by seeking, and obtaining, a preliminary injunction that required NPS to re-install the exhibits.

As we explain, however, the District Court lacked jurisdiction over Counts II through V, so we will vacate its preliminary injunction.[1] We will therefore remand with instructions for it to dismiss those counts.

I

To determine the rights of NPS and the City, we begin with the federal laws establishing Independence Hall National Historic Site and Independence National Historical Park. Next, we interpret the various agreements between the parties over the past 75 years. Then we apply that statutory and contractual law to the President's House Project and NPS's alterations that precipitated this action.

A

Independence National Historical Park did not exist until the 1940s. The area's revival began in 1943, when the Secretary of the Interior designated the "Independence Hall National Historic Site." 8 Fed. Reg. 7283 (June 1, 1943). It

---

[1] We have appellate jurisdiction over NPS's appeal of the interlocutory order entering the preliminary injunction under 28 U.S.C. § 1292(a)(1).

included "[a]ll those lots, pieces, or parcels of land which are now owned by the City of Philadelphia, located within the block bounded by Walnut, Fifth, Chestnut, and Sixth Streets, known as Independence Square." *Id.* About five acres, that block contains Independence Hall, Congress Hall, and Old City Hall.

Five years later, in 1948, Congress established Independence National Historical Park "for the purpose of preserving for the benefit of the American people as a national historical park certain historical structures and properties of outstanding national significance located in Philadelphia, Pennsylvania, and associated with the American Revolution and the founding and growth of the United States." Act of June 28, 1948, Pub. L. No. 80-795, §§ 1–2, 62 Stat. 1061, 1061–62 (1948) (codified as amended at 16 U.S.C. § 407m et seq.).

The 1948 legislation sketched the outlines of what would become the 55-acre Park we cherish today. The statute authorized the Interior Secretary to acquire various properties for the Park, including land to build Independence Mall, the site of Benjamin Franklin's Philadelphia residence, and the Graff House, where Thomas Jefferson drafted the Declaration of Independence. The statute also authorized the Secretary "to enter into cooperative agreements with the city of Philadelphia to assist in the preservation and interpretation of the property known as the Independence Hall National Historic Site and with the Carpenters' Company of Philadelphia to assist in the preservation and interpretation of Carpenters' Hall, in connection with the Independence National Historical Park." *Id.* § 2 (codified at 16 U.S.C. § 407n). Any such agreements had to specify "that no changes or alterations shall be made in the property within the Independence Hall National Historic

Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts." *Id.* Finally, the statute also specified that "[t]he administration, protection, and development of the park shall be exercised under the direction of the Secretary of the Interior by the National Park Service." *Id.* § 5 (codified at 16 U.S.C. § 407q).

In 1950, the City and the Secretary entered into a cooperative agreement as § 407n envisioned. Under the 1950 Agreement, the City retained ownership "of the Independence Hall group of structures and of the land whereon they are erected, and the park area adjacent thereto known as Independence Square." App. 237. But the Agreement gave the Secretary an exclusive right to occupy the property for park purposes and the "curatorial responsibility for the care and display of such museum objects, furnishings, or exhibits of historic interest as may be available in the Independence Hall group of buildings for exhibit and interpretive purposes, including the right to rearrange furniture and exhibits and to determine accession policy for items to be utilized in the museum or interpretive program." *Id.* The 1950 Agreement also had important carveouts: "[a]ny work of restoration or any major alterations or repairs to any of the buildings shall not be undertaken until the plans for such work shall have been mutually agreed upon"; and "neither of the parties to this agreement will erect or place, or permit the erection or emplacement of any monument, marker, tablet or other memorial in or upon the buildings or grounds without the written consent of the other." App. 239–40. And the parties "pledge[d] themselves to consult on all matters of importance to the program." App. 240.

5

The 1950 Agreement explained that "it is the purpose" of the parties "to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park for the inspiration and benefit of the people of the United States." *Id.* And upon "establishment of the Independence National Historical Park," the 1950 Agreement "terminated" the parties' prior 1943 Agreement, which designated "the Independence Hall Group as a national historic site." App. 241. The 1950 Agreement remains in effect today, unless and until "Congress enacts legislation inconsistent with its continuance or expressly providing for its termination." *Id.*

B

The President's House Exhibit is on the corner of Sixth Street and Market Street—a block north of Independence Square. After President John Adams moved to what later became known as the White House in Washington, D.C., the President's House in Philadelphia was forgotten and eventually demolished. In the early 2000s, new research pinpointed the exact location of the President's House and highlighted that its slave quarters, added to the building by President George Washington, used to stand at the entrance of the newly constructed Liberty Bell Center. *See* Ed Lawler, *The President's House in Philadelphia: The Rediscovery of a Lost Landmark*, 126 Penn. Mag. Hist. & Bio. 5, 93 (2002). In 2006, the City and NPS agreed to establish an Exhibit at the President's House site that commemorated the slaves who lived there.

That 2006 Cooperative Agreement outlined the scope of "the President's House Project and Archeological Research Dig." App. 252. It expressed the parties' "desire to establish an

6

exhibit at the Park that illuminates the history of the site of the former President's House, located directly north of the Liberty Bell Center, (where Presidents George Washington and John Adams lived and where at least nine enslaved Africans—kept by George Washington—also lived) and its symbolic importance to the founding of the United States." App. 253. The parties agreed to "cooperate in the planning, development, and preparation of the design, fabrication and installation of the Exhibit." App. 254. And the Cooperative Agreement acknowledged the "historical importance of the President's House for the City of Philadelphia, its citizens and all Americans nationwide" and that the Project conferred a "public benefit inuring to the City." *Id.*

The 2006 Cooperative Agreement also specified that after the Project was completed, "ownership of the Exhibit shall transfer to the NPS" and "NPS ownership of the Exhibit shall survive any termination of this Agreement." *Id.* A separate section of the Cooperative Agreement, titled "Management & Maintenance of the President's House Exhibit," provided that NPS "shall undertake all responsibility to manage, occupy, utilize, operate, repair, maintain, interpret and administer the Exhibit, which shall become property of the NPS in accordance with this Agreement." App. 255. At the City's option, the 2006 Cooperative Agreement was extended and amended in 2007, 2008, and 2009.

The 2009 Third Amendment, the final version of the parties' deal, governed ownership of the President's House Exhibit: "[t]he Project will be owned, maintained, managed, and interpreted by the NPS following completion of the Project and acceptance by the NPS." App. 309. The City agreed "to donate to NPS the Project identified in the Cooperative Agreement as amended" by "its own volition and without

compensation." App. 311. And "[c]onsistent with" its "intent to donate the Project to the NPS" the City also "waive[d] any claim or right to any property interest, including use rights, or to compensation for any Project components donated to NPS." App. 315.

The 2009 Third Amendment also stated that the President's House would be completed in accordance with the joint Project Development Plan. That Plan, which could be modified only "by written agreement of the parties," *id.*, specified that site interpretation "will focus on the house and the people who lived and worked there, the Executive Branch of the U.S. Government, the systems and methods of slavery, African-American Philadelphia, and the move to freedom for the enslaved," App. 332. NPS pledged to "review and approve any recommended changes to the Project in accordance with the Cooperative Agreement as amended." App. 333. Although the Cooperative Agreement, as updated by the 2009 Third Amendment, ceased in 2010, it contained a survival clause. The survival clause stated that "all provisions which, by themselves or their nature, are reasonably expected to be performed after the expiration or termination of this Third Amendment shall survive and be enforceable after the expiration or termination of this Third Amendment." App. 321.

The President's House opened to the public in 2010. The completed Exhibit reconstructed the footprint of the House, allowing visitors to walk through the original first-floor layout. Interpretive panels and visual exhibits covered topics like: "The Executive Branch"; "The House & the People Who Worked & Lived In It"; "The Dirty Business of Slavery"; "Mount Vernon to Philadelphia: A Path to Freedom—for Some"; and "Life Under Slavery." App. 511–12, 522, 525, 527, 532–56. The Exhibit also contained a stone memorial wall

with the names of the nine slaves President Washington kept in the House, and panels about several of those slaves, including Hercules, Washington's chef, and Oney Judge, a maid to Martha Washington who escaped from the House to freedom in New Hampshire. To honor Judge's escape, a woman's footprints are embedded in the concrete ground near the memorial wall. A glass vitrine housed elements of the 18th-century structure uncovered during the archeological dig.

C

In 2017, NPS issued its current "Foundation Document" for Independence National Historical Park. Each national park has a Foundation Document, which defines the park's purpose, core principles, and policy framework, providing a "single, shared understanding of what is most important about the park." App. 382. The Foundation Document for Independence National Historical Park specifically discusses the President's House Exhibit in a subpart entitled "Core Components," along with Independence Hall, Carpenters' Hall, the Liberty Bell Center, and other marquee sites. App. 385. The Foundation Document further describes the Exhibit as an "archeological resource[]" that is "fundamental" to the Park and recognizes the "significance" of the House's exploration of the "Paradox of Freedom and Slavery" to the Park. App. 389, 391. "Pioneering Partnerships and Collaboration," specifically with the City, is listed as a fundamental value of the Park. App. 392.

In 2022, the President's House was nominated for inclusion in NPS's National Underground Railroad Network to Freedom. Under the National Underground Railroad Network to Freedom Act of 1998, Congress directed NPS to establish "the National Underground Network to Freedom" and "produce and disseminate appropriate educational materials,

9

such as handbooks, maps, interpretive guides, or electronic information." 54 U.S.C. § 308302(a)(1). The Network commemorates sites that were part of the Underground Railroad. *Id.* § 308302(b). The President's House nomination documented Oney Judge's connection to the House, her escape in 1796, Washington's efforts to recapture her, and the eight other slaves who, at one time or another, lived in the House. That same year, NPS agreed to designate the site.

D

In March 2025, President Trump issued Executive Order 14253, "Restoring Truth and Sanity to American History." 90 Fed. Reg. 14563 (Mar. 27, 2025). The order directed Secretary Burgum to "take action, as appropriate and consistent with applicable law," to ensure that public monuments and similar properties within the Department's jurisdiction "focus on the greatness of the achievements and progress of the American people." *Id.* at 14564.

Almost a year later, on January 22, 2026, NPS removed all the interpretive panels and turned off the video exhibits in the President's House. NPS stored the materials in a warehouse beneath the National Constitution Center. The Superintendent of Independence National Historical Park averred that the "footprints in the concrete and the names on the Memorial Wall were to remain as-is." App. 59. One sign was left on the property "because additional tools were needed" to remove it. *Id.* NPS did not contact the City before removing the materials. The Superintendent also averred that NPS has the designs for all the removed exhibits and can, if necessary, produce replacements—for about $20,000 within three weeks.

The City sued NPS that same day and moved for a preliminary injunction that would order NPS to restore the removed materials. The District Court held a hearing eight days later. After the City presented testimony, the Court directed the City to file an amended complaint.

The Amended Complaint asserted five claims, four of which purported to arise under the Administrative Procedure Act (APA).[2] Count I alleged that NPS acted unlawfully under 5 U.S.C. § 702 because it breached the 1950 Agreement and the 2006 Cooperative Agreement, as amended. Count II alleged that NPS acted in an arbitrary and capricious manner in violation of 5 U.S.C. § 706(2) because its exhibit removal violated the National Underground Railroad Network to Freedom Act of 1998. Count III alleged that NPS acted in an arbitrary and capricious manner because its actions violated 16 U.S.C. § 407m and § 407n. Count IV alleged arbitrary and capricious action because NPS failed to give a reasoned explanation for its departure from its 2017 Foundation Document for Independence National Historical Park. Count V alleged that NPS acted ultra vires.

Just over two weeks after the hearing, the District Court ruled on President's Day. It ordered NPS to "restore the President's House Site to its physical status as of January 21, 2026." App. 4. The Court barred NPS from making "any and all further changes" to the President's House, including installing "replacement materials" without the City's "mutual

---

[2] The City sued Secretary Burgum; the United States Department of the Interior; Jessica Bowron, acting Director of NPS; and NPS. We refer to the Defendants collectively as NPS.

11

agreement." App. 4–5. The Court also directed NPS to provide "immediate, continuing, and proper maintenance" to the House and mandated that the video monitors and recordings "remain operable." App. 5. Finally, the Court told NPS to "immediately" maintain the site "in a clean and accessible manner, cleared of debris, snow, ice and/or any other impediment to public access." *Id.*

The District Court issued an opinion explaining its reasons for granting the preliminary injunction. The Court first determined that it had jurisdiction to hear the City's claims in Counts II through V. After surveying § 407n, the 1950 Agreement, and the 2006 Cooperative Agreement, as amended, the Court concluded that "the City has a statutory right and expectation to mutual agreement on any changes or alterations to the Park, including the President's House, to written agreement for placement of any monument or memorial, and to consultation on all matters of importance to the Park." *City of Philadelphia v. Burgum*, 820 F. Supp. 3d 313, 329 (E.D. Pa. 2026). NPS's actions, the Court opined, "invaded this legally protected interest." *Id.* The Court also concluded that the exhibit removal "affects the City in a personal and individualized way" because it "impacts not just the City's statutory rights, but also the City's tourism, use of approximately $5 million of the City's funds to establish and maintain the project, and its promotion of its history" ahead of the semiquincentennial. *Id.* at 329–30 (footnotes omitted). So the City, the Court held, had standing to sue NPS over the exhibit removal.

The Court also concluded that the APA did not bar judicial review of NPS's exhibit removal. As relevant here, the Court held that NPS's actions constituted final agency action because they marked the completion of NPS's decisionmaking

12

process and carried legal consequences: the "undermin[ing]" of "the City's statutory and long-running interests in the completion of Independence National Historical Park and the President's House." *Id.* at 332.

The Court next determined that the Tucker Act divested it of jurisdiction over Count I, which claimed that NPS acted unlawfully under 5 U.S.C. § 702 because it breached the 1950 Agreement and the 2006 Cooperative Agreement, as amended. So it did not base its preliminary injunction on that claim.[3] But the Court held that Counts II through V were not barred by the Tucker Act because those claims alleged that NPS violated its statutory (not contractual) duties.

Turning to the preliminary injunction factors, the District Court held that the City was likely to succeed on the merits of Counts II through V. The Court also held that the City demonstrated irreparable harm and that the equities weighed in the City's favor, so the injunction on Counts II through V issued. The Court did not mention Count I in its order on the preliminary injunction motion. NPS timely appealed, and moved for a stay pending appeal, which the District Court denied. NPS began to comply with the District Court's order. It also sought a stay pending appeal, which we granted in part and denied in part on April 9, 2026. Specifically, we ordered NPS "to continue to preserve the status quo as to the President's House." ECF No. 39, at 2. We stayed enforcement of the preliminary injunction that required NPS "to restore the President's House Site to its physical status as of January 21, 2026," which would include reinstallation of the removed

---

[3] The District Court, however, has not dismissed Count I, which is the subject of a motion to dismiss pending before it.

13

panels; "to provide immediate, continuing, and proper maintenance to the Site"; and "to maintain the President's House Site in a clean and accessible manner." *Id.* at 1–2. But we did not stay the portion of the order that forbade NPS "from taking any action to damage any exhibits, panels, artwork, or other items from the President's House Site"; required NPS "to take all necessary steps to ensure the safety, security, and preservation of any" removed items; and mandated that any changes to the site obtain the City's "mutual agreement." *Id.* at 2.

## II[4]

"Before considering the prerequisites for a preliminary injunction, we turn to jurisdiction." *Reading v. N. Hanover Twp.*, 124 F.4th 189, 196 (3d Cir. 2024). That threshold inquiry resolves this case. Although the City has standing to bring this action, the APA bars us from considering Counts II through V.[5]

## A

Start with standing. At the preliminary injunction stage, the City must make a "clear showing" that it "likely" suffered an injury caused by NPS that we can redress. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (citation modified). The City

---

[4] We review the District Court's subject-matter jurisdiction de novo. *Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 218 (3d Cir. 2023).

[5] We lack jurisdiction to rule on Count I in this interlocutory appeal. As there is no order on that Count, the parties are mistaken that we can adjudicate it now.

has standing to seek prospective relief, but it offers several invalid theories, each of which the District Court mistakenly accepted.

1

The District Court's standing analysis relied primarily on § 407n and the subsequent agreements between the City and NPS. According to the Court:

> Under the terms of the 1950 Agreement, 2006 Cooperative Agreement and amendments thereto, and 16 U.S.C. § 407n authorizing the agreements, the City has a statutory right and expectation to mutual agreement on any changes or alterations to the Park, including the President's House, to written agreement for placement of any monument or memorial, and to consultation on all matters of importance to the Park.

*City of Philadelphia v. Burgum*, 820 F. Supp. 3d at 329. From there, the Court concluded that "[r]emoval of the President's House displays invaded this legally protected interest." *Id.* While the Court did not so specify, the City's basic claim is that it suffered a procedural injury: NPS did not consult with the City before it removed the exhibits. Both parties have briefed this issue on the assumption that principles of Article III standing applicable "when a *statute* affords a litigant 'a procedural right to protect his concrete interests,'" also apply to procedural rights conferred by the 1950 Agreement. *Dep't of Educ. v. Brown*, 600 U.S. 551, 562 (2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992)) (emphasis added). On that understanding, to have standing to assert its

15

alleged procedural consultation injury, the City must tie that injury to an underlying concrete interest harmed by NPS's actions. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *see also Brown*, 600 U.S. at 562 (reiterating *Summers*). It is not obvious, however, that the principles of Article III standing relevant to procedural rights granted by statute also apply to procedural rights conferred by contract, but we need not reach the issue today. The District Court also rested its standing analysis on § 407n, opining: "the City has a *statutory* right and expectation to mutual agreement on any changes or alterations to the Park." *City of Philadelphia v. Burgum*, 820 F. Supp. 3d at 329 (emphasis added). On that premise, we will explain why the City has a concrete injury sufficient to confer standing in its own right, which also confers standing to assert its statutorily-conferred procedural rights under § 407n.

What is that concrete injury? The City contends that it suffered a property injury. But the City does not own the President's House. Nor does it own any of the exhibits included at the site. After all, the 2006 Cooperative Agreement, as amended, specified that "[t]he Project *will be owned, maintained, managed, and interpreted by the NPS* following completion of the Project and acceptance by the NPS." App. 309 (emphasis added). Adopting the District Court's language, the City says it has "inclusive rights" to the President's House because in the 2006 Cooperative Agreement and its amendments, NPS agreed that it "would 'maintain' the Exhibit, inclusive of its jointly developed interpretive themes." City Br. 24 (citation omitted); *see also City of Philadelphia v. Burgum*,

820 F. Supp. 3d at 329 ("[T]he 2006 Cooperative Agreement and amendments provide inclusive rights to the City, which continue and remain in full force and effect today."). But what are those "inclusive" rights?

The City does not provide much help; it does not connect its theory of "inclusive rights" to a traditional, cognizable property interest to allow us to assess whether its "inclusive" rights theory could confer Article III standing.[6] To some extent, the City reconceptualizes its injury as contractual. *See, e.g.*, Oral Arg. at 40:00–42:00 (conceding it does not have a property interest and agreeing it "has a contract-backed expectation"). The theory runs like this: the City was injured because NPS did not "maintain" the President's House in accordance with the 2006 Agreement, as amended. Such an injury gives the City standing in its own right. That injury also gives the City standing to assert an injury to its consultation rights, which § 407n allegedly confers. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–25 (2021). Although the City's understanding of the 2006 Cooperative Agreement, as amended, and § 407n, is incorrect, that point is not relevant for our jurisdictional analysis, which "accept[s] as valid the merits" of the City's "legal claims." *Fed. Election Comm'n v.*

---

[6] That oversight is telling. Peeking at the merits, the City does not have *any* property rights in the President's House, so it has nowhere to ground its theory of "inclusive" rights. The 2006 Agreement, as amended, states: "[c]onsistent with the Partner's intent to donate the Project to the NPS as stated herein," the City agrees to "waive any claim or right to any property interest, including use rights, or to compensation for any Project components donated to NPS by or on behalf of the Partner." App. 315.

*Cruz*, 596 U.S. 289, 298 (2022); *see also Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."). Accordingly, the City has standing because it alleges that NPS violated its residual contractual duties to maintain the President's House in accordance with the jointly adopted vision of both parties.[7]

2

In its standing analysis, the District Court also examined the merits of the statutory and contract claims that undergirded the City's standing theories. *City of Philadelphia v. Burgum*, 820 F. Supp. 3d at 327–31. But as just discussed, the standing

---

[7] Although the District Court correctly held that the City has standing, many of its reasons were incorrect. The City's past expenditures to help build the President's House do not establish standing because they are not traceable to the City's present alleged injuries, and no relief that we could grant would return that money to the City. Next, the City did not establish that it suffered or will suffer an injury to its tourism interests because it provided no evidence that fewer visitors would travel to Philadelphia or that City revenue would fall. The City also contends that NPS's actions impeded its ability to "tell its history." City Br. 26. But neither the City nor the District Court explained how this harm is a cognizable Article III injury. Finally, the City maintains that the President's House conferred a "public benefit" on it, and argues that NPS's acknowledgment of that benefit in the Cooperative Agreement establishes its standing. City Br. 24–25. But Article III injuries must "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. And the City cannot obtain standing by bootstrapping the alleged injuries of its residents.

inquiry requires courts to determine only whether a litigant has suffered a concrete injury, traceable to the defendant's conduct, that we can redress. The inquiry does not turn on the merits of the plaintiff's legal theories. So the Court should not have considered the merits in its jurisdictional analysis. And while the Court was ultimately correct to conclude that the City has standing, it did so on an incorrect (and premature) understanding of the relevant statutory and contractual agreements.

Begin with the 1948 Act that established the Park. Section 407n authorizes the Secretary to enter into cooperative agreements to manage two specific properties "in connection with the Independence National Historical Park": (1) "with the city of Philadelphia to assist in the preservation and interpretation of the property known as the Independence Hall National Historic Site"; and (2) "with the Carpenters' Company of Philadelphia to assist in the preservation and interpretation of Carpenters' Hall." The statute then requires that both agreements contain specific provisions, including a mutual-agreement clause: "no changes or alterations shall be made in the property within the Independence Hall National Historic Site, including its buildings and grounds, or in Carpenters' Hall, except by mutual agreement between the Secretary of the Interior and the other parties to the contracts." *Id.*

The "Independence Hall National Historic Site" referenced in § 407n has a clear and specific meaning. Five years before Congress enacted § 407n, the Department of the Interior designated the "Independence Hall National Historic Site" under federal law. 8 Fed. Reg. 7283 (June 1, 1943). That designation defined the "Independence Hall National Historic Site" to include: "[a]ll those lots, pieces, or parcels of land

19

which are now owned by the City of Philadelphia, located within the block bounded by Walnut, Fifth, Chestnut, and Sixth Streets, known as Independence Square, in the City of Philadelphia, Commonwealth of Pennsylvania." *Id.* Congress relied on that definition in drafting § 407n. *See, e.g.*, H.R. Rep. No. 80-1819, at 8 (1948); S. Rep. No. 80-1622, at 6 (1948). And after § 407n was enacted in 1948, the preamble of the 1950 Agreement—entered into under § 407n—also incorporated this definition.

Given this pre- and post-enactment evidence, we hold that "Independence Hall National Historic Site" in § 407n encompasses only Independence Square: the five-acre, City-owned block containing Independence Hall, Congress Hall, and Old City Hall. The President's House is not within Independence Square, as it is located a block north, on the corner of Sixth and Market Streets. So § 407n's mutual-agreement requirement does not apply to the President's House. That conclusion comports not only with the statutory language, but also with common sense. Section 407n protects the properties the City owned in 1948; it does not confer rights to the City in property it does not own.

The following map shows the boundaries for the property owned by the City of Philadelphia and the Carpenters' Company, as distinguished from rest of Independence National Historical Park, which is owned by the Federal Government:



NPS, *Maps*, Independence: National Historical Park Pennsylvania, https://perma.cc/XFX4-Z3V8 (last updated Sept. 9, 2021) (red boxes added).

The District Court saw it differently, concluding that § 407n grants the City "a statutory right and expectation to mutual agreement on any changes" to Independence National Historical Park as a whole, not simply Independence Hall National Historic Site. *City of Philadelphia v. Burgum*, 820 F. Supp. 3d at 329. The District Court thought § 407n applied because the President's House lies within Independence National Historical Park. But as we explained, § 407n's mutual-agreement provision is limited to the five-acre "Independence Hall National Historic Site" and does not include the 55-acre Park.

The District Court went astray because it wrongly deemed "[t]he region of the Park that is subject to bilateral decision-making" ambiguous. *Id.* at 330. The Court thought § 407n was ambiguous because Carpenters' Hall, where the First Continental Congress met, is subject to the statute's mutual-agreement provision, even though it "is not part of the Independence Square block." *Id.* True enough: Carpenters' Hall is two blocks away from Independence Square. But we are puzzled why this fact led the Court to conclude that § 407n was ambiguous. As explained above, § 407n is clear. The statute authorizes agreements to manage two properties not owned by the Federal Government—Independence Square and Carpenters' Hall—and draws a distinction between the two. The judiciary must honor that distinction. Indeed, it is uncertain which part of § 407n the Court thought was ambiguous, since it did not identify any ambiguous statutory term.

The District Court's reading of § 407n creates interpretive problems that our reading avoids. Under the District Court's interpretation, "Independence Hall National Historic Site" and "Independence National Historical Park" morph into the same thing. But when Congress uses different words in a statute, we ordinarily assume those words carry different meanings. *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("The principle is mostly applied to terms with some heft and distinctiveness, whose use drafters are likely to keep track of and standardize."). And that presumption is even stronger here because "Site" and "Park" appear in the same sentence. *Cf. Comm'r v. Lundy*, 516 U.S. 235, 249–50 (1996). Relatedly, collapsing the distinction between Site and Park renders mention of the Site superfluous. Lest there be any doubt, the District Court's interpretation leads to an odd result.

It transforms the City's authority from a right to supervise and veto changes to the City's own five-acre property into a right to supervise and veto changes to the entire 55-acre Park— including more than 40 historic structures on property owned by the United States.

The City does what it can to defend the District Court's statutory analysis. The City contends that "[a]dditional context" shows that Independence Hall National Historic Site was "subsumed by Independence Park by operation of statute and agreement," which allegedly expanded the mutual-agreement requirement to cover the entire Park. City Br. 42–43. In short, the City's position is that "the Independence Hall Site became Independence Park." City Br. 42.

The City provides two pieces of evidence for this "[a]dditional context." The City first says that § 407's statutory structure supports its reading. It notes that the term "Independence Hall National Historic Site" is not defined in § 407 and argues that the term "is used to differentiate the then-existing Site from the to-be-created Park and other properties." *Id.* The City then looks to § 407m, wherein Congress authorized the Secretary, "following the consummation of agreements with the city of Philadelphia and the Carpenters' Company of Philadelphia as prescribed in section 407n," to acquire certain properties to establish Independence National Historical Park. The Park, § 407m specified, would not be established until certain sites had been acquired. So the City says that once this acquisition process was completed, Independence Hall National Historic Site merged into, or "became," Independence National Historical Park. City Br. 42. Under the City's logic, the mutual-agreement provision, which in § 407n originally applied to Independence National Historic Site and Carpenters' Hall, now applies to the whole Park.

We are unpersuaded by the City's argument. Section 407m merely describes the steps that the Secretary needs to take to establish Independence National Historical Park; the provision says nothing about expanding the scope of the mutual-agreement requirement beyond Independence Hall National Historic Site and Carpenters' Hall, properties specified in § 407n. Indeed, the fact that § 407m speaks of acquiring other properties besides those within Independence Hall National Historic Site and Carpenters' Hall—with no mention of the City or any cooperative agreement—also suggests the City has no role in those other sites. Yet the City effectively asks for a veto over the entire Park, which includes many properties that it never owned. The illogic of the City's "subsumed by Independence Park" theory becomes apparent because the Carpenters' Company's mutual-agreement right in § 407n would have expanded too—giving a private organization with rights in a single Park property a management right over the entire 55-acre Park. We are confident that Congress did not intend to grant the Carpenters' Company such a vast and irregular power over federal property. That principle is equally true for the City.

Second, the City leans on the 1950 Agreement, arguing that it "illustrates the shared, broad understanding that the Congressionally-directed mutual agreement requirement applies to the entire Park." City Br. 42. The City references Article III(i) of the 1950 Agreement, which says that "[u]pon the execution of this agreement" the parties' prior agreement designating the site as a national historic site "shall be terminated: Provided that designation shall remain in effect until the establishment of the Independence National Historical Park." App. 241. But Article III(i) merely terminated the parties' prior designation agreement. The City does not explain

how it could have changed the statutory definition of "Independence Hall National Historic Site" in § 407n.

The City also cites the 1950 Agreement's language that "it is the purpose" of the parties "to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Historical Park" and that the parties "pledge themselves to consult on all matters of importance to the program." App. 240. The City says that this language also supports its theory "that Independence Hall became a component of Independence Park." City Br. 43. But once again the City does not explain how the 1950 Agreement can revise § 407n's statutory language. Nor are we aware of any precedent that allows such contracts to vitiate a federal statute.

At bottom, the City elides the fact that the 1950 Agreement was entered into under § 407n and is directed at Independence Square—not the President's House. Its preamble references "the Independence Hall group of historic structures comprising Independence Hall, Congress Hall, Old City Hall, and associated historic objects, located in Independence Square." App. 235. It imposes no obligations on NPS with respect to the Park writ large or the President's House in particular. The District Court made similar mistakes when it concluded that NPS likely violated the 1950 Agreement. *See City of Philadelphia v. Burgum*, 820 F. Supp. 3d at 335–36.

The District Court also erred when it concluded that NPS likely violated the 2006 Cooperative Agreement, as amended. The Agreements expired in 2010. The Agreements also state that NPS became owner of the President's House upon its completion—and that the City "waive[d] any claim or right to any property interest, including use rights, or to

25

compensation for any Project components donated to NPS." App. 315. The survival clause in the 2006 Agreement does not change our conclusion. That clause preserves provisions that "by themselves or their nature, are reasonably expected to be performed after the expiration or termination" of the Agreement. App. 321. The City attempts to leverage language in the Cooperative Agreement that obligates NPS to "maintain" the President's House after it is finished. App. 309. The City suggests that NPS's maintenance obligation survives and requires NPS to maintain the House in accordance with the interpretive themes outlined in the joint Project Development Plan. But it is hard to understand how such a requirement could be "reasonably expected" to survive within the maintenance obligation because NPS owns the President's House (and because the joint Project Development Plan does not discuss specific display requirements). The duty to "maintain" is better understood as a general management obligation that accompanies ownership, not a promise that the exhibits will forever remain in place regardless of the owner's wishes.

In sum, the City has standing to sue because it alleges that its contractual rights were violated, but we should not, as the District Court did, mistake that jurisdictional determination for a conclusion that the City's underlying statutory and contract claims have merit. They do not.

B

Having established our Article III jurisdiction, we now examine whether the APA permits us to review Counts II through V. As relevant here, the APA permits us to review only "final agency action." 5 U.S.C. § 704. NPS contends that its exhibit removal was not "agency action" as the APA defines it,

26

and even if it was, that action was not "final." We mostly agree with NPS.

1

The APA specifies that "'agency action' includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). NPS argued that there is no such "action" as defined in the APA, and the City did not address the issue. After we asked the parties to be prepared to do so at oral argument, the City suggested for the first time that NPS's exhibit removal qualifies as a "sanction" because NPS engaged in the "destruction, taking, seizure, or withholding of property" by removing exhibits from the President's House. *Id.* § 551(10)(D). This theory is a nonstarter because the City does not own the President's House or anything in it. And the City did not otherwise suggest that the exhibit removal is anything like a "rule, order, license, sanction, [or] relief." These too are defined terms, *see id.* § 551(4), (6), (8), (10), (11), and a decision to remove exhibits from a National Park site does not satisfy any of the definitions.

To be sure, § 551(13) contains the catchall phrase "or the equivalent or denial thereof, or failure to act." But the Supreme Court has explained that "failure to act" means only "a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004). Section 551(13)'s "equivalent" language is why we have explained that the statute's enumerated "categories are exemplary, not exhaustive." *Gentile v. Sec. & Exch. Comm'n*, 974 F.3d 311, 317 & n.10 (3d Cir. 2020) (citing examples of "equivalent" action that qualify as "agency action"). But the absence of

27

exhaustiveness does not mean that any action an agency takes satisfies the definition. Whatever the proper scope of "equivalent," what NPS did here is not "equivalent" to a "rule, order, license, sanction, [or] relief." *See* 5 U.S.C. § 551(13). That is especially true because statutory waivers of sovereign immunity are to be construed in favor of the United States. *Gentile*, 974 F.3d at 315–16.

Because NPS's actions here do not fall within the APA's definition of "agency action," the APA does not permit us to review Counts II through V.[8]

2

Nor do the City's APA claims involve "final" agency action, which provides another reason we cannot hear Counts II through V. Agency action counts as "final" only if: (1) it "mark[s] the consummation of the agency's decisionmaking process," and (2) it is "one by which rights or obligations have been determined or from which legal consequences will flow."

---

[8] To the extent the APA does not displace the City's ability to bring an ultra vires claim, that claim fails as a matter of law. Count V challenges action by NPS based on the City's assertion that NPS violated a mandate under 16 U.S.C. § 407n that would require mutual agreement for any change to the President's House site. As we hold, 16 U.S.C. § 407n does not apply to the President's House site. So the City cannot meet at least one of the requirements for an ultra vires claim here: that NPS "has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation modified).

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified). At argument, NPS noted, for the first time, that it had designed replacement panels and stood ready to install them should the injunction dissolve. Oral Arg. at 8:50–9:10, 12:30–14:00. NPS has also posted these "New Exhibits" to the Independence National Historical Park website, on a page entitled "Visiting the President's House Site: From Enslavement to Emancipation." NPS, Independence: National Historical Park Pennsylvania, https://perma.cc/33C5-YHQS (last updated Apr. 7, 2026). Because "that information is publicly available on government websites," we may "take judicial notice of it." *Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017); *see also Montanez v. Price*, 154 F.4th 127, 146 n.7 (3d Cir. 2025) (same).

One panel, entitled "Presidents Washington and Adams on Slavery," explains that Washington "often expressed discomfort with the institution and a desire to see it abolished," but, "as a Virginia plantation owner, his wealth and livelihood were deeply tied to it." Washington was against the slave trade, yet at the same time brought slaves from Mount Vernon to the President's House, and rotated them in and out of Philadelphia, "in acknowledgement of a Pennsylvania law requiring slaves to be set free after six months in residence." In a subsection called "Enslaved Members of Washington's Household," the panel details the nine slaves who lived at the President's House at one time or another, and their role in the House. For example, Hercules was "[t]he chef in charge of preparing the executive dinners hosted at the President's House" and "escaped to freedom in 1797." Oney Judge, Martha Washington's maid, "ran away from the President's House in 1796," and later settled in New Hampshire, where she "married a free black sailor, and had three children."

Further, the panel details that Washington "signed legislation that both upheld and limited slavery," including the 1793 Fugitive Slave Act, which empowered slaveholders to recapture runaway slaves, and the 1789 Northwest Ordinance, which forbade slavery in the Northwest Territory (now Ohio, Michigan, Indiana, Illinois, Wisconsin, and part of Minnesota). By contrast, President John Adams, a Yankee farmer, never held slaves and hired servants to work in the President's House. But even though Adams called slavery "an evil of colossal magnitude," he, the panel explains, preferred "careful, gradual emancipation" and believed that "immediate abolition" was unwise.

Another panel discusses "The Constitution and Slavery." It documents the Three-Fifths Compromise and fights over the slave trade at the Constitutional Convention. It observes that many Founders, including Jefferson, Washington, and Madison, owned slaves. The panel explains that the Declaration of Independence established a "new nation" that "was the greatest experiment in liberty ever conceived in the history of the world." The Declaration proclaimed that all men are created equal and endowed by their Creator with inalienable rights to life, liberty, and the pursuit of happiness. But, the panel notes, "slavery was an odious and pernicious affront to the glorious rule of liberty proclaimed in the Declaration of Independence and established in the United States Constitution." The panel also has a subsection on how the Declaration inspired later Americans to work for greater equality, and includes a picture and excerpt from Martin Luther King, Jr.'s "I Have a Dream" speech.

Other panels provide an even broader overview of slavery and the struggle to extirpate it. The "Slavery in the British Colonies" panel acknowledges that slavery was present

when the colony of Pennsylvania was founded, but also explains that resistance to the injustice grew steadily, spurred by the Quakers. In fact, "the first American abolition society was founded in Philadelphia" in 1775, which Benjamin Franklin eventually led. Pennsylvania was also "the first state to adopt a measure towards the abolition of slavery" in 1780. The panel also profiles "Philadelphian Black Abolitionists," including clergymen Absalom Jones and Richard Allen.

The panel entitled "Fighting for Freedom" highlights Harriet Tubman, an escaped slave who "worked as a free domestic laborer in Philadelphia" and later "became one of the most famous conductors on the Underground Railroad," guiding numerous other slaves to freedom. The panel also profiles Frederick Douglas and his connection to Philadelphia, recording that in 1862 he "gave a speech at National Hall, advocating for the admission of black soldiers into the Union Army." A portrait of Douglas taken in Philadelphia is also included. The panel next recounts the birth of the anti-slavery Republican Party and Abraham Lincoln's insistence in 1857 that "the Founders knew slavery violated the principle of liberty in the Declaration of Independence." Later, the panel continues, our Nation fought a Civil War "to determine whether the Union was to endure and whether slavery would finally be eradicated." The panel then discusses the Emancipation Proclamation, which was "constitutionally guaranteed, at Lincoln's insistence, by the 1865 passage of the 13th Amendment."

These new panels are full of historical context. They highlight the momentous events that took place in the President's House and the other sites at Independence National Historical Park. They acknowledge the evil of slavery, including its injustices and hypocrisies, and, by telling the story

of the nine slaves that Washington kept in the President's House, remind us of their essential humanity. And they recall the price our Nation paid "to finish the work that the Founders had begun and end slavery in the United States once and for all." Given all these developments, we cannot agree with the District Court that the exhibit removal six months ago was NPS's last word on the matter.

Finally, we note that two of the City's claims also fail to satisfy the second *Bennett* prong. As discussed, the City does not have any statutory, property, or contractual rights that empower it to curate the exhibits in the President's House, so Count III does not involve the City's legal rights or obligations. And Count IV, which alleges that NPS did not explain its alleged deviation from its 2017 Foundation Document for Independence National Historical Park, does not involve NPS's legal obligations. NPS's Management Policies state that they "are not intended to, and do not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." NPS, Management Policies 2006 (as amended) at 4, https://perma.cc/GQM7-8GF2 (last visited June 5, 2026). The 2017 Foundation Document sits below the Management Policies in NPS's planning hierarchy, and is, by its own terms, "basic guidance for planning and management decisions." App. 382. So here, the 2017 Foundation Document is not a source of judicially enforceable rights. *See Wilderness Soc'y v. Norton*, 434 F.3d 584, 594–96 (D.C. Cir. 2006) ("[T]he conclusion is inescapable that the MANAGEMENT POLIC[I]ES is a nonbinding, internal agency manual intended to guide and inform Park Service managers and staff."). That Counts III and

IV do not satisfy the second *Bennett* condition provides an additional reason we cannot consider these two claims.[9]

\*\*\*

For the reasons stated, we will vacate the District Court's preliminary injunction and remand with instructions to dismiss Counts II, III, IV, and V for lack of jurisdiction and to dispose of Count I consistent with this opinion.

Gregory B. in den Berken **[Argued]**
Gregory B. David
OFFICE OF UNITED STATES ATTORNEY
EASTERN DISTRICT OF PENNSYLVANIA
*Counsel for Appellant*

---

[9] Count II, however, does involve NPS's legal rights and obligations because the Network to Freedom Act requires that NPS "produce and disseminate appropriate educational materials" about the President's House. 54 U.S.C. § 308302(a)(1). NPS says that the Act "imposes no site-specific mandate." Reply Br. 20–21. But while what constitutes "appropriate educational materials" at a designated Network to Freedom site like the President's House may be broad, the term "appropriate" means that NPS's discretion is not boundless. For example, "educational materials" might not be "appropriate" for a designated site if they have nothing to do with slavery history or related topics. *Cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 33–34, 46 (1983) (assessing an arbitrary and capricious claim where the statute required safety standards to be "reasonable, practicable and appropriate").

Anne B. Taylor **[Argued]**
Kelly S. Diffily
Lydia M. Furst
Renee M. Garcia
Ryan B. Smith
Bailey Axe
CITY OF PHILADELPHIA LAW DEPARTMENT
*Counsel for Appellee*

Cara McClellan **[Argued]**
Mary Catherine Roper
Avatara A. Smith-Carrington
*Counsel for Amici Avenging the Ancestor Coalition
and the Black Journey in Support of Appellee*

Facundo Bouzat
Burt M. Rublin
BALLARD SPAHR
*Counsel for Amicus American Historical Association
in Support of Appellee*

Jacob B. Boyer
OFFICE OF THE ATTORNEY GENERAL OF
PENNSYLVANIA
*Counsel for Amicus Governor of Pennsylvania in
Support of Appellee*

Andrew M. Leblanc
MILBANK
*Counsel for Amicus Professor Adam Rothman in
Support of Appellee*

Chelsea C. Stine
ALL RISE TRIAL AND APPELLATE
*Counsel for Amici Historians, Archaeologists, and Scholars in Support of Appellee*

Shannon A. Sollenberger
Jesse Tomkiewicz
*Counsel for Amici Members of the Senate Democratic Caucus of the Senate of Pennsylvania in Support of Appellee*

Marcel S. Pratt
Jessica Rizzo
Travis W. Watson
BALLARD SPAHR
*Counsel for Amici Counties of Montgomery, Bucks, Chester, and Delaware Counties in Support of Appellee*

John S. Stapleton
STAPLETON SEGAL COCHRAN
*Counsel for Amicus Preservation Alliance for Greater Philadelphia in Support of Appellee*

Timothy K. Lewis
BLANK ROME
*Counsel for Amici Council of Bishops of the African Methodist Episcopal Church & Dr. Erica Armstrong Dunbar in Support of Appellee*

Dariely Rodriguez
HOWARD UNIVERSITY SCHOOL OF LAW
*Counsel for Amici Howard Law Civil Rights Clinic,*

*the Barristers' Association of Philadelphia, &*
*Philadelphia Bar Association in Support of Appellee*